FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 2 4 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X

UNITED STATES OF AMERICA,                )    MEMORANDUM & ORDER ON
                                         )    EVIDENCE OF DEFENDANT'S
                                         )    USE OF ACID
                                         )
    – against –                          )
                                         )
                                         )    08-CR-76
                                         )
CHARLES CARNEGLIA,                       )
                                         )
                        Defendant.       )
                                         )
------------------------------X

JACK B. WEINSTEIN, Senior United States District Judge:

Contents

I.   Introduction ........................................................................................................ 2
II.  Facts ................................................................................................................... 2
    A. Procedural Background ................................................................................ 2
    B. Hearing and Ruling ...................................................................................... 6
    C. Testimony at Trial ....................................................................................... 7
        1. Testimony on Acid in Uncharged Body Disposals ................................. 7
        2. Testimony on Acid in Charged Kidnapping-Torture ............................. 9
III. Law ................................................................................................................... 12
    A. Rule 404(b) ................................................................................................ 12
    B. Rule 403 .................................................................................................... 13
IV.  Application of Law to Facts ............................................................................. 15
    A. Acid in Uncharged Body Disposals ............................................................ 15
        1. Rule 404(b) ............................................................................................ 15
        2. Rule 403 ................................................................................................ 16
    B. Acid in Charged Kidnapping-Torture ........................................................ 17
V.   Conclusion ....................................................................................................... 18

1

## I. Introduction

The defendant is charged with conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Charged racketeering acts, in conjunction with a wide and long-standing mafia conspiracy, include numerous conspiracies to murder, murders and a conspiracy to kidnap and kidnappings.

At trial, the government sought to present testimony on the defendant's use of acid in the disposal of bodies and in the torture of kidnapping victims. The preliminary ruling was in limine excluded any reference to the defendant's use of acid. *See* Order, Jan. 20, 2009, Docket Entry ("D.E.") No. 1756. Based upon more information about the available evidence, the government moved for reconsideration.

Upon reconsideration, for the reasons stated below, references to the use of acid by the defendant in the disposal of bodies have been excluded pursuant to Rule 403 of the Federal Rules of Evidence. Evidence of the use of acid to torture kidnapping victims has been permitted since it is necessary to show the motive for, and method of, the kidnappings; the probative force of this evidence far outweighs unfair prejudice.

## II. Facts

### A. Procedural Background

Among the uncharged acts in this RICO conspiracy was the alleged murder of one John Favara. Defendant's role was to dispose of Favara's body by dissolving it in acid:

> The defendant told Gambino family associates [Cooperating Witness 2] and [Cooperating Witness 3] that he disposed of bodies for the Gambino family, and told [Cooperating Witness 2] that he disposed of Favara's body by placing it in a barrel of acid.

Gov't's Mot. in Limine at 9, Jan. 6, 2009, D.E. No. 1680.

Other evidence would, it was indicated, demonstrate the defendant's predilection for utilizing acid in his necrological activities:

> In a later discussion concerning his expertise at disposing of bodies for the Gambino family, which included a discussion of a book the defendant was reading on dismemberment, the defendant informed Gambino family associate [Cooperating Witness 1] that acid was the best method to use to avoid detection. Years later, the defendant asked [Cooperating Witness 2] to help him move barrels of acid in his basement, and alluded to the fact that the barrels had been used in connection with disposing of a number of bodies, which [Cooperating Witness 2] understood to be a key component of the defendant's value to the Gambino family.

*Id.* at 9-10. There are no allegations that the victims of the murders that are now charged against the defendant were subject to post-mortem acid treatment.

In his position as a mafia "enforcer," the defendant is charged with kidnappings that were designed to obtain information useful to his mafia "Boss" and administrative staff. The evidence would show that the defendant poured acid on the feet of his victims in the course of their interrogations:

> The defendant conspired with others to kidnap David D'Arpino, Dennis Cassara and possibly a third individual relating to an incident at the house of the defendant's nephew in approximately the spring or summer of 1994. The individuals were brought to a location controlled by the defendant, where he assaulted them while questioning them about the incident.

Gov't's First Mot. in Limine, at 13.

The defendant's motion for categorical exclusion of all evidence of acts not specifically alleged in the indictment had been denied. *See* Hr'g Tr. at 31-32, Jan. 15, 2009. Specific exception was taken by the defendant with respect to uncharged criminal acts that "are particularly sensational, and would thus encourage the jury to convict for emotional reasons." Deft.'s Resp. Opp. Gov't's Mot. at 7, Jan. 13, 2009. Among those acts was "the accessory to

3

murder allegation concerning Mr. Carneglia's disposal of a victim's body by immersing it in a barrel of acid." *Id.* The defendant requested exclusion of that and all other references to acid as unduly prejudicial. *See* Hr'g Tr. at 21-42.

As already noted, a preliminary order precluded all references to acid and provided direction on how the government's witnesses should testify:

> The word "acid" or any reference to the use of acid shall not be allowed at trial. *See* Fed. R. Evid. 403. Where acid was allegedly used in the disposition of a body, the witness may indicate that the defendant helped dispose of that body. Where acid was allegedly used or threatened to be used for torture, the witness may indicate that the defendant used or threatened to use painful methods against alleged victims.

Order, Jan. 20, 2009, D.E. No. 1756.

The government's request for reconsideration provided details of the nature of the prospective testimony and photographic evidence touching on the alleged use of acid in both body disposals and kidnappings. *See* Gov't's Letter, Jan. 25, 2009, D.E. No. 1775. Support for the admission of "acid" testimony as to the disposal of bodies centered on the need to bolster the credibility of cooperating witnesses through corroborative testimony:

> This case will be decided on the jury's determination concerning the truthfulness of the government's cooperating witnesses. Those witnesses are convicted felons who are former members and associates of organized crime, many of whom have pled guilty to more than one murder. Defense counsel will and must use all means at their disposal to discredit and attack the government's cooperating witnesses to effectively represent their client. Such attacks will necessarily include assaults on the cooperating witnesses' characters, their motives to fabricate stories about the defendant, and their memories. *The "acid" testimony here at issue is a remarkably powerful answer to these attacks.*
>
> To begin, with respect to the use of acid to dispose of bodies, the interlocking testimony of the three cooperating witnesses — who, it should be noted, are the three witnesses closest to the defendant

> and will provide the most damning evidence of his guilt — strengthens the government's case in significant ways. First, the testimony demonstrates the remarkable closeness each witness shared with the defendant. It is a sign of remarkable trust to confess to disposing of a murder victim. That the defendant chose to do so with these three witnesses speaks volumes about their relationships with him — *a fact which is paramount in establishing the veracity of their testimony on this relevant fact, but also concerning their other testimony, including the defendant's admission to a number of the charged murders.*
>
> *Second, the three cooperating witnesses' testimony on this score will serve to fend off attacks on their credibility through the corroboration each witness provides the other.* Just as the defense will pounce upon any inconsistencies in the cooperating witnesses' accounts of past criminal activity with the defendant, the government should be able to rebuff such attacks and restore its witnesses' credibility by pointing to the sorts of details each knows that could not be fabricated. Those facts — that the bodies were disposed of in an abandoned building[] adjacent to the defendant's junkyard, that he used acid – a highly unusual method — to dispose of the bodies, and that he readily extolled the virtues of this method — *provide the sort of corroboration that substantially adds to each witnesses' credibility not only concerning this aspect of the defendant's participation in the Gambino family, but as to the witnesses' entire testimony.*

*Id.* at 6-7 (emphasis added).

The government also urged the admission of testimony on the use and threatened use of acid in the commission of the alleged kidnappings. Evidence in support of the government's allegation would demonstrate that the defendant kidnapped people to question them about a matter of concern to the mafia's leaders – a shooting that had occurred during a party. *Id.* at 4. The defendant dripped car-battery acid onto the victims' feet using a turkey baster. *Id.* at 5. To corroborate testimony about the incident, the government would provide photographic evidence of one victim's scarred foot. *See* Gov't Ex. 159. The defendant opposed admission of all

5

references to the use of acid in connection with the kidnappings, arguing that such evidence would be inflammatory and warranted exclusion under Rule 403.

## B. Hearing and Ruling

A second hearing was conducted. *See* Hr'g Tr. 222-37, Jan. 27, 2009. The court affirmed its ruling excluding all references to acid in the disposal of bodies because this use had only a peripheral relationship to the case, and the potential of unfair prejudice substantially outweighed probative value. *See* Fed. R. Evid. 403. The government was permitted to elicit other testimony about defendant's involvement in uncharged murders, including his role in body disposals. *See* Part IV.A, *infra*. This ruling allowed the government to offer persuasive evidence of the defendant's guilt. *Id.*

With respect to the use of acid in the alleged kidnapping, the government was requested to review the record to determine whether any witnesses could testify that the defendant in fact used the word "acid" in connection with the incident. On January 31, 2009, the government provided additional information:

> Three cooperating witnesses recall the defendant specifically using the word 'acid' in discussing [the kidnapping] incident, and another cooperating witness recalls the defendant advising him that squeezing acid out of a turkey baster was an effective way to torture someone.

Gov't Letter, Jan. 31, 2009, D.E. No. 1782.

On February 2, 2009, the court ruled that evidence of defendant's use of acid during the kidnapping was admissible. *See* Part IV.B, *infra*. The evidence related directly to the circumstances of, motive for, and details of, the incident. Trial Tr. at 498-99, Feb. 2, 2009.

## C. Testimony at Trial

### 1. Testimony on Acid in Uncharged Body Disposals

On February 17, 2009, Kevin McMahon, a cooperating witness and long-time criminal associate of the defendant, testified about the defendant's role in disposing of the bodies of people killed by crime family members. At the court's direction, he was instructed by the government to make no reference to acid or the use of acid in dealing with cadavers. His testimony was permitted to allow the government to establish the defendant's role in the mafia conspiracy and the nature of his relationship with McMahon, a mafia associate:

> Q [Mr. Burlingame, for the government]: Did the defendant ever tell you about disposing of bodies?
> A [Mr. McMahon, witness]: He did.
> Q: Many bodies?
> A: Yes.
> Q: Do you know the identity of any of the bodies that he told you that he disposed of?
> A: John Favara.
> Q: Who was John Favara?
> A: He was a man that was driving home from work and hit . . . John Gotti's son on a mini bike.
> Q: Did the defendant tell you why he got rid of Favara's body?
> . . .
> A: Angelo Ruggiero gave it to him.
> . . .
> Q: Did the defendant say he had any problems disposing of John Favara's body?
> A: He did.
> Q: What was -- what was the problem?
> A: *It wasn't dissolving as quickly as they liked it to.*
> Q: So it was taking too long?
> A: Correct.
> Q: Was he facing any criticism for this?
> A: The usual. You are a drunk; you are this; you are that.
> Q: Did the defendant finish disposing of the body?
> A: He did.
> Q: What did he do afterward?
> A: He took a piece of the body and threw it in . . . Angelo's soup dish.

7

>   Q: What sort of piece?
>   A: I don't know the kind of piece it was. It was bones.

Trial Tr. 2512-13, 2730-31, Feb. 17, 2009 (emphasis added).

As indicated above, McMahon made one indirect reference to acid in commenting on the "dissolving" of Favara's body. This slip was clearly accidental, the consequence of a lay witness' retrieving vivid memories and describing them as best he could. To remedy any prejudice caused by the inadvertent mention of "dissolving," the court provided a forceful instruction to the jury:

> I caution you again, ladies and gentlemen, that the defendant is on trial for specific charges, and you are here only to find whether he is guilty or not [of] those specific charges . . . [, as] I will explain to you, not to decide whether or not you like the defendant. . . . Is that clear? Or whether the defendant did or did not do things that you disapprove of that are not charged. Is that clear? Some of this evidence and the evidence that the witness is just describing comes in just to show associations among various people and not to show that these acts, which you may disapprove of, actually happened. Is that clear? Unless they are charged. Do you all understand that? . . . Are there any of you who cannot follow my instructions on this?
> . . .
> You are not here to decide character. You are not here to decide any actions that you disapprove of generally. Is that clear? [Do a]ny of you feel you cannot . . . follow that charge?

*Id.* at 2731-32. The jurors and alternates indicated that they understood the court's instruction and would be able to follow it in reaching their verdict. *Id.* at 2732. The court also instructed them to strike the word "dissolve" from their minds. *Id.* Offered the opportunity to request further instruction on the matter, defense counsel indicated satisfaction with the court's directions to the jury. *Id.*

8

## 2. Testimony on Acid in Charged Kidnapping-Torture

On February 4, 2009, Peter Zuccaro, a cooperating witness and former crime family associate, testified about his knowledge of the use of acid in one kidnapping incident:

> Q [Mr. Norris, for the government]: Did you ever learn about a run-in that D'Arpino had with the defendant?
> A [Mr. Zuccaro, witness]: Yes.
>
> . . .
>
> Q: What did [Kevin McMahon, a coconspirator] tell you about the incident?
> A: He told me they picked Dave D'Arpino up. They brought him to the junkyard and poured acid on his feet.
>
> . . .
>
> Q: When you say that Kevin McMahon told you that they picked him up and brought him over to the junkyard, what did you understand him to mean by picked up?
> A: They put him in a car and brought him to the junkyard, forcibly.
> Q: Kevin tell you who was at the junkyard when D'Arpino arrived?
> A: Just Charles.
> Q: Kevin was there too?
> A: Yes.
> Q: [D]id Kevin McMahon tell you what kind of acid it was?
> A: Battery acid.
> Q: Did he tell you what --
> A: Car battery.
>
> . . .
>
> Q: Did he tell you what implement the acid was in?
> A: No. Just told me they threw acid on his feet and that was it.
> Q: [D]id he tell you what happened after he put acid on his feet?
> A: He let the kid go.
> Q: Did Kevin McMahon tell you what he was doing while the defendant was putting acid on the kid's feet?
> A: He filmed it.

Trial Tr. at 1118-21, Feb. 4, 2009.

The court sustained one request made by defendant with respect to Zuccaro's testimony about this incident. It precluded the witness or the government from characterizing the defendant's and coconspirators' actions as "torture." Hr'g Tr. at 1120-21.

9

Mob associate Kevin McMahon described his first-hand knowledge of the kidnapping incident. He testified that the defendant had arranged to kidnap two or three individuals who he believed had information about who was responsible for a shooting. McMahon described how the victims of the alleged kidnapping were abducted, brought to the defendant's junkyard for questioning, and treated during the interrogation:

> Q [Mr. Burlingame, for the government]: What happened when you got there?
> A [Mr. McMahon, witness]: [The defendant] was drinking or doing something and he was sweating and screaming and yelling and he said I'm going to get to the bottom of this and he told three kids or two kids that if they didn't come willingly and he had to go get them they'd have a problem. So, I was standing by the junkyard with the camcorder and a car pulled up and in the passenger seat and in the back, I don't know if it was two or three, I can't remember how many people but they had white trash bags over their heads and their hands were tied but they could see through. He didn't want them to know where they were going but they were clear bags.
> Q: They were clear bags or they were white bags?
> A: They were white but you could see right through them. Whoever covered them didn't cover them good, he didn't want them to know where they were going.
> Q: And where were the bags?
> A: Over their heads.
> Q: You said their hands were tied?
> A: Correct.
> . . .
> Q: Do you remember the names of any people who had bags over their heads and their hands bound?
> A: Denny Cassara and Dave D'Arpino.
> . . .
> Q: What happened next?
> . . .
> A: Charles lined them up . . . and then he asked them who did the shooting and they said we don't know who did the shooting. So, he sat them down and he took their shoes and socks off each one of them and he asked them again and then they said [they] don't know . . . .
> Q: Yes.

A: He took a turkey baster of acid and he [dripped] it on each one of their [feet] and they were screaming and yelling and he said, well, who did it now and they [said "]we don't know["] and he [dripped] more acid on their feet and they were still standing pretty strong saying they don't know who did it.
Q: He continued to ask them?
A: Continued to ask them.
Q: How long did this take place, how long did this go on where he was asking them who did the shooting and [dripping] acid on their feet?
A: Like five, ten minutes.
Q: Did Cassara and D'Arpino appear to be in pain?
A: Yes.
Q: What were they doing?
A: Saying ["]ah["], it hurt.
Q: Screaming?
A: Yes.
Q: Did you see their feet?
A: Yes.
Q: Were the effects of the acid visible on their feet?
A: It was. . . . It was getting all red and bubbly and they kept rubbing it to rub it off. As they were rubbing it, the skin was coming off.
Q: What were you doing while the defendant was putting acid on D'Arpino and Cassara's feet?
A: I was filming it.
Q: Why were you filming it?
A: He told me to.
Q: Did the defendant take any steps to make them talk beyond putting acid on their feet?
A: He did. . . . He then pulled their pants down and told them to bend over, I'm going to stick the turkey baster up your ass, and with that they screamed and said, "Chris did it."
Q: So he stopped?
A: Yes.
Q: What did he do after that?
A: He put their feet in water. . . .

Trial Tr. 2700-04, Feb. 17, 2009.

## III. Law

### A. Rule 404(b)

Rule 404(b) of the Federal Rules of Evidence provides that evidence of uncharged criminal acts is not admissible to prove a defendant's bad character and general proclivity for unlawful activities:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b).

A trial court has broad discretion to admit evidence pursuant to Rule 404(b) exceptions. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). It must consider whether the bad-acts evidence is (1) offered for a proper purpose, (2) relevant, and (3) substantially more probative than prejudicial. *See United States v. Downing*, 297 F.3d 52, 58 (2d Cir. 2002) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). The Court of Appeals for the Second Circuit has adopted an "inclusionary approach" under Rule 404(b), permitting admission of evidence of prior crimes, wrongs, or acts "unless it is introduced for the sole purpose of showing defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (citations omitted); *see also United States v. Salameh*, 152 F.3d 88, 123 (2d Cir. 1998)

("Evidence that tends to prove a character trait of a defendant is admissible if it is offered for another, proper purpose" (citation omitted)).

Where, as here, the government must prove the existence of a RICO conspiracy, evidence of acts committed in furtherance of the conspiracy is not excluded by Rule 404(b). *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). The acts prove the defendant's participation in the criminal enterprise and, therefore, the RICO charges against him. *See United States v. Williams*, 205 F.3d 23, 32-34 (2d Cir. 2000) (finding evidence of defendant's prior criminal conduct properly admitted under Rule 404(b) because it was relevant "to inform the jury of the background of the charged conspiracy, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed"); *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (affirming admission of evidence of pre-existing drug trafficking relationship because it furthered "the jury's understanding of how the instant transaction came about and [the defendant's and others'] role in it"). *Cf. United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) (emphasizing "the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history").

### B. Rule 403

Rule 403 of the Federal Rules of Evidence provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. The Court of Appeals for the Second Circuit has held that relevant evidence "is prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980); *accord* Fed. R. Evid. 403 advisory committee's note ("'Unfair

13

prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."). "When material evidence has an additional prejudicial effect, Rule 403 requires the trial court to make a *conscientious assessment* of whether the probative value of the evidence on a disputed issue in the case is substantially outweighed by the prejudicial tendency of the evidence to have some other adverse effect upon the defendant." *Figueroa*, 618 F.2d at 943 (emphasis added); *see also United States v. Birney*, 686 F.2d 102, 106 (2d Cir. 1982) ("To avoid acting arbitrarily a trial court applying Rule 403 must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value." (citations omitted)).

A "conscientious assessment" under Rule 403 includes a determination of "whether there exists any alternative evidence with the same or greater probative value, but with a lesser threat of unfairly prejudicing the defendant, as the proffered evidence." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 170 (S.D.N.Y. 2006) (citing *Old Chief v. United States*, 519 U.S. 172, 184 (1997)). The Supreme Court has endorsed this nuanced analysis:

> [W]hat counts as the Rule 403 "probative value" of an item of evidence, as distinct from its Rule 401 "relevance," may be calculated by *comparing evidentiary alternatives*. . . . [W]hen a court considers "whether to exclude on grounds of unfair prejudice," the "availability of other means of proof may . . . be an appropriate factor."

*Old Chief*, 519 U.S. at 184 (emphasis added). *See also United States v. Royer*, 549 F.3d 886, 903 (2d Cir. 2008) (affirming the trial court's decision to allow evidence of coconspirator's alleged involvement in the 9/11 attacks while excluding unduly prejudicial testimony, including direct references to Al Qaeda, under Rule 403).

14

In support of its argument for admission of the acid body disposal evidence, the government appropriately cited prior decisions that suggest that a defendant should not benefit from Rule 403 exclusion of evidence based on grisly acts that he committed. *See, e,g., Salameh,* 152 F.3d at 122-23 (finding that the trial court appropriately admitted photographic images of bloodied bombing victims); *United States v. Pepin,* 514 F.3d 193, 208 (2d Cir. 2008) (holding that the jury must be permitted, at the guilt phase in a capital case, to receive evidence of dismemberment of victims' bodies for which defendant faced murder charges); *Rivers v. United States,* 270 F.2d 435, 439 (9th Cir. 1959) (asserting that the conduct of an accused person following the commission of a crime, including the dismemberment and concealment of the body, may be circumstantially relevant and is properly admitted). *But cf. United States v. Tavares,* 584 F. Supp. 2d 535, 538-40 (E.D.N.Y. 2008) (excluding evidence of post-mortem dismemberment of murder victims at the penalty phase of a capital case).

## IV. Application of Law to Facts

### A. Acid in Uncharged Body Disposals

#### 1. Rule 404(b)

The defendant's statements to coconspirators about his use of acid in body disposals tend to prove his participation and role in the conspiracy, a requirement under RICO. *See* 18 U.S.C. §§ 1961-1968. While the murder and disposal of Favara and others are not among the charged acts against defendant, they do demonstrate more than a propensity to commit violent crimes under Rule 404(b). These acts establish the defendant's longstanding role as an "enforcer" in the RICO enterprise and his criminal relationship to coconspirators. Rule 404(b) does not preclude the government from offering evidence of these acts.

15

## 2. Rule 403

Evidence of body disposal by acid is relevant to the government's case against the defendant and, absent Rule 403 limitations, would be admissible at trial. *See* Fed R. Evid. 401, 402 (defining relevant evidence and asserting its general admissibility). "Admissibility of evidence is based upon pragmatic as well as logical grounds." Hr'g Tr. at 42, Jan. 15, 2009. Rules 401 and 402 are rooted in the logical principle that if evidence may tend to prove or disprove a material proposition of fact, it is relevant and therefore admissible. *See Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 138 F. Supp. 2d 357, 365-66 (E.D.N.Y. 2001); Jerome Michael & Mortimer Adler, *The Trial of an Issue of Fact I and II*, 34 Colum. L. Rev. 1224, 1252, 1462 (1934).

Rule 403 is based upon due process objectives to promote fairness and efficiency in trials. Prior cases cited by the government, though persuasive on their own facts, cannot be applied categorically to resolve individual evidentiary problems. In *Salameh*, *Rivers*, and similar cases, the disputed evidence was critical; if excluded, any evidentiary alternative would have hobbled the government's ability to prove its case beyond a reasonable doubt.

Careful assessment of the government's evidentiary needs and the potential of unfair prejudice to the defendant in this case led to the conclusion that exclusion of references to acid body disposal is warranted. Preclusion did not substantially diminish the government's ability to establish the defendant's conspiratorial role and the reliability of government witnesses' testimony. The government could – and did – present substantial evidence that defendant played a significant role in the uncharged murder of Favara and other criminal acts within the RICO conspiracy. The sole evidentiary limitation imposed was the exclusion of references to the specific method used in getting rid of the bodies of the mob's victims – to wit, submersion in

acid. Admission of such peripheral evidence, even though relevant insofar as it provides a more complete narrative to the jury, "must be balanced against . . . risks of undue prejudice under Rule 403." *See Philip Morris, Inc.*, 138 F. Supp. 2d at 370.

Judicial notice is taken of the fact that a substantial number of media reports have highlighted the defendant's fondness for acid as a tool used in the commission of his crimes. *See, e.g.*, Kati Cornell, *Gotti Hit of 'Acid'*, N.Y. Post, Jan. 8, 2009, at 25; John Marzulli, *Mobster Charles Carneglia Disposed of Body in Acid, Then Gave Boss the Finger – in His Soup*, N.Y. Daily News, Jan. 28, 2009, at 8; Anthony DeStefano, *Gotti Neighbor Dumped in Acid*, Newsday, Jan. 9, 2009, at A24. Some prospective jurors informed the court that they had read about the defendant's use of acid in dissolving corpses. They were obviously upset by this information. *See, e.g.*, Voir Dire Hr'g ("Voir Dire Hr'g I") Tr. at 24, Jan. 26, 2009; Voir Dire Hr'g ("Voir Dire Hr'g II") Tr. at 175, 181, Jan. 27, 2009. One juror called it a "disturbing" image. Voir Dire Hr'g II Tr. at 175. Obvious was the revulsion of the prospective jurors when the word "acid" was mentioned in relation to the treatment of the dead. *Id.* at 227.

Labeling this defendant the "acid killer" could unduly prejudice him. The probative value of the acid disposal evidence – to establish defendant's participation and role in the RICO conspiracy and to bolster credibility of witnesses – is reduced only minimally by this ruling.

### B. Acid in Charged Kidnapping-Torture

By contrast, the government's evidence of the use of acid in the commission of the act of kidnapping relates directly and inextricably to the crime charged. It is relevant under Rules 401 and 402 and admissible under Rule 403. As noted above, Rule 404(b) has no application because the kidnappings are charged in the indictment.

17

Testimonial evidence that the defendant dripped acid from a car battery on his victims during kidnappings is an essential aspect of the crime. It is corroborated by a photograph of one victim's scarred foot. Gov't Ex. 159. While the defendant's utilization of a corrosive, burning substance may disturb jurors, it is of considerable probative value and admissible under Rule 403. *See Salameh*, 152 F.3d at 123 ("Probative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact."). The significance of the use of the car-battery acid in the commission of the kidnapping was clear. *See* Part II.C.2, *supra*. Its inclusion was integral to the government's case. *Id.*

## V. Conclusion

In a complex criminal trial which includes charges that span many decades, includes many sprawling criminal allegations, and requires testimony from numerous law enforcement officers, cooperating witnesses, and eyewitnesses, the court is required to engage in a conscientious and fact-specific inquiry to ensure the complete and thorough presentation of relevant evidence while excluding evidence that may undermine the due process and efficiency principles that are deeply ingrained in the federal criminal justice system. Rulings on the use of acid by the defendant are reaffirmed.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: February 20, 2009
Brooklyn, New York