FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 1 3 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
           )
UNITED STATES OF AMERICA,   )
           )
           )
   – against –     )
           )
           )
CHARLES CARNEGLIA,     )
           )
     Defendant.   )
           )
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM & ORDER
ON POLICE REPORTS,
TALK IN COMMUNITY &
CONVERSATIONS RECORDED
BY COOPERATING WITNESS

08-CR-76

**JACK B. WEINSTEIN, Senior United States District Judge:**

I.  Introduction ........................................................................................................2

II.  Police Reports Offered by Defendant .............................................................6

 A.  Facts .............................................................................................................6

 B.  Law .................................................................................................................7

  1.  Authentication ........................................................................................7

  2.  Admissibility Generally .........................................................................7

  3.  Hearsay Statements ..............................................................................8

 C.  Application of Law to Facts .....................................................................10

  1.  Foundation ............................................................................................10

   a.  Authentication .................................................................................10

   b.  Records of Regularly Conducted Activity ...................................11

  2.  Hearsay in Reports .............................................................................11

   a.  Gelb .................................................................................................11

   b.  Puma ................................................................................................14

   c.  Delgado-Rivera ..............................................................................16

III.  Statement Implicating "Brown" in Cotillo Murder ......................................17

 A.  Facts ............................................................................................................17

 B.  Law ...............................................................................................................18

 C.  Application of Law to Facts .....................................................................19

IV.  Conversations Recorded by Cooperating Witness .....................................21



    A.    Facts ...........................................................................................................21

    B.    Law ...........................................................................................................21

    C.    Application of Law to Facts.......................................................................23

V.    Poisoning of Witness's Memory ........................................................................24

VI.   Conclusion...........................................................................................................25

## I.  Introduction

The defendant was charged with participation with the Gambino mafia crime family, in a Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy.  18 U.S.C. §§ 1962(c), 1961.  Among the many racketeering acts alleged were the murders of Albert Gelb, Salvatore Puma, Jose Delgado-Rivera, Michael Cotillo, and Louis DiBono, and the extortion of the owner of a restaurant and nightclub.  *See* Superseding Indictment ¶¶ 19-23, 25-27, 31, 63-66, 70-71, Dec. 4, 2008, Docket Entry ("D.E.") No. 1572.

Because of special circumstances, the government's heavy burden of proof and the presumption of innocence did not fully offset the prosecutor's whip hand at the trial.  The government has devoted tremendous resources and scores of government agents over several generations to closely observing suspected participants in organized crime – including this defendant; gathering evidence through photographic, video, audio and personal surveillances on the streets of the metropolitan area, wiretaps, audio and video bugs in criminal hangouts, prisons, and homes; utilizing forensic techniques such as nuclear DNA and mitochondrial DNA, fingerprinting, autopsy reports of the medical examiner, and ballistics analysis; and the seduction of a large coterie of undercover and cooperating former gang members now available to testify after plea agreements sharply reduced their prospective prison time.  The Federal Bureau of Investigation ("F.B.I."), New York City Police, New York State Police, Drug Enforcement Administration, District Attorneys, New York State Attorney General, Port Authority and other

law enforcement agencies have provided full-time squads to gather and stockpile evidence of the activities of New York's five mafia gangs and each of their members and associates over the past half century. These talented and devoted law enforcement personnel have provided a huge pool of evidence to bring to justice the dangerous and vicious criminals who are members and associates of the mafia, and to destroy or neutralize their organization.

Illustrative is the present prosecution, which includes charges of murders and other criminal activities committed over a period of more than thirty years. It is part of a series of related prosecutions of sixty-two Gambino family members and associates. *See United States v. Agate et al.*, No. 08-76 (E.D.N.Y.). Sixty-one of the *Agate* cases have been disposed of. The present defendant pleaded not guilty. His trial of some six weeks has resulted in a record of over 5,000 pages with sixty-two witnesses and hundreds of exhibits.

In such a convoluted and complex case, the preferred approach for the court is to apply the rule: "when in doubt, admit," relying on the jury – as is usually the case in the Eastern District of New York, a highly intelligent, well-educated group of widely diverse backgrounds, obviously observing the trial carefully, evaluating the evidence with meticulous good sense, and intent on deciding the facts fairly – to assess the evidence properly, estimate its probative force as accurately as possible, and put each snippet of evidence in its place in the huge jigsaw puzzle and novella it is constructing in its collective mind as it deliberates.

The Federal Rules of Evidence permit much of the available trove of prosecutorial evidence to be resurrected and introduced through authentication and exceptions to the hearsay rule. For charges dating back multiple decades and still prosecutable because of RICO's statutory framework and the dogged and often brilliant work of government investigators and

3

prosecutors, a defendant often does not have access to defensive evidence that may have been lost, damaged, or destroyed. Many formerly potential witnesses for the defense are no longer available years after an alleged crime was committed.

Federal conspiracy evidence and substantive rules are generally more favorable to the government than are state rules. Application of RICO's statute of limitations circumvents traditional mechanisms preventing stale prosecutions. *See, e.g.*, *United States v. Eppolito*, 436 F. Supp. 2d 532, 569-71 (E.D.N.Y. 2006), *rev'd*, 543 F.3d 25 (2d Cir. 2008). Under RICO conspiracy charges, an escape is possible from relevancy inhibitions, permitting proof of barely-related crimes extending to incidents of gang activity that did not directly involve the defendant. Using the federal RICO statute as a combined deep-sea trawling and long-line net and hook method of retroactive prosecution, the evidentiary problems for the prosecution are considerably reduced and those for defendants substantially enhanced.

Murder, as usually prosecuted in a state court, does not generally have the protection of a statute of limitations; yet, in a case such as the instant one, a federal prosecution for murders under RICO is often preferred by federal and state prosecutors because of favorable procedural and substantive rules. In the charged murders in the present case, for example, even though they were hobbled by the code of silence and intimidation of witnesses, the police could, and did, search out and question immediately after the events those who might have knowledge. Defense investigators would be searching for people long gone, or with unreliable memories.

Defense counsel in the present case necessarily entered late, long after the prosecutors, with the aid of the F.B.I. and other law enforcement agencies, had prepared and presented their

4

case to the grand jury. The defense had to scramble to locate evidence, identify witnesses, and prepare to meet the government's extensive charges.

The law does a great deal to help the defendant. Through section 3500 of title 18 of the United States Code, Rule 16 of the Federal Rules of Criminal Procedure, and other discovery devices, it opens wide government files. Court-appointed defense counsel, as in this case, are well qualified. Here, two defense attorneys of extraordinary talent were appointed by the court. They were supplied at government expense with experts, paraprofessionals, investigators and a host of litigation aids. Nevertheless, full equalization of resources was not possible.

The law need not subscribe to what Wigmore and others have ironically referred to as the fox hunter's ethic of giving the prey a fair chase, or, to mix metaphors, the Queensbury Rules of Boxing. *Cf. Miranda v. Arizona*, 384 U.S. 436, 440 n.3 (1966) ("The former police commissioner of New York, Michael J. Murphy [later a federal judge], stated of *Escobedo* [a case prior to *Miranda* excluding statements elicited from the defendant in violation of constitutional rights]: 'What the court is doing is akin to requiring one boxer to fight by Marquis of Queensbury rules while permitting the other to butt, gouge and bite.'"); *Wilson v. United States*, 221 U.S. 361, 392 (1911) (procedural rule favoring the defense "so far as based on hardship, is called an 'old woman's reason' . . . and a 'double distilled and trebled refined sentimentality.' So far as based on unfairness, it is called 'the fox hunter's reason,' its basis being that a criminal and a fox must have a chance to escape, the subsequent pursuit being made thereby more interesting."); *People v. Cahan*, 282 P.2d 905 (Cal. 1955) (Traynor, J.) (noting Wigmore's view that exclusion of illegally obtained evidence as a method of equalization is based upon "misguided sentimentality"). Yet, the need for some degree of balancing of litigation

capacity needs to be considered in some cases. *See, e.g., Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 520 (1989) ("clear is the . . . intention that [Rule 609(a)] shield the accused, but not the prosecution"); *id.* at 521 ("the Rule was meant to authorize a judge to weigh prejudice against no one other than a criminal defendant"); *id.* at 529 (Scalia, J., concurring) (citing "the policy of the law in general and the Rules of Evidence in particular of providing special protection to defendants in criminal cases"); *but cf. id.* at 533 (Blackmun, J., dissenting) ("I do not approach the Rules of Evidence . . . with the presumption that their general provisions should be read to 'provide special protection to defendants in criminal cases.'").

The Federal Rules of Evidence and Rules of Criminal Procedure are designed to ensure that the defense as well as the government can fully present their cases, "to secure fairness." Fed. R. Evid. 102. Application of the rules to permit the defendant to gather and present information favorable to his defense needs to take account of due process and fairness. *See Chambers v. Mississippi*, 410 U.S. 284, 289 (1973) (defendant should not be thwarted in efforts to present a defense by overly strict applications of evidence rules).

In the instant case, procedural and evidentiary rules were applied in an attempt to provide the defendant as well as the government with a fair trial in fact as well as theory. In view of the facts of the case and the nature of the evidence, the court adopted an explicit balancing test in admitting some documents and statements and excluding others. *Cf.* Fed. R. Evid. 403. The rulings set forth below hew to the formal evidence rules, while keeping an eye on due process, the defendant's constitutional right to put on a defense, and the government's right to prosecute.

## II. Police Reports Offered by Defendant

### A. Facts

The defendant moved to admit seven groups of documents, exhibits grouped as A, B, C, D, E, G, and Q. *See* Mem. Supp. Def.'s Mot. - Police Reports, Feb. 20, 2009, D.E. No. 1873. These exhibits consist of selected police reports related to the investigations of the murders of Albert Gelb in 1976, Salvatore Puma in 1983, and Jose Delgado-Rivera in 1990. The government did not object to the admission of Exhibit D, containing findings that fingerprints taken from Gelb's car did not match those of the defendant or his brother, John Carneglia. It sought to exclude exhibits A, B, C, E, G and Q on the ground that they consist of inadmissible hearsay. *See* Gov't. Mem. Opp'n - Police Reports, Feb. 23, 2009, D.E. No. 1879.

## B. Law

### 1. Authentication

Any written evidence to be admitted must be authenticated by "evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). "Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity. . . . The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007). In the case of public records or reports, including police reports, authentication may be provided by "[e]vidence that a writing authorized by law to be recorded or filed and [that was] in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept." Fed. R. Evid. 901(b)(7).

### 2. Admissibility Generally

In general, police reports may not be admitted when offered by the government in a prosecution against the defendant. *See* Fed. R. Evid. 803(8); *United States v. Oates*, 560 F.2d 45, 77 (2d Cir. 1977) (discussing legislative history of Federal Rules of Evidence reflecting intent "to render law enforcement reports and evaluative reports inadmissible against defendants in criminal cases"); *cf.* 4 Margaret A. Berger et al., *Evidence*, ¶ 803(8)[04] (Joseph M. McLaughlin, ed., Matthew Bender rev. 1996) (indicating that some police reports under Rule 803(8) as well as 803(6) may be relied upon by the government).

A criminal defendant may offer police reports under the business records hearsay exception in Federal Rule of Evidence 803(6). *See United States v. Snyder*, 787 F.2d 1429, 1434 (10th Cir. 1986) (noting admissibility under Rule 803(6) of "entries in a police or investigating officer's report which result from the officer's own observations and knowledge," if offered by the defendant). "Rule 803(6) 'favors the admission of evidence rather than its exclusion if it has any probative value at all.'" *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (*quoting In re Ollag Constr. Equip. Corp.*, 665 F.2d 43, 46 (2d Cir. 1981) (internal quotation marks omitted)).

Police reports offered by the defendant may also be admissible under the public records and reports hearsay exception. Fed. R. Evid. 803(8). They may sometimes be admissible under the hearsay exception for recorded recollections provided in Federal Rule of Evidence 803(5) and other exceptions.

### 3. Hearsay Statements

Separate from the inquiry into the admissibility of the police reports themselves is the question of the admissibility of their contents. Where reports contain statements of witnesses,

the contents of the reports may not be admitted without analysis of the hearsay. Any statement that is made by a declarant not testifying at trial, offered in evidence to prove the truth of the matter asserted, is excluded as hearsay absent applicability of one of the hearsay exceptions provided in the Federal Rules of Evidence or a relevant statute. *See* Fed. R. Evid. 802, 803, 804.

For example, some statements of witnesses contained in police reports may constitute excited utterances "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," Fed. R. Evid. 803(2), or present sense impressions "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Fed. R. Evid. 803(1). Others may constitute dying declarations admissible as statements of an unavailable declarant made "while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Fed. R. Evid. 804(b)(2).

If no other explicit hearsay exceptions in the Federal Rules of Evidence apply, a hearsay statement may be admitted under the "catch-all exception," which provides:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) *the general purposes of these rules and the interests of justice will best be served by admission* of the statement into evidence.

Fed. R. Evid. 807 (emphasis added).

"[T]he rules on hearsay should be read to exclude unreliable hearsay but to admit reliable hearsay. . . . [S]uch 'reliable hearsay' has, of course, the effect of promoting the truth-seeking

9

function of a criminal trial and, therefore, ought to be presented to the finders of facts." *In re Drake*, 786 F. Supp. 229, 234-35 (E.D.N.Y. 1992). Under the residual hearsay exception of Federal Rule of Evidence 807 (formerly found in Federal Rule of Evidence 803(24)), properly considered factors in an analysis of reliability of hearsay statements contained in reports of investigative interviews include: (1) the amount of time that elapsed between the event and the statements; (2) the degree of specificity of the statements; and (3) whether they were intended to be helpful to the officer or agent interviewing the witness. *See id.* at 234.

In connection with hearsay analysis, protections favoring the defendant must be considered. The defendant has a right to confrontation; the government does not. *See* Part III.C, *infra*. The defendant has a right to exclude evidence obtained in violation of his Fourth Amendment rights; the government has no corresponding protection.

Should the court find that a hearsay statement is admissible under an exception, it must still perform the balancing test applicable to all relevant evidence under Rule 403. "[E]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

### C. Application of Law to Facts

#### 1. Foundation

##### a. Authentication

Defense exhibits A through D were authenticated at trial by Detective Marlon Hopkins, a government witness. *See* Trial Tr. 1852-80, Feb. 10, 2009. The reports in exhibits E and G were

not authenticated, but were in any case inadmissible. Exhibit Q was deemed authenticated on implied consent.

### b.  Records of Regularly Conducted Activity

Exhibits grouped as A, B, C, D, E, G and Q offered by the defendant satisfy the hearsay exception of Federal Rule of Evidence 803(6) because they are police reports recording acts, events, conditions or opinions made at or near the time of the event, and were made and kept in the course of regularly conducted police activity.

### 2.  Hearsay in Reports

The reports contain double hearsay – i.e., the first level being the report itself, and the second level the hearsay in the document. Double hearsay is admissible if each level of hearsay satisfies a hearsay exception. *See* Fed. R. Evid. 805.

### a.  Gelb

Defense exhibit A consists of five police reports, A-1 though A-5, recounting the eyewitness statements of Charles Ball. Ball described watching from his window while an individual fired several shots into Gelb's car. The content indicates that the events he witnessed were startling. The Ball interview recorded in defense exhibit A-1 took place approximately one hour after the shooting of Gelb. *See* Mem. & Order Admis. Statements Murder Victim, *United States v. Carneglia*, No. 08-76, D.E. No. 1943 (E.D.N.Y. Mar. 5, 2009) (detailing facts of the Gelb murder). Ball's statements contained in defense exhibit A-1 were admissible as excited utterances, *see* Fed. R. Evid. 803(2), possibly as a present sense impression because of their closeness in time to the shooting, *see* Fed. R. Evid. 803(1), and under Federal Rule of Evidence 807, given circumstances that indicated the statements' reliability.

11

Defense exhibits A-2 through A-5 are reports of subsequent police interviews of Ball, bearing dates ranging from one day to eight months after the murder. While not excited utterances, the contents of these exhibits were admissible under Rule 807. These statements have circumstantial guarantees of trustworthiness reflected in their consistency with the statements recorded in exhibit A-1, the high degree of specificity of the statements, and the fact that Ball's only apparent motive was to assist law enforcement. Ball's statements were evidence relevant to a central issue, who shot Albert Gelb, and they were more probative on the point for which the defendant sought their introduction than any other available evidence. Where the charges relate to a crime committed over thirty years ago, recordings of contemporaneous statements by a reliable recorder, here a police officer, may be more valuable than any current recollections of available trial witnesses. Ball is, in any event, deceased and was thus unavailable as a witness. *See* Mem. Supp. Def.'s Mot. - Police Reports, at 4. The general purpose of the rules of evidence and the interests of justice were best served by the introduction of these reports, since they contain the statements of the only known eyewitness to the crime. Exhibits A-2 through A-5 were admissible under Federal Rule of Evidence 807.

Defense exhibit B consists of four internal police department transmissions, B-1 through B-4, seeking to head off the culprits and containing a description of the alleged perpetrator and the perpetrator's vehicle matching that given by Ball. They were excluded because they were cumulative and redundant, it was not clear what their source was, and their admission could have given the jury the false impression that multiple witnesses related this same description of the perpetrator. *See* Fed. R. Evid. 403.

12

Defense exhibit C consists of two reports, C-1 and C-2, that describe the circumstances of the homicide and identify officers who responded to the crime scene. They were admissible under Federal Rule of Evidence 803(6), because they contain recorded observations of the crime scene made as part of regular New York City Police Department practice by police officers. The reports in exhibit C have substantial indicia of reliability; they are backed up by photographs of the scene and body.

Defense exhibit D consists of three reports, D-1 through D-3, relating to the analysis of fingerprints found on Gelb's vehicle. The prints did not match those of the defendant or his brother, John Carneglia. The government did not object to the admission of these documents. *See* Gov't. Mem. Opp'n – Police Reports, at 3. Exhibit D was admissible under Rule 803(6) and under Rule 803(8), because the reports consist of records of a public office or agency offered by the defendant in a criminal case, containing "factual findings resulting from an investigation made pursuant to authority granted by law." Fed. R. Evid. 803(8).

Defense exhibit E-1 is a police report of an interview with David Vartian, a witness in this case who was a friend of Gelb and who discovered Gelb's body. The report includes Vartian's statement that Gelb never told Vartian about receiving any threats. Vartian was called as a government witness and testified to a lack of knowledge of any threats to Gelb. The report adds no information to what was already elicited through Vartian's uncontested testimony. It does not conflict with Vartian's more complete in-court testimony. *See* Trial Tr. 1469-74, Feb. 5, 2009. It was excluded under Rule 403.

Defense exhibit E-2 is a police report of an interview with David Werfel, who was assigned to prosecute the defendant in a 1976 gun possession case. The report includes Werfel's

13

statement indicating a lack of knowledge of any threats to Gelb. Werfel was called as a government witness. He did not remember anything about Gelb receiving threats. The report adds no probative information to what was elicited through Werfel's more extensive testimony, nor does it conflict with Werfel's in-court testimony. *See id.* at 1482-93. It was excluded under Rule 403.

### b. *Puma*

Defense exhibits Q and Q-1 consist of police reports from the Salvatore Puma murder file containing statements made by Puma after he was stabbed. The jury heard substantial evidence of defendant's guilt with respect to the Puma murder, including testimony of: (1) three cooperating witnesses who stated the defendant admitted to stabbing Puma, and one who explained that Puma kept money that was supposed to be sent to an incarcerated mob associate, *see* Trial Tr. 976-79, Feb. 3, 2009; Trial Tr. 2683-88, Feb. 17, 2009; Trial Tr. 3370-74, Feb. 23, 2009; and (2) a witness who saw Puma in a heated argument with the defendant on the night of the murder and minutes later observed Puma collapse from a stab wound, *see* Trial Tr. 2367-76, Feb. 12, 2009.

Exhibit Q includes the statement of a friend of Puma who reported that Puma told him on the way to the hospital: "I'm not going to make it." Exhibit Q-1 contains a statement made by Puma to a police officer at the hospital indicating that he had been stabbed by "three males black." The report was written by a detective who spoke to the officer who interviewed Puma. The evidence was important to the defendant since the deceased had a good opportunity to see his assailant, and defendant is clearly "white."

14

Exhibit Q provides the necessary basis for the court's finding that Puma's statement in exhibit Q-1 constitutes a dying declaration admissible under Rule 804(b)(2). Puma believed his death was imminent, and his statement related to the cause and circumstances of his imminent death.

The fact that the statement was relayed from one member of the police force to another in the course of making the report does not render it inadmissible. Where it is normal practice for officers to accurately transmit information internally and include it in reports to be relied upon by other officers, the report is admissible as a business record. "To satisfy Rule 803(6), each participant in the chain which created the record—from the initial observer-reporter to the final entrant—must generally be acting in the course of the regularly conducted business." 5 Margaret A. Berger et al., *Federal Evidence*, § 803.08[4] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. rev. 2008). The transmission of Puma's statement from one officer to another is consistent with Rule 803(6).

Though they are admissible, dying declarations are often not reliable. "[T]he lack of inherent reliability of deathbed statements has often been pointed out. Experience suggests that the desire for revenge or self-exoneration or to protect one's loved ones may continue until the moment of death." 5 Margaret A. Berger et al., *Federal Evidence*, § 804.05[1]. In this case, it is arguable that the required protocol of the mafia led to Puma's providing police with the false clue that "blacks" stabbed him. The discipline of gang rules was enforced not only by an "undying" commitment at the time men are sworn in as "made members" – and understood by associates – not to help the police, but also by the implicit threat that violation of the rule against cooperation might lead to vengeance imposed on the living family members of the deceased.

Kevin McMahon, a mob associate and cooperating witness, testified that when he sought hospital treatment after being shot by John Gotti, Jr., he was instructed to tell the police detective "I got jumped by a bunch of black guys," and that such statements to the police were standard practice for Gambino family associates. *See* Trial Tr. 2771-74, Feb. 18, 2009. This evidence of unreliability was available to the jury in weighing the credibility of Puma's dying declaration. Lack of probative force did not warrant exclusion under Rule 403.

Subsequent to the court's ruling that exhibits Q and Q-1 were admissible, the government asked that the contents of Q, other than Puma's statement of "I'm not going to make it," be redacted. *See* Trial Tr. 4455-59, Mar. 3, 2009. The court denied the government's request, allowing Q in evidence as the indication that Q-1 was a dying declaration. *Id.* The other observations contained in Q lend a sense of verity by giving a complete description of the context in which the declaration was made. Both documents were admissible to provide the jury with the content and context of Puma's statements.

      *c.  Delgado-Rivera*

Exhibit G is a police report relating to the Delgado-Rivera murder. Edwin Maldonado testified that he was the armored-truck employee partnered with Jose Delgado-Rivera on the day their truck was robbed and Delgado-Rivera was murdered. *See* Trial Tr. 3008-12, Feb. 19, 2009. On cross-examination, defense counsel questioned Maldonado about the description of the perpetrators contained in exhibit G, and unsuccessfully attempted to refresh the witness's recollection with the document. *See id.* at 3032-33. Maldonado's testimony was inconsistent with the description in the document. *See id.* at 3033 ("What I said was that I only saw one

person. That person that I saw with the corner of my eye with the double A patch, which is the American Airlines insignia.").

Exhibit G itself appears to contain a summary of the statements of more than one individual. *See* exhibit G; Trial Tr. at 3039. It is unclear from the document who was the source of the description of the armed robbers. Maldonado, who defendant claimed was the source, refused to adopt the statement. It was not a report that he himself had written, or had ever seen before. Thus there was no evidence that it constituted a prior inconsistent statement of the witness. *See* Fed. R. Evid. 613. Exhibit G was excluded pursuant to Rule 403 because it lacks reliability and could confuse and mislead. *See* Trial Tr. 3038-39.

### III. Statement Implicating "Brown" in Cotillo Murder

#### A. Facts

Among the racketeering acts alleged in furtherance of the RICO conspiracy was the 1977 murder of Michael Cotillo. *See* Superseding Indictment ¶ 22. The government presented strong evidence of the defendant's guilt of the Cotillo murder, including testimony of: (1) a woman who was at the scene when the murder occurred, accompanied by a man who was injured by a knife in the same moments that Cotillo was stabbed, *see* Trial Tr. 1799-1811, Feb. 9, 2009; (2) a lead investigator on the murder, *see* Trial Tr. 1841-50, Feb. 10, 2009; and (3) a mafia associate of the defendant's who heard the defendant discuss his committing the murder, *see* Trial Tr. 2512, Feb. 17, 2009. The jury also saw a video and audio recording of a conversation between the defendant and two members of the Gambino family, during which the three men discussed defendant's involvement in a stabbing identified as the Cotillo murder. *See* Gov't Ex. 318c-1.

17

The government informed the court that a prospective witness, Nicholas Ucci, would provide testimony related to the Cotillo murder. *See* Trial Tr. 1832-35, Feb. 10, 2009. Ucci was the first detective to arrive in response to reports of a physical altercation among several men. *Id.* at 1833. It was during this dispute that Cotillo was stabbed in the chest. Ucci would testify that he arrived at the scene, found a bleeding Cotillo, and drove him to the hospital. *Id.*

Ucci was not involved in the subsequent murder investigation. His testimony would be generally limited to the events he observed on the night of the stabbing. It was indicated that he recalled that in the neighborhood, some time after the murder, he heard someone say that "Brown" had killed Cotillo. *Id.* at 1833-34. He did not remember who implicated Brown, or the time and place of the statement. *Id.* The government sought to preclude the defendant from asking Ucci about the "Brown did it" statement on cross-examination, arguing that the statement constitutes unreliable hearsay to which no hearsay exception applies. *Id.* at 1833.

Outside the presence of the jury, Detective Marlin Hopkins testified to notes in his memorandum book recording statements of the witness Joy Giovi made not long after the stabbing that at the scene, "a few people had said Phil Brown had done it." *Id.* at 1905. Hopkins testified before the jury that in the course of investigating the Cotillo murder, he interviewed persons who had been at the scene of the fracas, including someone named Phil Brown. *Id.* at 1847. On cross-examination, Hopkins indicated that Phil Brown "[m]ight have been" a person of interest in the murder investigation, but that he did not remember. *Id.* at 1889-90.

**B. Law**

As already noted, hearsay is generally inadmissible, except when it falls into one of the numerous hearsay exceptions of the Federal Rules of Evidence. *See* Fed. R. Evid. 802, 803, 804, 807; Part II.B.2, *supra.*

The Federal Rules of Evidence "should be construed to secure fairness in administration . . . and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Fed. R. Evid. 102. Federal Rule of Evidence 102 is a failsafe provision to ensure justice. This rule serves as a reminder that "[t]he Federal Rules of Evidence were not . . . designed to render the law of evidence intransmutable." *United States v. Robinson*, 544 F.2d 110, 115 (2d Cir. 1976). Rule 102 explains that the Federal Rules of Evidence, taken as a whole: "(1) prefer[] general, normative goals above subservience to specific, technical rules; (2) require[] courts to choose between competing goals in applying the Rules; and (3) favor[] modifications in the law of evidence to ascertain the truth and determine issues justly even when this requires rejection of precedents." 1 Margaret A. Berger et al., *Federal Evidence*, § 102.02[2].

## C. Application of Law to Facts

The anticipated statement of Ucci, that he had heard "Brown did it," constitutes hearsay that falls under no hearsay exception, including the catch-all exception, given its lack of circumstantial guarantees of trustworthiness. The statement was nevertheless, the court ruled *in limine*, admissible under Federal Rule of Evidence 102.

The defendant in this case was at a distinct disadvantage given the delay in bringing the charges he faced. *See* Part I, *supra*. Rule 102 permits the court to take account of disparities between parties with an individually-crafted approach in a case such as the instant one, where

19

crimes charged took place some thirty years ago. *See* 1 Margaret A. Berger et al., *Federal Evidence*, § 102.02[1] ("Rule 102 encourages courts . . . to use rules of evidence to afford parties their substantive rights"). *But see United States v. Pelullo*, 964 F.2d 193, 203-04 (3d Cir. 1992) (declining to apply Rule 102 to uphold trial court's admission of documents otherwise inadmissible as hearsay because to do so would "would necessarily eviscerate the requirements" of the hearsay rules). In *Pelullo*, it was the government, and not the defendant, seeking circumvention of the explicit hearsay rules. In the present case, it is the defendant who sought to admit the "Brown" hearsay statements. Constitutional and evidentiary rules necessarily provide criminal defendants with greater protection – and leeway – in mounting a defense. *See* Part I, *supra*. For instance, as indicated above, confrontation rules protect the defendant, not the government. *See United States v. Dhinsa*, 243 F.3d 635, 651 (2d Cir. 2001) ("The right enjoyed by a criminal *defendant* to confront the witnesses against him is a fundamental right essential to a fair trial in a criminal prosecution, and is designed to secure for the *defendant* the opportunity of cross-examination.") (internal citations and quotation marks omitted) (emphasis added).

Ucci's statement was ruled admissible, although hearsay, under Rule 102. As a result of the court's *in limine* ruling, the government elected not to call this witness, who was, in any event, not particularly useful to its case. The defense also elected not to call him because he posed some danger to their theory of the case.

The court indicated *in limine* that it was also prepared to allow in evidence of neighborhood lore, still being bruited about decades after the event, that "Brown did it." Such a statement made at the time of the killing might have been characterized as an "excited utterance," Fed. R. Evid. 803(2). The neighborhood gossip could not be squeezed into any

exception. Yet, its very durability lends it a modicum of reliability. The issue was avoided since neither side offered this evidence.

## IV. Conversations Recorded by Cooperating Witness

### A. Facts

The defendant moved to exclude recordings by Gaetano Fatato, a cooperating witness in a related Colombo crime family investigation; his tapes were hundreds of hours long and spanned years. *See* Ltr. Supp. Def.'s Mot. - Fatato, Feb. 24, 2009, D.E. No. 1890; Ltr. Supp. Def.'s Mot. - Fatato, Feb. 25, 2009, D.E. No. 1902. The recordings were offered to prove an alleged nightclub and restaurant extortion. *See* Superseding Indictment ¶¶ 63-66, 70-71. The government sought to introduce the recordings through the testimony of the F.B.I. agent "handling" Fatato rather than Fatato himself – Fatato, being somewhat unreliable, provided a potential field day for cross-examination. *Id.* The defense objected on the grounds that the statements constitute inadmissible hearsay, and on confrontation clause grounds under *Crawford v. Washington*, 541 U.S. 36 (2004). The recordings were played to the court outside the presence of the jury to permit a ruling on admissibility. *See* Trial Tr. 3983-93, Feb. 26, 2009.

### B. Law

A statement recorded by a cooperating witness is admissible by the government if it constitutes an admission of the defendant. *See* Fed. R. Evid. 801(d)(2)(A). In an extension of this principle, statements of a defendant's co-conspirators made during the course of, and thought by the declarant to be in furtherance of, the conspiracy are also admissible. *See* Fed. R. Evid. 801(d)(2)(E).

The confrontation clause generally prevents the introduction of testimonial statements against the defendant where the defendant has not had the opportunity to cross-examine the declarant. "[A] statement produced through the '[i]nvolvement of government officers' and with an 'eye towards trial' is testimonial because it 'presents [a] unique potential for prosecutorial abuse.'" *United States v. Feliz*, 467 F.3d 227, 232 (2d Cir. 2006) (*quoting Crawford*, 541 U.S. at 56 n.7). Testimonial statements are only barred under the confrontation clause if they are admitted for their truth. *See Crawford*, 541 U.S. at 59 n.9.

Statements of a cooperating witness – who is acting as a law enforcement agent – designed to inculpate, in the form of a recording offered to prove the truth of the cooperating witness's statements, are not admissible. Where a tape recording includes co-conspirator statements, made in what the declarant conceived of as in the course of and in aid of the conspiracy, and not in response to government interrogation, they are admissible. *See* Fed. R. Evid. 801(d)(2)(E). In contrast, the "recorded statements [of the cooperating witness] are admissible [only] to provide the context for the [co-conspirator] declarant's admissions." *United States v. Stratton*, 779 F.2d 820, 830 (2d Cir. 1985); *see also United States v. Paulino*, 445 F.3d 211, 216-17 (2d Cir. 2006) (reaffirming after *Crawford* that statements that are admitted for context and not for the truth do not implicate confrontation clause rights of the defendant); *United States v. Murray*, 618 F.2d 892, 900 (2d Cir. 1980) (holding it proper for trial court to instruct jury not to consider recorded statements of cooperating witness for their truth).

Because of the fine lines that must be drawn when a cooperating witness is recording his conversations, the court must carefully weigh the probative value of the evidence against the

danger of unfair prejudice, or confusing or misleading the jury, when deciding whether to admit it. *See* Fed. R. Evid. 403, Part II.B.3, *supra*.

## C. Application of Law to Facts

Any statements made by Fatato on the tapes were the result of his involvement with, and guidance by, government officials. The tapes were made, the court found, with an eye towards eventual prosecutions. *Crawford* dictates that the statements of Fatato himself on the tapes could not be admitted for their truth against the defendant unless Fatato was called to testify and was subject to cross-examination. While the recorded statements of Fatato could not be admitted as evidence against the defendant, if the statements of other recorded individuals were properly characterized as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), Fatato's statements would be admissible as well, not for their truth, but to provide context for the statements of the co-conspirators.

In this case, regardless of whether the tapes in part fit the co-conspirator exception of Federal Rule of Evidence 801(d)(2)(E), they were properly excluded under Federal Rules of Evidence 402 and 403. The only two places in the recordings where the defendant's name was mentioned by an individual other than Fatato were where the declarant was merely repeating back the defendant's name after it had been introduced into the conversation by Fatato. There was no indication that the declarants on the Fatato tapes had any idea who the defendant was. *See* Trial Tr. 3992, Feb. 26, 2009. The defendant did not participate in any of the conversations taped by Fatato. Considering the substance of the alleged co-conspirators' statements alone, without the injection of the defendant's name by the cooperating witness, the conversations provided no relevant evidence. *See* Fed. R. Evid. 401, 402. Any probative value was

23

substantially outweighed by the potential to confuse or mislead the jury, even if offered under a limiting instruction. *See* Fed. R. Evid. 403. The defendant's motion to exclude these conversations – as introduced by an F.B.I. agent – was granted.

As a result of the court's exclusionary ruling on the Fatato recordings, there was no evidence to support Racketeering Act Eighteen of Count One, and Counts Five and Six. *See* Superseding Indictment ¶¶ 63-66, 70-71. They were dismissed. *See* Am. Order Den. Mot. Dismiss Charges, No. 08-76, D.E. No. 1945 (E.D.N.Y. Mar. 9, 2009).

## V. Poisoning of Witness's Memory

Another racketeering act alleged against the defendant was the 1990 murder of Louis DiBono. *See* Superseding Indictment ¶¶ 25-27. The final witness for the defense was a police officer who testified about the DiBono murder at prior trials, to which the present defendant was not a party. An eight-and-a-half by eleven inch photograph, government exhibit 40c, had been admitted in evidence at two prior trials in the early 1990s. *See* Trial Tr. 4754-56, Mar. 4, 2009. In the present trial it was shown to the jury blown up on a large placard.

Neither the officer nor anyone else could say that the picture, which showed the peculiar position of the deceased, was seen by any member of the public in the course of those past trials. Nevertheless, the defendant insisted that the testimony of prior use supported his argument that Kevin McMahon, a key witness for the government who claimed that he participated with defendant in the DiBono killing, tailored his testimony out of whole cloth, basing it entirely on the knowledge he had acquired from this picture. McMahon's testimony was that the victim's legs were hanging out of the car and that he had tucked the legs into the car under the body after the defendant shot DiBono so that the defendant could close the driver's door. *See* Trial Tr.

24

2594-2600, Feb. 17, 2009. The testimony was dramatically enhanced by having McMahon demonstrate by lying on chairs in the courtroom how the deceased's body was positioned.

The argument for relevancy to prove lack of McMahon's credibility could barely hold water. Yet, McMahon had shown an interest in prior murder trials of mafia members connected to the defendant, having participated in fixing a number of juries. There was a chance, however slight, that he had seen years ago the picture of DiBono's body tucked into his car and might have testified from a poisoned memory of the picture rather than a recollection of the event. The officer's testimony was admitted pursuant to the guideline favoring admissibility. *See* Part I, *supra*.

### VI. Conclusion

A series of evidentiary decisions were required, tailored to the unusual temporal and substantive scope of the case, and in light of the unusual challenges faced by the parties in this extraordinarily complex RICO prosecution. The rulings were required to provide the jury with evidence necessary to decide the case fairly, secure due process, and guard the defendant's constitutional right to put on his defense and the government's ability to mount its prosecution.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: March 11, 2009
        Brooklyn, New York