UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA,

                -against-

CHARLES CARNEGLIA

                Defendant.
----------------------------------------------------------x

MEMORANDUM AND ORDER
ON ADMISSIBILITY OF SEIZED
DOCUMENTS IN PRIOR CASE
AND POST-ARREST STATEMENTS
IN PRESENT CASE

08-CR-76 (JBW)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 18 2009 ★
BROOKLYN OFFICE

APPEARANCES:

For the Defendant:
    Curtis J. Farber, Esq.
    350 Broadway
    10th Floor
    New York, New York 10013

    Kelley J. Sharkey, Esq.
    26 Court Street
    Suite 1016
    Brooklyn, New York 11242

For the United States:
    United States Attorney's Office
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, New York 11201
    By:    Roger A. Burlingame, Esq.
            Evan M. Norris, Esq.
            Marisa M. Seifan, Esq.

**JACK B. WEINSTEIN, Senior United States District Judge:**

I. Introduction ........................................................................................................................... 2
II. Motion to Suppress Documents Seized at Arrest in 2000 ................................................ 3
  A. Facts .................................................................................................................................. 3
  B. Law .................................................................................................................................... 4
  C. Application of Law to Facts ............................................................................................ 4
    1. Propriety of Seizure ...................................................................................................... 4



|      | 2. Admissibility of Contents | 6 |
| III. | Motion to Suppress Defendant's February 2008 Post-Arrest Statements | 6 |
| A.   | Facts | 6 |
|      | 1. Defendant's Statements on Date of Arrest | 6 |
|      | 2. Trial Testimony and Other Evidence | 8 |
| B.   | Law | 12 |
| C.   | Application of Law to Facts | 13 |
|      | 1. Pre-*Miranda* Statements | 13 |
|      |   a. Relevance and Rule 403 | 13 |
|      |   b. Constitutional Grounds for Suppression | 14 |
|      | 2. Post-*Miranda* Statements | 15 |
| IV.  | Conclusion | 16 |
| V.   | Appendix A: Photograph of Replicated Array of Documents Seized on June 20, 2000 | 17 |

## I. Introduction

Defendant was charged with participation in a Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy as a longstanding member of the Gambino crime family who has committed numerous crimes on the family's behalf. Extensive evidence portrayed the defendant as an enforcer and killer for the mob. Included in the evidence offered were various written notes made by the defendant and seized by government agents executing an arrest warrant in 2000 for a prior case, and the defendant's oral statements made to law enforcement officers at the time of his 2008 arrest in the instant case.

Defendant moved to suppress twelve documents containing his handwritten notes that were seized by law enforcement officers from the defendant's home at the time of his 2000 arrest on the earlier charges. Def. Notice Mot., Nov. 21, 2008, Docket Entry ("D.E.") No. 1521. The twelve documents recovered at the defendant's home in 2000 were legally seized under the plain view exception to the Fourth Amendment, and were properly admitted in their entirety.

Suppression was also sought with respect to statements made by the defendant shortly after his 2008 arrest in the current case. Def. Mem. Mot. Dismiss at 21, Aug. 12, 2008, D.E. No. 1095. Pre-*Miranda* statements made in transit from the defendant's home to the Federal Bureau

2

of Investigation ("F.B.I.") processing facility in 2008 were excluded under Federal Rules of Evidence 401, 402, and 403, and alternatively, pursuant to the defendant's Fifth and Sixth Amendment rights. Post-*Miranda* statements made shortly after the 2008 arrest were admitted, subject to relevancy and Rule 403 determinations.

## II. Motion to Suppress Documents Seized at Arrest in 2000

### A. Facts

Pursuant to an arrest warrant in 2000, defendant was taken into custody at his home on criminal charges different from those he faces in the instant trial. Gov't's Letter Resp. Def. Mot. Suppress, Jan. 7, 2009, D.E. No. 1685. Agents undertook a protective sweep of the home to ensure that there were no other people or items presenting an unsafe situation for the arresting officers. Suppression Tr. 61, Jan. 8, 2009.

While waiting for the defendant to dress, the lead agent on the scene saw on the kitchen table "business cards and scraps of paper, along with other papers" fanned out in a "semicircular kind of organization," with information crucial to the charges, and obvious to any trained observer:

> One of the things that immediately popped out, there were dates at the top of a piece of paper and then listed down almost in a to-do fashion, list of things that was scheduled to be done . . . on a particular day, and on the piece of paper, as things to do, were names . . . of codefendants, names of indicted codefendants and names of other mob associates . . . and ranking members.

Trial Tr. 1262-63, February 5, 2009.

The agent immediately recognized multiple names, phone numbers, and other identifying information of known and suspected mob criminals. *See* Ct. Ex. 4, Mar. 9, 2009, attached as Appendix A (Photograph of Replicated Array of Seized Documents). For example, bold letterheads listed the "Fountain Auto Mall," a center of criminality; on one note, the agent

3

discerned "Genie" – Eugene Gotti, a brother of the mafia family boss and powerful mob captain; "Skinny Dom" – Dominic Pizzonia, a Gambino family captain; "Joe Panz" – Joe Panzarella, a Gambino family associate; and "Carl" – Carl Klein, a cooperating witness. *Id.* at 1265-66, 1273-74; *see also* Gov't. Ex. 405. A few of the pages were stapled together. Agents collected and seized the incriminating papers. Suppression Tr. 61-63, Feb. 5, 2009.

At the hearing on defendant's suppression motion, the court directed the agent to replicate the layout of papers as he found them. He assembled them in a substantially similar – though not identical – arrangement, which was photographed. *See* Appendix A. Some of the documents were partially covered, yet a significant amount of relevant and clearly incriminating information was readily visible.

## B. Law

A warrantless seizure is "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The "plain view" exception is well established. *See Horton v. California*, 496 U.S. 128, 133 (1990); *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971). It requires proof by the government by a preponderance of the evidence that: (1) government agents were lawfully in the position from which they viewed the seized object; (2) the objects were plainly visible; and (3) their incriminating character was immediately apparent. *Horton*, 496 U.S. at 136-37; *Coolidge*, 403 U.S. at 455; *Warden v. Hayden*, 387 U.S. 294, 301 (1967).

### C. Application of Law to Facts

#### 1. Propriety of Seizure

The officers were lawfully on the premises, having entered the defendant's residence to execute a valid arrest warrant. The lead agent's testimony and representation of how the papers

were displayed established that they were readily observable without searching. *See* Appendix A. Easily visible contents of uncovered portions of the documents lying on the table clearly connected the defendant to the criminal acts then being prosecuted. *See* Trial Tr. 1290, Feb. 5, 2009; Appendix A.

The defendant contended that the agent's inability to recall precisely how the individual documents were arranged or "with any specificity[,] which one, two or more of the twelve documents containing the names of mobsters or other information relevant to criminality were plainly visible to him at the time of the seizure" warranted suppression of all the documents. Def. Second Mot. Reconsider, Feb. 16, 2009, D.E. No. 1855; Def. First Mot. Reconsider, Feb. 8, 2009, D.E. No. 1812. No such precision is required. A trained and experienced agent may utilize his investigative skills to scan the defendant's home, both to ensure that the premises are free of potential danger and to identify any visible evidence related to the case. A law officer's proficiency in spotting evidence is in many ways analogous to skills used in other professions. Lawyers develop an aptitude to find a critical phrase or sentence quickly in lengthy briefs and treatises; those phrases jump off the pages as they are riffled by the experienced attorney. Journalists likewise learn to read an interviewee's notes or papers upside down during an interview, and archaeologists acquire the ability to intuitively distinguish excavated fragments of artifacts from nature's debris.

The touchstone of present Fourth Amendment jurisprudence is "reasonableness." *Virginia v. Moore*, 128 S. Ct. 1598, 1604 (2008); *California v. Rettele*, 127 S. Ct. 1989, 1992-93 (2007); *Samson v. California*, 547 U.S. 843, 855 n.4 (2006); *Utah v. Stuart*, 547 U.S. 398, 403 (2006). It was reasonable to seize the papers, with their highly incriminatory contents, as well as the few sheets stapled to them. Seizure during the 2000 arrest was consistent with professional

and appropriate law enforcement practice in executing an arrest warrant. There was no ground for suppression.

### 2. Admissibility of Contents

The evidence contained in the seized documents was admissible without limitation. The documents, though in some cases partially or entirely concealed by other papers, were part of a single collection. The argument that only contents of papers and documentary collections that are immediately visible at the time of seizure are admissible was rejected. It would be as if an observable glassine envelope marked "Drugs" could be admitted, while the enclosed white powder contents and its chemical composition could not be.

The present ruling would not support opening and seizing an entire file cabinet of documents merely because the name of a suspected member of the alleged conspiracy was on a document lying on top of the cabinet. In the scaled spectrum of possible scenarios of challenged seizures, the present one was on the "reasonable" end of the scale.

## III. Motion to Suppress Defendant's February 2008 Post-Arrest Statements

### A. Facts

#### 1. Defendant's Statements on Date of Arrest

After the defendant was arrested in 2008 on the instant charges, he was transported by the arresting officers to the F.B.I. field office for processing. While in transit, the defendant chatted with officers. Topics included baseball, the "toughest guy [the defendant] knew," and "the Gottis and the underworld." *See* Def. Aff. Supp. Mot. Dismiss Ex. 1 ("Police Report I"), Aug. 12, 2008, D.E. No. 1093; Def. Letter, Ex. B ("Police Report II"), Feb. 22, 2009, D.E. No. 1875. Also discussed was the defendant's reason for growing a beard, which, the defendant indicated, was to conceal facial swelling and to irritate his peers.

Upon arrival at the processing facility, the defendant was read his *Miranda* rights. Suppression Tr. 53, Jan. 8, 2009; Police Report I; Police Report II. When he inquired about the nature of the charges, the defendant was informed that he was charged with the murders of five named victims. Police Report I; Police Report II. The police reports recounted defendant's response when informed of the crimes charged:

> [Charles Carneglia] stated, "What am I being charged with"? [Carneglia] was given his *Miranda* rights. He was advised he was being charged with RICO. [Carneglia] stated "RICO, who's RICO . . . ?" [Carneglia] was also advised he was charged with five murders. [Carneglia] stated "I'm fucked." [Carneglia] stated "What murders?" [Carneglia] was advised by the detectives the murder of the Court Officer Albert Gelb. [Carneglia] stated, "Don't know him." [Carneglia was] advised he was charged with the murder of Mike Cotillo at the Blue Fountain. [Carneglia] stated, "Never heard of him." [Carneglia was] advised he was charged with the murder of Sal Puma. [Carneglia] stated, "Never heard of him, I know Sammy Puma." [Carneglia was] advised *he was charged with the murder of Jose Delgado Rivera at the airport.* [Carneglia] stated, "Never heard of him." [Carneglia] was also advised he was charged with the murder of Louis DiBono at the [World] Trade Center. [Carneglia] stated, "I knew Louie."

Police Report I at 2 (emphasis added).

The defendant continued:

> Ok so *your canaries said I killed* a Court Officer, a guy at the Blue Fountain, Puma, *a guy at Kennedy*, and Louie . . . . Those canaries are all rats . . . . I have to take this to trial, I need to get out and mount a defense, I could take my lawyer and [an] investigator and speak to people, I have got to take the stand.

*Id.* (emphasis added).

The F.B.I. facility where the defendant was interviewed contained several other Gambino family members and associates who had been arrested on the same day. The defendant asked "if there were any of 'his people in the room.'" *Id.* Officers observed the defendant acknowledge with a nod Vincent Dragonetti, a member of the Gambino crime family, who was seated behind

7

him. *Id.* Joseph Corozzo, Sr., a member of the Gambino family administration, walked past the defendant; the two men, police reported, did not acknowledge each other, but the defendant asked the officers whether "Joseph ha[d] the same problem" he did. *Id.*

### 2. Trial Testimony and Other Evidence

The defendant contended that suppression of his 2008 pre-*Miranda* statements was required because they were made during a custodial interrogation in violation of (1) his Fifth Amendment right against self-incrimination and (2) his Sixth Amendment right to counsel. Def. Mem. Mot. Dismiss at 20, Aug. 12, 2008, D.E. No. 1095. All post-arrest statements, made both before and after the *Miranda* warnings were given, were also challenged under Federal Rule of Evidence 403. Def. Letter, Feb. 22, 2009, D.E. No. 1875.

The government opposed the motion. Gov't Mem. Resp. at 22, Nov. 14, 2008, D.E. No. 1506. It specifically requested that the arresting officer be permitted to testify to pre-*Miranda* statements made by the defendant concerning the reason why he grew a beard. Gov't Mot. *In Limine*, Feb. 18, 2009, D.E. No. 1863. Early in the trial, defense counsel had suggested that his beard should be considered evidence of his withdrawal from the mob conspiracy; growing facial hair, it was indicated, may violate the mafia gang's rules of conduct. *See* Trial Tr. 370-72, 386-87 (cross- and re-direct examination of mafia expert John Carillo), Jan. 29, 2009. Disputed was whether the rule was strictly enforced by the gang and the actual reason that the defendant grew his beard. The beard-as-an-aesthetics-aid explanation that the defendant gave to the arresting officers, the government argued, would refute the defendant's contention that he had used the beard to signal withdrawal from the mob conspiracy, an issue critical to defendant's statute of limitations contention.

At trial, the government rebutted the "beard defense" by eliciting testimony from several witnesses about lax enforcement of mafia rules, and about other mob members who had grown facial hair with no intention of leaving the criminal conspiracy. *See, e.g.*, Trial Tr. 386-87, Jan. 29, 2009 (testimony of John Carillo); *id.* at 437-38 (testimony of Michael DiLeonardo); Trial Tr. 816-19, Feb. 3, 2009 (testimony of Peter Zuccaro); Trial Tr. 2013-15, Feb. 11, 2009 (testimony of Hunter Adams); Trial Tr. 2531-33, Feb. 17, 2009 (testimony of Kevin McMahon); Trial Tr. 3317-19, Feb. 23, 2009 (testimony of John Alite). In contrast, defendant's "beard defense" evidence, introduced through cross-examination in the course of the government's case-in-chief, was brief, undeveloped, and unpersuasive. *See, e.g.*, Trial Tr. 370-72, Jan. 29, 2009 (cross-examination of John Carillo on whether mob leaders approved of members and associates having facial hair).

During the defendant's case-in-chief, Mark Gioia, the defendant's neighborhood friend, testified to a conversation he and another friend, Allen Meshanski, had with the defendant, during which the defendant was apparently upset about mafia members or associates who ordered him to shave his beard following his release from prison in 2006:

> Q (Ms. Sharkey, for the defendant): Could you tell us about the incident at the restaurant?
> A (Mark Gioia): We got a call from Charles, Allen got a call, asking us to come down to the restaurant. He was upset. Very upset . . . .
> Q: What did he say happened or that you observed?
> A: When we got to Carosello [Restaurant], Charles came out storming, he was cursing, and fit to be tied . . . .
> It was these mother fuckers, these mother fuckers.
> Q: What did he say?
> A: After he said it 10 or 12 times, [we asked him "]Charles, what is up, what's wrong[?"]
> Q: What did he say?
> A: These mother fuckers think I'm going to shave my beard off. I'm not involved with them. They are not going to tell me what to do, no one is going to tell me how to run my life.

9

There was like six of them to reprimand him and tell him he had to shave his beard off.
Q: What was Mr. Carneglia's reaction to people telling him what to do?
. . .
A: Fuck them, they can't tell me what to do, *I'm not involved with them.*

Trial Tr. 4581-82, Mar. 3, 2009 (emphasis added).

On summation, the government argued that the "beard defense" was fabricated and suggestive of the robe-in-the-street insanity defense of Vincent "The Chin" Gigante, another mafia criminal:

> [Mr. Burlingame, for the government]: What might [the defendant] do? Lay down some lies to a group of people that he may be able to trot in front of a jury one day? Sounds to you like that might be too much advance planning?
> Let's take a look at who we are dealing with here. John Alite [a cooperating witness:]
>> Question [by Mr. Burlingame]: Any other ways you ever saw the defendant change his physical appearance?
>> Answer [by Mr. Alite]: Yes.
>> Question: What?
>> Answer: He would die his hair orange.
>> Question: Did he ever tell you why he changed his appearance?
>> Answer: Yeah, when he was going to do a score or he is going to do a murder or he is going to lay on somebody to hurt them.
>> Question: Did he tell you what the purpose was?
>> Answer: Yes, so he can't be identified by different people, individuals like you guys.
>> Question: Did he ever talk to you about his beard?
>> Answer: Yeah.
>> Question: What did he say?
>> Answer: He said that it's a secret organization, so he is going to keep it a secret . . . . *[H]e brought up the Chin Gigante who was the boss of the Genovese Family. He walked around in a robe and acted like he was crazy.* He said [the Chin] was smart. *So he is going to do something like that just, [just] like him.* He is going to be smart about it.
>> Question: What did you understand that to mean?

10

> Answer: That he wouldn't give [the] appearance of being a wiseguy.
>
> [The defendant] has been planning for this day for a while.
>
> . . .
>
> So the defense witnesses don't bring [the defendant one] inch closer to this withdrawal defense.

Trial. Tr. 5069-70, Mar. 10, 2009 (quoting testimony of John Alite, Trial Tr. 3318-19, Feb. 23, 2009) (emphasis added).

Trial testimony also included the defendant's post-*Miranda* statements to law enforcement agents upon being informed of the charges against him:

> He repeated . . . many times by saying he can't believe these canaries. They're rats, don't trust them. And then he said, 'let me get this straight, *the canaries are saying that I murdered* a court officer, a guy at the Blue Fountain Diner, Puma, Louie and *a guy at Kennedy airport*.

Trial Tr. 4198, Mar. 3, 2009 (emphasis added). The defendant's reference to the murder of "a guy at Kennedy airport" was significant, since he had not previously been told by law enforcement that John F. Kennedy Airport was the location of the armored car robbery and murder. The defendant's knowledge of this detail arguably evidenced his knowledge of, and possibly his involvement in, the Delgado-Rivera murder:

> A (Detective Kaplan, government witness): [He] knew what we were talking about because we had never mentioned Kennedy airport before. Nobody at the table mentioned Kennedy airport.
> Q (Mr. Burlingame, for the government): When you explained to the defendant that he was charged with the murder of Jose Delgado-Rivera, you said, "at the airport?"
> A: That's correct.
> Q: And then, [the defendant] was the first person to say it was Kennedy?
> A: That's correct.
> Q: None of the other law enforcement officers had specified Kennedy Airport up to that point?
> A: No.

*Id.* at 4198-99.

11

Defendant's post-*Miranda* comments about and interactions with other suspected mob associates and members arrested on the same day were also offered through the arresting officer's testimony to prove continued membership in the mob conspiracy. *Id.* at 4301-03.

**B. Law**

A proper *Miranda* warning serves to advise an arrestee of both his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) ("The defendant [after receiving the *Miranda* warning] may waive effectuation of [Fifth Amendment] rights, provided the waiver is made voluntarily, knowingly, and intelligently."); *Patterson v. Illinois*, 487 U.S. 285, 296 (1988) ("As a general matter . . . an accused who is admonished with the warnings prescribed . . . in *Miranda*, has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." (internal citation omitted)).

A defendant's statements not requiring suppression are admissible only if they are relevant – that is, if they constitute evidence tending to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *See* Fed. R. Evid. 401, 402. Rule 402 requires the exclusion of irrelevant evidence in order to ensure a fair and efficient adjudication.

Evidence may also be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The court may reassess the application of Rule 403 with respect to particular evidence in the course of the trial.

12

## C. Application of Law to Facts

### 1. Pre-*Miranda* Statements

#### a. Relevance and Rule 403

Even before reaching constitutional claims raised by the defendant, it was likely that all 2008 pre-*Miranda* statements warranted exclusion for lack of relevance, and pursuant to Federal Rule of Evidence 403. The pre-*Miranda* discussions summarized in the police reports appeared to constitute nothing more than persiflage. Defendant's frivolous and off-the-cuff comments about the Gottis or organized crime were so generic that they had no bearing on "any fact that is of consequence to the [jury's] determination." *See* Fed. R. Evid. 401. As the court ruled, "people in [defendant's] neighborhood [are] suffused with information about the Gottis and the underworld," and "everybody in the neighborhood could have reacted in the same way" as the defendant in the course of such casual conversation. Suppression Tr. 54-55, Jan. 8, 2009. These statements were inadmissible.

The beard evidence presented a more subtle problem. It was argued by the government that because the defense sought to present evidence in support of his "beard defense" theory of withdrawal from the conspiracy, the defendant's pre-*Miranda* comments to law enforcement about his reasons for growing a beard – having nothing to do with withdrawal – were relevant. *See* Gov't Mot. *In Limine*, Feb. 18, 2009, D.E. No. 1863. As noted, a detective would have testified that the defendant, upon being questioned about his beard, stated that (1) the beard was meant to hide swelling caused by infections in his mouth, and (2) he kept the beard to "piss off" fellow inmates who told him to shave it during his last period of imprisonment. Police Report II.

At the time of its *in limine* rulings excluding this evidence, the probative value of defendant's hirsute comments was believed by the court to be miniscule. Defendant did not raise

13

the issue of facial hair in opening arguments. In its case-in-chief, the government rebutted any possible "beard defense" through the testimony of numerous cooperating witnesses. Prior to the defense case, it was the court's view of the "beard" evidence that the post-arrest discussion by defendant of his facial hair would do more to distract the jury from the already complicated evidence and issues than provide helpful proof of the defendant's guilt or innocence. At that time, Rule 403 exclusion was warranted.

During the defendant's case-in-chief, "beard" evidence took on more significance: a defense witness provided testimony that defendant's growing and keeping a beard signaled his withdrawal from the mob conspiracy. *See, e.g.*, 4581-82, Mar. 3, 2009 (testimony of Mark Gioia). The defendant's positive evidence relating to the "beard defense" arguably then opened the door for the government to offer further evidence on the subject on rebuttal. Sensibly, the government elected not to revisit the issue on rebuttal. It made no motion to introduce on rebuttal the defendant's post-arrest remarks that the beard was grown for aesthetic reasons, not to reflect a break from gang discipline. The government dealt with the matter by arguing in its summation that the "beard defense" was trumped up and signified an attempt by defendant to prepare for the ultimate trial he knew he would face. As noted above, the defendant's eccentric behavior designed to show separation from the mob was compared by the prosecution to the robe-in-the-street insanity defense of former Genovese boss Vincent "The Chin" Gigante. *See* Trial. Tr. 5069-70, Mar. 10, 2009 (Gov't Rebuttal) (quoting testimony of John Alite, Trial Tr. 3318-19, Feb. 23, 2009).

### b. Constitutional Grounds for Suppression

Defendant's 2008 post-arrest, pre-*Miranda* statements, to the extent that they possessed any relevance and could be considered to meet Rule 403 admissibility requirements, would

arguably have warranted suppression under the Fifth and Sixth Amendments. The defendant was arrested pursuant to a grand jury indictment. The disputed statements were made while the defendant was in police custody following the arrest but before *Miranda* warnings were given.

If defendant's pre-*Miranda* comment about his beard had any bearing on the facts of the case, it could be assumed that these statements were the product of deliberate questioning by experienced law enforcement personnel who were aware of the mafia's rules against facial hair. The officer's questioning about the beard would then not have been characterized as affable chit-chat normally attendant to arrest, but designed to be "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). The defendant's pre-*Miranda* statements would thus be considered a product of a custodial interrogation obtained in violation of the defendant's Fifth Amendment right against self-incrimination. *Id.* Also implicated would be the defendant's Sixth Amendment right to counsel. Any statement elicited from a defendant while he was in custody following the issuing of an indictment, and made without his express waiver of the right to counsel, violates the Sixth Amendment and warrants suppression. *Patterson*, 487 U.S. at 286-90; *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007).

Defendant's 2008 pre-*Miranda* statements about his beard and other matters were properly excluded under Federal Rules of Evidence 401, 402, and 403, and, alternatively, pursuant to the Fifth and Sixth Amendments of the United States Constitution.

### 2. Post-*Miranda* Statements

Based on the evidence admitted at trial and information provided by the parties, the bulk of the 2008 post-*Miranda* statements were relevant and admissible under Federal Rule of Evidence 403. Evidence of the defendant being the first to identify John F. Kennedy Airport as the site of the Delgado-Rivera murder was relevant to establishing his guilty state of mind. The

15

remainder of defendant's statements lent contextual verity to this implied admission. Comments made by the defendant and his interactions with mob associates and members on the day of his arrest were relevant and probative. They served to prove the defendant's past and continued position in the alleged mob conspiracy.

In contrast, the defendant's statement, "I have to take the stand," as memorialized in the police reports, was excludable pursuant to Rule 403. A defendant need not testify in a criminal trial. *See* U.S. Const. amend. V. A statement suggesting the defendant's intent to take the stand could mislead the jury. The statement was inadmissible.

## IV. Conclusion

The documents seized during the defendant's arrest in 2000 were admissible in their entirety. The defendant's 2008 pre-*Miranda* statements made during transit with law enforcement officers to the F.B.I. processing facility and related testimony were properly excluded under Rules 401, 402, and 403 of the Federal Rules of Evidence, and, alternatively, suppressed pursuant to the Fifth and Sixth Amendments. The post-*Miranda* statements and actions of the defendant following the 2008 arrest were admissible to the extent that they met Rule 403 requirements.

SO ORDERED.

/s/ Jack B. Weinstein
Jack B. Weinstein
Senior United States District Judge

Dated: March 13, 2009
Brooklyn, New York

**V. Appendix A: Photograph of Replicated Array of Documents Seized on June 20, 2000**

