1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2
3    - - - - - - - - - - - -    X
4    UNITED STATES OF AMERICA,    :    08 CR 76
5                                 :
6
          -against-              :
7                                      United States Courthouse
                                       Brooklyn, New York
8    CHARLES CARNEGLIA,          :
9                                      February 5, 2009
          Defendant.            :    9:00 o'clock a.m.
10
     - - - - - - - - - - - -    X
11
12                   TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE JACK B. WEINSTEIN
13         UNITED STATES SENIOR JUDGE, and a jury.
14
15   APPEARANCES:
16
     For the Government:        BENTON J. CAMPBELL
17                              United States Attorney
                                BY: ROGER A. BURLINGAME
18                                   EVAN NORRIS
                                     MARISA M. SEIFAN
19                              Assistant United States Attorneys
                                271 Cadman Plaza East
20                              Brooklyn, New York 11201
21
     For the Defendant:         KELLEY J. SHARKEY, ESQ.
22                              26 Court Street
                                Brooklyn, New York 11201
23
24                              CURTIS J. FARBER, ESQ.
                                350 Broadway
25                              New York, New York 10013

GR    OCR    CM    CRR    CSR

1  Court Reporter:                    Gene Rudolph
                                      225 Cadman Plaza East
2                                     Brooklyn, New York
                                      (718) 613-2538
3

4  Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription.
5

6

7                        *****

8

9

10         (The following occurred in the absence of the jury.)

11         THE COURT:  Bring in the defendant, please.

12         Call the witness, please.

13         MR. BURLINGAME:  The government calls Gregory

14  Hagarty.

15         MR. FARBER:  Judge, before we get started with

16  today's proceedings, could I be heard for a brief moment?

17         THE COURT:  Yes.

18         MR. FARBER:  I know it's 9:00 o'clock and we are

19  scheduled to start the hearing.  I received a phone call from

20  Kelly Sharkey at about 8:20 this morning.  She had caught a

21  7:00 o'clock train which apparently was stopped due to

22  freezing of switches in New Jersey.  They backed her train

23  back up.  She was then put on the Path train I guess in Newark

24  and she called me about a quarter to nine saying the train was

25  just pulling into the World Trade Center and then she would be

1   rushing right over her.

2        Ms. Sharkey was the individual, the attorney, who

3   was preparing for this part of the hearing.  I am not fully up

4   to speed on the -- the suppression issues involved.  And with

5   the Court's indulgence, I expect Ms. Sharkey to be here within

6   fifteen minutes.  We anticipate the hearing will only be

7   approximately twenty minutes.  If we could wait for

8   fifteen minutes for Ms. Sharkey?

9        THE COURT:  We will wait a few minutes.

10       Take the stand, sir.

11       We will wait.

12       (The defendant is present.)

13       MR. BURLINGAME:  Should he take a seat for now,

14  Judge?  Should the witness just take a seat for now?

15       THE COURT:  Yes.  Just sit down.

16       (Pause.)

17       Take a seat for now.

18       MR. BURLINGAME:  Judge, would it be all right if I

19  prepared a witness in the hallway while waiting for

20  Ms. Sharkey?  As soon as she gets here, I will come back in.

21       THE COURT:  Yes.

22       (Pause continues.)

23       (Ms. Sharkey is now present.)

24       MS. SHARKEY:  Judge, I apologize.

25       THE COURT:  Okay.  Not a problem.

1          Swear the witness, please.

2          THE CLERK:  Please stand and raise your right hand.

3          Do you understand your obligations to tell the

4   truth, the whole truth and nothing but the truth under penalty

5   of perjury?

6          THE WITNESS:  Yes, I do.

7          THE CLERK:   You may be seated.

8          Please state and spell your name for the reporter.

9          THE WITNESS:  Gregory Hagarty, H A G A R T Y.

10          THE COURT:  This constitutes the continuation of a

11   hearing of January 8, 2009, a suppression hearing with respect

12   to some documents that were seized at the time the defendant

13   was arrested.

14          Proceed, please.

15   DIRECT EXAMINATION

16   BY MR. FARBER:

17   Q    Good morning, sir.

18   A    Good morning.

19          THE COURT:  The evidence previously taken will be

20   incorporated with today's hearing.

21          MR. BURLINGAME:  Thank you, Judge.

22   Q    What do you do?

23   A    I am an FBI agent.

24   Q    What's your current assignment?

25   A    I work foreign counterintelligence matters.

1   Q    What's your most recent assignment been?

2   A    I was temporarily assigned in Afghanistan from late

3   October until about a week ago.

4   Q    When did you join the FBI?

5   A    1989, September of 1989.

6   Q    What was your first assignment after you joined?

7   A    I was assigned to the Gambino squad of the FBI, located

8   in the Queens office.

9   Q    How long were you on the Gambino squad?

10  A    Approximately six years.

11  Q    What did you do after that?

12  A    I was then assigned to the Luchese organized crime squad,

13  for a year.

14  Q    And what after that?

15  A    I was assigned to the Long Island office of the FBI,

16  working organized crime matters on Long Island, for seven

17  years.

18  Q    What did you do after you finished your seven years in

19  Long Island?

20  A    I began working foreign counterintelligence matters.

21  Q    So it is fair to say, you worked on organized crime cases

22  for the first fourteen years you were in the FBI?

23  A    Correct, approximately.

24  Q    Have you testified in the Eastern District as and

25  organized crime expert?

1  A    Yes, I have.

2  Q    When?

3  A    On two occasions, once at Charles Carneglia's first

4  trial, which was back in approximately 2000, and then another

5  time, here in Brooklyn, at Peter Gotti's waterfront trial.

6  Q    Were you working on June 20, 2000?

7  A    Yes.

8  Q    What was your assignment that day?

9  A    I was assigned to arrest, effect arrests on an extortion

10 case, a racketeering extortion case.

11 Q    Who were you scheduled to arrest?

12 A    Kevin McMahon and Charles Carneglia.

13 Q    Do you see Charles Carneglia here today?

14 A    Yes.

15 Q    Can you identify him by something he is wearing?

16 A    He's wearing the white sweater with the gray beard and

17 gray hair.

18        MR. BURLINGAME:  Identifying the defendant?

19        THE COURT:  Yes.

20 Q    Do you know what he was being arrested for on June 20,

21 2000?

22 A    Yes; a racketeering charge with extortion as the

23 predicate acts.

24 Q    Did you work on the case?

25 A    Yes.

1  Q    Was there a wiretap in that case?

2  A    Yes.

3       I worked the wiretap and helped manage it, along

4  with various surveillances and other items in the case.

5  Q    Were you fully familiar with that investigation?

6  A    Very familiar, yes.

7  Q    What district was the defendant being prosecuted in?

8  A    This district, in the Eastern District, out in Central

9  Islip.

10 Q    Do you remember the arrest?

11 A    Do I remember?

12 Q    Do you remember the arrest?

13 A    Yes, I do.

14 Q    What time of the day did it take place?

15 A    It was in the morning hours.

16 Q    What happened that morning when you went to arrest the

17 defendant?

18 A    The agents knocked on the front door of Charles's

19 apartment.  There was no answer.  We believed he was in there.

20 Myself and another agent, Agent Edward, went up to the roof of

21 the apartment, climbed over, down the fire escape to the floor

22 where Charles's apartment was located, and we leaned over the

23 apartment -- the railing of the fire escape and you could see

24 into Charles's apartment.

25       What we saw was approximately a queen-sized bed and

1   we saw a -- what appeared to be the form of a body underneath

2   a comforter or a blanket and he was fully covered up to the

3   head, and we banged on the window and then we saw kind of the

4   head move up and there was someone I recognized as Charles

5   with eye shades on and he took the eye shades off, saw us

6   looking in his window and then pulled -- went to his ears with

7   his hands and appeared to pull out earplugs.  He lived near an

8   airport.  So at that point we kind of understood why he might

9   be wearing eye shades and earplugs.

10  Q    What happened next?

11  A    We told him to go to the door, Charles to go to the door,

12  that there were agents at the door.  He immediately got up,

13  went to the door.  From what I could see, he went to the door.

14        At that point I left, went up on the roof, went back

15  down to his front door that was -- at that point I had to

16  knock.  Another agent let me  in and I saw that there were

17  other agents with Charles going back and forth between the

18  bedroom area.  He had a one-story -- a one-bedroom apartment,

19  and they were attending to him, going between the bathroom and

20  his bedroom.

21  Q    Was he handcuffed at that point?

22  A    No, he was not.

23  Q    What did you do when you got back into the apartment?

24  A    I immediately looked around, you know, making sure there

25  were no weapons and, you know, just that there -- nothing else

1  that we should be concerned about.

2  Q    What happened while you were looking for weapons and

3  making sure there was nothing else you should be concerned

4  about?

5  A    I noticed that there was a cooler next to a table,

6  not -- not too dissimilar to this, and it looked as if the

7  cooler was like a bench that you would sit down at the table

8  for.  And at one point I sat down at the table and noticed

9  that fanned around an open area in the center of the table,

10  fanned around were a number of business cards and scraps of

11  paper, along with other papers all around.  So a setup almost

12  semicircular kind of organization around the center of the

13  table that was empty.

14  Q    Could you see what was on the notes?

15  A    Yes.

16        I saw that they were immediately relevant to this

17  case, to the case that he was being arrested for.

18  Q    How so?

19        MS. SHARKEY:  Objection.

20        THE COURT:  I will allow it.

21  Q    How so?

22  A    There were dates.  There were a number of

23  different -- different things.  But one of the things that

24  immediately popped out, there were dates at the top of a piece

25  of paper and then listed down almost in a to-do fashion, a

1  list of things that was scheduled to be done for -- on a

2  particular day, and on the pieces of paper, as things to do,

3  were names that were -- were of codefendants, names of

4  indicted codefendants and names of other mob associates and

5  members and ranking members on the list.

6  Q    Okay.  The RICO case that he was being charged with, was

7  that connected to the Gambino organized criminal family?

8  A    Yes.

9  Q    Did you recognize the names of the members and associate

10  of the Gambino Crime Family on those notes that you were

11  looking at?

12  A    Gambino and other crime family.

13  Q    What did you do after you recognized the papers were

14  relevant to your case?

15  A    I took the papers, collected them up and gave them to

16  another agent.

17  Q    I am showing you what's already in evidence as Government

18  Exhibit 2.

19       Do you recognize that?

20  A    Yes.

21  Q    What is that?

22  A    This is an inventory sheet of what was taken on the -- on

23  the morning of June 20, 2000.

24  Q    What's the purpose of filling out that inventory sheet?

25  A    It's to list what was taken and to advise who we are

1    taking it from what was taken.  It's an inventory sheet.

2    Q    Does the defendant's signature appear on it?

3    A    Yes.  In the lower right-hand corner, yes.

4    Q    I also placed in front of you what's in evidence as

5    Government Exhibit 1, a binder.

6    A    Okay.

7    Q    Do you recognize what's inside the binder?

8    A    Yes; I have reviewed it prior to my testimony.

9    Q    What is it?

10   A    It's some of the documents that were seized the morning

11   of his -- of June 20th.

12   Q    And if you could just flip through those notes and

13   explain to the Court any evidence -- any information that

14   jumps out at you that was relevant to you at the time that you

15   seized them?

16   A    Okay.  On the first page, there is listed --

17              THE COURT:  Are those pages numbered?

18              MR. BURLINGAME:  They are not, Judge.

19              THE WITNESS:  I will describe --

20              MR. BURLINGAME:  Does Your Honor still have the

21   exhibit from the last time?  I have another copy.

22              THE COURT:  I do.

23              MR. BURLINGAME:  I believe it's in the same order.

24   A    On the top -- I'm sorry.

25              THE COURT:  Yes.  Okay.

1    Q    If you could also call out some identifying information

2    as you flip the pages?

3    A    Yes.

4         At the top of the first page it says Monday, five

5    dash eight dash zero zero.  And on the other side of the page

6    it says Wednesday, five dash ten zero zero.

7         Going down on the left-hand side of the page, it has

8    Joel and then says Genie call.  I understood Genie to be Genie

9    Gotti, who regularly called in and gave orders to various

10   members of the family to carry out his business.

11   that -- Genie Gotti is a -- John Gotti's brother, who was a

12   member of the Gambino Family.

13        Skinny Dom, which is right below the screen -- Genie

14   call, Skinny Dom, Skinny Dom Pizzonia, who was a Gambino

15   Family captain, who ran -- who ran a -- a social club called

16   Liberty Cafe.  That was relevant in our case.

17        Call Panz, Joe Panzarella, who is a Gambino Family

18   associate.

19        Call Carl, is Carl Klein, who was involved and was

20   at one point a cooperating witness.  I recognized his cell

21   because we had gone up on a Title III wire on the cell and I

22   knew his beeper because I had dialed it myself.

23   Q    So you were on a wiretap of that number that appears here

24   on the notes?

25   A    I believe so, yes; 318-0384.

1    Going down the left-hand side of the page, for

2 May 10, 2000, Fat Sally or Sally Fat, 282-0317.  Fat Sally was

3 a Gambino captain.  He was one of the coconspirators, an

4 indicted coconspirator in the case.  May 10th was a relevant

5 date because there were certain calls on May 15th that tie in

6 Fat Sally and this continued to show that Charles was -- had

7 been in contact with Fat Sally prior to that.

8    Going down that page, on the right-hand side of the

9 page, Tommy D is Tommy DiFiore, who was a Bonanno captain, who

10 was involved in the dispute over the extortion.

11    Tommy Sneakers is a Gambino Family -- I don't know

12 whether he was a captain or a member at this point, but he is

13 a Gambino Family, at least a member at this point.

14    Flipping the page, on the reverse side of page one,

15 it says Fountain Auto Mall.  That was the -- the place that

16 Charles ran.  That was located in Brooklyn, Fountain Avenue.

17    On page two, the -- it's titled Monday, 3/27/00

18 3/27/2000.  Again, you have a call, the first item on the

19 list, is Genie call.  That's a call in from Genie Gotti,

20 Gambino Family member.  Again going through Skinny Dom.

21 Skinny Dom Pizzonia who was a Gambino Family captain.

22    Beano is Johnny Beano Setaro.

23    Then going down a little bit further, you have

24 Peter -- Peter Vario, V A R I O.  He is associated with the

25 Luchese Crime Family.

GR      OCR      CM      CRR      CSR

1          That's it for that page.

2          THE COURT:  In discussing this for the record, the

3   first page described by the witness will be called one, and

4   the back of it 1-A.

5          The second page will be two.  The back of it 2-A.

6          The third will be three; the back of it 3-A.

7          The fourth will be four; the back of it 4-A.

8          The fifth will be five; the back of it 5-A.

9          MR. BURLINGAME:  Judge --

10         THE COURT:  Six will be six; the back of it 6-A.

11         The seventh will be seven; the back of it 7-A.

12         The eighth will be eight; the back of it 8-A.

13         The ninth will be nine; the back of it 9-A.

14         The tenth will be ten; the back of it 10-A.

15         The eleventh will be 11; the back of it 11-A.

16         The last, or the next will be 12; the back of it

17   12-A.

18         The next will be 13; the back of it 13-A.

19         Now let's use those numbers so that we will all know

20   exactly what we are talking about --

21         MR. BURLINGAME:  That --

22         THE COURT:  -- for the record.

23         MR. BURLINGAME:  I predict there may be a tiny bit

24   of confusion because some of those documents he has are

25   stapled together and so if -- we can use those numbers the

1  Court just identified, but if the defendant can

2  just -- sorry -- sorry, Mr. Hagarty -- if Mr. Hagarty can just

3  describe which piece of paper he is looking it and then we

4  will take a minute and correspond to the numbers of the Court.

5          THE COURT:  As he describes this, just put the

6  number on for the record so that we have a record of what is

7  going on.  It is easy enough.

8          He is now describing two.  Is that correct?

9          THE WITNESS:  I just finished --

10         THE COURT:  The one beginning Monday, 3/27/00?

11         THE WITNESS:  Yes.  I just completed that, Your

12  Honor.

13         THE COURT:  The back of it?

14         THE WITNESS:  Is nothing that was relevant.  Nothing

15  that I noted as relevant, 2-A.

16         THE COURT:  That's 3-A -- 2-A.

17         Now three.

18         THE WITNESS:  Three?  Three is a small piece of

19  paper that has Skinny Dom, 835-9848, on it.  As I repeated

20  before, Skinny Dom is a captain in the family.  Skinny Dom

21  Pizzonia runs the Liberty Cafe, which is a social club.

22         THE COURT:  3-A, the back of it has nothing?

23         THE WITNESS:  The back of it is irrelevant.

24         Going on to page four, which at the top says

25  Wednesday, 3/15/2000.  Going down, let's see.  Beano, Beano

1   trailer, I note Beano is Johnny Beano Setaro.  Gambino

2   Family -- affiliated with the Gambino Family.

3          Going down further, about three quarters of the way

4   down, the -- this page it has Ronnie LI.  L dot I dot and

5   Tommy D.  Ronnie I understood from Long Island would be

6   Ronnie DeConza, who was an indicted codefendant in the case,

7   and Tommy D, who was an indicted codefendant in the case,

8   Ronnie was a -- was a Gambino Family associate.  He was picked

9   up on the wire speaking with the other codefendants.  Tommy D

10  is Tommy DiFiore, a Bonanno family captain, who was one of the

11  unindicted coconspirators in the extortion.

12         Fat Sally, the name just immediately below that, is

13  Fat Sally Scala, indicted codefendant in the case, Gambino

14  Family captain.

15         Skinny Dom is Skinny Dom Pizzonia.  I explained his

16  position and what he does before.

17         One, two, three -- on the back of 4-A is nothing

18  relevant.

19         Going on to page five, page five, I don't know how

20  it appears.

21  Q    Just describe what's at the top of the page.

22  A    Okay.

23         There are -- it's one piece of paper that has

24  writing on both sides.  It's folded.

25  Q    I believe that's two pages in the exhibit.  If you could

1  start with one of the folded halves.

2  A    Yes.  It begins with Monday, 3/13/2000, or 3/13 dash zero

3  zero.  I will go down that.

4        That has relevant on it Ronnie, 100 First Avenue.

5  That would be Ronnie, One Arm Trucchio, who has -- affiliated

6  with 101st Avenue.  He is a Gambino Family -- he is a member.

7  I don't know whether he was a captain at that point, but he

8  was at least a member.

9        Genie's call.  Again, Genie Gotti calling from

10  prison.  He had been sentenced to fifty years for heroin

11  trafficking, regularly called out, to other members of the

12  Gambino Crime Family from jail.

13        Midway down the page it says Skinny dollar sign

14  Beano dash trailer.  Skinny is Skinny Dom Pizzonia.  Beano is

15  Johnny Beano Setaro.  Both Gambino Family -- at least members.

16  Skinny Dom was a captain.

17        Going down a little bit more, there is nothing

18  relevant on that.

19        Can I ask what your next page -- your next page is?

20        THE COURT:  5-A.  The one saying, Friday, 3/10.

21        THE WITNESS:  Okay.  Friday, 3/10/2000.

22        THE COURT:  5-A.

23        THE WITNESS:  Let's see.  Call Kevin's

24  brother-in-law.  I was unsure, but I believe that could be

25  Kevin McMahon's brother-in-law.  Kevin McMahon was one of the

1   indicted coconspirators.

2          Again, Skinny Dom, listed immediately below that was

3   a Gambino Family captain.

4          Waterview Diner for Jackie.  It was a meeting

5   at -- the Jackie in that case, might possibly be Jackie

6   Cavallo, who was a Gambino Family member.

7          I was unsure and I was going to look, try and look

8   at the wiretap for that day to see which Jackie he may have

9   met with on that day.

10         Okay.  Down below, on the same page, it has

11  Saturday, 3/11/2000.  Again, the Waterview Diner.  There was a

12  meeting.  I would try and -- and look up and match up what was

13  on the wiretap for that day do see if there was in fact a

14  meeting or who he may have called to meet on that day.

15         Immediately below that is the -- the inscription

16  Peter Vario, 12:00 pm.  Peter Vario is a -- associated with

17  the Luchese Crime Family.

18         That's it for that page.

19         May I ask what the heading is on the next exhibit?

20         THE COURT:  It's six.  It's Thursday, 3/16 and

21  Friday, 3/17.

22         THE WITNESS:  Okay.  The heading -- in this sheet of

23  paper has a heading Thursday, 3/16 on the left-hand side,

24  upper left-hand side of the page.

25         Midway down -- approximately midway down was call

1   Dom, that could have been Dom Pizzonia, a Gambino Family

2   captain.  I would have to -- I was going to take this and try

3   to match it up with the log to see if in fact there was a

4   call.

5           Again, three quarters of the way down that page, on

6   the left-hand side, Thursday, March 23, 2000, has Skinny Dom,

7   11:00 am.  I think that's Skinny Dom Pizzonia.  11:00 am I

8   assume was a meeting.  He's a Gambino Family captain.

9           Okay.  On the right-hand side of the page, under the

10  heading Friday, 3/17, 3/17 was actually a very relevant day.

11  We had done a surveillance that day.  Saint Patty's Day

12  surveillance that a lot of the codefendants had met out on

13  Long Island.  It only has Nickey under there and then Monday,

14  3/20, Genie's call, Gene Gotti.  A Gambino Family member,

15  calling in.  To other members of the Gambino Family.

16          Skinny Dom, again, Gambino Family captain.

17          Ralphie for lunch.  I it wasn't sure who this was.

18  I was going to look up who he may have called that day.

19          Tuesday, 3/21/2000, right-hand side of the page,

20  midway down the page, Skinny Dom Pizzonia, 11:00 am meeting,

21  scheduled meeting.  That's what I believed it to be.

22          Joe Panzarella, again, Gambino Family associate.

23          Kevin for Nickey.  I believe the Kevin in that case

24  was Kevin McMahon and I was going to try and match up

25  something that may have come up during the wire with this item

1    on the to-do list.

2            THE COURT:  Excuse me.

3            While I think of it, do you have somebody from your

4    office here?

5            MR. BURLINGAME:  I have some agents and interns.  I

6    don't have another AUSA.

7            THE COURT:  Send one of them over to get a camera,

8    bring it right over.

9            THE WITNESS:  I have a camera in my bag.

10           THE COURT:  All right.  You have a camera?

11   All right.  That's fine.

12           THE WITNESS:  I have three of them.

13           THE COURT:  That's enough.

14           Go ahead.

15           THE WITNESS:  We are going on the reverse side of

16   the page, there was nothing relevant on there.  It

17   was just -- that side of the page is labeled US Department of

18   Commerce, Bureau of the Census.

19           THE COURT:  That it's 6-A.  Next is seven.

20           THE WITNESS:  This exhibit is -- says Fountain Auto

21   Mall at the top.  It's a lot of doodling, it appears.

22   Charles, I M, written all over it.  It is just doodling, but

23   it is attached to -- open the reverse side it's also a lot of

24   doodling, but it is attached to other sheets of paper and it

25   has Fountain Auto Mall on it.  It looks like a Fountain Auto

1   Mall pad.

2         Other than the Fountain Auto Mall there is nothing

3   particularly relevant.

4         I don't know which exhibits I am ending with.  There

5   appear to be one, two, three -- I don't know where you want me

6   to end.  There is doodling.  All the doodling pages we will

7   call them, and then there is the continuation.  It may have

8   separated here.  We come to relevant material here.

9         THE COURT:  The next thing I have is page eight.  It

10  is sideways, Tommy D with a telephone number.  It's probably

11  the next exhibit.

12        THE WITNESS:  It may be that I am -- I am going to

13  go to the page that doesn't have Fountain Auto Mall.  It looks

14  like it's on the reverse side.  It has 5/3/2000 in the upper

15  left-hand corner.

16        THE COURT:  No.  My next page number eight has a

17  Tommy D written on the side.  The back of it has Cafe Liberty.

18  EXAMINATION CONTINUES

19  BY MR. BURLINGAME:

20  Q    Why don't you set aside the five, three marked document

21  and flip forward to the Tommy DiFiore piece of paper, I

22  believe is the next one in your list.

23  A    Okay.  The next is -- they're all relevant material here,

24  but that's fine.

25        It looks like a business card.

1          I will put these away.

2    Q    If you can keep those out and set them aside, we will

3    come back to them at the end if they weren't properly copied.

4    A    Okay.  This has Tommy D, who I understood to be Tommy

5    DiFiore, Bonanno captain, involved in the extortion.  The two

6    of them, Fat Sally and Tommy D were fighting over the -- who

7    has rights to extort the victim.

8          I believe to be Tommy D's either cell or beeper.

9          On the flipside there is Cafe Liberty.  It is a

10   business card for Cafe Liberty, which is run by Skinny Dom

11   Pizzonia, Gambino Family captain.

12        THE COURT:  My nine is Fountain Auto Mall, Inc,

13   heading in print, and then Thursday, 5/4/00.

14        THE WITNESS:  Okay.  This is all -- that exhibit,

15   Thursday, 5/4/2000, is stapled together with the -- the

16   following exhibit that has Fountain Auto Mall and the -- the

17   writing across the middle is Frankie Radice, R A D I C E.

18   Q    You can start with the 5/4 page.

19        THE COURT:  Start with the Fountain Auto Mall, 5/4.

20   Tell me what's on that.

21        THE WITNESS:  Nothing particularly relevant, but it

22   is stapled to the next exhibit.

23        THE COURT:  What about Fat Sally?

24        MR. BURLINGAME:  I think the -- if you --

25        THE WITNESS:  Oh, it's -- Your Honor, I believe it

1  was photocopied and you may have this and not

2  this (indicating).

3          THE COURT:  It's stapled together in that way?

4          THE WITNESS:  It's stapled together, but I believe

5  the exhibit that -- Thursday, 5/4, is on a half cutoff page

6  and if you flip the half cutoff page, it reveals another page

7  with Fountain Auto Mall and other writing in there.

8          THE COURT:  No.  Flip that top back.  Put it back.

9  That's the way it appeared.

10          THE WITNESS:  Okay.

11          THE COURT:  What appeared below the half cutoff

12  page?

13          THE WITNESS:  Below the half cutoff page that was

14  hidden or not in your --

15          THE COURT:  Not hidden, no.  In open sight.  I only

16  want to see what's in open sight.

17          THE WITNESS:  Okay.  There is Fat Sally who is Fat

18  Scala, S C A L A, who is a Gambino Family captain, indicted

19  coconspirator.  It has the notation here, 11:30, call him.

20          Tommy D, 11:00 am.  Tommy, it says, 11:00 am.  I

21  believe that to be Tommy DiFiore, Gambino Family captain.

22  Bonanno family captain, who was involved in the extortion.

23          One of the code words on the wire that they used to

24  refer to Tommy DiFiore was Hot Dog, and that notation is on

25  the right-hand side of the page, and then below it, below Hot

1    Dog, it has two M O period, nobody come.  What I believe to be

2    C O M E, and that was one of the arguments that nobody had

3    come to the extortion victim in two months.

4            Okay.  Going on to the next exhibit.

5            THE COURT:  No.  Those were all covered up?  The

6    rest of it was covered?

7            THE WITNESS:  Yes, yes.

8            THE COURT:  I don't want it.  The back of the last

9    covered page is empty, 9-A.

10           MR. BURLINGAME:  The back of it.

11           THE WITNESS:  The back of the page has nothing on.

12   Nothing on it.  9-A.

13           THE COURT:  9-A.

14   Q    Go to --

15           THE COURT:  Go to ten, which is Fountain Auto Mall,

16   Inc.

17   Q    The next.

18           THE COURT:  Printed, and it begins with Frankie

19   Radice at the top.

20           THE WITNESS:  Okay.

21           MR. BURLINGAME:  I think the judge wants you to move

22   on from that stapled piece of paper.

23           THE COURT:  I don't want anything more of anything

24   stapled.  I just want to know what was in open, plain view,

25   that didn't have to be flipped.

1          THE WITNESS:  Okay.  The next exhibit I have is

2     Tuesday, 3/14/2000.

3          THE COURT:  No.  It's ten, it says Frank Radice at

4     the top.

5     Q    They might be out of order.

6     A    That would have been part of the stapled pages.

7     Q    Okay.

8          THE COURT:  Part of the stapled back -- back of the

9     stapled?

10         THE WITNESS:  Yes.  It was underneath the stapled

11    portion.

12         THE COURT:  Underneath the stapled?

13         Okay.  So ten is not in at all.

14         The back of it is blank.  The back of the whole

15    group is blank, correct?

16         THE WITNESS:  Yes.

17         THE COURT:  All right.  The next page is 11, top

18    Fountain Auto Mall.  It is Monday, 5/1/00.  That's eleven.

19         THE WITNESS:  Right.  Monday, Friday -- 5/1/2000.

20         THE COURT:  If you have to flip something, I don't

21    want to see it.

22         That's underneath?

23         THE WITNESS:  Yes.

24         THE COURT:  I don't want that.

25         Next, I have is Tuesday, 3/14.

1      THE WITNESS:  Yes.

2      THE COURT:  That's page 12.

3      THE WITNESS:  Okay.  Tuesday, 3/14/2000.  Middle of

4  the page, it says Ronnie about Sal.  Ronnie is Ronnie DeConza,

5  family associate, who was an indicted coconspirator in that

6  case.  About Sal, I believe to be Sal Scala, Fat Sally Scala,

7  Gambino Family captain, indicted coconspirator.

8          Again, Beano was Johnny Beano Setaro and it has

9  trailer Rickey, Nick, Johnny Beano Setaro, Gambino Family

10 associate.

11         That's all that was relevant on that page.

12     THE COURT:  The back of that I have is Albert Road?

13     THE WITNESS:  Road Management.  There was nothing

14 that was relevant on that.

15     THE COURT:  Okay.  My next page is 13 and it says

16 Wednesday, 4/25/00.

17     THE WITNESS: .  Okay.  Wednesday, April 25, 2000,

18 Genie called, again I believe it to be a call from prison from

19 Gene Gotti, Gambino Family member.  Below that is Skinny Dom,

20 who was a Gambino Family captain.  Fat Sally, 1:30 pm.  That

21 indicated either a call or a meeting.  I would have to match

22 that up with the logs of the Title III that was -- that had

23 just ended.  Fat Sally Scala indicted coconspirator in the

24 case.

25         Meet Carl.  Carl is Carl Klein, who had been a

1  cooperating witness at one point and a subject at another.

2  His beeper number is listed below there, 275-0013.  That was a

3  516, I believe, or 631 number.  It has beep next to the

4  number.  That was relevant to that case.

5          On the reverse side it just has Fountain Auto Mall.

6          THE COURT:  All right.  Now, what I want you to

7  do -- excuse me for taking over, but I must have it done so I

8  can understand what is going on.

9          There was a table?

10          THE WITNESS:  Yes.

11          THE COURT:  Where was the table?

12          THE WITNESS:  If you walked in, it was in the center

13  of the living room kitchen area.

14          THE COURT:  Okay.  How big was the table?

15          THE WITNESS:  About this size.

16          THE COURT:  This size?

17          THE WITNESS:  In depth.

18          THE COURT:  That would be about four-foot by

19  four-foot?

20          THE WITNESS:  Three-and-a-half by two-and-a-half.

21          THE COURT:  Three-and-a-half by two-and-a-half.

22  Okay.

23          And there was a chair in front of that table?

24          THE WITNESS:  There was a cooler that was used as

25  like a bench.

1          THE COURT:  That was a bench?  You sat on the bench?

2          THE WITNESS:  Yes.

3          THE COURT:  Your legs went underneath?

4          THE WITNESS:  Yes.

5          THE COURT:  So your stomach was up against the

6  table?

7          THE WITNESS:  Correct.

8          THE COURT:  Any drawers in the table?

9          THE WITNESS:  I don't recall.

10          THE COURT:  Okay.  What I want you to do, since this

11  is approximately the same size, is take the documents out and

12  lay them on this table the way they were when you came in,

13  with the ones up the way they were up and how it appeared to

14  you when you first looked at the table.

15          THE WITNESS:  Your Honor, I -- I don't remember.  I

16  just -- it's eight years ago.  I don't remember exactly.

17          THE COURT:  Do the best you can with it.

18          THE WITNESS:  Each individual piece won't be in

19  exactly the same place.

20          THE COURT:  I want to know what was open to view

21  without shuffling or touching the papers.

22          THE WITNESS:  Again, I don't know where they were,

23  but they were fanned out and spread out.  I will --

24          THE COURT:  What's important is that I see what was

25  open to view without touching them.

1      (Witness complying.)

2      THE WITNESS:  There were piles of business cards

3 that were interspersed throughout here.  They were seized

4 separately and they are -- they are noted on the inventory

5 sheet.

6      MR. BURLINGAME:  I will take the binder out of your

7 way.

8      THE COURT:  Is that it?

9      THE WITNESS:  In a fashion similar -- there may have

10 been other sheets of paper in here that were not particularly

11 relevant that were laid out or -- and -- or, you know, not

12 just fanned around but also up here and over here.  There were

13 newspapers in there.  It was a bit -- other than this kind of

14 being -- it looks disorganized, but it's actually pretty

15 organized.  It was a bit of a mess.

16      THE COURT:  All right.  Please get your camera and

17 take a picture of the way you have set this up.

18      As I understand it, this is what you saw as you sat

19 down, without touching any of the papers?

20      THE WITNESS:  In -- close enough, yes.

21      THE COURT:  Okay.  With a high probability that this

22 represents accurately what you then saw without touching the

23 papers?

24      THE WITNESS:  Similar, yes.

25      THE COURT:  Well, yes or no?

1        THE WITNESS:  Yes, yes.

2        THE COURT:  All right.  Take some pictures of that,

3   please.

4   EXAMINATION CONTINUES

5   BY MR. BURLINGAME:

6   Q    Is it fair to say this is not necessarily the exact order

7   that the papers were in, but the papers were all fanned out in

8   this manner open to your sight?

9   A    Yes.

10       THE COURT:  And this is what you would see if you

11  looked at them?

12       THE WITNESS:  Yes.

13       THE COURT:  All right.  Take a series of pictures.

14       Do you have to stand up in order to see them?

15       THE WITNESS:  I may need to stand on the chair to

16  give you a best view.

17       THE COURT:  Get a bench or something for him to

18  stand on.

19       MR. BURLINGAME:  He just spent three months in

20  Afghanistan.

21       THE COURT:  Pardon me?

22       MR. BURLINGAME:  This guy can stand on the chair.

23       THE COURT:  Will it help you to stand on the witness

24  box above?

25       THE WITNESS:  Yes.  Can I stand on there?

1    THE COURT:  You can stand on this.  I don't want you

2  to hurt yourself.  I don't want you to hurt yourself before

3  you complete your testimony.  Thereafter, I don't really care.

4          (Laughter.)

5          (The witness complying.)

6          MR. BURLINGAME:  This is what we should have a

7  picture of.

8          MR. FARBER:  That's the picture.

9          THE COURT:  Can you get a clear shot?

10          THE WITNESS:  Yes.

11          THE COURT:  Yes.  Take a few others.

12          THE WITNESS:  Yes.

13          THE COURT:  Take it from the other side.  Take it

14  from here, stand up here.

15          (Witness complying.)

16          THE WITNESS:  It's on a ten second delay.  I

17  apologize.

18          (Witness complying.)

19          THE COURT:  Okay.  Take it from the other side,

20  please.

21          THE WITNESS:  Yes.

22          (Witness complying.)

23          THE COURT:  Okay?

24          THE WITNESS:  Yes.

25          THE COURT:  All right.  This series will be

1  reproduced on page eight-by-eleven glossy.

2          THE WITNESS:  Okay.

3          THE COURT:  You will make three copies, one for the

4  Court, one for the government and one for the defendant.  It

5  will be marked as Exhibit 1, capital A.  The series will be 1

6  capital A.

7          How many pictures do you have?

8          THE WITNESS:  I have three, three pictures, Your

9  Honor.

10         THE COURT:  1 capital A, 1 capital B and 1 capital

11  C, all in evidence as pictures of the documents as they

12  appeared without touching.

13         (So marked.)

14         Anything further on direct?

15         MR. BURLINGAME:  Just one question, Judge.

16         If the Court later finds that the documents are

17  admissible, the documents themselves or at least the front

18  side of the documents will come in rather than the picture,

19  right?  Otherwise, I would want to make the witness take close

20  pictures so you could read what's on the pictures.

21         THE COURT:  No.  The documents themselves will come

22  in.

23         MR. BURLINGAME:  Okay.

24         (Continued on next page.)

25

1    EXAMINATION CONTINUES

2    BY MR. BURLINGAME:

3    Q    Just to review, you spotted the documents on the table

4    while you were conducting the search for weapons?

5    A    Yes.

6            MR. BURLINGAME:  I have no further questions.

7            MS. SHARKEY:  May I, Judge?

8            THE COURT:  Yes.

9    CROSS-EXAMINATION

10   BY MS. SHARKEY.

11   Q    Good morning.

12   A    Good morning.

13   Q    You testified on direct examination that you were part of

14   the arrest team that went to the apartment from which you

15   arrested Mr. Carneglia, correct?

16   A    Correct.

17   Q    You were executing a search warrant with other members of

18   your squad?

19   A    It was not a search warrant.

20   Q    I'm sorry.  I meant an arrest warrant.  Forgive me.

21   A    Yes.

22   Q    Now, sir, you testified about having it being

23   approximately eight years ago when these documents were

24   recovered, right?

25   A    Correct.

GR     OCR     CM     CRR     CSR

1  Q    In fact, when you arrested Mr. Carneglia, that was on

2  June 20th of 2008?

3  A    Correct.  No.  2000.

4  Q    2000.

5        And also, sir, you testified that your memory wasn't

6  clear as to which document appeared where on the table, right?

7  A    Correct.

8  Q    And it would also be accurate to say that you are not

9  aware as to which document was on top of which document on the

10 20th of June 2000?

11 A    Partially covering certain pieces, yes.

12 Q    You executed the arrest with an arrest team, right?

13 A    Correct.

14 Q    You also recovered the documents with other members of

15 your squad, right?

16 A    They were present in the room, yes.  In the room, in the

17 apartment.

18 Q    All right.  You testified earlier to an inventory that

19 was prepared by one of the members of your squad, right?

20 A    Correct.

21 Q    That's a contemporaneous document that was made out on

22 the 20th?

23 A    Yes.

24 Q    That reflected the way in which the documents were

25 recovered, right?

1    A    Not the way.  Just an inventory, a listing of what was

2    recovered.  Not the way it was recovered.

3    Q    Well, that document was entered into evidence and you

4    reviewed it, right?

5    A    Correct.

6    Q    That document is truthful, correct?

7    A    Yes.

8    Q    And you didn't add anything to that document, right?

9    A    I did not write anything.

10   Q    When I say "add anything," either yourself or your fellow

11   agents didn't include anything in that inventory that wasn't

12   present in the apartment, right?

13   A    Correct, yes.

14   Q    And you didn't rearrange the documents before you put

15   them in the inventory, correct?

16   A    No.  I guess I'm -- I am a little unsure what you are

17   asking.  I apologize.

18   Q    Did you alter the documents before you listed them?

19   A    No, no.

20   Q    In the inventory?

21   A    No.  I didn't understand the question.  I apologize.

22   Q    No.  I think the question was botched.  Don't apologize.

23        How long were you seated at the table on top of the

24   cooler?

25   A    I don't recall.  I am going to guess.  It was a couple of

1  minutes.  Really wasn't all that long.  I just was, you know,

2  things are jumping out at you.  It is pretty easy.  I didn't

3  have to spend a long time thinking about it.

4  Q    Where was the inventory prepared?

5  A    On site.  We spent, if I remember correctly, we spent a

6  fairly long time -- not long time, but long time for an

7  arrest.  No, normally we like to go in and out.  We spent a

8  fair bit of time at Charles's house.  He had wanted to get

9  groomed and we prefer our arrestees to brush their teeth

10 before they leave, so it kind of takes some time.  We gave him

11 a fair bit of liberties as well, getting dressed and we didn't

12 cuff him immediately.  So we spent a good bit of time.

13 Q    And you reviewed the inventory on the 20th, right?

14 A    I don't know whether I did.  I know I gave the papers to

15 Agent Begley, Catherine Begley, who signed the sheet there and

16 I believe it's the -- these are listed as miscellaneous

17 papers, yes.

18 Q    The --

19 A    I may have seen it.  I don't -- I don't have a vivid

20 recollection of reviewing the document, that inventory sheet,

21 on the 20th, no.

22 Q    But you have reviewed it since, right?

23 A    Yes.

24 Q    You testified that you don't remember exactly where,

25 which document was, on the table, right?

1   A    Correct.

2   Q    You don't remember which document was on top of another

3   document, correct?

4   A    Correct.

5           MS. SHARKEY:  Thank you.

6           Nothing further, sir.

7           MR. BURLINGAME:  Just to clarify.

8   REDIRECT EXAMINATION

9   BY MR. BURLINGAME:

10  Q    When you said the documents, certain portions of the

11  documents were partially covered by the other documents, those

12  documents that were partially covered, were you still able to

13  see information that you deemed relevant on the documents that

14  were partially covered?

15  A    Yes.

16          MR. BURLINGAME:  Nothing further.

17          THE COURT:  All right.  Thank you very much, sir.

18          You will take care of those photos immediately

19  before they are lost, please.

20          THE WITNESS:  Yes, Your Honor.

21          (Witness excused.)

22          THE COURT:  All right.  Everybody can brief it.  I

23  will tell you my preliminary ruling subject to briefing and

24  argument.  I don't want to keep the jury.  It's two minutes to

25  ten.

1    These were clearly open and plainly visible and the

2  names just jump out at you for anybody who has any familiarity

3  with these mobs.

4    MS. SHARKEY:  Respectfully, Judge, before the Court

5  comes to a preliminary matter, we certainly will brief it.  I

6  would request that the Court review the document inventory,

7  how those documents were found.  In fact, it does not comport

8  with the testimony at this hearing.

9    THE COURT:  I believe this witness is fully

10  credible.

11    MS. SHARKEY:  Judge, if --

12    THE COURT:  The inventory itself is just a summary.

13  It's really useless for this inquiry.

14    MS. SHARKEY:  Respectfully, Judge, that's not what

15  this witness said.  I will follow up if that's the Court's

16  preliminary ruling.

17    THE COURT:  You may ask further questions.

18    MS. SHARKEY:  Sure.

19    THE COURT:  That's the purpose of my giving you a

20  preliminary view, so that you can exhaust your inquiry.

21  CROSS-EXAMINATION CONTINUES

22  BY  MS. SHARKEY:

23    MS. SHARKEY:  I appreciate the opportunity, Judge.

24  Q    Agent, you said the document inventory made out on the

25  20th was made out at the location, right?

1  A    Yes.

2  Q    And it would be accurate to say that -- do you have a

3  copy of the inventory in front of you, sir?

4  A    It's in front of me now, Government Exhibit 2.

5  Q    I believe that's Government Exhibit 2 in evidence for

6  purposes of the hearing.

7           MS. SHARKEY:  Is that right, Mr. Burlingame?

8           MR. BURLINGAME:  Yes.

9           THE COURT:  Yes.

10  Q    Item number three, on the inventory, Government

11  Exhibit 2, notes a Chase envelope with miscellaneous papers.

12           Where is the Chase envelope?

13  A    It may be not -- may have had other stuff with it and we

14  didn't include it here.

15  Q    Wouldn't it be more accurate to say those documents were

16  in fact inside the Chase envelope, Agent?

17  A    No.

18           We piled all the -- we piled the papers together.

19  Q    What did you do with those other papers, sir?

20  A    I imagine, they are still back at the office.

21  Q    And --

22  A    There were other items that, you know, like the Chase, I

23  think we took it because it indicated where he may have

24  banked.  That may have become relevant at a later point.

25  Q    Well, item number four on Government Exhibit 2 in

1   evidence indicates miscellaneous papers in a MasterCard

2   envelope, correct?

3   A    In, yes.

4   Q    Where is the MasterCard envelope?

5   A    It's -- the prosecutor I guess decided it was not

6   relevant.

7   Q    Wouldn't it be accurate to say that those documents were

8   inside the MasterCard envelope?

9   A    No.

10   Q    What documents were inside the MasterCard envelope?

11   A    Again, I'd have to go back and look at all the -- at the

12   entire -- everything that was seized and figure out what was

13   in there.  I'd have to see it.

14   Q    You have no independent memory, is that correct, sir?

15   A    Not of that.  And I may not have been the one that took

16   that.

17   Q    Where on government inventory Exhibit 2 are the group of

18   papers in a rubberband?

19        Weren't those in fact the documents that you are

20   referencing at this hearing?

21   A    No.

22   Q    So is it your testimony today that this inventory sheet

23   isn't an inventory sheet of these documents that you say are

24   so relevant?

25   A    It has these -- this inventory document contains list of

1  these papers as - -- as number three, Chase envelope with

2  miscellaneous papers.  These are the miscellaneous papers.

3  Q    Inside the Chase envelope?

4  A    No, it don't say inside.  It says Chase envelope with

5  miscellaneous documents.

6  Q    Where is the Chase envelope?

7  A    I think -- back at the office.  If --

8  Q    Where was the Chase envelope on June 20, on the table,

9  sir, respectfully?

10 A    I don't know.  It may have been on the table as well.

11 Q    Directing your attention to item six on the inventory,

12 group of papers with a Bell Atlantic bill on top.

13       That group of papers with a Bell Atlantic bill on

14 top refers to a phone bill on top of those documents, correct?

15 A    Correct.

16 Q    Those documents, is your testimony, those are not the

17 documents that you have just spread out on the table?

18 A    It may have been one of the other pieces of paper that

19 were around it, may have been interspersed in here, or at the

20 other end, may have been -- it was on the table, I imagine.  I

21 mean, do I remember where the Bell Atlantic bill was?  It

22 was -- I am pretty sure it was actually up in the -- it's -- I

23 kind of remember because I thought it was kind of ridiculous

24 that Charles had a cooler that he sat on and how everything

25 was just laid out with a little -- little room to eat in the

1   middle.  The -- I believe the Bell Atlantic bill was actually

2   on the table.

3   Q    Respectfully, this inventory that you say reflects the

4   documents that you have just testified about at this hearing,

5   you didn't identify one of the documents that -- about which

6   you testified, did you?

7   A    I'm sorry?

8         MS. SHARKEY:  May I have that read back to the

9   witness, please?

10        THE COURT:  No, I didn't understand it.

11        MS. SHARKEY:  I will rephrase it.

12  Q    Where on this inventory do you note any of these

13  documents that you have testified have such or were so

14  obviously relevant to you on the 20th, Agent?

15  A    Number three.  Chase envelope, miscellaneous papers.

16  Q    And the miscellaneous papers were inside the Chase

17  envelope, correct?

18  A    No.  If it was inside, I would have noted it as in number

19  four, miscellaneous papers MasterCard envelope.  This was --

20  it was distinguished -- Agent Begley distinguished between

21  what was inside an envelope and what was with the papers.

22  Chase envelope with miscellaneous papers.

23        I believe she used the Chase envelope as an

24  identifier.  This is the group of things that I am grouping

25  together.  It wasn't necessarily that they were sitting in a

1  pile.

2  Q    When you say you believe, is this based on a conversation

3  you have had with Ms. Begley?

4  A    No, kind of knowing what was seized at the time and

5  knowing her.  She is very particular.

6  Q    Where is the Chase envelope?

7           MR. BURLINGAME:  Again, asked and answered.

8  A    If you want me to go back to the office and look for the

9  stuff that was seized, I can come up with it.

10           MS. SHARKEY:  I think it is up to the Court to

11  determine whether the evidence is closed.

12           THE COURT:  I don't want anything further.  This is

13  the end of the inquiry.

14  Q    Now, the documents that you have testified to you say

15  were spread out on the table in front of you on June 20th,

16  right?

17  A    Yes.

18  Q    But the dates of those documents run from May?

19  A    Back to March, yes.

20  Q    March, they are dated, correct?

21  A    Correct.

22  Q    Months prior to this arrest?

23  A    Correct.

24           MS. SHARKEY:  I have nothing further.

25           THE COURT:  Thank you very much, sir.

1          That will be all.

2          THE WITNESS:  Thank you.

3          (Witness excused.)

4          THE COURT:  My tentative view is they all come in.

5   It is in plain view.  The names just jump out at you if you

6   are familiar at all with these inquiries.

7          MR. BURLINGAME:  Judge, may I ask two redirect

8   questions, just to address the --

9          THE COURT:  Let's close it up.  All right.  I want

10  to get to the jury.

11  REDIRECT EXAMINATION.

12  BY MR. BURLINGAME:

13  Q    Were you the one who prepared the inventory?

14          Did you determine how to characterize the documents

15  in the inventory?

16  A    No.

17  Q    Any doubt in your mind that these are documents that you

18  were looking at today were the ones you saw in plain view on

19  the table?

20  A    No, no doubt in any mind.

21          MR. BURLINGAME:  That's all.

22          THE COURT:  Thank you.

23          We will get the pictures.

24          MR. FARBER:  May I have five minutes to run to --

25          THE COURT:  All right.  We will convene at a quarter

1    after ten.

2         Tell the jury we will come in at a quarter after

3    ten.

4         (Recess taken.)

5         (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (court resumed)

2          THE COURT:  Bring in the witness, bring in the

3     defendant, and then get the jury.

4          (Defendant now present in the courtroom)

5          P E T E R   Z U C C A RO , resumed the stand and

6     testified further as follows:

7          MR. BURLINGAME:   I wanted to move to have one

8     important party, Jerry Conrad designated.

9          THE COURT: Yes.

10         MR. BURLINGAME:   Thank you, Judge.

11    CROSS-EXAMINATION

12    BY MR. FARBER:

13         (The following took place in the presence of the

14    jury)

15         THE COURT: Sit down, everyone, please. Good morning,

16    everybody. Sorry we had hold you up but the hearing took a

17    little longer than we thought.

18         You are still under oath, sir.

19    Q    Over the past two days you testified about committing

20    crimes with various individuals, correct?

21    A    Yes.

22    Q    And one of the individuals you testified about was

23    Johnny Alite?

24    A    Yes.

25    Q    And would you characterize Mr. Alite as a career

1  criminal?

2  A    Yes.

3  Q    And did you commit or conspire to commit acts of violence

4  with him?

5  A    Yes.

6  Q    That would include murders?

7  A    One murder.

8  Q    Assaults?

9  A    I don't believe anybody was assaulted. I believe they

10  were murdered.

11  Q    Robberies?

12  A    I didn't do a robbery with him, no.

13  Q    Did you commit or conspire to commit any drug offenses

14  with him?

15  A    Now, I never sold drugs to him or with him.

16  Q    From your association with the Gambino Crime Family are

17  you aware of the fact that Mr. Alite has committed numerous

18  types of these crimes?

19  A    Yes.

20  Q    And as an associate of the Gambino Crime Family did you

21  come to learn Mr. Alite's overall reputation in the organized

22  crime community?

23  A    I had somewhat of an idea of what he did.  I didn't know

24  very detail of what he did.

25  Q    Was it important to you as an associate in the organized

1  crime family of the Gambinos to know whether or not he was a

2  stand-up guy?

3  A    Yes.

4  Q    And that means a guy who could be trusted to keep

5  secrets?

6  A    Yes.

7  Q    A guy that would lie to law enforcement officials if

8  necessary?

9  A    Yes.

10 Q    And in fact, Mr. Alite, had such a reputation within the

11 organized crime community, correct?

12 A    Yes, he was like the rest of us.

13 Q    He was a long-standing associate of the Gambino Crime

14 Family?

15 A    I met Johnny Alite in the 1988 or '89.  I don't know how

16 long his association with the Gambino family was Gambino

17 Family.

18 Q    From 1988 going forward to the time that you got arrested

19 in 2004 was Mr. Alite an active member in organized crime?

20 A    He was an associate to the Gambino Crime Family.  He

21 wasn't a member.

22 Q    I stand corrected, but he was active with the family?

23 A    Yes.

24 Q    So your knowledge was Mr. Alite was fully indoctrinated

25 into the mob life?

1   A      He knew the rules and regulations?

2   Q      Did he follow the creed that you testified to yesterday,

3   money and power?

4   A      Umm, to my knowledge, yeah.

5   Q      A life of self-interest and rewards, correct?

6   A      Yes.  Not self-interest. He had the crew's interest at

7   heart.

8   Q      He did whatever was necessary to get what he wanted, he

9   was that type of guy?

10  A      I wouldn't say he was a greedy type person; not what he

11  wanted, but what had to be done for his crew he did.

12  Q      What about Kevin McMahon, is that a guy you did some

13  crimes with?

14  A      I stole some cars with him.

15  Q      You know him for a number of years as well?

16  A      Yeah.

17  Q      How many years did you know him to be associated with

18  organized crime?

19  A      Well, I met Kevin McMahon in 1988. So from '88 forward.

20  Q      And as an associate of the Gambino crime family you came

21  to learn his reputation in the organized crime community?

22  A      Yes.

23  Q      And again, it was important for you as an associate to

24  know if he was a stand-up type of guy?

25  A      Yes.

1  Q    And again, that meant he would be one to keep secrets?

2  A    Yes.

3  Q    A guy who would lie to law enforcement officials when

4  necessary?

5  A    Yes.

6  Q    And it's correct, Mr. McMahon had such a reputation that

7  he would so lie?

8  A    Yes.

9  Q    What about Kevin Bonnor (ph)?

10  A    Never heard of him. Never met him.

11  Q    Robert Aingel (ph)?

12  A    Never met him on a personal level but knew who he was.

13  Q    Do you know his reputation?

14  A    Don't know anything about him except he was involved in a

15  murder on Atlantic Avenue.

16  Q    Pascual Andeano (ph)?

17  A    Senior, yes.  Knew him very well.

18  Q    Joseph DeAngelo?

19  A    Never met him. Knew who he was.

20  Q    Hunter Adams?

21  A    Met Hunter.  Knew who he was.

22  Q    You knew Hunter Adam's reputation?

23  A    He was a stock broker, was a pot dealer.

24  Q    He wasn't a legitimate stock broker, was he?

25  A    I would say that he was semi legitimate stock broker.

1   Q    He was semi illegitimate?

2   A    He was knocking around.

3   Q    You described him yesterday as being an associate of the

4   Gambino Crime Family?

5   A    Yes.

6   Q    Committed crimes?

7   A    Just like I said, he was a knock around guy.  He was

8   knocking around.

9   Q    And as a member of the -- as an associate of the Gambino

10  Crime Family he, too, would be a stand-up type of guy?

11  A    I didn't have too much interaction with Hunter.

12  Q    You heard his reputation?

13  A    I heard he was a good kid.  That's all.

14  Q    No one in the Gambino Crime Family had problems with him?

15  A    Not to my knowledge.

16  Q    They trusted him?

17  A    I don't know who trusted him and who didn't trust him.  I

18  just knew Hunter.

19  Q    They trusted that he would lie to law enforcement

20  officials as well?

21  A    I guess. I couldn't answer that question. I never had any

22  real interaction with him except couple of drinks hanging out

23  in the Hamptons.  Never done business with him.

24  Q    Is it fair to state that lying is part of the organized

25  crime life?

1  A    You are not supposed to betray the life.  You are

2  supposed to lie by questioned by law enforcement.  That's just

3  the way it is.

4  Q    And if you were called to testify to, say, in the grand

5  jury you were supposed to try to dodge that, correct?

6  A    I can't answer that question.

7  Q    If you were called in by subpoena to the grand jury

8  wasn't it mob protocol that you would lie to the grand jury

9  unless you could hide?

10 A    I don't know what the grand jury would ask. I mean I

11 can't answer that question. How could I say I would lie at the

12 grand jury if I don't know the questions they're asking.

13 Q    How much money did you earn in all the years that you

14 were committing crimes?

15 A    A lot of money.

16 Q    What's a lot of money?

17 A    I couldn't put a number on it. I filed taxes on it.  I

18 didn't keep track of it.

19 Q    Fair to say millions?

20 A    Yes.

21 Q    Many millions?

22 A    I made a lot of money.

23 Q    You talked about yesterday putting that money in shell

24 companies to launder it?

25 A    Yes.

1  Q    Now, you entered into a cooperation agreement with the

2  government here, correct?

3  A    Yes.

4  Q    That cooperation agreement does not cover any tax issues

5  that may arise for you, correct?

6  A    The tax people are going to come to me.

7  Q    Have the tax people contacted you as of today?

8  A    Not yet.  I am in the witness security program, so nobody

9  has access to me.

10 Q    Nobody has access except the government, correct?

11 A    I'm in the government's program.

12 Q    You talked about pleading guilty in Florida for the

13 kidnapping of that businessman on Long Island?

14 A    Yes.

15 Q    And that was guy who was kidnapped and held until he

16 signed over half his business to somebody else?

17 A    Could I explain that answer?

18 Q    Sir, just is that what the facts were in that case?

19 A    Well, you made a mistake there.  It was only half his

20 company.  He beat the guy out of the other half, and the guy

21 went on the lam.  He just wanted his half back.

22 Q    So you were doing someone a favor?

23 A    Basically I was doing somebody a favor.

24 Q    And for that favor you pled guilty?

25 A    Yes, I did.

1   Q    Because in the eyes of the law that favor was actually a

2   criminal act?

3   A    Yes.

4   Q    Because you held someone against their will?

5   A    Yes, and forced him to sign a document.

6   Q    That's kidnapping; isn't it sir?

7   A    Yes, it was.

8   Q    And I take it you were armed when that happened?

9   A    Yes, I think there was weapons.

10  Q    When you took the plea in Florida to that offense do you

11  recall your lawyer telling the judge that you had no money to

12  pay a fine?

13  A    I told my lawyer I didn't want to pay a fine. I don't

14  remember what he told the judge.

15  Q    Bad enough you had to plead guilty and get 46 months, the

16  fine was going to be an outrage for you?

17  A    I don't know if it was going to be an outrage.  I just

18  told him I didn't want to pay a fine.

19  Q    The fine was a range of zero to $250,000; correct, sir?

20  A    Yes.

21  Q    And your lawyer based on what you said stood before the

22  judge in that court and said my client lacks the funds to pay

23  a fine, correct?

24  A    My lawyer didn't know my worth. Whatever he said he said,

25  but as far as the plea deal went, I wasn't supposed to mention

1  Gambino Crime Family, nothing to do with a crime family.  I

2  was supposed to plead guilty that day and get sentenced that

3  day without a PSI report, and I didn't want to pay a fine.

4  Q    And you didn't want to pay a fine and you didn't?

5  A    And I didn't pay a fine.

6  Q    And your lawyer made a misrepresentation to the court on

7  your behalf that you can't afford to pay one?

8  A    I don't know if he made a misrepresentation. I told him I

9  didn't want to pay a fine.

10 Q    Was it up to you, sir?

11 A    He didn't know my worth or what I had.

12 Q    Sir, is it ever up to you what your punishment is going

13 to be?

14 A    No.

15 Q    In fact, you told us yesterday it is going to be up to

16 the sentencing judge what your punishment will be?

17 A    Yes.

18 Q    But you're telling us here now you decided you didn't

19 want to pay a fine, so that's what was going to happen?

20 A    No, that was how I entered into a plea deal to take a

21 guilty plea in a case in Florida.

22 Q    And sir, when you --

23 A    I wasn't deciding anything.  I was telling him how I

24 wanted to make a deal.

25 Q    And when you entered into this plea deal here, your

1  cooperation, you also told the government they had to take any
2  death penalty element off the table, you weren't going to have
3  that hanging over your head; isn't that correct, sir?
4  A    I didn't tell the government anything like that. My
5  lawyer worked out the deal and we went forward with the
6  cooperation agreement.
7  Q    And when you read your plea deal, which you read
8  yesterday, isn't it a fact it tells you that you are facing
9  life imprisonment, it doesn't say you are facing the death
10 penalty, does it sir?
11 A    It says if I don't testify honestly and to the truth
12 they're going to rip my deal up and I will face the death
13 penalty.
14 Q    Does it say if you are going to face the death penalty in
15 that agreement, sir?
16 A    No, it says here life imprisonment, but when once the
17 deal is off the table it goes back to stage one.
18 Q    But isn't it a fact, sir, in the course of all this
19 history in the courts there's never been a situation where the
20 death penalty was imposed in a situation where someone's
21 cooperation agreement was ripped up?
22 A    I don't know.
23         THE COURT:  Don't answer that, and ignore that
24 question, ladies and gentlemen.
25 Q    Sir, yesterday you stated you had no empathy for any of

1  your victims, do you recall saying that?

2  A    I didn't say no empathy; I just didn't give it a second

3  thought.

4  Q    Didn't give it a second thought?

5  A    Right.

6  Q    You didn't even care to learn what your victims' names

7  were?

8  A    Exactly.

9  Q    Whether it was a person you were beating to a pulp,

10 killing, or maiming, stealing their money, invading their

11 homes, to you it was all about what was needed to be done,

12 simply that?

13 A    It was business.

14 Q    Business?

15 A    Yes, it was.

16 Q    Strictly business?

17 A    That is the way I was taught.

18 Q    Nothing personal?

19 A    That's the way I was taught.

20 Q    You showed no mercy to any of those victims, did you?

21 A    No.

22 Q    In fact, you had no mercy for them?

23 A    Absolutely none.

24 Q    Now that you're on the receiving end of justice is it

25 fair to say that you are going to be begging the sentencing

1   court for mercy?

2   A    Am I going to beg the sentencing court for mercy,

3   probably. More than likely.

4   Q    You're hoping that the fact that you committed thousands

5   of crimes, killed and robbed who knows how many times, that

6   this will be forgiven because you testified here and perhaps

7   other proceedings?

8   A    Forgiven?  I'm hoping on my part.  I don't know what's

9   going to be the outcome.

10  Q    When you decided to cooperate, sir, this was done

11  entirely for your own self-interest, correct?

12  A    That, and my family.

13  Q    You were facing a life sentence?

14  A    I was facing a life sentence.  I was facing 20 years.

15  Q    Twenty years and now you're facing a life sentence

16  because you decided to cooperate?

17  A    Now I'm facing a life sentence.

18  Q    You are relatively young, sir?

19  A    Fifty-three years old.

20  Q    So if you have got 20 years that means you would be in

21  jail close to your 70s, correct?

22  A    Yes.

23  Q    The idea of spending that much time of your life in jail

24  made you sick?

25  A    Doing the 20 years?  In the beginning when I was just

1  facing 20 years I would have went and took the 20.  The

2  problem came up when I was going to go to the penitentiary and

3  live with people looking at me like I was a rat when I wasn't

4  a rat.

5  Q    So is it not correct that jail is a horrible place

6  whether or not someone sees you as a rat or not?

7  A    I could have dealt with the horrible place. The problem

8  was fighting every day, maybe getting stabbed here and there,

9  and having to go through all of that after I put my whole life

10 into organized crime for my friends and then they betrayed me

11 and put a rat wire on me.

12 Q    So you were angry at them?

13 A    I wasn't angry at anybody.  I said this life is just

14 bullshit. There's no loyalty. There's no anything for this

15 life. You know what it is?  It's all bullshit.

16 Q    All bullshit?

17 A    The whole life.

18 Q    Everything you did was bullshit, wasn't it, sir?

19 A    The crimes I committed were very serious.

20 Q    You were afraid about getting into fighting everyday in

21 the jail?

22 A    I wasn't afraid of fighting. I was 40 something years

23 old.  I didn't want to go to the pen and start fighting and

24 stabbing everyday.

25 Q    You were getting into fights everyday you said when you

1  were on the streets, correct?

2  A    Yes.

3  Q    Everyday practically you were stabbing or punching or

4  shooting or doing something to somebody else?

5  A    I didn't stab anybody everyday.

6  Q    Just once in a while, here and there?

7  A    I didn't stab anybody once in a while.  I stabbed one

8  person.  That was Frank Peppitone.

9  Q    Jail has a horrible control over your life, doesn't it

10 sir?

11 A    Yes.

12 Q    Restricts your movement?

13 A    Yes, it does.

14 Q    And restricts when you can call people?

15 A    Yes, it does.

16 Q    And they listen on all your telephone conversations?

17 A    Yes, they do.  The phones are monitored.

18 Q    And it restricts how much TV you could watch, what you

19 could read?

20 A    Yes.

21 Q    Constant strip searches?

22 A    Yes.

23 Q    You have to stand for count several hours a day?

24 A    You stand for count one time a day at 4 o'clock for ten

25 minutes.

1    Q    And the food's horrible?

2    A    The food's bad.

3    Q    And the thought of 20 years of being locked in a cell,

4    you were going to just suck that up, no problem?

5    A    You are not locked in a cell for 20 years.

6    Q    You're locked in a building for 20 years, sir?

7    A    You are in a prison. You conduct your life the way they

8    want you to conduct it but you are not locked out unless you

9    commit infractions.

10   Q    You get to go shopping when you want?

11   A    Once a week.

12   Q    And that's out in the local stores?

13   A    No, that's in the commissary.

14   Q    You get to wear fancy clothes like you were used to?

15   A    You get to wear sweat clothes.

16   Q    You get to go out?

17   A    Prison clothes.

18   Q    You get to go out to nice restaurants?

19   A    No.

20   Q    So you were living a life of luxury, leisure?

21   A    Yeah, but I knew the penalty.  It's not if, it's when.

22   When you get caught you go to jail and you got to deal with

23   it.  You got to suck it up.

24   Q    And the fact that you were going to be deprived of

25   everything you came to love didn't cause you any concern,

1  that's your testimony?

2  A    I mean I was concerned about it but I did what I did. I

3  was involved in the life and I knew it was a consequence of

4  the life I would have to go to jail.

5  Q    At some point in time you started to attend proffer

6  sessions with the government?

7  A    Yes, I did.

8  Q    You began meeting with various government prosecutors and

9  FBI agents?

10 A    Yes.

11 Q    And the government told you when you first went in for

12 those proffer sessions that there were no deals on the table,

13 they wanted to hear you speak first and decide whether or not

14 they were going to sign you up?

15 A    The government made me sign a queen for the day letter,

16 and I spoke about crimes for a couple of hours and they put me

17 back in the jail.

18 Q    How many times did you meet with the government?

19 A    A lot of times.

20 Q    In fact, you met with the government over the scope of a

21 year before they decided to give you a deal; isn't that

22 correct?

23 A    I didn't plead guilty with a cooperation agreement to the

24 plea deal, I think, it was maybe 13 months.

25 Q    Thirteen months?

1   A    I'm not absolutely sure.

2   Q    And during the time that you were proffering with the

3   government there were sessions where they accused you of

4   lying?

5   A    They never accused me of lying.

6   Q    No?

7   A    No.

8   Q    A whole year went by before they signed you up,

9   13 months?

10  A    That's when I pled guilty.

11  Q    How many trials have you testified in?

12  A    Cooperating for the government?

13  Q    Cooperating for the government.

14  A    This is the second one.

15  Q    What about grand jury proceedings?

16  A    Never went to the grand jury.

17  Q    Hearings?

18  A    Never went to any hearings.

19  Q    Prior to you giving testimony either here or at the other

20  trial you testified at, you read newspaper articles or

21  listened to the TV about the case?

22  A    No.

23  Q    You weren't aware of what was coming up that was going to

24  involve you?

25  A    I was told that I can't read any articles or look at any

1   newspapers and they screened everything before anything comes

2   into the units.

3   Q    And no one told you what was coming up in the news?

4   A    No.

5   Q    What about before you went to jail, did you read

6   newspaper articles about your fellow associates?

7   A    Really didn't matter.  I mean I wasn't like Kevin looking

8   on Gangland everyday or anything like that.  I didn't do

9   stupid things like that.  It didn't matter.

10  Q    So you didn't read --

11  A    No, I didn't go on the computer and read that or play

12  games. I was too busy to be focusing on what's going on like

13  that.

14  Q    Now, isn't it a fact that certain trial transcripts like

15  Sammy the Bull's transcript found its way onto the street

16  after he testified?

17  A    I have no knowledge of that. I've never seen any kind of

18  transcripts or anything to do with that.

19  Q    You didn't read the testimony of Sammy the Bull with the

20  rest of the people from organized crime?

21  A    No.

22  Q    No interest in what he had to say?

23  A    No, not really.

24  Q    No concern that he might have said something about you?

25  A    I had concern but I didn't read anything. I didn't read

1  any transcripts or look at anything that he testified to.

2  Q    What about FBI 302 reports that somehow filtered their

3  way onto the streets, see any of those?

4  A    The only time I seen an FBI 302 form was when a defense

5  attorney handed it to me when I testified in the first trial

6  and yesterday when you brought a 302 form here to me here at

7  this desk.

8  Q    Is it fair to state as time progressed you became more

9  practiced in your ability to testify?

10  A    More practiced?

11  Q    Yes.

12  A    No.

13  Q    This is your second trial?

14  A    I testified from my friends in '86. I mean I didn't

15  become practiced.  I am here telling the truth. I'm doing what

16  I've agreed to do for my cooperation agreement.

17  Q    In 1986 the government lawyer ripped you to shreds?

18  A    Probably.

19  Q    She called what you were, a liar?

20  A    I don't know what she called me.

21  Q    Did you meet the prosecutors here today prior to

22  testifying?

23  A    Yes.

24  Q    How many times did you meet with these attorneys before

25  you came in here to testify?

1  A    Several times.

2  Q    What's "several"?

3  A    I don't know. I met with them several times.

4  Q    You have a good memory, sir, correct?

5  A    I have a decent memory when it comes to certain facts,

6  yes.

7  Q    You testified about things you said took place in the

8  1970s, correct?

9  A    Yes.

10 Q    Any reason why you can't seem to remember the number of

11 times you met with the government in this case?

12 A    Well, when I'm committing certain acts of violence it's

13 like burned into my memory certain things and it's hard to

14 forget those things. Meeting with a person everyday, like I

15 met with my friends in the street, I don't remember exactly,

16 or how many times, I don't count, and keep track on a piece of

17 paper and look at it and say, you know, what I meant with them

18 again today, let me write it.  I met with them a lot of times,

19 several times, several different agencies, a lot of different

20 people.

21 Q    They stand between you and the 5k1 letter and getting out

22 of jail, and you tell me that somehow doesn't burn something

23 in your memory as to how many times you met with them?

24 A    I'll tell you the truth. I mean I'm testifying honestly,

25 and I'm not worried about jeopardizing my 5k1 letter, or my

1   plea agreement, or my cooperation agreement because I'm here

2   telling the truth, so it doesn't have to burn anything into my

3   mind.

4   Q    Do you have a problem answering my questions that I'm

5   asking as opposed to giving these speeches about being honest?

6   A    I have to explain myself.

7   Q    Sir, you didn't ask answer my question.

8   A    What's the question?

9   Q    The question was how many times did you meet with the

10  government attorneys?

11  A    A lot of times.

12  Q    All you want to do is give a speech about you being

13  honest.

14  A    A lot of times.

15  Q    A lot of time,  is that more than a dozen?

16  A    Yes.

17  Q    More than 20?

18  A    Could be, yes.

19  Q    Thirty?

20  A    Could be.

21  Q    How long were each of the sessions you sat with the

22  government lawyers?

23  A    Well, I didn't only meet with government lawyers, I met

24  with a lot of FBI agents, too, but sometimes it would go for

25  two hours, sometimes it would go for five hours, sometimes six

1    hours.

2    Q    When you met with the government lawyers did they tell

3    you what questions they would be asking you during this trial?

4    A    At what point?

5    Q    When they were preparing you to testify at this trial?

6    A    They asked me questions.

7    Q    Did they tell you this is what we will ask you, yes or

8    no, sir?

9    A    No, they didn't tell me this is what we'll ask you.

10   Q    They didn't go over it with you, practice your direct

11   examination testimony?

12   A    No. They asked me a lots of different questions, lots of

13   different ways.

14   Q    Did they explain to you that you would be subject to

15   cross-examination by a defense attorney?

16   A    Yes.

17   Q    Did they give you proposed cross-examination questions

18   that you should prepare for?

19   A    For about 20 minutes.

20   Q    And in fact, sir, didn't one of the government lawyers

21   pretend to be a defense attorney and cross-examine you as if

22   he really was a defense attorney?

23   A    They cross examined me.

24   Q    Which one of the lawyers pretended to be me?

25   A    He is not in this courtroom.

1   Q    A different prosecutor?

2   A    I don't see him in here.

3   Q    And they wanted you to be prepared to answer the

4   cross-examination questions, yes or no?

5   A    They wanted me to answer the cross-examination questions.

6   Q    So, sir, you are not sentenced yet, correct?

7   A    Not sentenced yet.

8   Q    In the end you need to satisfy the prosecutors in this

9   case?

10  A    I need to testify honestly and truthfully.  I mean I

11  can't get away from that.

12  Q    You need to --

13  A    That's all there is to it.

14  Q    You need to get a 5k1 letter?

15  A    I need the 5k1 letter but to get that letter I have to

16  testify honestly and truthfully.

17  Q    That's what your agreement says?

18  A    Exactly.

19  Q    The government is the only person -- the prosecutors who

20  will give you that 5k1 letter, correct?

21  A    The U.S. Attorneys Office.

22  Q    It's not going to come from a judge?

23  A    No, it is not.

24  Q    And it's not going to come from defense table?

25  A    No, it is not.

1  Q    Has to come from the prosecutors?

2  A    It has to come from who I'm cooperating with.

3  Q    And you understand that a letter by itself is not

4  important, it's what the contents of the letter is that is

5  important?

6  A    Well, the letter lists all my crimes, everything that I

7  pled guilty to, everything that I proffered to that I've done

8  wrong, and I guess my extent of my cooperation but --

9  Q    Then is the letter that the prosecutor will give the

10 Judge for the Judge to consider when imposing sentence?

11 A    Yes.

12 Q    Sir, there's a difference, is there not, between a letter

13 that says this is Mr. Zuccaro, he tried to help us, take it

14 into consideration versus a letter that says this is

15 Mr. Zuccaro, he gave us great help, we really recommend you do

16 the right thing?

17 A    I can't read the Judge's mind, and what he's going to

18 decide to do. I mean I would like a letter to read very -- to

19 the extent of my cooperation. I mean --

20 Q    And the government alone decides how strong a letter to

21 write the Judge?

22 A    Yes.

23 Q    And it's based on the strength of that letter that the

24 Judge will understand how valuable you were as a cooperator?

25 A    Could you repeat that question?

1  Q    And it is based on the strength of the letter the

2  government writes to the Judge that the Judge will get cues as

3  to whether or not you were really very helpful?

4  A    I guess so. I mean, you know, it is up to the Judge.

5  Q    So, sir, is it fair to state you need to produce?

6  A    I need to produce?

7  Q    Yes, you need to give the government something in order

8  for them to write that letter?

9  A    I think I need to proffer to the truth and testify to the

10 truth is all I have to do.

11 Q    You've been in jail since, what, 2004?

12 A    Yes.

13 Q    So you have about four years time credited toward you?

14 A    July of 04.  This July it will be five years.

15 Q    Do you think that's sufficient punishment for all the

16 thousands of crimes that you have committed?

17 A    I can't make that decision. I mean, you know, if I was to

18 make that decision I would have been out in July of 2004.

19 Q    So you don't think you deserve to be in jail at all?

20 A    I don't -- I can't come to a conclusion for that, but if

21 I had to do this I would want to be out in July of 04.

22 Q    Are you hoping that in the end when that 5k1 letter goes

23 before the Judge you will get time served?

24 A    I wish that would happen but I don't know what's going to

25 happen.

1   Q    You know that Sammy the Bull got five years for 19

2   murders?

3   A    I don't know how much time Sammy got exactly.

4   Q    That would translate to four months per murder?

5   A    I don't know exactly how much time Sammy received.

6   Q    You never learned about that when you were on the

7   streets?

8   A    I heard a lot of different rumors.  He was out of jail,

9   he was in Ohio, he was in here, he was there, he never went to

10  jail. There was a thousand different rumors.  I never seen

11  Sammy after he flipped.

12  Q    Now, you talked about your plea agreement yesterday and

13  you read for us the crimes to which you admitted, correct?

14  A    The crimes?

15  Q    Admitted to?

16  A    Yes.

17  Q    Those aren't the crimes that you committed only -- let me

18  rephrase that.

19           Those are not all the crimes that you committed?

20  A    They are not all the crimes I committed?

21  Q    Right.

22  A    I proffered to everything I've done.

23  Q    But you've told us that you committed thousands of

24  crimes?

25  A    That's including assaults, fights in the street.  Just

1   stupid crimes that I committed -- car thefts.  If you add them

2   up, I mean, you know, there's lost different situations.

3   Q     Those stupid crimes had victims, did it not, sir?

4   A     Yes.

5   Q     And each of those victims suffered for those stupid

6   crimes, as you call them?

7   A     Yes, they were inconvenienced somewhat.

8   Q     Inconvenienced?

9   A     If I stole your car you are inconvenienced is how I

10  looked at it at the time.

11  Q     As you beat someone down to a pulp and they needed

12  stitches that's another inconvenience?

13  A     Usually if I beat somebody up they deserved to get beat

14  up.  I didn't go around looking to beat people up.  It's just

15  the life I led and it was the people that I dealt with on a

16  day-to-day basis, and if they needed a beating I gave them the

17  beating.  That was it. Cut and dry. I mean where are we going

18  with that?

19  Q     You, were judge and jury in that situation?

20  A     Yes, I was.

21  Q     You decided who needed a beating, who deserved?

22  A     No.  Sometimes other fellows would make that decision. I

23  mean it is just the life we led, the neighborhood I come from,

24  the people I dealt with.  Violence faces off with violence.  I

25  wasn't going to go there like Mary Had a Little Lam to the Big

1  Bad Wolf.

2  Q    Prior to you entering into this cooperation agreement

3  your entire identity was that of an associate of organized

4  crime, correct?

5  A    Could you repeat that question please?

6           MR. FARBER:  I will just have it read back.

7           (Record read)

8  A    Yes.

9  Q    Its rules and codes of conduct became your own?

10 A    Somewhat, yes.

11 Q    And you lived by those rules your entire life?

12 A    I didn't live by those rules 100 percent my entire life.

13 Q    It was something you knew since the age of 15?

14 A    Yes, maybe before 15. I mean I was groomed.  I was taught

15 these rules by Charles and by his brother by Frank Bononno, by

16 different fellows that were involved in organized crime,

17 people that taught me how to carry myself, yes.

18 Q    Sir, let me ask you, because you have a tendency to blame

19 everyone else for your decisions?

20 A    I am not blaming anybody else for my decisions.  I made

21 the decision to get involved.  I lived that life. I mean I'm

22 not getting away from that. I committed these crimes.  I did

23 it.

24 Q    Sir, you wanted to do this from when you were a child?

25 A    Yes, I did.

1  Q    Your parents tried to give you a good life and you

2  betrayed them?

3  A    I didn't betray my parents.  I always treated my parents

4  with respect and love.  I disappointed them when I did what I

5  did but that's on me and I got to live with that.

6  Q    So they were hard-working people.  Your father was a

7  truck driver.  They scrounged to pay for your private school

8  education and you think that you didn't betray them by

9  becoming a thug?

10 A    I think that I disappointed them and maybe hurt their

11 feelings very, very much. I mean I did what I did.

12 Q    You testified earlier that you lied to your parole

13 officer when you got out of jail in 1988, you recall that?

14 A    From day one, all the way to the day I got off parole.

15 Q    And when you were asked why you lied to your parole

16 officer you said because you were the criminal and he was the

17 cop, do you recall giving that testimony?

18 A    Yes, yes.

19 Q    You lied because you wanted to stay out of jail and get

20 on with your life?

21 A    Yes.

22         MR. FARBER:   Thank you.

23         I have no further questions.

24         THE COURT:  Redirect.  Very brief, please.

25         MR. NORRIS:   One moment, Your Honor.

1    THE COURT:  Very brief.

2         (Mr. Norris handing to the witness)

3   REDIRECT EXAMINATION.

4   BY MR. NORRIS:

5   Q    Mr. Zuccaro, I have put on the table in front of you your

6   cooperation agreement.  You identified it yesterday.  It is

7   marked as 3500- PZ 2A; is that right?

8   A    Yes.

9         MR. NORRIS:   We offer it.

10        MR. FARBER:   Objection, subject to redactions.

11        THE COURT:  Yes.  What I had the parties do, ladies

12  and gentlemen, is redact that agreement. That means I have had

13  them cross out a lot of it that's highly technical and relates

14  to various problems in sentencing and the like.  You will a

15  have enough of it to see what's there, but not be confused by

16  a lot of technical jargon, and that's what you will have

17  before you when you deliberate. So we're taking out all the

18  jargon; otherwise, admitted.

19        (Exhibit 3500- PZ 2A so marked)

20  Q    Sir, did you plead guilty to every crime you ever

21  committed?

22  A    No.

23  Q    Did you plead guilty to the most serious crimes you've

24  committed?

25  A    Yes, I did.

1   Q    What crimes?

2   A    Two murders.

3   Q    Who decides what your sentence will be?

4   A    The Judge.

5   Q    Does your sentence depend on the outcome of this trial?

6   A    No.  My sentence depends on what the Judge imposes.

7   Q    Sitting here today do you have any idea what your

8   sentence will be?

9   A    None whatsoever.

10  Q    When you started cooperating, in addition to the pleading

11  guilty to murder, what did you agree to do?

12  A    Read the brief and testify fully and honestly to the

13  truth of what happened in my life.

14  Q    Have you done that?

15  A    What I've done and what I've witnessed and what I've seen

16  and yes, I have.

17  Q    You have done that?

18  A    Yes, I have.

19  Q    Have you lied to the government?

20  A    No.

21  Q    Have you lied to this jury?

22  A    Never.

23          MS. SHARKEY:   Objection.

24          THE COURT:  I will allow.

25  Q    And what happens to your cooperation agreement if you

1  lie?

2  A    Like I stated, it gets ripped up.

3  Q    Do you get to take your guilty plea back?

4  A    No, I don't.

5  Q    If your cooperation agreement is ripped up what's the

6  maximum penalty you face?

7  A    Death penalty.

8         MS. SHARKEY:    Objection.

9         THE COURT:    This defendant on trial does not face

10  the death penalty. Don't consider what he may be given as a

11  penalty.

12  Q    If your cooperation agreement, sir, gets ripped what is

13  the maximum penalty you will face?

14  A    The death penalty.

15  Q    If you don't get the death penalty what will you get?

16  A    Life in prison.

17  Q    Any possibility of parole?

18  A    None.

19         MR. NORRIS:    No further questions.

20         THE COURT:    All right.    Step down.    That will be

21  all. Thank you.

22         You have your next witness available?  Do you want a

23  few minutes.

24         MR. BURLINGAME:    We do need a five minute break just

25  to set up the exhibit.

1        THE COURT:  All right.  Take ten minutes, ladies and

2   gentlemen. You can all go.  Take ten minutes.

3        (Whereupon, the jury exited the courtroom)

4        (Court recessed)

5        (Court resumed)

6        (Jury not present)

7        THE COURT:  Who is the next witness?

8        MR. BURLINGAME:   Kenneth Santare.

9        (The following took place in the presence of the

10  jury)

11       THE COURT:  Be seated, please.

12  K E N N E T H   S A N T A R E , having been first duly sworn,

13  testified as follows:

14       MR. BURLINGAME:   May I inquire, Judge?

15       THE COURT:  Yes.

16  DIRECT EXAMINATION

17  BY MR. BURLINGAME:

18  Q    Good afternoon, Mr. Santare.

19       What do you do for a living?

20  A    I am -- right now I am a president of an investigative

21  firm.

22  Q    What sort of investigations do you conduct?

23  A    All types of private investigations, including corporate,

24  governmental.

25  Q    How long have you been doing that?

1    A      Since 1993.

2    Q      And what did you do before 1993?

3    A      Actually I retired from the NYPD in 1992.  Took a year

4    off.  My last assignment in NYPD was from 1985 to 1992 working

5    in Organized Crime Intelligence Unit of the Brooklyn District

6    Attorney's Office.

7    Q      And what were your duties while you were on the organized

8    crime unit of the Brooklyn District Attorney's Office?

9    A      During the time I was at that assignment I was basically

10   -- I had worked deep undercover into -- involving organized

11   crime's influence into the trucking industry; also during that

12   time I was conducting overt and covert surveillance of

13   organized crime figures.

14   Q      What is the difference between overt and covert

15   surveillance?

16   A      Overt normally -- perfect example would be a function

17   that known organized crime figures would show up at -- a wake,

18   a wedding; a covert would be information that we received that

19   we would set up a surveillance on a location.

20   Q      And what's the purpose of conducting those sorts of

21   surveillances?

22   A      Basically it's to identify organized crime members, see

23   their associates, and basically cover their activities.

24   Q      And you said you conducted overt surveillances of

25   weddings and wakes, how much did you cover during your time

1   you were with the organized crime squad?

2   A    Probably between that time 20 -- 20 to 25.

3   Q    When you conducted surveillances did you use any

4   equipment?

5   A    Yeah, I used -- I basically got the specifics of this

6   camera that we used.  It was a basic 35 millimeter Canon with

7   a - a still camera with a 300 telephoto lens coupled to a 2X

8   converter using, I think it was, 1600 Kodak film.  1600 means

9   it's rating ASA and usually shot out of a vehicle using a

10  monopart (ph) to steady the shot.

11  Q    And that sounds like fairly specialized equipment, what's

12  the purpose of using that equipment?

13  A    The purpose is that subject that you were taking is in

14  focus, there's no camera shake, and you can get a clear, clear

15  facial features of the individual.

16  Q    Now, when you were conducting surveillances would you or

17  -- would you typically conduct it alone or with other people?

18  A    No, probably one or two other people.

19  Q    And were notes taken of the surveillances?

20  A    Yes, that is correct.

21  Q    And what would happen to those notes after the

22  surveillance was concluded?

23  A    After the surveillance we would make notes and then we

24  would compile a report indicating who we identified at the

25  whatever function it was, and we also list -- we had a list of

1   cars, vehicle registrations that showed up, and we would also

2   indicate the registered owner of the vehicles.

3   Q    Okay.  I believe sitting in front of you, you have what's

4   been marked as Government Exhibit 3500 KS-2, KS-3, and

5   KS-four, can you tell me what those are?

6   A    That's correct. These are reports that we had submitted.

7   Q    And are these reports for events that you conducted

8   surveillance of?

9   A    That's correct.

10  Q    Have you had an opportunity to review these reports?

11  A    Yes, I did.

12       MR. BURLINGAME:  I would ask if the witness needs

13  to during the course of his testimony he would be allowed to

14  refer to those notes in order to refresh his recollection.

15       MS. SHARKEY:  I have no objection just as long as we

16  know which one he is referencing.

17       THE COURT:  Yes, just indicate which one you are

18  looking at.

19       THE WITNESS:  Yes, Judge.

20       THE COURT:  Thank you.

21  Q    Now, Mr. Santare, did you conduct surveillance of the

22  John Gotti wake on June 27th and June 28th, 1992?

23  A    Yes, I did.

24  Q    I'll refer you to the board which is on the easel here,

25  which is in evidence as Government Exhibit 267, and did you

1  take the pictures in Government Exhibit 267?

2  A    Yes, I took all of them.

3  Q    If you would like to step down and just go through the

4  pictures for us?

5  A    Sure.

6  Q    So you took each one of these pictures?

7  A    Yes, I did.

8  Q    And this is at -- now, which John Gotti is this?

9  A    Okay. John Gotti Senior who was John Gotti Junior who was

10 the boss of the Gambino family, that was his father.

11 Q    Oh, this would be the person who is commonly referred to

12 as John Gotti Senior's father?

13 A    Right -- no, John Gotti Junior's father.

14 Q    Okay.

15        MR. BURLINGAME:    Judge, if I could just lead for a

16 second.

17        THE COURT:  Yes.

18 Q    Okay.  Is it fair to say that to organized crime members

19 you investigated John Gotti Senior and John Gotti Junior both

20 achieved extraordinary prominence in organized crime?

21 A    Yes.

22 Q    Okay. And John Gotti Junior was the son of John Gotti

23 Senior?

24 A    Yes.

25 Q    And this John Gotti Junior whose wake we are looking at

1   here who died in 1992, is it fair to say that he is the father

2   of John Gotti Senior and the grandfather of John Gotti Junior?

3   A    Oh, I will go with that.

4   Q    In other words --

5   A    There are three John Gottis.

6   Q    And the person commonly referred to as John Gotti Junior

7   is actually John Gotti III?

8   A    Right.

9   Q    And the person commonly referred as John Gotti Senior is

10  actually John Gotti II?

11  A    That's correct.

12  Q    And the person whose wake this is, John Gotti I?

13  A    Now we have it.

14       MR. BURLINGAME: Sorry about that, Judge.

15  Q    So if you could just walk us through the picture you took

16  here?

17  A    Well, the individuals --

18  Q    Sure?

19  A    First of all, I was on the other side of the street,

20  which is Woodhaven Boulevard, so if anybody is familiar with

21  that, Crossbay Boulevard.  Obviously, Pelligrino, Jackie the

22  Nose, John D'Amico and Mike DiLeonardo.  Obviously, they seen

23  me across the street, but it was an overt surveillance. So

24  that was in -- this was a shot of Peter Zuccaro.  I did not

25  know him at the time. This was taken in '92, over 15 years

1 | ago. These individuals here Frankie Citriniti and Nicholas
2 | Corozzo. This is an entrance of the funeral theme is Peter
3 | Gotti, Joseph Panzerella Junior, Vinnie Corrao, Augie
4 | Sclafani, Michael Lombardi Tommy Cacciopoli and John Gotti
5 | Junior.
6 |          (Continued on next page)
7 |
8 |
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |

1  **BY MR. BURLINGAME:**

2  Q    I'd like to just show you  --

3          THE COURT:  Can you indicate what plaque number that

4  is?

5          MR. BURLINGAME:  Yes.  It's Government's Exhibit

6  267.

7  Q    Now, I would like you to review Government's Exhibit 266?

8          Did you take these photos.

9  A    Yes, I did.

10 Q    And this is -- so, you conducted surveillance of the

11 Phillip Rastelli wake in June of 1991?

12 A    Correct.  In Maspeth, Queens.

13 Q    These are your photographs?

14 A    These are my photographs, yes.

15 Q    And who do we have here?

16 A    That's John Gotti, Jr., Charles Carneglia, another shot

17 of John Gotti, Jr., a shot of Charles Carneglia, and this is

18 Rob Pellegrino, Nicky Martino, John Cavallo and Jackie the

19 Nose D'Amico.  Joe Corrozo in this photo, Iggy Alonga and

20 Peter Gotti.

21 Q    I ask you to retake the stand.

22          Now, returning to the original photo we looked at,

23 the surveillance we looked at, the wake of John Gotti the

24 First, and referring you back to your notes, what's been

25 marked as Government's Exhibit 3500-KS-4, I would like to just

1  ask you whether the following individuals were in attendance

2  at that wake.

3              Carmine Agnello.

4  A    Carmine was there, yes.

5              MR. BURLINGAME:  Judge, I'm going to refer the

6  jurors to the photos on Government's Exhibit 2.

7              THE COURT:  Yes.

8              MR. BURLINGAME:  I'll call out the exhibit number

9  for the person that's being identified.

10 Q    Carmine Agnello, previously in evidence as Government's

11 Exhibit 2-DD?

12             MR. BURLINGAME:  These are all previously in

13 evidence.

14 Q    Ignazio Alonga, was he at the John Gotti wake?

15 A    Yes, he was.

16 Q    2-A, Government's Exhibit 2-A?

17             Dominick Borghese, was he at the John Gotti wake.

18 A    Dominick Borghese, yes.  We don't have a photo of

19 Dominick Borghese.

20 Q    John Brancato, was he at the John Gotti wake?

21 A    Yes.

22 Q    Government's Exhibit 2-HL?

23             Thomas Cacciopoli.

24 A    Yes.

25 Q    Government's Exhibit 2-B?

1          Mark Caputo.

2  A     Yes.

3  Q     Mark Caputo, previously in evidence as Government's

4  Exhibit 2-KK?

5          John Cavallo.

6  A     Yes.

7  Q     Previously in evidence as Government's Exhibit 2-E?

8          Domenico Cefalu.

9  A     Yes.

10 Q     Previously in evidence as Government's Exhibit 2-NN?

11         Anthony Corrozo.

12 A     Yes.

13 Q     I'll do all the Corozzos together.

14         Anthony Corozzo, Joseph Corozzo, Jr., Joseph

15 Corozzo, Sr., Nicholas Corozzo, Rocco Corozzo.

16 A     That's correct.

17 Q     And the Corozzos we have on the board are Nicholas

18 Corozzo, which is Government's Exhibit 2-G, and Joseph

19 Corozzo, who is Government's Exhibit 2-F?

20         Was Vincent Corrao at that wake.

21 A     Yes.

22 Q     Vincent Corrao is in evidence as Government's Exhibit

23 2-OO?

24         John D'Amico.

25 A     Yes.

1   Q    John D'Amico is previously in evidence as Government's
2   Exhibit 2-J -- I'm sorry -- 2-I?
3            Joseph de Angelo.
4   A    Yes.
5   Q    Joseph de Angelo is not on the board?
6            Michael DiLeonardo.
7   A    Yes.
8   Q    Michael DiLeonardo, in evidence as Government's Exhibit
9   2-J?
10           Frank Fappiano.
11  A    Yes.
12  Q    Frank Fappiano is in evidence as Government's Exhibit
13  2-M?
14           Joseph Gambino.
15  A    Yes.
16  Q    I do not have a photo of Joseph Gambino on the board?
17           John Gammarano.
18  A    Yes.
19  Q    He's in evidence as Government's Exhibit 2-N?
20           Edward Garafola.
21  A    Yes.
22  Q    He's in evidence as Government's Exhibit 2-N?
23           I'll read all the Gottis together:  John Gotti the
24  Third would be John Gotti, Jr.  Joseph Gotti.  Peter Gotti,
25  Jr.  Peter Gotti, Sr.  Peter Gotti.  Richard Gotti, and

1  Vincent Gotti.

2          Were they all in attendance.

3  A    Yes, they were.

4  Q    And the Gottis that we have on the board are Peter Gotti,

5  which is Government's Exhibit 2-Q, Richard Gotti, which is

6  Government's Exhibit 2-YY, and Richard Gotti, which is

7  Government's Exhibit 2-YY, and John Gotti, Jr., which is

8  Government's Exhibit 2-O?

9          Richard Ingardia, was he at the wake.

10  A    Yes.

11  Q    Joseph Lombardi?

12  A    Yes.

13  Q    He's in evidence as Government's Exhibit 2-FFF?

14          Daniel Marino.

15  A    I'm sorry.

16          Dan Marino, that's correct.

17  Q    He is in evidence as Government's Exhibit 2-GGG.

18          Joseph Panzarella, Jr.?

19  A    Yes.

20  Q    He's in evidence as Government's Exhibit 2-U?

21          Dominick Pizzonia.

22  A    Yes.

23  Q    He's in evidence as Government's Exhibit 2-B?

24          John Ruggiero.

25  A    Yes.

1  Q    He's in evidence as Government's Exhibit 2-X?

2        Salvatore Scala.

3  A    Yes.

4  Q    He's in evidence as Government's Exhibit 2-Y?

5        Louis Scida.

6  A    Yes.

7  Q    He's in evidence as Government's Exhibit 2-Z?

8        August Sclafani.

9  A    Yes.

10 Q    He's in evidence as Government's Exhibit 2-AA?

11       Ronald Trucchio.

12 A    Yes.

13 Q    He is in evidence as Government's Exhibit 2-QQ?

14       Quicker, but I would like to go through the same

15 exercise with you for the wake -- for Joseph Corozzo, Jr.

16 wedding surveillance, is that a surveillance that you

17 conducted.

18 A    Yes, it was.

19 Q    And do you have the notes on it there in front of you?

20 A    Yes.

21 Q    That's Government's Exhibit 3500-KS-3.  There's no board

22 prepared for that, so I would like to just run through the

23 names of the people in attendance, and I think, so we get

24 through it a little faster, I won't point out every person who

25 is on the board?

1          Was Carmine Agnello at that wedding.

2     A    Yes.

3     Q    Ignazio Alonga?

4     A    No.

5     Q    Dominick Borghese?

6     A    Yes.

7     Q    Thomas Cacciopoli?

8     A    Yes.

9     Q    Charles Carneglia?

10    A    Yes.

11    Q    John Cavallo?

12    A    Yes.

13    Q    Anthony Corozzo?

14    A    Yes.

15    Q    Blaise Corozzo?

16    A    Yes.

17    Q    Joseph Corozzo?

18    A    Yes.

19    Q    Joseph Corozzo, Jr.

20    A    Yes.

21    Q    Nicholas Corozzo?

22    A    Yes.

23    Q    Rocco Corozzo?

24    A    Yes.

25    Q    Vincent Corrao?

1   A   Yes.

2   Q   John D'Amico?

3   A   Yes.

4   Q   Michael DiLeonardo?

5   A   Yes.

6   Q   Leonard DiMaria?

7   A   Yes.

8   Q   John Gammarano?

9   A   Yes.

10  Q   John Gotti, Jr., John Gotti the Third?

11  A   Yes.

12  Q   Peter Gotti?

13  A   Yes.

14  Q   Richard Gotti?

15  A   Yes.

16  Q   Robert Pellegrino?

17  A   Yes.

18  Q   Dominic Pizzonia?

19  A   Yes.

20  Q   John Ruggiero?

21  A   Yes.

22  Q   August Sclafani?

23  A   Yes.

24  Q   Ronald Trucchio?

25  A   Yes.

1  Q    Again, Charles Carneglia was at the Joseph Corozzo, Jr.
2  wedding?
3  A    Yes.
4  Q    Turning your attention to the Phillip Rastelli wake,
5  which is one of the wakes that we have a board of here that
6  you took the photos of?
7         I would like to perform the same exercise, run
8  through and ask you if the following people were at that wake:
9  Ignazio Alonga.
10 A    Yes.
11 Q    Charles Carneglia?
12 A    Yes.
13 Q    John Cavallo?
14 A    Yes.
15 Q    Joseph Corozzo?
16 A    Yes.
17 Q    John D'Amico?
18 A    Yes.
19 Q    John Gotti the Third or John Gotti, Jr.?
20 A    Yes.
21 Q    Peter Gotti?
22 A    Yes.
23 Q    Robert Pellegrino?
24 A    Yes.
25 Q    Dominic Pizzonia?

1  A    Yes.

2         MR. BURLINGAME:  One moment, your Honor.

3         (Pause.)

4         MR. BURLINGAME:  I have nothing further for this

5  witness.

6         THE COURT:  Thank you.

7         MS. SHARKEY:  No questions.  Thank you, your Honor.

8         THE COURT:  Thank you, sir.  That will be all.

9         THE WITNESS:  You are welcome.

10        (Witness excused.)

11        THE COURT:  Next witness, please.

12        MR. BURLINGAME:  The government calls Frank Russo.

13        THE COURT:  Swear the witness, please.

14  F R A N C O    R U S S O,

15        having been duly sworn, was examined and

16             testified as follows:

17        THE LAW CLERK:  State your name and spell it,

18  please.

19        THE WITNESS:  Lieutenant Franco Russo, R U S S O.

20  DIRECT EXAMINATION

21  BY MR. BURLINGAME:

22

23  Q    Lieutenant Russo, what do you do for a living?

24  A    I'm a lieutenant with the Queens County District

25  Attorney's office.

1  Q    What do you focus on in your job?

2  A    Organized crime.

3  Q    When did you start investigating organized crime?

4  A    Approximately 1983.

5  Q    How did you start investigating organized crime?

6  A    I was assigned to Queens Narcotics in a task force to

7  investigate wiretaps, certain wiretaps.

8  Q    If you could run through with the jury the different jobs

9  that you have had that have entailed conducting organized

10 crime investigation?

11 A    I was assigned to the Queens Narcotics Task Force with

12 the state-organized crime task force from 1983 to 1984.  From

13 1984 to 1985, I was assigned to the Federal Narcotics Task

14 Force.

15 Q    Did you do organized crime work while you were with the

16 Narcotics Task Force?

17 A    Yes.

18       From 1985 to 1986, I was assigned to the state

19 Organized Crime Task Force, also investigating organized

20 crime.

21       In 1986, I was assigned to the Federal Organized

22 Crime Task Force, which I worked there until 1988.  I was

23 promoted to detective in 1986.

24       In 1988, in December of 1988, I was promoted to

25 sergeant and was transferred to patrol.  I stayed on patrol

1    working uniformed patrol in Midtown South in the 1st Precinct

2    until 1992.

3            In October of 1982, I was assigned to the Queens

4    County District Attorney's office as a sergeant in charge of

5    investigating organized crime and rackets cases.  I stayed in

6    that position until I retired in 2001.

7            At that point, I was hired by the Queens County

8    District Attorney's office as a supervising rackets

9    investigator, where I worked investigating organized crime,

10   medical fraud and auto crime thefts.

11   Q    Is it fair to say that you have been doing organized

12   crime investigations for approximately twenty-five years?

13   A    Yes, sir.

14   Q    During the course of your investigations, did you conduct

15   surveillance?

16   A    Yes.

17   Q    And can you tell me what's entailed in conducting

18   surveillance?

19   A    Basically, in surveillance, you do an investigation of

20   mobile surveillance or a fixed surveillance of a location,

21   where you take notes, license plates, take photos and document

22   the goings on of that particular day.

23   Q    What's the purpose of conducting surveillance?

24   A    It's to make a -- document the goings on, associations,

25   license-plate information on the particular individual that

1  you are investigating.

2  Q    Are you trying to identify people?

3  A    Yes, sir.

4  Q    Now, you said that when you conduct surveillances, you

5  would take notes.  What would happen to those notes?

6  A    You would take those notes and make either a DD-5 or a

7  surveillance report.

8  Q    Now, sitting before you in the corner of your table is a

9  binder.

10 A    Yes.

11 Q    Within it are documents marked Government's Exhibit

12 3500-FR-2 and Government's Exhibit 2500-FR-3?

13       Can you explain what those documents are.

14 A    3500-FR-2 is the wedding of Alphonse Trucchio at Russo's

15 Catering Hall.

16 Q    3500-FR-3 there, too?

17 A    Yes.

18 Q    What's that?

19 A    That's the wake of Anthony Ruggiano and Alphonse

20 Trucchio.

21 Q    Is there a 3500-FR-4, as well?

22 A    Yes.  That is the surveillance and wake of Michael

23 Agnello.

24 Q    And did you conduct surveillances of these events?

25 A    Yes, sir.

1  Q    And do these reports contain information that was gleaned

2  during those surveillance?

3  A    Yes, sir.

4        MR. BURLINGAME:  Your Honor, I would ask that the

5  witness be allowed to refer to his notes in response to my

6  questions, if needed.

7        THE COURT:  Yes, granted.

8  Q    So, starting with the --

9        MR. BURLINGAME:  I'm sorry, your Honor.  There's one

10 more report of this witness that I wanted to just allow him to

11 look at.  I forgot to show it to defense counsel.

12       (Pause.)

13 Q    I'm showing you what I'm marking as Government's Exhibit

14 3500-FR-5?

15       Do you recognize that.

16 A    Yes, sir.

17 Q    What is that?

18 A    That's a surveillance of the Joseph Scopo wake.

19 Q    Did you conduct a surveillance of the Joseph Scopo wake?

20 A    Yes, sir.

21 Q    Did you have an opportunity to review this board prior to

22 your testimony today?

23 A    Yes, sir.

24 Q    Are these pictures that were taken during the

25 surveillance of the Joe Scopo wake?

1   A    Yes.

2   Q    Could you please come up and just explain to the jury who

3   are in the photos.

4   A    Peter Zuccaro, Charles Carneglia, John Cavallo and Ralph

5   Scopo, Jr.

6   Q    This is the Joseph Scopo wake on October 23 and 24, 1993?

7   A    Yes, sir.

8   Q    This is previously in evidence as Government's Exhibit

9   271?

10            You testified you also conducted surveillance of the

11  Alphonse Trucchio wedding; is that correct.

12  A    Yes, sir.

13  Q    And does this board contain pictures that were taken at

14  the Alphonse Trucchio wedding?

15  A    Yes.

16  Q    Can you identify who is present?

17  A    Charles Carneglia, Kevin McMahon, Peter Gotti, Salvatore

18  Scala, August Sclafani, Joseph Panzarella, Jr., Freddy

19  DeCongilio and Dominic Pizzonia.

20  Q    When you conduct these surveillance, do you try to take

21  pictures as many people as you can?

22  A    Yes.

23  Q    Do you always take pictures of everyone who is in

24  attendance at the event?

25  A    No, sir.

1  Q    What are some reasons that someone might attend but you

2  couldn't be able to snap their photo?

3           MS. SHARKEY:  Objection to form.

4           THE COURT:  I'll allow it.

5  A    Sometimes the individual walks too fast.  You might be

6  taking a picture of somebody else.  They might go in a

7  different entrance.  You might not see the direction from

8  which he came from.

9  Q    This is already in evidence as Government's Exhibit 253,

10 the Alphonse Trucchio wedding?

11           Government's Exhibit 259, this is the Michael

12 Agnello wake.  I believe you testified previously this is

13 another wake you conducted surveillance of.

14 A    Yes, sir.

15 Q    And are these photographs that were taken at that wake?

16 A    Yes.

17 Q    Can you just identify who is present in the photographs?

18 A    Michael Rockaforte, Jr., Alphonse Trucchio, John

19 Ruggiero, Peter Gotti and Eric Trantell.

20 Q    Very good.  I'll ask you to retake the witness stand.

21           I want to ask you the names of some other people who

22 were in attendance at those wakes.

23           MS. SHARKEY:  I ask, if the witness is referring to

24 3500 material, what page and what exhibit.

25 Q    Sir, let's start with the Phillip Rastelli wake.

1          MS. SHARKEY:  Which exhibit?

2          MR. BURLINGAME:  Which is Government's Exhibit

3     3500-KS-2 -- I'm sorry.  I just grabbed the wrong one.  Sorry,

4     Judge.

5     Q    Start with the Michael Agnello wake?

6               That's Government's Exhibit 2500-FR-4.

7               Was Carmine Agnello wake.

8     A    Yes, sir.

9     Q    Peter Gotti?

10    A    Yes, sir.

11    Q    Michael Rockaforte, Jr.

12    A    Yes, sir.

13    Q    Let's move onto the Alphonse Trucchio wake -- scratch

14    that -- the Alphonse Trucchio wedding reception, which is

15    Government's Exhibit 3500-FR-2?

16              Was Carmine Agnello in attendance.

17    A    Yes, sir.

18    Q    Charles Carneglia?

19    A    Yes, sir.

20    Q    Joseph Corozzo, Jr.

21    A    Yes, sir.

22    Q    Peter Gotti?

23    A    Yes, sir.

24    Q    Dominic Pizzonia?

25    A    Yes, sir.

1  Q    Salvatore Scala?

2  A    Yes, sir.

3  Q    August Sclafani?

4  A    Yes, sir.

5  Q    I also wanted to ask you about the Ruggiano and Trucchio

6  wakes, which I don't believe we have a board for there?

7           Were the following individuals in attendance -- and

8  this took place on Saturday, March 20 and Sunday, March 21,

9  19; is that correct.

10 A    Yes, sir.

11 Q    Were the following individuals in attendance:  Carmine

12 Agnello?

13 A    Yes, sir.

14 Q    Thomas Cacciopoli?

15 A    Yes, sir.

16 Q    Charles Carneglia?

17 A    Yes, sir.

18 Q    Domenico Cefalu?

19 A    Yes, sir.

20 Q    Anthony Corozzo?

21 A    Yes, sir.

22 Q    Blaise Corozzo?

23 A    Yes, sir.

24 Q    Blaise Corozzo, Jr.?

25 A    Yes, sir.

1  Q    Joseph Corozzo, Jr.?

2  A    Yes, sir.

3  Q    Rocco Corozzo?

4  A    Yes, sir.

5  Q    Salvatore Gambino?

6  A    Yes, sir.

7  Q    Peter Gotti?

8  A    Yes.

9  Q    Two Peter Gottis?

10  A    Yes.

11  Q    Richard Gotti?

12  A    Yes.

13  Q    Richard Ingardia?

14  A    Yes, sir.

15  Q    Joseph Panzarella?

16  A    Yes, sir.

17  Q    Dominic Pizzonia?

18  A    Yes, sir.

19  Q    John Ruggiero?

20  A    Yes, sir.

21  Q    Albert Ruggiano?

22  A    Yes, sir.

23  Q    Sal Scala?

24  A    Yes, sir.

25  Q    Gus Sclafani?

1  A    Yes.

2  Q    And Eric Trantell?

3  A    Yes.

4  Q    Finally, on the last report that I gave you, that's

5  Government's Exhibit 3500-FR-5, did you and I review that

6  yesterday in preparation for your testimony?

7  A    Yes, sir.

8  Q    Did we highlight certain names of people in attendance?

9  A    Yes.

10 Q    Could you read the highlighted names, people that were in

11 attendance that we highlighted?

12        MS. SHARKEY:  Objection, can we have a date as to

13 what this document represents?

14        THE COURT:  Yes.

15 Q    Can you explain what the document is, again?

16 A    It's the surveillance report from the Joseph Scopo wake,

17 October 23, 1993.

18        MS. SHARKEY:  Thank you.

19 Q    This is the Joe Scopo wake?

20 A    Yes.

21 Q    This is the same wake as the board that is Government's

22 Exhibit 271 that took place on October 23 and 24, 1993?

23 A    Yes, sir.

24 Q    If you could now read the highlighted names.

25 A    John Gotti, Jr., Peter Gotti, Richard Gotti,

1   John D'Amico, John Cavallo, Ronald Trucchio, Jackie D'Amico,

2   John Ruggiero, Charles Carneglia.

3           MR. BURLINGAME:  I have no further questions.

4           THE COURT:  Thank you.

5   CROSS-EXAMINATION

6   BY MS. SHARKEY:

7   Q    Good morning.

8   A    Good morning.

9   Q    Just to be clear, the document that you just read from,

10  3500-FR-5, that was from 1993?

11  A    Yes, ma'am.

12  Q    And Alphonse Trucchio's wedding reception was from 1999;

13  right?

14  A    Yes.

15  Q    And the Ruggiano and Trucchio wakes that you referenced

16  in the beginning of Mr. Burlingame's questions were also from

17  1999; is that correct?

18  A    Yes.

19          MS. SHARKEY:  Nothing further.

20          THE COURT:  Thank you.  Next witness, please.

21          (Witness excused.)

22          MR. BURLINGAME:  The government calls Lynn

23  Fantauzzi.

24          MS. SHARKEY:  Before we start, we need a copy of

25  that last document you showed us.

1     MR. BURLINGAME:  Sure.

2     THE COURT:  Swear the witness, please.

3  L Y N N    F A N T A U Z Z I,

4          having been duly sworn, was examined and

5               testified as follows:

6     THE LAW CLERK:  State your name and spell it,

7  please.

8     THE WITNESS:  My name is Lynn Fantauzzi,

9  F A N T A U Z Z I.

10  DIRECT EXAMINATION

11  BY MR. BURLINGAME:

12  Q    Ms. Fantauzzi, if you could pull the microphone right in

13  front of you?

14          Good morning.

15  A    Good morning.

16  Q    And if you could speak into it and try and keep your

17  voice up?

18  A    Okay.

19  Q    Thank you?

20          Where did you grow up.

21  A    I grew up in Manhattan until I was twelve, and then from

22  there, I was -- I lived in Queens.

23  Q    Do you still live in New York City?

24  A    No.  I moved upstate in '86.

25  Q    During the time you lived in New York, did you know a man

1  named Albert Gelb?

2  A    Yes, I did.

3  Q    How did you meet Albert Gelb?

4  A    I moved into an apartment across the street from his

5  family home in Howard Beach.

6  Q    And did he live in his Family home?

7  A    Yes.

8  Q    Do you know who he lived there with?

9  A    His parents and sister.

10  Q    How old were you when you moved into that apartment

11  across the street?

12  A    Almost eighteen.

13  Q    And approximately what year was that?

14  A    1970-ish, 1971.

15  Q    Do you remember the fires time you met Albert Gelb?

16  A    It was in the summer of the year I moved in.  He was

17  walking his dog, and I was outside, and we started talking

18  about the dog.

19  Q    Do you remember anything particular about that

20  conversation?

21  A    I remember that I was admiring the dog, and I asked him

22  what breed it was because it looked like it was a pedigree,

23  and he laughed and he said it was a Jamaica Bay retriever.

24  Q    I would like to show you what's been marked as

25  Government's Exhibit 4.

1    MS. SHARKEY:  Objection.

2    THE COURT:  Overruled.

3  Q   Do you recognize those people?

4  A   Yes.  That's Al and his parents, and I can't remember the

5  person, the young lady, with him.

6  Q   And "Al," when you say "Al," you mean Albert Gelb?

7  A   Yes.

8  Q   His parents, these are the people who lived across the

9  street from you?

10 A   Yes.

11 Q   Did he live with anyone else?

12 A   His sister Emily.

13    MR. BURLINGAME:  Move to admit Government's

14 Exhibit 4.

15    MR. FARBER:  Objection.

16    THE COURT:  Yes.  What's the problem?

17    MR. FARBER:  Can we have a sidebar?

18    THE COURT:  No.

19    Proceed.  It is admitted.

20    (So marked.)

21    MR. BURLINGAME:  Judge, permission to just show the

22 photo a little more closer to the jury?

23    THE COURT:  Yes.

24    (Jury views exhibit.)

25 Q   Now, you testified you were about eighteen years old when

1  you met Albert Gelb?

2  A    Yes.

3  Q    How old was he?

4  A    About twenty-one.

5  Q    Did you become friends with him?

6  A    Yes, I did.

7  Q    How long did you know him?

8  A    Until he was murdered.  So, it was about five, six years.

9  Q    Did you have a boyfriend or a husband during that period?

10 A    Yes, I did, and after we were married, moved into the

11 same apartment with me.  His name was Peter.

12 Q    What did he do for a living?

13 A    He was a school-bus driver at the time.

14 Q    What did you do for a living at the time?

15 A    I worked at McDonald's, a few blocks away.

16 Q    Did your husband and Albert Gelb become friends?

17 A    Yes.  They were very close friends.

18 Q    During the time, were all three of you close?

19 A    Yes.

20 Q    How many times a week would you see each other?

21 A    When we weren't working, it would be every day, but, you

22 know, when we were working, obviously it would be on weekends.

23 Q    Fair to say that Albert Gelb was one of your best

24 friends?

25 A    Yes, he was.

1  Q     Did you have nicknames for each other?

2  A     Yes.  He was kind of funny.  Because he was bald, he

3  would like to wear different kinds of hats.  He came over with

4  a large hat on that looked like a cowboy hat, it was white,

5  looked like a hat that Horse Cartwright would wear.  When he

6  opened the door, he stood there with his hat on.  I said, You

7  like Dudley Do Right.  He said, If I'm Dudley, you're Nell,

8  and we would call each other by that.

9  Q     What kind of a person was Gelb?

10 A     He was a really kindhearted and funny kind of person.  He

11 had a great sense of humor.  He was talented.  He was taking

12 guitar lessons and he could play classical guitar music.  It

13 was extraordinarily well how he could do with that.  He was

14 very generous and thoughtful.  When his grandmother passed

15 away, he gave me some of her furniture because he knew I

16 needed some.  He gave me her cookbook, and I still have it to

17 this day.  He was just a really nice-all-around guy.

18 Q     You said he was funny.  Can you give us an example of

19 that?

20 A     Well, I had mentioned about telling his me his dog was a

21 Jamaica Bay retriever.  There was no such breed.  We were

22 living next to Jamaica Bay.  I finally caught on.  He meant

23 that to be funny.

24        He would do funny little things.  His sister had a

25 very small car at the time, and she would park it in front of

1  the house, and when he would come home from work, he would
2  pick up the front end of it and put it up on the sidewalk and
3  it looked like she parked it in an odd way.  She would get
4  angry, and he would do it every day, had the same reaction.
5  She was worried the police would come by and give her a
6  ticket.  He just thought it was funny.  She drove such a small
7  car.
8  Q    What did Gelb do for a living?
9  A    He had a number of different jobs when I knew him.  One
10 was an EMT, and he wanted to be a policeman, but he wasn't
11 able to pass the height requirement, and he got a job as a
12 court officer, and that was the last job he had that I knew
13 of.
14 Q    Did he like being a court officer?
15 A    He seemed to.  He could get along with everybody, so he
16 never had a problem with that.  And he seemed to be pretty
17 proud of the work he was doing.
18 Q    Can you give me an example of how you knew he was proud
19 about the work that he was doing?
20 A    Well, he liked doing things that would -- excuse me.  I'm
21 nervous.
22        He would just tell us about different instances in
23 the courtroom where he came upon things that got -- he would
24 get people arrested for, because they brought contraband into
25 the courtroom, and he suspected there was something going on

1   with these individuals, and he would investigate it, and he

2   found drugs at one point.  So, he was kind of pleased that he

3   was able to catch people doing wrong things.

4   Q   He was proud of that?

5   A   Yes.

6   Q   So, he was able to make arrests as a court officer?

7   A   I suppose he was able to, because he did.

8   Q   Were you ever present when he arrested anyone?

9   A   Yes.  Unfortunately, I was with him on the evening -- at

10  this point in his life, he didn't have a car, and it was cold,

11  so he would borrow my husband's car to go to work at night

12  court.  While I would wait for him to bring the car back, so

13  my husband could go to work in the morning, and I would give

14  him something to eat most nights when he got back from work,

15  this one night, I didn't feel like cooking.  He went out to

16  the diner, and the usual diner we would go to was closed, and

17  he ended up at the Esquire.

18  Q   What was the usual diner you would go to?

19  A   Lindenwood.

20  Q   You said this was after he got home from work.  What time

21  would that be?

22  A   Midnight, maybe a little later.

23  Q   So, he worked the night shift?

24  A   Yes.

25  Q   Do you remember when this took place, what month or year?

1  A    It was in February of '75.

2  Q    What was your last name at the time?

3  A    Baranello.

4  Q    Was that your maiden name?

5  A    No.  That was the name I had with my first husband.

6  Q    Was there a reason why your husband didn't come to the

7  diner with you and Albert that night?

8  A    Yes.  He was a school-bus driver.

9  Q    If you could hold on for a second?

10        (Pause.)

11 Q    You can continue.

12 A    He was a school-bus driver at that time, and he had to

13 get up around 5:00, so being out at 12:00 or 1:00 was a little

14 hard for him.

15 Q    So, you said you went to the Esquire Diner?

16 A    Yes.

17 Q    What did you do when you went to the diner, when you got

18 to the diner?

19 A    Well, we went in and took a booth and sat down, and there

20 was hardly anybody there except for about six or seven other

21 guys at one other booth.

22 Q    Which booth did you select in the diner?

23 A    We sat at the very last, or the very first booth,

24 depending on which way you are looking at the diner, and it

25 was right across from the stairway that went down to the

1   bathrooms.

2   Q    Which way were you facing and which way was Albert

3   facing?

4   A    I sat facing the window, and Albert sat facing me, which

5   was looking into the diner.

6   Q    You said there were six or seven other guys in the diner.

7   Were they there when you arrived?

8   A    Yes.

9   Q    Were they sitting near to you?

10  A    A couple of tables away.

11  Q    Did anything draw your attention to this group?

12  A    Well, yes.  They were all squished into the one booth,

13  and there was more than could fit, and one of them kept

14  getting up, because he would sit on the edge, and he would

15  come to the booth behind that group and lean over it.  They

16  were very interested in the conversation they were having.

17  Q    Was there any problems between that group and the

18  waitress?

19  A    At one point, she went to take their order, I believe,

20  and they were very rude to her, and they were fresh, I would

21  guess that was what you'd call it, and Al got up to talk to

22  them about the way they were treating her.

23  Q    Did the waitress come over to you?

24  A    Yes, to take our order, and she thanked him for standing

25  up for her.

1  Q    So, you are sitting in the booth with Albert Gelb next to

2  the staircase going down to the bathroom, and you are

3  looking -- correct me if I'm wrong -- you would be looking

4  down the staircase, in the direction you were facing?

5  A    No.  If this was the booth, the staircase was here.  So,

6  I would have to look this way.

7  Q    And can you tell us --

8         THE COURT:  Indicating looking to the right?

9  Q    Indicating to the right of where she was sitting?

10  A    Yes.

11  Q    Can you tell me what happened next?

12  A    Well, one of the people at the other booth got up and

13  went down toward the stairs -- down the stairs to the

14  bathroom, and this person was wearing a long overcoat, and it

15  had a slit up the side -- or up the back, rather.  And I guess

16  as the person was sitting at the booth and pulled the coat up

17  to sit down, he had a handgun in the back of his pants, and it

18  was sticking out of his belt, and the coat had fallen around

19  the gun, so when he walked down the stairs, it was quite

20  obvious that he had this very large gun in his pants.

21  Q    You could see the gun clearly?

22  A    Yes.

23  Q    Did you know what kind of a gun it was?

24  A    Well, I had seen a couple of the Dirty Harry movies, and

25  it looked like the gun he had used in the movie, and that was

1   a .357 Magnum, I believe.

2   Q    Is that a large gun?

3   A    Yes, it was very large.

4   Q    What did you do when you saw the gun?

5   A    Well, I brought it to Al's attention -- I mean, it was

6   not something you see every day -- and I just kind of like

7   nudged him and motioned to him -- to the man going down the

8   stairs.  And he looked and saw it, and he looked at me for a

9   few seconds and he said, I think I'm going to go find out if

10  he has a permit for that gun.  I tried to stop him, but he

11  wouldn't listen, and he got up and went down after him.

12  Q    What happened next?

13  A    Well, he went into the bathroom after the first person

14  that went in there, and then there was a struggle, and they

15  came back out struggling outside of the bathroom and fighting.

16  And then the other guys that were at the booth with this

17  original man, they all ran down the stairs after what was

18  going on.  And I got up and ran to the waitress, and we ran

19  into the kitchen, and I was trying to hide, because I didn't

20  know what was going to happen, and she was scared, and the

21  cook was scared, and the dishwasher was scared.

22  Q    What did you do next?

23  A    Well, we were kind of trying to figure out what to do,

24  and t he only phone that was in the diner was at the bottom of

25  the stairs.  It was a pay phone.

1  Q    That's next to the bathroom?

2  A    Yes.

3         And we all knew we needed to call the police.  They

4  had pulled up, and they were very rough with him.  They threw

5  him into one of the booths, and there was a lot of commotion.

6         We figured the waitress and I would run down the

7  stairs to call the police, so we did.  We were on the phone

8  for only a few seconds, and we didn't know how to call for

9  help to say what was needed, but she told me that she knew a

10  code, because I told her he was a court officer, and she said

11  she knew a code that meant that a policeman was in trouble, so

12  she told me the number to say.  And I gave that code, and

13  that's what the operator told, I guess, the dispatcher at the

14  police station.  I don't know how it worked.

15         But one of the men from upstairs came down and made

16  us hang up and made us get upstairs.  So, that's what we did,

17  and we -- there was just a lot of yelling and commotion going

18  on, and the one man that had the gun had jumped up on the

19  tables, and he was marching back and forth across the diner on

20  top of the tables yelling, What am going to do with you?, or,

21  What should we do with you?, or something to that effect.

22  Q    That's the person you originally saw with the gun

23  sticking out of the back of their waistband?

24  A    Yes.

25  Q    And the dress coat bunched around it?

1  A    Yes.

2  Q    What happened next?

3  A    Well, I started to hear the sirens to the police cars

4  coming, and so did the people in the diner, and one of the men

5  grabbed -- took the gun and another gun and put it under his

6  sweatshirt and ran out to the parking lot and hid it in the

7  car -- hid them in the car.  I made sure I watched what he was

8  doing, so I could tell the police where the gun was when they

9  got there.

10  Q    Did the police arrive?

11  A    Yes, they did, and there was quite a few of them.  And I

12  don't remember at this point all the details, but I know I

13  told them where the gun was, and one of the officers went and

14  found the gun in the car with another gun that he had.

15  Q    What else happened after the police arrived?

16  A    Al told them what was going on -- you know, they wanted

17  to know the whole story like you are asking me -- and he

18  explained everything to them.  And they asked me what had

19  happened, and I told them what I knew, and then Al was given

20  the opportunity to decide on who he was going to have

21  arrested, and he just had the one man with the gun arrested,

22  and he let the others go.

23  Q    When you say "the one man with the gun," you're talking

24  about the person you originally spotted with that gun sticking

25  out of his waistband?

1  A    Right.

2  Q    Can you describe that man that they arrested that night?

3  A    He was a short, stocky individual.  He looked like he was

4  in his thirties, he had very black hair and a black beard,

5  full beard.  He was very well dressed, like in a tuxedo, and

6  he had this overcoat over it.

7  Q    Did you learn his name later that night?

8  A    Yes, I did.  I learned his name was Charles Carneglia.

9  Q    I would like to show you what's in evidence as

10 Government's Exhibit 2-C-2?

11        Do you recognize that person.

12 A    Yes, I do.  That's him without his beard.

13 Q    This is the man you saw with the gun sticking out of his

14 waistband?

15 A    Yes, it is.

16 Q    This is the man who was arrested that night?

17 A    Yes.

18 Q    This is the man who fought with Al better Gelb that

19 night?

20 A    Yes.

21        THE COURT:  What number is that?

22        MR. BURLINGAME:  2-C-2.

23 Q    What happened after Carneglia was arrested?

24 A    We had to follow the police to the police station, so Al

25 could fill out the paperwork, and that's when I learned what

1  the man's name was, and they had printed out his arrest record

2  and showed us the long --

3         MS. SHARKEY:  Objection.

4         THE COURT:  Sustained.

5  Q    You said that Gelb had to fill out arrest paperwork.  Was

6  it your understanding that he was the arresting officer?

7  A    Yes.

8  Q    What happened while you were waiting at the police

9  station?

10 A    I was very upset with Al, I was very angry that he had

11 put us in this situation, I was mad at him for getting me

12 involved in this.  And he was starting to think that maybe he

13 shouldn't have done this, and he was uncomfortable, and I

14 don't know if it was at the police station or later on, but I

15 remember he said that he was going to go talk with this

16 individual and just try to say, you know, something like, No

17 hard feelings.

18 Q    When you say "this individual," you mean Charles

19 Carneglia?

20 A    Yes.  I know he went down to see him at some point to

21 talk to him and say that.

22 Q    Did he return?  Did he come talk to you after he spoke

23 with --

24 A    Yes, he did.  He looked very upset, 'cause the man was

25 furious, and he told me that he had --

1      MS. SHARKEY:  Objection.

2      THE COURT:  Sustained.

3      MR. BURLINGAME:  Judge, this is the Mastrangelo

4  statements.

5      THE COURT:  The which?

6      MR. BURLINGAME:  Mastrangelo, 804(b)(6) statements,

7  the admission.

8      THE COURT:  Yes, I've already ruled on it.

9      Do you make an objection on some other ground?

10      MS. SHARKEY:  No, your Honor.  I make it on those

11  grounds.

12      THE COURT:  All right.  Overruled.

13      You may answer.

14  Q    Just to rewind --

15      THE COURT:  Was he excited at that time, he seemed

16  excited and upset?

17      THE WITNESS:  Yes, he was.

18      THE COURT:  All right.

19  BY MR. BURLINGAME:

20  Q    So, just to go back --

21      THE COURT:  It comes in on that ground, too.

22  Q    -- you testified that Gelb had decided that he was going

23  to go talk to the defendant -- go talk to Charles Carneglia to

24  say, No hard feelings.  When he came back upstairs, you

25  noticed that he was upset.  And can you tell me what happened

1  next?

2  A    Well, Al said that he was very angry with him and he

3  wasn't accepting his peace offering and he told him that he

4  was going -- he was a dead man, he was going to kill him.

5  Q    Gelb told you that Charles Carneglia said, You're a dead

6  man?

7  A    Yes.

8  Q    You said he appeared upset when he told you this?

9  A    Yes.

10  Q    What was your reaction?

11  A    Well, of course, I was upset, too.  I was upset for the

12  whole situation, and this didn't help, and I was, you know,

13  thinking, Well, maybe he just said --

14        MS. SHARKEY:  Objection to what she was thinking.

15        THE COURT:  I'll allow it.

16        You may answer.

17  A    I was just thinking that maybe under the circumstances,

18  and he was angry that he was just blowing off steam.  I was

19  hoping that would be the case.

20  Q    Did there come a time when you left the police precinct?

21  A    Yes.  We had to leave and then come back for the

22  arraignment later that morning.

23  Q    So, the arraignment took place the same hours after the

24  arrest at the diner?

25  A    Yes.

1  Q    What happened at the arraignment?

2  A    Well, I was questioned as to what happened.  Al was in

3  the room, and they had questioned me on a number of different

4  things about the incident, and then they tried to imply --

5             MR. FARBER:  Objection.

6             THE COURT:  Just state what happened without using

7  implication.

8             THE WITNESS:  Okay.  Sorry.

9  A    They asked me -- the lawyer for this individual asked me

10 if I was having a relationship with Al that was improper, and

11 I said, Absolutely not, and they just tried to make me look

12 like I was doing something wrong.

13            MS. SHARKEY:  Objection.

14            THE COURT:  I'll allow it.

15 Q    That was Charles Carneglia's lawyer during the

16 arraignment?

17 A    Yes.

18 Q    Did Gelb testify at the arraignment?

19 A    Yes, he did.

20 Q    And you testified, as well?

21 A    Yes.

22 Q    What happened after you and Albert Gelb testified?

23 A    We went home.

24 Q    In the months that followed, did you continue to see

25 Albert Gelb frequently?

1  A    Yes.  We saw as much as we ever did.  Like I said before,
2  we were good friends.
3  Q    What, if anything, happened in those months to Gelb
4  related to the incident at the diner?
5            MS. SHARKEY:  Objection.
6            THE COURT:  That you yourself observed.
7  Q    Or heard from Gelb's lips.
8            MR. FARBER:  Objection to the second.
9            THE COURT:  First, what you observed.
10           MR. BURLINGAME:  Judge, I believe your Honor has
11 already ruled on this.
12           THE COURT:  First, what she observed, and then we'll
13 go further.
14 A    Once I was at Al's apartment with my husband, and his
15 roommate was there, and they had a phone call, and it turned
16 out to be some of the -- either one of or two of the people
17 that were --
18           MS. SHARKEY:  Objection.  It's not an observation.
19           THE COURT:  What did you hear?
20           THE WITNESS:  That the individual who had been at
21 the diner that night was on the phone threatening him, his
22 life, again.
23           THE COURT:  Did you hear the person threaten?
24           THE WITNESS:  No.  I did grab the phone, though, and
25 yelled at them to leave him alone, and I hung up on them.

1    MR. FARBER:  Objection as to which person was on the

2  phone, Judge.  It's not clear.

3        MR. BURLINGAME:  If I could lay some foundation?

4        THE COURT:   Continue.

5

6  Q    Did you have conversations with Gelb during that period

7  about telephone calls he was receiving?

8  A    Numerous.

9  Q    Did he say that he was receiving telephone calls from

10  Charles Carneglia, the man at the diner that night?

11  A    Numerous calls.

12        MR. FARBER:  Objection.

13        THE COURT:  Establish how she knew that.

14  Q    Did Albert Gelb tell you that he was receiving telephone

15  calls from the defendant?

16  A    Yes, he did, and so did his roommate.

17        MR. BURLINGAME:  May I proceed, your Honor?

18        THE COURT:  Not as to the roommate, but just as to

19  Gelb.

20  Q    What did Gelb tell you was the content of those calls?

21  A    That they were telling him -- he was being told by this

22  individual that they would be killing him, they were going to

23  remove him.

24  Q    When you say "this individual," you are talking about

25  Charles Carneglia?

1  A    Yes.

2  Q    So, your testimony is that Gelb was receiving phone calls

3  from Charles Carneglia saying that they were going to kill

4  him?

5  A    Yes.

6  Q    Do you know if Carneglia was supposed to have a trial on

7  the gun-possession case?

8  A    Yes.  I know that, because I had to go before the grand

9  jury, and then there was a schedule for his trial on the gun

10 charge.

11 Q    Did Gelb talk to you about the trial?

12 A    Yes, because we were -- both had to go.

13 Q    Did he say if you would have to have any role at the

14 trial?

15 A    He wanted --

16        MR. FARBER:  Objection.

17        THE COURT:  What was your understanding of what you

18 were going to do at the trial?

19        THE WITNESS:  That I was going to say exactly what I

20 have been saying here this morning.

21        THE COURT:  All right.  Proceed.

22 BY MR. BURLINGAME:

23 Q    As the trial date approached, what, if anything, did Gelb

24 tell you about the death threats he was receiving from Charles

25 Carneglia?

1  A     They were increasing.  They were more frequent.

2  Q     Did Gelb tell you or did you observe how he responded

3  when he would receive these calls?

4  A     He told me that he tried to reason with the individual,

5  and at this point in his life, he was studying with Jehovah's

6  Witnesses, and he was trying to encourage this man to look

7  into the scriptures himself.

8  Q     You said you were present when he received one of these

9  calls?

10  A     Yes, I was.

11  Q     Can you explain -- can you tell us about that incident?

12  A     I don't remember everything about it, but I know he was

13  on the phone again.  I know that Al was trying to talk with

14  him in a calm voice, and I know I got angry and yelled at

15  them.

16  Q     As the trial was approaching, did Gelb ever visit you at

17  work?

18  A     Yes.  At this point, I was working for a dentist, and he

19  came to see me and to just to say good-bye.  He said that he

20  didn't think that he would be alive much longer, and that he

21  wanted me to know that he cared about me as his friend.  And

22  he knew that my husband at that time and I weren't doing well,

23  and he said, I want you to promise me you'll get married again

24  and have lots of babies.  And I told him that, you know, I

25  planned on that, but I didn't know with who.  And he asked me

1  if I really believed in the resurrection hope, and I told him

2  that I did, I believed in it as firmly as I'm looking at him

3  that moment, and he hugged me, and that was the last I saw

4  him.

5  Q    When did you see him next?

6  A    I didn't see him.  It was at his funeral.

7  Q    Could you see his face then?

8  A    No.  It was a closed coffin.

9  Q    Did you ever tell Gelb that he should go to the police?

10 A    Many times, I told him.

11 Q    What did he say?

12 A    He would just kind of shrug it off, and I couldn't

13 understand --

14          MR. FARBER:  Objection.

15          THE COURT:  Sustained.

16          Don't go further.

17 Q    You testified earlier that you learned Gelb had been

18 murdered.  How did you find that out?

19 A    As I was getting ready to go to work, I had the

20 television on, and there was a news bulletin, and they said on

21 the news bulletin that a court officer had been murdered down

22 the block from his apartment, in his neighborhood, and on that

23 street.  So, I knew it was him.  I called the 105th Precinct,

24 which was the local precinct in the area, and I was asking

25 them if the person that was killed, is his name Albert Gelb,

1  and they wouldn't answer me until -- they wanted to know if I

2  was family.  I said, No, I'm his friend.  And they asked me my

3  name, and I told them, and he told me to hold on.

4          MR. FARBER:  Objection.

5          THE COURT:  Sustained.

6  Q    What happened to you the day that you found out Gelb was

7  arrested -- I'm sorry -- that Gelb had died?

8  A    What happened to me?

9  Q    Yes.  Just describe your day.

10          MR. FARBER:  Objection, relevance.

11          THE COURT:  Sustained.

12  Q    Did anything happen to you the day you learned Gelb had

13  been murdered that related back to the incident at the diner?

14          MR. FARBER:  Objection.

15          THE COURT:  I'll allow it, subject to a motion to

16  strike.

17  A    A detective got on the phone when I was calling to see if

18  it was Al, and he asked me my name.  And when I told him, he

19  said, We've been looking --

20          MR. FARBER:  Objection, move to strike.

21          MS. SHARKEY:  Hearsay.

22  Q    Without saying who said what, can you explain to us what

23  happened to you that day?

24  A    I had to leave the --

25          MR. FARBER:  Objection.

1      THE COURT:  What physically happened to you?  Just

2  describe what physically happened.

3      MR. BURLINGAME:  I believe she was, Judge.

4  A    I left my apartment, and I went to a friend's house, and

5  I stayed there for a few days without anyone knowing where I

6  was.

7  Q    What was your understanding as to why you had to do that?

8      MS. SHARKEY:  Objection.

9      THE COURT:  That's sustained.

10 Q    Do you know how long it was between the night Gelb

11 arrested Carneglia and the night -- and the day you learned

12 that Gelb had been murdered?

13 A    About thirteen months.

14 Q    And you testified that the trial on that arrest was due

15 to start near the time when Gelb was killed?

16 A    A few weeks later.

17 Q    Do you know if Gelb was going to be part of that trial?

18 A    Yes.

19 Q    What role was he going to have in the trial?

20     MR. FARBER:  Objection.

21     THE COURT:  You can say whether he was a prospective

22 witness, and that's all.

23 A    He was a prospective witness.

24 Q    After the incident in the diner, did you ever see Charles

25 Carneglia again?

 1  A    On occasion, I would bump into him at the Lindenwood
 2  Diner.
 3  Q    What happened when you bumped into him?
 4  A    He said a smart remark to me.
 5            MR. FARBER:  Objection.
 6            THE COURT:  That, I'll permit, whatever he said.
 7            You may say whatever he had.
 8  A    He would just make smart remarks on my appearance.  I had
 9  cut my hair at that point, and the color was different, and he
10  made a comment on that.
11  Q    What was the comment?
12  A    I went from being a blonde to a brunette.  He said he
13  liked it better as blonde.
14  Q    Have you ever testified against Charles Carneglia before
15  today?
16  A    Yes.  At the original gun-possession trial.
17            MS. SHARKEY:  Objection.
18            THE COURT:  The arraignment, you mean?  Do you mean
19  the arraignment?
20            MR. BURLINGAME:  To.  This is the later trial.
21            THE COURT:  Yes.  You may testify.  Just tell us
22  whether you testified.
23  A    Yes, I testified at that trial.
24  Q    How did the defendant look at that trial?
25  A    He did not look like the person that I had originally

1  seen at the diner.  He had also cut his hair and shaved his

2  beard, and he died his hair blond, and he looked better as a

3  blond, too.

4  Q    What sort of clothes was he wearing during the trial?

5           MR. FARBER:  Objection, relevance.

6           THE COURT:  Sustained.

7  Q    Did he appear different sartorially than he had the night

8  you saw him in the diner?

9           MS. SHARKEY:  Objection.

10          THE COURT:  Sustained.

11  Q    You said he changed his appearance, in that he changed

12  his hair color, he had shaved his beard.  Was there any other

13  way in which his appearance had changed radically?

14  A    The choice of clothing that he wore.  He did not look at

15  all like the person I seen at the diner.  He was dressed

16  rather collegiate.  He had on khaki pants and a pastel-colored

17  shirt.

18  Q    Did he look at all like the person you saw in the diner

19  that night?

20  A    No.  He looked like a regular college kid.

21  Q    Ms. Fantauzzi, did you bring anything with you when you

22  came to testify here today?

23  A    Yes.  One of the times that Al and my husband went out

24  and we went to Chinatown, and Al and I and my husband were

25  looking at one of those novelty shops in Chinatown, and there

1   were some rings that I was looking at, and Al said, Pick one

2   out and I'll buy it for you.  It will be a memento you can

3   always remember me by.  So, I wore it today.

4           MR. BURLINGAME:  I have nothing further, your Honor.

5           THE COURT:  All right.  We'll take a break for

6   lunch.

7           Would you mind staying for the lunch hour?

8           THE WITNESS:  I don't mind.

9           THE COURT:  Be back, please, at 1:30.

10           (Jury excused.)

11           THE COURT:  All right.  1:30 everybody.

12           Any applications?

13           MS. SHARKEY:  Yes, your Honor.  When the witness

14   leaves.

15           THE COURT:  Leave the room, please, madam.

16           (Witness excused.)

17           THE COURT:  Yes.

18           MS. SHARKEY:  Respectfully, we had thought that the

19   morning session was designed for exhibits that were coming in.

20   We were shown that photo right before --

21           THE COURT:  What photo?

22           MS. SHARKEY:  The photo that was entered into

23   evidence.

24           THE COURT:  Which photo?

25           MS. SHARKEY:  The photo of Mr. Gelb and his family.

1    THE COURT:  Yes.

2    MS. SHARKEY:  I just want to point out -- and I

3    would request we be allowed to litigate this outside the

4    presence of the jury in the future -- I had indicated to the

5    prosecutors that we were objecting to its entrance and we

6    would make the application to the Court, but the witness was

7    called in immediately after Mr. Santare or whichever

8    surveillance witness.  I just think it moves more orderly and

9    allows the defense to put the proper objection on the record,

10   as was previously agreed to when these items came up prior to

11   the day's testimony.

12   THE COURT:  Yes.

13   They should be handled between 9:00 and 9:30 every

14   morning.  That's why we start at 9:00.

15   MR. BURLINGAME:  Judge, there must have been a

16   miscommunication.  I showed the letter to Ms. Sharkey.  She

17   said she planned on objecting.

18   MS. SHARKEY:  To the letter.

19   MR. BURLINGAME:  The photo to Ms. Sharkey.  That's

20   exactly how I thought it played out.  I didn't know you were

21   making an objection prior.

22   MS. SHARKEY:  Yes.

23   THE COURT:  You should have made it then between

24   9:00 and 9:30.

25   MS. SHARKEY:  Judge, we didn't have the opportunity

1  to.  It was shown to us prior to the witness taking the stand.

2           THE COURT:  Thank you.

3           (Lunch recess.)

1         A F T E R N O O N       S E S S I O N

2        (The following occurred in the absence of the jury.)

3        THE COURT:  Bring in the defendant, please.

4        Have the witness take the stand, please.

5        MR. BURLINGAME:  Judge, I realized I forgot to put

6  in one exhibit.  The defense has agreed to let me just

7  continue direct for one more question.

8        THE COURT:  Yes.

9        MR. BURLINGAME:  Thank you.

10        THE COURT:  Where is the witness?

11        MR. NORRIS:  Judge, before the witness comes in, I

12  would like to make a brief application.

13        THE COURT:  Yes.

14        MR. NORRIS:  The next witness after Ms. Fantauzzi is

15  a gentleman named Malcolm Settle.  He was at the Esquire Diner

16  that night.

17        I have provided his Giglio.  I have provided his

18  criminal history report to the defense.  He has I think five

19  arrests dated from 1972 up through 1991.

20        I believe the criminal history report, only one

21  conviction that resulted in a violation.  I did -- of the

22  five, as I read it, only one goes into -- they are all well in

23  excess of ten years old.  As I read it, only one of the five

24  goes into credibility, for grand larceny.  Because it's

25  relevant to his testimony, because he was arrested with Peter

1  Zuccaro.  I plan to go into that.

2         But not the others.

3         THE COURT:  Okay.

4         MR. NORRIS:  I wanted to elicit that he has been

5  arrested before and then talk about that specific arrest and

6  make a motion under Rule 609 the defense not be permitted to

7  impeach him with any of the other arrests.

8         THE COURT:  Arrests are nothing.

9         MS. SHARKEY:  No, Judge.  I do think, though, we

10 just received this, this morning.  That's okay.  I am not

11 objecting to it.  I am not objecting to that.

12        My point is, that I would like the opportunity, if

13 it's relevant to his relationship to the individuals at the

14 diner, I know Mr. Norris intends to cross-examine him about

15 one arrest.  I don't intend at this juncture to go into those

16 other arrests.

17        However, if it develops during the course of his

18 testimony, perhaps his relationship concerning some of the

19 other individuals present that day, I do think it might be

20 relevant.  That's all.  I ask not to be precluded outright.

21 It is not my intention at this point to go into it.

22        THE COURT:  Thank you.

23        Bring in the jury.

24        MR. NORRIS:  I don't believe any of them do pertain.

25        MS. SHARKEY:  Okay.  You would know better.

1        (Jury present.)

2        THE COURT:  Be seated, please.

3        Continue, please.  Proceed.

4    EXAMINATION CONTINUES

5    BY MR. BURLINGAME:

6    Q    Ms. Fantauzzi, I realize I forgot to show you one exhibit

7    during my direct examination.

8        I am showing you what's been marked as Government

9    Exhibit 3.

10        Do you recognize the person in that photo?

11    A    Yes.  That's Albert Gelb.

12        (Exhibit displayed to jurors.)

13        MR. BURLINGAME:  I offer it, Judge.

14        THE COURT:  Admitted.

15        (So marked.)

16        MR. BURLINGAME:  I have no further questions.

17        THE COURT:  Yes.  Cross.

18    CROSS-EXAMINATION

19    BY MR. FARBER:

20    A    Hello.

21    Q    Going back to the night of at the diner, when you say

22    Mr. Gelb first went downstairs, at some point in time you

23    heard a commotion?

24    A    Yes.

25    Q    And did you hear any words actually being stated?

1  A    No.

2  Q    Did you hear someone say, put your gun away?

3  A    I don't remember.

4  Q    At some point in time, you said the individuals who were

5  upstairs went running downstairs?

6  A    Yes.

7  Q    The only people in the diner at this point in time were

8  you and Officer Gelb and that group that was six or seven men

9  squeezed in that booth?

10 A    Yes; and the staff of the diner.

11 Q    And the staff.

12       Did the six to seven men all go downstairs?

13 A    I believe so.  I don't recall.

14 Q    At some point in time, you said Officer Gelb was brought

15 back upstairs?

16 A    Yes.

17 Q    And you and the night waitress ran downstairs to place

18 the phone -- phone call to the police?

19 A    Yes.

20 Q    While the group was upstairs, did you hear anyone calling

21 out I want the police called myself?

22       Any of the participants, any of these men scream out

23 "Let's get the police"?

24 A    They may have.

25 Q    The police did ultimately arrive?

1  A    Yes.

2  Q    Is it fair to state they arrived about fifteen minutes

3  after the incident?

4  A    Approximately.

5  Q    At the time that the police arrived, it was just

6  Mr. Carneglia who had remained at the diner?

7  A    No.  There were other people there.

8  Q    Are you sure?

9  A    I don't remember how many people were there.  Some left.

10  But I don't recall how many.

11  Q    It is your testimony that only Mr. Carneglia was

12  arrested?

13  A    Yes.

14  Q    Prior to his being arrested, isn't it a fact that he said

15  to the officers that he wanted Albert Gelb arrested?

16  A    I don't recall.  He may have.

17  Q    It was Mr. Carneglia who got arrested?

18  A    Yes.

19  Q    Then you ultimately -- ultimately you went with Mr. Gelb

20  and you went back to the precinct?

21  A    Yes.

22  Q    Because Mr. Gelb was actually considered the arresting

23  officer?

24  A    I believe so.

25  Q    Then later that same day, you were required to go to

GR      OCR      CM      CRR      CSR

1  court?

2  A    Yes.

3  Q    You testified at what is called a preliminary hearing?

4  A    I guess so.

5  Q    This is what you were referring to as the arraignment?

6  A    I think so, yes.

7  Q    And when you testified at the preliminary hearing,

8  Mr. Carneglia was present in the room?

9  A    I think he was.  I don't remember.

10 Q    He was the accused and this was a proceeding against him?

11 A    A hum.

12 Q    You said there were lawyers there representing him?

13 A    Yes.

14 Q    The Assistant District Attorney asked you a series of

15 questions?

16 A    I know I was asked a series of questions.  I don't

17 remember who did it.

18 Q    Do you recall also being asked a series of questions by

19 another group of attorneys, another attorney, the defense

20 attorney?

21 A    Yes.

22 Q    When you testified, you testified as you indicated here

23 today about your observations?

24 A    Right.

25 Q    You testified at that hearing about seeing Mr. Carneglia

1  go downstairs with the butt of the gun sticking out of his

2  waistband?

3  A    Yes.

4  Q    You testified further that Mr. Carneglia -- that someone

5  came upstairs and took the gun and threw it into one of the

6  cars outside?

7  A    Yes.

8  Q    And Mr. Carneglia was present when you testified to all

9  this?

10  A    I believe he was.

11  Q    So it would be clear, is it not, that you were a witness

12  to all facets of this case?

13  A    That happened at the diner, yes.

14  Q    Yes.

15       In fact, you were the sole witness who made the

16  observation that the gun had been placed inside the car

17  outside the diner?

18  A    Right.

19  Q    Officer Gelb had not made that observation?

20  A    I don't believe he did, no.

21  Q    Subsequent to your testimony at the preliminary hearing,

22  which was on February 10th of 1975, you additionally testified

23  before the Queens County grand jury on March 20th of 1975?

24  A    Yes.

25  Q    That testimony again related to your observations of

1   Mr. Carneglia possessing the gun?

2   A    Yes.

3   Q    And, additionally, of your observations of the gun being

4   placed in the car outside the diner?

5   A    Yes.

6   Q    An indictment was handed down by the grand jury following

7   your testimony?

8   A    I guess it was.

9   Q    And --

10        THE COURT:  Don't guess.  If you don't know, say I

11  don't know.  Don't guess.

12  A    I don't remember.

13  Q    Fair enough.

14        Up -- after your testimony at the preliminary

15  hearing and at the grand jury, and up until the time you

16  testified -- you did ultimately testify at the criminal trial

17  against Mr. Carneglia for criminal possession of a weapon?

18  A    Yes.

19  Q    This was sometime after Officer Gelb was killed?

20  A    Yes.

21  Q    You had not received any death threats yourself?

22  A    No.

23  Q    Is it fair to state that when you ran into Mr. Carneglia,

24  as you indicated, at the Lindenwood Diner, he never threatened

25  you when you personally met him?

1  A    Right, he never did.

2  Q    You were never approached by anyone, whether it be

3  Mr. Carneglia or any other individual, and offered money or

4  otherwise threatened not to testify?

5  A    I never was approached by anyone.

6  Q    You testified you were very close to Albert Gelb?

7  A    Yes.

8  Q    And that you saw each other on a regular basis?

9  A    Yes.

10 Q    You indicated that the attorneys at what you called the

11 arraignment made some inference that you were having an

12 improper relationship?

13 A    Yes, they did.

14 Q    So the record is clear, that was not myself or

15 Ms. Sharkey?

16 A    No.

17 Q    After Officer Gelb was murdered, you spoke to the police

18 that day?

19 A    Yes, I did.

20 Q    You spoke to the police several times thereafter?

21 A    Yes, I did.

22 Q    You spoke to them in great detail about everything you

23 knew?

24 A    I don't remember.

25 Q    Do you recall that approximately one year later, on

1  January 10th of 1977, you were reinterviewed by the police?

2  A    I don't remember.

3  Q    Do you recall in January 10th of 1977, at that point in

4  time the police asking you about where your former husband,

5  Peter Baranello's, whereabouts were the night of the murder?

6  A    I know I was asked about that at some point.  But I don't

7  recall on what date.

8  Q    When the police asked you about that, they told you they

9  were investigating him as a potential suspect, am I correct?

10  A    No.  I don't recall that ever being said.

11  Q    They asked you about where your husband was that night?

12  A    I don't recall that.

13  Q    Do you recall whether or not they asked if you can vouch

14  for his whereabouts the night of the murder?

15  A    I know I left him home and he was asleep.

16  Q    I understand that.

17         What I am asking you is, do you recall whether or

18  not you were asked to verify that?

19  A    I don't remember.

20         MR. FARBER:  I have no further questions.

21         THE COURT:  Thank you.

22         That will be all, madam, thank you.

23         (Witness excused.)

24         THE COURT:  Next witness, please.

25         MR. NORRIS:  The government calls Malcolm Settle.

1       THE COURT:  Swear the witness, please.

2       THE CLERK:  Please stand and raise your right hand.

3       Do you understand your obligation to tell the truth

4  the whole truth and nothing but the truth under penalty of

5  perjury?

6       THE WITNESS:  Yes.

7       THE CLERK:  Please state and spell your name for the

8  reporter.

9       You may be seated.

10      THE WITNESS:  Malcolm Settle, S E T T L E.

11  M A L C O L M      S E T T L E

12  DIRECT EXAMINATION

13  BY MR. NORRIS:

14  Q    Good afternoon.

15       How old are you, sir?

16  A    I'm fifty-three.

17  Q    Where were you born?

18  A    Brooklyn, New York.

19  Q    Where did you grow up?

20  A    In Brooklyn.

21  Q    What neighborhood?

22  A    East New York.

23  Q    How far did you go in school?

24  A    Ninth or tenth grade.

25  Q    What do you do now?

1  A    Truck driver.

2  Q    Have you moved away from New York?

3  A    Yes, I have.

4  Q    When did you move away from New York?

5  A    1980.

6  Q    Are you married?

7  A    Yes.

8  Q    Do you have kids?

9  A    Yes.

10  Q    How many?

11  A    Five.

12  Q    Can you tell the jury who some of your friends were

13  growing up in East New York?

14  A    Robert Zuccaro, Peter Zuccaro, guy named Andrew, a guy

15  named Frank, Hector, a guy named Pablo.

16  Q    Where did the Zaccaros live?

17  A    About three doors down from us.

18  Q    Three doors down from you?

19  A    Yes.  Across the street, three doors down.

20  Q    How old is Peter Zuccaro?

21  A    I believe he's the same age as I am, fifty-three.

22  Q    What about Robert?

23  A    I believe Robert was a year or two younger than I.

24  Q    Did the Zuccaros have another brother?

25  A    They had a younger brother.  I think his name was Steven.

1    Q    Which of the Zuccaro brothers were you closest to?

2    A    Robert.

3    Q    Can you describe for the jury just briefly what Peter

4    Zuccaro was like?

5    A    Always seemed to me like tough sort of person.

6    Q    Did you ever know him to get into any fights?

7    A    On a regular basis.

8    Q    Showing you what's in evidence as Government Exhibit

9    2-BB-2.

10            Do you recognize that individual?

11   A    I believe that's Peter.

12   Q    Peter Zuccaro?

13   A    Yes, Peter Zuccaro.

14            (Displayed to jurors.)

15   Q    Have you ever been arrested before, sir?

16   A    Yes, I have.

17   Q    A few times?

18   A    Yes.

19   Q    Were you ever arrested with Peter or his brother Robert?

20   A    Yes.

21   Q    Which one?

22   A    Both.

23   Q    What were you and Robert -- what were you and Peter and

24   Robert arrested for?

25   A    The original charge was grand larceny.

1  Q    For stealing what?

2  A    They accused of -- they accused me of stealing a car.

3  Q    What kind of a car?

4  A    '68 Camaro.

5  Q    Were you and Peter Zuccaro and Robert Zuccaro held at

6  Central Booking for a time?

7  A    Yes.

8  Q    About how long?

9  A    About two days.

10  Q    And what happened while you were at Central Booking with

11  them?

12  A    We kind of gave the police a hard time and they kind of

13  beat up on us.

14  Q    Pretty bad?

15  A    Yeah.  I mean, nobody had to go to the hospital or

16  anything.  But yeah.

17  Q    What happened to Robert Zuccaro?

18  A    A couple of days later he passed away.

19  Q    What happened to that case?

20  A    It was dismissed.

21  Q    Now, you said that you and Peter Zuccaro were friends

22  growing up?

23  A    Yes.  We lived in the same neighborhood and --

24  Q    Did you ever come to know any of his friends?

25  A    Just a few of them.

1  Q    Can you name some of them?

2  A    There was a kid named Andrew, there was a guy named

3  Chris.  I believe there was somebody named Vito.

4  Q    Do you remember Andrew's last name?

5  A    No, I don't.

6  Q    Did you and Peter and Andrew ever hang out at diners

7  together?

8  A    Yes.

9  Q    Frequently?

10  A    Pretty regular, maybe once or twice a week.

11  Q    Did there come a time that the three of you went to a

12  diner and a fight broke out?

13  A    Yes.

14  Q    Do you recall if Robert Zuccaro was still alive that

15  night?

16  A    I don't remember.

17  Q    Do you recall what year this was, that the fight broke

18  out at the diner?

19  A    I am not sure of the exact year.  I believe it was

20  somewhere between maybe '75 and '77.

21  Q    Do you remember the name of the diner?

22  A    No, I don't.

23  Q    Do you remember what neighborhood it was in?

24  A    I believe it was Ozone Park.

25  Q    Do you remember what street it was on?

1  A    I am not sure if it was Woodhaven or Cross Bay.  It's

2  the -- one road.  It just changes names somewhere in there.

3  Q    The roads connect?  It is the same road, in essence?

4  A    Yes.

5  Q    Do you remember whether it was day or night that the

6  fight broke out?

7  A    I believe it was late at night.

8  Q    Do you remember why you were there that night?

9  A    I am not sure if we were there for a specific reason.

10  Just getting something to eat.

11  Q    Do you remember how you got there?

12  A    I drove my mother's station wagon.

13  Q    Your mother's name?

14  A    Mabel.

15  Q    Where were the three of you sitting in the diner?

16  A    In one of the booths, by the window.

17  Q    Do you recall a time that night when someone entered the

18  diner?

19  A    Yes.

20  Q    Did you recognize him?

21  A    I recognized him at the time, yes.

22  Q    Whom did you recognize him to be?

23  A    I believe his name was Charles.

24  Q    Did you know him personally?

25  A    No.

1   Q    Did you know someone he was related to?

2   A    I know his brother.

3   Q    Who was his brother?

4   A    I believe his brother's name was John.

5   Q    Do you know what John did?

6   A    I think he owned a junkyard on Fountain Avenue.

7   Q    Did you ever go to that junkyard?

8   A    Yes.

9   Q    To do what?

10  A    Sometimes we'd pick up car parts or drive Peter over

11  there.

12  Q    Peter Zuccaro?

13  A    Yes.

14  Q     When you and Peter Zuccaro would go to the Fountain

15  Avenue to the junkyard, what would you do?

16  A    He asked me to sit in the car.

17  Q    What would he do?

18  A    He would go in the office.

19  Q    You mentioned that John Carneglia's brother's name you

20  believe is Charles, is that right?

21  A    I believe, yes.

22  Q    Do you recall when you learned that was his name?

23  A    I believe it was -- I believe it was that night at the

24  diner.

25  Q    Do you recall who told you?

1   A    I believe it was Peter.

2   Q    Did Peter and Charles appear to know each other?

3   A    Yes.

4   Q    Did Charles sit down.

5   A    I believe he sat down.

6   Q    In the same booth as you?

7   A    No.  I believe it was the booth behind us.

8   Q    Did there come a time where you learned where he had come

9   from?

10  A    Yes.

11  Q    Where?

12  A    I believe he said he came from a wedding.

13  Q    How did you hear that?

14  A    I overheard them talking about it.

15  Q    Who is them?

16  A    Peter and Charles.

17  Q    Do you recall Charles's physical appearance that night?

18  A    He appeared to be drunk.

19  Q    Do you recall -- can you -- withdrawn.

20       Can you describe him physically?

21  A    Dark hair, maybe a light dark colored beard.  I thought

22  he was wearing a black leather jacket.

23  Q    The jacket long or short?

24  A    It was long.

25  Q    The beard you said light.  Do you mean light in color?

1   A    No.  I mean not real thick.  Like close to the face.

2   Q    But dark in color?

3   A    Right.

4   Q    Did Peter Zuccaro and Charles Carneglia interact for a

5   time?

6   A    Yes.

7   Q    What happened next?

8   A    I believe Charles had went downstairs to the bathroom and

9   then I heard a -- what appeared to be a scuffle.

10  Q    Specifically, what sounds did you hear?

11  A    It just sounded like people scuffling around together,

12  you know, like holding each other, like sort of wrestling.

13  Q    Were you hearing words?

14  A    Yeah.  I don't remember the exact words, but just noises

15  were being made, something was going on.

16  Q    A commotion?

17  A    Yes, a commotion.

18  Q    Was the bathroom on the same level as the diner where you

19  were sitting?

20  A    No.  The bathroom was downstairs.

21  Q    How far was staircase from where you were sitting?

22  A    I am not sure of the exact.  Maybe twenty,

23  twenty-five feet.

24  Q    What happened after you heard -- withdrawn.

25           What happened after you heard the sounds of the

1  scuffle?

2  A    Peter got up and went down there.

3  Q    Peter Zuccaro?

4  A    Yes.

5  Q    He went down the stairs?

6  A    Yes.

7  Q    Did Andrew go?

8  A    I don't know.

9  Q    Did you go?

10  A    I went, yes, to the edge of the stairs.

11  Q    The top of the edge of the stairs?

12  A    Yes.

13  Q    What did you see when you looked down?

14  A    As I got there, Peter was coming out.  He was coming back

15  up and he went by me.

16  Q    What did you see when you looked down the staircase?

17  A    Two men appeared to be scuffling down there.

18  Q    Now that you could see them, what were you actually

19  seeing them do?

20  A    They appeared to be wrestling each other, trying to -- I

21  don't know -- get the upper hand on another or something to

22  that effect.

23  Q    One of those men was Charles?

24  A    Yes.

25  Q    The other man, did you know him?

1  A    No.

2  Q    Can you describe him for the jury?

3  A    Just appeared to be a white male.

4  Q    What happened after you saw the scuffle?

5  A    I believe I went back to the booth and they had come up

6  from downstairs.

7  Q    Charles Carneglia and the other man?

8  A    Yes.

9  Q    Where was Andrew at that point?

10 A    I don't remember.

11 Q    Where was Peter at that point?

12 A    I believe he was back at the booth by the time we got

13 over there.

14 Q    And was the person that Charles Carneglia was scuffling

15 with, was he there with anyone that night?

16 A    I believe he was there with a woman.

17 Q    What happened after they came back upstairs?

18 A    They got into one of the booths and Charles was yelling

19 at the guy and cursing at the guy, appeared to be physically

20 threatening him.

21 Q    And where was Charles standing when he was doing this?

22 A    At one point he was standing on top of the table.

23 Q    Do you recall specifically what he was yelling?

24 A    No, I don't.

25 Q    What was the other guy doing?

1   A    He was kind of cringing in the booth.

2   Q    What did you do next?

3   A    I believe I got up to leave at that point.

4   Q    Where did you go?

5   A    I started heading outside toward the car and at that time

6   I heard police cars coming.  So I just left.  I headed out

7   toward the street.

8   Q    Where specifically to the street did you go?

9   A    There is a car service across the -- the boulevard.  I

10  went over there.

11  Q    Did you go with anyone else?

12  A    I am not sure if somebody was with me.

13  Q    Could you see the diner from where you were standing

14  across the street?

15  A    Yes.

16  Q    What did you see as you were standing across the street?

17  A    At one point when I was getting ready to get in the cab,

18  there was a police officer holding a gun up next to my

19  mother's station wagon.

20  Q    Had you seen a gun at any time before that point?

21  A    No.

22  Q    Do you recall anyone talking about a gun?

23  A    No.

24  Q    Did you see anything else happen before you left?

25  A    No.

1  Q    Where did you go next?

2  A    I believe -- I am not sure if I went to another diner

3  or -- I believe I went to a phone, to call my parents.

4  Q    To call your parents?

5  A    Yes.

6  Q    What did you tell them?

7  A    I told them -- my mother and father that there had been

8  some kind of an incident and that they should report our car

9  stolen.

10 Q    Why did you tell them that?

11 A    Because I was afraid of something -- the gun being traced

12 back to my parents, something to that effect.

13 Q    Why?

14 A    I didn't want to get in any trouble over it.

15 Q    The police ever come to your house?

16 A    Yes.

17 Q    Did you ever get arrested?

18 A    No.

19 Q    Did you ever tell the police what happened at the diner

20 that night?

21 A    No.

22 Q    Did you ever talk to Peter Zuccaro again?

23 A    I believe right after the incident.

24 Q    Did you and he discuss what had happened that night, any

25 of the details?

1  A     Not in detail.  We just kind of argued over how the gun

2  got into my mother's car.

3  Q     What did he tell you?

4  A     I really never got a straight answer out of him.  I don't

5  know if he put it there or Andrew put it there.

6  Q     What happened to your relationship with Peter Zuccaro

7  after that day?

8  A     We kind of parted ways.

9  Q     Why?

10  A     Just I wasn't into the kind of crap that was going on

11  with guns involved.

12  Q     Did you ever hang out with Andrew again?

13  A     No.

14  Q     Do you know what happened to Charles Carneglia that night

15  at the diner after you left?

16  A     No.

17              (Continued on next page.)

18

19

20

21

22

23

24

25

1  BY MR. NORRIS:

2  Q    Did you ever see Charles Carneglia again?

3  A    No.

4  Q    Did you ever hear anything about who the guy was that

5  Charles Carneglia was fighting with at the diner?

6          MS. SHARKEY:  Objection.

7          THE COURT:  I'll allow it.

8          MR. NORRIS:  I'll ask it again.

9  Q    Did you ever hear anything about who the guy was that

10 Charles Carneglia was fighting with at the diner?

11 A    No.

12 Q    When was the last time you saw Peter Zuccaro?

13 A    Probably thirty years ago.

14 Q    When was the last time you talked to him?

15 A    Phone conversation, about twenty years ago.

16 Q    What did you talk about?

17 A    He was asking me about moving to where I live and

18 starting his own business.

19 Q    Did you ever talk to him again after that?

20 A    No.

21 Q    You said you left New York in 1980; is that right?

22 A    Yes.

23 Q    After 1980, when is the next time that you were contacted

24 about what happened at the diner?

25 A    By the FBI, probably -- I don't know -- a couple of

1  months back.  I don't know the exact number.

2          MR. NORRIS:  No further questions.

3  CROSS-EXAMINATION

4  BY MS. SHARKEY:

5  Q    Good afternoon, Mr. Settle.

6  A    Good afternoon.

7  Q    Mr. Settle, you testified on direct examination that you

8  knew Peter Zuccaro from the neighborhood?

9  A    Yes, ma'am.

10  Q    You knew him to be a tough guy; right?

11  A    Yes, ma'am.

12  Q    Violent guy?

13  A    Yes, pretty violent.

14  Q    Was he dealing drugs at that point?

15  A    Not that I know of.

16  Q    Well, his brother Robert and you and Peter had been

17  arrested for theft of a car; right?

18  A    Yes, ma'am.

19  Q    And Robert died shortly after that arrest; right?

20  A    Yes, ma'am.

21  Q    And you are aware that Robert used heroin?

22  A    I didn't know the exact drug, but I found out after his

23  death, yes.

24  Q    And how long after your arrest and the incident at the

25  police station did Robert Zuccaro die?

1   A    I believe it was a couple of days.

2   Q    And you testified that you stole a car with them and you

3   were arrested.  Is that the only time you stole a car?

4   A    No, ma'am.  I was arrested for stealing the car.  We

5   didn't steal the car.

6   Q    Oh?

7        When you say you were arrested for stealing a car,

8   you mean that the police just picked you up and brought you to

9   the station and beat you up.

10  A    No, ma'am.  Can I into detail?

11  Q    Please do.

12  A    I purchased a car that was on its way to a junkyard that

13  had license plates on it and had a temporary registration that

14  couldn't be transferred.  I contacted the owner, and he said

15  that he would try and get me the right registration to

16  transfer the tags, and I told him I would pay for it, and I

17  never went back to him.  Evidently, he reported the license

18  plates or the car stolen, and we got pulled over on the Belt

19  Parkway and got arrested for it.

20  Q    Did Peter Zuccaro have anything to do with the purchase

21  of that car?

22  A    No.

23  Q    And the owner of the car that you say you purchased

24  reported that car stolen?

25  A    Yes, lam.

1   Q    And the police arrested you and the other persons in the

2   car as a result of that report of a stolen car; is that your

3   testimony?

4   A    Yes, ma'am.

5   Q    And you testified that on the night when you were at the

6   diner, you were with Peter, his -- his brother wasn't there,

7   obviously?

8   A    No.

9   Q    Who else was is there, if you remember?

10  A    I believe Andrew was there.

11  Q    And how many other people?

12  A    With us, there wasn't anybody else.  But there were other

13  people in the diner.

14  Q    How many other tables, if you remember?

15  A    I don't remember.

16  Q    More than two?

17  A    I don't remember.

18  Q    When you testified on direct examination that there were

19  other people, are you referring -- who were you referring to?

20  A    The woman and the other gentleman, and I don't know if

21  there was anybody else there at the time.

22  Q    But it's your testimony that at your table, it was just

23  you, Peter and Andrew?

24  A    Yes, ma'am.

25  Q    Now, you testified on direct examination that at some

1   point, Charles Carneglia came into the diner?

2   A    Yes, ma'am.

3   Q    And he came into the diner with his date?

4   A    Excuse me?

5   Q    He came into the diner with a date, with a woman?

6   A    I don't remember that.

7   Q    Did you just testify on direct examination that he was

8   sitting at a table with someone else?

9   A    No.

10  Q    Excuse me.  I misheard you, then?

11       You remember him coming into the diner.

12  A    Yes, ma'am.

13  Q    What time do you remember him coming in?

14  A    I don't know what time this was.

15  Q    You testified that he sat at the table behind you; right?

16  A    I believe it was behind me.  I'm not sure.

17  Q    Well, was he sitting with you?

18  A    I mean, in the booth that was facing toward me, I

19  believe.

20  Q    Okay?

21       When you characterize it as you believe, do you

22  remember.

23  A    I just remember that he was in front of me.  Like I'm

24  sitting, if this would be the booth, this would be the aisle.

25  I believe Peter was sitting on that side, and I believe he was

1  on the other side in the other booth.

2  Q    Now, I'm a lawyer, so you have as to forgive me for

3  pushing for details?

4        When you say you believe, was he sitting in front of

5  you.

6  A    He was sitting to where I could see him.  I don't know if

7  he was in the booth, or he was in the booth next to our booth.

8  Q    So, you don't know where he was sitting?

9  A    No, ma'am.  I'm not sure, ma'am.  This was over thirty

10  years ago.

11  Q    Okay.  Okay?

12        So, would it be fair to say that you don't remember

13  a lot of these events.

14  A    I mean, I remember seeing who I believe to be Charles

15  there talking to Peter, yes.

16  Q    Okay.  Fair enough?

17        And you saw a booth with a man, and a woman, also;

18  right.

19  A    I don't remember where they were.  They were there in the

20  diner.  I don't know exactly which booth they were in.

21  Q    How many booths were in this diner, sir?

22  A    I'm just guessing.  At least eight, maybe more.

23  Q    When you say you are just guessing, I think the Court

24  would probably say, Don't guess.

25        Was it a large diner.

1    A    I don't know what you would consider large.

2    Q    Mr. Settle, do you remember where the other individuals

3    in the diner were?

4    A    No.

5    Q    Do you remember how many other tables of people were at

6    the diner, sir?

7    A    No.

8    Q    You testified on direct examination that at some point,

9    you saw Peter go downstairs; right?

10   A    Yes.

11   Q    And that was before or after you heard some scuffling

12   sound?

13   A    That was after.

14   Q    Do you remember that?

15   A    Yes.

16   Q    And then you said you got up?

17   A    I had got up and also went to the stairs.

18   Q    Did you go down the stairs?

19   A    No, ma'am.

20   Q    When you went down the stairs, did you see how many --

21   A    I didn't go down the stairs.

22   Q    Thank you.  Forgive me?

23         When you went to the stairs -- forgive me -- did you

24   see how many other people were sitting inside the diner.

25   A    I didn't pay attention.

1  Q    And had you or Andrew or Peter been drinking that night?

2  A    I don't believe I was.

3  Q    Do you know if they had been?

4  A    I don't know.

5  Q    Do you know if any of the three of you had used any

6  illegal substances?

7  A    I know I didn't.  I don't know about them.

8  Q    Did you ever get high with Peter Zuccaro and his brother?

9  A    No, ma'am, I never did drugs in my life.

10 Q    You had you heard a scuffle and you saw Peter Zuccaro go

11 down the stairs; right?

12 A    Yes, ma'am.

13 Q    And then you went to the top of the stairs; right?

14 A    Yes, ma'am.

15 Q    And then it's your testimony that Peter Zuccaro came up

16 the stairs?

17 A    He came up the stairs and went by me.

18 Q    And he came up the stairs by himself?

19 A    Yes, ma'am.

20 Q    Now, you also testified that you don't remember where

21 Peter went after that?

22 A    No, ma'am.

23 Q    You don't remember?

24 A    I don't remember.

25 Q    So, you don't know if he sat at the table or went

1  outside?  You have no independent memory of that?

2  A    No, ma'am.

3  Q    Where did you go?

4  A    I was still at the top of the stairs.

5  Q    Now, you testified on direct examination that you saw

6  Charles Carneglia in the diner; right?

7  A    Yes, ma'am.

8  Q    And this is after the scuffling that was going on down in

9  the basement?

10 A    Yes.

11 Q    And what table did you see him at?

12 A    I believe he was at the same booth that the man and the

13 woman were sitting.

14 Q    Pardon?

15 A    That they were sitting at.

16 Q    And Zuccaro was nowhere around?

17 A    I believe he was back in our booth at that time.

18 Q    Now, were you ever interviewed on the evening of this

19 incident --

20 A    No, ma'am.

21 Q    -- about what happened?

22 A    No, ma'am.

23 Q    And the first time that you were interviewed about this

24 incident was in 2007; is that correct?

25 A    I believe it was 2008.

1  Q    How long ago?

2  A    A few months, maybe six, eight months.  I'm not sure of

3  the exact time.  It's when the FBI came to my home.

4  Q    And how many times were you interviewed, Mr. Settle?

5  A    That time, once.

6  Q    And you've been interviewed prior to your testifying

7  today, though; right?

8  A    Yes, ma'am.

9  Q    And did you meet with the prosecutors on this case?

10  A    Yes, ma'am.

11  Q    About how many times?

12  A    Twice, I believe.

13  Q    And did you talk about your testimony today?

14  A    Yes, ma'am.

15  Q    Now, you testified that you had an argument with Peter

16  Zuccaro after this incident occurred?

17  A    Yes, ma'am.

18  Q    And you have not spoken with him since?

19  A    I testified I spoke to him on the phone roughly -- I'm

20  guessing -- about twenty years ago.

21  Q    Well, you guys lived in the same neighborhood, though;

22  right?

23  A    Yes, ma'am.

24  Q    And you were almost next-door neighbors; is that fair to

25  say?

1  A    His parents lived about three doors down at this time,

2  and we didn't see each other very much after that.

3  Q    Did you see him around and about the neighborhood?

4  A    Yes.

5  Q    No problems?

6  A    No.

7  Q    You didn't talk to Mr. Carneglia about that evening?

8  A    No.

9  Q    Mr. Carneglia never reached out to you; right?

10 A    No.

11           MS. SHARKEY:  Nothing further.

12           Thank you, Mr. Settle.

13           THE COURT:  Thank you.

14           Any redirect examination?

15           MR. NORRIS:  No.  No further questions.

16           THE COURT:  Thank you, sir.  That will be all.

17           (Witness excused.)

18           THE COURT:  Next witness, please.

19           MR. NORRIS:  Your Honor, at this time, we would like

20 to offer an exhibit, Government's Exhibit 20, into evidence, a

21 death certificate of Robert Zuccaro.

22           MS. SHARKEY:  No objection.

23           THE COURT:  Admitted.

24           (So marked.)

25

1        MR. BURLINGAME:  If I could briefly publish it to

2   the jury.

3        Government's Exhibit 20 is the death certificate of

4   Robert Christopher Zuccaro.  It states that the date of death

5   is February 9, 1975.

6        THE COURT:  The death certificate is for whom?

7        MR. NORRIS:  Robert Christopher Zuccaro.

8        I'll hand it to the jurors and have them pass it

9   around.

10       THE COURT:  Yes.

11       (Jury views exhibit.)

12       THE COURT:  Witness, please.

13       MR. NORRIS:  Just one more stipulation.

14       THE COURT:  Go ahead.

15       MR. NORRIS:  At this time, we would like to offer

16  Government's Exhibit 5-S, which is a stipulation.

17       MS. SHARKEY:  I apologize.

18       MR. NORRIS:  Government's Exhibit 5-S, a

19  stipulation.

20       MS. SHARKEY:  If I can see it?

21       No objection.

22       THE COURT:  Admitted.

23       (So marked.)

24       MR. NORRIS:  Can I read the contents?

25       THE COURT:  Go ahead.

1    MR. NORRIS:  The stipulation reads as follows: "It

2  is hereby stipulated and agreed by and between the United

3  States of America by the undersigned Assistant United States

4  Attorney and the defendant Charles Carneglia by his

5  undersigned attorneys that:

6    "1.  Government's Exhibit 5 is a true and correct

7  copy of certain sworn testimony given by Albert Gelb in People

8  of the State of New York v. Charles Carneglia, Docket Q 503467

9  before the honorable Morris Goldman in Queens, New York

10  February 10, 1975.

11    "2.  This stipulation may be received in evidence,

12  dated February 2, 2009."

13    Now, your Honor, we would like to offer Government's

14  Exhibit 5.  That's the testimony.

15    Any objection?

16    MS. SHARKEY:  Nothing in addition to what counsel

17  has previously discussed with the Court.

18    THE COURT:  Admitted.

19    (So marked.)

20    MR. NORRIS:  At this time, your Honor, we would ask

21  to publish the testimony to the jury, by having an agent read

22  the answers and I will read the questions in the testimony.

23    THE COURT:  I don't want any objection or rulings on

24  objections.  Did I go through that and mark it?

25    MR. NORRIS:  You did, and it has been redacted.

1    THE COURT:  As redacted, it may be read.

2    MR. NORRIS:  But some objections do remain, the ones

3  that your Honor permitted.

4    THE COURT:  I don't want the objections in.

5    Let me see what you have.

6    (Pause.)

7    MR. NORRIS:  To be clear, that is a retyped

8  transcript to reflect the redactions that your Honor ordered,

9  so that portions have been taken out.

10    THE COURT:  Well, I'm striking out some on page

11  five, colloquy between judge and counsel.

12    (Pause.)

13    THE COURT:  Next time you're going to do this, give

14  it to me in advance, so I see what's in it.

15    MR. BURLINGAME:  We actually had a hearing and went

16  through this with the Court and the parties.  Maybe we should

17  have a break.

18    THE COURT:  Yes.  I didn't see the redacted one.

19    That's all right.  Stay there.  I'll finish with it.

20    MR. BURLINGAME:  Perhaps we could have a break, so

21  we could go through the corrections?

22    THE COURT:  No, I don't want to break unnecessarily.

23    I'm just cutting out the discussion, so that you

24  don't --

25    (Pause.)

1      THE COURT:  All right.  Here it is with my

2  redactions.

3      MR. NORRIS:  Is there any changes -- will the

4  witness need this, or it doesn't change what the witness is

5  going to say?

6      THE COURT:  Yes, it does, in some cases.

7      Take a five-minute break while we make a copy.

8      (Jury excused.)

9      THE COURT:  Show it to defense counsel.

10      All right.  Give it to the law clerk after you have

11  gone through it, please.

12      (Pause.)

13      MS. SHARKEY:  Your Honor, that looks fine.

14      I just want the record to be clear:  We said

15  originally, and I tried to couch my conversations with my

16  responses to the Court, when you said, Do you have any

17  objections?, and I had nothing that we had not discussed

18  previously, obviously, we object to the whole transcript

19  coming in.  We had litigated that and had a whole hearing on

20  it.  I want it preserved for the record.

21      MR. BURLINGAME:  We have another four witnesses this

22  afternoon.  I think we should be able to get them in around

23  4:30.  A couple have traveled together here.  If it's a little

24  bit long, I ask that we hold the jury a little bit late to get

25  through them.

1    THE COURT:  If they are available, we'll do that, of

2  course.

3            Take ten minutes, please.

4            (Recess taken.)

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:   Is this the new number 5?

2    MR. BURLINGAME:   Would you instruct the jury it's

3  proper for the government to prepare its witnesses?  There's

4  been a comment on cross about that.

5    THE COURT:  Yes.

6    MR. BURLINGAME:   The lawyers' questions are not

7  evidence.

8    (Pause.)

9    MR. BURLINGAME:   Suggesting the husband --

10    THE COURT:   I don't think it's necessary.  It's an

11  absurd suggestion.

12    Bring in the jury.  Who is going to read?

13    MR. NORRIS:   I'll read the question and Special

14  Agent Jonathan Malone will read the answers.

15    THE COURT:   Have him take the stand and tell the

16  jury what's happening.

17    (Jury enters courtroom)

18    THE COURT:   Be seated, please.

19    MR. NORRIS:   With the court's permission, I'll now

20  read the transcript, Government Exhibit 5 with Special Agent

21  Jonathan Malone who will act as the witness.

22    THE COURT:   What witness is that?

23    MR. NORRIS:   Albert Gelb.  This is in the People of

24  the State of New York against Charles Carneglia, transcript

25  dated February 10th, 1975.

1    THE COURT:   This is the so-called preliminary

2  hearing?

3    MR. NORRIS:   Yes.

4    THE COURT:   At which he testified?

5    MR. NORRIS:   Correct, Judge.

6    THE COURT:   Proceed.

7    COURT OFFICER: Added to the calendar, 47, Q503467,

8  Charles Carneglia, C A R N E G L I A, Officer Gelb.  This is a

9  ready hearing referred to us from AR-1.  He has a private

10  attorney, Judge.

11    MR. CIMINI:   Gene Cimini, Assistant District

12  Attorney.  Can we have this case called again for a number of

13  reasons, one of which I wanted to talk --

14    COURT OFFICER:   47 Q503467, Charles Carneglia,

15  Officer Gelb.  Ready hearing.

16    MR. ERLBAUM:   Ready for a hearing, your Honor, Lyon

17  and Erlbaum by William Erlbaum, 123-6083rd Avenue, Queens

18  gardens, New York.

19    THE COURT:   Appearing for the defendant?

20    MR. NORRIS:   Yes help.

21    MR. WERFEL:   David Werfel, Assistant District

22  Attorney.  People ready.

23    THE COURT:  Have a seat, please.

24    (Pause.)

25    THE COURT:   He was appearing for the prosecutor?

1    MR. NORRIS:  Yes.

2    THE COURT:  Have a seat, please.

3    MR. WERFEL:   People call Albert Gelb.

4    Uniformed court officer, Albert Gelb, shield 708,

5    Criminal Courts of the City of New York, called to the stand

6    on behalf of the People, upon having first been duly sworn by

7    the court, testified as follows.

8    COURT OFFICER:   Name, shield number and assignment?

9    THE WITNESS:  Alert L. Gelb, Uniformed Court

10   Officer, Criminal Court, Kings County, shield 708.

11   MR. CIMINI:  I'll take this.

12   DIRECT EXAMINATION

13   BY MR. CIMINI:

14   Q    Officer Gelb, on February 10th, 1975, approximately 3:15

15   a.m., were you in the vicinity of 107th Avenue and Cross Bay

16   Boulevard in the County of Queens.

17   A    Yes, I was.

18   Q    Did you see the defendant at that time and place?

19   A    Yes, I did.

20   Q    Will you please tell this court what you saw or what

21   happened with respect to this defendant.

22   A    I was in the diner.  I was having a bite to eat and I was

23   at the last table in the row which is directly alongside the

24   staircase that leads to the basement and the rest rooms.  I

25   saw the defendant stand up and start to walk down the stairs.

SS    OCR    CM    CRR    CSR

1  Protruding out of a slit in the back of his coat was what --
2  was a revolver.  I put down my hamburger and started to walk
3  down the stairs and I spoke to the defendant in the bathroom.
4  I asked him "Do you have a tin." He looked at me.  He said
5  "Why, what for," or something to that effect.  At that point I
6  realized that the defendant was not a police officer.  I held
7  out my badge.  I said "Please put your hands up against the
8  wall and don't move." At that point I saw the defendant reach
9  for where the gun was.  I reached for my weapon.  He grabbed
10 for my gun with his two hands and a struggle ensued.  The
11 struggle became loud and his friends who were at the booth ran
12 down.  At this time --
13 Q    How many people did you observe rundown and join the
14 involvement you were in with the defendant?
15 A    Well, to my recollection I didn't see anyone come but
16 they were immediately upon me out in the corridor or the area
17 that's outside the two rest rooms right by the telephones --
18 Q    How many people are you talking about?
19 A    Four, I believe.  And they were each clutching for my gun
20 as was the defendant.  I told them all "I'm a peace officer.
21 I'm a court officer." And I told them again "You are under
22 arrest." They still clutched for my gun.  The defendant got
23 the gun from my hands.  I grabbed it back and eventually I
24 suppose we all realized that it was a stalemate because I had
25 the gun and I wasn't able to shoot it and they were

1    overpowering me.  The idea to call the police came up.  I

2    agreed or they agreed to my idea.  I was -- well, and we went

3    back upstairs.  They did not call the police.  The person who

4    I was with snuck away from the people who were with him and

5    called the police because numerous times before this she had

6    tried to call the police and she was stopped by the

7    defendant's friends.  The police had come.  They entered the

8    diner, a lieutenant, I believe, he said "What's going on here.

9    I said I'm a court officer.

10              "THE COURT:  Don't tell us what you told the police,

11   what happened next?

12   A    I pointed out the defendant as the man who had the gun.

13   The defendant was arrested.  A .357 cold Magnum and a

14   five-shot Smith & Wesson revolver which are vouchered at the

15   106 Precinct, were recovered from a car outside the diner.

16   Q    Had you ever seen either of those guns before?

17   A    Yes, I saw the Magnum sticking out of the back of the

18   defendant's coat.

19   Q    Did you voucher those guns into the precinct yourself?

20   A    No, Police Officer Pontile badge 24649 of the 101st

21   Precinct responded with the captain.  Vouchered those guns.

22   CROSS-EXAMINATION

23   BY MR. ERLBAUM:

24   Q    Officer, I'm sorry -- withdrawn.  At the time -- this

25   was a diner, was is not, sir?

1    A     Yes.

2    Q     What was the name of this place?

3    A     The Esquire Diner.

4    Q     Now there's a parking lot outside?

5    A     Excuse me?

6    Q     There's a parking lot outside that diner?

7    A     Yes.

8    Q     Were many cars parked at that hour of the morning?

9    A     Yes.

10    Q     You have to answer so the court reporter could get your

11 answer down.  Now, at that time you were in plain clothes,

12 were you not?

13    A     Yes.

14    Q     What is your best estimate of the time you first laid

15 eyes on Mr. Carneglia?

16    A     Between 3, 3:15, I'm not quite sure because I don't have

17 a watch on.

18    Q     And, you said that you were not alone at the time?

19    A     Yes.

20    Q     You were sitting with someone?

21    A     Yes, with --

22    Q     With one or more persons?

23    A     Yes.

24    Q     With one person?

25    A     Yes.

1 Q    Can you state the name of that person?

2 A    Lynn Baranello.

3 Q    Is that a social friend of yours?

4 A    Yes.

5 Q    She was also in plain clothes?

6 A    Yes.

7 Q    Now, you weren't wearing any badge or anything at that

8 time, were you?

9 A    No.

10 Q    Now, there came a time when you say you saw the accused

11 here?

12 A    Yes.

13 Q    And was he walking or sitting at the time you first saw

14 him?

15 A    Walking.

16 Q    You say you saw a revolver, what you concluded to be a

17 revolver protruding at that time; is that right?

18 A    Yes.

19 Q    Were you --  where on his person did you see that

20 revolver?

21 A    I saw protruding from the slit which he --  which is on

22 his coat that he has with him at the present time --

23 Q    Is it one slit or more than one slit?

24 A    It's one slit.

25 Q    One slit?

1  A    One split.

2  Q    Was the gun toward the front of his body or toward the

3  rear of his body?

4  A    It was sticking out of the dead center of the lumbar

5  region.

6  Q    Which part of the gun was visible?

7  A    The butt, the hammer, the trigger housing, the rear

8  sight.

9  Q    Now there came a time you said you went after this

10  accused; is that right?

11  A    Yes.

12  Q    How much time elapsed from the time that you saw him

13  until the time when you next saw him?

14  A    I had him in constant sight except for when the bathroom

15  door closed between him and me.

16  Q    Came a time when you absented yourself from your

17  companion to go to the bathroom; is that right?

18  A    Yes.

19  Q    Did you call out to the defendant at that time or did you

20  address him only after you went into the bathroom?

21  A    Only in the bathroom.

22  Q    Now, what did you say to him?  Was there anyone else in

23  the bathroom when you went in the bathroom?

24  A    No, I don't believe so.

25  Q    Okay.  Now, so that when you went into that bathroom as

1  far as you know, sir, there was you and there was the accused

2  and there was no one else; is that right?

3  A    Right.

4  Q    At that time you did not withdraw what you concluded to

5  be a gun, did he, from his belt?

6  A    No.

7  Q    And he didn't attempt to take what you concluded had been

8  a gun on this person and in any way menace you; is that right?

9  A    Right.

10 Q    Did you have a conversation with him at that time?

11 A    Yes.

12 Q    What did you say to him and what did he say to you?

13 A    I asked him if he had a tin.

14 Q    What did he say to you?

15 A    He said "Why, what for?"

16 Q    What did you say?

17 A    At this point I realized he was not a police officer.

18 Q    What did you say, sir?

19 A    I said place your hands up against the wall and don't

20 move.

21 Q    What did he say to you?

22 A    He moved.

23          "THE COURT:  Did he say anything?

24          "THE WITNESS:  No.

25          "THE COURT:  All right, counsel.

SS      OCR      CM      CRR      CSR

1  Q    All right.  You are still alone in the men's room; is

2  that right?

3  A    Yes.

4  Q    Jump ahead of myself for a moment with the court's

5  permission.  Came a time you said a gun was recovered from an

6  automobile or two guns were recovered; is that right?

7  A    Yes.

8  Q    And those --  that automobile is not the automobile of

9  this accused, is it, sir?

10  A    I don't know.

11  Q    Well, as far as you sit here now, sir --  as you sit here

12  now, sir, this is some ten hours or 12 hours after the event

13  you described for his Honor, do you know is the owner of the

14  gun --  the owner of the car in which you did --  in which you

15  found a gun.

16       Found two guns.

17  A    No.

18  Q    You don't know the owner of that car?

19       THE COURT:   Already said he doesn't know.

20  A    I don't know for certain who the owner of the car is.

21  Q    You do not know who the owner of that car is now as you

22  sit here now?

23  A    For certain, no.

24  Q    Do you have any information that this accused owned that

25  car?

1  A    No.

2  Q    In fact, you do know as you sit here now this accused

3  does not own that car, do you not?

4  A    I was told by an officer that someone else owns the car

5  but I didn't check it out myself.

6  Q    Did this defendant make any statement to you with respect

7  to the guns in question that you found in that car?

8  A    Yes.

9  Q    What did you say to him and what did he say to you?

10  A    Well, he told me that he had -- that I had the right pea

11  but I looked under the wrong cup.  He made various

12  insinuations that it was his gun.

13  Q    Where did this conversation take place?

14  A    It took place in the 112 Precinct.

15  Q    Now, tell his Honor what did you say to him and what did

16  he say to you?

17  A    I don't remember exactly, counsel.

18  Q    Did you make --  well, can you tell us the substance of

19  what you said to him?  In other words, doesn't have to be

20  word-for-word but the substance of what you said to him.

21  A    He said --  I said "I know you had the gun." He kept

22  insisting "What gun?  What gun."  Eventually, I said "Listen,

23  you are --  it was sticking right out of your the back of your

24  coat."  He said "Well, to me you got the right pea but you

25  looked under the wrong cup."

1  Q    What did you say when he said you got the right pea but

2  you looked under the wrong cup?

3  A    I laughed.

4  Q    Did you say anything else?

5  A    No.

6  Q    Incidentally, I noticed during your direction and once

7  during your cross you looked at your notes.  Did you make any

8  notes or memorandum concerning this incident?

9  A    Yes.

10  Q    May I see them, please?  Perhaps you want to show it to

11  the district attorney first.  Other than the complaint and

12  arrest report, did you make any log entries?

13  A    No.

14  Q    I take it what the district attorney holds in his hands

15  is the complete --

16  A    I -- all I have is the complaint, the vouchers in

17  triplicate copy.

18  Q    Okay.  Official police forms, the complaint and the

19  voucher?

20  A    Yes.

21  Q    You made no other memo except this pink form that I hold

22  in my hand?

23  A    Right, that's correct.

24          "THE COURT:  Is that the arrest report?

25          "THE WITNESS:  Yes, Judge.

Q    Now, there came --  now, you described for his Honor a
conversation at a police precinct.  Was there anything more in
that conversation other than what you have testified to
already?

A    Well, I had to ask him certain questions to fill the
boxes in on that arrest form.

Q    Pedigree information, background information, any other
conversation concerning the facts of this case between
yourself and this accused.  You have to answer for the court
reporter.

            "THE COURT:  Yes or no?

            "THE WITNESS:  Not that I remember.

Q    Did you ever hear any conversation between this accused
in your presence and a brother officer concerning the facts
and circumstances of this case?

A    No.

Q    All right.  Now, sir, you were telling us before I jumped
ahead of myself about a conversation in the bathroom in which
you and this accused were alone.  There came a time that you
say the accused made a suggestion --  he was in plain clothes
as well; is that correct?

A    Yes.

Q    And he made a suggestion that the police be called?

A    I don't remember who it was who made the suggestion.

Q    In any event, there was a discussion between you and you

1  went along with the idea the police should be called; is that

2  right?

3  A    Yes.

4  Q    And that would establish whether or not you were or you

5  weren't who you claimed to be; is that right, sir?

6  A    I don't know the --

7  Q    Could you tell his Honor how much time approximately

8  elapsed from the time that the suggestion made that the police

9  be called until the police actually arrived?

10 A    A few moments.  I'm not quite sure how long.

11 Q    Can you give us your best estimate?

12 A    Three to 5 minutes, I believe.

13 Q    Three to 5 minutes.  Were you assisted in that three to

14 5-minute period by any other brother officer, assisted by any

15 other patron in the bar?

16 A    No.

17 Q    And in that three to 5 minutes the defendant did not

18 attempt to flee; is that correct?

19 A    I don't know.  I didn't see where he was.

20 Q    At any rate he was there when the police arrived some

21 five minutes later; is that right?

22 A    Yes.

23 Q    Had you done any drinking earlier that evening?

24 A    No, I don't drink.

25 Q    Now, you mentioned certain individuals and your

1  conclusions they were friends of the defendant's.  Can you

2  identify any of those persons by name for his Honor?

3  A    At this time, no, no.

4  Q    Have you ever laid eyes on those individuals prior to

5  this time in question?

6  A    No.

7  Q    And had you ever laid eyes on this accused prior to this

8  time in question?

9  A    No.

10 Q    Did he have --  withdrawn.

11       You testified that he never withdrew the weapon and

12 pointed it at you that you say you saw upon him.  Was there a

13 struggle for the gun in the men's room?

14       MR. CIMINI:    Objection, which gun?

15       "THE COURT:  Which gun are you referring to,

16 counsel?

17       MR. ERLBAUM:   Well, the gun this witness indicated

18 he brought -- had with him in that men's room.

19 Q    You had a gun with you, did you not, sir?

20 A    Yes.

21 Q    There was a struggle for that gun, was there not?

22 A    Right.

23 Q    Did this defendant --  did there come a time you got back

24 your gun?

25 A    Yes.

1  Q    Did this defendant every point a gun -- other than your

2  gun, did you ever see any other gun in the hands of this

3  accused?

4  A    No.

5  Q    All right.  Was there any conversation between this

6  accused and the other men you  say came into the men's room?

7  A    I believe --

8  Q    What did you say to those men?

9  A    I'm not sure, no.

10 Q    So you don't know the words or the substance; is that

11 right?

12 A    There were words spoken but I don't remember what the

13 words were, counsel.

14 Q    Just to clarify for the record, as you sit here now, do I

15 understand your testimony to be that you do not know what this

16 defendant said, if anything in words or in substance to the

17 other men who arrived; is that right?

18 A    That's right.

19 Q    Do you have another witness as to any of the events in

20 the men's room other than yourself?

21 A    No.

22 Q    Isn't it a fact, sir, this accused insisted that you

23 remain there until the police arrived?

24 A    Yes.

25 Q    He did insist that, isn't that a fact?

1  A    I insisted he remain there.

2  Q    And he insisted you remain there; isn't that right, sir?

3  A    Yes.

4  Q    Isn't it a fact, sir, this accused sought to make a

5  complaint against you to the police officers because of --

6  did you sustain any injuries in this case, officer?

7  A    Yes.

8  Q    What injuries?

9  A    Bloody nose.

10 Q    Do you know which of the four men gave you the bloody

11 nose?

12 A    No.

13 Q    Other than the bloody nose you sustained, any other

14 injuries?

15 A    Scratches.

16 Q    Do you know which of those four men gave you the

17 scratches?

18 A    All of them.

19 Q    Was the defendant dressed in a suit and tie at that

20 point?

21 A    Yes.

22 Q    In fact, didn't he indicate to you or in your presence to

23 other brother officers that he had been to a wedding that

24 evening?

25 A    Yes.

1  Q    He did indicate that, didn't he?

2  A    Yes.

3  Q    When did he indicate that?

4  A    A number of times.

5  Q    Did you make any notes as to his report of his activities

6  earlier in the evening?

7  A    Why?

8  Q    I asked you.

9         "THE COURT:  Officer, did you or didn't you make any

10  notes?

11  A    No.

12  Q    Did you ask him where he had gotten the gun from?

13       If he had a gun.

14  A    He denied having a gun.

15  Q    He denied it.  Did he deny at all times having a gun?

16  A    No.

17  Q    Well, when he made that remark which you say concerning,

18  "You looked under the wrong pea," or whatever you say he said

19  at that point, didn't you ask him, "What were you doing with

20  the firearm," sir?

21  A    No.

22  Q    Did you ask him who were the other men, sir?

23  A    No.

24  Q    Didn't you ask him to identify the persons who you

25  concluded and stated to his Honor your conclusion as being his

1  friends?

2  A    No.

3  Q    Did anyone make any notes at your direction?

4  A    Excuse me?

5  Q    Did anyone make any notes as to the defendant's

6  representation at your direction.  Did you have anyone make

7  any notes as to what this defendant's of this was?

8  A    No.

9  Q    Did you tell the other police when they arrived "I'm a

10 cop, too"?

11 A    I identified myself as a court officer.

12 Q    How did you do that?

13 A    I said "I'm a court officer."

14 Q    Did you do it in any other way?

15 A    Well, to the best of my recollection, "I said I'm a court

16 officer."

17 Q    You didn't show them any credentials, did you?

18 A    I don't remember.  I probably showed them my badge.

19 Q    By the way, in the midst of this struggle, did you ever

20 place your hands upon this defendant?

21 A    Yes.

22 Q    Would you tell his Honor what part of your body came into

23 contact with what part of his body.

24 A    My hands, my feet, my head, my mouth, my toes.

25 Q    Did you kick this defendant?

1  A    I can't --  I don't know.

2  Q    You punched this defendant?

3  A    It was a fight.

4  Q    Did you participate in that fight?

5  A    Yes.

6  Q    And in the course of this fight, you -- in short, struck

7  some blows against this accused, too; is that right?

8  A    Yes.

9  Q    Did you put out any alarm for the other gentlemen?

10 A    I don't know who they are.

11 Q    Did you put out any alarm based on a description?

12 A    No.

13 Q    Oh, one thing I did mean to ask you.  Did you say where,

14 from where the defendant had come before he passed your table?

15 A    I believe it was from the table --

16 Q    Did you see, sir, I'm not asking you to guess.  I'm

17 asking you to testify to your observations upon your oath.

18 A    Yes.

19 Q    Where did he come from?

20 A    The table where the others were.

21 Q    Where was that table?

22 A    There was a table right alongside of mine.

23 Q    And did you take any statements from anybody else in that

24 premises other than your social guest?

25 A    No.

1  Q    Officer, when you say you saw this accused with a gun,

2  out of his jacket, you didn't know at this point that that was

3  a Magnum, did you, sir.

4  A    Yes.

5  Q    And, could you tell us, sir, your best estimate of the

6  time when two guns were allegedly found in a car later that

7  morning?

8  A    I haven't the faintest idea.

9  Q    Well, could you give his Honor the approximate time

10 between the time of the alleged observation in the diner until

11 the time when the gun was found, just the approximate

12 interval?

13 A    20 minutes.

14 Q    20 minutes.  And you don't know what, you cannot testify

15 of your own personal knowledge, sir, can you, that the gun

16 that was found in a car unconnected to this accused was the

17 same gun you claim was on his person 20 minutes earlier?

18 A    I can.

19 Q    You can say that?

20 A    Yes.

21 Q    Can you just for the record identify on the basis of what

22 characteristics?

23 A    Magnum has a very large handle and this gun has

24 adjustable sights.  It has --

25 Q    Do you see the sights when the gun was --  you say in

1    this defendant's jacket you saw sights as well?

2    A    I was very close, yes.

3    Q    Did you see bullets, too?

4    A    No.

5    Q    So that you don't know at the time that you claimed to

6    have seen a gun whether the object that he allegedly had at

7    that time, at that time, was or wasn't loaded?

8    A    No.

9    Q    And you don't know what if any -- withdrawn.  Do you

10   recall during those 20 minutes the defendant was in the diner,

11   is that right, until during the period the police came, is

12   that right?

13   A    Yes.

14   Q    And you are -- you were not arrested, he was arrested.

15   But he remained on the premises; is that right?

16   A    I don't know.

17   Q    All right.  Isn't it a fact that many cars were searched

18   outside that diner?

19   A    Yes.

20   Q    Many cars.  Give his Honor the best estimate as to how

21   many cars.

22   A    Three.

23   Q    Came a time some guns were found in one of those cars; is

24   that right?

25   A    Yes.

1  Q    Then you said "That's the gun"?

2  A    Yes.

3  Q    And who did you first identify the gun to, sir?

4  A    A police officer.

5  Q    Will you state his name for the record?

6  A    I don't know.

7  Q    Can you state his shield number for the record?

8  A    Don't know.

9  Q    Do you have a memo somewhere reflecting the shield number

10 of the officer or the name of the officer to whom you claim

11 you identified that gun?

12 A    All I have is the officer who found them.  I don't

13 remember who showed them to me.  I was shown them at the

14 police station.

15 Q    The fact is, you weren't even at the premises when the

16 guns were found; isn't that a fact?

17 A    Yes.

18 Q    You were in the police station some miles away; isn't

19 that right, sir?

20 A    (No response.)

21 Q    And, didn't you indicate to the officers there that you

22 didn't want to be the subject of an arrest that he's -- this

23 accused is the only one who should be arrested?

24       MR. ERLBAUM:    I have no further questions.

25 Q    When this defendant you say struggled with you in the

SS    OCR    CM    CRR    CSR

1    bathroom and there came a time you say you were --

2              THE COURT:    This is the prosecutor on redirect, I

3    take it?

4              MR. NORRIS:    Yes, confusing as it looks, but I

5    think it is.

6              THE COURT:    You're now the prosecutor.  Go ahead.

7    Q    When the defendant you say struggled with you in the

8    bathroom and there came a time you say you were temporarily

9    out of possession of your gun; is that right?

10   A    Yes.

11   Q    He never threatened you with your gun, did he, sir?

12   A    No.

13   Q    In words or in substance; is that right, sir?

14   A    Right.

15   Q    Just for clarification it was you who pulled your gun

16   upon him; is that correct, sir?

17   A    Yes.

18             MR. NORRIS:    That's it, your Honor.

19             THE COURT:  Call your next witness.

20             THE CLERK:  Your name.

21             THE WITNESS:  Gerald Beyrer, B E Y R E R.

22   DIRECT EXAMINATION

23   BY MS. SEIFAN:

24   Q    Good afternoon.

25   A    Good afternoon.

1   Q    How old are you?

2   A    56.

3   Q    Married?

4   A    I am.

5   Q    Do you have any children?

6   A    I have three.

7   Q    What do you do for a living?

8   A    I'm retired from the court system now and I'm also a

9   commissioner in one of the fire departments in northern

10  Westchester.

11  Q    What did you do before you retired?

12  A    I retired from the New York State court system as a

13  New York State court officer, captain, in Bronx Supreme Court.

14  Q    How long were you a court officer?

15  A    33 years and 8 months.

16  Q    Did you know someone named Albert Gelb?

17  A    I did.

18  Q    When did you meet Albert Gelb?

19  A    Some time the end of 1973, the beginning of 1974.

20  Q    How did you know him?

21  A    We worked together as uniformed court officers in

22  Brooklyn night court.

23  Q    Where was Brooklyn night court located?

24  A    120 Schermerhorn Street right down the block.

25  Q    Would you tell the jury what a court officer does?

1  A    A court officer is a sworn peace officer of the State of

2  New York who is empowered by the legislature to carry weapons,

3  to make arrests within the State of New York.  They are

4  charged with the security, both physical and personal

5  security, of all the courthouses in the State of New York that

6  are managed by the Office of Court Administration.  That

7  security is both outside, physical security, which is

8  maintained by patrols, motor patrols, foot patrols, inside

9  security by different posts we have, magnetometers, stationary

10  posts in the courtrooms themselves, special posts we do cover.

11  We also have special response teams just in case an event or

12  special situation happens in any of the courthouses throughout

13  New York State, that we can have court officers respond to

14  that emergency.  We also do judicial security protection in

15  the event of judicial threats against judges or justices.

16  Q    When did you begin working in Brooklyn night court?

17  A    In August of '73.

18  Q    How long did you work in Brooklyn night court?

19  A    Until December of '74.

20  Q    What did you do after you worked in Brooklyn night court?

21  A    I was promoted to senior court officer and assigned to

22  Queens Supreme Court in Long Island City.

23  Q    Did you keep in touch with Court Officer Gelb after you

24  were promoted?

25  A    Yes, not only Court Officer Gelb but all the officers I

1  worked with in night court.

2  Q    Do you know whether Court Officer Gelb ever made off duty

3  arrests?

4  A    Yes.

5  Q    Do you recall how many?

6  A    Several.  I don't know the exact number.

7  Q    Do you recall any of those off duty arrests in

8  particular?

9  A    Yes, I do.

10 Q    Which arrest was that?

11 A    He arrested a person with a gun in a diner/restaurant in

12 Queens County  where he was involved in a large fight getting

13 the gun away from the person, I believe, the bathroom of the

14 restaurant.

15 Q    Did you ever discuss the arrest of the guy in the diner

16 with Court Officer Gelb?

17 A    Yes.

18 Q    Do you recall when this conversation took place?

19 A    I recall at least one of the conversations I had with him

20 regarding the case, was when he came to the courthouse and he

21 requested me to see if I could arrange parking for him at our

22 Jamaica courthouse in Queens County.

23 Q    Did he explain why?

24 A    Yes, he did.

25        MR. FARBER:    Objection.

1     THE COURT:  Sustained.

2     MS. SEIFAN:   Your Honor, this is also represented

3  in Mastrangelo --

4     THE COURT:  I'm not going to allow it.

5     MR. BURLINGAME:   If I may say, specifically the

6  hearing, you ruled these specific statements would come in.

7     THE COURT:  On this witness?

8     MR. FARBER:   No, your Honor, with regard to this

9  witness.

10     THE COURT:   No, I don't want it from this witness.

11     MR. BURLINGAME:   Could we have a side bar?  I could

12  go through the record yesterday.

13     THE COURT:   Let's see the record.  Hand it up.

14     (Pause.)

15     THE COURT:   I have before me Government Exhibit

16  35-G B-1 --  3500.  Ask him to repeat paragraph number 2, I

17  don't want all the rest of this.

18     MS. SEIFAN:   This specific testimony was included

19  in a letter we submitted to the court.

20     THE COURT:   May I have it?

21     (Pause.)

22     THE COURT:   Page 1014 of the record.

23     MR. BURLINGAME:   All of the statements

24  (indicating).

25     THE COURT:   Put it down.

1        MR. BURLINGAME:   Here's the letter (indicating).

2        THE COURT:   1014 does not deal with this specific

3   issue.  It deals with the general issue.

4        With respect to the third bullet on page 3 of the

5   letter of February 3rd, 2009, I ruled no.  You could ask him

6   to repeat what is in paragraph two, about asking for a special

7   parking permit, all of that, but just what is in number 2 --

8   let me see paragraph 2.  Paragraph 2 of 3500 G B-1, that

9   alone.  Just get to it; get the witness off the stand.

10        (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (In open court.)

2  EXAMINATION CONTINUES

3  BY  MS. SEIFAN:

4  Q    Did you ever discuss the arrest of the guy in the diner

5  with court officer Gelb?

6  A    Yes, I did.

7  Q    Do you recall where this conversation took place?

8  A    It was at my courthouse in Long Island City, come down to

9  visit me one day.  He had asked me --

10         MS. SHARKEY:  Objection.

11         THE COURT:  No.  Don't --

12         THE WITNESS:  Sorry.

13         THE COURT:  I don't want that.

14  Q    Do you recall whether he received any threats?

15         THE COURT:  No.

16         MS. SHARKEY:  Objection.

17         THE COURT:  Just use that paragraph.  Ask the

18  question in terms of that paragraph and he will answer it yes

19  or no.

20  Q    You indicated that Court Officer Gelb visited you at your

21  court, where you worked?

22  A    That's correct.

23  Q    You talked to him about the arrest of the guy in the

24  diner.

25  A    That's correct.

1    Q    Did he indicate that he had received any threats?

2              MS. SHARKEY:  Objection.

3              THE COURT:  Use that paragraph, or if you can't ask

4    the question, I will.

5              (Pause.)

6    Q    Around the Christmas holidays, did Court Officer Gelb

7    visit you at the court and tell you that fellows who were with

8    the fellow who was arrested threatened him outside the Court?

9    A    Basically that's what he said to me, yes.

10   Q    Do you recall what those people said to him?

11             MS. SHARKEY:  Objection.

12   Q    What he told you those people said to him?

13             MS. SHARKEY:  Objection.

14             THE COURT:  Is that in the paragraph?

15             MS. SHARKEY:  No.

16             MS. SEIFAN:  Yes, Your Honor.

17             THE COURT:  Then go ahead.

18   A    I'm sorry?

19   Q    Do you recall what those people said -- what those

20   threats entailed?

21             MS. SHARKEY:  Objection.

22   A    Yes.

23             MR. FARBER:  Objection.

24   Q    What were they?

25             MS. SHARKEY:  Objection.

1       THE COURT:  Excuse me.

2       I will ask the question, because I instructed you

3  very specifically.

4       Is it true that around the Christmas holidays the

5  deceased came and visited you at the court and told you that

6  the fellows who were with the fellow who was arrested

7  threatened him outside of court?

8       THE WITNESS:  Yes.

9       THE COURT:  And that the deceased didn't give any

10  further details about the incident other than to say that they

11  told him he wasn't a policeman but a court officer and should

12  forget the incident?

13       THE WITNESS:  Basically, yes.  He said other things

14  regarding the threats too.

15       THE COURT:  What?

16       THE WITNESS:  He said other things regarding the

17  threats.

18       THE COURT:  I didn't ask you that.

19       THE WITNESS:  Sorry, Your Honor.

20       THE COURT:  What is your answer?  Yes or no to the

21  question I asked?

22       THE WITNESS:  Yes.

23       THE COURT:  All right.  Any cross-examination?

24       MS. SHARKEY:  No.

25       THE COURT:  Step down, sir.

1        (Witness excused.)

2        MS. SEIFAN:  The government calls Dave Vartian.

3        THE COURT:  Swear the witness, please.

4        THE CLERK:  Please stand and raise your right hand,

5   sir.

6        Do you understand your obligation to tell the truth,

7   the whole truth and nothing but the truth under penalty of

8   perjury?

9        THE WITNESS:  Yes.

10        THE CLERK:  Please state and spell your name for the

11   court reporter.

12        THE WITNESS:  My name is David  Varitan,

13   V A R T I A N.

14   DIRECT EXAMINATION

15   BY MS. SEIFAN:

16   Q    How old are you, sir?

17   A    Sixty.

18   Q    Are you married?

19   A    Yes.

20   Q    Do you have any children?

21   A    Three.

22   Q    Did you know someone named Albert Gelb?

23   A    Yes, I did.

24   Q    When did you meet him?

25   A    Oh, sometime 1974, 1975.

1  Q    How did you know him?

2  A    From work.  We worked together in Brooklyn night court.

3  Q    Where was Brooklyn night court located?

4  A    It's at 120 Schermerhorn Street.

5  Q    What was your job in Brooklyn night court?

6  A    I was an assistant court clerk.

7  Q    What was Mr. Gelb's job?

8  A    He was a uniformed court officer.

9  Q    You still work in the court?

10 A    No, I don't.

11 Q    What do you do now?

12 A    I'm self-employed.  I do janitorial work.

13 Q    I want to direct your attention to March 10, 1976.

14        Were you working that day?

15 A    Yes, I was.

16 Q    Do you recall the shift that you were working?

17 A    It was night court.  It was 6:00 pm to 1:00 am.

18 Q    Did you always work the same shift?

19 A    Yes.

20 Q    Do you recall whether Court Officer Gelb was working on

21 the evening of March 10, 1976?

22 A    Yes, he was.

23 Q    Was he working the same shift as you?

24 A    Yes.

25 Q    Did you make any plans to do anything with him after work

1  that night?

2  A    Yes.

3        We were going to get together to do a little

4  personal bible study together.

5  Q    Had you studied the bible with Court Officer Gelb prior

6  to this night?

7  A    One or two times.

8  Q    As a night court clerk, did you usually stay up several

9  hours after work?

10 A    Yes.

11       When you work nights, you do work to one, get home

12 1:30, 2:00 o'clock in the morning.  And then you stay up a

13 little bit.  It's like somebody working from nine to five.

14 They go home, they eat and they stay up a little while and

15 then they go to bed.  That's the way it is with somebody who

16 works nights.

17 Q    Do you recall where Court Officer Gelb lived?

18 A    Yes.

19       It was in Richmond Hill, on 109th Street, off of

20 101st Avenue.

21 Q    That was in Queens?

22 A    Yes.

23 Q    What happened after your shift ended that night?

24 A    Well, we agreed to go to a place to meet and I went

25 there.  I took the Brooklyn Queens Expressway to the Long

1  Island Expressway to the Van Wyck Expressway and I got off at

2  the Atlantic Avenue exit, proceeding on to his home.

3  Q    Did Court Officer Gelb travel with you in the same car?

4  A    No, sir, he did not.

5  Q    He went in his own car?

6  A    Yes.

7  Q    Do you recall what kind of car he drove?

8  A    It was a Volvo.

9  Q    What time was this approximately?

10 A    1:30, 2:00 o'clock in the morning.

11 Q    Had you been to Court Officer Gelb's house before?

12 A    Maybe once or twice.

13 Q    While you were driving to Court Officer Gelb's home, did

14 you hear anything unusual?

15 A    Yes.

16      I -- on Atlantic Avenue, around 111th Street there

17 was a traffic light.  I stopped.  I did hear what seemed to me

18 to be sounds of firecrackers going off.

19 Q    How many firecrackers seemed to go off?

20 A    Oh, maybe four or five.

21 Q    Did you hear anything else?

22 A    Yes.

23      Right after that, I heard the sound of what seemed

24 to me to be a car going off at a high rate of speed, the

25 engine being revved up high and some tires squealing.

1  Q    Where did you hear these unusual noises?

2  A    I was on Atlantic Avenue, about 111th Street, which is at

3  a stoplight.

4  Q    How far away were you from Court Officer Gelb's home?

5  A    It was just several blocks away.

6  Q    But it was around 1:30 in the morning?

7  A    Yes.

8  Q    Pretty quiet in the streets?

9  A    Yes, it was.

10 Q    After you made the turn on to Court Officer Gelb's

11 street, what if anything did you see?

12 A    Well, his car was parked over on the right side as if he

13 was double-parked.  And I didn't see him in it.  So I figured

14 well, maybe, he's helping someone or visiting a friend in the

15 area, since he lived there.  So I headed on down the block and

16 parked in front of where he lived and waited.

17 Q    How long did you wait for him?

18 A    Must have been several minutes, maybe five, ten minutes,

19 something like that.

20 Q    What did you do next?

21 A    Well, I began to figure something is not quite right.  He

22 is supposed to meet me and his car was still back up the

23 block.  So I got out and I started walking back up the block

24 to the car.

25 Q    What did you see when you walked up the block?

1  A    When I got to the car, the car window was rolled down,

2  the driver's side.  I looked in and he was slumped over on his

3  right side.  And I called his name and he didn't respond.  I

4  shook him just a little bit.  There was no response.  But in

5  doing that I saw there was some blood near the side of his

6  mouth so I realized something terrible had happened to him.

7  So I decided to go and call the police, and as I was heading

8  away from the car the police arrived.

9  Q    I am showing you what's been marked for identification

10  as -- I am showing what's been marked for identification as

11  Government Exhibit 6.

12  A    Yes.

13  Q    Do you recognize this photograph?

14  A     That was the scene that night, as I saw it.

15  Q    Are these photographs a fair and accurate depiction of

16  what you saw that night?

17  A    Yes.

18         MS. SEIFAN:  I offer this.

19         THE COURT:  Yes.  Admitted.

20         MS. SHARKEY:  May we see it?

21         No objection.

22         (So marked.)

23         (Displayed to jurors.)

24  Q    Just for clarification, when you approached the car, the

25  driver's side was open -- door was open or closed?

1    A    It was closed.

2    Q    What happened after the police arrived?

3    A    Well, I stayed around for a little while.  Then they

4    asked me to go to the police station with them and they asked

5    me a few questions, took a statement and then I went home.

6    Q    How did you react after you found Albert Gelb slumped

7    over in his car?

8    A    I've never forgotten it.  The pictures remind me now of

9    how terrible it was.  But it was shocking.  He was my friend.

10        MS. SEIFAN:  Thank you.

11        I have no further questions.

12        I do have one.  Sorry.  Sorry.

13    Q    When you approached the car, was the car engine running

14    or was it off?

15    A    I don't recall if the car engine was running, but the

16    headlights were on.  I do remember that.

17        MS. SEIFAN:  Thank you.

18        No further questions.

19    CROSS-EXAMINATION

20    BY MS. SHARKEY:

21        MS. SHARKEY:  Judge, can I take this down?  It

22    blocks the -- the defendant.

23        THE COURT:  Yes.

24    Q    Good afternoon, Mr. Vartian.  Thank you for coming.

25        Are you okay?

1  A    Yes.

2  Q    Mr. Vartian, you testified that you were working night

3  courts in March, '76, right?

4  A    Yes.

5  Q    You testified on direct examination that you had become

6  friends with Court Officer Gelb?

7  A    Yes.

8  Q    And how long had you been friends with Court Officer Gelb

9  as of March 11, 1976, sir?

10 A    Well, I don't remember when he came to night court.  I

11 can't remember the day.  It was within a year or two.  I

12 really don't remember.

13 Q    But you socialized a little bit with Officer Gelb?

14 A    Not socialized, but with the -- some bible study work I

15 got to know him.

16 Q    Okay.  Night court is pretty intense, right?

17 A    Yes, it is.

18 Q    It's a very animated, eight to ten hours, correct?

19 A    Yes.

20 Q    And it's your testimony that sometimes in order to wind

21 down after a frantic night, you and Officer Gelb would relax

22 or wind down by studying the bible together?

23 A    Only once or twice.

24 Q    But I imagine that prior to those bible study times, you

25 two had talked quite a bit, is this fair?

1   A      About the bible, yes.

2   Q      You were friends?

3   A      Yes.

4   Q      You counted him among your friends, right?

5   A      Yes.

6   Q      Now, you testified on direct examination that you had

7   spoken with police officers after you had found Court Officer

8   Gelb in his auto?

9   A      Yes.

10          They took me to the police station, took a

11  statement.

12  Q      You had spoken to court officers -- withdrawn.

13          You had spoken to police officers subsequent to that

14  evening too, correct?

15  A      I don't remember.

16  Q      If I showed you a copy of your interview with Sergeant

17  Gavore on March 14th of 1976, would that refresh your

18  recollection?

19  A      Probably would.

20          THE COURT:  What document are you showing, please?

21          MS. SHARKEY:  Judge, it's an interview.

22          THE COURT:  What's the number of it?

23          MS. SHARKEY:  I don't have the -- forgive me.

24          MR. FARBER:  3500-DB-1, 2 -- DB-1 and 2.

25          MS. SHARKEY:  3500-DB-1 and 2.

1   Q    I am showing you a document, would you read both pages

2   and see if this refreshes your recollection, sir, as to your

3   conversation with law enforcement a few days after this

4   incident?

5            Take your time.

6            (Pause.)

7   A    Okay.

8   Q    Fair enough?

9            Does -- did you want to hold the document?

10  A    If you'd like.

11  Q    I think the Court will say that you can't read from it

12  but you could refresh your recollection by looking at it, sir.

13           You spoke with Sergeant Gavore a few days after your

14  initial interview on March 11th, right?

15  A    Actually, I don't remember what date it was.

16  Q    Okay.  You spoke to Sergeant Gavore a few days after the

17  incident, correct?

18  A    Actually, I don't remember when this took place.  I

19  thought it was that evening.

20  Q    Okay.

21           Do you remember speaking -- do you remember having a

22  conversation with the sergeant, sir?

23  A    And I don't know who I spoke to.

24  Q    Do you remember having a conversation with a member of --

25  A    With a police officer.

1   Q    Okay.  And would it be accurate to say that you were

2   asked some questions by the police officer?

3   A    Yes, that's true.

4   Q    In response to those questions, did you tell the police

5   that Officer Gelb -- corrections officer -- excuse me -- Court

6   Officer Gelb never told you at any time that he had been

7   threatened in regard to any of the arrests he made?

8   A    No.  He never mentioned that to me.

9   Q    It would also be accurate to say that you were aware

10  based on your conversations with Court Officer Gelb that he

11  had made a number of arrests, right?

12  A    I didn't really learn that from him.  I had heard that in

13  court.

14  Q    Would it be accurate to say that you told the sergeant

15  that he didn't seem concerned nor did he feel apprehension

16  about those arrests?

17  A    He didn't tell me anything.

18  Q    Did you tell the sergeant that he didn't seem concerned

19  nor did he feel apprehensive about those arrest?

20          MS. SEIFAN:  Objection, Your Honor.

21          THE COURT:  I will allow it, if you can answer it.

22          From your own recollection, can you answer it?

23          THE WITNESS:  Not from my recollection, no.  I

24  didn't recall.

25          THE COURT:  Okay.

1  Q    From reading that document on page two, does that refresh

2  your recollection, sir, as to what you told a sergeant or a

3  member of the NYPD?

4          THE COURT:  Your recollection.  Not what's on the

5  document.  Your recollection.  Can you recollect?

6          THE WITNESS:  No.

7  Q    Does that document help you remember?

8          MS. SEIFAN:  Objection, Your Honor.  Asked and

9  answered.

10         THE COURT:  You can answer.

11         Does it help you recollect anything?

12         THE WITNESS:  Not really.

13         THE COURT:  All right.  That's enough.

14 Q    Do you remember that Court Officer Gelb told you that --

15 withdrawn.

16         Do you remember that Court Officer Gelb never told

17 you that he had been threatened in regard to any of his

18 arrests?

19 A    No.  We never spoke about things like that.

20 Q    Do you remember speaking to a member of the NYPD and

21 having a conversation concerning this subject?

22         THE COURT:  What subject?

23         MS. SHARKEY:  The subject as to whether or not this

24 witness was aware.

25         Let me rephrase that.

1          The subject as to whether or not Court Officer Gelb

2   had ever expressed that he had been threatened.

3          THE COURT:  Do you remember any such conversation

4   with him?

5          THE WITNESS:  No.

6          THE COURT:  Move to something else.

7          MS. SHARKEY:  That's it.

8   Thank you so much.

9          THE COURT:  Thank you.

10          (Witness excused.)

11          THE COURT:  Next witness, please.

12          MS. SEIFAN:  Your Honor, just briefly, redirect?

13          MS. SHARKEY:  Thank you.

14   REDIRECT EXAMINATION.

15   BY MS. SEIFAN:

16          THE COURT:  Excuse me.  I don't want the jurors

17   talking to each other while they are in the jury box.

18          Obviously, you are never to discuss anything among

19   yourselves about what you have heard or seen here.

20          Is that clear?

21          I don't want you to wink or raise your eyebrow or do

22   anything.

23          Proceed.

24   Q    Mr. Vartian, other than studying the bible with Court

25   Officer Gelb, did you socialize with him outside of work?

1   A    No.  We went to a couple -- we went to some bible

2   meetings, but other than that, no.

3   Q    So other than knowing that he generally -- generally that

4   he had made some off duty arrests to other people, he never

5   talked to you about that?

6   A    No.

7   Q    Do you know every single person that he talked to about

8   these arrests?

9   A    No.

10   Q    Did you ever discuss these arrests with anyone else?

11         THE COURT:  Don't answer.

12   A    No.

13         MS. SEIFAN:  Okay.

14         THE COURT:  Thank you.

15         That will be all.

16         MS. SHARKEY:  May I?

17         THE COURT:  No, you may not.

18         Step down, sir.

19         (Witness excused.)

20         THE COURT:  Next.

21         MS. SEIFAN:  The government calls David Werfel.

22         THE COURT:  Swear the witness, please.

23         THE CLERK:  Please raise your right hand.

24         Do you understand your obligations to tell the

25   truth, the whole truth and nothing but the truth under penalty

1    of perjury?

2              THE WITNESS:  Yes.

3              THE CLERK:  Please be seated.

4              State and spell your full name for the court

5    reporter.

6              THE WITNESS:  David Werfel, W E R F E L.

7    DIRECT EXAMINATION

8    BY MS. SEIFAN:

9    Q    Good afternoon.

10   A    Good afternoon.

11             MS. SHARKEY:  I'm sorry.  Can we have that down so

12   we can -- thank you.

13             THE COURT:  Turn it to the side so the jury doesn't

14   watch it.

15   Q    Mr. Werfel, what do you do for a living?

16   A    I am an attorney, in private practice.

17   Q    Where do you work?

18   A    My office is in Long Island, in Hauppauge.

19   Q    You have your own law firm?

20   A    Yes.

21   Q    How long have you been a lawyer?

22   A    Since -- I was admitted to the bar in February of 1974.

23   Q    Where were you working in 1975?

24   A    The District Attorney's office, in Queens County.

25   Q    When did you begin your employment with the District

1   Attorney's office in Queens County?

2   A    November of '73.

3   Q    When did you end your employment with the DA's office in

4   Queens County?

5   A    August of '77.

6   Q    At some point during your term in the DA's office in

7   Queens County, were you assigned to work in the Supreme Court

8   in Jamaica, Queens?

9   A    Yes.

10  Q    What is the Supreme Court?

11  A    It's the highest trial court in the state system.

12  Q    Were you assigned to the particular rooms in the Supreme

13  Court?

14  A    I was assigned to many courtrooms -- several courtrooms.

15  Q    Do you recall which ones?

16  A    In Queens?  In Jamaica?

17  Q    Yes.

18  A    Certainly, parts nine and ten.

19  Q    Were you ever assigned to Justice O'Connor's courtroom

20  when you worked in part nine?

21  A    Yes.

22  Q    At some point did you learn that the case People versus

23  Charles Carneglia had been assigned to Justice O'Connor in

24  part nine?

25  A    Yes.

1  Q    Were you assigned to prosecute that case?

2  A    Yes.

3  Q    Do you recall whether this was an old or new case when

4  you were assigned to prosecute it?

5  A    The case had been in the part for many months before I

6  got there.

7  Q    Do you recall the charges facing Charles Carneglia in

8  that case?

9  A    Yes.

10        It was criminal possession of a weapon and resisting

11  arrest.

12  Q    Do you know generally -- do you recall generally what the

13  charges related to?

14  A    Well, possession of a gun and then resisting arrest by

15  the arresting officer.

16  Q    Do you recall the facts surrounding that arrest?

17  A    Yes.

18  Q    What were they?

19  A    There was an altercation in a -- I think it was a diner.

20  It might have been a restaurant, but I think it was diner in

21  Queens.  The -- excuse me.  The Court officer and

22  Mr. Carneglia, and I think it was down in the restroom, where

23  this took place, in the diner or restaurant, and the court

24  officer thought he saw a gun and went to arrest Mr. Carneglia.

25  And those are basically the facts.

1  Q    Okay.

2  A    As I recall.

3  Q    Were you present in Justice O'Connor's courtroom in

4  January 1976 when the case was called?

5  A    Did you say January?

6  Q    January 1976.

7  A    Yes.

8  Q    Do you recall what happened?

9  A    It was adjourned.

10  Q    Do you remember what date it was adjourned to?

11  A    No.  But it would have been about a month, February.

12  Q    Were you present in Justice O'Connor's courtroom when the

13  case was called again in February 1976?

14  A    Yes.

15  Q    Do you recall what happened?

16  A    The same thing.  It would have been adjourned and I know

17  on that day for sure it was marked final.

18  Q    When you say it was marked final, what does that mean?

19  A    Be ready to go to trial on the next day.

20  Q    Based on the Court's direction in February 1976, had you

21  made any preparations with respect to the case People versus

22  Charles Carneglia?

23  A    Yes.  I was ready to go to trial.

24  Q    Do you recall the trial date for People versus Charles

25  Carneglia?

GR      OCR      CM      CRR      CSR

1  A    It was in March, I think it was the 16th, of 1976.

2  Q    You said you recall it was March --

3  A    It was March in 1976.  I think it was --

4  Q    Do you recall if it was March 15, 1976?

5  A    It can very well have been.  It was March 15th.

6  Q    Did you expect to try the case on March 15, 1976?

7  A    Yes.

8  Q    Were you prepared to pick a jury?

9  A    Yes.

10  Q    Were you prepared to present witnesses?

11  A    Yes.

12  Q    Do you recall how many witnesses you intended to call?

13  A    It would have been a maximum of two but I think it was

14  two.

15  Q    Do you recall the names of any witnesses you intended to

16  call?

17  A    One was the Court Officer Gelb.  I don't remember the

18  name of the lady.

19  Q    You planned to call Court Officer Gelb as a witness on

20  March 15, 1976?

21  A    Yes.

22  Q    Was he going to be a witness in the trial?

23  A    He was going to be the only eyewitness.  He was the

24  arresting officer.

25  Q    Did you learn anything about the case on March 15, 1976?

1  A   On my way in to court that day I had heard something on

2  the radio.

3          MS. SHARKEY:  Objection.

4          THE COURT:  Just don't tell us what you heard.

5  A   And then I proceeded into the courtroom.

6  Q   What happened once you got into the courtroom?

7  A   I was told what had happened to Court Officer Gelb and

8  the question was whether or not the case was going to proceed.

9  Q   Did anyone make a motion when you got to court that

10 morning?

11         MS. SHARKEY:  Objection.  Relevance.

12         THE COURT:  I will allow it.

13 A   I -- defense counsel made a motion to dismiss, as I

14 recall.

15 Q   How would you describe the courtroom when you arrived

16 there that morning?

17         MR. FARBER:  Objection.

18         THE COURT:  Sustained.

19 Q   What was your reaction to the defendant motion to dismiss

20 the case?

21 A   I opposed it.

22 Q   Was the case dismissed that day?

23 A   No.

24 Q   Do you know whether the case was later dismissed?

25 A   It was not dismissed.

1  Q    What did it do to your ability to prosecute the case to

2  lose Court Officer Gelb?

3           MR. FARBER:  Objection.

4           THE COURT:  I will allow it.

5  A    Well, he would have been my only witness, eyewitness.

6  But I was ready to proceed anyhow.

7           MS. SEIFAN:  I have no further questions, Your

8  Honor.

9           THE COURT:  Thank you, sir.

10          Cross?

11          MR. FARBER:  Thank you, Your Honor.

12 CROSS-EXAMINATION

13 BY MR. FARBER:

14 Q    Good afternoon, sir.

15 A    Good afternoon.

16 Q    You stated you were admitted as an attorney in New York

17 State on February 6, 1974?

18 A    Yes.

19 Q    And in 1975, you were employed as an Assistant District

20 Attorney in the Queens County DA's office?

21 A    Yes.

22 Q    This was your first job upon graduating law school?

23 A    No.

24 Q    Your second job?

25 A    Yes.

1  Q    What had you done prior?

2  A    After law school, and during law school, actually, I also

3  worked for the New York City Corporation Counsel.

4  Q    In 1976, in January, you were eventually assigned to

5  Justice O'Connor's courtroom?

6  A    Yes.

7  Q    And this judge sat in part nine of the Queens County

8  Supreme Court?

9  A    I believe so, yes.

10 Q    Just so it is clear, despite the name "Supreme," in New

11 York State, that is actually the trial level court?

12 A    Yes.

13 Q    And you were assigned to this courtroom with one other

14 Assistant District Attorney?

15 A    That's right.

16 Q    Is it correct that the two of you were responsible to

17 handle all the cases that were assigned to that judge's

18 particular courtroom?

19 A    Yes, that's correct.

20 Q    Do you know how many cases were assigned to this

21 particular judge?

22 A    No.  But I don't know if you mean on a given day or

23 month?  There would have been many.

24 Q    Many?  Many on a particular day?

25 A    I don't remember how many he'd have on a particular

1  calendar on a day.  But because some would be for trial.  Some

2  would be for motions.  Some could be for other issues.  But a

3  couple of dozen would not be unusual.

4  Q    On any given day?

5  A    Yes.

6  Q    In overall, is it fair to state that judge's calendar may

7  be one hundred plus cases?

8  A    Total for the whole month?

9  Q    No.  Well, his active caseload.

10 A    Yes.  Over the course of a month.

11 Q    Cases would come and go on a regular basis?  Some would

12 finish, new cases would come in?

13 A    Yes.

14 Q    It was a constant stream of cases?

15 A    Yes.

16 Q    Out of that caseload, you had to split it with one other

17 Assistant District Attorney?

18 A    Yes.

19 Q    Now, on any given day, how many cases were marked for

20 trial?

21 A    It would depend on what day.  On some days that could be

22 the only case marked for trial.  On other days there could be

23 others.

24 Q    Some days literally there could be ten cases marked for

25 trial?

1   A    That's a high number.  You could have a couple.

2   Q    When the cases were marked for trial on the particular

3   day, did they always proceed to trial?

4   A    No.

5   Q    In fact, you weren't engaged on trial every day you

6   worked in the District Attorney's office?

7   A    No.

8   Q    In fact, you had days to do your other legal work, from

9   drafting, responding to motions?

10  A    Sure.

11  Q    Do investigations?

12  A    We had a staff to do that, but yes.

13  Q    You would interview witnesses and do other trial

14  preparation?

15  A    Yes.

16  Q    In fact, in state court, once pretrial motion practice is

17  completed, the case automatically finds itself on the trial

18  calendar, isn't that correct?

19  A    I don't think I would phrase it that way.  You are not

20  really incorrect in what you are saying.  But it's really on

21  the calendar and then you also have motion practice.  So it's

22  sort of simultaneous.

23  Q    Once motions are done, there is nothing left to do but

24  either try the case or plead it out?

25  A    Correct.

1  Q    Some cases are resolved by plea bargains?

2  A    Yes.

3  Q    Other cases do proceed to trial?

4  A    Correct.

5  Q    Isn't it correct that it's quite ordinary back then for

6  cases to have been marked for trial and then be postponed for

7  a variety of reasons, such as plea bargaining?

8  A    That's one reason.

9  Q    Or that the Court was not available because it was

10 engaged on another trial?

11 A    Yes.

12 Q    Or there was an adjournment because the defense attorney

13 was not available?

14 A    Certainly.

15 Q    Or the trial was postponed because you were otherwise

16 engaged?

17 A    Yes.

18 Q    Or the -- or a witness was not available?

19 A    Yes.

20 Q    That happened routinely?

21 A    There were constantly ajournments, yes.

22 Q    And Justice O'Connor, he didn't try all the cases that he

23 had on his calendar, did he?

24 A    No.

25 Q    Is it fair to state that he had a reputation for giving

1  very generous plea deals?

2          MS. SEIFAN:  Objection.

3          THE COURT:  Overruled.

4  A    I --

5          THE COURT:  Excuse me before you answer.  Where are

6  you going with this?  I really am not interested in the

7  general calendar practice.

8          MR. FARBER:  I am moving forward to what the

9  government brought on direct examination, which --

10          THE COURT:  Why don't you get to it, please.

11          MR. FARBER:  Very well, Judge.

12          (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. FARBER:

2  Q    You testified there were two witnesses in this case?

3  A    Yes.

4  Q    You said Officer Gelb and a woman whose name you forgot?

5  A    Correct.

6  Q    And those were the two witnesses you were planning to

7  call at trial?

8  A    Yeah.

9  Q    You said Officer Gelb was your main witness?

10  A    Yes.

11  Q    Did you prep this case before trial?

12  A    Sure.

13  Q    Were you aware of the fact that the woman witness that

14  you are referring to actually saw more of the events than

15  Officer Gelb?

16  A    You know, that could be, but this is almost thirty-three

17  years ago.  But in terms of the resisting arrest, he would

18  have been the only witness to that.  As far as the possession

19  of the gun, he definitely would have been the eyewitness.  I

20  don't recall what she would have seen, but she was in the

21  diner.

22  Q    The resisting-arrest charge is a misdemeanor; correct?

23  A    Yes.

24  Q    The possession of the gun is the felony?

25  A    Yes.

1  Q    Which is the more serious charge?

2  A    The felony, the gun.

3  Q    And this female witness, she observed -- she told you the

4  possession of the gun by the individual and the disposal of

5  the gun and where the gun was recovered?

6  A    I really don't remember.

7  Q    You don't recall?

8  A    No.

9  Q    But you said you were ready for trial on that date?

10  A    Yes, and I would have interviewed her before that date.

11  Just, thirty-two years later, thirty-three years later, I

12  don't recall.

13  Q    I understand?

14        I want to make sure it's clear, though.  You

15  indicated this case was marked final for trial.

16  A    Yes.

17  Q    Do you recall stating that?

18  A    Yes.

19  Q    In fact, this case had been on the trial calendar not

20  only January, February and March of that particular year, but

21  it had been on the trial calendar marked for trial eight times

22  the year before?

23  A    I don't remember that, but I wouldn't be surprised if

24  that's true.

25  Q    The marking final for trial, has not necessarily meaning

1  final?

2  A    Yes.

3  Q    In fact, if you weren't ready, there was going to be an

4  adjournment to April?

5  A    I'm sorry?

6  Q    There would be an adjournment after that March date?

7  A    I don't know about that.  That depends on the judge, of

8  course.

9  Q    It depends on the judge, but if the defense attorney was

10 engaged in another trial, that final marking meant nothing?

11 A    I don't know that I would phrase it that way.  That

12 depends on the judge.

13 Q    Would the judge dismiss the case because the defense

14 attorney refused to come to court on that date?

15 A    Dismiss the case?

16       Dismiss the case, no.

17 Q    Would the case would have been continued?

18 A    It may have been held over for the next day.  It depends

19 on the circumstances, and, of course, the judge.

20 Q    You said you walked into court and there was a motion

21 being made to dismiss the case?

22 A    Yes.

23 Q    And the motion was being made by the lawyer, because he

24 thought there could be no case, a witness had died?

25 A    Yes.

1  Q    And that lawyer was factually incorrect?

2           MS. SEIFAN:  Objection.

3           THE COURT:  Don't answer the question.

4  Q    That motion was denied?

5  A    The motion was denied.

6  Q    The motion was denied because he was not the only

7  witness?

8  A    No.  That's not why it was denied.

9  Q    The case could go forward based on the testimony from the

10 preliminary hearing?

11          THE COURT:  Excuse me.  Why was it denied?

12          THE WITNESS:  It was denied because I said I was

13 ready to proceed, and I wanted to proceed based on the minutes

14 from the preliminary hearing, the lower court, if you will,

15 and it was permitted.  Judge O'Connor agreed that because the

16 cross-examination was so detailed at the lower-court level,

17 which is unusual, by the way, he allowed the case to proceed

18 and take Officer Gelb's testimony, if you will, through that

19 prior recorded testimony.

20 Q    But that wasn't the only testimony that was offered at

21 that trial; correct?

22 A    Well, I wasn't there for the trial, so I don't know what

23 was offered at the trial.

24 Q    Isn't it a fact the woman who you said was the secondary

25 witness, she was called for the trial, as well?

1  A     I wouldn't know that.

2          MS. SEIFAN:  Objection.

3  A     I did not handle the trial.

4  Q     You did not handle the trial?

5  A     No.

6  Q     Now, you met with officers investigating the murder of

7  Officer Gelb?

8  A     I don't recall meeting with anybody about that, no.

9  Q     I'm going to ask you if you would take a look at what has

10 been marked as Government's Exhibit 3500-DW-1?

11         I'll ask you if you can read it to yourself.

12 A     Sure.

13         (Pause.)

14 A     I've read it.

15 Q     Do you recall being interviewed by Detective Walter Cassi

16 with regard to the murder of Albert Gelb?

17 A     No, I don't.  But I'm a little confused by this document.

18         THE COURT:  That's enough.

19 A     I don't.

20 Q     Do you recall ever telling members of the Police

21 Department that Officer Gelb never told you that he had been

22 threatened in any form or fashion by anyone related to the gun

23 arrest?

24         MS. SEIFAN:  Objection.

25         THE COURT:  If you recall.

1  A    I don't recall that.  I don't recall any threats that I
2  would have been aware of.
3  Q    The form that you have before you, you say you are
4  confused.  What are you confused about?
5         THE COURT:  I don't want anything about this form.
6  Q    Do you recall ever being interviewed by the police?
7  A    No.  There were --
8         THE COURT:  That's enough.
9         MR. FARBER:  I have no further questions.
10        THE COURT:  Thank you.
11        MS. SEIFAN:  Briefly, your Honor.
12 REDIRECT EXAMINATION
13 BY MS. SEIFAN:
14 Q    March 15, 1976, you came to court to try the case that
15 day, People v. Charles Carneglia?
16 A    Right.
17 Q    Did the defendant and his attorney show up that day?
18 A    Yes.
19 Q    Did Albert Gelb show up?
20 A    No.
21        MR. FARBER:  Objection.
22        THE COURT:  Sustained.
23        MS. SEIFAN:  No further questions, your Honor.
24        THE COURT:  Thank you.
25        That will be all, sir.  Thank you.

1        (Witness excused.)

2        THE COURT:  Next witness, please.

3        MS. SEIFAN:  The government calls Susanna Zerbo.

4        THE COURT:  Is this your last witness of the day?

5        MR. BURLINGAME:  We have one more after this

6   witness.  They are both short.

7        THE COURT:  Swear the witness, please.

8   S U S A N N A    Z E R B O,

9        having been duly sworn, was examined and

10            testified as follows:

11       THE LAW CLERK:  State your name and spell it,

12  please.

13       THE WITNESS:  My name is Susanna Zerbo,

14  S U S A N N A, Z E R B O.

15  DIRECT EXAMINATION

16  BY MS. SEIFAN:

17  Q    I ask you to pull the mike close to you, so we can hear

18  you.

19  A    Okay.

20  Q    Speak into the mike?

21       How old are you.

22  A    Forty-seven.

23  Q    What do you do for a living?

24  A    I'm a technical director for a radiology firm.

25  Q    Did you know someone named Peter Zuccaro?

1  A    Yes.

2  Q    Where did you meet him?

3  A    I met him in Queens in a building that I worked in on

4  Queens Boulevard.

5  Q    Do you recall what building that was?

6  A    No.  It was on the corner of Union Turnpike and Queens

7  Boulevard.

8  Q    How did you meet him?

9  A    He was doing the construction for the building, and I

10 worked there.

11 Q    And what were you doing in the building at the time?

12 A    I worked for Newsday, and I was an office assistant.

13 Q    Do you recall approximately what year you met

14 Mr. Zuccaro?

15 A    1989.

16 Q    And how would you do your relationship?

17 A    We were good friends.

18 Q    I'm showing you what's already in evidence as

19 Government's Exhibit 2-BB-2?

20       Do you recognize this picture.

21 A    Yes.

22 Q    Who do you recognize it to be?

23 A    Peter Zuccaro.

24 Q    Did there come a point when Peter Zuccaro introduced you

25 to a friend of his who was visiting from out of town?

1  A    Yes.

2  Q    Do you remember when this occurred?

3  A    Approximately 1990.

4  Q    Do you recall the name of his friend?

5  A    Lynne Tomlin.

6  Q    Do you know whether Lynne knew anyone else in New York

7  other than Peter?

8  A    No, not to my knowledge.

9  Q    Did there come a point when Lynne stayed in your

10 apartment with you?

11 A    Yes.

12 Q    Do you recall when Lynne stayed at your apartment?

13 A    Shortly after I met him.

14 Q    Why would you agree to allow someone you just met to stay

15 at your apartment?

16 A    He was looking for an apartment, and he was a nice guy.

17 He was a friend of Peter's, and it was going to be for a week

18 or so, so it was okay.

19 Q    Where were you living at the time?

20 A    On Seventh Street and Avenue A in Manhattan.

21 Q    That's in Manhattan?

22 A    Yes.

23 Q    Were you close to any parks?

24 A    Tompkins Square Park.

25 Q    What kind of an apartment were you living in?

 1  A    A studio.

 2  Q    Do you recall why Lynne needed to stay your apartment?

 3           MR. FARBER:  Objection.

 4           THE COURT:  Sustained.

 5  Q    Do you know why Lynne didn't stay with Peter?

 6  A    No, I don't.

 7  Q    Do you know why Lynne was in New York?

 8  A    He was going through a divorce, and he didn't want to get

 9  served with divorce papers, so he was hiding from his wife.

10  Q    Do you recall what Lynne looked like?

11  A    Fair skin, big guy with a toupee.

12  Q    I'm showing you what's already in evidence as

13  Government's Exhibit 2-IIII?

14           Do you recognize this person.

15  A    Yes.

16  Q    Who is it?

17  A    Lynne Tomlin.

18           MS. SHARKEY:  Play I see that, also?

19           Okay.

20  Q    Do you know how Peter Zuccaro knew Lynne?

21  A    No, I don't.

22  Q    Did you know what Lynne did for a living?

23  A    No.  He seemed to be independently wealthy, actually.

24  Q    Why did you think he was independently wealthy?

25  A    Just conversations, the neighborhoods he was looking for

1  apartments in, just his cash flow.

2  Q    His cash flow?  Did he always use cash?

3  A    Yes.

4  Q    How long was Lynne supposed to stay with you?

5  A    Just a couple of weeks until he found an apartment that

6  he liked.

7  Q    And how long did he end up staying with you?

8  A    A little over a couple of weeks.

9  Q    How did you feel about Lynne staying with you?

10  A    Well, it became uncomfortable.

11  Q    Why was it uncomfortable?

12  A    Because it was a studio apartment, and I thought he would

13  be out all the time, but instead, he was always at my

14  apartment, and there was just no privacy.

15  Q    Fair to say he never left the apartment?

16  A    Yes.

17  Q    Did Lynne talk on the telephone with anyone while he

18  stayed at your apartment?

19  A    Not that I know of.

20  Q    Did he seem to be waiting for someone when he was in your

21  apartment?

22  A    He seemed to be always waiting for Peter.

23  Q    Did you tell Peter you were unhappy that Lynne was

24  staying with you?

25  A    Yes.

1    Q    What happened after you told Peter?

2    A    He came and got him someplace else to stay.

3    Q    Do you know where Lynne went after he left your

4    apartment?

5    A    From what I remember, he -- Peter brought him -- was

6    building these townhouses somewhere in Queens, and he was

7    staying in one of the model homes.

8    Q    Do you know where he went after the model homes?

9    A    To Long Beach.

10   Q    Do you know how he got that apartment in Long Beach?

11   A    I actually got it for him.

12   Q    Do you recall where that apartment was located in

13   Long Beach?

14   A    No.  It was a block from the beach, but I don't remember

15   what street it was on.

16   Q    Was it on the beach?

17   A    Yes, right on the beach.  The apartment was on the beach.

18   The building was on the beach.

19   Q    Do you know how Lynne paid for that apartment in Long

20   Beach?

21   A    Cash.

22   Q    Ms. Zerbo, when was the last time you saw or spoke to

23   Peter Zuccaro?

24   A    Twenty-two years ago.

25   Q    Thank you?

1          MS. SEIFAN:  No further questions.

2     CROSS-EXAMINATION

3     BY MS. SHARKEY:

4     Q    Hi, Ms. Zerbo, how are you?

5     A    Okay.

6     Q    Ms. Zerbo, when you let Mr. Zuccaro's friend stay at your

7     apartment, you were trying to do him a favor; right?

8     A    Yes.

9     Q    You were nice, right?

10    A    Hmm.

11    Q    You believed that the individual that you have identified

12    as Lynne was actually someone who was attempting to avoid a

13    divorce proceeding, right?

14    A    Exactly.

15    Q    Did you come to learn that Mr. Zuccaro had lied to you

16    about this person's identity?

17    A    No.

18    Q    Do you know that today, that he lied to you about the

19    individual's identity?

20    A    I'm not sure.  No.  I'm not sure what's going on actually

21    but --

22         THE COURT:  That's enough.

23    Q    Don't be uncomfortable.

24    A    Okay.

25    Q    Ms. Zerbo, did you ever come to know that Peter Zuccaro

1  had put a drug dealer in your studio apartment?

2  A     No.

3           THE COURT:  Don't answer.

4           MS. SHARKEY:  Pardon.

5           THE COURT:  Do not answer what she came to know

6  unless you indicate --

7  Q     Did you know --

8           THE COURT:  At what time?

9           MS. SHARKEY:  At any time.

10           THE COURT:  No.

11           MS. SHARKEY:  Okay.

12  Q     Did you know when Peter Zuccaro asked you to put up his

13  friend that he was a drug dealer?

14  A     No.

15  Q     How long did you stay friends with Peter Zuccaro?

16  A     Maybe a year after that, but frequently, once in a while

17  we would talk but not...

18  Q     How old were you when you were friend with Peter Zuccaro?

19  A     Probably 27.

20  Q     Did you know he had committed numerous murders?

21  A     No.

22  Q     Did you know that he was a drug dealer?

23  A     No.

24  Q     Did you know that he was extremely violent?

25  A     No.

1  Q    Did you know that he was considered an enforcer?

2  A    No.

3  Q    Did you know that he committed murder for hire?

4  A    No.

5  Q    Have you ever learned that?

6         THE COURT:  No.  Don't answer.

7  Q    Would it be accurate to say, Ms. Zerbo, that the reason

8  you let this individual stay in your apartment was because you

9  trusted him?

10 A    Yes.

11 Q    And you trusted Peter Zuccaro?

12 A    Yes.

13        MS. SHARKEY:  Nothing further.  Thank you Mrs.

14 Zerbo.

15        THE COURT:  Any redirect?

16        MS. SEIFAN:  No, your Honor.

17        THE COURT:  Thank you, madam.

18        (Witness excused.)

19        THE COURT:  Do you have another witness.

20        MS. SEIFAN:  One last witness for the day.

21        MS. SEIFAN:  Frank McDaniel.

22        THE COURT:  Swear the witness, please.

23 F R A N K    M I C H A E    M c D A N I E L,

24        having been duly sworn was examined and

25             testified as follows:

 1          THE LAW CLERK:  State your name and spell it,

 2   please.

 3          THE WITNESS:  Frank Michael McDaniel.

 4   DIRECT EXAMINATION

 5   BY MS. SEIFAN:

 6   Q    Good afternoon, sir.

 7   A    Good afternoon.

 8   Q    Who do you work for?

 9   A    For the Drug Enforcement Administration.

10   Q    What is your title?

11   A    I'm assistant special agent in charge of the Houston

12   field division.

13   Q    How long have you been a special agent with the DEA?

14   A    Just short of 22 years.

15   Q    Are you currently assigned to a particular unit?

16   A    Yes, the high intensity drug trafficking area, major drug

17   squad in Houston.

18   Q    As a DEA agent, have you ever been involved in undercover

19   operations?

20   A    Yes, a great deal.

21   Q    How many, approximately, do you think?

22   A    Too many to count.

23   Q    Have you ever participated in a undercover operation that

24   resulted in the arrest of someone named Darrell Preston Smith?

25   A    I did.

1  Q    Could you tell the jury how that undercover operation

2  first got started?

3  A    We were posing as wealthy South Texas ranchers operating

4  with air strips on our ranches and posing as marijuana

5  distributors based out of the Houston area.

6  Q    Through your undercover operation did you meet

7  individuals who were working for Darrell Preston Smith?

8  A    Yes, I did.

9  Q    Do you recall what year this was, approximately?

10  A    1989.

11  Q    Who were the individuals that you met who were working

12  for Darrell Preston Smith?

13  A    An individual name John Rosario Cameola and Milton Eugene

14  Robbins.

15  Q    And through your investigation who did you learn John

16  Cameola to be?

17  A    He was an individual who had just gout out of the federal

18  penitentiary here in New York and he was alleging that he had

19  ties to large buyers of marijuana throughout the United

20  States.

21  Q    Through your investigation who did you determine

22  Mr. Robbins to be?

23  A    He was a marijuana distributor also.  He was introduced

24  to us through John Cameola and he ultimately was the one that

25  led to us Darrell Preston Smith and he was large marijuana

1  trafficker himself.

2  Q    Would you say he was a broker?

3  A    Yes.

4  Q    Let me direct your attention to November 1989.  Did

5  Milton Robbins approached you on behalf of an individual who

6  was looking to purchase a large shipment of marijuana?

7  A    Yes, he did.

8  Q    How much marijuana was that individual looking to

9  purchase?

10  A    Approximately 4,000 pounds of marijuana.

11  Q    What happened after Mr. Robbins approached you to make

12  this large purchase of marijuana?

13  A    I contacted Mr. Robbins and told him that we had

14  approximately -- had just received a shipment of 6,000 pounds

15  of marijuana and that it was available for him to observe at

16  our ranch in the Clear Lake, Texas area.

17  Q    What happened next?

18  A    I met Mr. Robbins along with some other undercover agents

19  and we spent about four hours with Mr. Robbins going through

20  each bale of the marijuana and he ultimately handpicked and

21  selected and weighed out 2,883 of that 6,000 that he thought

22  that his buyer would want to purchase.

23  Q    And how much were you going to charge for 2883 pounds of

24  marijuana?

25  A    We were charging an average of about 325 dollars a pound.

1 So the sales price for the 2883 was going to be 940 thousand

2 dollars.

3 Q    After Mr. Robbins picked out the marijuana plants, did

4 you make plans to deliver those marijuana plants to his buyer?

5 A    Yes, we did.  And the first thing that we worked out is

6 that the same day that we did the flash of marijuana in

7 November he delivered me a 1982 GMC pickup with attached

8 enclosed trailer and I did picked that up that afternoon and

9 the plan was for us to load the marijuana and the next morning

10 deliver it to his buyers.

11 Q    Where did you arrange to make that delivery?

12 A    It was agreed that I would pick a hotel on the north side

13 of Houston because the plan was that the load was going to

14 Dallas and they didn't want to go through the heavy traffic in

15 Houston.  So I picked a location of a Holiday Inn on the north

16 side of Houston the following morning.

17 Q    Tell me what happened that follow morning at this Holiday

18 Inn?

19 A    I checked into the hotel.  I actually drove the truck

20 with the marijuana in the back of enclosed trailer and then I

21 was waiting for another undercover agent to call me and let me

22 know when John Cameola had delivered a large sum of money to

23 pay for the marijuana.

24 Q    So the exchange of money was not happening at the same

25 place that the delivery of the marijuana?

1  A    That's correct.  Two separate locations.

2  Q    Did you receive a call that the money had been delivered?

3  A    Yes, I did.

4  Q    So what happened next?

5  A    I was informed that 600 thousand had been delivered and

6  at that point I called Mr. Robbins and told him the location

7  of the hotel where we were at and told him that he could come

8  pick up the truck and trailer and to bring his buyers.

9  Q    Did he meet you at the Holiday Inn?

10  A    Yes.  I had rented a hotel room there.  I was with

11  another undercover agent.  Mr. Robbins came into our hotel

12  room.

13  Q    And what did you do after he came into the hotel room?

14  A    I gave him the keys and told him that I would be

15  following in my vehicle.  I told him I would be following the

16  load vehicle out of the city limits of Houston and that I

17  would just make sure nothing happened to it before I left

18  town.  I gave him the keys to the truck.

19  Q    What happened after you gave him the keys to the truck?

20  A    At that point myself and Mr. Robbins walked to the hotel

21  lobby where I observed him meeting with an individual I later

22  identified to be Darrell Preston Smith and at that point he

23  handed him the keys.

24  Q    Who did you understand Darrell Preston Smith to be?

25  A    At that time he was only telling me his name was Ramer.

1  But I knew that he was his buyer.

2  Q    You understood him to be the purchaser of the marijuana?

3  A    That's correct.

4  Q    So you went to the lobby, followed Mr. Robbins to the

5  lobby, and what happened?  He spoke to Darrell Preston Smith?

6  A    That's correct.

7  Q    Were you involved in that conversation?

8  A    No.  I was not just standing there.

9  Q    What happened after that conversation was over?

10  A    Mr. Robbins and I walk back to the hotel room and just

11  looked out the window waiting for the loaded truck and trailer

12  to be driven up.

13  Q    What did observe when you got back to the hotel room?

14  A    I observed an individual named Glenn Ivan Allison and we

15  didn't know who he was at the time but that's who we found out

16  later that day that his name was.  He got into the truck with

17  the trailer and I saw some other individual in a white

18  Cadillac get into the white Cadillac and I saw Mr. Smith,

19  Darrell Preston Smith, get into a black 1987 GMC pickup.

20  Q    What did you do next?

21  A    I joined -- as they departed the motel parking lot, I

22  left the motel room along with Mr. Robbins.  Mr. Robbins and I

23  parted ways at that time and then I joined in behind the black

24  pickup, the white Cadillac and then the truck and the trailer.

25  Q    How long did you follow those cars for?

1  A    About 15 miles.

2  Q    Then what happened?

3  A    We approached the city limits of Conroe, just north of

4  Houston, going toward Dallas and when we approached Conroe,

5  they actually -- all three vehicles got off the highway and I

6  followed in behind them.  They went through the light at the

7  underpass of the freeway and the light was still green but at

8  that point Mr. Smith actually blocked -- he pulled into the

9  middle of both lanes and he blocked me and he got out and

10  reached for a shotgun in the rear window of his pickup truck

11  and got out, looked at me pretty sternly and racked a round

12  into the chamber of the shotgun and at that point I was

13  figuring out that he was pretty irritated that I was still

14  with him.  At that point I broke off.

15  Q    So what happened next?

16  A    I rejoined in the back of the surveillance where he

17  couldn't see me because obviously I was an undercover agent

18  and I didn't want him to see that I was still following him.

19  But I joined behind our surveillance team and we proceeded

20  toward the Dallas area.

21  Q    Was the trailer ever stopped by law enforcement?

22  A    Yes, it was.

23  Q    Where did that occur?

24  A    It was just south of Ft. Worth Texas, which is to the

25  left of Dallas.  It's another major metropolitan area.

1  Q    Was the black pickup truck in which Darrell Preston Smith

2  was in, was that stopped as well?

3  A    Yes, I had requested -- we had Ft. Worth Police

4  Department units stop and I had asked them to also stop and

5  identify Mr. Smith for purposes of indictment at a later date.

6  Q    So what happened after they stopped the trailer?

7  A    Glen Ivan Allison signed a subsequent consent with the

8  police officers to search the truck and trailer.  They

9  discovered the marijuana and he was charged on state charges

10 at that time.

11 Q    What happened to Mr. Smith?

12 A    We had him stopped and identified him and he was allowed

13 to leave after they wrote him a citation for something.  But

14 he was allowed to leave after they got him fully identified.

15 Q    Why did you allow Darrell Preston Smith to leave?

16 A    At that time we weren't ready to expose in court that we

17 were undercover officers because we had a lot of other aspects

18 of the investigation going on.  So we were just going to get

19 him ID'd so we can get him indicted.  We didn't want to

20 jeopardize our ongoing operation.

21 Q    After that day did your investigation into Darrell

22 Preston Smith continue?

23 A    Yes, it did.

24 Q    Through your investigation, did you learn the location of

25 his customers, his marijuana customers?

1   A    Yes, we did.

2   Q    Where were those customers located?

3   A    We revealed that he was supplying marijuana to people in

4   Kansas, of course Dallas and Ft.  Worth, Detroit, New Jersey

5   and New York.

6   Q    Do you recall whether the seizure was covered in the

7   newspapers?

8   A    I don't recall.

9   Q    Did there come a point when Darrell Preston Smith was

10  eventually indicted for the marijuana seizure?

11  A    Yes.

12  Q    And where was he indicted?

13  A    He was indicted out of the Northern District of Texas in

14  the Dallas U.S. Attorney's Office.

15  Q    What was he indicted for?

16  A    For conspiracy to possess the marijuana and some Title 18

17  charges.

18  Q    When did this indictment come down?

19  A    In May of 1990.

20  Q    Was an arrest warrant issued as a result of this

21  indictment?

22  A    Yes, it was.

23  Q    Did you arrest Darrell Preston Smith?

24  A    I attempted to but I was not able to.

25  Q    What happened?

1  A    In June of 1990 we went to an apartment where we believed

2  that he was going to be residing at and when we effected the

3  arrest warrant and search warrant at the apartment we

4  discovered that he actually had his dad Vernon Smith living in

5  the apartment.  So we had an arrest and search warrant and

6  during the search we were able to figure out that Darrell

7  Preston Smith actually resided at a residence about 15 miles

8  to the south of us in the Dallas area.

9  Q    What did you do next?

10  A    We had a marked patrolman with us when we did the search

11  and arrest warrant and I asked the patrolman to stay with his

12  dad and not allow him any phone calls until we could go to the

13  new residence that we had just identified to try to attempt to

14  arrest Darrell Preston Smith.

15  Q    What happened?

16  A    Shortly before we got there I got a phone call from the

17  patrolman letting me know that Mr. Smith had actually gone in

18  the bathroom.  He had asked to go to the bathroom and the

19  patrolman didn't know there was a phone in there and he heard

20  his dad warning Darrell to get out.  We arrived at the

21  residence to see an opened garage door at the residence and

22  when we entered to effect the arrest warrant we could tell

23  that Darrell Preston Smith had just fled in a hurry and left

24  his residence.

25  Q    What led you to believe that he had just been there?

A    There was an open safe.  There was an open floor safe in one of the bedrooms.  The door was open on the safe and we could actually see a money trail of various denominations U.S. currency laying on the floor going out toward the garage.

Q    How would you describe the house?

A    Very -- a very high style of living.  He had, for 1989, a very state of the art home entertainment.  He had a home gymnasium.  He had very high style of living.  We saw a lot of receipts of where he paid cash for everything.  I didn't see any sign that he was using credit cards, checking accounts. It was all in cash purchases and we saw a lot of pictures of lavish trips to the Caribbean and whatnot.  We could tell that he was living a very high life-style.

Q    So Darrell Preston Smith became a fugitive?

A    That's correct.

Q    Were you involved in trying to apprehend him?

A    Yes, I was.

Q    What steps did you take to apprehend him?

A    We did a lot of debriefings of confidential informants, trying to determine where his whereabouts were and we also had some cooperating defendants that had been arrested in the same case he had that were providing us information.

(Continued on next page.)

1  CONTINUED DIRECT EXAMINATION

2  BY MS. SEIFAN:

3  Q    Did you learn through your investigation where he had

4  gone?

5  A    The only thing we kept insistently hearing is that he was

6  not coming back to the Dallas area; that he had fled to the

7  northeast somewhere, but we had no idea where in the

8  northeast.

9  Q    Was Darrel Preston Smith ever caught by authorities?

10 A    Yes, he was.

11 Q    Do you recall when he was caught?

12 A    In November of 1992.

13 Q    Approximately how long was he a fugitive?

14 A    Two and a half years.

15 Q    I'm showing you what's already in evidence, Government

16 Exhibit 2-I I I.  Do you recognize this?

17 A    Yes I do.

18 Q    Who is that?

19 A    Darrel Preston Smith.

20 Q    Are you aware through your investigation whether Darrel

21 Preston Smith used any aliases?

22 A    Yes.

23 Q    Do you recall any of those aliases?

24 A    A lot of aliases.  Some of the ones I recall are Lynn

25 Thomas, Darrel Lynn Thomas, Darrel Paul Smith, Rammer, Smiley.

1    He had a lot of aliases.

2    Q    Is it fair to say Darrel Preston Smith was a major

3    marijuana drug dealer?

4    A    That's correct.

5    Q    Where was he primarily based out of?

6    A    Based out of the Dallas area.  He was distributing to

7    various cities across, throughout the United States.

8             MS. SEIFAN:   Thank you.  No further questions.

9             MR. SHARKEY:   No cross.

10            THE COURT:   Thank you, sir.  That will be all.

11            (Witness excused).

12            THE COURT:   Is that all for today?

13            MR. BURLINGAME:   Yes, Judge.

14            THE COURT:   I believe tomorrow we don't meet for

15   this case with the jury, but we meet Monday at 9:30.  See you

16   then.  Enjoy your weekend.

17            (Jury leaves courtroom.)

18            THE COURT:   Any applications or motions?

19            MR. BURLINGAME:   No.

20            MR. SHARKEY:   No.

21            THE COURT:   Good night.  Have a good weaken.

22   Counsel will be here at 9:00 o'clock with the defendant,

23   9:00 a.m. Monday, please.

24            (Whereupon this matter concluded for this date.)

25

1                    I N D E X                    1257

2    W I T N E S S E S :

3    G R E G O R Y    H A G A R T Y

4    DIRECT EXAMINATION                          1257

5    CROSS-EXAMINATION                           1286

6    REDIRECT EXAMINATION                        1290

7    CROSS-EXAMINATION CONTINUES                 1291

8    REDIRECT EXAMINATION.                       1297

9    CROSS-EXAMINATION                           1299

10   REDIRECT EXAMINATION.                       1329

11   BY MR. NORRIS:

12                                               1332

13   K E N N E T H    S A N T A R E ,  having been   1332

14   first duly sworn, testified as follows

15   DIRECT EXAMINATION                          1332

16   CROSS-EXAMINATION                           1359

17                                               1360

18   L Y N N    F A N T A U Z Z I

19   DIRECT EXAMINATION                          1360

20   CROSS-EXAMINATION                           1392

21                                               1400

22   M A L C O L M    S E T T L E

23   DIRECT EXAMINATION

24   CROSS-EXAMINATION                           1415

25                                               1453

I N D E X

W I T N E S S E S:  (Continued)


Gerald Beyrer

DIRECT EXAMINATION                                    1453

                                                      1462

David  Varitan, V A R T I A N

DIRECT EXAMINATION                                    1462

CROSS-EXAMINATION                                     1468

REDIRECT EXAMINATION.                                 1474

                                                      1476

W E R F E L.

DIRECT EXAMINATION

CROSS-EXAMINATION                                     1482

REDIRECT EXAMINATION                                  1493

                                                      1494

S U S A N N A   Z E R B O

DIRECT EXAMINATION                                    1494

CROSS-EXAMINATIONBY MS. SHARKEY:                      1500

                                                      1502

F R A N K   M I C H A E  McD A N I E L,

DIRECT EXAMINATION                                    1503

GR     OCR     CM     CRR     CSR

I N D E X

E X H I B I T S:

  1 capital A, 1 capital B and 1 capital C       1285


  Exhibit 3500- PZ 2A       1329


   4       1362

  3       1392

  20       1424

  5-S       1425

  5       1426