1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,  :
4                                      08 CR 76

5          -against-              United States Courthouse

6                             :    Brooklyn, New York

7    CHARLES CARNEGLIA,

8             Defendant.
                              :    March 2, 2009
9                                  9:00 o'clock a.m.
   - - - - - - - - - - - - - - X
10
                           TRANSCRIPT OF TRIAL
11              BEFORE THE HONORABLE JACK B. WEINSTEIN
                UNITED STATES DISTRICT JUDGE, and a jury.
12
   APPEARANCES:
13
   For the Plaintiff:     BENTON CAMPBELL
14                         United States Attorney
                           BY:  ROGER ANSON BURLINGAME
15                         MARISA M. SEIFAN
                           EVAN NORRIS
16                         Assistant United States Attorneys
                           225 Cadman Plaza East
17                         Brooklyn, New York 11201

18   For the Defendant:    KELLY J. SHARKEY, ESQ.
                           26 Court Street
19                         Brooklyn, N. Y. 11242

20                         CURTIS JORDAN FARBER, ESQ.
                           350 Broadway
21                         New York, N. Y. 10013

22   Court Reporter:       Henry R. Shapiro
                           225 Cadman Plaza East
23                         Brooklyn, New York
                           718-613-2509
24

25   Proceedings recorded by mechanical stenography, transcript
   produced by CAT.

1          (In open court.)

2          THE COURTROOM CLERK:  All rise.

3          THE COURT:  Good morning.

4          ALL:  Good morning.

5          THE COURT:  Call the case.

6          (Pause in the proceedings.)

7

8          MR. FARBER:  I did speak to the defendant personally

9    this morning.  At 6:00 o'clock this morning he informed me

10   they were about to put him on the bus.  I just wanted to

11   confirm that court was going to be in session.  I confirmed

12   that it was and he was getting on the bus.

13         THE COURT:  The matters we're going to talk about

14   now are strictly matters of law.

15         Court Exhibit 1 is the new jury charge.  Exhibit 1

16   of 3/2/09, which was distributed to the parties after our

17   conference last week.

18         Court Exhibit 2 is the Government letter of

19   March 1st, dealing with hearsay.

20         Court Exhibit 3 is the new witness list of the

21   defendant.

22         Court Exhibit 4 is a reargument of the Government on

23   the issue of withdrawal.

24         MS. SHARKEY:  We don't have any documents.  We don't

25   have Court Exhibit 4.

1          MR. BURLINGAME:  We sent it around yesterday.

2          THE COURT:  All right.  I'll deal with it when we

3  get to it.

4          Now, on the charge, I have some suggested changes on

5  pages 34, 35 and 36.  Turn to that, please.

6          (Pause in the proceedings.)

7

8          MS. SHARKEY:  Judge, I'm sorry, we don't have the

9  charge with us.

10          THE COURTROOM CLERK:  I don't have that with me.

11          THE COURT:  You don't have an extra copy?

12          THE COURTROOM CLERK:  No.

13          THE COURT:  Well, you had better go up and get it.

14          MS. SHARKEY:  Sorry.

15          THE COURT:  While we're getting that charge, I'll

16  discuss with you Court Exhibits 4 and 2.

17          Court Exhibit 4 relates to the charge.  The

18  Government reiterates its contention about the misleading

19  nature of the charge.  The Court approved --

20          MS. SHARKEY:  Judge, if you're going.

21          THE COURT:  -- on the ground that he had to

22  affirmatively establish withdrawal.

23          It's rejected.  I'm not reconsidering that point.

24          MS. SHARKEY:  Okay.

25          MR. BURLINGAME:  Judge, it wasn't actually, it was

1  just some suggested new language.

2          THE COURT:  I'm not going to change it.  It's been

3  thoroughly compromised and worked over and I'm not re-doing

4  it.

5          Now, with respect to Court Exhibit 2, the hearsay

6  problem.  We'll take them up one at a time.  I'll hear

7  argument first from the Government and then, from the

8  defendant, and then rule.

9          MR. BURLINGAME:  I think that the Government's

10  position is basically just sort of a prophylactic one

11  reminding the Court that the defendant cannot put on -- he

12  cannot avoid testifying and put on hearsay statements through

13  his witnesses either through the co-conspirator statement rule

14  or through the admissions against penal interest.

15          I don't think there's really too much to be argued

16  on the point.  It's not controversial.  It's just more to

17  raise the issue in advance to remind defense counsel of, you

18  know, just to raise the issue in advance.

19          MS. SHARKEY:  Judge, can I have one minute?  I have

20  notes on this and I'm a little scattered.

21          THE COURT:  All right.  Pull yourself together and

22  then I'll hear your argument.

23          (Pause in the proceedings.)

24

25          MS. SHARKEY:  Judge?  Oh, I'm sorry.

1          (Pause in the proceedings.)

2

3          THE COURT:  Yes?

4          MS. SHARKEY:  Without a specific challenge to

5    certain evidence, it's difficult for me to address this, but I

6    can address it in a larger context.

7          I'm wondering if the prosecution is making this

8    argument concerning the introduction of taped statements by

9    Mr. Carneglia.  I believe one of the witnesses this morning,

10   if we go forward, is putting in jail calls of the defendant.

11   The Court indicated on Thursday that we would also be allowed

12   to introduce jail calls contemporaneously through the

13   Government's witness to contextualize the statements.

14         THE COURT:  Only for purposes of completeness.

15         MS. SHARKEY:  Okay.

16         THE COURT:  But not if it doesn't throw light on the

17   Government's excerpts.

18         MR. BURLINGAME:  Correct and --

19         MS. SHARKEY:  And if I could finish, Mr. Burlingame?

20         MR. BURLINGAME:  Yes.

21         MS. SHARKEY:  A number of the transcripts that the

22   Government has provided to Counsel and the Court, and intends

23   to play through the witness, are excerpts of conversations.

24         What the defense has done on a number of those

25   transcripts is transcribe the entire call.

1          THE COURT:  Well, take it up with the Government.

2  If there's any controversy about it, I'll have to decide.

3          I can't handle this in context.  You have my general

4  position.

5          MS. SHARKEY:  Right.  You just asked me about this,

6  Judge.  I was going to say, we have full transcripts.

7          THE COURT:  Show them to the Government.

8          MS. SHARKEY:  Okay.

9          THE COURT:  The Government will play what you want

10  played, unless it's a controversial issue, in which case I

11  would decide it.

12          I cannot do anything further at this time.  You have

13  my general view.

14          MS. SHARKEY:  All right.  So, you do know, we have

15  two additional calls that we think should be included to

16  contextualize the statements.  I'll show them to the

17  Government if we can have a break and do it.

18          THE COURT:  Show it to the Government.  If the

19  Government objects, I'll have to decide.

20          MS. SHARKEY:  Okay.

21          THE COURT:  In general, you can't use his admissions

22  in favor of the defendant.  It is a one-way street.

23          MS. SHARKEY:  And as far as the hearsay statements

24  from witnesses, Mr. Burlingame has indicated that the letter

25  filed last night was a prophylactic letter.

1          I would note that depending on the reason for any

2    purported statements is what should guide the Court, and I

3    would note that under Federal rule of evidence 801(c) where a

4    statement is offered as circumstantial evidence of the

5    declarant's state of mind rather than for the truth of the

6    matter asserted, it's not hearsay.

7          Similarly, under Rule 803, Subsection 3, the state

8    of mind exception to the hearsay rules allows into evidence,

9    quote:  "A statement of the declarant's then-existing state of

10   mind, but not including a statement of memory or belief.  A

11   determination of whether a statement falls within the state of

12   mind exception requires a predicate finding as to whether the

13   statement then relates to an existing state of mind or to a

14   past memory or belief offered to prove the fact remembered or

15   believed.  It is well established that statements offered for

16   their effect on the listener are nonhearsay."

17         Certainly, we believe that any testimony elicited

18   from witnesses proffered by the defense on the issue of

19   withdrawal statements will fall within any of these

20   evidentiary rules.  We understand the nature of hearsay.

21   We're not offering anything as a co-conspirator --

22         THE COURT:  I cannot decide these specific issues

23   without seeing the exact statement you're relying upon.

24         The general principle you state is accurate, but how

25   it applies -- whether 403 applies, whether it is used for more

1   than one purpose and what rules should be applied to the

2   specific statement -- depends on that statement and its

3   context.  So, when you want to introduce anything, if the

4   Government is objecting, I would like to rule on it in advance

5   while we're waiting for jurors.  That's why we're here at

6   9:00 o'clock.

7          Do you have what you are going to show?

8          MS. SHARKEY:  Judge, the witness's testimony is what

9   we're going to show.  I can share it.  What I anticipate it to

10  be at this point --

11         THE COURT:  You have to indicate what the witness is

12  going to say; otherwise, I can't rule on it.  And I am not

13  going to take a series of sidebars every few minutes while

14  there is objection to what the witness is saying.

15         MS. SHARKEY:  Okay.

16         THE COURT:  So, you might as well sit down with the

17  Government and reveal what it is you're going to use the

18  witnesses for.

19         MS. SHARKEY:  I'm happy to do that right now.  Right

20  here.

21         THE COURT:  Very good.  Do it right now with either

22  with the Government and not the Court first, or with the Court

23  and the Government.  However you wish.

24         MS. SHARKEY:  All right, Judge.

25         The defense, if we go forward -- I don't know if we

1   have jurors today, I don't know what the story is -- intends

2   to call three witnesses.  One is our investigator, Mr. Dwyer

3   who has been noticed.  This does not implicate Mr. Dwyer.

4          The witness where it might be implicated --

5          THE COURT:  Who is the witness?

6          MS. SHARKEY:  Mark Goia -- G-O-I-A.

7          THE COURT:  And who is he?

8          MS. SHARKEY:  He is a friend of Mr. Carneglia's.

9          THE COURT:  A member or associate?

10         MS. SHARKEY:  No.

11         THE COURT:  Okay.  And what is he going to say?

12         MS. SHARKEY:  Mr. Goia would testify, amongst other

13  things, that prior to Mr. Carneglia going to jail in October

14  of 2001, he told Mr. Goia, I'm done with this life, I am

15  finished with this -- I'm paraphrasing -- and he communicated

16  to him in the present tense that he was no longer affiliating

17  himself with organized crime.

18         THE COURT:  To show state of mind.

19         MS. SHARKEY:  Yes.

20         THE COURT:  State of mind is not sufficient.

21         MS. SHARKEY:  Well, why not, Judge?  Respectfully --

22         THE COURT:  Because it requires affirmative acts.

23         MS. SHARKEY:  Well, those are also.  It not only

24  requires affirmative acts but as you know, that the defense of

25  withdrawal requires communicating this to fellow individuals.

1  Or that's part of it, part of what the jury could consider.

2          THE COURT:  You just told me this witness is not a

3  member of the conspiracy.

4          MS. SHARKEY:  No, Judge, but he is a member --

5  member's a wrong word -- he is a member of the community.  He

6  is an individual who lives in the community in and around

7  where individuals congregate.  So, that's the --

8          THE COURT:  Okay.  Let's hear what the Government

9  has to say.

10          MR. BURLINGAME:  Judge, I think it's clearly hearsay

11  for the reasons Your Honor identified.

12          It doesn't go to his state of mind.  It's a

13  self-serving statement the defendant's free to make if he

14  takes the stand.  He is simply trying to get hearsay

15  statements --

16          THE COURT:  Well, he can't make it if he takes the

17  stand because it was made years ago --

18          MR. BURLINGAME:  We can't discuss that --

19          THE COURT:  -- and the importance of it is the

20  contemporaneous nature of the statement, which he cannot

21  duplicate on the stand.

22          MR. BURLINGAME:  But there's the, but I don't think

23  any of the -- I'd like a second to review the rule, but I

24  don't think any of the indicia of reliability that underlie

25  the presence of suppression rule are present here.

1        Plus, the fact that he's talking to simply a member

2   of the community doesn't have any, as Your Honor pointed out,

3   he's not taking this, the statement would have some meaning if

4   it was --

5        THE COURT:  The statement is used to show, at the

6   least, present state of mind to show contemporaneous acts.

7        MR. BURLINGAME:  Right.

8        THE COURT:  If he has the -- yes?

9        MR. BURLINGAME:  A statement made while describing

10  an event or condition made while the declarant is perceiving

11  the event or condition.

12       THE COURT:  That's not the situation.

13       He's stating not what he's perceiving, but he's

14  describing his current state of mind, which only he can

15  observe.

16       MR. BURLINGAME:  Well, I think you would have to

17  have much more context as to why the state of --

18       THE COURT:  As a matter of inference, if a person

19  has a state of mind, he's likely to act in accordance with

20  that state of mind.

21       The statement to the friend I'm inclined to let in.

22       What else?

23       MS. SHARKEY:  That's it for the testimony today.

24  That statement comes in at the -- prior to the defendant going

25  to jail in '01.  And also, after his release in '05.

1          THE COURT:  He made the same statement to this guy?

2          MS. SHARKEY:  He made the same statement.

3          THE COURT:  Current, okay.  If he said that, 'I

4   presently intend,' okay.

5          MS. SHARKEY:  And similarly, the witness Salvaggio

6   is also a friend of the defendant, lives in Howard Beach,

7   knows everyone in Howard Beach.  As apparently I've learned,

8   everybody knows everybody in that small community.

9          That is the same grounds for Mr. Salvaggio, both

10  before and after.

11         THE COURT:  Was Salvaggio a member of the crime?

12         MS. SHARKEY:  No.

13         THE COURT:  Conspiracy?

14         MS. SHARKEY:  No.

15         THE COURT:  I'll let it in.  It's not of much value,

16  but he's entitled to put in a defense.  He has a burden.

17         MS. SHARKEY:  And the other statement --

18         MR. BURLINGAME:  I'm sorry, what was the statement

19  that's coming in through Salvaggio?

20         MS. SHARKEY:  Similar to the statement of Mr. Goia.

21  Prior to the defendant going to jail after -- prior to the

22  defendant going to jail in October of 2001.

23         And then, Judge, we have two individuals that were

24  incarcerated -- three individuals that were incarcerated with

25  Mr. Carneglia during the incarceration of '01 to '05.

1          THE COURT:  Say that again, please.

2          MS. SHARKEY:  Yes, Judge.

3          We have three witnesses who we intend to call who

4    were present with Mr. Carneglia during the course of his

5    incarceration from '01 to '05.

6          THE COURT:  And?

7          MS. SHARKEY:  And one of those witnesses will

8    testify.  That is Salvatore Cassiano to a contemporaneous

9    statement under Rule 801(c) and 803-3 about the defendant's

10   withdrawal.

11         And the other two witnesses I don't believe, and

12   I'll apply to the Court at tomorrow morning's session, I've

13   had some trouble with the weather with some of these

14   witnesses.  The communications to Jamaica have been awful.  As

15   you know, we're calling a witness who was incarcerated.

16         THE COURT:  And what is the witness going to say?

17         MS. SHARKEY:  Cassiano will say that the defendant

18   communicated to him a contemporaneous withdrawal.

19         The other two witnesses are more witnesses to the

20   defendant's life in prison and their observations of the

21   defendant.

22         As I said, I'm having some problems --

23         THE COURT:  Okay.

24         MS. SHARKEY:  -- but we could talk about it.  They

25   won't be on the stand today.

1          MR. BURLINGAME:  Judge, correct me if I'm wrong, my

2     understanding of the state of mind exception is that it cannot

3     be introduced for its truth.  It's to prove extraneous fact.

4          THE COURT:  It has to be introduced to the truth of

5     the state of mind.

6          MR. BURLINGAME:  Right, but this is, their reason

7     they're introducing the statements is solely to prove the fact

8     at issue that the defendant withdrew from the Gambino Family.

9     That's specifically precluded by the rule.

10         THE COURT:  Well --

11         MR. BURLINGAME:  This goes to:  I executed the

12    document.

13         THE COURT:  Not past.  It's present.  If you have a

14    state of mind, you're likely to act on this state of mind --

15         MR. BURLINGAME:  But exactly --

16         THE COURT:  -- present and future.  Not past.

17    Present and future when you have a state of mind.

18         MS. SHARKEY:  Right.

19         THE COURT:  You can brief it.

20         MR. BURLINGAME:  It says, the rules, just let me

21    read the text of the rule.

22         "The statement of the declarant's then-state of

23    mind, emotion, sensation or physical condition, such as

24    intent, plan, motive, design, mental feeling, pain or bodily

25    health, but not including a statement of memory or belief to

1  prove the fact remembered or believed, unless it relates to

2  the execution, revocation, identification or terms of the

3  declarant's will."

4          There's no, I think that we need a much stronger

5  contextual proffer as to why the then-existing state of mind

6  was something other than just purely a self-serving statement.

7          THE COURT:  I don't agree, but you can brief it.

8          MR. BURLINGAME:  Well...

9          THE COURT:  Anything further?

10         MS. SHARKEY:  Judge, we, I have a question.

11         Do you anticipate that we're going to have the

12  jurors to move forward today?

13         THE COURT:  I do.

14         MS. SHARKEY:  Okay.  Okay.

15         Do you, there's supposed to be a snowstorm tonight

16  and we have the witness from Jamaica scheduled for tomorrow

17  and the facility from where he will be testifying isn't as

18  flexible as the courthouse.

19         THE COURT:  Where is it?  Is it in the northeast?

20         MS. SHARKEY:  No, it's in Jamaica.  It's in

21  Kingston.

22         THE COURT:  It's not snowing in Jamaica.  What's the

23  problem?

24         MS. SHARKEY:  No, no, no, but it's at a university

25  and they have time slots allotted.

1          THE COURT:  Excuse me, that is your problem.  I told

2     you that last week.  I am not adjourning this trial further.

3          MS. SHARKEY:  I'm not asking you to.  I'm asking if

4     there's a phone number I could find out so I could let them

5     know.  That's all.

6          THE COURT:  Excuse me.  We are sitting today.  We

7     are sitting tomorrow.

8          MS. SHARKEY:  Okay.  That's all I -- that's it.

9     That's it.

10         THE COURT:  Anything further?

11         MS. SHARKEY:  Yes.

12         THE COURT:  Now, let's turn to my proposed changes

13    on those pages.

14

15              (Continued on following page.)

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Line three.  I say, or may not be

2    considered as evidence.  "Considered as evidence" is

3    misleading.  It is evaluated by you, which is what we are

4    talking about.  It is evidence that they have to consider.

5    In place of "considered" I put evaluated by you. Instead as

6    evidence we can say evaluated by you as proof.  I think that

7    is better.  That will be done.  Evaluated by you as proof.

8          On the next line I would end it with "that charge by

9    conspiracy period" and strike-- if the conspiracy in passed

10   membership the defendant in it have been independently

11   proved.  It does not have to be independently proved. It has

12   to be proved.  I would take all of that out

13          MS. SHARKEY:  How does it read, Judge?

14          THE COURT:  The defendant's continued membership in

15   that charged conspiracy period.

16          MS. SHARKEY:  We ask that the charge remain as is,

17   your Honor. I think it explains it more fully.

18          THE COURT:  I think it's confusing confusing and

19   it's wrong.  It's out.

20          Under the statute of limitations, the first line

21   bars conviction of instead of on conspiracy. The next full

22   paragraph, last line, a charged racketeering act need not

23   have been committed on or after, since we used "on"

24   throughout.

25          MR. BURLINGAME:  Where are we?

1          THE COURT:  Last line, third full paragraph, page

2     34.

3          MR. BURLINGAME:  On or after.  In the first sentence

4     the one your Honor changed the statute of limitations bars

5     conviction of racketeering crimes?

6          THE COURT:  Correct.

7          MR. BURLINGAME:  Should it be racketeering

8     conspiracy?

9          THE COURT:  Yes, it should be. I thought it was

10    implied.  You are better off having it. Racketeering

11    conspiracy crimes.

12         MS. SHARKEY:  Racketeering conspiracy crimes.

13         THE COURT:  Yes.  We might as well, going that far,

14    say of a racketeering conspiracy crime.  Racketeering

15    conspiracy crime.  That is the way it is.  Page 35, the first

16    full paragraph I would strike the whole thing.  It just

17    repeats in effect the next full paragraph.

18         MR. BURLINGAME:  Agreed.

19         MS. SHARKEY:  Which paragraph?

20         THE COURT:  The first full paragraph on 35.

21         MS. SHARKEY:  Yes.

22         THE COURT:  It is just repetitive.  That is all I

23    have at the moment-- I have on page 36 I have some changes.

24         The second full paragraph parallel the change I made

25    a few moments ago, incarceration of the defendant may be

1  evaluated by you as proof --

2       MS. SHARKEY:  Proof of his withdrawal.

3       THE COURT:  -- of withdrawal instead of considered

4  as evidence.

5       MS. SHARKEY:  Okay.

6       MR. BURLINGAME:  Judge, while we're there, I know

7  your Honor had an opportunity to review our letter.  But I

8  would just -- I think it would take an extremely minor

9  correction to make this an accurate statement of the law,

10  something to do with the defendant's conduct while he's

11  incarcerated, not the mere fact that the government locked

12  him up and threw him in jail.

13       There has to be an affirmative act to effect the

14  withdrawal and an involuntary act of being sent to prison is

15  not it.  We'd have no objection to defendant's conduct while

16  he's incarcerated, anything that shows that he has to do the

17  act, but what that suggests now simply him being skooped up

18  by the government and put in jail effects a withdrawal and

19  that's not the case.

20       THE COURT:  It is some proof.

21       MS. SHARKEY:  I'm sorry, you are leaving it as is?

22  I would request that the Court not add that modifier. The

23  cases --

24       THE COURT:  Excuse me. I am changing that paragraph

25  to read:  Incarceration of the defendant may be evaluated by

1   you as proof of withdrawal, et cetera.

2           Do you object to that?  That is the only change

3   being made.

4           MS. SHARKEY:  Sorry, I misunderstood.

5           THE COURT:  The fourth paragraph, the last line, by

6   considering all of the evidence on the issue, instead of in

7   deciding which evidence is more convincing.  I think that is

8   more accurate. The evidence submitted by either side may be

9   used.

10          MS. SHARKEY:  All the evidence on the issue period.

11          THE COURT:  All of the evidence on the issue or we

12  can say all of the evidence.  I think that may be better.

13  What do you prefer?

14          MR. BURLINGAME:  I think that is better.

15          MS. SHARKEY:  Yes.

16          THE COURT:  All of the evidence.  That's the way it

17  will read.

18          Last line on page 36, it's more accurate and clearer

19  to say, the last line.  If you cannot say upon which side it

20  weighs its weight is heavier, the defendant has not met his

21  burden of proof on the issue.  Instead of must resolve the

22  question.  That seems to me --

23          MS. SHARKEY:  Could you repeat that.

24          THE COURT:  Yes.  Last line will read.  The last two

25  lines -- we have one change on the next to last. The two

1  lines together, last sentence reads as follows:

2       If the evidence appears to be equally balanced, or

3  if you cannot say upon which side its weight is heavier, a

4  defendant has not met his burden of proof on the issue.

5       MR. BURLINGAME:  Judge, I think that clause would be

6  fine, but I think we should keep the final clause, you must

7  resolve the question against the defendant when the

8  government does not meet its burden of proof --

9       THE COURT:  No, I took out generally, the must find

10 guilt throughout the charge, because of my view that is an

11 improper charge and the same thing is true of this burden.

12      MR. BURLINGAME:  Right.  Where the government is

13 carrying the burden and the instruction the government has

14 not met its burden you must acquit the defendant--.

15      THE COURT:  I did not.

16      MR. BURLINGAME:  Does not say you must acquit the

17 defendant if the government doesn't carry its burden?

18      THE COURT:  This is the way I want this.  If you

19 have a problem, let's see it.

20      MR. BURLINGAME:  No, it was a perceived imbalance.

21 If you are telling me the instruction do not otherwise --

22      THE COURT:  I am not tell you that at all.  I am

23 telling you, if you have an objection to specific language

24 make it.

25      MR. BURLINGAME:  I'm fine, Judge.

1    THE COURT:  That is the charge as we go through it

2  we may see little minor touch ups, which we can take care of.

3  We will make those changes.  As it now stands that is what is

4  going to the jury.

5    MR. BURLINGAME:  Judge, we request an opportunity to

6  brief the presence impression issue.  We may very case law on

7  that.

8    THE COURT:  By all means, please do.

9    MR. BURLINGAME:  Would we-- obviously it will be

10  difficult to brief it while sitting in court--.

11    THE COURT:  There is little time now while we're

12  waiting.  I am not adjourning the case further.  We have to

13  move.  I can always strike it if you convince me.

14    MR. BURLINGAME:  I just think the basics of the

15  issue is the context of the conversation which is important

16  so that your Honor evaluate it on the foundation laid down

17  for that particular conversation rather than a blanket rule

18  anybody from the neighborhood said anything to the defendant.

19    THE COURT:  It is not a blanket rule. I am telling

20  you what my general view is on it and I will have to rule on

21  it on individual pieces of testimony.

22    MR. BURLINGAME:  My understanding, what statement of

23  the defendant would not come in under your Honor's ruling as

24  to his states of mind. As I understand it the ruling is if

25  the defendant said it then it shows what his state of mind

1  was at that moment, then it comes in, so why have a hearsay

2  rule?

3          MS. SHARKEY:  Do you want me to respond, Judge.

4          THE COURT:  Part of the reason is there is no direct

5  way of knowing what is in a person's mind except what the

6  person says is in his mind.  Therefore, you expand the

7  hearsay rule or extend the hearsay rule to what he says is in

8  his mind to prove what was in his mind earlier to prove what

9  happened earlier, because that would negate the whole hearsay

10  rule.

11          But with respect to current state of mind, where the

12  current state of mind is relevant, or current state mind to

13  prove future conduct you are not really dealing with the

14  credibility issue, where his memory is involved.

15          MR. BURLINGAME:  I agree.  That would be the

16  point -- that would be exactly correct why your Honor first

17  question, were these people members of the conspiracy, it

18  was, hey, let's conduct some Gambino family activity --

19          THE COURT:  If they were members of the conspiracy,

20  I would not have allowed it in. I would have balanced

21  everything.  They are not.  They are just neighbors.

22          MR. BURLINGAME:  What you are saying it's important

23  to show in the context of the conversation, it's important to

24  show his state of mind --

25          THE COURT:  Excuse me.  Let me explain again my

1   view, which may or may not be the proper view.

2          If he is telling one of his co-conspirators

3   something one way or the other.  Generally he is doing that

4   to enhance his position in the group and I wouldn't let it

5   in.  But each statement and each piece of testimony has to be

6   evaluated in the light of the underlying theory and principle

7   of the rule.

8          MR. BURLINGAME:  Right.  The question here if you're

9   not talking -- if he was talking to his eleven year old niece

10  and said, I'm no longer part of the conspiracy, there is no

11  indicia of liability.  It doesn't matter what his state of

12  mind is at that time.

13         THE COURT:  Yes, it does. If he thinks he's not

14  going to be a member, it is likely that he will act in that

15  way, if he is telling the truth about his own state of mind.

16         MR. BURLINGAME:  There needs to be some indicia --

17  the presence or the present state of mind there is some

18  external factor, which gives the Court indicia of

19  reliability, it's the persons' state of mind.

20         If it's just a random conversation, there is no

21  indicia, why he is telling the truth then rather than five

22  minute later he said something different.

23         THE COURT:  You can argue that.  I will consider

24  each statement separately.

25         I am informed that juror number four is still in

1  Central Islip and won't be here until 10:30 or 10:45.  The

2  marshals are making trips back and forth to collect jurors so

3  I think we can assume that we will break now until eleven

4  o'clock.

5          MS. SHARKEY:  We can do the transcripts.

6          THE COURT:  If you want to brief it, go ahead.

7          MR. BURLINGAME:  Would that be a futile briefing,

8  your Honor?

9          THE COURT:  No.  It's a very interesting area of the

10  evidence that I used to think about a lot.  I haven't thought

11  it about it for many, many years.  It will be interesting for

12  me to think about it again.

13          MR. BURLINGAME:  We'll see if we can put something

14  together.

15          THE COURT:  It's interesting to read your briefs.

16  They are always useful and thoughtful.

17          MR. BURLINGAME:  We'll take all of the compliments

18  that we can get.

19          THE COURT:  You deserve it. So does defense counsel.

20          MR. BURLINGAME:  I think, before we go off the

21  record we can deal, with the two transcripts, the ones you

22  showed us on Friday, we can address that issue now.  We don't

23  believe those transcripts are properly admitted.

24          THE COURT:  Give me whatever you have and I will

25  rule on it.

1         MS. SHARKEY:  I don't have that at the moment.

2         THE COURT:  It's twenty to 10:00. Why don't we break

3  until ten and then you will have everything together, give me

4  the copies.  June while give you access to her copying

5  machine and 10:00 I will consider the issue.

6         MS. SHARKEY:  Could I just suggest we do it a little

7  later, we might as well bring in both sets of transcripts.

8  The transcripts that Mr. Burlingame is referencing --

9         THE COURT:  10:30.  We will see you 10:30 and we

10  will make all the other preliminary rulings that are to be

11  made today.

12         MS. SHARKEY:  Thank you.

13         (Recess taken.)

14         (Followed on next page.)

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Court Exhibit 5, the letter of March 2nd

2   with respect to state of mind. I have reviewed the letter.

3   It's a very interesting letter, but it doesn't change my

4   mind.

5        MS. SHARKEY:  Sorry, Judge.  You haven't changed

6   your mind.  Okay.

7        THE COURT:  Now, we have problems with respect to

8   transcripts.  Do you have them?

9        MS. SHARKEY:  I do, Judge. I gave a set to

10  Ms. Seifan, who is looking at them.  I have a set for the

11  Court.  I don't think, just to give you background, I don't

12  think there will be argument on most of them.  We ask for the

13  full transcript.  There is one new call that we ask be

14  included.  Judge, the set that I handed you are for the jail

15  calls of Charles Carneglia.

16       THE COURT:  Mark this as Court Exhibit 6, today's

17  date.  This is February 14th?

18       MS. SHARKEY:  Yes, Judge. The government -- we're

19  talking about Charles Carneglia's jail calls.  The government

20  is seeking to put in a portion of the February 14th call at

21  1:31 p.m.  it's the defense's position that that portion

22  takes this out of context and we're seeking to put in the

23  entire call and we have prepared a transcript of the entire

24  call.  We've included the government's transcript without

25  change.

1          THE COURT:  Where is the government's transcript?

2          MS. SHARKEY:  It starts at page 11.

3          THE COURT:  This is all one call.

4          MS. SHARKEY:  All one call.

5          THE COURT:  I will allow it.

6          MR. BURLINGAME:  The only problem, we haven't --

7    since we were provided the transcript this morning, we

8    haven't had an opportunity to review the accuracy.

9          THE COURT:  Look at it while you can.

10         MR. BURLINGAME:  What we'd ask is that we put the

11   calls on through our witness in the manner that we planned

12   to.

13         THE COURT:  Put the whole call in.

14         MR. BURLINGAME:  Then we have no way of knowing --

15   it takes a while to listen to the call and check the

16   transcript.

17         THE COURT:  Cheek it now while we're waiting for the

18   jury.

19         MS. SHARKEY:  February 14, 2008, of 7:17 p.m., again

20   we've included the entire call, the government excerpted a

21   part of the call that we think misrepresents the context.

22   The government's call is the first -- one second.

23         (Pause.)

24         MS. SHARKEY:  That transcript, Judge, is the entire

25   phone call.

1          THE COURT:  What was the government's part?

2          MR. BURLINGAME:  Excuse me?

3          THE COURT:  What was your part that you wanted to

4    put in?

5          MR. BURLINGAME:  Judge, the fundamental problem, we

6    don't object to playing the full calls.  We had problems with

7    the defendant's transcript being accurate.  Your Honor

8    ordered --

9          THE COURT:  Excuse me.  I'm going ahead. Don't keep

10   arguing about it.

11         MR. BURLINGAME:  It's fundamentally unfair.

12         THE COURT:  You can put your transcript in later.

13   The jury is coming at great risk and burden to themselves.

14   I'm not putting off the rest of the case.  Let's deal with

15   what we have.

16         MR. BURLINGAME:  I don't want to put the

17   government's imprimatur on the defendants.

18         THE COURT:  You don't have to put it on. If you

19   would like, understanding your problem, that the defendant

20   should have given you this earlier, you can put on your part

21   with your transcript and then we'll immediately thereafter

22   play the whole part.

23         MR. BURLINGAME:  Thank you.

24         MS. SHARKEY:  With the defense transcript?

25         THE COURT:  Correct.

1          MS. SEIFAN: I'm noticing in your transcript you

2     indicated the beginning of the government excerpt and it's

3     not the government's excerpt.

4          MS. SHARKEY:  I believe it is.

5          THE COURT:  The government is going to play its own

6     and you'll play the whole transcript.

7          MS. SHARKEY:  The third call, Judge, is not part of

8     the government's call.

9          THE COURT:  This is April 3rd, 8:20?

10         MS. SHARKEY:  Yes.

11         What April 3rd of 2008 does is it explains the

12    government April 13th call, which we submit is taken out of

13    context.  It's one of the calls that I described to the Court

14    as sounding somewhat sinister in and of its own accord.

15         THE COURT:  It can come in.

16         MS. SHARKEY:  Thank you.

17         THE COURT:  In context.

18         MS. SHARKEY:  The final call, Judge, is the full

19    call of the government's transcript --

20         THE COURT:  You have April 4th at 8:34.  What is

21    that?

22         MS. SHARKEY:  That is the full transcript of the

23    government's April call.

24         THE COURT:  The government will put its portion in

25    and then you will put the whole thing in.

1        What about April 13th?

2        MS. SHARKEY:  It's the full transcript of the

3   government's call.

4        THE COURT:  The government has a portion which you

5   will put in and then they will put in the whole thing.

6        MS. SHARKEY:  And the May 25th is the full

7   transcript of the government's call.

8        THE COURT:  Why do we need yours?

9        MS. SHARKEY:  Theirs is excerpted.  They have only

10  used a few lines. Ours is the full transcript of the call.

11       MR. BURLINGAME:  Judge, I would ask that if we will

12  play them immediately after, you explain what is happening.

13       THE COURT:  I will tell them.

14       MR. BURLINGAME:  Judge, I would also just return

15  back to the initial issue from the government's letter, I

16  understand Your Honor is not going to change its ruling, I

17  would ask that a limiting instruction then be provided to the

18  jury.

19       This is going to his state of mind and not to show

20  his previous conduct, on the face of the rule --

21       THE COURT:  Not to show previous conduct?

22       MR. BURLINGAME:  It's limited -- these conversations

23  are limited for considering solely what was in the

24  defendant's mind at that time and not considering whether he

25  took any conduct --

1            THE COURT:  Prior to this.

2            MR. BURLINGAME:  Or after in furtherance.

3            THE COURT:  No.  In furtherance I think it comes in.

4            MR. BURLINGAME:  I took the case out of Your Honor's

5    treatise. It's not to show conduct and to show state of mind

6    alone.

7            THE COURT:  May I see my treatise.  It's a very

8    difficult problem --

9            MS. SHARKEY:  Judge, Ms. Van Ness is joining me at

10   defense table.  She has been assigned by the Court --

11           THE COURT:  It may not be used to show previous

12   conduct. It doesn't say anything about concurrent or future.

13   Your own quote.

14           MR. BURLINGAME:  Sorry.  We will get that

15   instruction.

16           THE COURT:  Not to show prior conduct.

17           MS. SHARKEY:  Judge, the other set --

18           THE COURT:  Mark your transcripts, please, as

19   defendant's items of evidence.  February 14, 2008, 1:31

20   Defendant's N.

21           MR. FARBER:  I think we're up to Q.

22           THE COURT:  Defendant's Exhibit Q.

23           MR. FARBER:  I will tell you in two seconds, Judge.

24           MR. FARBER:  We're up to R.

25           THE COURT:  February 14, 2008, 1:31 p.m. is S.

1          February 4th, 2008, 7:17 is P.

2          April 3rd, 8:20 is U.

3          April 4th, 8:34 is V.

4          April 13th, 6:11 is W.

5          May 25th, 9:10 is X.

6          All admitted, for purposes of assisting the jury in

7     understanding the transcript.

8          MS. SHARKEY:  Judge --

9          THE COURT:  The recording.

10         MS. SHARKEY:  Now, physically, how do you want to do

11    this?

12         Will the government play the entire call?  Do you us

13    to play the entire call?

14         THE COURT:  You can arrange it with the government

15    any way you wish.

16         MR. BURLINGAME:  We will play you snippets with our

17    transcripts and if you want to play something else you are

18    welcome to.

19         MS. SHARKEY:  We have to set up on your computer.

20         THE COURT:  Do it.

21         MS. SHARKEY:  We had -- I believe the paralegals had

22    the transcripts at a copy center, which was not open this

23    morning because of the weather.  They are in the process of

24    copying them and they have been since they came in this

25    morning. That was part of the delay.  When they stopped to

1  pick them up the place was not open because of inclement

2  weather.

3          The other issue that we have are the John Carneglia

4  phone calls.  The defense had provided the prosecution last

5  week, when we thought we were going through with the three

6  transcripts that the defense seeks to introduce, they have a

7  copy of this, I'm handing the Court a copy of the three

8  transcripts and also a reference transcript. The defendant

9  seeks, and I believe the government objects to introducing

10  the May -- do you have the May 31st call in front of you,

11  Your Honor?

12          THE COURT:  I have the December 10th, February 14th

13  and March 7th that you just handed to me. That is all I have.

14          MS. SHARKEY:  You should have December 10th, May

15  31st and February 14th. Didn't I just hand those to you?

16          THE COURT:  Yes.  I have December 10th, which is

17  Defendant's Y.

18          February 14th, which is Defendant's Z.

19          May 31st, which is Defendant's AA, and March 7th,

20  which is Defendant's BB.

21          MS. SHARKEY:  Now, Judge, if I could explain the

22  basis for the introduction of these calls, I would like to go

23  to the March 31st call first, which I think Your Honor marked

24  as Z.

25          THE COURT:  Z is February 14th.

1          MS. SHARKEY:  Sorry.  AA is May 31st.

2          MS. SHARKEY:  I would like to go to AA, Judge.

3          THE COURT:  Yes.

4          MS. SHARKEY:  The government seeks to introduce a

5     phone call from Charles Carneglia on March 7th -- dated March

6     7, 2008.  That's the document that I handed to the Court with

7     the yellow sticky.  That call -- that is important for the

8     Court to have before it to understand the context of our

9     request for the introduction of AA.  In that call --

10          THE COURT:  Are you objecting to this?

11          MR. BURLINGAME:  Yes.

12          MS. SHARKEY:  We objected to all of the calls and

13     the Court said that the government could introduce them.

14     That's when we came back in the afternoon.

15          THE COURT:  I'm finding that the conspiracy

16     continued and this was in the aid of conspiracy, in

17     furtherance of it while both Carneglias were members.

18          MS. SHARKEY:  On page 11 of the government's call,

19     which has the yellow sticky and underlined on March 7, 2008,

20     the government is seeking to offer -- among other things -- a

21     statement by Carneglia that my brother has been sending --

22          THE COURT:  Which Carneglia is this?

23          MS. SHARKEY:  Looking on March 7, 2008, that is

24     Charles.

25          THE COURT:  Yes.

1          MS. SHARKEY:  "My brother has been sending messages,

2     you know, tell my brother if he needs anything call me.  I

3     wouldn't call that house for all the tea in the world."  The

4     government is seeking to introduce, as the Court said,

5     evidence of the -- of the ongoing conspiracy through the

6     calls of Charles Carneglia or receiving messages from his

7     brother. The May 31st call, Defendant's AA, in fact, puts

8     that call in context.

9          The May 31st call, in fact, explains that the

10     messages are that the defendant's brother is speaking to an

11     unknown male that, "my brother needs a lawyer, I will get him

12     one."  This is the gist of the messages, "tell my brother, if

13     he needs an investigator, I will get him one," so it's the

14     defendant's position that for fairness, completeness, and

15     context, Defendant's AA should be put into evidence to

16     explain the messages that the defendant is receiving from his

17     brother.

18          Additionally, Judge, as a secondary matter, it's

19     relevant to the state of mind of John and the other

20     individuals who are speaking in the course of the call.

21          THE COURT:  I don't understand how it bears.  First

22     of all, it's long after the March call.  March 7th is the

23     call and this is May, doesn't explain prior messages.

24          MS. SHARKEY:  It does for individuals who are

25     incarcerated.  They are neither allowed to speak to each

1  other on the telephone nor are they allowed, according to

2  Bureau of Prisons rules, to write to each other.

3        THE COURT:  What's the government's view.

4        MS. SEIFAN: The March 7th call between Jackie

5  Cavallo and Charles Carneglia, the May 31st call is between

6  John Carneglia and unknown male, we don't know who it is.

7  It's not -- it's two months later and it's not the

8  defendant's statement.

9        THE COURT:  I will not let it in.

10        MS. SHARKEY:  Respectfully, they are insinuating --

11  direct proof of the continuance of the conspiracy is Charles

12  Carneglia saying on March 7th, "my brother has been sending

13  me messages, right."  That directly references the May 31st

14  call.

15        THE COURT:  May 31st is two months after the call.

16        MS. SHARKEY:  Right. The brother had been sending

17  messages to Carneglia about his lawyer and about

18  investigators.  They are making it sound as if it's an

19  ongoing conversation that goes to the conspiracy and is for

20  conspiratorial illegal acts when, in fact, the messages go

21  exactly to John Carneglia.

22        THE COURT:  You don't know that.  The message you

23  are relying on took place two months after the call the

24  government is relying on.

25        MS. SHARKEY:  There are also additional calls prior

1   to this, Judge.

2          THE COURT:  I don't have them before me.  As to May

3   31st, it's excluded. It's not sufficiently probative.

4          MS. SHARKEY:  I would respectfully request that the

5   Court reconsider that and if you want to instruct the jury

6   that it goes to the weight or is the defendant's contention

7   that this is what it explains, but factually it does, Your

8   Honor, and that context has been selected --

9          THE COURT:  Okay. You can put it in.  I will not

10  inhibit your contextual argument.

11         MR. BURLINGAME:  Judge, then we will get into a back

12  and forth with the tapes.  We have dozens of tapes with John

13  Carneglia talking with the defendant before and after this.

14  We tried to limit the presentation to one call.

15         THE COURT:  What have you got?

16         MR. BURLINGAME:  This is the entire John Carneglia

17  call on this sheet of paper.

18         MS. SEIFAN: They are seeking to introduce other

19  calls.

20         MR. BURLINGAME:  That had to do with the specific

21  crime about Bobby Schiavo paying Christmas money, which is

22  the extortion charge.

23         THE COURT:  What else do you have?

24         MR. BURLINGAME:  This idea that the defendant and

25  his brother are not on good terms, we can play calls where

1 the defendant's brother is asking about how his brother's

2 case is going.  It's endless and extraneous.  Your Honor, on

3 403 grounds there is no probative value.

4 　　　　MS. SEIFAN: It's confusing. We don't see how it

5 relates in any way --

6 　　　　MR. BURLINGAME:  The only way it comes in as a rule

7 of completeness and, as Your Honor observed, it's two months

8 later, it's not the same participants in the call and there

9 is extremely tenuous argument as to how it relates back to

10 the call.

11 　　　　MS. SHARKEY:  Respectfully, Judge, I go back to the

12 contextualization of that phone call.

13 　　　　The government initially noticed numerous John

14 Carneglia calls and for strategic purposes reflected the one

15 that they put in.

16 　　　　The government also put in or intends to put in the

17 March 7th call between Carneglia and Cavallo. My brother has

18 been sending me messages.  This call specifically --.

19 　　　　THE COURT:  You can put it in. I ruled on it.  What

20 else?

21 　　　　MS. SHARKEY:  The defendant also seeks to put in the

22 call which is dated December 10th and I'm not sure what

23 exhibit the Court has assigned to that.

24 　　　　THE COURT:  I will tell you.  It's Y.

25 　　　　MS. SHARKEY:  The defendant seeks to put that call

1   in relevant to the state of mind of John Carneglia and the

2   individual with whom he's speaking.

3         THE COURT:  I don't see what his state of mind has

4   to do with anything.

5         What does it have to do anything?

6         MS. SHARKEY:  The reason that his state of mind has

7   to do with something is the fact that the government has

8   painted -- has brought forth evidence that John Carneglia is

9   a powerful soldier in the Gambino crime family.  Certainly

10  his statement concerns his brother being disengaged and not

11  responding to any outreach or comments --

12        THE COURT:  It's used by you or proposed to be used

13  by you to show a past events. It doesn't come in.  Why is it

14  excluded?

15        MS. SHARKEY:  Judge, it's my same argument for the

16  February 14th call.  Again that is --

17        THE COURT:  To show John Carneglia's state of mind,

18  no.

19        MS. SHARKEY:  It's also Charles Carneglia's Current

20  state of mind.  This is a call between Charles Carneglia

21  and --

22        THE COURT:  Where does it show Charles' state of

23  mind?

24        MS. SHARKEY:  One second.  On page 3, Judge, about

25  16 lines down, John carrying says what is up with the

1 heart --

2          MS. SEIFAN: What page?

3          MS. SHARKEY:  Three.  "What's up with the heart" .

4          Charles Carneglia:  "I have no idea, John.  I don't,

5 I don't bother with these people."

6          John Carneglia:  "What's up with the weasel, did he

7 get sentenced yet" .

8          Charles Carneglia:  "How the fuck do I know, John" .

9          Two lines down:  John Carneglia:  "Well, he is

10 getting sentenced."

11          Charles Carneglia:  "I will hear about it.  I don't

12 see anybody to listen to this shit, John."  That goes --

13          THE COURT:  Okay.

14          MS. SHARKEY:  Thank you.

15          THE COURT:  Z goes in.

16          MS. SEIFAN: The entire call?

17          THE COURT:  If they want it for context, they can

18 have it.

19          MS. SHARKEY:  Thank you.

20          THE COURT:  What about AA?

21          MS. SHARKEY:  AA you already ruled and said that

22 went in.  That is what the --

23          THE COURT:  BB.

24          MS. SHARKEY:  I'm confused on the dates.  Judge, we

25 gave you three calls.

1          THE COURT:  AA is May 31st at 10:31.

2          MS. SHARKEY:  The Court ruled that goes in and --

3          THE COURT:  BB is March 7th.

4          MS. SHARKEY:  That is the government's call, Judge.

5     I just gave that to the Court so that you can contextualize.

6          THE COURT:  That is coming in as what exhibit

7     number?

8          MR. BURLINGAME:  March 7th?

9          THE COURT:  Yes.

10         MS. SEIFAN: March 7th is coming in as Government

11    Exhibit 230 T, as in Tom, dash five.

12         THE COURT:  Exhibit 230 D-5.  That will be coming in

13    as a Government Exhibit.  That is admissible.  That covers

14    everything, does it?

15         MS. SHARKEY:  I think it does.

16         MS. SEIFAN: We have, in response to their

17    introduction of these calls, we'd like to introduce two

18    additional John/Charles Carneglia calls.

19         MS. SHARKEY:  May we have a copy that we can see?

20         THE COURT:  This is now government.

21         MR. NORRIS:  230 T-12 and 230 T-13.

22         THE COURT:  May I see the transcript?

23         MR. NORRIS:  Yes, Judge.  We believe the date is

24    wrong, 230 dash 13 is November 26th at 2:29 p.m.

25         MR. NORRIS:  And 230 T-12 is November 27th.  It

1   states it's 2007, but we think it's 2006.  Yes, both calls

2   are from 2006.

3         MS. SHARKEY:  Judge, I would ask that the Court --

4   that we can take care of authentication by stipulation, given

5   these two additional calls, we will also seek to look at the

6   record later this afternoon for calls which place the John

7   calls in context and the Court has directed defense counsel

8   to put the John calls in on our case.

9         MR. NORRIS:  Just if I could briefly make clear,

10  this is in response --

11        THE COURT:  You want to put it in as rebuttal or

12  part of your main case?

13        MR. NORRIS:  I think we will put it in in our main

14  date.

15        THE COURT:  230 T-12 is in evidence and 230 T-13 is

16  in evidence.

17        MR. NORRIS:  Briefly, Your Honor. To make one point

18  with respect to the calls.

19        THE COURT:  Yes.

20        MR. NORRIS:  With respect to context, these are the

21  context of these calls, these are about four months prior to

22  the March 2007 call that the defense is seeking to

23  introduce --

24        MS. SHARKEY:  March 7th is your call.

25        MR. NORRIS:  Withdrawn. The point is these calls are

1   from November 2006 and Ms. Sharkey referenced the defense

2   would like to play calls in which the defendant expresses no

3   concern or interest in what other people in the family are

4   doing. These two calls --.

5          THE COURT:  You wanted them admitted. I'm admitting

6   them.  You have to decide only whether up want them in your

7   main case or as rebuttal.  I take it you want them as your

8   main case and you can have it.

9          MR. NORRIS:  Thank you, Your Honor.

10          THE COURT:  230 T-12 and 230 T-13 are in evidence.

11   Anything further?  We are still waiting for the jury.

12   Standby, please.  They are half an hour away.

13          MS. SHARKEY:  Judge, do you -- so we're ready to

14   move forward, my understanding, it's supposed to snow all

15   day, are you going to keep the jury until 5:00.

16          THE COURT:  I am.  However, the latest report I have

17   indicates the snow is supposed to stop at 6:00.  I was

18   arranging for hotel accommodation, but I don't think that

19   will be necessary because tomorrow it should be all clean.

20   We will work until 5:00 and then tomorrow as usual.  We

21   should finish tomorrow, shouldn't we?

22          MR. BURLINGAME:  The government will finish its case

23   within a couple of hours of today.

24          THE COURT:  The defendant doesn't have much.  We'll

25   have finish tomorrow and we will go ahead with summations as

1   scheduled on Wednesday.  The Court is in recess.

2          MR. BURLINGAME:  11:30.

3          THE COURT:  Yes, I think she should be here by then.

4   Be prepared.

5          The defendant, please.  Do you have a government

6   witness?.

7          I did make one ruling in which I misspoke.  If he

8   told a co-conspirator that he was leaving, it does come in as

9   an act.

10         MR. NORRIS:  If it had been done that way.

11         THE COURT:  It could have come in as an act.

12         (Followed on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BURLINGAME:  It's the cross of Special Agent

2     Haggerty, the extortion call.

3          THE COURT:  Haggerty is recalled for cross.  You are

4     still under oath.

5     G R E G O R Y    H A G G E R T Y ,

6        called as a witness, having been previously duly

7        sworn, was examined and testified as follows:

8          MS. SHARKEY:  Your Honor we had a question as to how

9     the Court would best like the calls on the next witness put

10     in.  Do you want -- we have more fulsom calls --

11          THE COURT:  Fulsom?

12          MS. SHARKEY:  You went through it this morning.  A

13     more complete.  Do you want us to do it on the defense or

14     after each call is played.

15          THE COURT:  It's your case.

16          What do you want to do?

17          MS. SHARKEY:  I think it's easier to do it on cross

18     with the paralegals.

19          MR. BURLINGAME:  We have no objection.

20          THE COURT:  Whatever you want to do.

21          Court Exhibit 7 from October 5, 1990.  New York

22     Times reported that Louie DiBono was found slain in the

23     basement of the World Trade Center on October 4, 1990 at 3:00

24     p.m. by consent.  Court Exhibit A, the Court takes judicial

25     notice the Rock and Roll band Pink Floyd made a concert

1    appearance at Yankee Stadium in the Bronx on June 10th and

2    11th 1994.  By consent.

3            MR. BURLINGAME:  It was not on consent.  It's

4    judicial notice.  We tried to get a stipulation.

5            THE COURT:  Consent is refused. The Court takes

6    judicial notice based on the document attached to the

7    submission, which are part of the exhibit.  Notice having

8    been given to the defendant.  The government was seeking

9    judicial notice and the defense had an opportunity to

10   contest.  The defendants did not contest nor did it submit

11   any evidence to the contrary.

12           THE COURT:  We will break for lunch for half an hour

13   at 1:00.

14           Bring in the jury, please.

15           MR. BURLINGAME:  After the cross of this witness is

16   completed, we will read a couple of stipulations and if Your

17   Honor wants to do the judicial notice at that point.

18           THE COURT:  You can read it to the jury yourself. I

19   have taken judicial notice.

20           (Followed on next page.)

21

22

23

24

25

1        (Jury present.)

2        THE COURT:  Be seated, please.  Good morning.

3   Congratulations for making it this morning. I know it was

4   difficult. I had arranged for hotel accommodations on the

5   theory that it would continue to snow into the evening, but I

6   now have the more current weather report indicating that the

7   snow is tapering off on Long Island and in the City and would

8   be completely ended by 6:00, you'll be taken home or to your

9   place of pickup at about 5:00 and tomorrow we will proceed in

10  the normal course when you get here at 9:30.  Thank you on

11  behalf of all of us.

12        Proceed, with cross.  Mr. Haggerty is still under

13  oath.

14  CROSS-EXAMINATION

15  BY MS. SHARKEY:

16  Q    Good morning, Special Agent. How are you?

17  A    Good morning, fine, Thank you.

18  Q    Sir, you testified last Thursday on direct examination

19  that as part of your job one of the things that you were

20  doing was that you were conducting a wiretap on Carl Klein,

21  Ronnie DeConza and Kevin McMahon, correct?

22  A    Correct, DeConza.

23  Q    It was DeConza, Klein and McMahon, those three

24  individuals cell phones that the Court authorized a Title

25  Three wiretap, right?

1    A    Correct.

2    Q    And to refresh the jury's memory what that is, you

3    listened in and fellow agents listened in on the calls made

4    and received by McMahon, DeConza and Klein, right?

5    A    Correct.

6    Q    And how long did that wiretap investigation last, until

7    you made arrests on that matter?

8    A    Approximately five months, somewhere around there.  At

9    different points there were, for example Kevin McMahon's

10   phone was intercepted longer and Ronnie DeConza and Carl

11   Klein's telephone.  They came in at different points.

12   Q    And Agent Haggerty, you introduced a number of phone

13   calls that were intercepted when you testified last week and

14   those phone calls were between Kevin McMahon and Charles

15   Carneglia and Kevin McMahon and Jodi Ryan, right?

16   A    Among others, yes.

17   Q    Well, did you put in any other phone calls last week

18   besides between McMahon and Carneglia and McMahon and Jodi

19   Ryan?

20        THE COURT:  The witness puts in nothing, it's the

21   government that offers it and the Court admits it.

22   Q    You didn't testify about any other known calls except

23   the calls between McMahon and Carneglia and McMahon and Ryan,

24   correct?

25   A    No, I believe there was also a conversation between

1   McMahon and DeConza and then between -- no -- and then

2   between Fats Alley Scala and Ronnie DeConza.

3   Q    You are right.  That you.

4        Now, there were a number --

5   A    I'm sorry, and one other phone call between Kevin

6   McMahon and someone I could not identify.

7   Q    Fair enough.  And there were actually hundreds and

8   hundreds of phone calls, correct?

9   A    Correct, thousands.

10  Q    Thousands?

11  A    Kevin dialed an awful lot.

12  Q    I wanted to ask you about that.  Kevin McMahon was on

13  the phone quite a bit, right?

14  A    Correct.

15  Q    Kevin McMahon made thousands of phone calls, correct?

16  A    In excess of a thousand.  I don't know how many -- if it

17  was more than 1,000, but it was at least a thousand.

18  Q    And Kevin McMahon called hundreds of times to DeConza,

19  right?

20  A    No.

21  Q    How about to Sal Scala?

22  A    No, not hundreds.

23  Q    How many would you say?

24  A    To whom?

25  Q    To DeConza.

1   A    There were not many, I would say 10 to 12, between Kevin

2   McMahon and Ronnie DeConza.

3   Q    How about Kevin McMahon and Carl Klein?

4   A    There were a fair number, I'm guessing, as I did,

5   estimating as I did in the last question, 30.

6   Q    To Klein?

7   A    Between Kevin McMahon and Carl Klein, yes.

8   Q    And there were calls between Sal Scala and DeConza,

9   right?

10  A    Correct.

11  Q    And calls between DeConza and Klein, right?

12  A    No, I do not believe there were calls between Ronnie

13  DeConza and Klein.  If there were, may have been one.

14  Q    And calls between McMahon and Klein, right?

15  A    Yes, as we went over a few questions, but yes.

16  Q    You testified that there were literally thousands of

17  calls from Kevin?

18  A    Kevin, yes, McMahon and --.

19  Q    Kevin McMahon would make numerous calls in one day,

20  right?

21  A    Correct.

22  Q    You testified that he was, I think you were gesturing he

23  was a dialer, he used the phone a lot?

24  A    Yes.

25  Q    He would make numerous calls between different persons,

1  right?

2  A    Himself and other people, yes.

3  Q    Now, you also testified that as a result of this

4  investigation you arrested Charles Carneglia, right?

5  A    Correct.

6  Q    And when you arrested Charles Carneglia you went into

7  his apartment, right?

8  A    Correct.

9  Q    And you went in with a number of agents, right?

10  A    Correct.

11  Q    Mr. Carneglia didn't seek to evade arrest, right?

12  A    No.

13  Q    And when you were in his apartment, you didn't discover

14  any guns, right?

15  A    No.

16  Q    No silencers, right?

17  A    No.  None that were in plain sight.  We didn't conduct a

18  search.  We didn't have a search warrant, but there were none

19  in plain view.

20  Q    When you say there were none in plain sight, had you

21  suspected there were weapons or silencers present, you would

22  have sought a search warrant, right.

23       MR. BURLINGAME:  Objection.

24  A    If I --

25            THE COURT:  Sustained.

1    Q    In your job as an agent, you have sought search warrants

2    subsequent to arrest of locations that were suspect of

3    containing contraband, right?

4          MR. BURLINGAME:  Objection.

5          THE COURT:  I will allow that.

6    A    When I had enough evidence to bring to the Court to get

7    the probable cause that was necessary to obtain a warrant,

8    yes.

9    Q    Right.  And you didn't suspect that there were hidden

10   guns or silencers, right?

11         MR. BURLINGAME:  Objection?

12         THE COURT:  Sustained.

13   Q    You didn't go and make an application --

14         THE COURT:  Go to something else.

15         MS. SHARKEY:  Nothing further.

16         Thank you.

17         THE COURT:  Any redirect?

18         MR. BURLINGAME:  No, Judge.

19         THE COURT:  Thank you, sir.

20         Next witness, please.

21         MS. SEIFAN:  We just want to read a stipulation.

22   The Court takes judicial notice that on October --

23         THE COURT:  Give the number of the stipulation.

24         MS. SEIFAN: Court Exhibit 7:

25         The Court takes judicial notice on October 5, 1990,

1  the New York Times reported that Louis DiBono was found slain

2  in his car in the World Trade Center parking garage on

3  October 4, 1990 at 3:00 p.m.  Court Exhibit 8.

4        The Court takes you judicial notice that the rock

5  and roll band Pink Floyd played a concert at Yankee Stadium

6  in the Bronx on June 10th and 11th of 1994.

7        THE COURT:  I take judicial notice of it.  You can

8  consider it true, absent contrary evidence.

9        MS. SEIFAN: Government Exhibit 413-S.  Stipulation

10  between the parties.  It's hereby stipulated and agreed by

11  and between the United States of America, by the undersigned

12  Assistant United States Attorney and the defendant Charles

13  Carneglia, by his undersigned attorneys, that:

14        One.  John Gotti, Sr., was arrested on December 12,

15  1990.

16        Two. This stipulation may be received into evidence

17  at trial.

18        So stipulated.  It's dated February 23, 2009, and

19  it's signed by Kelley Sharkey and myself.

20        Your Honor, we move to admit Government Exhibit

21  413-S.

22        THE COURT:  Admitted.

23        MS. SEIFAN: Government Exhibit 414-S.  It's hereby

24  stipulated and agreed by and between the United States of

25  America, by the undersigned Assistant United States Attorney,

1    and the defendant Charles Carneglia, by his undersigned

2    attorney, that:

3            One.  Justine Carneglia, the defendant's niece was

4    born in July 1976.

5            Two, this stipulation may be received in evidence at

6    trial.

7            Dated February 23, 2009, signed by Kelley Sharkey

8    and myself.

9            The government moves to admit Government Exhibit

10   414-S.

11           THE COURT:  Admitted.

12           MS. SEIFAN: Finally, Government Exhibit 3 is a

13   certificate of birth for John Gotti, Jr. At this time we move

14   to admit Government Exhibit 33 and publish it to the jury.

15           THE COURT:  Admitted.

16           You may publish.

17           MS. SEIFAN: Just indicates date of birth is February

18   14, 1964.

19           MS. SEIFAN: The next witness is Jamaica Hospital

20   records witness, Ole Pedersen.

21           THE COURT:  Swear the witness, please.

22   O L E    P E D E R S E N ,

23      called as a witness, having been duly

24      sworn, was examined and testified as follows:

25           THE CLERK:  State your full name and spell it for

1  the record

2          THE WITNESS:  O L E; P E D E R S E N.

3  DIRECT EXAMINATION

4  BY MS. SEIFAN:

5  Q     Good morning.

6  A     Good morning.

7  Q     Mr. Pedersen, where do you work?

8  A     I work at Jamaica Hospital Medical Center.

9  Q     How long have you worked there?

10 A     I worked there since 1982.

11 Q     What do you do for Jamaica Hospital?

12 A     I'm vice-president of emergency medicine and public

13 affairs.

14 Q     What are your job responsibilities as vice-president of

15 emergency medicine and public affairs?

16 A     I'm administratively responsible for the emergency

17 department and also responsible for public affairs, which is

18 public relations, marketing, emergency management, community

19 outreach and various other areas of the hospital.

20 Q     What other jobs have you had at Jamaica Hospital since

21 you started to work there?

22 A     I began there as a paramedic and paramedic supervisor,

23 then I was promoted to administrator of the emergency

24 department, and then I became vice-president of the emergency

25 department and this position at the same time.

Pedersen-Seifan/direct

1  Q    And in the course of your duties, you are familiar with

2  emergency department medical records?

3  A    Correct.

4  Q    Was Jamaica Hospital -- you said it was called Jamaica

5  Hospital Medical Center?

6  A    It was -- it's currently called Jamaica Hospital Medical

7  Center.  It was called the Jamaica Hospital prior to 1989.

8  When a new hospital building was built, it was changed to

9  Jamaica Hospital Medical Center about that time.

10  Q    I'm going to show you what is marked for identification

11  as Government's Exhibit 27.  Can you take a moment and look

12  at that document?

13         (Shown to witness.)

14         Do you recognize the document.

15  A    Yes.

16  Q    What is this document?

17  A    Appears to be a copy of an older version of the hospital

18  emergency department medical record from that period of time,

19  approximately.  1977 is the date on this record.

20  Q    Who is this record, who is the patient in the record?

21  A    Excuse me?

22  Q    Who is the patient listed?

23  A    On this record it's Joseph Gallo.

24  Q    How do you recognize this to be a Jamaica Hospital

25  record?

1    A    This record would have come to us -- a form that we use

2    in the emergency department --

3    Q    The form is a form that Jamaica Hospital --

4    A    Every patient that comes in gets a record and the record

5    is a pre-printed form and the form, at the time, comes off of

6    a computer, the computer generates a number. At the time it

7    was a hospital main frame that generated a number, which is

8    on the top of this record.

9    Q    What number is that?

10   A    32427. The top of this record says the Jamaica Hospital

11   emergency department medical record. The form --

12   Q    You testify prior to 1989 it was called the Jamaica

13   Hospital?

14   A    Correct. The front top was demographics, which was the

15   practice of this form to have the demographics on the top for

16   the patient. The nurse's information was on the bottom of the

17   front and then on the back it was a form that was flipped

18   over, it would be this way, it would be flipped over and the

19   physician information was on the back and the physician would

20   document on the back of the form.

21   Q    And on this record the nurse's information is on the

22   front and the doctor signed it on the back?

23   A    Correct.

24   Q    The second page?

25   A    Correct.  There is a pre-printed place for the nurse on

1 the front to sign and a pre-printed place for the doctor to

2 sign.

3    MS. SEIFAN: The government moves to admit Government

4 Exhibit 27 into evidence.

5        THE COURT:  I have it as previously admitted.

6        MS. SEIFAN: It was subject to connection.

7        THE COURT:  It's admitted without any limitation.

8        MS. SEIFAN: Thank you.  No further questions.

9        MS. SHARKEY:  No questions.

10        THE COURT:  Thank you, sir.

11        Next witness.

12        MS. SEIFAN: Detective Beam.

13        THE COURT:  Is this a new witness?

14        MS. SEIFAN:  He may have just been added.

15 D A R I N   B E A M ,

16    called as a witness, having been duly

17    sworn, was examined and testified as follows:

18        THE CLERK:  State your full name and spell it for

19 the record

20        THE WITNESS:  Darin Beam; B E A M, D A R I N.

21 DIRECT EXAMINATION

22 BY MS. SEIFAN:

23 Q    Good morning.

24 A    Good morning.

25 Q    Detective Beam, where do you work?

Beam-Seifan/direct

1    A    106th detective squad, NYPD.

2    Q    How long have you worked at the NYPD?

3    A    Approximately 18 years.

4    Q    Right now you're working at the 106th detective squad?

5    A    Yes.

6    Q    What does that mean?

7    A    Investigating cases from the 106th Precinct.

8    Q    Where is the 106th Precinct located?

9    A    In Ozone Park, Queens.

10   Q    And prior to working the 106th Precinct, where did you

11   work?  Where were you assigned?

12   A    Special victims, also located in Queens.

13   Q    Prior to special victims unit?

14   A    Yes.

15   Q    Prior to that, where did you work?

16   A    106th detective squad, prior to that I worked at the 106

17   also.

18   Q    You did?

19   A    Yes.

20   Q    Where were you assigned in May 2003?

21   A    The 106 detective squad.

22   Q    Let me direct your attention to May 4, 2003.  Were you

23   working that day?

24   A    Yes, I was.

25   Q    Do you recall responding to a shooting that day?

1    A    Yes, I do.

2    Q    Do you recall the name of the victim?

3    A    Yes, I do.

4    Q    What was the name of the victim?

5    A    Angelo Mugnolo.

6    Q    Angelo Mugnolo?

7    A    Yes.

8    Q    Did you respond to the crime scene?

9    A    Yes.

10   Q    Do you recall generally what happened?

11   A    Yes.

12   Q    What?

13   A    The victim in the morning hours, the victim got into his

14   car, a vehicle came up by his auto in the morning and he was

15   shot.

16   Q    Where did he get into his car?

17   A    At his residence.  It was 157-36 83rd Street, in Queens.

18   Q    Is that where Mr. Mugnolo lived?

19   A    Yes.

20   Q    Is there a church on 83rd Street?

21   A    Yes.

22   Q    So the church is on the same street as Mr. Mugnolo's

23   house?

24   A    Down the block, yes.

25   Q    What is the name of the church?

1   A    St. Helen's.

2   Q    St. Helen's Church?

3   A    Yes.

4   Q    Showing you what has been marked for identification as

5   Government Exhibit 415?

6            (Shown to witness.)

7            Take a look at that.

8   A    Yes.

9   Q    What is that?

10  A    It's a map of the borough of Queens.

11  Q    Is that the kind of map that you could buy in any store?

12  A    Yes, it is.

13          MS. SEIFAN: Your Honor, I move to admit Government

14  Exhibit 415.

15          THE COURT:  Admitted.

16          MS. SEIFAN:  I have no further questions of this

17  witness.

18          MR. FARBER:  No questions.

19          THE COURT:  Thank you.

20          MR. BURLINGAME:  The government calls Steven Kaplan.

21          JUROR:  Could we lower the heat?

22          THE COURT:  We will try.

23  S T E V E N    K A P L A N ,

24      called as a witness, having been duly

25      sworn, was examined and testified as follows:

1      THE CLERK:  State your full name and spell it for

2  the record

3      THE WITNESS:  Steven Kaplan; S T E V N, k A P L A N.

4  DIRECT EXAMINATION

5  BY MR. BURLINGAME:

6  Q    Good morning, sir.

7  A    Good morning.

8  Q    What do you do?

9  A    I work for the Department of Justice.

10 Q    Where?

11 A    Eastern District of New York.

12 Q    U.S. Attorney's Office in the Eastern District?

13 A    That is correct.

14 Q    When did you start working for the U.S. Attorney's

15 Office for the Eastern District of New York?

16 A    This morning.

17 Q    Your first day?

18 A    Yes.

19 Q    What did you do before joining the U.S. Attorney's

20 Office in the Eastern District of New York?

21 A    I worked for the New York City Police Department for

22 over 24 years.

23 Q    What was your rank when you retired?

24 A    A detective first grade.

25 Q    And is that -- what is a detective first grade?

1    A    Highest ranking detective in the Police Department.

2    Q    Where were you first assigned when you came out of the

3    police academy?

4    A    I was assigned to the neighborhood stabilization unit on

5    number 18, in South Jamaica, I did my rookie training there.

6    Then the Queens robbery task force and after that I was in

7    the organized crime control bureau, narcotics division.

8    After that I went to the career criminal apprehension unit.

9    Q    What is that?

10   A    A program designed to lock up or arrest, apprehend, the

11   worst criminals in New York City.

12   Q    And what did you do after that?

13   A    After that I went to the cold case squad.

14   Q    What is the cold case squad?

15   A    We investigate unsolved homicides.

16   Q    What year did you start with the cold case squad?

17   A    In February of 1996.

18   Q    And how long did you stay with the cold case squad?

19   A    Until the end of January, end of February, I'm sorry, of

20   2009.

21   Q    You were there for approximately three years?

22   A    Correct.

23   Q    What were your primary duties there?

24   A    I was primarily investigating organized crime homicide.

25   Q    Directing your attention to February 7th of 2008, were

1  you working that day?

2  A    Yes, I was.

3  Q    Did you make an arrest?

4  A    Yes, I did.

5  Q    Who did you arrest?

6  A    Mr. Charles Carneglia.

7  Q    Do you see him in the courtroom?

8  A    Yes, I do.

9  Q    Can you identify him?

10  A    He's the yes in the white sweater, gray beard, gray

11  hair.

12      MR. BURLINGAME:  Identifying the defendant.

13         THE COURT:  Yes.

14  Q    Detective Kaplan, did you compile a report concerning

15  your arrest of the defendant on February 7, 2008?

16  A    Not on February 7th, but I did.

17  Q    Concerning your arrest of the defendant, did you later

18  write a report?

19  A    Correct.

20      MR. BURLINGAME:  Judge, with permission, may the witness

21  refer to his report to refresh his recollection?

22         THE COURT:  Granted.

23  Q    Detectives Kaplan, were you part of a team when you

24  arrested the defendant?

25  A    Yes, I was.

1   Q    Did you have an arrest warrant?

2   A    We did.

3   Q    Do you know if arrest warrants were issued for any

4   co-defendants?

5   A    There were.

6   Q    And where did you arrest the defendant?

7   A    At his residence, which is 163-27 85th Street, in Queens

8   County.

9   Q    What time?

10  A    Approximately 6:00 a.m.

11  Q    Who were the other members of the arrest team?

12  A    The team leader was Special Agent John Reynolds,

13  Detective John Riley of the Port Authority Police Department,

14  Detective Oscar Hernandez, and myself of the New York City

15  Police Department.

16       (Followed on next page.)

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MR. BURLINGAME:  (Continued)

3  Q    Was there any other -- you said John Reynolds.

4       What organization is he a special agent with?

5  A    I'm sorry, he's a special agent in the Federal Bureau of

6  Investigation.

7  Q    Were there any other members of the FBI that morning?

8  A    Yes, there were.

9  Q    What?

10 A    There was the FBI S.W.A.T. team led by Special Agent Gary

11 Pontecourville.

12 Q    How big is the S.W.A.T. team?

13 A    P-O-N-T-E-C-O-U-R, "ville."

14 Q    How many people are on the S.W.A.T. team?

15 A    From what I recall, it was like, six to ten members of

16 the S.W.A.T. team.

17 Q    And if you could just explain to the jury; what happened

18 that morning when you arrived at Mr. Carneglia's residence.

19 A    We arrived, the S.W.A.T. team entered the residence and

20 we waited.  We were the, Detective Hernandez and myself were

21 the outside front security, Special Agent Reynolds and Special

22 Agent Reilly were the rear security, and we waited for Special

23 Agent Pontecourville to come outside and tell us that they had

24 cleared the residence.

25 Q    And he was the head of the S.W.A.T. team?

1  A    That's correct.

2  Q    So, the S.W.A.T. team went in first?

3  A    That's correct.

4  Q    What happened after you were told that the residence had

5  been cleared?

6  A    We entered the residence and went to Mr. Carneglia's

7  bedroom, which is on the second floor, the rear of the house.

8  Q    Was he placed under arrest?

9  A    He was.

10  Q    Was he cooperative?

11  A    Yes, sir.

12  Q    What did you do after you placed the defendant under

13  arrest?

14  A    We placed him in Detective Reilly's unmarked auto, it's a

15  Port Authority Police car, with Detective Reilly driving.

16  Special Agent Reynolds was in the front passenger seat,

17  Mr. Carneglia was in the rear, right passenger seat behind the

18  passenger in the front, and I was behind the driver.

19  Q    And where did you go?

20  A    We went to 26 Federal Plaza, which is the FBI

21  headquarters of New York City.

22  Q    What happened when you got to FBI headquarters?

23  A    We parked the car in the basement and went to the 26th

24  floor for arrest processing.

25  Q    What is arrest processing?

1  A    Well, it's, in this case, it was a big procedure because

2  there were almost 60 defendants in this case and it -- on the

3  26th floor they have a whole big large area.

4        Arrest processing will begin with photographs,

5  fingerprinting.  You have to get the man's pedigree or the

6  woman's pedigree.

7  Q    What does that mean, pedigree?

8  A    Pedigree is your hair color, your eye color, name, date

9  of birth, where you live, where you were born.

10 Q    And you said there were approximately 60 arrests that

11 day.

12       Were those the defendant's co-defendants?

13 A    Yes.

14 Q    Now, are you familiar with some of the people arrested

15 the same day as the defendant?

16 A    Some of them, yes.

17 Q    Do you know if Tommy Cacciopoli was arrested that day?

18 A    Yes, he was.

19 Q    Frank Cali?

20 A    Yes.

21 Q    ^  Mario Casalino?

22 A    Yes.

23 Q    ^  Domenico Cefalou?

24 A    Yes.

25 Q    Joseph Corozzo?

```
 1  A    Yes.

 2  Q    Jackie D'Amico?

 3  A    Yes, he was.

 4  Q     ^  Lenny DeMaria?

 5  A    Yes, he was.

 6  Q    Vinny Dragonetti?

 7  A    Yes.

 8  Q    Vinny Dragonetti, do you know who his father-in-law is?

 9  A    He is married to Nicholas Corozzo's daughter.

10  Q    Was Richard Gotti arrested on February 7th, 2008?

11  A    Yes, he was.

12  Q    Vinny Gotti?

13  A    Yes.

14  Q     ^  Vinny Grillo?

15  A    Yes.

16  Q    Angelo Ruggiero, Junior?

17  A    Yes.

18  Q    And Gus Sclafani?

19  A    Yes, he was.

20  Q    Or August Sclafani.

21           Now, was Nicky Corozzo arrested that day?

22  A    Nicky was not.

23  Q    Do you know why not?

24  A    Speculation. He was --

25           MR. FARBER:  Objection.
```

1        THE COURT:  Sustained.

2   Q    Was there an attempt to arrest him that day?

3   A    Yes, there was.

4   Q    Was there evidence of flight?

5   A    Yes, there was.

6   Q    Are you familiar with Jackie Cavallo and Allen Meshanski?

7   A    I am.

8   Q    Were they arrested that day?

9   A    No, they were not.

10  Q    Who participated in the arrest processing of the

11  defendant?

12  A    The four mentioned individuals; Reilly, Reynolds,

13  Hernandez, and myself.

14  Q    And explain to the jury what happened during the

15  defendant's arrest processing?

16  A    Well, in this type of a processing, the first thing you

17  have to do is unload your weapons.  They don't want any

18  weapons in the arrest processing area.  So, we all unloaded

19  our weapons.

20       Then, we were brought into another room where

21  Mr. Carneglia sat at the table with the four of us, at which

22  time Mr. Carneglia asked what is he being charged with.  And I

23  looked at the team leader, Reilly -- Reynolds, I'm sorry --

24  and he said, "Read him his Miranda rights," which I did.

25  Q    Did you actually read them off of a card?

1    A    Yes, sir.

2    Q    And is that your normal practice?

3    A    Yes, it is.

4    Q    And how did he respond when you read him his Miranda

5    warnings?

6    A    After each one, I don't have them in front of me, but

7    after each one, I asked him if he understood what I was asking

8    him and he said yes.  And upon completion, I asked him to sign

9    the paper and the his response was no autographs.

10   Q    What was the paper that you asked him to sign?

11   A    The Miranda warnings.

12   Q    So, something that documented that he had received his

13   Miranda warnings?

14   A    That's correct.

15   Q    All right.  What did you do with that paperwork?

16   A    I took the paper and I signed it myself that he had

17   refused.  And then, I handed it to Detective -- Special Agent

18   Reynolds and he witnessed it.  And that's it.

19   Q    So, he refused to sign the paper acknowledging that he

20   had been read his Miranda rights.

21        But you read him his Miranda rights and he nodded

22   after each one?

23   A    That's correct.

24   Q    All right.  What happened next?

25   A    The next thing I did, somebody, and I believe it was

1  Reynolds, told him he was being charged with RICO.  And

2  Mr. Carneglia -- it was a joke and he didn't mean anything by

3  it -- he says, 'RICO, the only RICO I ever heard of is Edward

4  G.  Robinson.'

5  Q    What happened next?

6  A    I told him that he was charged with five murders and I

7  told him each murder individually.

8  Q    Can you tell us what you told him?

9  A    Yes.

10  Q    And what he responded as well?

11  A    I told him that he was being charged Albert Gelb, a court

12  officer who was murdered in 1976.  He stated that he never

13  heard of him.

14        I told him you're being charged with Michael Cotillo

15  from the Blue Fountain Diner, 1977.  He said, 'never heard of

16  him.'

17        I told him he was being charged with Sal Puma, 1983

18  in Lindenwood.  He said, I know a Sandy Puma, I don't know Sal

19  Puma.

20        Then, after that, I told him ^ Louie DeBono at the

21  World Trade Center, 1990.  He said, 'I know Louie.'

22        And then, I told him about Jose Delgado-Rivera, at

23  the airport, also 1990.  And he said he never heard of him.

24  Q    Did the defendant say anything after that?

25  A    He did.  He started talking.  He repeated himself many

1  times by saying he can't believe these canaries.  They're

2  rats, don't trust them.  And then he said, 'let me get this

3  straight, the canaries are saying that I murdered a court

4  officer, a guy at the Blue Fountain Diner, Puma, Louie and a

5  guy at Kennedy airport.'

6  Q    What, if anything, did you do when he said, 'a guy at

7  Kennedy Airport?'

8  A    Well, I looked at Reilly, Detective Reilly, and he smiled

9  at me and we nodded because we had never mentioned --

10        MS. SHARKEY:  Objection as to the --

11  A    -- Kennedy Airport.

12        THE COURT:  Strike the smile.  The rest of it can

13  stay in.

14  Q    So, you had nodded to Detective Reilly.

15        And what was the purpose of nodding to Detective

16  Reilly?

17  A    Well, I just --

18        MS. SHARKEY:  Objection.

19        THE COURT:  I'll allow it.

20  A    I looked, you know, I didn't nod.  I just turned and

21  looked at him, he looked at me, and we knew what we were

22  talking about because we had never mentioned Kennedy airport

23  before.  Nobody at the table mentioned Kennedy airport.

24  Q    When you explained to the defendant that he was charged

25  with the murder of Jose Delgado-Rivera, you said, 'at the

1   airport?'

2   A    That's correct.

3   Q    And then, he was the first person to say it was Kennedy?

4   A    That's correct.

5   Q    None of the other law enforcement officers had specified

6   Kennedy Airport up to that point?

7   A    No.

8   Q    So, he was the first person in the room to say the word

9   Kennedy?

10  A    Yes, sir.

11  Q    What happened next?

12  A    Then he started, you know, we were talking about various

13  different things, nothing about the crimes.  We were talking

14  about baseball, about food.  And he had mentioned -- then he

15  went into, 'I gotta get out of here, I have to mount a

16  defense, I have to go with my investigator and we have to go

17  and talk to these witnesses, right, I have big problems.'

18  Q    What next?

19  A    Then, after that, we started -- again, small talk.  It

20  was a long day.  And he mentioned longevity.  He goes to me --

21  not longevity.

22       First, he says to me, 'is this a death penalty

23  case?'  I didn't know what he was getting at.  I was never

24  asked that question before.

25       MS. SHARKEY:  Objection.  Move to strike.

1        THE COURT:  Strike the phrase "I was never asked

2   that question before."

3        The rest is in.

4   Q    He asked you if he was charged with the death penalty.

5        And what did you respond?

6        MS. SHARKEY:  Objection.  It was just struck.

7        MR. BURLINGAME:  I'm sorry, my understanding was

8   that --

9        THE COURT:  I'll allow it.

10  Q    He asked you if he was charged with the death penalty?

11       THE COURT:  Only to show the state of mind of the

12  defendant.

13       Go ahead.

14  A    I said, 'what does it matter to you?' And he said,

15  'longevity runs in my family, my mother's over 90 years old

16  and I don't want to spend the next 30 years in jail.  I'd

17  rather get the needle.'

18  Q    What happened next?

19  A    Can I refresh my recollection?

20  Q    Sure.

21  A    Oh, at this point, from what I recall, he stood up, at

22  the next juncture and he motioned to me like this

23  (indicating), 'Mingo (phonetic), what did you charge me with

24  five murders for?'  And then, I said --

25  Q    What was the first word that he said?

1  A    "Mingo."  It's Italian.

2  Q    Do you know what it means?

3  A    It's just a phrase, I guess.  It's just a, you know, what

4  the heck, something like that.

5  Q    Okay.

6         THE COURT:  Indicating.  Do you want to describe

7  what the witness did when he said that?

8         MR. BURLINGAME:  Oh, sure.

9         The witness stood up and placed his hands together

10 in a supplicating gesture and bowed back and forth a few times

11 while speaking.

12        THE WITNESS:  He, he didn't bow, he just stood up

13 straight.  I'm sorry, I couldn't stand up.  I'm sorry.

14        He just went like this (indicating), 'Mingo, what

15 did you charge me with five bodies for?'

16        MR. BURLINGAME:  The witness is making the same

17 gesture.

18 Q    And what did you respond?

19 A    I told him there's, there were more, we just couldn't

20 prove it.

21        MS. SHARKEY:  Objection.  Move to strike.

22        THE COURT:  Strike that.

23 Q    What happened next?

24 A    At this point, he had asked if there was any of those

25 other people in the room because the room started getting

1    crowded with more arrestees and he saw there was a lot of

2    people in the room.  And then, he turned around and he saw

3    Vinny Dragonetti.  They nodded to each other and then, that

4    was it.  I didn't answer him.

5    Q    And Vinny Dragonetti, you testified that's the son-in-law

6    of Nicholas Corozzo?

7    A    That's correct.

8    Q    Did he see anyone else in the room?

9            MS. SHARKEY:  Objection.

10           THE COURT:  Whether he saw it or not is for the jury

11   to determine.  Just let the witness describe what happened.

12   Q    What happened next?

13   A    Next, Joseph Corozzo, Senior walked past.

14           MS. SHARKEY:  Objection.

15           THE COURT:  I'll allow that.

16   A    He didn't look at anybody.  He just looked straight

17   ahead, went to his seat and sat down.  And Mr. Carneglia asked

18   me, does Joseph have the same problems I do?  And I said,

19   don't worry about Joseph, worry about yourself.

20   Q    Okay.  What happened next?

21   A    Then I asked him, I was kind of curious and I asked him,

22   why did Little Joe, why did his son Joseph become a criminal

23   defense attorney?  And he said that Big Joseph didn't have a

24   choice in it.  He said he's got another son who's a very, very

25   good civil attorney.  He has two sons, one's a civil attorney

1  and young Joseph was a criminal attorney.

2  Q    What happened after that?

3  A    After that, Reynolds and Reilly took Mr. Carneglia away

4  to be further processed.

5  Q    So, to review:  You testified that when you explained

6  that the defendant was charged with 1976 murder of court

7  officer Albert Gelb, the defendant said, 'Don't know him.'

8        Is that correct?

9  A    That's correct.

10 Q    And you testified that when you --

11       MS. SHARKEY:  Objection.

12       MR. FARBER:  Objection; asked and answered.

13       THE COURT:  Yes.

14       Don't repeat what was already testified to, please.

15 Q    Who was the first person, just again, who was the first

16 person in the room to mention Kennedy Airport that morning?

17       MR. FARBER:  Objection.

18       MS. SHARKEY:  Objection.

19       MR. FARBER:  Asked and answered.

20       THE COURT:  Sustained.

21 Q    And you testified that the defendant stated that to beat

22 the case --

23       MS. SHARKEY:  Objection.

24 Q    -- he needed to get out and talk to witnesses?

25       MS. SHARKEY:  Objection; asked and answered.

1      THE COURT:  I'm sorry, I didn't hear the question.

2      MR. BURLINGAME:  That in order to fight his case he

3  needed to get out and talk to witnesses.

4      MS. SHARKEY:  Objection; asked and answered.

5      THE COURT:  Sustained.

6      MR. BURLINGAME:  I have nothing further.

7      THE COURT:  Take the placard down, please.

8      MR. BURLINGAME:  Oh, sure.

9  CROSS-EXAMINATION

10 BY MR. FARBER:

11 Q    Good afternoon.

12 A    Good afternoon.

13 Q    February of last year, you arrested Charles Carneglia at

14 his home?

15 A    That's correct.

16 Q    And at that point in time, he was living with his

17 90-plus-year-old mother and her aide, a companion?

18 A    Yes, sir.

19 Q    Those were the individuals living in the home with him?

20 A    As far as I know.

21 Q    And it was around 6:00 o'clock in the morning?

22 A    Correct.

23 Q    The S.W.A.T. time came in, secured the area.  And then,

24 you went into Mr. Carneglia's bedroom and arrested him?

25 A    Correct.

1   Q    And you describe Mr. Carneglia as being very cooperative?

2   A    That's correct.

3   Q    And is it fair to state that you didn't observe any

4   contraband inside the home when you went in?

5   A    No, I did not.

6   Q    And you didn't observe any weapons?

7   A    No.

8   Q    And Mr. Carneglia was under supervision at that time; am

9   I correct?

10  A    I don't know.

11  Q    You didn't know whether or not he was on supervised

12  release from his previous case?

13  A    Oh, yes, yes, I'm sorry.

14  Q    And in fact, a condition of his supervised release is his

15  home could be searched without a warrant; isn't that correct?

16  A    That, I don't know.

17  Q    You don't know about that?

18  A    No.

19  Q    You've been a police officer for --

20          THE COURT:  Excuse me, I'm not sure that's the case.

21          Was that limited to probation?

22  Q    Did you notify Mr. Carneglia's probation officer, Larry

23  Goldman?

24  A    I did not.

25  Q    Do you know if anyone else in the arrest team did?

1  A    I don't know.

2  Q    You don't know.

3        You brought Mr. Carneglia down to the precinct?  Or

4  to 26 Federal Plaza?

5  A    That's correct.

6  Q    FBI headquarters?

7  A    Correct.

8  Q    Correct?

9  A    Correct, yes.

10 Q    And you went up to the 26th floor?

11 A    Correct.

12 Q    And at that point in time, you read Mr. Carneglia his

13 Miranda warnings?

14 A    That's correct.

15 Q    And I just want to go back for a second.

16        Before he left the home to get in the car with you,

17 did Mr. Carneglia do anything with regard to his mother?

18 A    He did.

19 Q    And in fact, he kissed her good-bye?

20 A    That's correct.

21 Q    And now you're back at 26 Federal Plaza.

22        You read him his Miranda warnings; correct?

23 A    Correct.

24 Q    And you went through, you told him he was being charged

25 with five distinct murders?

1  A    Correct.

2  Q    And you gave, not just the name of the victim, but you

3  gave a bit of the detail with regard to each one?

4  A    Very little detail.

5  Q    You said Albert Gelb, the Court officer?

6  A    I did.

7  Q    That was pretty direct detail; isn't it?  Correct?

8  A    Not as far as a location.

9  Q    Not location, but identifying the victim?

10 A    Okay.  I'll go with that.

11 Q    So, by suggesting out there the court officer, it

12 precluded Mr. Gelb -- Mr. Carneglia ever saying:  Who, you

13 mean the Court officer?

14 A    That's correct.

15 Q    And then, you asked him about the killing of Michael

16 Cotillo at the Blue Fountain Diner?

17 A    Michael Cotillo, yes.

18 Q    He didn't say, 'at the diner?'

19 A    No.

20 Q    You didn't say, 'at the restaurant?'

21 A    No.

22 Q    You actually gave the name of the diner?

23 A    That's correct.

24 Q    And then, you talked about the killing of Sal Puma?

25 A    Yes.

1  Q   And again, you gave the year when that took place?

2  A   Correct.

3  Q   And then you talked about Louie ^ DeBono

4  A   Yes.

5  Q   And then you said Jose Delgado-Rivera at the airport?

6  A   Correct.

7  Q   It's your recollection you said "the airport?"

8  A   That's correct.

9  Q   You are sure you didn't --

10 A   Positive.

11 Q   -- might say JFK?

12 A   Positive.

13 Q   And you arrested Mr. Carneglia at his home in Ozone Park?

14 A   Yes.  Howard Beach.

15 Q   Howard Beach.

16      And just so I make sure I understand, the airport

17 that is close to where Mr. Carneglia lives is?

18 A   Would be Kennedy airport.

19 Q   JFK?

20 A   Yes.

21 Q   And you have no way of knowing when he said to you, as

22 you said, oh, I don't know a Jose Delgado-Rivera, I know

23 nothing about JFK, if he was just combining airport and JFK in

24 his mind as one and the same?

25      MR. BURLINGAME:  Objection.

1    A    Could you...

2    Q    You don't know what Mr. Carneglia was thinking when he

3    said JFK.

4    A    No.

5    Q    You're making an assumption that he was admitting to

6    something more than what he said?

7    A    Could you repeat that, please?

8    Q    When you raised your eyebrows, you said, and there was a

9    smile between you and your fellow officers?

10   A    Mm-hmm.

11   Q    You were making an assumption that Mr. Carneglia admitted

12   to something?

13   A    Well, no, not admitting.  He admitted to being -- it was

14   at Kennedy airport.

15   Q    Well, he said Kennedy airport, but you don't know if he

16   said Kennedy airport because he uses Kennedy airport JFK

17   interchangeably?

18   A    No, I don't.

19        MR. FARBER:  I would ask that the prosecution stop

20   smirking in front of the jury, Your Honor.  I think that's

21   inappropriate.

22        THE COURT:  I didn't see it, but if it did happen,

23   stop.

24        MR. FARBER:  Thank you.

25   Q    He knew he was being charged with five murders; is that

1    correct?

2    A    When I told him.

3    Q    And he told you that he wanted to get out to try to fight

4    the case?

5    A    He did.

6    Q    Was that an unusual statement to be made?

7    A    No.

8    Q    And he told you that, oh, the canaries that are liars and

9    he has to do something to try to save himself from their lies?

10   A    Can I go back to the last question again, please?

11   Q    Which question is that?

12        THE COURT:  Yes, you may amend your answer.

13   A    When you said it's not unusual for somebody to say I have

14   to get out and mount a defense.

15        It wouldn't be unusual, but the last time he mounted

16   a defense --

17        MS. SHARKEY:  Objection.

18        THE COURT:  Sustained.

19   Q    In your experience as a law enforcement agent, how many

20   times has someone who's been charged with five murders gotten

21   out on the street to fight their case from the outside?

22   A    None, to my knowledge.

23   Q    And so, is it fair to describe Mr. Carneglia as being

24   panicked when he realized he was going to be in jail and

25   having to fight his case from being in jail?

1  A     His demeanor wasn't a person that was panicking, no.

2  Q     He told he wanted to be able to get an investigator;

3  correct?

4  A     Correct.

5  Q     He wanted to be able to get an investigator and go out

6  and interview witnesses?

7  A     Correct.

8  Q     It wasn't that he told you he was going to try to

9  threaten anyone; did he?

10 A     No, he did not.

11 Q     He told you he wanted to go out and get a lawyer?

12 A     Yes.

13 Q     He wanted to follow all the legal and proper channels to

14 fight his case?

15 A     Yes, he did.

16 Q     In fact, he indicated that he was worried about spending

17 the rest of his life in jail?

18 A     Wouldn't we all be?  Of course.

19 Q     Now, at some point you said he went stood up and went,

20 'Mingo, why are you charging me with five murders?'

21 A     Mm-hmm.

22 Q     Can you tell me where that is reflected in your report?

23 A     Right here.  It says:  "Why did you charge me with the

24 five murders?"

25 Q     No, the mingo part.

1  A    No, I didn't put that in.

2  Q    You didn't put that in?

3  A    No, I did not.

4  Q    Is that something you might have remembered a little bit

5  later?

6  A    I remember him standing up and going, 'Mingo, why did you

7  charge we with' -- either 'five murders' or 'five bodies.'

8  Q    You wrote this report when?  The next day after the --

9  A    No, I did not.

10  Q    How soon after the arrest?

11  A    November of 2008.

12  Q    And that detail didn't make it to your report then?

13  A    I didn't write a report in the beginning, no.

14  Q    But you're testifying about it today?

15  A    There was a report that was written either that, on

16  February 7th or within the few days following February 7th of

17  2008, written by Detective Reilly.

18  Q    You testified that Jo-Jo Corozzo walked in at some point.

19       Into the room?

20  A    That's correct.

21  Q    And so, you can refresh the jury's recollection, Jo-Jo

22  Corozzo is the consiglieri of the Gambino Crime Family?

23  A    He is.

24  Q    And he walked in and he -- you said he walked straight by

25  Charles Carneglia and didn't even acknowledge him?

1  A    He didn't acknowledge anybody.  He very stoic.  From what

2  I remember, he just looked straight ahead and down, and he was

3  placed in a seat.  He didn't talk to anybody.

4  Q    He didn't talk to Charles?

5  A    No, he did not.

6  Q    Charles didn't say, hey, Joe, how are you doing?

7  A    No, he did not.

8  Q    Now, you talked about 60-some-odd people being arrested?

9  A    Correct.

10 Q    And these were people who were part of one larger

11 investigation?

12 A    That's correct.

13 Q    And in fact, the 60 people were all on one indictment?

14 A    That's correct.

15 Q    And isn't it correct, all of them but Charles Carneglia

16 pled guilty?

17            MR. BURLINGAME:  Objection.

18            THE COURT:  Sustained.

19 Q    Now, you mentioned a bunch of people on direct

20 examination who were arrested?

21 A    Correct.

22 Q    You did not mention the name Jackie Cavallo?

23 A    I didn't mention any names.  I was asked names.

24 Q    Was Jackie Cavallo arrested that day?

25 A    That day?  I don't recall.

1  Q    He wasn't part of that indictment; is that correct?

2  A    Not that -- I was mainly interested, I was a cold case

3  detective and I was mainly interested in the homicides and

4  attempted homicides.

5        So, no, he wasn't involved in the homicides or

6  attempted homicide.

7  Q    Allen Meshanski was not part of that indictment; am I

8  correct?

9  A    He was not.

10       MR. FARBER:  One second, please.

11       (Pause in the proceedings.)

12

13       MR. FARBER:  I have no further questions.

14       Thank you.

15       THE WITNESS:  Thank you.

16  REDIRECT EXAMINATION

17  BY MR. BURLINGAME:

18  Q    Detective, Mr. Farber asked you a number of questions

19  concerning the defendant's house and whether or not you were

20  allowed to search it.

21       Do you remember that?

22  A    Yes.

23  Q    Did you ask the defendant if you could search his house?

24  A    I did ask that.  I did ask him.

25  Q    What did he respond?

1   A    He said no.

2   Q    And what was it that led you to ask the defendant whether

3   you could search his house?

4            MS. SHARKEY:  Objection.

5            THE COURT:  Just tell us what you observed.

6   A    I observed, along with others, Mr. Carneglia walking back

7   and forth down the hallway and there was a hole in the ceiling

8   which leads to the attic.  And every time somebody would walk

9   back and forth in the hallway, he would stop his conversation

10  and look; look at that person that was walking right by the

11  attic.

12  Q    And so, in response to observing that, you asked him

13  whether or not you could search his residence?

14  A    I did.

15  Q    And he said no?

16  A    That's correct.

17  Q    And your understanding was that prevented you from

18  searching his residence that day; correct?

19  A    That's correct.

20  Q    Even though you observed him acting suspiciously.

21           THE COURT:  No, don't even.

22           Let's move ahead, shall we?

23           MS. SHARKEY:  Move to strike.

24           THE COURT:  To strike what?

25           MS. SHARKEY:  Mr. Burlingame's comments.

1      THE COURT:  Strike what?

2      MS. SHARKEY:  Mr. Burlingame's -- withdrawn.

3  Withdrawn.  Withdrawn.

4  Q    Now, Mr. Farber also asked you a number of questions

5  about the defendant wanting to get a lawyer, wanting to hire

6  an investigator.

7      He also told you that he wanted to talk to

8  witnesses; correct?

9  A    That's correct.

10 Q    And Mr. Farber asked you about Jo-Jo Corozzo walking by

11 and not showing any reaction when he walked by the defendant?

12 A    That's correct.

13 Q    You said the room was filled with -- and he asked you

14 whether or not Jo-Jo Corozzo was the consigliere of the

15 Gambino Family?

16 A    Yes, sir.

17 Q    Okay.  And you said the room was filled with

18 approximately 60 other people who had been arrested that

19 morning?  There were dozens of people in the room?

20 A    There were dozens, yes.

21 Q    Okay.  And is it fair to characterize all those people as

22 members or associates of the Gambino Family?

23      MS. SHARKEY:  Objection.

24 A    Yes.

25      THE COURT:  I'll allow that.

1  Q    Did Jo-Jo Corozzo acknowledge any of them?

2  A    No, he walked straight past.  I told you, he was very

3  stoic.  He didn't talk to anybody.  He sat in his chair,

4  didn't speak to a soul.

5  Q    None of the other people in the room?

6  A    No.

7  Q    So, he didn't single out the defendant to ignore?

8  A    No.

9  Q    And Mr. Farber asked you whether or not Jackie Cavallo

10 and Alan Meshanski were arrested that day --

11 A    No, they were not.  I'm sorry.

12 Q    -- correct?

13 A    They were not.

14 Q    Correct.

15       And but Gus Sclafani you testified was arrested that

16 day.

17       That's correct; right?

18 A    Gus was, yes.

19       MR. BURLINGAME:  Nothing further.

20       THE COURT:  Thank you, sir.

21       Next witness, please.

22       THE WITNESS:  Thank you, Your Honor.

23       (Witness excused.)

24       MR. NORRIS:  One moment, please, Your Honor.

25       THE COURT:  Yes.

1          MR. NORRIS:  Can we just have one moment to confer

2    with Counsel?

3          THE COURT:  Yes.

4          (Pause in the proceedings.)

5

6          MR. NORRIS:  I think we have a stipulation.  I just

7    need to get one document from outside.  I'll just be very

8    quick.

9          (Pause in the proceedings.)

10

11         MR. NORRIS:  The Government calls, recalls --

12         MS. SHARKEY:  We don't object to this witness

13   testifying.  We didn't have any notice.

14         Can I just get something out of back room?

15         THE COURT:  Can you do what?

16         MS. SHARKEY:  Can I have two minutes?

17         THE COURT:  Yes, you have two minutes.

18         MR. NORRIS:  Get the witness in the meantime.

19         THE COURT:  Yes.

20         MR. NORRIS:  The Government recalls Joseph Mauro.

21         (Witness enters and takes stand.)

22         THE COURT:  You're still under oath, sir.

23         You may sit down.

24         THE WITNESS:  Thank you.

25         / / /

 1

 2  **J O S E P H   M A U R O,**

 3       called as a witness, having been previously duly

 4       sworn, was examined and testified as follows:

 5

 6  DIRECT EXAMINATION

 7  BY MR. NORRIS:

 8  Q    Good afternoon, Mr. Mauro.

 9  A    Good afternoon.

10  Q    Now, you testified, sir, last week that you took out a

11  mortgage to buy your unit at Green Tree back in the late

12  1980s; is that correct?

13  A    Yes, it is.

14  Q    And you still owed money on that mortgage when you went

15  to sell that unit in 2001; correct?

16  A    Yes.

17  Q    And who did you have the mortgage with at that time when

18  you went to sell?

19  A    When I went to sell?

20  Q    Yes.

21  A    It was Home -- HomeSide, I believe it was.

22  Q    Okay.

23           MR. NORRIS:  I'm showing you what's been marked for

24  identification as Government's Exhibit 171-A.

25           (Handing.)

1    Q    Do you recognize that?

2    A    Yes.

3    Q    What is it?

4    A    It's a payoff statement.

5    Q    A payoff statement issued by whom?

6    A    HomeSide.

7    Q    And who is the payoff statement issued to?

8    A    Myself, Joseph Mauro, and my wife, Regina.

9         MR. NORRIS:  The Government offers 171-A.

10        THE COURT:  Admitted.

11        (Government's Exhibit 171-A was received in

12   evidence.)

13   Q    Now, looking at the bottom of that statement, sir --

14        MR. NORRIS:  Withdrawn.

15   Q    At the top of that statement, the name of the mortgage

16   company is what, again?

17   A    HomeSide Lending, Incorporated.

18   Q    And at the bottom of the statement, is there an address

19   where payments are to be sent?

20   A    Yes.

21   Q    And what is that address?  Please, read it slowly for the

22   record.

23   A    P.O. Box 47524, San Antonio, Texas, 78265-7524.

24   Q    Now, you testified last week that a couple of weeks

25   before your closing, you got that $47,000 assessment from the

1  Board; is that correct?

2  A    That's correct.

3  Q    And that was later knocked down to $36,000 or so?

4  A    That's correct.

5  Q    And you had a buyer named Cryley (phonetic) or Crowley

6  (phonetic) lined up.

7          And you were also in contract to purchase a home in

8  Staten Island with the proceeds of the sale; correct?

9  A    Yes, it is.

10 Q    And you testified that you paid the $36,000 assessment,

11 even though you didn't think you owed it, so both sales would

12 go through; correct?

13 A    Yes, that's correct.

14 Q    And when the sales went through, you paid off your old

15 mortgage with Countryside; correct?

16 A    Can you repeat that, please?

17         MR. NORRIS:  Let me make sure I'm not misstating

18 this name of this company.

19 Q    HomeSide?

20 A    HomeSide, yes.

21 Q    And when you finished the closing on the your unit at

22 Green Tree, you and your wife paid off your lender HomeSide;

23 correct?

24 A    Yes.

25         MR. NORRIS:  No further questions.

1          MS. SHARKEY:  May I see the document, please?

2          MR. NORRIS:  Pardon me, maybe one question.

3          (Pause in the proceedings.)

4

5  Q    And you wouldn't have been able to pay off that mortgage

6  if you hadn't paid the assessment; correct?

7  A    Correct.

8          MR. NORRIS:  No further questions.

9          MS. SHARKEY:  May I see the document?

10         THE COURT:  Yes.

11         (Handing.)

12         MS. SHARKEY:  May I?

13         THE WITNESS:  Yes.

14         MS. SHARKEY:  Thank you.

15         THE WITNESS:  You're welcome.

16         (Handing.)

17         (Pause in the proceedings.)

18

19  CROSS-EXAMINATION

20  BY MS. SHARKEY:

21  Q    Mr. Mauro?

22  A    Yes.

23  Q    You are familiar with the mortgage payoff, Government's

24  Exhibit 171-A?

25  A    Yes.

1  Q    And this document solely reflects the balance on your

2  mortgage that was paid off; correct?

3  A    Yes.

4           MS. SHARKEY:  Nothing further.

5           THE COURT:  Thank you, sir.

6           Do you have another witness?

7           MR. NORRIS:  We have three more, Your Honor.

8           THE COURT:  Well, we can break now if it will take

9  more than five minutes.

10          MR. BURLINGAME:  It will.

11          MR. NORRIS:  Yes, they're a little bit longer.

12          THE COURT:  We'll take a break.  At 1:30, you'll be

13  back here.

14          THE WITNESS:  I'm done?

15          THE COURT:  You're through.  Thank you, sir.

16          THE WITNESS:  You're welcome.

17          (Jury is excused.)

18

19          (Continued on following page.)

20

21

22

23

24

25

1          (The following occurs outside the presence of the

2 jury.)

3          THE COURT:  All right.  Thank you.

4

5          (Continued on following page with AFTERNOON

6 SESSION.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        A F T E R N O O N   S E S S I O N

2

3            THE COURT:  Bring in the defendant.  Have the

4    witness take the stand, please.

5            (Jury present.)

6            THE COURT:  Swear the witness.

7    L A W R E N C E   G O L D M A N ,

8        called as a witness, having been duly

9        sworn, was examined and testified as follows:

10           THE CLERK:  State your full name and state your name

11   for the record

12           THE WITNESS:  Lawrence Goldman; L A W R E N C E,

13   G O L D M A N.

14           THE COURT:  Proceed.

15   DIRECT EXAMINATION

16   BY MR. NORRIS:

17   Q    Would you please state your name again?

18   A    Lawrence Goldman.

19   Q    Good afternoon.

20   A    Good afternoon.

21   Q    Where do you work, sir?

22   A    U.S. Probation Department.

23   Q    What district?

24   A    Eastern District of New York.

25   Q    And how long have you been with the Probation Department

Goldman-Norris/direct

1  in the Eastern District of New York?

2  A    About 14 and a half years.

3  Q    What is your title?

4  A    Senior U.S. probation officer.

5  Q    What does a probation officer do?

6  A    I ensure that the orders of the court are carried out,

7  if a defendant requires correctional treatment, I make sure

8  they receive it and I monitor the risk a defendant poses to

9  the community and report to the Court.

10 Q    You step in after an offender has been released from

11 prison?

12 A    Correct.

13 Q    What is supervised release?

14 A    It's a term of supervision that follows a prison

15 sentence.

16 Q    Typically -- does it range in years?

17 A    Yes.

18 Q    Who imposes the supervised release?

19 A    The court.

20 Q    And in addition to a range of years, does the Court

21 impose certain terms and conditions of supervised release?

22 A    Yes.

23 Q    What are your duties and responsibilities with regard to

24 those terms and conditions?

25 A    I meet with the offender face to face, conduct

1  interviews with them in my office, at their residence or

2  place of employment.

3  Q    In order to do what?

4  A    To ensure compliance with the condition of supervision.

5  Q    And do you also attempt to conduct surveillance of

6  offenders from time to time?

7  A    Yes.

8  Q    What happens if you catch an offender violating the

9  terms of his or her supervised release?

10 A    A report would be completed and submitted to the Court,

11 violation report.

12 Q    And what steps is the Court permitted to take in

13 response to a violation submitted by your office?

14 A    Court has discretion, they could revoke the term of

15 supervision, place someone back into custody, modify the

16 conditions, extend their term of supervision, various options

17 that the Court has.

18 Q    One of those options, the offender can be placed back in

19 prison?

20 A    Yes.

21 Q    Did you supervise Charles Carneglia?

22 A    Yes.

23 Q    Do you see him in the courtroom?

24 A    Yes.

25 Q    Please point him out and describe something that he's

1    wearing?

2    A    A white sweater.

3         MR. NORRIS:  Let the record reflect that the witness

4    identified the defendant.

5              THE COURT:  Yes.

6    Q    What time did you supervise the defendant?

7    A    From May 2006 to February 2008.

8    Q    Now, how long was his term supposed to be?

9    A    Three years.

10   Q    That was the supervised release term?

11   A    Yes.

12   Q    What happened February of 2008?

13   A    He was rearrested on new federal charges.

14   Q    So the term of supervision was cut short?

15   A    Yes.

16   Q    You supervised him for a total of approximately 21

17   months; is that right?

18   A    Yes.

19   Q    Can you estimate how many offenders you supervised over

20   the course of your 14 and a half years with the Probation

21   Department?

22   A    Hundreds.

23   Q    Hundreds?

24   A    Yes.

25   Q    And the offenders, do they sometimes give you a hard

1  time?

2  A    They do.

3  Q    Sometimes difficult to supervise offenders?

4  A    Yes.

5  Q    And sometimes in your experience they give you a hard

6  time personally?

7  A    Yes.

8  Q    How would you characterize the defendant's level of

9  cooperation during the period of your supervision?

10 A    He was very cooperative, he wasn't rude or

11 disrespectful, he didn't give me a hard time at all.

12 Q    You got along?

13 A    Yes.

14 Q    He showed up at meetings when he was supposed to?

15 A    Yes.

16 Q    Didn't give you a hard time?

17 A    Yes.

18 Q    During the period of supervision, did you observe him

19 violate the terms of the conditions of his release?

20 A    No.

21      MR. NORRIS:  I would ask the Court for permission for

22 the witness to be able to look at his notes from time to time

23 to refresh his recollection.

24      THE COURT:  Yes.

25 Q    Sir, did you meet with the defendant on May 3, 2006?

1   A    Yes.

2   Q    For what purpose?

3   A    That was Mr. Carneglia's initial appointment, he was

4   just released two days prior, just the first time I met him

5   in my office.

6   Q    And what did you review with him during that meeting, if

7   anything?

8   A    We went over the conditions of supervision, and I also

9   gave Mr. Carneglia an association prohibition form.

10  Q    What is an association prohibition form?

11  A    It's a list of individuals that have been identified as

12  being members of the Gambino crime family.

13  Q    Is that a list that you compiled or someone else

14  compiled?

15  A    The FBI.

16  Q    Did you meet with the defendant on May 22, 2006?

17  A    Yes.

18  Q    Where did you meet with him that day?

19  A    At his residence.

20  Q    Did he ask you for any kind of permission that day?

21  A    He requested permission to attend the wake of Michael

22  Agnello and visit a friend of his John Cavallo.

23  Q    Did he say why he wanted to visit Cavallo?

24  A    He was sick and he wanted to visit him.

25  Q    Was John Cavallo on the permission list?

1    A    Yes.

2    Q    Was Mr. Agnello?

3    A    Yes.

4    Q    Did you grant the defendant permission to see Cavallo?

5    A    No.

6    Q    Did you grant the defendant permission to go the Michael

7    Agnello wake?

8    A    Yes, we normally do under conditions of that kind.

9    Q    During the period of his supervision term, how often did

10   you meet with the defendant in your office?

11   A    Monthly.

12   Q    During the time, did your frequency change?

13   A    Yes.

14   Q    To what?

15   A    Every other month.

16   Q    Can you estimate how many times you met with him outside

17   the office during the period of his supervision?

18   A    Approximately twice at his residence.

19        MS. SHARKEY:  I did not hear the last answer.

20   A    Approximately twice at his residence.

21        MS. SHARKEY:  Thank you.

22   Q    Approximately twice over 21 months you went to his

23   house?

24   A    Yes.

25   Q    Over 21 months -- withdrawn.

1    Turning your attention to January 17, 2007.  Did you

2  meet with the defendant on that date, January 17th?

3  A    Yes.

4  Q    And did the subject of one of the defendant's friends

5  come up that day?

6  A    Yes.

7  Q    Who was the friend?

8  A    Allen Meshanski.

9  Q    Did the defendant tell you where Allen Meshanski lived?

10  A    No -- sorry, yes, he did tell me.

11  Q    Where was that?

12  A    150-05 95th Street, Ozone Park, New York.

13  Q    Did the defendant tell you anything about

14  Mr. Meshanski's physical condition?

15  A    Yes, he told me that he suffered from some sort of back

16  or spine injury.

17  Q    And did the defendant tell you how old Mr. Meshanski

18  was?

19  A    He said he was 40 years old.

20  Q    Turning your attention to April 3, 2007.  Did you meet

21  with the defendant on that day?

22  A    Yes.

23  Q    And did you ask him on that day whether he had any

24  contact with anyone on his list?

25  A    Yes.

1  Q    And he said no?

2  A    That is correct.

3  Q    And at this time you had been supervising the defendant

4  for a year?

5  A    Yes.

6  Q    Did he have any observable sort of income?

7  A    He was subsisting on life insurance policies that he was

8  cashing in.

9  Q    Did he have a job?

10 A    No.

11 Q    Was he able bodied?

12 A    Yes.

13 Q    Did the defendant tell you anything about how he manages

14 to get by?

15 A    He told me that he doesn't need money when he goes out,

16 all of his meals and drinks are taken care of, paid for

17 essentially.

18 Q    And did he make that same statement to you on other

19 occasions as well?

20 A    Yes, he did.

21 Q    How would you characterize the way in which he told you?

22      MS. SHARKEY:  Objection?

23      THE COURT:  You may describe what he looked like and

24 how he said what he said.

25 A    He was basically trying to convey that he was popular,

Goldman-Norris/direct

1  and he didn't have to pay for his meals and his drinks.

2  Q    Turning your attention to September 19, 2007.  Did you

3  meet with the defendant on that day as well?

4       MS. SHARKEY:  What date?

5       MR. NORRIS:  September 19, 2007.

6       MS. SHARKEY:  Thank you.

7  A    Yes.

8  Q    And did the defendant make statements to you on that day

9  as well about getting free meals and drinks?

10 A    Yes.

11 Q    Just free meals?

12 A    That is correct.

13 Q    Now, you testified before that typically -- withdrawn.

14      You testified before that one of the things you

15 sometimes do with offenders is conduct surveillance?

16 A    Yes.

17 Q    Did you conduct surveillance of the defendant from time

18 to time?

19 A    Yes.

20 Q    Typically how did you do it?

21 A    I would use a government leased vehicle and I would go

22 to either his residence or there is a restaurant called

23 Carosella's Restaurant in Howard Beach, New York, typically

24 those two locations where the surveillance was conducted.

25 Q    You said you would use a government leased vehicle.  Did

1 you use the same car every time?

2 A    For the most part, yes.

3 Q    And during some of those occasions, did you observe the

4 defendant speaking with other people?

5 A    Yes.

6 Q    Did you conduct any surveillance of the defendant on

7 November 28, 2007?

8 A    Yes.

9 Q    Did you observe the defendant on that day?

10 A    Yes.

11 Q    And you mentioned a restaurant Carosella.  Did you

12 observe the defendant near Carosella that day?

13 A    Yes, I did.

14 Q    And when you saw him at Carosella's, typically what

15 entrance of the restaurant would he use?

16 A    It was a door to the rear of the restaurant, almost like

17 a side door.

18 Q    And did you observe the defendant meeting with anyone

19 that day before he went to Carosella's?

20 A    Yes.  When I arrived at the restaurant I saw his vehicle

21 parked on 163rd Avenue at a meter.  I began my surveillance

22 at that point.  Shortly thereafter, I saw him get dropped off

23 by a gray Mercedes, he got out of the passenger side, leaned

24 into the window and was speaking with the driver of that

25 vehicle at that time.

1  Q    Could you observe the driver of the vehicle?

2  A    Yes, the driver side window was down.

3  Q    Could you describe him physically?

4  A    White male, middle age, salt and pepper hair.

5  Q    And he drove a Mercedes?

6  A    Yes.

7  Q    To correct myself, I believed you said a moment ago you

8  saw the defendant go into Carosella's.  I will ask you again,

9  did the defendant go to Carosella's on that date?

10 A    Yes.

11 Q    Going back to the Mercedes, after the defendant got out

12 of the car and you observed the driver through the open

13 window, did you catch the license plate?

14 A    I did.

15 Q    Did you write it down?

16 A    Yes.

17 Q    And as a probation officer, do you have the capability

18 of running license plates with the DMV to determine

19 registration?

20 A    Yes.

21 Q    Did you later run the plate to determine who that car

22 was registered to?

23 A    I did.

24 Q    Who did it come back to?

25 A    Last name, Panzarella, Darlene, first initial A.

1   Q    It wasn't a woman driving the car that day, correct?

2   A    That is correct.

3   Q    And did it give Panzarella's date of birth?

4   A    6/20/67.

5   Q    About 40 years old at that time?

6   A    Yes.

7   Q    Turning your attention to January 16, 2008, did you meet

8   with the defendant on that date, January 16th?

9   A    Yes.

10       MS. SHARKEY:  May I have that date again?

11       MR. NORRIS:  January 16, 2008.

12   Q    Let's do one more thing.  In addition to seeing the

13   defendant with this unknown male in a Mercedes, did you ever

14   observe the defendant with anyone else?

15   A    During the course of surveillance?

16   Q    Yes.  You are free to look through your notes if you

17   need to.

18   A    I did.

19   Q    You did?

20   A    Yes.

21   Q    Who did you observe him meeting with?

22   A    There was surveillance conducted on May 22, 2006.

23   Unknown subject that dropped him off at his residence.

24   Q    And that individual, could you describe what he looked

25   like?

1    A    That was also a white male, short hair, he was in his

2    early to mid 30's.

3    Q    Different from the male you saw the defendant with

4    before?

5    A    Yes.

6    Q    Did you also catch the license plates of the car that

7    person was driving?

8    A    Yes.

9    Q    Did you later run that plate as well?

10   A    Yes.

11   Q    What did the plate come back to?

12   A    John J. Ryan.

13   Q    Date of birth?

14   A    October, 29, 1937.

15   Q    That would have been someone who was in his late-60's,

16   is that correct?

17   A    Yes.

18   Q    Different from the person you saw drive the car, fair to

19   say?

20   A    Yes.

21   Q    Now, going back to January 16, 2008, did you meet with

22   the defendant that day?

23   A    Yes.

24   Q    And you testified earlier that the defendant was

25   rearrested in February of 2008; is that right?

1  A    Yes.

2  Q    Was this your last meeting with him before he was

3  arrested?

4  A    Yes, it was.

5  Q    Did the defendant again talk about his ability to eat

6  and drink for free at restaurants that day?

7  A    He did.

8  Q    And did the defendant also -- withdrawn.

9       Did the subject of a grand jury investigation come up

10 that day?

11 A    Yes.

12 Q    What, if anything, did the defendant tell you about it?

13 A    He told me that he heard that there was a grand jury

14 convening and I asked him if he was worried and he said that

15 he wasn't.  I asked him if he had secured an attorney.  He

16 said not at this time, but he'll wait and see how it plays

17 out.

18 Q    And did he say anyone that he was considering retaining?

19 A    Joseph Corozzo.

20 Q    Joseph Corozzo?

21 A    Yes.

22      MR. NORRIS:  No further questions.

23          THE COURT:  Cross?

24          MS. SHARKEY:  Yes.

25 CROSS-EXAMINATION

1  BY MS. SHARKEY:

2  Q    How are you, Mr. Goldman?

3  A    Fine, thank you.

4  Q    Mr. Goldman, you testified about the prohibition list?

5  A    Yes.

6  Q    That would be the list of the individuals that an

7  individual on supervised release was prohibited from meeting

8  with, right?

9  A    Yes.

10 Q    And you testified that that list was compiled by members

11 of the FBI?

12 A    Yes.

13 Q    Is that correct?  And you were familiar with the reason

14 for the list, right?

15 A    Yes.

16 Q    And, in fact, the list contained the names of

17 individuals who were associated with the Gambino crime

18 family?

19 A    Correct.

20 Q    Joseph Panzarella's last name was not on the list?

21 A    Yes.

22 Q    John Ryan's name was not on that list?

23 A    Correct.

24 Q    And the reason that such a list is compiled is so that

25 you can effectively monitor whether an inmate has been -- has

1  been complying with the Court's orders, once they are

2  released, right?

3  A    Correct.

4  Q    And, in fact, you checked out the individuals that you

5  saw Charles Carneglia with to make a determination as to

6  whether or not he was in compliance with post supervision

7  release, right?

8  A    Correct.

9  Q    And Panzarella wasn't a prohibited individual?

10 A    Correct.

11 Q    He was an individual -- that list was provided to you by

12 FBI agents, right?

13 A    Yes.

14 Q    And neither was John Ryan?

15 A    Correct.

16 Q    Did you speak with Mr. Carneglia about those meetings?

17 A    With those two individuals?

18 Q    Yes.

19 A    No.

20 Q    Now, it was important for you to familiarize yourself as

21 the parole officer both with Mr. Carneglia's history, his

22 list and how he was readjusting to release from jail, right?

23 A    Yes.

24 Q    And that was the purpose of your meeting with him on a

25 regular basis, right?

1  A    Yes.

2  Q    And that was the purpose of your surveilling him

3  covertly, right?

4  A    Correct.

5  Q    And when we say surveilled covertly, for lay purposes,

6  that means that you engaged in activities that Mr. Carneglia

7  wouldn't know about so that you could make a determination as

8  to whether or not he was in compliance, right?

9  A    That is correct.

10 Q    And you never violated him, right?

11 A    No.

12 Q    You found him to be in compliance, correct?

13 A    Yes.

14 Q    And you know that Mr. Carneglia lived with his elderly

15 mother, right?

16 A    Yes.

17 Q    And you never violated him for eating at Carosella's

18 restaurant?

19 A    Right.

20 Q    Are you familiar with that restaurant?

21 A    Familiar where it's located?

22 Q    Yes.

23 A    Yes.

24 Q    Have you ever eaten there yourself?

25 A    No.

1    Q    And when Mr. Carneglia wanted to attend the wake of Mike

2    Agnello, he asked your permission, right?

3    A    Yes.

4    Q    And you testified on direct examination that that wasn't

5    uncommon in your 15 years of experience, right?

6    A    That is correct.

7    Q    And wouldn't it be accurate to say that you had a

8    conversation with Mr. Carneglia about his attendance of that

9    wake to go early, so that he wouldn't bump into anybody else

10   that was present, correct?

11   A    Correct.

12   Q    He complied with that directive, right?

13   A    As far as I know.

14   Q    And you were satisfied with his representation as to

15   where he was receiving monies, right, the cancelled life

16   insurance policies?

17   A    He provided the statements to me.

18   Q    So I saw those cancelled financial -- those life

19   insurance policies, right?

20   A    Yes.

21   Q    And when you saw him with Allen Meshanski, you asked

22   about his relationship with Mr. Meshanski, right?

23   A    Yes.

24   Q    And you checked to see if Mr. Meshanski was considered

25   to be associated with the Gambino crime family on the

1  prohibition list, right?

2  A    Yes.

3  Q    Meshanski's name is not on the prohibition list, right?

4  A    Correct.

5  Q    Did you ever meet with Mr. Meshanski personally?

6  A    No.

7  Q    Did you ever see him walking?

8  A    No.

9  Q    So you don't know about his physical condition, right?

10  A    Not other than Mr. What carrying had told me.

11  Q    And when Mr. Carneglia came under your supervision, he

12  was 60 years old; is that right?

13  A    I believe so.

14      MS. SHARKEY:  Nothing further.  Thank you very much,

15  sir.

16      MR. NORRIS:  Briefly, Your Honor.

17  REDIRECT EXAMINATION

18  BY MR. NORRIS:

19  Q    Sir, do you have the association prohibition list in

20  front of you?

21  A    I don't think that I do.

22  Q    Let me give you a copy.

23  A    I don't.

24      MR. NORRIS:  I'll give you a copy of the association

25  prohibition list marking it as 3500 LG 4.

1    (Shown to witness.)

2  Q    Ms. Sharkey asked you whether Allen Meshanski was on the

3  list?

4  A    Yes.

5  Q    Just to confirm, he's not on a list, is he?

6  A    No, he is not.

7  Q    Do you see Angelo Ruggiero, Jr., on the list?

8       MS. SHARKEY:  Objection; relevance.  There was no

9  question about Mr. Ruggiero?

10       THE COURT:  I'll allow it.  You may answer.

11  A    Angelo Ruggiero, Jr.?

12  Q    Yes.

13  A    John Ruggiero.

14  Q    John Ruggiero, no Angelo?

15  A    I don't see -- no.

16  Q    No?

17  A    I see John Ruggiero, but not Angelo.

18  Q    No Angelo Ruggiero?

19  A    Not that I can see.

20  Q    How about Michael DiLeonardo.  Do you see him on that

21  list?

22  A    Can you repeat the name?

23  Q    Michael DiLeonardo?

24  A    No.

25  Q    I'll help you out, try that first page?

1  A    I'm sorry, Mikey Scars, yes.

2  Q    He's on that list, yes.

3       Ruggiero is not on the list?

4  A    I did not see.

5  Q    You gave this list to the defendant in 2006, is that

6  correct?

7  A    Yes, May 3rd.

8  Q    Do you know how often it's updated?

9  A    I'm certain it probably needs to be updated, but I

10 couldn't say how often it is updated.

11      MR. NORRIS:  No further questions.

12 RECROSS-EXAMINATION

13 BY MS. SHARKEY:

14 Q    Mr. Goldman, you were satisfied that Mr. Carneglia was

15 in compliance with your rules, right?

16 A    Yes.

17      MS. SHARKEY:  Nothing further.  Thank you.

18           THE COURT:  Next witness.

19           MR. BURLINGAME:  The government calls Paul

20 Quisenberry.

21 P A U L   Q U I S E N B E R R Y ,

22      called as a witness, having been duly

23      sworn, was examined and testified as follows:

24           THE CLERK:  State your full name and spell it for

25 the record

1        THE WITNESS:  Paul Quisenberry;

2    Q U I S E N B E R R Y.

3    DIRECT EXAMINATION

4    BY MR. BURLINGAME:

5    Q    Good afternoon, sir.

6    A    Good afternoon.

7    Q    What do you do for a living?

8    A    I'm a special agent with the Federal Bureau of

9    Investigation.

10   Q    When did you join the FBI?

11   A    June 3, 1990.

12   Q    What did you do before that?

13   A    Came straight from law school. University of Arkansas.

14   Q    What was your first assignment with the FBI?

15   A    I was first assigned to a squad that worked primarily

16   civil rights investigations.

17   Q    What does that mean?

18   A    Mostly allegations of police brutality, police

19   shootings, covers also hate crimes, and other things like

20   that.

21   Q    How long did you do that for?

22   A    That was only for six months.

23   Q    What did you do after that?

24   A    I was assigned to a squad that worked Italian organized

25   crime, specifically the Gambino family.

1   Q    And how long did you work on the Gambino squad?

2   A    About six and a half years.

3   Q    What did you do after that?

4   A    I transferred to another squad which did interstate

5   transportation of stolen property, primarily art and jewelry

6   theft.

7   Q    How long there?

8   A    Around two years.

9   Q    What after that?

10  A    In September of 1999 I transferred to the New Orleans

11  division of the FBI.

12  Q    What did you do down in the New Orleans division?

13  A    For the first year and a half or so I worked organized

14  crime.

15  Q    And then after that?

16  A    After that did I civil rights.

17  Q    The same sort of stuff, police brutality?

18  A    Yes.

19  Q    How long did you stay in New Orleans?

20  A    Seven years.

21  Q    When did you come back -- what did you do after that?

22  A    I returned back to the New York division in December of

23  2006.

24  Q    What have you done since then?

25  A    I came back, from that time to now I was assigned to a

1   squad -- that's how we break down squads, 8 to 12 people

2   assigned to a squad special operations branch. We generally

3   abbreviate it as SO, specifically SO 3.

4   Q    What does SO 3 do?

5   A    Surveillance.

6   Q    Is there a focus on any particular kind of crime?

7   A    No, it's prioritized by the bosses basically and

8   whatever is the thing of the day.  Our squad specifically

9   tends to work a lot more organized crime matters than most.

10  Q    When you say organized crime, were you talking about

11  traditional organized crime, Mafia?

12  A    Yes.

13          THE COURT:  When you say bosses what do you mean?

14          THE WITNESS:  The supervisor.  We have -- there is a

15  coordinating supervisor who sees all of the requests that

16  come in from the different agencies that we are working with

17  and they have so many teams, so many requests and prioritize

18  them.  Typically now that is terrorist related, Homeland

19  Security related gets the higher priority.

20  Q    How many people in special operation surveillance teams?

21  A    Right now there are ten of us on the squad.

22  Q    Were you all assigned to surveil the same thing on the

23  same day?

24  A    Yes.

25  Q    And please take the jury through what a typical day in

1    SO 3 would look like?

2    A    For instance, when we were surveilling Mr. Carneglia,

3    for instance, get out of the residence, given a package from

4    the case agent, agent who is back in the office, who asked us

5    for assistance, sort of their eyes and ears on the street, we

6    think he gets up and leaves 8:00 or 9:00, this is where he

7    lives, this is his car, we will get out there, 5:00, 6:00

8    whatever time you need to get there ahead, try to identify

9    the vehicle coming out of the neighborhood, I identify who is

10   driving and basically follow and try to document any people,

11   the places, any other vehicles, either written log or taking

12   videotape or pictures that we can get back to the case agent

13   to help them with their investigation.

14   Q    And the whole team would participate in those

15   investigations?

16   A    Yes.

17   Q    Why would you need so many people to surveil one guy?

18   A    It's just a lot easier.  It's very difficult with less

19   than really five or six, because the same car, you're in

20   tight neighborhood, to rotate cars around and just the

21   nature, the more the better.

22   Q    There is a worry that you would identified?

23   A    Yes.

24   Q    That is the reason for switching back and forth?

25   A    Yes.

1  Q    You testified that you conducted surveillance of the

2  defendant. In what period did that take place?

3  A    From -- it was 2007 from August until sometime in

4  December, over like a four month period.

5  Q    And did you take photographs or videos when you take

6  surveillances?

7  A    Try as much as you can.

8  Q    And did you take photographs or videos of the defendant?

9  A    Yes.

10 Q    Did the defendant establish any patterns -- how many

11 days during that time period did you conduct surveillance of

12 the defendant?

13 A    25.

14 Q    25 days of surveillance?

15 A    Yes.

16 Q    And during those 25 days, did the defendant establish

17 any patterns?

18 A    The biggest pattern on 16 of the 15 days, I believe it

19 is, he went to Carosella's Restaurant, which is at 163rd

20 Street and Cross Bay Boulevard.  I think I know the address,

21 162-54 Cross Bay Boulevard.  He would go from the residence

22 or after going to get gas, but end up most days, 16 out of 25

23 stopping there and going in.

24 Q    How long would he typically spend at Carosella's?

25 A    It depended, sometimes show-up look around and back into

Quisenberry-Burlingame/direct

1  the car and leave.  Other times, you know, as of May 30th,

2  11:00 in the morning, go in, when our shift ended at 2:00 or

3  2:30 still hadn't come out.

4  Q    Did you observe him meeting with various people at

5  Carosella's?

6  A    Yes.

7  Q    Where would he typically meet with them?

8  A    There is a bench on the sidewalk, sometimes talking to

9  people, but there is a rear parking area at Carosella's, off

10  of 163rd Street, which appears to be a valet lot in the

11  evenings, but back in that sort of lot area, smoking a

12  cigarette talking to people.

13  Q    When he would go into Carosella's, would he use the

14  front door?

15  A    I don't think I ever saw him use the front door.  It

16  didn't appear at that time that the front door was much in

17  use, there wasn't a lot of foot traffic at all in the front

18  door.

19  Q    Did you ever send anyone into Carosella's to try to

20  establish surveillance of the defendant inside?

21  A    No.

22  Q    And do you know why?

23  A    The decision --

24        MS. SHARKEY:  Objection.

25            THE COURT:  I will allow it.  You may answer.

1   A    It was the decision by the team leader that because of

2   what we saw, didn't see a lot of foot traffic, it wasn't a

3   McDonalds or Burger King with people coming and going, there

4   were very few people during lunchtime and seemed to be

5   everyone knew each other, seemed to be neighborhood people,

6   in greeting and talking and the risk of being identified or

7   raising suspicion seemed to outweigh any advantage that we

8   saw to it.  Just didn't seem it was going to work basically.

9   Q    And you testified that SO 3 took photographs and videos

10  during the surveillance, correct?

11  A    Yes.

12  Q    In preparing for your testimony today, did you review a

13  compilation tape containing segments of the videos?

14  A    Yes, I did.

15  Q    Did you also review a CD containing certain surveillance

16  pictures?

17  A    Yes.

18  Q    Showing you what is marked Government Exhibit 343 and

19  344.

20       (Shown to witness.)

21          Do you recognize those.

22  A    Yes, I do.

23  Q    What are they?

24  A    They are CDs, one of compilation on five different dates

25  of five different video surveillance and a CD with

1  photographs from one day.

2  Q    And you reviewed these CDs?

3  A    Yes.

4  Q    How do you know these are the ones that you reviewed?

5  A    They have my initials on them.

6       MR. BURLINGAME:  Move to admit Exhibits 343 and 344.

7          THE COURT:  Admitted.

8  Q    When you conduct surveillances do you-- when SO 3

9  conducts a surveillance, do they take notes?

10 A    Yes.

11 Q    And are those notes later compiled into a surveillance

12 log?

13 A    Yes, they are.

14 Q    Did you review surveillance logs concerning the dates

15 that the videos were taken and these photographs were taken?

16 A    Yes, I did.

17      MR. BURLINGAME:  Your Honor, I ask that the agent be

18 able to refer to his notes to refresh his recollection as we

19 go through the tapes.

20         THE COURT:  Yes.

21         MR. BURLINGAME:  I will need to move the video

22 screen around to in front of the jury.

23         THE COURT:  Are these on a specific date or over a

24 period of time?

25         MR. BURLINGAME:  The videos are five separate dates

1    and the photographs are from one day.

2              THE COURT:  What's the date?

3              MR. BURLINGAME:  The photographs are from

4    November -- sorry, November 20, 2007, and the surveillance

5    videos are from October 15th, November 2nd, October 30th,

6    November 20th and December 2nd all of 2007.

7              THE COURT:  While we're getting that setup, why

8    don't you take ten minutes, please, ladies and gentlemen.

9              (Jury leaves courtroom.)

10             THE COURT:  The defendant has into the seen this

11   before?

12             MS. SHARKEY:  I would like to see them before

13   they're shown.  If these are the stills that we received

14   those, we never received the video and we never received any

15   surveillance logs, we'd like an opportunity to see it before

16   it's shown to the witness.

17             MR. BURLINGAME:  She has received all of it in

18   discovery.

19             THE COURT:  Let's show it to them.  Show everything.

20             MS. SHARKEY:  Can we see the logs as well, so that

21   we do not waste too much time.

22             THE COURT:  Mark them with a number, please.  What

23   number are you assigning?

24             MR. BURLINGAME:  Government Exhibit 3500 PQ 1, and

25   if we refer to documents within we will make them A, B, and

1  C.

2         MS. SHARKEY:  We never received these.

3         MR. BURLINGAME:  I believe that is incorrect.

4         THE COURT:  Proceed.

5         Do you want to get up and indicate who is on the

6  screen.

7  A    That is Mr. Carneglia.  Michael -- Carosella's is off to

8  your right.  That's the rear parking area.  This is on

9  Lefferts Boulevard at Don Peppe's Restaurant, South Ozone

10 Park.

11 Q    Who does that license plates number come back to?

12 A    To Darlene Panzarella.

13 Q    Who does she live with?

14 A    Joseph Panzarella.

15        THE COURT:  Who is that man.

16 A    That was Mr. Carneglia.  That's Mr. Carneglia once

17 again, and again that is the rear parking area.  He's walking

18 north on Cross Bay and talking to the gentleman in the black,

19 approaching 163rd Street, rear of Carosella's. This is the

20 defendant once again with a male unidentified to us on Sutter

21 Avenue and Crescent Street.  They met and spoke for about 30

22 minutes and got into their individual cars and drove away.

23 This is continuation of the same.

24        MS. SHARKEY:  Could you keep your voice up?

25 A    This is the Waterview Diner about a block from

1    Carosella's to the south between 163rd and -- near 163rd the

2    Waterview Diner on Cross Bay.  Leaving the diner with that

3    gentleman who is unknown to us.

4         MR. BURLINGAME:  Judge, there is testimony in the record

5    about Carosella's and the Waterview Diner associated with the

6    Gambino family. In the still photographs, also covering the

7    video, unidentified male, as far as I know on Sutter Avenue,

8    vicinity of Crescent Street. It was a rainy day,

9    Mr. Carneglia drove over there, they met, sat around and

10   talked for about 30 minutes, got into their individual cars

11   and left.

12   Q    All five pictures are from the same day?

13   A    Yes.

14        MR. BURLINGAME:  That's all.

15        THE COURT:  That is it?

16        MR. BURLINGAME:  Yes.

17        THE COURT:  Take another five and we will continue.

18        MS. SHARKEY:  Judge, we have seen the stills, prior

19   to today we have not seen that video montage, nor did we

20   receive it in evidence.  The defense objects to its entrance

21   into evidence. We believe it's a violation of Rule 16. The

22   first time seeing it when this witness hits the stand

23   certainly is unfair.

24        Additionally, if there is no indicia on the styles,

25   other than the defendant standing on the street or standing

Quisenberry-Burlingame/direct

1  in a doorway, there appears to be no relevance to the

2  entrance of this -- these documents into evidence.

3          If there is some sort of link as to relevance, I

4  would ask that the Court direct the prosecution to make that

5  offer of proof, but we had not seen the video, we have not

6  received these line sheets.  Sitting next to me is our

7  paralegal who has indexed it as it was coming up.  I was

8  surprised at this witness being called.  His name does not

9  appear.  We have no 3500 for this witness.

10         MR. BURLINGAME:  The witness was originally

11  identified as Brian Cope who is another member of SO 3. The

12  video surveillance were turned over in discovery, 418 through

13  424 on December 10, 2008.  I believe defense might be correct

14  that I neglected to provide those five reports as 3500 for

15  this witness, and I apologize, that is my mistake, I believe

16  the entirety of the surveillance -- of the surveillance

17  reports were produced, but again I'm not sure. All I know the

18  surveillance videos themselves were produced.

19         THE COURT:  Are you going to identify the

20  unidentified person?

21         MR. BURLINGAME:  No.

22         THE COURT:  Motion denied.

23         There is no prejudice to the defendant.  Take five

24  and then we will continue with the jury.

25         (Recess taken.)(Followed on next page.)

1          (In open court.)

2          THE COURT:  The jury can come in.

3          MR. BURLINGAME:  So, Judge, what we're going ask to

4    do -- sorry -- since the video clips are so short is to go

5    through them once, just allow them to play and let the jurors

6    see them once.  And then, go through them again and pause them

7    and ask him to explain them.

8          THE COURT:  Yes, you may.

9

10          (Continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury enters.)

2          (The following occurs in the presence of the jury.)

3          THE COURT:  Sit down, please.

4          MR. BURLINGAME:  Judge, permission to publish the

5  Exhibits and to have the, ask the witness to step down and

6  explain them.

7          THE COURT:  Granted.

8          MR. BURLINGAME:  Okay.

9  Q    Special Agent Quisenberry --

10         MR. NORRIS:  I think we'll just play them once,

11 actually, Judge.

12         THE COURT:  All right.

13 DIRECT EXAMINATION

14 BY MR. BURLINGAME:  (Continued)

15         MR. BURLINGAME:  I'm going to ask Ms. Moore to pause

16 them on occasion and we will just explain where we are and who

17 is who in the videos.

18 Q    Okay?

19 A    Okay.

20         (Video played for jury.)

21

22 Q    So, what's this building here?

23 A    This is Carosello's Restaurant.

24 Q    Is this the front or back?

25 A    The rear.  This is the rear.

1  Q    And who is the gentleman in the orange shirt?

2  A    Mr. Carneglia.  Charles Carneglia.

3         MS. SHARKEY:  Mr. Burlingame, the juror can't see.

4  Q    Is this typical of what you were describing?  You would

5  observe the defendant hanging around behind Carosello's?

6  A    Yes.

7  Q    And I see a gentleman with a bald head and a black shirt

8  just came out?

9  A    Right.

10 Q    So, this would be one of the meetings behind Carosello's

11 you were discussing?

12 A    Yes.

13 Q    Do you know what day this is from?

14 A    I believe it's October 15th, 2007.

15 Q    There was another individual just came through the --

16         MR. BURLINGAME:  Could you pause it a second,

17 please?  If you could rewind just a little, okay?

18 Q    There was another individual that came by with a cane and

19 a black sweat jacket?

20 A    Yes.

21 Q    Were you able to identify either of the people he was

22 meeting with that day?

23 A    No, I was not.

24         MR. BURLINGAME:  Thanks.  You can pause it.

25         (Video played for jury.)

 1   A     And this clip is from November 2nd, 2007.  It's Charles

 2   Carneglia in front of Don Pepe's restaurant.

 3   Q     What's this?  There's a gray Mercedes here.

 4             Were you able to get the license plate?

 5             MR. BURLINGAME:  Could you pause for a second,

 6   Ms. Moore?

 7   A     Yes, we were.

 8   Q     And you were able to get that license plate number?

 9   A     Yes.

10   Q     Did you run the plate?

11   A     Yes.  We ran the plate and it came back to a Darlene

12   Panzarella with an address in Nassau County.

13   Q     Okay.  And were you able to determine who else lived at

14   that address?

15   A     Yes.  Through a public source online, on the Internet,

16   checked with -- the same residence is also a Joseph E.

17   Panzarella.

18   Q     Okay.

19             MR. BURLINGAME:  You can continue.

20             (Video played for jury.)

21

22   A     And that's the vehicle.  As I said, it's in front of

23   Don Pepe's restaurant on Lefferts Boulevard in South

24   Ozone Park.

25   Q     And that's the defendant standing next to the Darlene

1   Panzarella vehicle?

2   A    Yes.

3        MR. BURLINGAME:  Would you pause for one second.

4   Q    Were you able to see the driver of that vehicle that day?

5   A    No.

6        MR. BURLINGAME:  Thank you.  Continue.

7        (Video played for jury.)

8

9   A    Once again, this is the back of, the rear of Carosello's.

10  Mr. Carneglia and this unknown gentleman are walking down the

11  street talking.  They've come from the Waterview Diner, which

12  is a few doors down to the south, and they're preparing to

13  cross 163rd Street, which leads to the rear instance of

14  Carosello.

15  Q    And that was Mr. Carneglia in the white shirt and the

16  gentleman he was talking to in the black shirt?

17  A    Yes.

18  Q    Were you able to identify the gentleman he was talking

19  to?

20  A    No.

21        MR. BURLINGAME:  Please, continue.

22        (Video played for jury.)

23

24  Q    Where are we here?

25  A    This is on Sutter Avenue near Cresson Street, about a

1    five-minute drive from -- five- or six-minute drive from

2    Mr. Carneglia's residence.  And he, Mr. Carneglia, met with

3    this, this gentleman with the black hat.

4            They met.  They spoke out on the sidewalk for around

5    30 minutes.  They got into their individual -- I think on the

6    video, they each get into their own cars and went their

7    separate ways.

8    Q    And so, SO-3 would have followed him to this location,

9    observed him while he was meeting with this unidentified

10   man --

11   A    Yes.  And he got the license plate off of that vehicle,

12   but it didn't come back to -- a lot of times we don't know

13   what happens.

14           We get the information, we get the videos, we get

15   the things, and we hand them back to the case agent, the

16   person in the office who knows the cases.  We don't know the

17   ins and outs of them.  We work on one thing one day and

18   another thing another.  And so, we give that to him, the

19   license plate information and all that, and maybe something

20   comes back and maybe it doesn't.

21   Q    Okay.

22   A    On this case we were never told this person is this

23   person, so next time you can put his name on it.  So, that's

24   how it works.

25   Q    Okay.

1      And now, this clip.  Where are we now?

2  A    This is the Waterview Diner, which is about a half block

3  down from Crossbay Boulevard, from Carosello's.

4      And this gentleman, Mr. Carneglia, is on the

5  passenger side.  And the other gentleman, they've gone into

6  the diner.  They were in there for some period, I'm not sure

7  how long, I don't remember.  And then, they walk back to the

8  vehicle.

9  Q    And okay.  And that was Mr. Carneglia in the blue jacket

10  with the white stripe on the shoulder?

11  A    Yes.

12  Q    And the other individual had a black jacket?

13  A    Yes.

14  Q    What date was that clip from?  Would you like to check

15  your notes?

16  A    I believe it's, I believe it's one -- I know it was

17  December 12th.

18      (Pause in the proceedings.)

19  A    December 12th, 2007.

20  Q    Okay.  And then, do you also have still photographs from

21  one of the days of surveillance?

22  A    Yes.

23      MR. BURLINGAME:  Okay.  Ms. Moore, if you could

24  switch over to the photograph CD.

25      (Pause in the proceedings.)

1   Q     And you said this is still photographs from one of the

2   days that we already talked about.

3         Which day was this?

4   A     One moment.  They're not in date sequence.

5         This was November 20th, and it was when the video --

6   it was the same video.  This is on Sutter Avenue right off of

7   Cresson Street.  It was on the video before, the gentleman,

8   that's the black hat, dark hat, dark jacket.  Mr. Carneglia is

9   standing there.

10  Q     And you testified that on this day you followed him five

11  or six minutes from his house.  He stopped here and met with

12  this man for about a half-hour and then they both left in

13  separate cars?

14  A     Correct.

15  Q     Okay.  If you could just flip through the rest of the

16  photos.

17        Same two individuals?

18  A     Correct.

19  Q     Now, when you followed the defendant, was there any, did

20  he ever do anything strange that appeared to you like he might

21  be being surveillance conscious?

22        MS. SHARKEY:  Objection as to form.

23        THE COURT:  Overruled.

24  A     Nothing that would seem overt or, I don't know, you say

25  amateurish, like out of a movie that would seem like, no

1    squaring the block again and again and again or a lot of

2    looking around, but some behavior that could have been --

3              MR. FARBER:  Objection to what "could have been."

4              THE COURT:  Just describe the behavior.

5              THE WITNESS:  Okay.

6              THE COURT:  Don't characterize it.

7              THE WITNESS:  Okay.

8    A     For instance, well, from his residence, which is on a

9    one-way going south, he would back up and come the quarter

10   block to the north, the wrong way on a one-way, which may just

11   be a shortcut or it may just be a way to look because I know

12   when we first -- doing that, and again, I'm going to say

13   that's a judgment.  It's -- I don't know the word.  It's

14   subjective whether that was something or not.

15             And then on another occasion, cleaning the car,

16   dusting the car for an extended period of time for

17   20-30 minutes, which could also be a way of looking around.

18   Driving up Crossbay Boulevard a certain distance.  Then,

19   basically making a U-turn and coming back to where he started.

20             He just, it's subjective, but those type of things

21   makes you think a little maybe we should back off a little

22   maybe.  It may be something, if that makes sense.

23   Q     So, nothing amateurish, but some things that raised

24   suspicion with you?

25             MS. SHARKEY:  Objection.

 1          MR. FARBER:  Objection.

 2          THE COURT:  Sustained.

 3          MR. BURLINGAME:  I have -- nothing further.

 4          MS. SHARKEY:  One second, please.

 5          You can take a seat.

 6          THE WITNESS:  Thank you.

 7          (Pause in the proceedings.)

 8

 9          THE COURT:  Did you submit 3500-LG-4?

10          MR. BURLINGAME:  No, Judge.  It was just for the

11  witness to refresh.

12          THE COURT:  Okay.

13  CROSS-EXAMINATION

14  BY MS. SHARKEY:

15  Q    Good afternoon, sir.

16  A    Good afternoon.

17  Q    You testified that you were involved in the surveillance

18  of Mr. Carneglia; is that correct?

19  A    Yes, ma'am.

20  Q    What period of time was that?

21  A    The, it was sometime in late, I'm trying to remember.

22  August until around the middle of December.

23  Q    August '07 to December '07?

24  A    August '07, yes, yes.

25  Q    And that would be about four months?  Five months?

1  A    Yes.

2  Q    Isn't that correct?

3  A    Yes.

4  Q    And you testified on direct examination that when you

5  took pictures or took surveillance, I guess surveillance

6  photos; right?

7  A    Yes, ma'am.

8  Q    You would give those photos to the case agent --

9  A    Yes.

10 Q    -- on the case?

11 A    Yes.

12 Q    And it would be accurate to say that well --

13       MS. SHARKEY:  Withdrawn.

14 Q    Were you involved in the five-month surveillance?

15 A    Yes.

16 Q    You and other members of your team?

17 A    Yes.

18 Q    And in order for your surveillance to be effective, you

19 needed to know what you were looking for; right?

20 A    Yes.

21 Q    So, when you took video surveillance or stills, you would

22 show those photos to case agents; right?

23 A    Yes.

24 Q    And those weren't the first snapshots of the individuals

25 who were depicted; were they?

1   A    In some cases they may well have been.  It might have

2   been just once that he met with the -- the defendant met with

3   these people.

4   Q    You testified on direct examination that you were never

5   told that the photos that you had taken were of value; right?

6   A    Correct.

7   Q    The case agents never said, aha, go back and make sure

8   you follow this guy and look for this guy again; right?

9   A    The only thing like that, was --

10  Q    Yes or no, please.

11  A    Well, then I would have to say -- let me think.

12          THE COURT:  You can say, 'I can't answer it in that

13  form.'

14          THE WITNESS:  I just don't remember the beginning of

15  the question.

16          THE COURT:  Re-frame it.

17          THE WITNESS:  I'm sorry.

18  Q    The photos that you've just shown to the jury were given

19  to the case agents; right?

20  A    Correct.

21  Q    And were you directed to look for those individuals

22  again?

23  A    No.

24  Q    And were those individuals identified for you as anyone

25  of interest in the Gambino Crime Family?

1   A     No.

2   Q     And when you say you do surveillance, sir, and you make a

3   subjective decision as to, or a subjective opinion as to

4   whether or not someone is conscious or trying to elude

5   surveillance, that's something that you've concluded in your

6   own mind; right?

7   A     Correct.

8   Q     And in fact, wouldn't it be accurate to say that members

9   or that yourself would consider somebody driving very fast may

10  be attempting to evade surveillance?  Right?

11  A     Yes.

12  Q     And that same person may be driving very slow, and they

13  may be attempting to evade surveillance; right?

14  A     Yes.

15  Q     So, absolutely anything you see an individual do is

16  subject to two inferences; fair enough?

17  A     Fair.

18  Q     And it's your testimony that because Mr. Carneglia

19  frequently washed his car, you thought that that was an

20  attempt to evade surveillance?

21  A     (No verbal response.)

22  Q     Yes or no, if you can.

23  A     Well, I can't answer in that form.  To take...

24  Q     Did you see Mr. Carneglia wash his car?

25  A     Yes.

1  Q    Did you testify on direct examination that you suspected

2  that washing the car was an attempt to evade surveillance?

3  A    It could be.

4  Q    And it could be an old guy washing his car; right?

5  A    Yes.

6  Q    And this Carosello Restaurant; right?

7  A    Yes.

8  Q    That's a big restaurant on Crossbay Boulevard; right?

9  A    Yes.

10  Q    And Carosello Restaurant is a family restaurant; right?

11  A    My understanding, yes.

12  Q    It has video games inside; right?

13  A    Yes.

14  Q    A lot of family parties are conducted there; right?

15  A    Yes.

16  Q    And when I say "family," I mean any individual.  I don't

17  mean that with any organized crime connotation; right?

18  A    Yes.

19  Q    And when Mr. Burlingame asked you if Mr. Carneglia used

20  the front door, you testified that the front door really

21  wasn't in use; correct?

22  A    Yes.

23  Q    And Carosello Restaurant is four or five blocks from

24  where Charles Carneglia was living with his 90-year-old

25  mother; right?

1  A    Yes.

2  Q    And the Waterview Diner is how many blocks from

3  Carosello?

4  A    Half a block.

5  Q    So, Carosello and the Waterview Diner are neighborhood

6  eateries; right?

7  A    It would appear -- it seems so, yes.

8          MS. SHARKEY:  Nothing further.  Thank you.

9          THE WITNESS:  Thank you.

10 REDIRECT EXAMINATION

11 BY MR. BURLINGAME:

12 Q    You testified you were on the Gambino Squad for how long?

13 About seven years?

14 A    Almost seven years, yes.

15 Q    During that period, did you ever have any trouble

16 identifying anyone who was meeting with made members of

17 organized crime?

18 A    Yes.

19 Q    Now, Ms. Sharkey asked you if absolutely everything that

20 anyone does is subject to two interpretations.

21          And one of the things that you testified on direct

22 you observed Mr. Carneglia do was pull out of his driveway and

23 drive the wrong way down a one-way street?

24 A    Yes.

25 Q    And that he would then proceed for certain direction in

1  one -- along a certain course and then reverse and come back

2  to exactly where he started and get out of his car?

3  A    Yes.

4            MS. SHARKEY:  Objection as to form.

5            THE COURT:  You may enquire.

6  A    Yes.

7  Q    And those are the things you are saying could be subject

8  to multiple interpretations?

9  A    Yes.

10 Q    Okay.  Now, when you -- Ms. Sharkey asked you about

11 Carosello's being a family restaurant.

12            When you saw the defendant there, were there a lot

13 of kid's parties going on?

14 A    No.

15 Q    A lot of kids coming in and out of the restaurant?

16 A    No.

17 Q    Okay.  The people he was meeting with, which door did

18 they use?

19 A    The rear door.

20 Q    Okay.  Did any people use the front door?

21 A    Not that I remember seeing at all, but we focused where

22 he was on the rear, in the rear.

23 Q    Okay.  And you testified that there weren't many people

24 coming in and out of Carosello's when you were watching.

25 A    Correct.

1   Q    Is it fair to say it wasn't -- business wasn't booming at

2   Carosello's?

3   A    Not at that time.

4   Q    And this is the restaurant that you thought that FBI

5   agents couldn't go into because you would be worried about

6   blowing your cover; correct?

7   A    Correct.

8   Q    And just explain to the jury; Ms. Sharkey asked you some

9   questions about an old man washing his car.

10          What exactly would he do when he was quote, unquote

11  "washing his car?"

12  A    Well, it was more of a, a dusting.  We were a long way

13  away, we were using binoculars but more of like, dusting

14  pollen or something off of the car.  But everything from

15  opening the driver's side door to stand on the, basically, the

16  floor of the car to do up on the roof of the vehicle, the

17  back.  Cleaning it just all over, completely all over, 360

18  around and on top of the car.

19  Q    Okay.  So, there's no hose involved in this?

20  A    No.

21  Q    He would get out and dust his car before driving around?

22  A    Some days.

23  Q    And I believe you testified on direct that that would

24  give him an opportunity to look around; correct?

25          MS. SHARKEY:  Objection.

1  Q    I believe you testified on direct that that would give

2  him an opportunity to look around; correct?

3           MS. SHARKEY:  Objection.

4           THE COURT:  I'll allow it.

5  A    Correct.

6  Q    I believe you testified on direct that that would give

7  him an opportunity to look around; correct?

8  A    Correct.

9           MR. BURLINGAME:  No further questions.

10          MS. SHARKEY:  May I re --

11          THE COURT:  No, we've had enough.

12          Next witness, please.

13          THE WITNESS:  Thank you.

14          (Witness excused.)

15          MS. SEIFAN:  Your Honor, at this time we want to

16 play two calls between John Carneglia and Charles Carneglia.

17 The parties have already stipulated to the authentication of

18 these calls.

19          THE COURT:  You may.

20          MS. SEIFAN:  I just want to move to admit

21 Government's Exhibit 230-A.

22          THE COURT:  Yes.

23          (Government's Exhibit 230-A was received in

24 evidence.)

25          MS. SEIFAN:  And we have transcripts as well.

1          MS. SHARKEY:  Could we have that removed?  Unless
2     it's being used.

3          MS. SEIFAN:  For the next witness we're going to
4     need it.

5          MS. SHARKEY:  Okay.  No objection.

6          MS. SEIFAN:  Your Honor, we also have transcripts of
7     these calls.

8          THE COURT:  Yes.

9          MS. SEIFAN:  They're identified as Government's
10    Exhibit 230T-13.

11         THE COURT:  C?

12         MS. SEIFAN:  T as in Tom.

13         THE COURT:  T.

14         MS. SEIFAN:  Dash, 13.  And 230T, as in Tom, dash,
15    12.

16         THE COURT:  All right.  The transcripts are admitted
17    for purposes of assisting the jury.

18         (Government's Exhibits 230T-13 and 230T-12 were
19    received in evidence.)

20         THE COURT:  230-A is in.

21         (Pause in the proceedings.)

22

23         MS. SEIFAN:  Your Honor, there are several
24    transcripts in there in the binders we're handing out because
25    we're going to use them later on.  So, I'm just going to

1   direct the jury to focus on the last two transcripts.

2                   THE COURT:  Yes.

3                   Don't look at anything until you're told to, please.

4                   MS. SEIFAN:  Don't look at anything prior to the

5   last two transcripts, 230T-13 and 230T-12.  And they relate to

6   a November 5th, 2006, call.

7                   (Pause in the proceedings.)

8

9                   MS. SEIFAN:  So, the first call we're going to

10  play --

11                  THE COURT:  I don't see 230T-12.

12                  MR. FARBER:  It's out of order, Judge.  It's

13  actually the --

14                  MS. SEIFAN:  It's the last one, Judge.

15                  THE COURT:  230T-13?

16                  MS. SEIFAN:  Yes.

17                  THE COURT:  You all have it?  It's the last two.

18                  THE JURY:  Yes.

19                  MS. SEIFAN:  Okay.  So, the first call we're going

20  to play is the last transcript in the binder, 230T-12.  It's

21  dated November 27th -- it says 2007, it's actually 2006 --

22  4:35 p.m., between John Carneglia and Charles Carneglia.  It's

23  the last transcript in the binder.

24                  THE COURT:  You're playing which one first?

25                  MS. SEIFAN:  November 27th.  The 230T-12, the last

1  transcript in the binder.

2          THE COURT:  All right.

3          (Pause in the proceedings.)

4

5          MS. SEIFAN:  So, this call is between Charles

6  Carneglia and John Carneglia.

7          (Audio played for jury.)

8

9          MS. SEIFAN:  Now, we're going to play 230T-13.  The

10 call is dated November 5th, 2006, at 2:29 p.m., and it's

11 between Charles Carneglia and John Carneglia.

12          Just, it's the transcript right before the last

13 transcript you looked at.

14          Is everyone on the right one?

15          THE JURY:  Yes.

16          (Audio played for jury.)

17

18          MS. SEIFAN:  The Government calls Walter Obando.

19          (Witness enters and takes stand.)

20          THE COURTROOM CLERK:  Please, raise your right hand.

21 W A L T E R     O B A N D O,

22          called by the Government, having been

23          first duly sworn, was examined and testified

24          as follows:

25

1          THE COURTROOM CLERK:  You may be stated.  Please,

2   state and spell your name for the court reporter.

3          THE WITNESS:  Walter Obando -- O-B-A-N-D-O.

4   DIRECT EXAMINATION

5   BY MS. SEIFAN:

6   Q    Good afternoon.

7   A    Good afternoon.

8   Q    Mr. Obando, who do you work for?

9   A    I work at MDC Brooklyn.  It's a Federal Bureau of Prisons

10  facility located here in Brooklyn, New York.

11  Q    What does the MDC stand for?

12  A    Metropolitan Detention Center.

13  Q    What is your title?

14  A    Special investigative technician.

15  Q    What does a special investigative technician do?

16  A    At office investigations at MDC Brooklyn we conduct

17  investigations regarding inmate misconduct such as fights,

18  assault, drug usage, narcotics trafficking.  We monitor the

19  inmates' -- randomly monitor the inmates' phone conversations.

20  We monitor their incoming and outgoing mail and we serve as a

21  liaison between the institution and various law enforcement

22  agencies.

23  Q    So, some of your duties and responsibilities include

24  responding to subpoenas for inmate information?

25  A    Yes.

1  Q    And are you familiar with the various documents that are

2  contained in an inmate's file?

3  A    Yes.

4  Q    What are some of those documents?

5  A    Some of the documents might contained in an inmate's

6  central file might be intake information forms that an inmate

7  fills out upon entrance to the MDC; his visitor list, phone

8  list, separation orders, which details the inmates that are

9  supposed to be separated from the individual inmate.

10 Q    And in the course of your duties you review the inmate's

11 Bureau of Prisons file?

12 A    From time to time, yes.

13 Q    Is it fair to say that the documents or the forms in

14 those files are standard throughout the Bureau of Prisons

15 system?

16 A    Yes.

17 Q    How long have you worked at the MDC?

18 A    Twelve years.

19 Q    You stated one of the things you do is monitor, you

20 randomly monitor inmate telephone calls?

21 A    Yes.

22 Q    How does the telephone system at the MDC work?

23 A    The system is called Tru Phone.  It's a computerized

24 system that the inmate phone conversations are stored via hard

25 drive.

1  Q     Are there telephones located in each unit?

2  A     Yes.

3  Q     And how many units are there at the MDC?

4  A     Approximately, over 28 Housing units at the MDC.

5  Q     Are you able to monitor each and every call that an

6  inmate makes?

7  A     No.

8  Q     But are each and every one of the inmates' calls

9  recorded?

10 A     Yes.

11 Q     Is there a way to retrieve those calls --

12 A     Yes.

13 Q     -- that are recorded?

14 A     Yes.

15 Q     How are they retrieved?

16 A     Normally, through a subpoena or through our database

17 system.  We can retrieve the calls and download them on CD or

18 bring the call up.  That way we can listen to it.

19 Q     Okay.

20       MS. SEIFAN:  I'm going to show you a series of

21 documents.  I'll start with, I'm showing you what's been

22 marked for identification as Government's Exhibit 228.

23       (Handing.)

24 Q     Can you take a look at that?

25 A     Yes.

1  Q    What is it?

2  A    It's an Inmate Quarters History for inmate Anthony

3  Ruggiero, Junior.

4  Q    Is this document kept in the ordinary course of business?

5  A    Yes.

6        MS. SEIFAN:  Your Honor, I move to admit

7  Government's Exhibit 228.

8        THE COURT:  It's admitted.

9        (Government's Exhibit 228 was received in evidence.)

10       MS. SEIFAN:  I'm showing you what's been marked for

11 identification as Government's Exhibit 227.

12       (Handing.)

13 Q    Take a look at that.

14 A    Yes.

15 Q    Do you recognize it?

16 A    Yes.

17 Q    What is it?

18 A    It's a Visitor Information Form for inmate John Alite.

19 Q    Is that document kept in the ordinary course of business?

20 A    Yes.

21       MS. SEIFAN:  Your Honor, I move to admit

22 Government's Exhibit 227.

23       THE COURT:  Admitted.

24       (Government's Exhibit 227 was received in evidence.)

25       MS. SEIFAN:  Okay.  Now, I'm going to show you a

 1  series of documents.  They're not in numerical order, so I'll
 2  go slowly.
 3          I'm showing you what's been marked for
 4  identification as Government's Exhibit 190.
 5          (Handing.)
 6  Q    Take a look at that.
 7  A    Yes.
 8  Q    Do you recognize it?
 9  A    Yes.
10  Q    What is it?
11  A    It's a Inmate Quarters History for inmate Charles
12  Carneglia.
13  Q    Okay.  Is that document kept in the ordinary course of
14  business?
15  A    Yes.
16          MS. SEIFAN:  Your Honor, I move to admit
17  Government's Exhibit 190.
18          THE COURT:  It's admitted.
19          (Government's Exhibit 190 was received in evidence.)
20          MS. SHARKEY:  What Exhibit Number, please?
21          MS. SEIFAN:  190.
22          I think what I'm going to do is I'm just going to
23  show you the next series of documents, what's been marked for
24  identification as Government's Exhibits 176, 178, 180, 191,
25  182 -- I apologize it's not in numerical order -- 179, 181,

1    183, 187, 184 and 203.

2            (Handing.)

3    Q    Can you take a look at these documents.  Take your time

4    going through them.

5            (Pause in the proceedings.)

6

7    Q    Do you recognize these documents?

8    A    Yes.

9    Q    What kind of documents are these?

10   A    Various forms, such as Telephone Number Request forms, an

11   Account Telephone Number List.  You also have the inmate's

12   Visitor List and you have the Commissary Records.  And another

13   telephone list.

14   Q    For whom?

15   A    Inmate Charles Carneglia.

16   Q    And are these documents kept in the ordinary course of

17   business?

18   A    Yes.

19           MS. SEIFAN:  Your Honor, I move to admit these

20   series of documents.

21           THE COURT:  Yes.  They're all admitted.

22           (Government's Exhibits 176, 178, 180, 191, 182, 179,

23   181, 183, 187, 184 and 203 were received in evidence.)

24           MS. SEIFAN:  Okay.

25           Finally, I'm just going to show you, before we go

1   through them, I'm just going to publish them to the jury.

2            I'm going to show you what's been marked for

3   identification as Government's Exhibits 204, 205, 206, 207,

4   208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219,

5   220, and 221.

6            (Handing.)

7   Q    Take a look at these.

8            (Pause in the proceedings.)

9

10  Q    Do you recognize these documents?

11  A    Yes.

12  Q    What do you recognize them to be?

13  A    Inmate Visitor Forms.  Telephone -- excuse me -- Inmate

14  Account Telephone Number forms and Visitor Information forms

15  for Inmate John Carneglia.

16  Q    Are these documents kept in the ordinary course of

17  business?

18  A    Yes.

19           MS. SEIFAN:  Your Honor, I move to admit all these

20  documents, Government's Exhibits 204 to 221.

21           THE COURT:  Admitted.

22           (Government's Exhibits 204 through 221 were received

23  in evidence.)

24           MS. SEIFAN:  Permission to publish them to the jury.

25           THE COURT:  You may.

 1          MS. SEIFAN:  And to have Mr. Obando step down and

 2   explain them.

 3          THE COURT:  Yes.

 4          (Witness steps down.)

 5          MS. SEIFAN:  The first document I'm going to show

 6   you is Government's Exhibit 190.

 7          (The above-referred to Exhibit was published to the

 8   jury.)

 9          MS. SEIFAN:  Could you lower the lights?

10          (Pause in the proceedings.)

11

12          MS. SEIFAN:  Okay.

13   Q    Can you explain to the jury what we're looking at?

14   A    This is Inmate Quarters History for Inmate Charles

15   Carneglia.

16   Q    Okay.  And what's a quarters history?

17   A    Basically, it's a detailed housing assignment for the

18   inmate during the specified period of time.

19   Q    Okay.  Let's just, before we look at any particular line,

20   can you just explain the different categories that are here?

21          The first category, all the way to the left?

22   A    FCL stands for facility.

23          As you see, it says BRO.  That's a three-letter

24   abbreviation for Brooklyn.

25          FTD is a three-letter designation for Fort Dix.

1          And if you see here down at the bottom, it says PHL,
2    which is Philadelphia.
3          And CUM is Cumberland.
4    Q    So, the first category indicates where an inmate is
5    housed?
6    A    Yes.
7    Q    What prison or location?
8    A    What prison.
9    Q    Okay.  And those are abbreviations for the prison?
10   A    Yes.
11   Q    And then, the next category is called "assignment?"
12   A    It's the actual bed assignment that the inmate is
13   assigned to.
14   Q    Okay.  And then, the next category, "description?"
15   A    Description is basically the same thing as the actual
16   assignment.
17   Q    Okay.
18   A    If you see over here, it says "G03."  You see House G,
19   Range 3.
20         And the actual bed assignment, which is cell
21   assignment, which is 420.
22         Over here, 420, same thing (indicating).
23   Q    Okay.  And what is the "start date and time stop?"  Here
24   at the next category, "start date."
25   A    You have April 4th, 2008, to current.

1  Q    Okay.  So, what are these categories?  What are all these

2  numbers, dates?

3  A    Basically the start date and time stop basically when an

4  inmate changes housing assignments.

5           As you see here, over here, it gives an example.

6  "GO3418."  Inmate Charles Carneglia was assigned to that

7  specific cell from March 27th, '08 to April 4th, '08.

8           And basically, he was assigned to a different cell,

9  which was 420, basically from April 4th, 2008, to the present.

10 Q    Okay.  Let's start at the bottom and work our way up.

11          The last line on this screen reads BRO; right?

12 A    Yes.

13 Q    And it's, the start date is 11/5/2001?

14 A    Yes.

15 Q    How long did Mr. Carneglia -- and "BRO" you said stands

16 for MDC, the Brooklyn prison?

17 A    Yes.

18 Q    How long was he in the Brooklyn prison?

19 A    He arrived at -- RO2 stands for receiving and discharge.

20          He was, he came in approximately on November 5th,

21 2001, at approximately 10:39 p.m., and he left Brooklyn, it

22 looks like December 13th, 2001, at 11 -- I can't read the last

23 number.  Looks like 11:20.

24          MS. SEIFAN:  I can adjust it.

25          (Pause in the proceedings.)

 1   A    11:29 a.m.

 2   Q    Okay.  And then, after MDC, the next facility?

 3   A    He was transferred to FTC Oklahoma.  "OKL" is the

 4   abbreviation for FTC Oklahoma.

 5   Q    Okay.  And how long was he there for?

 6   A    He was there for, it looks like 12/13/2001, from

 7   approximately 6:05 p.m., and he was transferred basically four

 8   days later on December 17th, 2001, at 7:38 a.m.

 9   Q    So, he was probably in transit going to another prison?

10   A    Yes.

11   Q    Okay.  The next prison?

12   A    FCI Cumberland.

13   Q    Okay.

14   A    He arrived at receiving and discharge 12/17/2001 at

15   approximately 5:46 p.m.

16   Q    Okay.

17   A    And he was at FCI Cumberland until, it looks like until

18   September 16th, 2002, at approximately 11:02 a.m.

19   Q    And then, he went to PHL for a couple days, it looks

20   like?

21   A    Yes.

22   Q    In transit.

23        And then, he went to -- what's the next prison?

24   A    FCI Fort Dix.

25   Q    Okay.  And how long was he at Fort Dix?

1  A    He was at Fort Dix, looks like approximately 9/16/2002,

2  through looks like September 26th, 2002.

3  Q    A couple of days?

4  A    Yes.

5  Q    Then he was moved back to the MDC?

6  A    Yes.

7  Q    For how long?

8  A    He arrived at MDC at 12/12/2002, at approximately

9  1:55 a.m., and it seems he left, it looks like 1/12/2003, at

10 approximately 8:10 a.m.

11 Q    Okay.  And then he went to Fort Dix?

12 A    Yes.

13 Q    Okay.  And at Fort Dix, how long was he at Fort Dix?

14 A    He was at Fort Dix, looks like 2/11/2003, at

15 approximately 2:02 p.m.  He was there at Fort Dix until

16 6/29/2005 at approximately 1:57 --

17 Q    I'm sorry?

18 A    6/29/2005, 9:09.

19        (Pause in the proceedings.)

20

21 Q    Okay.  Can we just clarify for a moment what period he

22 was in Fort Dix in 2002?

23 A    That would be, he was there from -- excuse me.

24        Looks like he was there from September 24th, 2002,

25 through September 26th, 2002.

1   Q    Okay.  And then, the next time he was at Fort Dix?

2   A    He was there from 2/11/2003, through 6/29/2005.

3   Q    Well, this reads -- I just need some clarification.

4        This reads...

5   A    July 7th, 2003.

6   Q    Yes.  Right.  And then, the next time?

7   A    Basic change.  He just basically changed bed assignments.

8   Q    Okay.

9   A    Actually, it looks like the same bed assignment.

10  Q    Okay.  And then, the next prison was MDC Brooklyn?

11  A    Yes.

12  Q    Okay.

13       (Pause in the proceedings.)

14

15  Q    Where was he between September 24th, '02, and

16  December 12th, '02?

17       MS. SHARKEY:  I'm sorry, I couldn't hear the

18  question.

19       Can I have it read back?

20       THE COURT:  Yes.

21       Read it back, please.

22       (The requested portion of the record was read back

23  by the Official Court Reporter.)

24  A    He was as FCI Fort Dix from September 24th, 2002, to

25  September 26th, 2002.

1    Q    Okay.  And then, where did he go next?

2    A    Basically, he arrived at Brooklyn on December 1st, 2002.

3    Q    Okay.  So, he was in transit between September 26th, '02,

4    and December 1st, '02?

5    A    Well, it doesn't state over here if he was in any transit

6    facility.  There's a gap in there between September 26th and

7    December 12th.

8    Q    But after Fort Dix, he went to MDC?

9    A    Yes.

10   Q    All right.

11            (Pause in the proceedings.)

12

13            MS. SEIFAN:  Okay.  I'm showing you what's been

14   marked for identification -- it's already in evidence as

15   Government's Exhibit 178.

16            (The above-referred to Exhibit was published to the

17   jury.)

18   Q    What are we looking at here?

19   A    It's a Telephone Number Request form for Inmate Charles

20   Carneglia.

21   Q    Okay.  Can you, let's talk about what does the

22   "add/delete" mean?

23   A    That means either he's adding the number or deleting a

24   number off his phone list.

25   Q    Okay.  So, let's take the third line.

1           The "A" stands for add?

2   A    Add.  He's adding a number.

3   Q    And whose number is he adding?

4   A    J. Cavallo.

5   Q    Okay.  And who filled out these documents?

6   A    The inmate himself.

7   Q    The inmate himself fills out these documents?

8   A    Yes.

9   Q    So, he's asking the prison to add these people to his

10  telephone list?

11  A    Yes.

12  Q    So, the person he's asking to add to his telephone list

13  is a guy named -- is a friend, J. Cavallo?

14  A    Yes.

15  Q    And what's the phone number for J. Cavallo?

16  A    Area code (516) 334-3446.

17  Q    And then, the inmate also puts down the person's address?

18  A    Yes.  A listed address of 736 Pleasant Avenue, Westbury,

19  New York, 11590.

20  Q    Okay.  And this document was, is from what prison?

21  A    This document is from FCI Cumberland.

22  Q    Okay.  And what is it, what's, what is the date on this

23  document?

24  A    It looks like the date/time stamp on here is

25  January 23rd, 2002.

1    Q    So, the time stamp is when the prison received that

2    document?

3    A    Yes.

4    Q    Okay.

5              MS. SEIFAN:  Okay.  I'm showing you the first page

6    of Government's Exhibit 180.

7              (The above-referred to Exhibit was published to the

8    jury.)

9    Q    What are we looking at in this -- what is this document?

10   A    This is a Visitor Form for Inmate Charles Carneglia.

11   Q    Okay.  And who fills out this document?

12   A    The prospective visitor.  The person that wants to visit

13   the inmate.

14   Q    And who is the prospective visitor on this document?

15   A    John Cavallo.

16   Q    So, John Cavallo is the person who filled this out?

17   A    Yes.

18   Q    And what is John Cavallo's date of birth?

19   A    The date of birth is 5/26/48.

20   Q    And his telephone number?

21   A    Listed as, excuse me.

22             The listed telephone number is (516) 334-3446.

23   Q    Is this the same person that the inmate, Charles

24   Carneglia, wanted to add to his telephone call list?

25   A    Yes.

 1  Q    Okay.  And this number at the top, 08773-016, what is
 2  that?
 3  A    That's the inmate's register number.
 4  Q    And what prison is that document related to?
 5  A    Oh, excuse me.  FCI Cumberland.
 6  Q    Okay.  So, this is Mr. Cavallo requesting to visit inmate
 7  Charles Carneglia?
 8  A    Yes.
 9  Q    Okay.  And does this document have a date on it?
10  A    It's going to be on the corner.
11       MS. SEIFAN:  Okay, let me just...
12  Q    Can you see the date at all?
13  A    No, I don't.
14  Q    Okay.
15  A    There's -- excuse me.
16       There's a date up here.  The NCIC was supposedly
17  conducted on 4/30 -- I can't read if that's '02 or '04.
18  Q    What does NCIC mean?
19  A    NCIC stands for National Crime Information Center.  It's
20  a database that utilizes diverse law enforcement agencies to
21  query the information as far as an individual or property.
22  Q    Okay.  Now, when an individual seeks to be put on a
23  visitor list of an inmate, is a criminal background check run
24  on that person?
25  A    Yes.

1   Q    And that's the NCIC check?

2   A    Yes.

3   Q    And is that run for every single person who wants to

4   visit --

5   A    Yes.

6   Q    -- an inmate?

7   A    Yes.

8   Q    And what's the purpose of doing that?

9   A    To ascertain if the individual has a criminal record.

10  Q    Okay.  And if they have a criminal record, are they

11  permitted to...

12          What happens if it comes back and the person does

13  have a criminal record?

14  A    The warden has final approval authority as far as

15  allowing the visitor to come to the institution.  Sometimes

16  they basically, you take the severity of the charge, the

17  frequency and how recent was it.

18  Q    Okay.  So, the second page of Government's Exhibit 180

19  was an NCIC check?

20          (The above-referred to Exhibit was published to the

21  jury.)

22  A    Yes.

23  Q    Okay.  And what was the date this check was run?

24  A    Looks like the date on it is 4/30/2002, at approximately

25  2:13 p.m.

1    Q    Okay.  And when is the NCIC check done?  How soon after a

2    visitor form is submitted is an NCIC check done?

3    A    Normally, the procedure is, the inmate sends the visitor

4    form to the prospective visitor.  The prospective visitor

5    fills out the form, sends it back to the institution to the

6    counselor that's designated to the inmate and then, the

7    counselor runs the NCIC check.  It could be days, it could be

8    weeks.

9    Q    Okay.  But is it fair to say probably at the most, a

10   couple of weeks after the visiting form is submitted?

11   A    Yes.

12   Q    So, on this page, on the first page of Government's

13   Exhibit 180, there's no date on the form.

14        But is it fair to say, because the NCIC was run on

15   4/30/02, it was probably the document was not submitted more

16   than a few weeks before?

17            MS. SHARKEY:  Objection; "probably."

18            THE COURT:  I'll allow it.

19   A    Probably.

20            MS. SEIFAN:  Okay.  Let's turn back to this document

21   for a second.

22            THE COURT:  What document have you put on?

23            MS. SEIFAN:  I'm sorry, the first page of

24   Government's Exhibit 180.

25            (The above-referred to Exhibit was published to the

1  jury.)

2  Q    So, what other information does a prospective visitor

3  have to fill out other than their name, their date of birth,

4  their address, their telephone number, their race and their

5  sex?

6  A    Prime example, Section 6:  "Are you a U.S. citizen?"

7        Section 7:  "Relationship to the above-named

8  inmate."

9        Number 8, which is the desire to visit him or her.

10       Section 9:  "Did you know this person prior to his

11  or her current incarceration?"

12       Number 10:  "Indicate the length of time you have

13  known this person and where the relationship developed."

14       Number 11 --

15  Q    So, I'm sorry.  So, on number ten, Mr. Cavallo is

16  indicating that he knows the inmate, Charles Carneglia, since

17  child hood.

18       It says:  "Since childhood, parents were good

19  friends."

20  A    Yes.

21  Q    Okay.

22  A    Number 11 says:  "Have you ever been convicted of a

23  crime?"  It stated:  "No."

24       12:  "Are you currently on probation, parole or any

25  kind of supervision?"  He responded:  "No."

1          Section 13:  "Do you correspond or visit with other

2  inmates?"  "Yes."  And he indicates Gene Gotti and an address

3  of Bradford, Pennsylvania.

4  Q    So, indicating that Gene Gotti, he visits another inmate

5  in the prison system?

6  A    Yes.

7  Q    All right.  And then, that person, the prospective

8  visitor, is required to sign the document?

9  A    Yes.

10 Q    Okay.

11         MS. SEIFAN:  Maybe we'll just, I'll show you the

12 first page of Government's Exhibit 191.

13         (The above-referred to Exhibit was published to the

14 jury.)

15 Q    Again, this is for inmate -- what inmate is this?

16 A    Charles Carneglia.

17 Q    Okay.  Who's the person who's asking to visit him?

18 A    Jodi Ryan.

19 Q    Okay.  And what prison is this?

20 A    FCI Cumberland.

21 Q    What's the date?

22 A    April 2nd, 2002.

23 Q    And this number again at the top, 08773-016?

24 A    Is inmate Charles Carneglia's register number.

25 Q    And do they stay with the same register number?

1    A    Yes.

2    Q    The telephone number for Ms. Ryan is what?

3    A    Area code (718) 845-4862.

4    Q    Okay.  And how did this person meet him?  Do you know

5    that?

6    A    Based on Section 10, "indicate the length of time you've

7    known this person and the relationship developed," it says:

8    "Four to five years, met him through a friend."

9    Q    Okay.

10

11                (Continued on following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  DIRECT EXAMINATION

2  BY MS. SEIFAN: (Cont'd)

3  Q    The first page of Exhibit 191, the document, dated April

4  2, 2002?

5  A    Yes.

6  Q    You said when a visitor comes -- applies to see an

7  inmate, a NCIC check is made?

8  A    Yes.

9  Q    The second page of Government Exhibit 191 indicates that

10  the NCIC check was run when?

11  A    April 19, 2002.

12  Q    The document dated April 2, 2002, the NCIC check is

13  dated April 19, 2002?

14  A    Yes.

15  Q    Pretty close in time?

16  A    Approximately, two weeks.

17  Q    Within two weeks this check was done for this

18  prospective visitor of Jodi Ryan?

19  A    Yes.

20  Q    The next document is Government Exhibit 182.  Again, who

21  is requesting to visit Charles Carneglia?

22  A    Allen Meshanski.

23  Q    Where is he requesting, what prison?

24  A    FCI Cumberland.

25  Q    And Mr. Meshanski did not provide a telephone number?

1  A    No phone.

2  Q    He provided an address?

3  A    149-42 83rd Street, Howard Beach, New York 11414.

4  Q    What's his relationship to the inmate?

5  A    Friend.

6  Q    Indicated he knew him through--?

7  A    Seems 44 years from neighborhood -- four years from the

8  neighborhood.

9  Q    Showing you the second page of Exhibit 182. This is the

10 NCIC check for Allen Meshanski?

11 A    Yes.

12 Q    What is the date?

13 A    3/15/02.

14 Q    Fair to say that this check was run within a few weeks

15 of this person requesting a visit with Charles Carneglia?

16 A    Probably.

17 Q    When you say "probably"?

18 A    Estimated time from when counsel receives -- the person

19 fills it out to the time that counsel receives it, looking at

20 a couple of weeks time frame.

21 Q    Not like a year?

22 A    No.

23 Q    Three weeks at the most?

24 A    Yes.

25 Q    Showing you Government Exhibit 179. I will show you the

1  bottom for a second.  You see the institution?

2  A    Yes.

3  Q    Fort Dix?

4  A    Yes, FCI Fort Dix.

5  Q    What does FCI mean?

6  A    Federal Correctional Institution. This is an inmate

7  approved visitors' list, inmate Charles Carneglia.

8  Q    Who is the first visitor?

9  A    John Cavallo, listed address 736 Pleasant Avenue,

10  Westbury, New York 11590.

11  Q    The telephone number?

12  A    (516) 334-3446.

13  Q    This person said approved, what does that mean?

14  A    Approval date.

15  Q    For what?

16  A    FCI Fort Dix approved to be on the visitor's list.

17  Q    The third row?

18  A    Allen Meshanski, 149-42 83rd Street, Howard Beach, New

19  York 11414, listed phone number (718) 845-4862.

20  Q    This number (718) 845-4862, do you recall this being the

21  number that Jodi Ryan put down on the visitors' form?

22  A    Yes.

23  Q    The number for Allen Meshanski is  (718) 845-4862?

24  A    Yes.

25  Q    Going back to Jodi Ryan's visitor's request?

1   A    (718) 845-4862.

2   Q    Jodi Ryan, on a different document, and Allen Meshanski

3   put down the same telephone number?

4   A    Yes.

5   Q    That's the same Allen Meshanski indicated on this other

6   document that he had no phone?

7   A    Yes.

8   Q    Allen Meshanski is approved on what date?

9   A    May 17, 2004.

10  Q    And the address that he gives?

11  A    149-42 83rd Street, Howard Beach, New York.

12  Q    Going to the fourth line, Jodi Ryan?

13  A    She has listed the address of 150-05 95th Street, Ozone

14  Park, New York 11417.

15  Q    Does she have a phone number listed?

16  A    No.

17  Q    What does that mean if there is no phone?

18  A    There is no phone, no phone.

19  Q    The visitor did not provide a phone?

20  A    Probably.

21  Q    The approved -- when was she approved?

22  A    September 15, 2004.

23  Q    The next one Government Exhibit 181.  What is this

24  document?

25  A    Inmate visitor information form, inmate Charles

1  Carneglia.

2  Q    Who is requesting a visit?

3  A    Thomas Cacciopoli, C A C C I O P O L I.

4  Q    Does this document indicate how Mr. Cacciopoli knows

5  Charles Carneglia?

6  A    He indicates he knows the individual for about 40 years

7  from the same area.

8  Q    In question eleven it says have you ever been convicted

9  of a crime?

10 A    He indicates, no.

11 Q    This is -- does this document have a date on it

12 anywhere?

13 A    No.

14 Q    Not in the right-hand corner?

15 A    No.

16 Q    I will show you the second page of Government Exhibit

17 181.  When was the NCIC check run?

18 A    On November 23, 2004.

19 Q    Fair to say that Mr. Cacciopoli submitted this document,

20 you know, within a few weeks -- at the latest a few weeks

21 before November '04?

22 A    Yes.

23 Q    And again, who fills -- let me show the first page.  Who

24 fills out the document?

25 A    Thomas Cacciopoli.

1  Q    He indicated he was never convicted of a crime?

2  A    Yes.

3  Q    Did the NCIC report come back as showing that he had?

4  A    Yes, it was called a positive hit.  Based on the NCIC

5  check conducted there was an arrest that was done --

6  conducted April 11, 1969.  Looks like the arresting agency is

7  the New York City Police Department, the 75th, and he was

8  arrested for promoting gambling and possession of gambling

9  records.

10  Q    We don't have to go through every single -- there are

11  other arrests and convictions listed on the document?

12  A    Yes.

13  Q    What happens when an inmate -- what happens when a

14  visitor, prospective visitor, indicates that they were never

15  convicted of a crime but a check is done and it shows that he

16  has?

17  A    The person is providing false information on the form.

18  Q    It's fair to say that this person provided false

19  information on the inmate visitors form?

20  A    Yes.

21  Q    To remind the jury, how do these prospective visitors

22  get the forms?

23  A    They are mailed by the inmate themselves.

24  Q    The inmate sends them out to people who he would like to

25  visit him?

1      MS. SHARKEY:  Objection as to form.

2    Q    How do prospective visitors get these forms?

3    A    The inmate sends it to the prospective visitor, the

4    prospective visitor fills it out and sends it back to the

5    institution.

6    Q    I will show you Government Exhibit 183.  Again this is a

7    visitor request form for Charles Carneglia?

8    A    Yes.

9    Q    Who is the visitor?

10   A    Allen Meshanski.

11   Q    What institution is this person requesting a visit?

12   A    FCI Fort Dix.

13   Q    What is the phone number --

14   A    (718) 845-4862.

15   Q     -- of Allen Meshanski.

16   Q    The next document is Government Exhibit 187.  What is

17   this?

18   A    Inmate visitor form.

19   Q    For whom?

20   A    Charles Carneglia.

21   Q    Who is requesting the visit?

22   A    William Victor.

23   Q    How does William Victor know Charles Carneglia?

24   A    Apparently --

25        MS. SHARKEY:  Objection.

1  Q   What does the document say as to how William Victor

2  knows Charles Carneglia?

3  A   Section ten, the length of time, he responded 35 to 40

4  years.

5  Q   Look at question eleven again.  Have you ever been

6  convicted of a crime?

7  A   He stated, no.

8  Q   Is there a date on this document?

9  A   Not on the form.

10  Q   I will show you the second page of Government Exhibit

11  187, the NCIC check?

12  A   Yes.

13  Q   When was this conducted?

14  A   May 18, 2005.

15  Q   May 18, 2005. It's fair to say although the first page

16  of Government Exhibit 187 is not dated, it was submitted

17  within a few weeks of May 18, 2005?

18  A   Yes.

19       MS. SHARKEY:  Objection.

20       THE COURT:  I'll allow it.

21  Q   And Mr. Victor indicated that he had not been convicted

22  of a crime.  Does the NCIC check show differently?

23  A   Yes.

24  Q   Is it fair to say that Mr. Victor lied on this form

25  submitted to the Bureau of Prisons?

1    A    Yes.

2    Q    I will now show you Government Exhibit 184.  What are we

3    looking at?

4    A    This is a commissary record for inmate Charles

5    Carneglia.

6    Q    What is commissary?

7    A    It's basically the inmate's account that he uses for

8    phone calls and purchase commissary items, toiletries, food

9    stuff, sweat pants.

10   Q    How do they get money?

11   A    They receive it through Western Union, which is done

12   through Western Union or through money orders.

13   Q    Let's start at the top.

14        MS. SHARKEY:  What exhibit is that?

15        MS. SEIFAN:  184.  I think it's easier.

16   Q    I will show you what is marked for identification

17   Government Exhibit 184 A.  Do you recognize this?

18   A    Yes.

19   Q    What is it?

20   A    Commissary records for inmate Charles Carneglia.

21   Q    Is this a fair and accurate reproduction of Government

22   Exhibit 184

23   A    Yes.

24        MS. SEIFAN:  Move to admit.

25        THE COURT:  Admitted.

1    Q    Why don't we start at the top.  What is True View?

2    A    This information is gotten from the program.

3    Q    Transaction date is indicates what?

4    A    The date the money was transferred to the inmate's

5    account.

6    Q    And the time of?

7    A    The time the transaction was made, the location-- the

8    location where the inmate is housed at the time that the

9    transaction is made.

10   Q    BRO stands for?

11   A    Brooklyn.

12   Q    The Metropolitan Detention Center, which is the federal

13   prison in Brooklyn?

14   A    Yes.

15   Q    And the transaction time?

16   A    Western Union.

17   Q    Lock box what does that mean?

18   A    The money order sent to the account.

19   Q    After that it says the amount, that is the amount the

20   inmate received?

21   A    Yes.

22   Q    The sender's last name?

23   A    Yes.

24   Q    First name?

25   A    Yes.

1  Q    The address of the sender and phone number?

2  A    Yes.

3  Q    If we're looking at 10/24/08, at 12:10 p.m. Western

4  Union, who is the sender?

5  A    Jackie Cavallo.

6  Q    And he sent?

7  A    Approximately $200.

8  Q    The phone number?

9  A    516, 334-3446.

10  Q    Let's go to 8/31/08.

11  A    It was Western Union transaction for $100 by the same

12  individual Jackie Cavallo.

13  Q    And we go to July 3rd through eight?

14  A    Western Union transaction $200 from Jackie Cavallo.

15  Q    6/20/08?

16  A    That was $200 transaction, Western Union from Augustus

17  Sclafani.

18  Q    It's not highlighted, there is a Ryan they're, 6/12/08?

19  A    Approximately 5:08.  Western Union transaction for the

20  amount of $1,000 from Jodi Ryan.

21  Q    And she indicates (718) 854-4862?

22  A    Yes.

23  Q    The next person after that, 6/10/08?

24  A    At 11:11 a.m. Western Union transaction was completed

25  for the amount of $200 from Allen Meshansky, (718) 845-4862.

1  A     Yes.

2  Q     That is the same number that Jodi Ryan had provided for

3  the thousand dollars?

4  A     Yes.

5  Q     Let's look at the next section, February 13, at

6  approximately 12:09?

7  A     Western Union transaction in the amount of $300 by Allen

8  Meshanski.

9  Q     Looking under that, it indicates, FTD payroll dash IPP

10 for FTD lock box CD?

11 A     Yes.

12 Q     I think.  You testified that the locked box CD is a

13 money order?

14 A     Yes.

15 Q     When an inmate receives a money order the person doesn't

16 put down the name, who is sending it, you don't know?

17 A     Exactly.

18 Q     Fair to say here it says $700 Carneglia yeah.  What does

19 that mean?

20 A     The individual might have wrote the last name.

21 Q     Who?

22 A     Whoever sent the money order.

23 Q     Let's go back.  Showing you government 203.  What is

24 that?

25 A     This is the approved telephone list for Charles

1 Carneglia.

2 Q    When you request numbers to be put on your phone list,

3 do you have to indicate who you are calling?

4 A    Normally the new procedures when the inmates fills out a

5 telephone number request form, it's a scanable form,

6 previously, years ago, they used to use a handwritten form,

7 which we seen before, but the problem is some inmates wanted

8 to, how you say it -- they weren't too keen in what they

9 wrote down.

10 Q    What does that mean?

11    MS. SHARKEY:  Objection?

12    THE COURT:  Sustained.

13 A    The inmates -- I don't want to say they were illiterate,

14 they couldn't spell names and the handwriting was real poor,

15 sometimes it was hard to translate the information from the

16 telephone request form to the actual computer, the BOP

17 started a form, which the inmate can fill out the ovals and

18 the category of relationships, attorney, friend, parent,

19 sibling.

20 Q    What are the categories?

21 A    This form says attorney, friend, parent, and other cases

22 you could put down sibling.

23 Q    And the numbers in the first column are the numbers that

24 they requested, that Charles Carneglia has indicated that he

25 would like to call?

1   A    Yes.

2   Q    And this is for what prison?

3   A    MDC Brooklyn.

4        MS. SEIFAN:  I don't know if the jury wants to take a

5   break. Do you wish to take a break?  Some of the jurors wish

6   a break.

7            THE COURT:  We will take one.

8            (Jury leaves courtroom.)

9            (Recess taken.)

10

11           THE COURT:  Bring the jury in.

12           (Jury present.)

13  BY MS. SEIFAN:  (Continued)

14  Q    You testified earlier that the MDC or the Metropolitan

15  Detention Center, the prison in Brooklyn, records telephone

16  calls of inmates?

17  A    Yes.

18  Q    Are there times during the course of your duties that

19  you are required to respond to subpoenas or inmate telephone

20  recordings?

21  A    Yes.

22  Q    Are you responsible for retrieving those calls and

23  submitting them to whoever requested them?

24  A    Yes.

25  Q    Were you requested to do that for the inmate Charles

1    Carneglia?

2    A    Yes.

3    Q    I'm going to show you what has been marked for

4    identification as Government Exhibit 202-A and Government

5    Exhibit 230.  Take a look at Government Exhibit 202-A first?

6    A    Yes.

7    Q    Do you recognize that document?

8    A    Yes.

9    Q    What do you recognize it to be?

10   A    It's a call record for inmate Charles Carneglia.

11   Q    What is the date range of the records?

12   A    From 2/14/08 through November 3, 2008.

13   Q    Are those documents kept in the ordinary course of

14   business?

15   A    Yes.

16         MS. SEIFAN:  I move to admit Government Exhibit

17   202-A.

18         THE COURT:  Just 202-A?

19         MS. SEIFAN:  Yes.

20   Q    I showed you a CD labeled Government Exhibit 230?

21   A    Yes.

22   Q    Do you recognize that CD?

23   A    Yes.

24   Q    What does it contain?

25   A    Contains phone conversations of inmate Charles

1  Carneglia.

2  Q    Did you listen to the CD?

3  A    Yes.

4  Q    You said that is a copy?

5  A    Yes.

6  Q    Of the original recordings that you provided to the

7  government?

8  A    Yes.

9  Q    Only certain calls?

10  A    Yes.

11  Q    Is it a fair and accurate copy of the original

12  recordings?

13  A    Yes.

14  Q    Have you compared those calls to the original -- those

15  calls to the one on the original CD that you produced to the

16  government in response to the subpoena?

17  A    Yes.

18       MS. SEIFAN:  We move to admit Government Exhibit 230.

19       THE COURT:  Exhibits 202-A and 230 are admitted  the

20  transcripts 230 T 1 through 11.

21       MS. SEIFAN:  I'm about to show him those.

22  Q    That CD, you know you listened to it because your

23  initials are on it?

24  A    Yes, and the date.

25  Q    I show you 230 T-1 to 230 T-2, 3, 5, 6, 7, 8, 9 and 10?

1   A    Yes.

2   Q    Take a look at these.

3        (Shown to witness.)

4            Do you recognize the transcripts.

5   A    Yes.

6   Q    How do you recognize them?

7   A    It has my initials and the date that I transcribed these

8   calls.

9   Q    Did you review these transcripts while listening to

10  Government Exhibit 230?

11  A    Yes.

12  Q    Are these transcripts fair and accurate transcripts of

13  the certain portions of the calls on Government Exhibit 230.

14  A    Yes.

15       MS. SEIFAN:  Your Honor we move to admit them as an aid

16  to the jury.

17           THE COURT:  Yes.

18           MS. SEIFAN:  Permission to publish?

19           THE COURT:  Yes.

20           MS. SEIFAN:  You can look into your binders now.

21  Q    The first call we play dated February 14, 2008, at 1:31

22  p.m. between Charles Carneglia and Jodi.  We will start the

23  excerpt at 10:24.

24       (Tape played.)

25  Q    Are the inmates aware that the telephone calls are

1   recorded?

2   A    Yes.

3   Q    How could they know that?

4   A    Upon entrance to MDC they fill form 407, it's an

5   acknowledgment that the inmates know that their phone calls

6   are monitored at the MDC.

7   Q    Are there signs in the unit that let inmates know their

8   calls are being recorded?

9   A    On most phone stations they have a sign in English and

10  Spanish that the phone calls are monitored.

11  Q    In your experience, do you think inmates try to mask

12  what they are talking about when they are on the telephone?

13  A    Yes.

14  Q    Do they often speak in code when they are on the

15  telephone?

16  A    Yes.

17       MS. SHARKEY:  Objection.

18            THE COURT:  I'll allow it.

19            MS. SEIFAN:  We will play the next call. Government

20  Exhibit 230 T-2.  February 14, 2008 at 3:05 p.m., Charles

21  Carneglia and Allen Meshanski.

22            (Tape played.)

23  Q    What does it mean to be in the hole?

24  A    Inmates refer to the hole as special housing unit.

25  Q    What kind of housing unit?

1   A    It's used for PC, protective custody or inmates facing

2   disciplinary sanction for some type of infraction.

3   Q    I will now play --

4        THE COURT:  Have him describe it, the jury will

5   believe it's a big hole in the ground. Tell them what it is.

6   A    It's basically a unit that is contained in what they

7   call two ranks, rank one and two, each has 30 to 40 cells,

8   two man cells and the individuals that are in the cells are

9   in the cells 23 hours a day and one hour for rec time.  No

10  access to TV, they do have the option of having a radio but

11  as far as contact if they were in a dormitory setting or a

12  sublock setting they don't have.

13       THE COURT:  What is the, approximate, size?

14       THE WITNESS:  The federal regulations, six by eight

15  by eight.

16  Q    Do inmates have access to telephone calls in the hole?

17  A    Yes.

18  Q    They do?

19  A    Yes.

20  Q    We will now play the call February 14, 2008, 7:17 p.m.

21  transcript Government Exhibit 330 T-3, call between Charles

22  Carneglia, Allen Meshanski and Jodi.

23       (Tape played.)

24       (Followed on next page.)

25

1  DIRECT EXAMINATION

2  BY MS. SEIFAN:  (Continued)

3          (Audio played for jury.)

4

5          MS. SEIFAN:  The excerpt stopped at four minutes and

6  12 seconds.

7          And we're going to pick up again at ten minutes and

8  30 seconds.

9          (Audio played for jury.)

10

11          MS. SEIFAN:  The excerpt ended at ten minutes

12  58 seconds.

13          Okay.  Now, we're going to move to March 7th, 2008.

14  1:02 p.m.  It's a call between Charles Carneglia and Jackie

15  Cavallo.  The transcript is Government's Exhibit 230T-5.  It's

16  going to start at one minute and 17 seconds.

17          (Audio played for jury.)

18

19  Q    Mr. Obando, just to remind the jury, there's a sign next

20  to the telephone when an inmate is making a call that says

21  it's being monitored?

22  A    Yes.

23  Q    Okay.

24          MS. SEIFAN:  Turning to March 7th, 2008, 7:21 p.m.,

25  Charles Carneglia and Bruno.  Government's Exhibit 230T-6 is

1    the transcript.  Starting at one minute, 57 seconds.

2         I think in your binder, just for the jury, I think

3    pages two and one are flipped.

4         MS. SHARKEY:  I'm sorry?

5         MS. SEIFAN:  I think in the binders page two comes

6    before page one.  At least in my binder.  No?  I'm sorry, in

7    my binder it was.  Okay.

8         The first excerpt begins at 1:57 and ends at 2:10.

9         (Audio played for jury.)

10

11        MS. SEIFAN:  The next excerpt starts at two minutes,

12   43 seconds and ends at three minutes and 17 seconds.

13        (Audio played for jury.)

14

15        MS. SEIFAN:  The next call is April 4th, 2008, at

16   8:34 p.m., between Charles Carneglia and Brian.  It's

17   Government's Exhibit 230T-7.  That's the transcript.

18        The call is going to begin at seven minutes and

19   35 seconds and end at eight minutes and 21 seconds.

20        (Audio played for jury.)

21

22        MS. SEIFAN:  The next excerpt is going to begin at

23   ten minutes and 20 seconds and end at ten minutes, 36 seconds.

24        (Audio played for jury.)

25

1          MS. SEIFAN:  The next call, April 8th, 2008,

2   5:46 p.m., Charles Carneglia and Jackie Cavallo.

3          The transcript is Government's Exhibit 230T-8.

4          (Audio played for jury.)

5

6          THE COURT:  All right, we'll continue tomorrow.

7          MS. SEIFAN:  Your Honor, we have two calls left.

8   One is a few seconds and one is five minutes.

9          THE COURT:  Do the jurors want to wait?

10         THE JURY:  Yes.

11         THE COURT:  All right.  Finish the five minutes.

12         MS. SEIFAN:  Just one question for Mr. Obando.

13  Q    Is there a Federal prison near an airport?

14  A    No.

15  Q    No?

16  A    No.  Actually, there's what you call the GAO, which is a

17  private facility in Jamaica, Queens.

18  Q    All right.

19         MS. SEIFAN:  Let's turn to April 1st, 2008,

20  6:11 p.m., the Charles and Allen Meshanski transcript,

21  Government's Exhibit 230T-9.

22         The excerpt begins at 2:29 and ends at 2:48.

23         (Audio played for jury.)

24

25         MS. SEIFAN:  Okay.  The next call is May 25th, 2008,

1  9:10 a.m., Charles Carneglia and Jackie Cavallo.  The

2  transcript is 230T-10.

3          I'm going to start the excerpt at one minute and six

4  seconds.  This is the last call we're going to play today.

5

6          (Continued on following page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good night everybody.  9:30, please.

2          (Jury leaves courtroom.)

3          THE COURT:  Thank you. You may step down.

4          Any other witness?

5          MR. BURLINGAME:  We may have one two minute witness,

6    but it's doubtful.  This is probably the last witness.

7          THE COURT:  This is the end of your case.

8          MR. BURLINGAME:  Yes.

9          THE COURT:  Make your motions.

10         MR. BURLINGAME:  It wouldn't effect the motions.

11         MS. SHARKEY:  We'd like to make a motion.

12         THE COURT:  Make it.

13         MS. SHARKEY:  Judge, we're moving for a judgment of

14   acquittal.

15         I specifically want to talk about a couple of counts

16   and the first count I would like to reference is Racketeering

17   Act Nine, the extortion of John Doe Number Three, who has

18   subsequently been identified.  When the Court directed the

19   government to identify who the victims were as Bobby

20   Chiavo.

21         In Racketeering Act Nine, your Honor, the government

22   charges Mr. Carneglia with extortion, lasting, approximately,

23   14 years.

24         Respectfully, the government has elicited nothing,

25   nothing on those charges. We did a transcript search on this

1    individual and his name came up at two or three places.

2    There was nothing concerning an extortion.  He was viewed

3    during the course of Kevin McMahon's testimony in a video

4    that was taken in the Hamptons when it was testified by

5    McMahon that John Carneglia was going away to jail.

6              During the course of Peter Socarro's testimony on

7    February 3rd, of 2009, at page 859, there was Q and A

8    concerning whether or not Sicarro stole cars for the

9    defendant.

10             "Did you do it alone or with other people?  With

11   other people.

12             "Did you steal cars for other people in addition to

13   the defendant.  Yes.  Sicarro, D'Gino and Bobby Ciaffa.  Who

14   is Bobby Ciaffa?  He's a close friend of Charles and John's.

15             "QUESTION:  Did he have a position in the Gambino

16   family?

17             "ANSWER:  I would say he was an associate

18             "QUESTION:  Did he have a relationship with any

19   organized crime family?

20             "Later in life he married Frank Vergenti's daughter

21   who was an associate of the Genovese."

22             Nothing about a 15 year extortion.

23             The next portion of testimony that deals with Mr.

24   Chiavo is an identification of ahead shot by Sicarro.  Agent

25   Haggerty, is asked about Bobby Chiavo.

1          THE COURT:  Go ahead.

2          MS. SHARKEY:  Agent Haggerty is asked about Bobby

3    Chiavo.

4          "QUESTION:  Was he part of your investigation?

5          "ANSWER:  No, the name did not jump out at me at

6    that time at all.

7          That's at page 2497 on February 17.

8          On February 17 --

9          THE COURT:  Go ahead.

10         MS. SHARKEY:  Judge, on February 17th Kevin McMahon

11   testified about the video in which Bobby Chiavo appeared on

12   the deck of the home rented by John Carneglia.

13         "QUESTION:  Do you know who John Carneglia's friends

14   were?

15         "ANSWER:  He gives a list names.

16         At page 2555 and he says John Carneglia friends

17   included Bobby Chiavo.

18         "QUESTION:  He was a friend of John Carneglia?

19         "ANSWER:  Yes.

20         "QUESTION:  Did John Carneglia ever do any favors

21   for Chiavo?

22         "ANSWER:  John Carneglia did favors for Chiavo.

23   Somebody was looking to kill Chiavo, John Carneglia took care

24   of it.

25         "QUESTION:  Do you know if Chiavo was every

1  arrested?

2       "ANSWER:  Yeah, I was in court in Nassau on a car

3  case and I saw Chiavo had a trial going on.

4       Mr. McMahon I identifies a head shot of Bobby

5  Chiavo.

6       He identifies in a video.

7       Judge, that is the extent of the testimony on

8  Racketeering Act Nine where Bobby Chiavo appears in the

9  testimony.  There is absolutely no testimony to support the

10  count and based on -- it was also pointed out to me there is

11  a John Carneglia jail call to Charles Carneglia on January

12  15th of 2007 where John Carneglia asks if Bobby comes around

13  for Christmas.  That is it.

14       There is absolutely nothing in the record to support

15  a 15 year extortion and the defense respectfully requests

16  that the Court dismiss that count on defendant's motion.

17       THE COURT:  Denied.

18       MR. FARBER:  I ask the Court if we overlooked

19  something that is in the record.

20       THE COURT:  I think there is enough there in terms

21  of his total work for the conspiracy so that the jury could

22  infer guilt on that count.

23       MR. FARBER:  The government is required to establish

24  that Mr. Chiavo paid money out of fear.  There is nothing in

25  the record establishing this man made any payments out of

1  fear.

2      MS. SHARKEY:  Or made any payment at all or did

3  anything in furtherance of the conspiracy.

4      THE COURT:  What's the government's view?

5      MR. BURLINGAME:  Judge, on Bobby Chiavo briefly is

6  Kevin McMahon testified that John Carneglia took care of a

7  problem, somebody was trying to kill him and he became an

8  associate of John Carneglia, an associate of John and Charles

9  Carneglia.

10      Multiple witnesses testified when John Carneglia

11  went to prison his associate started reporting to Charles

12  Carneglia, a lot of testimony about Christmas money, the

13  associates have to pay up to made men that they are under and

14  the 2007 phone call again the defendant and his brother in.

15  Which the defendant's brother says, did Bobby Chiavo see you

16  and he says he usually sees me for Christmas.

17      Sees me for Christmas means paying the extortion

18  money at Christmas.  That is the essentials of the count.

19      MS. SHARKEY:  That is certainly more than a leap of

20  faith.

21      THE COURT:  Excuse me.

22      You can brief it. At the moment I'm denying it.

23      MR. FARBER:  We will be.  I don't think the Court is

24  prepared to go much further today in terms of actually

25  dismissing counts.  I would like to set forth on the record

1   the basis which I think ultimately a Rule 29 should be

2   granted, should the jury come back -- after the jury comes

3   back with a verdict.

4          With regard to Racketeering Act Number One, the

5   murder of Officer Gelb, I would submit to the Court that

6   there has been no evidence to establish that particular crime

7   was done in furtherance of the criminal enterprise.  There

8   may be circumstantial evidence or evidence construed to point

9   to Mr. Carneglia having a motive.

10         At most, and I submit I'm not granting that, there

11  is nothing to show that murder murdered the enterprise, there

12  was testimony in the record a murder of a law enforcement

13  agent is something the crime family disapproved of and tried

14  to avoid.

15         Similarly, with regard to the murder of Michael

16  Corteo. Aagain it was a brawl brought out spontaneously, a

17  fight over a girl at the Blue Fountain Diner.

18         There is nothing in the record to establish that

19  that further advanced the criminal enterprise. The same thing

20  with the death of Salvatore Puma. If you take it on face

21  value it's a dispute between Mr. Carneglia and Mr. Puma and

22  not to advance the criminal enterprise.

23         There is no evidence to establish that Mr. Carneglia

24  was involved in the securities fraud charge in this

25  particular case. The evidence against him with regard to both

1   the Sears and Papa Varo robberies, I submit, is insufficient

2   for the case to be moved forward to the jury.

3        The Green Tree counts again are insufficient.

4   Nothing more than a dispute between shareholders and the

5   condominium board and indeed if there was some sort of

6   malfeasance there is nothing to connect Mr. Carneglia to the

7   board other than the fact that he happened to know Joe

8   Panzarella.  There is nothing to show that he benefited or

9   took part in the scheme.

10       The government is asking the jury to judge from the

11  realm of speculation and that is not permissible.

12       MS. SHARKEY:  If I can chime in.  There was no

13  evidence of an extortion.  Both witnesses who testified for

14  the government Marrow and Crowely said they were assessed

15  fees.  Crowley concluded his stay at Green Tree with paying a

16  water bill that was due. He never said that he was in fear.

17  Marrow simply said that although he paid, I believe, $32,000,

18  there was no evidence of any extortion.  He never testified

19  that he was in fear --

20       THE COURT:  He was shaking on the witness stand.

21  These people were terrorized.  Their stake in the Green Tree

22  was put the risk so that they couldn't sell.  To people of

23  modest means that is devastating.

24       MS. SHARKEY:  Respectfully, Judge, I don't think

25  that is what the testimony bore out.

1          THE COURT:  I disagree.

2          At least at this stage you can review it when I hear

3    your case.

4          MR. FARBER:  If the Court would accept a blanket

5    Rule 29 application across the indictment.

6          THE COURT:  Racketeering Act Ten we have already

7    dealt with, have we not?

8          MR. NORRIS:  The securities fraud.

9          THE COURT:  The original act ten.

10         MR. BURLINGAME:  The extortion of the restaurant --

11         THE COURT:  Racketeering Act Ten --

12         MR. BURLINGAME:  You are talking about the counts

13   which don't involve the defendant in the original indictment.

14         MS. SHARKEY:  Those were dismissed.

15         MR. FARBER:  Racketeering Act 18-- wasn't that

16   Racketeering Act Ten?

17         MR. BURLINGAME:  I believe, it was.

18         THE COURT:  I have the indictment before me.

19         MR. BURLINGAME:  It's the ones where the defendant

20   is not named.

21         THE COURT:  Extortionate involving Vincent

22   DeCongilio and Vincent Gotti.

23         MR. BURLINGAME:  Your Honor dismissed that.

24         THE COURT:  Ten is dismissed.

25         MR. FARBER:  16 and 17 as well.

1          THE COURT:  As to 16 and 17 they are dismissed.  I'm

2     talking about the individual indictment for lack of proof and

3     Counts Five and Six of the original indictment --

4          MR. BURLINGAME:  If I might, you dealt with these

5     charges and the record is clear why your Honor got rid of

6     them.  We have introduced sufficient evidence for the counts

7     to go to the jury, if your Honor was so inclined. We

8     understand your Honor doesn't think they are relevant to the

9     case.

10          There has been evidence introduced on the counts, we

11     put the evidence in for appellate purposes, if your Honor is

12     going to dismiss the count.  We handled it pretrial and we

13     rely on the record as it is.

14          THE COURT:  For the record, I'm dismissing them,

15     they are out of the case.

16          MR. BURLINGAME:  Correct.

17          THE COURT:  I'm ruling however that the evidence

18     that came in on all of those counts would have been

19     admissible with respect to those counts, which are remaining,

20     and with respect to the racketeering acts that have remained.

21          MR. BURLINGAME:  Thank you. I misunderstood.

22          THE COURT:  The dismissal of the racketeering acts

23     and of the two individual counts, five and six, do not

24     warrant a new trial in connection with the counts that will

25     go to the jury.

1          MR. FARBER:  I believe, Racketeering Act 18 at this

2   point in time was either withdrawn by the government or being

3   dismissed by the Court.

4          THE COURT:  What are you doing with respect to that?

5          MR. BURLINGAME:  I missed that.

6          MR. FARBER:  Racketeering Act 18.

7          MR. BURLINGAME:  That, I believe, has been dismissed

8   as well.

9          THE COURT:  It's dismissed now for the record.

10         MR. FARBER:  Thank you.

11         THE COURT:  Is that record clear now?

12         MR. FARBER:  Now it's clear.

13         MR. BURLINGAME:  I would like to clarify your Honor

14  IS dismissing 10, 16 and 17 --

15         THE COURT:  And 18.

16         MR. BURLINGAME:  Wasn't based on the reasons that

17  your Honor put on the record when you made that ruling.

18         THE COURT:  And Counts Five and Six are being

19  dismissed for lack of sufficient evidence as previously

20  stated.

21         MR. BURLINGAME:  I believe, Judge, what you

22  previously ruled was that you didn't think, the Colonel of it

23  wasn't appropriate for the defendant to be -- for these

24  counts concerning other individuals for the defendant to be

25  tried on those.

1          We understand your Honor's position, we included

2     those counts for -- seeing some potential pitfalls on appeal

3     and I would ask that the record be clear we did introduce

4     evidence on those counts and I think there is sufficient

5     evidence for the count to go to the jury were they to go the

6     jury.

7          I understand they have been dismissed. I want the

8     record could be clear they are not being dismissed for

9     insufficient evidence because there was evidence produced on

10    those counts, 10, 16 and 17 that deal with the Magnolo

11    murder.

12         THE COURT:  I don't think so.

13         MR. BURLINGAME:  We had multiple witnesses testify

14    to their admissions to the murder, how they took place --

15         THE COURT:  There was no doubt the events took

16    place, but there is no connection between the defendant --

17         MR. BURLINGAME:  Correct.  We're arguing there is a

18    connection --

19         THE COURT:  There is not enough to go to the jury

20    connecting the defendant.

21         MR. BURLINGAME:  As to this defendant.  We did

22    introduce evidence as to how it's charged against the other

23    members of the conspiracy.

24         THE COURT:  That maybe so.

25         MR. BURLINGAME:  Thank you.

1       THE COURT:  Some of them were dismissed before

2  trial.  I'm reiterating now for purposes of trial unless the

3  defendant objects.

4       MS. SHARKEY:  No, your Honor.

5       THE COURT:  I think for purposes of appeal

6  clarification what is in and out of the indictment is

7  desirable as to most of these counts, which I've denied.  I

8  think there is sufficient to go to the jury.  However, after

9  I hear your case I will reconsider.

10      MS. SHARKEY:  Thank you.

11      We'll also be filing something on the racketeering

12  act concerning John Doe Bobby Chiavo prior to the defense

13  case.

14      THE COURT:  I will be happy to read any brief that

15  you have.

16      MR. BURLINGAME:  Just one other matter.  I think the

17  defense originally said their case would be a day to a day

18  and a half. I wanted to see if that is still the estimate so

19  that we can possibly revisit the decision as to the

20  summations.

21      MS. SHARKEY:  I think if we start at 9:30 and

22  depending on the length of the cross-examination we would be

23  done by close of business tomorrow.

24      THE COURT:  I can't see cross-examination.  It's

25  more argument than cross-examination.

1        You are depending primarily, as I understand it, on

2   these recordings and the one or two statements he is said to

3   have made saying that I am out of the gang.

4        MS. SHARKEY:  Right.

5        THE COURT:  Very little on that. It should go very

6   quickly. I see no reason we shouldn't finish tomorrow and sum

7   up Wednesday.

8        MR. FARBER:  Your Honor less the government is

9   anticipating a rebuttal case.

10       MR. BURLINGAME:  It would depend on what your case

11  is --

12       THE COURT:  Let's leave it open.  I'm not going to

13  press either the government or defendant with respect to

14  summations to the point where they feel uncomfortable because

15  they haven't had enough time to prepare.  It has been an

16  exceptionally complex case.

17       From a forensic point of view it's probably the most

18  complex case we've had in many years in this Court, almost

19  every aspect of evidence, five murders, more than five

20  murders actually were referred to.  Enormous amount of

21  information, the necessity of integrating a lot of the

22  details on timing on these telephone calls, on everything

23  else and rebutting is going to be terribly difficult.  If you

24  feel you are not ready on Wednesday we won't have summation

25  on Wednesday, we will go over to Thursday.  There is a

1 certain loss of momentum.  I prefer to go through.

2        MR. BURLINGAME:  I appreciate your Honor recognizing

3 that.  I think it's going to be extraordinary pressed to

4 be -- we anticipated we'd have a day to try to get things

5 together.

6        THE COURT:  I understand your problem. The case has

7 been exceptional well tried by both sides and I'm not going

8 to put you in a position where you have to flounder because

9 you have not had time to prepare.  There may be charts to

10 prepare and other materials for both sides.  If you tell me

11 tomorrow you want Wednesday off and you want to come back

12 Thursday for the summations-- can we get all summation in one

13 day?

14        MR. BURLINGAME:  I believe so.

15        MR. FARBER:  I would join in that application,

16 having a day off in between.

17        THE COURT:  I don't think that is unreasonable.

18 I'll be happy to grant it.

19        MR. BURLINGAME:  The preliminary ruling is that we

20 will sum up on Thursday.

21        THE COURT:  If that is what you want.

22        MR. BURLINGAME:  I think that is what we want.

23        THE COURT:  That's what we will do.  Then I will

24 charge. The charge will probably has a couple of hours, I

25 think, and they can deliberate the rest of Friday and come

1   back Monday.

2           MS. SHARKEY:  You're going to charge on Friday.

3           THE COURT:  Yes, I think we have to.

4           I think we ought to charge after the summation.

5           MR. FARBER:  How long is the charge, do you think?

6           THE COURT:  It is roughly one hundred pages and I

7   read at the rate of about three minutes a page, that's

8   roughly 300 minutes, that is about four hours.

9           Anything further?

10          MS. SHARKEY:  No.

11

12          (Court adjourned to 9:30 a.m. March 3, 2009.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>I N D E X</u>

2

3  <u>WITNESS</u>                                    <u>PAGE</u>

4

5       G R E G O R Y   H A G G E R T Y        4170

6    CROSS-EXAMINATION

7    BY MS. SHARKEY:                           4172

8       O L E   P E D E R S E N               4179

9    DIRECT EXAMINATION

10   BY MS. SEIFAN                             4180

11      D A R I N   B E A M                   4183

12   DIRECT EXAMINATION

13   BY MS. SEIFAN                             4183

14      S T E V E N   K A P L A N             4186

15   DIRECT EXAMINATION

16   BY MR. BURLINGAME:                        4187

17   CROSS-EXAMINATION

18   BY MR. FARBER                             4204

19   REDIRECT EXAMINATION

20   BY MR. BURLINGAME                         4214

21

22  J O S E P H   M A U R O

23   DIRECT EXAMINATION

24   BY MR. NORRIS                             4219

25

1     CROSS-EXAMINATION

2     BY MS. SHARKEY                 4222

3     L A W R E N C E   G O L D M A N     4225

4     DIRECT EXAMINATION

5     BY MR. NORRIS:                4225

6     CROSS-EXAMINATION

7     BY MS. SHARKEY:               4239

8     REDIRECT EXAMINATION

9     BY MR. NORRIS:                4244

10    RECROSS-EXAMINATION

11    BY MS. SHARKEY:               4246

12    P A U L   Q U I S E N B E R R Y   4246

13    DIRECT EXAMINATION

14    BY MR. BURLINGAME:            4247

15    CROSS-EXAMINATION

16    BY MS. SHARKEY               4268

17    REDIRECT EXAMINATION

18    BY MR. BURLINGAME            4273

19    **W A L T E R   O B A N D O**

20    DIRECT EXAMINATION

21    BY MS. SEIFAN                4280

22

23

24

25

## E X H I B I T S

230 T-12 is in evidence and 230 T-13                4167

Government Exhibit 413-S                             4178

Government Exhibit 414-S                             4179

Government Exhibit 3                                 4179

Government Exhibit 27 into evidence                 4183

Exhibit 415.                                        4186

Government's Exhibit 171-A                          4220

Exhibits 343 and 344.                               4254

Government's Exhibit 230-A                          4276

Government's Exhibits 230T-13 and 230T-12           4277

Government's Exhibit 228                            4283

Government's Exhibit 227                          4283

Government's Exhibit 190                          4284

Government's Exhibits 176, 178, 180, 191,
182, 179, 181, 183, 187, 184 and 203             4285

Government's Exhibits 204 through 221            4286

Government Exhibit 184                            4310

Government Exhibit 202-A                          4316

Exhibits 202-A and 230 are admitted              4317

Government Exhibit 230.                           4318