UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA, :
08 CR 76

-against- United States Courthouse

: Brooklyn, New York

CHARLES CARNEGLIA,

Defendant.
: March 3, 2009
9:00 o'clock a.m.

- - - - - - - - - - - - - - - - X

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE JACK B. WEINSTEIN
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: BENTON CAMPBELL
United States Attorney
BY: ROGER ANSON BURLINGAME
MARSIA M. SEIFAN
EVAN NORRIS
Assistant United States Attorneys
225 Cadman Plaza East
Brooklyn, New York 11201

For the Defendant: KELLY J. SHARKEY, ESQ.
26 Court Street
Brooklyn, N. Y. 11242

CURTIS JORDAN FARBER, ESQ.
350 Broadway
New York, N. Y. 10013

Court Reporter: Henry R. Shapiro
225 Cadman Plaza East
Brooklyn, New York
718-613-2509

Proceedings recorded by mechanical stenography, transcript produced by CAT.

THE COURT: The letter of the defendant dated March 3rd is marked Court Exhibit 1 of today's date.

I will hear your motion briefly.

MS. SHARKEY: The defense is asking the Court to reconsider the ruling on striking the count concerning the extortion of Bobby Shiavo.

In brief, Judge, as the Court knows when you determined to grant a motion for acquittal, you have to view it in the light most favorable to the government.

Here, Judge, no rational jury, based on the evidence at trial, could find that the Schiavo extortion was established beyond a reasonable doubt.

I had gone through yesterday the facts that were or the comments that were elicited, based on a transcript search, and in response to that the government's indication was that there was a 2007 phone call, which I don't believe was introduced into evidence -- it must have been -- at any right the phone call is:

"How about Bobby Schiavo?

"Charles Carneglia: I missed him for Christmas, he comes at Christmas. That's all he comes."

The people have entered no evidence on the essential elements of the crime. Specifically, the people have entered

no evidence that the defendant stole property from Schiavo. They have entered no evidence that the defendant stole property from Schiavo by instilling in him a fear that he or another would cause physical injury or cause damage to his property in the future. There is no reference to any extortion anywhere in the record. It is naked and this count should not proceed to the jury.

THE COURT: I will hear the government briefly.

MR. BURLINGAME: Your Honor, the government would make the same proffer that it did yesterday, which is that the government has established from a number of witnesses the method in which extortion money flowed up in the family, Christmas payments are part of that.

There are a number of witnesses who testified that if you don't pay Christmas payments there can be retribution against you. We have established that Schiavo was an associate of the defendant's brother and then the defendant.

We had a conversation in which the defendant sees Schiavo for Christmas every year. I think there is sufficient evidence to sustain the charge.

MS. SHARKEY: There is no evidence as to a Christmas payment. This is a long time family friend. The Court harkened back the witness was in the video at a social event hosted by John Carneglia and there was testimony from -- there was testimony from McMahon and Sicarro they were long

time friends. The record is naked as to--.

THE COURT: Thank you. I understand your position.

There are a number of charges brought against Charles Carneglia that were dismissed prior to the trial. This Court's memorandum and order 2009 WL-185727 of January 27, 2009, granted the defendant's motion to dismiss three racketeering acts alleged in Count One that did not name the defendant.

The dismissed charges were Racketeering Act Ten, extension of credit to John Doe Four and Five between 1993 and 2005.

Racketeering Act 16, extension of credit conspiracy between 2003 and 2004.

Racketeering Act 17 conspiracy, murder of John Doe between April 1st, 2003 and May 4th of 2003.

At the conclusion of the government's case in chief the defendant moved for a judgment of acquittal on all counts and specifically on several counts and charged crimes on the ground there was insufficient evidence to sustain the conviction.

A well established rule is that the dismissal will not be granted if in the Court's view of the evidence, in a light most favorable to the government, drawing all reasonable inferences in the government's favor a rational juror could have found the defendant guilty beyond a

reasonable doubt.

With respect to Racketeering Act 18 of Count One, which included federal law extortion conspiracy, federal law attempted extortion and state law attempted grand larceny related to Joseph Stassi and Chi the night club restaurant he owned. There was insufficient evidence, so Act 18 is dismissed on the lack of evidence theory.

The defendant's view, with respect to a number of other murders charged, is that the murders were a manifestation of the defendant's personal folic and escapade for personal reasons that were independent of the mob's operations. This contention is rejected.

The Court finds that for purposes of this motion and introduction of evidence generally that the defendant was a member of this criminal conspiracy up to the time of indictment and that the criminal conspiracy continued as charged up to the time of the indictment, that the defendant was the assigned killer and enforcer and torturer for the mob. That he acted in his role and his role was to act to terrorize the community and those who might have been in contact with members of the mob. That it was important to the conspiracy and the defendant to maintain the reputation that he had in the mob's territory as a killer and a person without any moral control that would prevent him from acting at times in what appeared to be an irrational manner. His

unrestrained and somewhat irrational killings, apparently based on almost child like motives and lack of control that one expects in an adult were important in maintaining the mob's control by keeping those who knew of his reputation and the reputation of other members of the conspiracy and the utilization by the mob of this defendant off balance.

The killing of a court officer was generally frowned upon by the mob. But this killing by the defendant was accepted as necessary as an occasional showing of the mob's power.

The nearest equivalent that we have today is what is happening in Mexico and along the southern borders of the United States, contiguous with Mexico. The drug gangs, in order to exercise control over their territories, will kill police officials and others from time to time.

There is an article by Marc Lacey in the New York Times of March 1st, 2009 discussing this matter. These techniques are used not only by this Mafia mob that is essentially on trial in these and related cases, by drug groups and terrorists from Mexico and just north of the Mexican border, by the so-called M-Gangs from Central and South America and in Los Angeles by the Crips, the Bloods and essentially all of the terrorist organizations of this type with their control on a hierarchial basis and the use of vicious criminality for terrorist purposes.

Now, with respect to the other 60 defendants in these related cases the Court has made its position very clear. In sentencing all of those 60 defendants, who pled guilty and were sentenced, with the exception of two awaiting sentence, the Court made it clear that the mere fact of a dealing between an associate or a member of the public and a made member of the gang implies coercion by the made member of the gang and implicit accession to that coercion by the person who was forced effectively to give tribute, as tribute was obtained on these Christmas "gifts". Gifts, of course, in quotation marks since they were coerced and not given out of friendship.

Members of the gang were automatically deemed to have used coercion because of their position in the enterprise and non-members were not deemed to have coerced. In some instances the non-members used their association possibly for coercion, but the Court assumed that that bright line was appropriate in sentencing the sixty people.

That same rule could be applied by the jury. The defendant by his mere membership in the mob, and particularly by his irrational striking out in this cruel manner, which caused him to be hated and feared in the community and among his so-called friends and associates, was applying coercion, the jury could find. Therefore, the motion to dismiss act nine of count one must be and is denied.

Do we have a full jury?

MS. SHARKEY: Judge, there are a few other matters that I would like to bring up briefly. We never received a copy of this time surveillance video that went in. We would like to use the composite CD 343 and would ask that been made available to us.

THE COURT: It is.

MS. SHARKEY: I also e-mailed the government last night with an additional witness. I believe, the Court was copied -- my paralegal did it for me.

I received a call this morning and I gave the government the name before I came to court that another witness was going to comply with the subpoena that had been served on them.

These are witnesses to the Green Tree aspect and in fact, their names had been listed as victims, by the government. I think they'll be brief.

THE COURT: You may use them.

MR. BURLINGAME: If we could get -- there has been a lot of late breaking defense witnesses. I would like to get the defense to put on the record exactly who their witnesses will be.

THE COURT: Yes, give them the names.

MS. SHARKEY: I did. I will do it again. Our first witness is Joe Dwyer. Our second witness is John White.

THE COURT: Give the addresses so that the government can prepare at this late date an attack on their credibility.

MS. SHARKEY: Respectfully, the government has already reached out to John White. I don't have his address with me.

MR. BURLINGAME: For the record, we didn't get any address information.

MS. SHARKEY: The government called --

THE COURT: Excuse me. Can you give them their addresses if you have them?

MS. SHARKEY: I gave them all of the information that they requested.

THE COURT: Can you give them the addresses and telephone numbers?

MS. SHARKEY: I don't have the telephone numbers on me.

THE COURT: Do you have their addresses?

MS. SHARKEY: I could find them. The government has contacted most of them.

THE COURT: Excuse me. Did you hear my order?

MS. SHARKEY: I did, Judge.

THE COURT: Why don't you comply with it as soon as you can, respectfully.

MS. SHARKEY: Okay.

The next witness is Mark Gioia, who has been contacted by the government. Alex Linden. Mr. Norris had asked that we put the Green Tree witnesses on this afternoon. We can accommodate that. I expect that this afternoon we will also call Jodi Ryan, Frank Salvaggio, and probably Sal Casiano.

THE COURT: Thank you very much.

MR. BURLINGAME: And not Robert Schiavo.

MS. SHARKEY: Yes and Robert Schiavo.

THE COURT: Of course, you can do that.

MS. SHARKEY: May I have a moment?

THE COURT: Yes.

MS. SHARKEY: Could I get 343 the surveillance video?

MR. BURLINGAME: It's in evidence.

There is one issue to Bobby Schiavo. We called him to the Grand Jury, his lawyer provided us with a letter, which he invoked his Fifth Amendment rights. I think, it's appropriate the Court to advise him if he waives his Fifth Amendment rights on direct he would be waiving them on cross so that he doesn't get himself in trouble.

THE COURT: I will not advise him if he has had an attorney. He has had an attorney.

MR. BURLINGAME: That's true.

MS. SHARKEY: Respectfully, Judge, I'm sure we don't

expect to call Mr. Schiavo until after lunch. I think that issue can be taken up at the break.

Maurice Kelley, the witness from Jamaica the tech services was in this morning.

THE COURT: Thank you.

MR. BURLINGAME: I also have the final redaction on all of the cooperation agreements that were submitted subject to redaction.

THE COURT: Show them to the defendant.

MR. BURLINGAME: I have a copy for the defense and a copy for the Court.

They were all redacted exactly the same way that the Court reviewed previously except for the John Alight cooperation agreement, which is done by Tamper, Florida and extremely similar. We didn't redact anything.

THE COURT: The defendant can object at an appropriate time.

I have a note that Juror Four, that is the juror who was late yesterday is late again. They are waiting for him so we'll have a short delay I'm afraid.

Anything else anybody wishes to take up?

MS. SHARKEY: I think that is it.

MR. BURLINGAME: There is one. I neglected to bring the report with me, it was unclear -- maybe Mr. Norris can explain.

MR. NORRIS: On the issue of the admissibility of the police reports that your Honor went through last week. With respect to the murder of Salvatore Puma there were two reports that the defense sought to admit and in looking over -- there is an F-1, and a F-2.

In looking over the transcript from that date's proceedings, your Honor referred to Exhibit F, which was the report that had the Puma dying declaration and said it came in.

I don't believe your Honor referred to the other report. The other report dealt with a statement made by a David Eastzer, unrelated to the dying declaration. We wanted to clarify whether that is in.

MR. FARBER: I thought the Court said both would come in. F-2 talks about Sal Puma, makes the statement, I don't think I'm going to make it.

THE COURT: That comes in.

MR. NORRIS: Okay.

Any other problem?

MR. BURLINGAME: Judge, I think, the argument would be that F-1 has the dying declaration in, F-2 would be the reason for the Court to know that he thinks he's dying, if the dying declaration comes in, F-2 contains a lot of other information which is about what this person observed, who he supposedly drive in a car with. It's extraneous to the dying

declaration --

THE COURT: It is only the dying declaration.

MS. SHARKEY: No, if --

THE COURT: Let me see it. It can come in as the dying declaration part because it may give greater credence to it if the man knew he was dying.

MR. BURLINGAME: We ask that the rest be redacted.

MR. FARBER: It's our exhibit letter Q. It was F-2 for the purposes of the motion.

(Shown to court.)

THE COURT: Defendant's Exhibit Q.

MR. FARBER: Correct, your Honor.

THE COURT: I don't see how F-2 indicates he knew he was dying.

MR. FARBER: There is a statement where he approaches the individual and says, I don't think I'm going to make it.

THE COURT: You are talking about F-1 and not F-2.

MR. FARBER: Did I mix them up.

MR. BURLINGAME: If two is the one that we want out--.

THE COURT: What is it in F-2 that relates.

MR. FARBER: F-2 is the dying declaration. I think you have them mixed up.

MR. NORRIS: I was looking at your brief last night.

It was a longer statement.

MR. BURLINGAME: It's the statement of David Eastzer.

MR. FARBER: You want F-1 out.

MR. NORRIS: F-2 was admitted.

MR. BURLINGAME: Where is the three black guys did it?

MR. FARBER: F-2.

MR. BURLINGAME: I my have my numbers reversed. F-1 should stay out altogether or just the statement, I'm not going to make it.

THE COURT: Why are they stapled together?

MR. FARBER: They were one Exhibit Q.

THE COURT: Contained F-1 and F-2.

MR. FARBER: Yes.

THE COURT: But they weren't stapled together in the official police report. They are two separate reports.

MR. FARBER: You asked me to staple them together.

THE COURT: Mark F-1 as Defendant's Q and F-2 as Defendant's Q-2 so that we can deal with them.

MR. FARBER: That is fine, Judge.

THE COURT: Q comes in as showing this is a dying declaration. Q-1 comes in, which is the equivalent of F-2 as essentially the dying declaration. They both come in.

MR. BURLINGAME: We'd ask that the report be

redacted to extract information which is not related to the dying declaration. There is a bunch of information that goes to what happened at the scene, who was driving with who, who drove who. It's relevance conflicts with testimony.

There is no reason why that part of the report comes in. He's an available witness.

THE COURT: Exhibits Q and Q-1 are in evidence.

MR. BURLINGAME: We've spoken to David Eastzer, we did not call him because we believed his testimony was incredible, he was lying to the government.

THE COURT: Call him.

MR. BURLINGAME: I am not going to stubborn perjury when I know a witness is lying on the stand. If the Court is --

THE COURT: What is it that he says that hurts your case?

MR. BURLINGAME: He identifies who drove the vehicle, it conflicts with what the witness who was on the scene and testified said drove the vehicle. It conflicts with who was in the car -- the vehicle that took Puma to the hospital.

THE COURT: What difference does it make?

MR. BURLINGAME: It's a bit of conflict testimony to say the witness is a liar, the sole purpose is to show the dying declaration, what does that have to do the dying

declaration.

MR. FARBER: Not to help the government, not a contradiction, Mr. Rosetta said Kurt Russo was in the car that took Mr. Puma to the hospital. That is what this form says as well.

MR. BURLINGAME: There were two additional people that he says were in the car --

THE COURT: I will not redact it at this time. Anything further?

MR. FARBER: Nothing further, your Honor.

THE COURT: I have note from Juror Two. Mark it as Court Exhibit 2 of today's date.

Several jurors feel a little uncomfortable when defense attorney Farber and Mr. Carneglia converse and point and look directly at the jury box smiling or laughing. Could you please address this behavior.

MR. FARBER: I don't know how to respond to that. I'm conversing go with my client. It's appropriate during the trial. Unfortunately, how our table is setup, if I look up I'm going to be looking at the jury box.

THE COURT: I'm not going to instruct you further. You are an experienced attorney. You know the jury observes every bit of activity within the courtroom and the unrestrained laughter and smiling of your client is being observed.

Anything further?

MR. FARBER: Nothing from me, Judge.

MR. BURLINGAME: No, your Honor.

THE COURT: I am told that the juror should be here shortly. Why don't we get together at 10:00.

(Recess taken.)

(Followed on next page.)

THE COURT: I will not be able to sit Friday on this case so I'll have to charge Monday. I have too heavy a calender. I cannot move my cases.

Tomorrow we will be off while you prepare your summation. You will sum up on Thursday and I will charge on Monday. I can't switch enough cases off my Friday calendar.

Bring the defendant in. This is now part of the defendant's case.

MS. SHARKEY: This is cross of their witness. We're putting on the CDs.

THE COURT: This is cross of the last witness of the government's case?

MS. SHARKEY: Yes.

What the defense is putting on through this witness, are the calls that the Court allowed in through the defense for completeness and then I have a I will have a little bit of cross at the completion of that.

Our next aspect would be to put the calls in of John Carneglia.

THE COURT: That is part of the defendant's case?

MS. SHARKEY: Yes, your Honor.

THE COURT: After this witness gets off the stand, I will say that the government has rested.

(Followed on next page.)

(Jury present.)

THE COURT: Be seated, please. Good morning, everybody. I know there was some difficulty getting in again this morning. Even when you all came in we had to get the Court assembled again. I had wanted to charge you on Friday, but I understand one of you has a doctor's appointment so we will not meet on Friday.

The present schedule, which I hope we can meet is that this witness is the last witness of the government. The government will then rest.

The defendant will then put forward its witnesses, some of what this witness will identify is being put in at the request of the defendant and the defendant will then cross-examine and then the defendant will put in its case and our plan is to finish that today.

It may or may not be finished. If it's not you will have to come in tomorrow. Tomorrow, except for the portion of the case of the defendant that may need to come in tomorrow, will be off for the jury.

If the defendant's case is not finished today we will come in tomorrow and then you'll be off for the rest of the day.

The reason for that is that, as you recognize it's an enormous sprawling case with all kinds of evidence that has been integrated and the summations by the attorneys are not evidence, but they are valuable part of the case, because

they help you pull it all together from their view point.

I want to give them a day off to pull it all together for you and then you will come in Thursday, they will sum up, Friday as I say I have other matters and some of you have matters, we can't meet.

Monday I will charge you, that charge will take three or may be four hours because it's a complex case, and then you will have the case for deliberation, we hope Monday. That is the way it shapes up.

You are still under oath.

Proceed.

W A L T E R   B I A N D O ,

called as a witness, having been previously duly sworn, was examined and testified as follows:

CROSS EXAMINATION

BY MS. SHARKEY:

Q    Yesterday you testified on direct examination concerning recorded phone calls of Mr. Carneglia from the Bureau of Prisons?

A    Yes.

Q    Every phone conversation that an inmate makes is in fact recorded and preserved by the Bureau of Prisons, right?

A    Yes.

Q    And the unit in which you work is sometimes called upon to collect those phone calls and provide them to either the

defense or the prosecution, right?

A Yes.

Q And all of the phone calls of Mr. Carneglia when he was incarcerated on this matter as every other defendant who is incarcerated have been recorded, right?

A Yes.

Q And yesterday on direct examination you played portions of some of those phone calls, right?

A Yes.

MS. SHARKEY: Judge, at this point pursuant to the Court's order, the defense requests to play the full phone call from February 14, 2008, a transcript has been prepared of that full phone call provided to the Court and the prosecution and has been marked as Defense Exhibit S.

I would ask your Honor --

THE COURT: Defense Exhibit S.

MS. SHARKEY: Your Honor, respectfully there are a series of phone calls that the Court has approved and I am asking one of our paralegals to hand out a packet of those transcripts, which have been provided to the government and the Court and the first transcript and the first call is represented on defense Exhibit S.

I will identify each transcript for you before the call is made.

THE COURT: Defense Exhibit S is in evidence for

purposes of assisting the jury.

MR. BURLINGAME: Judge, we'd object to the use of the transcripts based on the fact that though they were provided too late for the government to review their accuracy. There has been no witness to testify as to their accuracy.

THE COURT: Thank you.

Whatever is on the tape you understand is what counts this may help you in following.

You are going to play February 14th at 1:31 p.m., which is Defense Exhibit S.

MS. SHARKEY: Yes.

(Tape played.)

(Followed on next page).

CROSS-EXAMINATION

BY MS. SHARKEY: (Continued)

(Audio is playing for jury.)

MS. SHARKEY: Thank you.

Q Sir, yesterday you played a portion of a second phone call on February 14th, at 7:17 p.m.; right?

A Yes.

MS. SHARKEY: Judge, I would ask at this time that the defense play the full portion of that phone call. The Court has the transcript in front of it and it has been previously marked as Defendant's Exhibit T.

THE COURT: T as in Tom?

MS. SHARKEY: Yes, sir.

THE COURT: It is admitted for the limited purpose indicated.

(Defendant's Exhibit T was received in evidence.)

(Audio played for jury.)

MS. SHARKEY:

Q Sir, yesterday you played a portion of a phone call from April 13th; right?

A Yes.

MS. SHARKEY: Judge, pursuant to --

THE COURT: April 3rd? You mean?

MS. SHARKEY: Yes, Judge.

At this point I'd ask that the Court, the defense be allowed to play the April 3rd tape.

THE COURT: Yes.

MR. BURLINGAME: Judge, just to clarify the record, the Government played the tapes, not the witness.

THE COURT: Yes, true.

Exhibit U?

MS. SHARKEY: Yes, sir.

THE COURT: This is U.

MS. SHARKEY: Yes, sir.

THE COURT: It's admitted for the limited purpose. April 3rd, 8:20 p.m.

MS. SHARKEY: Thank you, Judge.

(Defendant's Exhibit U was received in evidence.)

(Audio played for jury.)

Q Sir, yesterday a portion of a phone call from April 4th at 8:34 p.m. was played; right?
A Yes.

MS. SHARKEY: Judge, respectfully, I would request that the full telephone call be played.

And that would be the transcript previously marked as Defense Exhibit V.

THE COURT: Admitted for that purpose.

(Defendant's Exhibit V was received in evidence.)

(Audio played for jury.)

Q Sir, yesterday was a portion played of an April 13th, phone call beginning at 6:11 p.m.?
A Yes.

MS. SHARKEY: Judge, I'd ask at this point that the full phone call be played.

And the transcript is marked as Defendant's Exhibit W.

THE COURT: Admitted for that limited purpose.

(Defendant's Exhibit W was received in evidence.)

THE COURT: You may play it.

(Audio played for jury.)

Q Sir, yesterday was a portion of a phone call on May 25th, 2008, played for you?
A Yes.

MS. SHARKEY: Judge, at this point, I'd ask that the entire transcript be played or the entire phone call be played, which is in Defendant's Exhibit X.

THE COURT: Yes, for the limited purpose, admitted.

(Defendant's Exhibit X was received in evidence.)

MR. BURLINGAME: And I just note for the record the transcript, the previous transcript, has deleted the portion

of the call the Government transcribed. So, the jurors don't have that available to them while they're listening to the call.

MS. SHARKEY: Do you have that? Why don't you give it to me --

THE COURT: Excuse me, don't address each other.

Proceed with your playing, please.

MS. SHARKEY: Defendant's Exhibit X, please.

(Audio played for jury.)

MS. SHARKEY: Those are all the phone calls.

Q Sir, you testified on direct examination that you worked at the BOP, that's Bureau of Prisons, for a number of years; right?

A Yes.

Q How many years is that?

A Total of 12 years.

Q And prior to your current assignment in SIS, did you also work in other parts of a BOP facility?

A No. The MDC Brooklyn is the only Bureau of Prisons facility that I worked at.

Q What is SIS again?

A Special Investigations Section.

Q And prior to being assigned in Special Investigations, did you work in other jobs in the prison?

A Yes.
Q And what would be some of those?
A I was a correction officer.
Q Okay. And so, you were on the units with the defendants; right?
A Yes.
Q Were you also in the visiting room?
A Yes.
Q And for the members of the jury, the visiting room is on the first floor of the MDC; right?
A Yes.
Q And that's where prisoners, inmates, have visits with their family; right?
A Yes.
Q And around the edge of the visiting room are rooms for lawyers to meet with their clients; correct?
A Yes.
Q And frequently, lawyers are meeting with their clients when other inmates are meeting with their family; right?
A Yes.
Q And it's in separate areas; right?
A Yes.
Q But nonetheless, the visits with the lawyers require the defendants and the lawyers to walk through the general visit room; right?

A Yes.

Q Now, Mr. Carneglia was -- you testified yesterday that Mr. Carneglia was incarcerated in a Federal detention facility, and this is referring to Government's Exhibit 190.

Do you need it to refresh your recollection?

A Yes, please.

(Handing.)

Q Mr. Carneglia was in a Federal deposition facility from November -- I need it to refresh my recollection.

What date does that document, which is in evidence, first reflect his detention in a Federal lock-up facility?

A Where -- are you referring to MDC Brooklyn.

Q Yes.

A You're looking at November 5th, 2001.

Q And when was he released?

A He was released on December 13th, 2001.

Q When was he re -- not from MDC.

A He wasn't released. He was transferred to Oklahoma.

Q Okay. I don't really want to go through the whole thing, sir.

A Mm-hmm.

Q When was his last -- I'm sorry, I have to share this with you.

(Pause in the proceedings.)

Q Was he released from Fort Dix; in November of '05?

A Yes.

Q How long was he at Fort Dix?

A Looks like he got to Fort Dix on February 11th, 2003, and he left on November 16th, 2005.

Q All right. Now, you testified on direct examination yesterday about "The Hole;" right?

A Yes.

Q And that's the Special Housing Unit; right?

A Yes.

Q And when inmates are first brought to the Metropolitan Detention Center of the Federal lock-up in Brooklyn, they're first placed in The Hole for classification.

Is that fair to say?

A Depends on the inmate.

Q Okay. Some are, some aren't?

A Some aren't, yes.

Q Now, it would also be accurate to say that inmates are assigned to units and particular cells by the Bureau of Prisons; right?

A Yes.

Q The inmate doesn't get to pick who is on their tier; right?

A No.

Q The inmate doesn't get to pick who is in their cell or

across from their cell; right?

A No.

Q Okay. That's all selected by the Bureau of Prisons; correct?

A Yes.

Q And similarly, when there are a number of inmates on the same case -- and I'm specifically talking about the Metropolitan Detention Center -- special accommodations are made for them to review discovery in a case; right?

A Yes.

Q In fact, it's pretty normal for tape-recorded conversations and discovery provided by the prosecution to be parked in the library; right?

A Yes.

Q And the inmates are directed to go and review those documents at the library; right?

A Yes.

Q And it's been your experience, certainly, that inmates frequently review tapes together down in the visit room; right?

A Yes.

Q And that's actually at the direction of the Bureau of Prisons; right?

A Yes.

Q And that's putting all the inmates together, or a number

of the inmates together, on the same case to go through their discovery; right?

A Yes.

Q And that's to facilitate an individual being familiar with the charges that are brought against them; right?

A Yes.

Q There's no ability when there's numerous tapes and numerous documents to provide each inmate with a separate set; right?

A Yes.

Q Now, also; it would be fair to say that accommodations are made for multi-defendant cases to have what's called a co-defendant meeting; right?

A Yes.

Q And that happens down in the visit room; right?

A Yes.

Q And that happens when the lawyers apply to the Bureau of Prisons to meet with their clients and the defendants in a group; right?

A Yes.

Q And that's common practice; right?

A Yes.

Q That's good lawyering; right?

A Yes.

MR. BURLINGAME: Objection.

MS. SEIFAN: Objection.

THE COURT: I'll allow it.

Q Now, you testified yesterday on direct examination that you had familiarized yourself with the Bureau of Prisons records for Charles Carneglia; right?

A Yes.

Q And did you review his entire prison record?

A Yes.

Q You reviewed those records provided to you by the Government; right?

A Yes.

Q And you testified specifically that Thomas Cacciopoli and John Cavallo had submitted requests to visit Mr. Carneglia; right?

A Yes.

Q And you know that, from a review of the records, neither of those individuals ever visited Mr. Carneglia; right?

A I never seen actual visitor records as far as seeing these individuals come inside the VR, like a visitor log or the actual printout that these individuals did visit. I can't ascertain if these individuals entered the MDC.

Q Okay. So, amongst the records you were provided to review for your testimony, you weren't provided the actual visitor logs; is that correct?

A No, no.

Q But, so the members jury know, an actual visitors log is kept; right?

A Yes.

Q And before an individual can enter into the visit room, they have to show identification and sign the visit book; correct?

A Yes.

Q And as far as you know, that's true at all facilities; right?

A Yes.

Q It's common practice at the Bureau of Prisons that before an individual can gain entry, they have to show ID and sign the book; right?

A Yes.

Q Now, you testified about an application to visit Charles Carneglia by Allen Meshanski; right?

A Yes.

Q And Allen Meshanski did visit Carneglia, Mr. Carneglia; right?

Do you know that?

A Like I said, I do not have any information that these individuals did, in fact, visit Mr. Charles Carneglia.

Q Okay. Because you weren't provided with a visitor log?

A Exactly, yes.

Q But if you looked at the visitor log, you would be able

to determine who did and who did not visit; right?

A Yes.

Q Now, you testified yesterday that based on the application to visit Mr. Carneglia, a records check was run; right?

A Yes.

Q And Allen Meshanski had no record; right?

A To my recollection, when I looked at the, at the NCIC check, no. He didn't have any hits on the NCIC.

Q And let's talk in lay language. When you look at the NCIC check and he didn't have any hits, that's a database for criminal convictions; right?

A Yes.

Q And Mr. Measure didn't have any of those; correct?

A No.

Q Similarly, you talked about a visitor request of Jodi Ryan; right?

A Yes.

Q And Jodi Ryan also -- well, anybody who puts in a visitor request has an NCIC check; right?

A Yes.

Q And as I said, that's a database of criminal history of an individual; right?

A Yes.

Q And Ms. Ryan, similarly, did not have any criminal

history; correct?
A No.
Q Correct that she doesn't have a criminal history.
A She doesn't have a criminal history.
Q Right.
And you also testified about the phone record log; right?
A Yes.
Q And that would be Government's Exhibit 178.
Do you need it to refresh your recollection?
A Yes.
(Handing.)
Q Now, that Exhibit, Government's Exhibit 178, a phone record log, is a request by the inmate to the Bureau of Prisons to be able to make phone calls to certain individuals; right?
A Yes.
Q And in fact, that request has to be filled out by the defendant himself; right?
A Yes.
Q And that request, that is a record that is kept by the Bureau of Prisons; right?
A Yes.
Q It's no secret that that's an official record of the Government; right?

A No.
Q And Mr. Carneglia requested to make phone calls to Jackie Cavallo; correct?
A Yes.
Q Now, you also testified yesterday concerning deposits in an inmate account; right?
A Yes.
Q And that information was contained in Government's Exhibit 184; right?
A Yes.
Q And you testified that there were -- and that's in evidence; correct?
A Yes.
Q And there were deposits made by Cavallo, Bonamolo, Sclafani, Ryan and Meshanski; right?
A Yes.
Q And also, deposits made by family member Carneglia; correct?
A Yes.
Q Now, when somebody deposits money in an inmate's account, the inmate does not have the ability to reject that; correct?
A No.
Q Right. In fact, anybody can send money to an inmate; right?
A Yes.

Q And when somebody sends money to an inmate, sometimes they identify who the sender is; right?
A Yes.
Q And that's when you're able to keep a record and say who sent the money; right?
A Yes.
Q And in this case, the individuals who were sending money to the BOP identified themselves; right?
A Yes.
Q Cavallo identified himself; right?
A Yes.
Q Sclafani identified himself; right?
A Yes.
Q Ryan identified himself; right?
A Yes.
Q Meshanski identified hem self?
A Yes.
Q And similarly, monies can also be accepted from an inmate where it's not identified; correct?
A Yes.
Q And that happens, too; right?
A Yes.

MS. SHARKEY: Nothing further.

Thank you very much.

THE COURT: Thank you.

Any redirect?

MS. SEIFAN: Nothing, Your Honor.

THE COURT: All right. Thank you.

Next witness.

(Witness excused.)

THE COURT: You have no further witnesses?

MR. BURLINGAME: No further witnesses. The Government rests.

THE COURT: The Government has rested.

Defense case, do you want a few minutes or a break?

MS. SHARKEY: If the jury wants a break. Otherwise, we're ready to go.

THE COURT: Do you want a break?

THE JURY: Yes.

THE COURT: Yes, they do. Okay. They can.

(Jury is excused.)

(Recess taken.)

(Continued on following page.)

THE COURT: Bring in the defendant.

THE COURT: Are you going to have any redirect?

MR. NORRIS: No redirect, your Honor.

(Jury present.)

THE COURT: Be seated, please.

MS. SHARKEY: Judge, pursuant to the Court's permission previously granted, the defense and the authentication agreed upon by the government, the defense enters into evidence and would ask to be played to the jury phone conversations, two.

The first defense Exhibit Z, which is a February 14, 2007, at 5:38 p.m. and the second would be Defense AA,, which is May 31, 2008, at 10:31 a.m. and transcripts have been prepared by the defense and are being handed out to the jury, the Court and the government.

THE COURT: Both these items are admitted for their limited use.

MS. SHARKEY: At this time I would ask that the phone conversation of February 14, 2007 be played.

THE COURT: Do you all have it. Proceed, please.

MS. SHARKEY: This is February 14, 2007, at 5:38, John Carneglia and Charles Carneglia.

(Tape played.)

MS. SHARKEY: Defense Exhibit AA from May 31st 2008, between John Carneglia and an unknown male.

THE COURT: Excuse me, on Z, the fifth page, 612, have you played that?

MS. SHARKEY: We did not.

Would you like us to?

THE COURT: I do not care.

Don't look at it, ladies and gentlemen.

MS. SHARKEY: Would you like us to play the whole tape?

THE COURT: I have no desire. It's your case.

MS. SHARKEY: AA please, May 31, 2008.

(Tape played.)

MS. SHARKEY: Those are the completion of the calls from John Carneglia. The defense calls Joe Dwyer.

J O H N D W Y E R,

having been first duly sworn, was examined and testified as follows:

THE CLERK: State and spell your full name

THE WITNESS: Joseph Dwyer, D W Y E R.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Hello, Mr. Dwyer?

A Good morning.

Q What do you do for a living?

A I'm a private investigator.

Q How long have you been a private investigator?

A Going on five years.
Q What did you do before that?
A New York City Police Department, I was a police officer.
Q How long were you with the NYPD?
A About five years.
Q What units?
A I was first assigned to Midtown South and then to the 25th Precinct, that is in East Harlem, and then a street narcotics enforcement unit that worked out of the 25th Precinct and then I was injured and I out of the street enforcement unit and I left the job.
Q Why did you leave the job?
A I was injured, a line of duty injury.
Q Did there come at that time when you became involved in this case?
A Yes.
Q How did that come about?
A I was assigned by the Court as a private investigator.
Q And as a private investigator have you worked with himself and Mr. Farber over the course of this case?
A Yes, I have.
Q Met with Mr. Carneglia?
A Yes.
Q Now, did you ever meet or have any contact with John Carneglia?

A No, I have not.

Q Did the defense attorneys have any contact with John Carneglia?

A Not to my knowledge, no.

Q Now, do you know a restaurant named Carosella's?

A Yes, I do.

Q Where is that located?

A That's in Howard Beach on Cross Bay Boulevard, 162-54 Cross Bay Boulevard.

Q Did I ask you to take some photographers of Carosella's?

A Yes.

Q Did you take those photographs?

A Yes.

Q Are they a true and accurate representation of the inside and the outside of the restaurant?

A Yes, they are.

MS. SHARKEY: Judge, I'm providing Mr. Dwyer with a series of photographs that I provided to the government, Defense Exhibit CC.

Could I put them in as a group or do you want them individually marked?

THE COURT: Whatever you think.

I suppose, individually marked if he is going to refer to them.

MS. SHARKEY: I will provide the witness with a

series of pictures, marked CC, DD, EE, FF, GG, HH, II, JJ, HH, II, JJ, KK, LL.

Would you take a look at those as a group, Mr. Dwyer

(Shown to witness.)

Q Mr. Dwyer when did you take those photos?

A Sunday, March 1st of this year.

Q And do they fairly and accurately represent the Carosella's restaurant?

A Yes, they do.

Q Prior to Sunday of March 1st, you had been by that restaurant before, right?

A Yes, I had been there before.

Q Has the exterior or the interior of the restaurant changed in any way since you were there?

A No.

MS. SHARKEY: I move these in as CC through LL.

MR. BURLINGAME: Permission to voir dire?

THE COURT: You can do it on cross.

Q Mr. Dwyer, would you holdup the first photograph and explain what it is?

A This is a bulletin board that is right when you walk into the restaurant, there is a bulletin board, I has plaques of different establishments that have contributed to Carosella, towards little league in the area and stuff like

that. Other organizations that have --

MR. BURLINGAME: Objection, to the hearsay to reading what is on the boards.

THE COURT: I will allow it.

A Other establishments that are in there that have had functions at the facility there before and given emblems of what their organization and stuff like is that.

MR. BURLINGAME: Objection to foundation as to the witness's knowledge.

THE COURT: I will allow it.

MS. SHARKEY: I ask that this be published to the jury as a Defense Exhibit.

THE COURT: Why don't you give them all to the jury.

Q Mr. Dwyer, are all those pictures taken of the interior and exterior of Carosella's?

A Yes.

THE COURT: I think they speak for themselves. Give them to the jury.

(Shown to jury).

THE COURT: Proceed.

MS. SHARKEY: I have no further questions.

If the jurors could see the photographs prior to cross-examination.

THE COURT: No, you can cross-examine now. I will not have silence in the court.

CROSS EXAMINATION

BY MR. BURLINGAME:

Q Good afternoon, Mr. Dwyer?

A Good afternoon.

Q So you started working on this case when?

A I would say spring, early summer of '08.

Q Early summer of '08.

When did you first go to Carosella's?

A I don't remember exactly when I first went there. I would say maybe August of '08.

Q How many times have you visited Carosella's?

A Three times.

Q Were you there at all in the fall of 2007?

A No.

Q Did you observe Mr. Carneglia there in the fall of 2007?

A No, I did not.

Q You didn't conduct surveillance of Mr. Carneglia 25 times in the fall of 2007?

A No.

Q Fair to say you are unaware of what Carosella's looked like in the fall of 2007?

A I was not there in the fall of 2007.

Q And these pictures you testified are taken on a Sunday, correct?

A Yes.

Q What time of the day was that?

A Early afternoon.

Q Early afternoon.

There are some sort of kids party going on at that point?

A Yes, there was.

Q Now, you said you've been on this case since March of 2008, is that correct?

A Early spring, late spring, early summer.

Q Have you interviewed witnesses during the course of your investigation?

A Yes.

Q How many times witnesses would you say you interviewed.

MS. SHARKEY: Objection, beyond the scope of direct?

THE COURT: I will allow it.

A A couple of dozen.

Q A couple of dozen witnesses.

You take notes when you interview the witnesses?

A Sometimes I do, sometimes I don't.

MS. SHARKEY: Judge, I requested the copy of the witness's notes as 3500 material.

MS. SHARKEY: There is not 3500 material. There are no notes on these witnesses.

MR. BURLINGAME: This witness's 3500 material.

THE COURT: He is coming in for the limited purpose

of identifying these exhibits. Denied.

Q Did you take notes of your interview with John White?

A No.

Q Alex Linden?

A No--.

Q Did you interview--?

A -- I never interviewed him.

Q Mark Gioia?

A No.

Q Bobby Schiavo?

A No.

Q Frank Salvaggio?

A No.

Q Jody Ryan?

A No.

Q Sal Casiano?

A No.

Q Maurice Kelly?

A No.

Q How do you decide which witnesses to take notes on and which witnesses not to take notes on?

A Defense counsel tells me.

Q Do you know why they tell you not to take notes for certain witnesses?

A No, I don't.

MS. SHARKEY: Objection.

THE COURT: Sustained.

Q Defense counsel instructs you not to take notes on certain witnesses?

A Yes.

Q Are you aware of which witnesses are being called at trial?

A Yes, I am.

Q And is it just so happens the witnesses you were instructed not to take notes on are the witnesses that will testify here today.

MS. SHARKEY: Objection?

THE COURT: Sustained.

Q Now, when you interview witnesses for the defense, do you interview them multiple times.

MS. SHARKEY: Objection.

A Sometimes.

THE COURT: Sustained.

Q Do you take any steps to verify whether the information they provide you is accurate.

MS. SHARKEY: Objection?

THE COURT: Sustained.

Q And if you don't take notes on them, do you have any way of telling if they are telling you one thing one day to the next.

MS. SHARKEY: Objection?

THE COURT: Sustained.

MR. BURLINGAME: No further cross.

THE COURT: Step down.

Next witness, please.

MS. SHARKEY: The defense calls John white.

J O H N W H I T E,

having been first duly sworn, was examined and testified as follows:

THE CLERK: State your full name and spell it for the record

THE WITNESS: John Michael White, W H I T E.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Good morning, Mr. White?

A Good morning.

Q How old are you?

A I'm 25.

Q Would you keep your voice up?

A I will sit closer.

Q Where did you grow up?

A I grew up in Langcaster County in Chester.

Q What was your life like growing up?

A I had a middle class upbringing, two parents, parents together.

Q Did you graduate high school?

A I did.

Q Do you have any siblings?

A I have two sisters, older and younger.

Q What do your parents do for a living?

A My dad originally he went to law school, he was in the DA's office in Westchester, Pennsylvania, and then he made his way into the radio industry, Christian radio out of Philadelphia and then, you know, bounced around difference radio stations and I spent most of my childhood in Langcaster.

He worked for WDAC a Christian radio station.

Q Did you graduate high school?

A Yes.

Q What high school?

A I graduated from Langcaster Catholic High School.

Q Are you in college?

A I am in college.

Q What college is that?

A DeSalles Univeristy in Center Valley PA.

Q Have you been arrested?

A I was, once.

Q How old were you?

A 19.

Q Were you ever arrested before that?

A No.
Q Have you ever been arrested since that?
A No.
Q Now, what were you arrested for?
A I was arrested for bank robbery.
Q When was this?
A The arrest was on June 17, 2003.
Q And what caused you to commit a bank robbery?
A Well, I have a pretty strong head and I was dating a girl who -- I'm sorry.
Q You are nervous?
A Yeah, I need to take my time. Her name was Savannah. I was dating someone who was a bank teller and she was a little troubled. I didn't know that at the time.
 I was smitten with her, you know, kind of young love, it was me and Savannah. She had problems at home and problems with the bank, she would come to me, you know, with her problems.
 She would talk about her parents and talk about the troubles at the bank. She would come to me with stories of them trying to gets her fired and sabotage her life and I thought well I can't solve anything, everything, I wanted to, so I just said the bank's insured, I could rob the bank and we can run away together and that would be that.
Q Did you rob the bank?

A I did.
Q And how was that robbery conducted. Did you use a gun?
A No, I did not.
Q Did you use something that looked like a gun?
A I did. I used a pellet, a fake.
Q Tell the members of the jury what a pellet gun is and where you got it?
A Okay.

There is a farmers market near my house, a pellet gun is like a toy gun, kids us it to shoot at targets. I wanted a fake to rob the bank, so that it would look like a real one but it wouldn't be.
Q Did you use any other equipment during the course of this bank robbery?
A I wore a mask and glasses and rubber gloves.
Q And was Savannah a bank teller at the bank that you robbed?
A She was.
Q How old was she?
A She was 18.
Q So she was 18 and you were 19?
A That is correct.
Q Tell the jury what you did?
A I waited until the afternoon when I thought there wouldn't be anyone in the bank really, I waited -- I knew she

would be on, I ran in, I pulled out the pellet gun and I said, hands in the air, and I jumped over the teller's station and there were two tellers on, Savannah and another teller, I had them both open up their drawers and face the wall.

Q Did you get any money?

A I did.

Q How much money did you get?

A I got about $77,000.

Q Did you leave the bank without getting arrested?

A Yes.

Q Was anybody hurt?

A No.

Q And where did you go?

A I got into my station wagon and drove home.

Q When you say home, whose home was it?

A My parents home, I was living with my parents.

Q And what did you do with the gloves, the glasses and the pellet gun?

A I put everything, the gloves, the glasses and the pellet gun in my dresser right next to my bed.

Q How about the money?

A The money I put in my closet.

Q Now, did you spend any of that money?

A I did.

Q What did you spend it on?

A I bought a 2000 Jetta. I found a guy out of Allantown through like an auto trade magazine.

Q How much did you spend for it?

A $15,000.

Q And in relation to the time of the robbery, how much after the robbery did you buy the car?

A It was about two weeks after.

Q What happened?

A I didn't know that -- I thought that after getting away from the bank that I wouldn't be caught and I was in a manic state I didn't think anything was going to happen to me.

Q Let me stop you for a second. When you say you were in a manic state. After this robbery were you diagnosed with anything?

A I was.

Q What was that diagnosis?

A I was diagnosed with bipolar disorder, something that my family has a history of.

Q And when you say you were in a manic state, what do you mean by that?

A Well, being about bipolar there are extremes highs and extreme lows and when you're in extreme highs it's called a manic state and you can have feelings of invulnerability or just feeling the rules don't apply to you, you can do

anything, like superman.

Q Were you arrested?

A I was.

Q Were you indicted?

A I was.

Q Was Savannah indicted?

A Yes, she was.

Q Did you plead guilty or go to trial?

A I plead guilty.

Q Did you go to jail?

A I did.

Q What sentence did you receive?

A I received 51 months.

Q And this was in federal court, is that correct?

A Yes, it is.

Q Where were you first incarcerated?

A I was first incarcerated Lee High County prison in Allantown, Pennsylvania and then I was moved to the federal courts, I moved to Philadelphia, there is a holding place, I was there for a year and then I was moved to Fort Dix where I spent the rest of my time, around two and a half years.

Q Keep your voice up?

A Sorry.

Q When did you go to Fort Dix?

A I went to Fort Dix in the summer of 2004.

Q Describe what Fort Dix looked like for the members of the jury?
A Fort Dix is not like anything you every seen on TV with the jail cells and the doors. Fort Dix is the complete opposite. It's an old military base. There are huge buildings spread out over a lot of land and there are soccer fields, baseball fields, a library and an enormous fence.
Q It's a secured facility?
A It's secure.
Q Now, how many prisoners if you know about were at Fort Dix?
A Over 3,000.
Q And how long did you spend at Fort Dix?
A About two and a half years.
Q And in your time there, did you notice or did you observe the inmates socializing with each other?
A Sure.
Q And did inmate like breakdown into groups of inmates that socialized with each other?
A There were a lot of Hispanic people, a lot of Dominicans, a lot of Jamaicans, there were a lot of white, blacks, there were Russians, Polish people, mob people, all types.
Q And in your observation, did these groups of individuals stick together?

A Absolutely.
Q And did you have a group?
A Not really. I mean I'm a super minority being young and small and white.
Q Now, when you say the groups stuck together, for what reasons if you know did they stick together?
A I mean it was natural, there is a language barrier, so I mean a lot of people there, they don't even speak English, I mean it's natural for different ethnic groups to stick together, you know, people of different backgrounds, a way of life, it was natural for survival.
Q When you say "for survival", were there reasons of safety to your knowledge why individuals stuck together in groups?
A Yes, there were.
Q And what reasons would those be?
A We'll, I didn't always feel safe.
Q But was there theft on the grounds?
A Sure.
Q Assaults?
A Yes.
Q Sexual assaults?
A Yes.
Q And I would on you -- you said one of the groups was the mob, right?

A That's right.

Q When you say "the mob", would that be fair to say what you perceive to be the organized crime group, is that correct?

A Yes, it is.

Q And what nationality was the majority of those persons?

A They looked to be Italian.

Q And how would you describe that group?

A Like how would I recognize them?

Q Yes.

A Well, the compound was closed during the day, but at night, we had a senses count at 4:00 o'clock, and after that the compound was pretty much open.

Q What is the compound?

A The whole prison, you know, Fort Dix everything within the fence and just when the compound was open, when the different groups would hangout and spend their time together. The mob people they kind of -- they would roam in one big group or a lot of them liked to lay Bacci Ball. I never seen it, I didn't know what it was, it's an Italian game, they played cards, a lot of sitting around and walking.

Q Did they have elaborate parties?

A Yes, they did.

Q Would you describe that for members of the jury?

A When someone goes back home, that's a big deal for

anybody, and with the mob guys they like to have a send off on a Sunday night, they would make coffee and cakes, they would pay other inmates to make them these elaborate looking cakes and have a little get together for everybody right before they go home.

Q Was there a point in your time at Fort Dix when you felt in danger?

A Yes, there was.

Q From whom?

A There was a guy named Moe who threatened me.

Q Tell the jury how he threatened you and what happened?

A There is -- one of the things about Fort Dix that surprised me we I got there, how few correctional officers there were to the number of inmate, so you can walk around the compound a lot and not see a correctional officer, a lot can go on.

Definitely, when I first got there, I didn't feel safe at all. This guy Moe he was-- some of the guys in my room-- I was living in a 12 man room-- they let me know that guy Moe, he's got his eye on you, and doesn't feel good, it's really scary.

Q What did you understand he got his eye on you to mean?

A That meant-- I mean they were pretty clear, they said -- they used the words he likes young white kids, that means to me he wanted to either rape me or very sex with me in some

way or another.

Q And Mr. White, did you ever have an exchange with this Moe?

A I did.

Q What happened?

A I was going into the line in the mess hall and there are two lines, I happened to pick the one on the left, and there was kind of like a little visibility issue where, you know, it was hard to see in the back and -- I knew who he was, I didn't want to make eye contact, it's a scary thing, it's a sign of acknowledgment of someone, I was looking away from him, and he noticed that and he said to me, you know, what are you looking at, who are you looking at white boy.

People made fun of my name as it is, my last name is white. I said I'm looking here, I'm not worried about you, he said well, you know, when are we going to see eye to eye on this. I was still trying to ignore him, I said we will not going to see eye to eye. He said, he looked right at me and he said, you're going to come around, you're going to see things my way, you're going to come around.

That to me, that meant exactly what the guys in my room was telling me, he wanted to have sex with me.

Q What did you do?

A I went to someone I knew who had the same problem with the same guy.

Q Who was that?

A His name was Chris Sefalo.

Q Where was he from?

A Scranton, Pennsylvania.

Q What did Chriss tell you to do?

A Chris said that he would talk to some people and that we'd get it straightened out so that I wasn't going to get hurt.

Q What happened next?

A Chris brought me to Charles and Sal and they asked me what happened. Had me tell the same story, so they knew.

Q And why didn't you report this incident to the BOP?

A Because when I first went to the holding place in Philly, I had a problem there with someone, and someone who managed to get locked in my cell with me, made threats and just talked a lot of sexual things that he was going to trim me out and make me his bitch.

I went to the BOP and I didn't know what to do, I was still brand new, and they said we'll put a separation on you and this guy you will never see him again and they said that I should signed paperwork you will never see him again.

When I left Philly and showed up at Fort Dix, the very first person I practically saw was this guy that I was supposed to have separation against and again I went to the BOP, I went to the case manager and I said, why is this

happening, you told me that would I never see this guy again and they just looked at me and said, you know, this guy is in the drug program, he won't do anything to hurt you, he doesn't want to mess his time up, just wait it out, It will be a few weeks.

Q That's why you didn't go to the BOP when you were afraid of this other guy?

A Yes.

Q Who was this other guys name again?

A Moe, Maurice Johnson.

Q After you told the story to Charles, what happened?

A Well, Charles just, you know, he understood what the guy meant so Charles just had me spend time with him and the problem more or less went away because when you're in prison and people can see you stick with another person or you know somebody they won't mess with you, but up until that point I was on my own.

Q Did you strike up a friendship with Charles Carneglia?

A Yes, I did.

Q What sorts of things would you and Mr. Carneglia do during the course of that friendship?

A Well, I became a better gin rummy player, played a lot of cards, we walked around the compound. It seems small but he had problems with his teeth, he couldn't eat meat. He liked to make sandwiches for me, he would say, I can't eat

meat at least you can enjoy it.

Q When you say walk the compound, what does that mean?

A Well, it's a big compound and even still you are confined and to walk around the compound it's the only way you can get around and get exercise and that's when people would, like at night, go into their own groups and spend time with each other, and that's what we'd do.

Q Did Charles Carneglia affiliate himself with the wise guy group?

A No, he did not.

Q Who did he affiliate himself with?

A Well, he knew Anthony, he knew Sal. He knows me and he knew Jason Willet.

Q Was Sal a wise guy?

A No.

Q Now, did you see how your friendship with Charles affected his interaction with other people?

A Could you repeat the question.

Q Sure.

Did you notice, did you observe how your friendship with Charles Carneglia affected his interaction with other people, specifically wise guys?

A Well, when I first met him and we'd walk the compound anything, you know, there was just -- there was just respect with anybody. Wise guy or not, if you saw someone you would

say hello and goodbye, when we'd see the wise guys, hello and goodbye, that was it. But it got to the point where Charles and I had spent so much time together other people like the wise guys in particular they didn't like it, they didn't understand it, they looked at me like young Irish kid and they didn't want Charles spending time with me.

Q How do you know that. What did you see?

A He got into a fight with his friend Sal over it and it was to the point where Charles would spend time with me and we'd play cards in his room. If we walked the compound, he wouldn't even acknowledge the other people and they wouldn't acknowledge him. There was no more hi.

Q And what was his appearance?

A Shorter than me, older, gray and white hair, a beard.

Q Were there ever any comments made towards Mr. Carneglia about his facial hair.

MR. BURLINGAME: Objection?

THE COURT: Sustained.

Q Did you -- did Mr. Carneglia make any comments to you about his facial hair.

MR. BURLINGAME: Objection?

THE COURT: Sustained.

MS. SHARKEY: Offered for state of mind, Judge.

THE COURT: Sustained.

Q Do you know if Charles Carneglia was similarly generous

to other people while you were at Fort Dix?

A Yes.

Q Can you tell the jury.

MR. BURLINGAME: Objection, foundation?

THE COURT: I'll allow it as a description. Go ahead.

A Yes, he did. There were other -- there were Hispanic people that he knew didn't have money, so he would have money sent in so that they had money to by clothes.

MR. BURLINGAME: Objection.

THE COURT: I will allow it.

Q Was that consistent with how other wise guys treated the Hispanic in jail.

MR. BURLINGAME: Objection?

Q Based on your observations?

THE COURT: I will allow it.

A No, the wise guys pretty much stuck with each other, there wasn't, you know, they wouldn't have done something like that for someone that wasn't Italian.

A They didn't even like me for being Irish.

Q How often would you see Charles during this time?

A I definitely saw him every Sunday when we'd have diner together and definitely three, four, five times a week, after I was done work.

Q Did Charles have a subscription to the New York Post?

A Yes, he did.

Q During your friendship with Charles, did he talk to you about organized crime.

MR. BURLINGAME: Objection?

THE COURT: I'll allow it.

A He did.

Q Tell us about that?

A I can recall the New York Post, it's not a newspaper that I ever saw, he got a subscription to it and a lot of the stuff that was coming out at the time had to do with John Gotti Jr.'s trial.

MR. BURLINGAME: Objection.

THE COURT: I'll allow it.

Q And what did Charles say to you and what did you say to Charles?

A Well, he would point at a picture, you know, about junior and he told me, he said his father John Gotti, you know, he died a man and he died in prison and when he died the old mob died and he said he was part of the old mob and it's dead now, he was no longer a part of the new mob, he pointed out the picture.

Q Charles said that to you?

A He did.

Q Did he also talk to you about what he intended to do with his life when he got out of jail.

MR. BURLINGAME: Objection?

THE COURT: I will allow it.

A He did tell me.

Q What did he say?

A He said -- he had pictures of his junk yard and showed the pictures to me and he said when he gets out, it's important that he get back home and get back to doing that, and working the junk yard and seeing his mom was really important because she had two sons in prison, so it was really important for him to get back to her before she died.

Q Mr. White, did you have more than one conversation with Charles concerning the old mob and the new mob?

A It probably came up every time, you know, there was a newspaper article.

Q Again what would he say to you.

MR. BURLINGAME: Objection?

THE COURT: Not about describing anything that happened, what his intention was.

Q Do you understand the question?

A No, I don't.

Q May I rephrase it, Judge?

THE COURT: Yes.

Q When pictures of the crime families would come up in the New York Post, what did Charles say to you about life in the mob?

THE COURT: No, I don't want that.

MS. SHARKEY: How would you like me to phrase it, Judge?

THE COURT: He's only to say something about his present state of mind or present intention.

Q When pictures of the mob came up in the New York Post, did Charles tell you anything -- did Charles say anything to you about how he felt about that in the moment, that day, with the newspaper.

MR. BURLINGAME: Objection?

THE COURT: I'll allow it.

A He would repeat himself, you know, and say that -- he would say the old mob is dead, I'm not a part of this, and he would point to the pictures of the new people.

Q Now, you and I met last night?

A We did.

Q And we talked about your testimony today, correct?

A We did.

Q Had we meet prior to last night?

A No, we had not.

Q Do your parents know that you are testifying?

A They do.

Q And are you grateful to Mr. Carneglia?

A I am -- my family is grateful too. My dad said to me before I came up that --

THE COURT: No.

Anything further?

Q Are you telling the truth?

A I am telling the truth.

MS. SHARKEY: Thank you very much.

THE COURT: It's 1:00 o'clock. We will break an hour for lunch, please. Perhaps we ought to take half an hour. Your lunch is here.

(Luncheon recess taken.)

A F T E R N O O N   S E S S I O N

THE COURT: Bring the witness in. Bring the jury in. Have the witness take the stand, please.

MS. SHARKEY: I have two more questions -- I withdraw that. I'm fine.

(Jury present.)

THE COURT: Be seated, please.

J O H N   W H I T E ,

called as a witness, having been previously duly sworn, was examined and testified as follows:

CROSS-EXAMINATION

BY MR. BURLINGAME:

Q Good afternoon, sir.

A Good afternoon.

Q Now, you testified on direct the moment you started hanging around with the defendant, this Moe person left you alone; is that right?

A Correct.

Q And the defendant looked pretty much as he does now, right?

A Yes.

Q Not particularly big or threatening, correct?

A Yes.

Q And you testified that you had various conversations

with the defendant about the old mob and the new mob, right?
A Yes.
Q And fair to say you are not an expert on the Mafia?
A That is correct, I'm not an expert.
Q I want to show you some pictures. Do you know who that is?
A No.
Q You don't know that to be Richie Gotti?
A I don't know that.
Q You don't know him to be a soldier in the Gambino family?
A Correct.
Q And do you know who that guy is?
A I don't know who that is.
Q You don't know that is Jackie D'Amico, he was the acting boss of the Gambino family?
A That is correct.
Q You know that guy?
A No.
Q You don't that is Joseph Panzarella and he was an associate in the Gambino family under the defendant?
MR. FARBER: Objection.
MS. SHARKEY: Objection as to relevance.
THE COURT: Strike the last part of the question.
Q You know that guy?

A I do not.
Q You don't know that would be Italian Dom Cello?
A No.
Q Underboss of the Gambino family?
A I don't know him.
Q You know that guy --
A I don't know him.
Q -- to be Vinnie Gotti, the brother of Richie Gotti?
A No.
Q Soldier in the Gambino family, no?
A No.
Q You know that to be Pete Gotti?
A No.
Q One time boss of the Gambino family, you don't know that?
A No.
Q You know that guy?
A That's Charles.
Q You recognize him?
A I do.

THE COURT: Who did you show the last one?

MR. BURLINGAME: The defendant, a young picture of the defendant.

Q You recognize that person?
A I believe that's John Gotti, Jr.

Q That's the one that the defendant would bring up the conversations when his name was in the paper?
A That is correct.
MS. SHARKEY: Could you keep your voice up?
Q Do you recognize him?
A No, I don't.
Q You don't know that to be Gus Sclafani, a captain in the Gambino family?
A I don't recognize him.
Q What about this guy, do you know him?
A No, I do not.
Q You don't recognize him, Lenny DiMaria, another captain in the Gambino family.
How about this guy?
A I don't know who that is.
Q You don't know that to Bobby Schiavo, a Gambino family associate?
A No.
Q Do you know him?
A I do not.
Q You don't know him to be Angelo Ruggiero, Jr., a soldier in the Gambino family?
A I don't know.
Q You didn't know that he was the defendant's bunkee in 2008?

A No.
Q You know this guy?
A No, I don't.
Q You don't know that is the defendant's brother, Gambino family captain John Carneglia?
A I don't know him.
Q How about him?
A I don't know recognize him.
Q You don't know that Tommy "Sneakers" Cacciopoli, another captain in the Gambino family?
A No.
Q You don't know about him being the defendant's captain?
A That is correct.
Q You know that guy?
A I do not know him.
Q You don't know that is Little Nicky Corozzo, captain in the Gambino family, one time member of the rule committee?
A That is correct.
Q What about that guy?
A I don't recognize him.
Q You don't know that is Nicky Corozzo, Joseph Corozzo's brother, consiglieri of the Gambino family?
A That is correct.
Q You know him?
A I don't recognize him.

Q You don't know that is Jackie Cavallo, soldier in the Gambino family and the defendants oldest friend?

MS. SHARKEY: Objection. Mr. Burlingame is testifying?

THE COURT: If he is or was.

MR. BURLINGAME: I was asking him if he knows.

THE COURT: You are saying that he is a member.

Q Do you know him to be --

THE COURT: Do you know if he's a member?

Q Do you know him to be a member of the Gambino family and the defendant's closest friend?

A I do not.

Q Showing you-- do you know this guy?

A No, I don't.

Q And so do you know if his name is Robert Porto and if he's an associate of the Gambino family?

A I don't know who he is.

Q Do you know that guy?

A No, I do not.

Q You don't know if is Allen Meshanski?

A I don't know who he is.

Q You don't know if he's a Gambino family associate?

A Correct.

Q And you don't know if he's under the defendant?

A Correct.

Q Now, you talked about the old mob and the new mob. You

testified you got to Fort Dix when?

A In the summer of 2004.

Q And are you aware that in the summer of 2004 the defendant sent an visitor form to --

MS. SHARKEY: Objection?

THE COURT: I will allow it.

Q Are you aware in the summer of 2004 the defendant sent a visitor form for this guy Tommy Cacciopoli?

A I'm not aware of that.

Q It was in November of 2004?

Q You said you are not aware of Tommy Cacciopoli being the defendant's captain in the Gambino family?

A I'm not.

THE COURT: Put in the conditional sense.

Q Are you aware if John Gotti, Jr. was the defendant's captain in the Gambino family?

A I'm not aware.

Q Are you aware if John Gotti, Jr. then became the boss of the Gambino family?

A I was aware that the newspaper, the way that it was put in the paper, that he was the new head.

Q And are you aware that the boss of the Gambino family has absolute power over all its members?

MS. SHARKEY: Objection as to relevance?

THE COURT: I requested of you repeatedly instead of

saying it as a fact to put it conditionally, and if you can't do that stop this line.

Q Are you aware if the boss of the Gambino family has absolute power?

A I don't know how it works.

Q You don't know how it works. Are you aware if the defendant talked a number of times on the phone with this guy, Jackie Cavallo, in 2008?

MS. SHARKEY: Objection. It's not even when they were incarcerated.

MR. BURLINGAME: I asked if?

THE COURT: I will allow it. He says he was an intimate of the defendant. I will allow questions about the defendant's activity while he was incarcerated, but put them in the conditional form.

Q Are you aware if he had conversations with Jackie Cavallo in 2008?

A I was released in 2006 so, no, I'm not aware.

Q Are you aware if in those conversations they discussed Joe Corozzo.

MS. SHARKEY: Objection.

A I'm not aware of the conversations.

THE COURT: He answered. I think you better move to something else, you exhausted this line.

Q Do you have a familiarity with the rules of the Mafia?

A What rules, if you ask me a specific rule I could answer.

Q Do you know if a person takes a blood oath to kill on command when they join the Mafia?

A I don't know about that.

Q Do you know if they take a blood oath to follow the boss' orders?

A I don't know about that either.

Q Do you know if they take a blood oath that the only way they could get out of the Mafia is by dying?

MS. SHARKEY: Objection?

THE COURT: Did you say if?

MR. BURLINGAME: I did.

THE COURT: Then the question stands.

A I'm also not aware of that.

Q And do you know if you could be killed for trying to withdraw from the Gambino family?

A I'm not aware of that.

Q Do you know if members of the Gambino family have taken a sacred oath to, in fact, kill anyone that tries to withdraw?

MS. SHARKEY: Objection?

THE COURT: If. I will allow it.

A Again, I'm not aware of that.

Q Do you know if the Mafia is about friendship or it's

about committing criminal activity together?

A I don't -- I can't speak on that.

Q Do you know if killers are considered to be available in the Gambino family?

A I don't know that.

Q Do you know if killers get away with breaking more rules in the Gambino family?

A I don't know that.

Q And do you know if people in organized crime don't often get along?

A I don't know that.

Q So you don't know whether or not everybody has to be honkey-dorey all of the time.

MS. SHARKEY: Objection.

A Who?

THE COURT: Yes.

I don't understand the question.

Q Fair to say you are not super knowledgeable about organized crime rules?

A That is correct.

Q And when you did your robbery you testified you put the, I believe, the money in your closet, correct?

A That is correct.

Q And the clothes you did the robbery in -- you did the robbery you put in your dresser?

A The mask, the rubber gloves and the fake gun, yes.

Q Correct me if I'm wrong, you testified you went out and bought a car with the money you stole a couple of weeks later?

A Correct.

Q It's fair to say that you are not the most sophisticated criminal in the world?

A Yes.

Q There are other criminals at Fort Dix more sophisticated than you?

A What do you mean by sophisticated?

Q You testified that you were an unsophisticated criminal?

A Yes, I did.

Q And you testified that you were at sea at Fort Dix, would that be a fair characterization of your testimony, you didn't feel at home there?

A Yes.

Q And were there other people who seemed to have less of a hard time getting along at Fort Dix than you did?

A Yes.

Q And fair to say that the defendant was one of those people, since you went to him to solve this problem for you and then the problem was solved?

A Can you rephrase that? I didn't know who he was.

Q That's a fair point. Fair to say, he seemed to be

getting along better in jail than you were?

A Just about everybody was getting along better than I was.

Q Now, you testified that you had conversations with the defendant about the old mob and the new mob. Did you overhear him having those conversations with any of the guards at the prison?

A No.

Q Are you aware of him telling any federal agents that he was part of the old mob but not the new mob?

A I'm not aware.

Q Are you aware of him telling that to anybody in law enforcement?

A I'm not aware.

Q Are you aware of him turning his back on the Gambino family and trying to obstruct its activities?

A No.

Q Are you aware of him -- withdrawn.

You testified about Anthony and Sal. Do you know their last names?

A Anthony Caponella and Sal Casciano.

Q And you testified that you guys were all friends together?

A Sure, yes.

Q They were friends of the defendant in Fort Dix?

A They were friends of Charles, yes.
Q And are you aware of Caponella being an associate of the Genevese mafia family?
MS. SHARKEY: Objection?
Q Are you aware if and the Caponella was a captain in the Genevese family?
A No.
Q Are you aware if Sal Casciano was a member of the Bonanno family?
A I'm not aware.
Q To correct the record are you aware Anthony Caponella was a member of the Genevese family and not the Bonanno family?
A I'm not aware.
Q How many people while in prison told you what their organized crime affiliation was, they said, hi, I'm a soldier in the Gambino family, I'm a soldier in the Bonanno family, how many times did that happen?
A No one in prison would talk about --
Q Let's me ask you--?
THE COURT: Let him finish.
A I wanted to get the picture across there is a general fear if you talk about anything that you ever done someone will bring a case against you, so no one would say I did this or that.

Q Nobody except the defendant when he told you about the old mob and the new mob?

A In private, yes.

Q Now, are you aware if this guy, Gus Sclafani, that he sent money to the defendant in the last year while he was in jail?

A No, I am not aware.

Q And did this guy, Allen Meshanski, are you aware if he sent money to defendant while he was in jail?

A No, I'm not aware.

Q And this guy, Joe Panzarella, Jr., are you aware if the defendant continued to meet with him after he got out of jail?

A No.

Q And are you aware of if -- I'm not sure if I asked you this -- if I did tell me, are you aware that Tommy Cacciopoli, one of the defendant's closest life long friends --.

MS. SHARKEY: Objection; form?

THE COURT: If.

MR. BURLINGAME: I believe I said if.

THE COURT: If you did, answer the question.

A I'm not aware.

Q And I believe you testified you were not aware that he -- whether or not if he was the defendant's captain in the

Gambino family, correct?
A    Right, I said I didn't recognize the picture.
Q    And this guy Jackie Cavallo, are you aware that he sent money to the defendant in the last year?
A    I'm not aware.
Q    You are not aware if he's a soldier in the Gambino family, correct?
A    That is correct.
MR. BURLINGAME:  I have nothing further.
THE COURT:  Any redirect?
MS. SHARKEY:  Briefly.
REDIRECT EXAMINATION
BY MS. SHARKEY:
Q    Mr. White, when were you at Fort Dix, what year to what year?
A    I was at Fort Dix from the summer of 2004 and until October 17, 2006.
Q    And Mr. Burlingame asked you questions concerning the context of your conversation with Mr. Carneglia about the old mob and the new mob.  Do you remember those questions?
A    Yes.
Q    Did Mr. Carneglia give you advice?
MR. BURLINGAME:  Objection?
THE COURT:  He can answer that.
MR. BURLINGAME:  Hearsay, Judge.

THE COURT: He gave him advice, yes, but I haven't heard a question asking what the advice was.

Q In the context of your relationship with Mr. Carneglia, did Mr. Carneglia talk to you about your life pack -- your future life pack?

A He did. He was very concerned with --

THE COURT: Don't go beyond the yes.

Q What did he say to you?

MR. BURLINGAME: Objection?

THE COURT: Sustained.

MS. SHARKEY: Nothing further. Thank you

THE COURT: Thank you.

That will be all.

Thank you, sir.

THE WITNESS: You are welcome.

THE COURT: Next witness, please.

MS. SHARKEY: The defense calls John Hayes.

THE COURT: Swear the witness, please.

J O H N   H A Y E S ,

called as a witness, having been duly sworn, was examined and testified as follows:

THE CLERK: State your full name and spell it for the record

THE WITNESS: John Hayes; H A Y E S.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Good afternoon, Mr. Hayes.

A How you doing?

Q What do you do for a living?

A Sanitation worker.

Q Where do you live?

A Long Island, New York.

Q And have you ever lived at the Green Tree Condominium Complex?

A Yes.

Q Did you own a unit there?

A Yes, I did.

Q For approximately how many years?

A Well, the unit was first bought by my mother, she deceased and I took it over, it was in my family for about nine years.

Q What unit did you live in, sir?

A 150-07 95th Street, the top floor.

Q Did you live at that unit?

A Yes.

Q How long did you live at that unit?

A Up until about 1998.

Q Are you a little nervous?

A Little bit.

Q Are you here pursuant to subpoena?

A Yes.

Q Who were your neighbors?

A I really don't know many of the neighbors, I pretty much kept to myself.

Q Did you have any difficulty when you lived at Green Tree in relation to the condominium board?

A No.

Q Were you ever threatened by Robert Porto?

A No.

Q Were you ever in fear of the condominium board?

A No.

Q Were you a friend of Robert Porto's?

A No.

Q Did you know who he was?

A I knew who he was, yes.

Q And did you feel that there was a mob influence in the administration of the condo board?

A Absolutely not.

Q And did you sell your unit?

A Yes, I did.

Q When did you sell your unit?

A I'm not sure of the exact month, but in the year 1998.

Q Were you extorted by the Gambino family when you sold your unit?

A    Absolutely not.

Q    Did you see anything about that nature in your years at Green Tree?

A    No.

MR. BURLINGAME:  Objection.

MS. SHARKEY:  Nothing further.

THE COURT:  I will allow it.

MS. SHARKEY:  Thank you for coming.

CROSS-EXAMINATION

BY MR. NORRIS:

Q    Good afternoon.

A    Hello.

Q    Mr. Hayes, briefly, you sold your unit in 1998 at Green Tree?

A    Yes.

Q    Did you talk with someone named Kevin McMahon about the sale of his unit in 1999?

A    No.

Q    Did you talk with someone named Joseph Morrow about the sale of his unit in 2001?

A    No.

Q    Did you talk someone named Brian Crowley about the sale of his unit in 2007?

A    No.

Q Did you know Robert Porto?

A Yes.

Q Withdrawn. Do you know if Robert Porto was an associate of the Gambino family?

A No.

MR. NORRIS: No further questions.

THE COURT: Thank you.

Next witness, please.

MS. SHARKEY: Gaetano Marcotrigiano.

G A E T A N O M A R C O T R I G I A N O ,

called as a witness, having been duly sworn, was examined and testified as follows:

THE CLERK: State your full name and spell it for the record, please

THE WITNESS: Gaetano Marcotrigiano; G A E T A N O, M A R C O T R I G I A N O.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Good afternoon, sir.

A Good afternoon.

Q What do you do for a living?

A I'm dispatcher for New York City Transit.

Q Where do you live?

A Northport, New York, Long Island.

Q And prior to living at Northport, where did you live?

A Green Tree Condos in 1150-01 95th Street.
Q For what years did you live at the Green Tree Condominium Complex?
A From 1997 to 2001.
Q And what was your unit again?
A I had apartment 2.
Q And did you know who Robert Porto was?
A Yes.
Q Who was Robert Porto?
A He was the president of the condo board and he lived right upstairs from me.
Q Did you feel during your tenancy from '97 to 2001 that the condo board was controlled by the Gambino family?
A No.
Q Did you see any sort of organized crime influence the administration of the condo board duties towards the owners of the apartment complexes?
A No.
Q Did you have any problems with Mr. Porto, threatening you or extorting you on any level?
A No.
Q How long did you live there?
A Four years, '97 -- yeah, four years.
Q And did you sell your unit?
A Yes.

Q And were you extorted by the Gambino family at the time that you told your unit?
A No.
Q Did you know Panzarella?
A Yes, Joe Panzarella.
Q Was Joe Panzarella, to your knowledge, a member of the Gambino crime family?
A Not that I know of.
Q And were you ever extorted or threatened by Joe Panzarella?
A No.
Q Was there anything in your tenancy during the years at Green Tree that made you believe the condo was mob controlled?
A No.
Q Do you know Charles Carneglia?
A No.
Q That's him over there.
A No.

MS. SHARKEY: Thank you, nothing further, sir.

CROSS-EXAMINATION

BY MR. NORRIS:

Q Mr. Marcotrigiano, good afternoon. You lived at Green Tree until 2001, is that correct?
A 2001.

Q September 2001; is that right?
A No, September, I remember September 11th I was already in Northport, I think we sold like July something like that.
Q Do you recall when you closed, July or August?
A I know I was in Northport already by August.
Q Who was on the board of Green Tree while you lived there?
A As far as I know Robert Porto.
Q And you're friends with Robert Porto, right?
A Yes, I know Robert Porto. I lived on the second floor, he lived right above me.
Q And when you closed Porto made you pay a small water bill before you closed, is that correct?
A Yes.
Q And you didn't think you had to pay, but because you're friends with him you paid the water bill, is that correct?
A Yeah.
Q That is correct?
A Yes.
Q Showing you what has been marked for identification as Government Exhibit 182.
Do you recognize that?
(Shown to witness.)
A I guess that is the bill, yeah.
Q That is the bill you got before you closed on your unit

at Green Tree?

A Yes.

Q That's the bill that reflects the water bill that we just discussed?

A Yeah. It was $1142.

Q $1,142?

A Yes.

MR. NORRIS: The government offers Government Exhibit 182.

MS. SHARKEY: May I see it?

MR. NORRIS: I'm sorry.

(Handed to counsel.)

THE COURT: 182.

MR. NORRIS: Exhibit 192. I misnumbered it, Judge.

MS. SHARKEY: No objection.

Q This water bill reflects that in September of 2001 you were assessed $1,142.40, is that right?

A Yes, exactly.

Q If you could look at it for another moment. That reflects the total water bill that was outstanding at Green Tree, is that right?

A The 54 thousand?

Q Could you read that figure?

A The water bill amount is $54,289.

Q Does it then show what your percentage --

A The amount due for your unit is $1142.

Q It shows that's your percentage?

A 2.104.

Q Hold on a second. That document reflects that you owned 2.104 --

A Of the entire quarter.

Q That percentage of the $54,000, that is the $1,142 that you had to pay?

A I guess, yeah.

Q Rather than make a stink you paid because you were friends with Robert Porto, although you didn't think you owed it?

A I paid it.

MR. NORRIS: No further questions.

THE WITNESS: That's it?

MS. SHARKEY: The defense calls Alex Linden.

A L E X L I N D E N ,

called as a witness, having been duly sworn, was examined and testified as follows:

THE CLERK: State your full name and spell it for the record

THE WITNESS: Alex Linden.

MS. SHARKEY: Good afternoon, Mr. Linden.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q What do you do for a living?

A I'm a certified public accountant.

Q What's your educational background, sir?

A I received a Bachelor of Science degree in accounting from Fairly Dickinson University in 1976 and I received my CPA license in 1980.

Q Were you contacted by myself to aid in our understanding of the condo documents?

A Yes, I was.

Q And how were you retained?

A I was retained by the Court under an order under the Criminal Justice Act.

THE COURT: The witness is not the Court's witness. Defense counsel was authorized to retain the witness by the Court. The witness was selected by defense counsel.

MS. SHARKEY: Thank you.

Q As a result of your being retained, did you receive any documents?

A Yes, I did.

Q And how many documents did you receive?

A I received nine boxes of documents relating to the Green Tree Condo and one redwell of documents.

Q From whom were they received?

A I believe they were received from the federal government.

Q Now, how many pages of documents did you receive, sir?

A Approximately, maybe, 10,000 pages of documents. It was nine and a half boxes of documents.

Q Did you review those documents for defense counsel?

A Yes, I did.

Q Now, were you in court last week sitting next to me during the course of testimony concerning the Green Tree Condominium Complex?

A Yes, I was.

Q As a result of being in court that day, did I ask you to go back to the documents that you received from the government and review some things?

A Yes, you did.

Q And did I ask you to review the documents again for documents relating to Mr. Crowley?

A Yes, you did.

Q And did I also ask you to review the documents for the financials and the water bills of Green Tree Condominiums?

A Yes.

Q Did you find any documents relating to those requests?

A Yes, I did.

Q Do you have a copy of those documents with you?

A I believe you have them, my set of copies.

MS. SHARKEY: Judge, with the Court's permission I would like to provide Mr. Linden with a copy of Green Tree

documents received from the government in December of 2008.

THE COURT: Give them a number, please.

MS. SHARKEY: For his review and to aid him during the course of his testimony.

THE COURT: Give them collectively a number, please.

MS. SHARKEY: Defense Exhibit MM.

(Shown to witness.)

Q Mr. Linden, would reviewing those documents aid you in the course of your testimony at this proceeding?

A Yes, they will.

Q And have you reviewed those documents in the past based on your retention by counsel?

A Yes, these were documents that were in the boxes that I received from the government.

MR. BURLINGAME: We'd object to the witness' use of the documents. They are not in evidence. They are not his documents.

As far as we can tell they are not relevant. They are not authentic. They have not been introduced under any business rule exception. He has not been called as an expert. There are many reasons that the relevance has not been established.

THE COURT: May I see the collective documents, please?

(Shown to court.)

MS. SHARKEY: I note these were the documents received from the prosecution.

MR. BURLINGAME: Could we request a short break. There are other arguments that I would like to make without the jury being present.

THE COURT: Yes, take ten minutes, please.

(Jury leaves courtroom.)

(Followed on next page.)

MR. BURLINGAME: I don't think there is a need for expert witness on this count. What has been admitted into evidence is a couple of owners of the Green Tree condos who received when it was time to sell they were hit with exorbitant fees. I don't think the jury needs expert assistance to wrap their mind around that issue. It's a simple extortion, anyone who knows anyone that owns a house tried to sell it can wrap their minds around.

Two, those documents were -- the people who -- those documents were collected by the government investigator from any number of people who lived in the Green Tree Condos over the years.

The government made no effort to authenticate them, check their veracity, we collected everything that we could about Green Tree and turned it over. If the defense wants to get any of those in, they should properly introduce them into evidence, rather than trying to get them in through this expert.

I don't see there is any relevance to the documents, given how simple the issue is as to Green Tree.

THE COURT: The documents first consist of a series of signed statements that Green Tree owners received something and it's not clear what they received. These can't come in.

MS. SHARKEY: Actually, I believe, Mr. Linden can

identify --

THE COURT: Excuse me. I haven't finished.

MS. SHARKEY: I apologize.

THE COURT: Then there are pages 1 and 2 of the Department of Environmental Protection, what appears to be their statement, marked one in ink at the top with a circle around it, another page 1 and 2 marked in the same way, two.

Another two-page document marked in the same way, three.

Another two-page document marked in the same way, four.

Another two-page document marked in the same way, five.

A one-page document marked six.

Two-page document marked seven.

There is no document marked eight, but there is a document, two pages, marked nine and that is followed by two pages marked eight.

There is one page marked ten attached to a second page and unmarked and the third page unmarked.

Two pages marked eleven -- one page, I guess, marked eleven.

One page marked 12. Another page attached.

Two pages marked 12, and two pages marked 13.

All of which appear to be New York City Department

of Environmental Protection documents. They appear to be what they are, Department of Environmental Protection documents.

Have you ever seen documents like this before?

THE WITNESS: These represent water bills --

THE COURT: You know them?

THE WITNESS: Yes.

THE COURT: From your other work?

THE WITNESS: I have other co-ops and condos.

THE COURT: That is the kind of document they supply as the Department of Environmental Protection?

THE WITNESS: Correct.

THE COURT: You would say these are authentic copies?

THE WITNESS: Yes, they are.

THE COURT: I will allow these to come in, but nothing else.

MS. SHARKEY: Respectfully, if I could explain the relevance of those other documents. The witness Mr. Crowley testified that he never received any financial documents from -- concerning Green Tree Condominium, wherein fact Mr. Crowley signed off in 2003 for receiving three years worth of Green Tree documents, his signature appears in there.

THE COURT: Where?

MS. SHARKEY: I will show you. I would just note --

THE COURT: Just tell me what you told me you would do first before you make further arguments.

MS. SHARKEY: For 2003 Mr. Crowley is the top signature on page 5. Those are identified as Green Tree financials.

THE COURT: It says you are being given 13 water bills.

MS. SHARKEY: It says at this time the first sentence says you are being given financial reports.

THE COURT: Where is his signature?

MS. SHARKEY: It's the top signature.

THE COURT: This is Crowley's signature?

MS. SHARKEY: Yes.

THE COURT: Who is authenticating the signature?

MS. SHARKEY: We're offering it -- I don't have Mr. Crowley to authenticate it. However, I believe --

THE COURT: The witness recognizes Crowley's signature?

THE WITNESS: There are four documents signed by Mr. Crowley.

THE COURT: Did you see him sign it?

THE WITNESS: No.

THE COURT: Do you recognize his signature?

THE WITNESS: I can't authenticate it.

MS. SHARKEY: What you could say through the course of the years it's the same signature.

THE COURT: I'm not going to allow those documents purportedly signed by Crowley. They don't even appear to be legible.

MS. SHARKEY: Could I show you the follow years? This is a direct contradiction of this witness' testimony.

THE COURT: Excuse me. When did you have these documents?

MS. SHARKEY: I had them since December.

THE COURT: You had Crowley on the stand.

MS. SHARKEY: I didn't have the document when Crowley was on the stand.

THE COURT: You had the documents since December?

MS. SHARKEY: Yes.

THE COURT: You had the documents when Crowley was on the stand.

MS. SHARKEY: I hadn't been able to find -- I hadn't had those documents with us at the time Crowley was on the stand.

THE COURT: I'm not going to permit that to come in. They look like scrawls of something. They don't look like signatures to me.

MS. SHARKEY: May I ask you a question, over the course of six years, there is the same signature of

Mr. Crowley.

THE COURT: It might have been put on that document at one time and that's why it's the same signature, and it might have been something else. Those documents are not coming in.

MS. SHARKEY: Would the Court let the documents in with a limiting instruction --

THE COURT: I will not. They will come in under no condition.

MS. SHARKEY: Okay, that is clear.

THE COURT: They are not sufficiently authenticated. I will mark this group of documents as Defendant's MM-1 for identification.

MS. SHARKEY: Judge, even shown the witness --

THE COURT: Excuse me.

MS. SHARKEY: Sorry.

THE COURT: That is MM-1 marked for identification and not in evidence. MM-2 are what the witness as an expert in this field tells me he recognizes as authentic New York City Department of Environmental Protection documents and they will come in as evidence, at MM-2. MM-1 is not admitted.

MS. SHARKEY: Judge, I would ask this witness questions about his review of the documents and whether or not he based on his review of the documents he observed

financials that were purported to be financials from Green Tree Condo Association from those particular years.

THE COURT: I don't see that those kinds of questions have any basis on any documentation before me.

MS. SHARKEY: With all do respect, Judge --

THE COURT: Let me see the documents that you are relying on.

MS. SHARKEY: The documents that you have just marked --

THE COURT: MM-1. They are excluded.

MS. SHARKEY: Respectfully, Judge, the documents say they are financial reports from Green Tree Condos in Ozone Park, so I can make the record, for the years 2000, 2001, 2002, 2003, 2004, 2005, 2006. The witness stated on the stand that --

THE COURT: Which witness?

MS. SHARKEY: Crowley. There were no financials distributed and that was the genesis of his displeasure and arguments with the president of the condo board association. This witness has reviewed --

THE COURT: When you say this witness --

MS. SHARKEY: Mr. Linden has reviewed the documents provided by the government. They are, in fact, represented within that review that financials were distributed to the condo owners.

More than that, I take it the Court is not going to let me put in Crowley's five different signatures, but more than that each of those years, the reason these are multiple pages, only about 10, 12, the condo owners I identified -- the condo owners signed the sheet and next to it put down their address. Crowley through the five or six different years signed his name and put down his address.

THE COURT: Were you there when they signed the name?

MS. SHARKEY: No, Judge, I was not there.

THE COURT: Was this witness there?

MS. SHARKEY: No.

THE COURT: Do you have a witness who was there?

MS. SHARKEY: No.

THE COURT: Then I won't take it. A document it's not speaking for itself.

MS. SHARKEY: Correct.

But I do take it that I can ask the witness based on his expertise whether or not he has reviewed documents from the Green Tree Condominium Association reflecting financial statements from those following years.

THE COURT: I will not permit it.

MS. SHARKEY: I will not put the documents in.

THE COURT: You certainly can't indirectly do it through this witness' testimony.

MS. SHARKEY: Is the issue that I didn't qualify him as an expert. I could do that in two seconds.

THE COURT: I'm willing to take him as an expert. He looked like an expert, talks like an expert, he's qualified as an expert in accounting.

MS. SHARKEY: Respectfully then, I don't understand why the Court -- I can understand why the Court --

THE COURT: I don't know where they came from.

MS. SHARKEY: They came from the government.

THE COURT: The government didn't prepare them.

MS. SHARKEY: The government retrieved the documents from the condo board.

THE COURT: I do not know when the documents were prepared, who prepared them and how they were distributed.

MS. SHARKEY: They are dated --

THE COURT: We have documents which do not indicate the source.

MS. SHARKEY: They do respectfully. One of the reasons we sought an expert was that this was confusing and what the documents -- at the top of the document it says Green Tree Condominium Association --

THE COURT: It says Green Tree at Ozone Park and there is a typed report.

MS. SHARKEY: That is another document.

THE COURT: Show me in MM-1, what you are asking

this witness to base his testimony on.

MS. SHARKEY: Thank you, judge. Let me confer with my expert.

THE COURT: Give me one page as an exemplar.

MS. SHARKEY: What I'm providing to the Court --

THE COURT: Where is that material that I stapled together?

MS. SHARKEY: I will describe it for the record.

THE COURT: May I see it?

MS. SHARKEY: Yes.

THE COURT: What page are you showing me.

MS. SHARKEY: I'm showing you the first paragraph of MM-1.

THE COURT: Do you have a document --

MS. SHARKEY: Yes.

THE COURT: These financials statement of cash income and expenses for the Green Tree Condominium Association --

THE COURT: Sir, I'm showing you what I will mark as MM-3. Pages 1, 2, and 3, which are a list figures?

THE WITNESS: Correct.

THE COURT: Can you tell me who prepared that list?

THE WITNESS: I believe it was prepared by Mr. Moriano the accountant for the condo association.

THE COURT: What is the basis of that opinion?

THE WITNESS: There were other sets of financial statements in the boxes that I received that showed his letter on it. This was attached as an addendum to the correspondence where Mr. Crowley's signature was placed, that was one set of documents.

THE COURT: You have nothing attaching these reports to the accountant's reports, do you? These are unattached papers.

THE WITNESS: I have them unattached here. In my office they are attached.

THE COURT: I won't take them. I don't know where they came from. I don't know when they were prepared and you had the witness on the stand who could have testified.

MS. SHARKEY: Judge, respectfully, this must be --

THE COURT: You had this accountant next to you when Crowley was testifying.

MS. SHARKEY: And we didn't --

THE COURT: This accountant had gone through the papers. I'm not going to permit this kind of work in the Court. Sorry. MM-1 is out.

MS. SHARKEY: I think there is a failure on my ability to explain what this is. You said that the documents aren't attached. The staples have been removed for purposes of copying.

They are attached and they are attached to the

document that says at this time you are being given the financial reports for Green Tree Condos at Ozone Park.

THE COURT: No one is authenticating those documents. I'm not allowing the documents to speak for themselves.

MS. SHARKEY: Judge, what we're requesting is not that the actual numbers be accepted, but the fact that there is a representation that financial documents were in fact --

THE COURT: Representation by whom, by the document?

MS. SHARKEY: By the Green Tree owners.

THE COURT: By the documents?

MS. SHARKEY: Yes.

THE COURT: How do you know they were signed by the Green Tree owners? You had at least four of them on the witness stand.

MR. FARBER: May I have a moment to speak to my colleague?

THE COURT: You may. I don't want to appear difficult. I can't allow this kind of documentation to come in.

(Pause.)

MS. SHARKEY: Mr. Farber suggested a line of questioning that should be acceptable to the Court

THE COURT: I will hear you outside of the presence

of the jury.

MS. SHARKEY: Judge, I would ask Mr. Linden that based on -- did he receive the nine boxes of documents. Yes. What they do purport to be.

They purport to be records of the Green Tree Condominium Association provided by the government. During your review of these nine boxes did you see anything that were indicated to be financial statements. Yes, I did. For what years. He provides the answers.

THE COURT: Where did you get these documents?

MR. NORRIS: We got these documents from a number of different sources. Got some from Robert Porto, some from Glen Bassett, some from John Moriano.

THE COURT: Some from the office; the office of Green Tree?

MR. NORRIS: There is really no office, but Porto the president and some of the accountants.

THE COURT: That is not sufficient for me.

MS. SHARKEY: He is saying some from the accountant.

THE COURT: I'm not allowing it in without some authentication.

MS. SHARKEY: I'm not putting it in. I'm asking to --

THE COURT: That is the incorrect way. I will not permit it. He can testify to anything that you want to ask

him with respect to MM-2.

I have gone as far as I can go in order to assist you because in MM-2 we have documents that this expert tells me appear to be what they purport to be that is New York City Department of Environmental Protection statements, correct, sir?

THE WITNESS: Yes.

THE COURT: That you can ask him about. MM-2 is in evidence. Nothing else is. Bring in the jury.

MS. SHARKEY: Could I have one minute with Mr. Linden to confer?

THE COURT: Of course.

(Pause.)

MS. SHARKEY: I want to alert the Court to another issue, which will require a break from the jury.

THE COURT: What is that?

MS. SHARKEY: The Fifth Amendment issue.

THE COURT: Of whom?

MS. SHARKEY: Bobby Schiavo.

THE COURT: Bring him in. We will take care of it during this break.

Does he have his counsel with him?

MS. SHARKEY: He does.

THE COURT: Bring them both in. The witness come forward with his attorney, please. Where is Mr. Schiavo?

Sit here in Juror One seat, please, Mr. Schiavo.

Counsel, give your appearance, please.

MR. LIBRETT: Richard A Librett. 1325 Franklin Avenue, Garden City, New York.

THE COURT: You are representing Mr. Schiavo.

MR. LIBRETT: Yes.

R O B E R T   S C H I A V O ,

called as a witness, having been duly sworn, was examined and testified as follows:

THE CLERK: State and spell your name

THE WITNESS: Robert Schiavo.

THE COURT: Ask him your first consequential question, please, defendant.

MS. SHARKEY: Sorry.

THE COURT: Ask your first consequential question for the defendant.

MS. SHARKEY: For the witness?

THE COURT: For the witness.

MS. SHARKEY: Judge, if I could just provide the Court with a little context concerning this. The government, the witness would invoke the Fifth Amendment concerning certain issues on cross examination.

The government's position that the testimony would be stricken if that was not -- if it was gone into on direct.

It's the defense's position that the crimes for which the government contends -- that the government intends to cross-examine this witness on are dated. They are from --

THE COURT: Excuse me. Would you ask this witness the first consequential question so that we can get on with it? Do you have a question for the witness?

Are you calling him?

MS. SHARKEY: Yes.

THE COURT: Ask him the question you're going to call him for outside the presence of the jury.

MS. SHARKEY: Judge, what I'm failing to describe --

THE COURT: Do you have a question you're going to ask this witness?

MS. SHARKEY: I have a series of questions.

THE COURT: Ask him the question.

MS. SHARKEY: What's your name -- I'm not understanding the Court's point.

THE COURT: I want to know at what point he's going to claim the Fifth Amendment.

MS. SHARKEY: When the prosecution --

THE COURT: I want to know from him and his counsel. Ask him a question.

MS. SHARKEY: Are you an associate of the Gambino crime family?

THE WITNESS: I take the Fifth.

THE COURT: Counsel, will he answer the same way with respect to any questions with relevance to this trial in connection with his membership or the membership of anybody else in the Gambino crime family.

MR. LIBRETT: Yes, Your Honor.

THE COURT: And any acts charged in this case as crimes by the Gambino crime family or its members or associates.

MR. LIBRETT: Your Honor, I'm not that familiar with the acts in the case. I couldn't honestly answer that question at this point.

MS. SHARKEY: The cause for concern came up from representation from the government --

THE COURT: Excuse me.

Do you have another question? He answered that question by pleading the Fifth. Do you have another question?

MS. SHARKEY: Did you ever receive stolen cars from Peter Sicarro?

THE WITNESS: I take the Fifth.

THE COURT: Do you have another question?

MS. SHARKEY: Did you ever provide money to Charles Carneglia out of fear of retribution or physical harm?

THE WITNESS: Fifth.

THE COURT: All right. He is not a witness that

will testify here. I don't see how we can allow him to be called. It's clear he's going to, with respect to anything relevant to direct and cross, plead the Fifth.

MS. SHARKEY: It's the defense's position, Your Honor, that the witness could invoke the Fifth on a limited basis for cross-examination of unsubstantiated prior bad acts and we believe this witness has material evidence to offer on behalf of Mr. Carneglia, he would like to testify, on behalf of Mr. Carneglia but he would like to testify with the availability of the Fifth Amendment.

THE COURT: I am afraid that he can't do that.

MS. SHARKEY: I take exception to that. We will not be calling the witness because of the Court's ruling.

THE COURT: Thank you. You may submit a brief on it, of course. Thank you very much.

MR. LIBRETT: Thank you, judge.

THE COURT: You are excused.

Bring in the jury.

MR. BURLINGAME: Given the inconvenience to the jurors, I ask that we go a little late tonight, if it will be a little bit tomorrow morning.

MS. SHARKEY: I think it will be more than a little bit at this point.

(Followed on next page.)

(Jury present.)

THE COURT: Sit-down, please. Proceed, please.

MS. SHARKEY: Thank you.

DIRECT EXAMINATION (continued)

BY MS. SHARKEY:

Q I neglected to ask you, how long have you been a CPA?

A 29 years.

Q During the course of your career as a Certified Public Accountant, have you had experience in reviewing financial documents of home ownership?

A Yes, I have.

Q Condominium ownership?

A And cooperative, yes.

Q Approximately how many clients and documents associated therewith have you reviewed in regard to that over the course of 29 years, ball park?

A I've been retained as an accountant for two condominium coops since 1987 so about 21, 22 years and during the course I had about six or seven different condominium coop clients.

Q As a result of that, do you review the financials and the documents associated with condominium home ownership?

A We review and help prepare them. It's part of our role.

MS. SHARKEY: Your Honor, could I have Mr. Linden certified as an expert in the field of certified public accounting in reviewing condominium documents?

THE COURT: Yes, we'll be happy to have his opinion. He appears to be well qualified in this field.

MR. BURLINGAME: I note my objection. There is no issue -- there is no fact at issue requiring expert testimony.

THE COURT: We don't know yet. We haven't heard the questions and answers.

BY MS. SHARKEY:

Q Mr. Linden, did you in the course of your reviewing the documents for the Green Tree Condominium complex, did you review a water bill?

A Yes, I did.

Q And would it be accurate to say that there were multiple water bills that you reviewed?

A Yes.

Q For what period of time -- withdrawn.

Was there a back water bill that was assessed to the Green Tree Condominium complex?

A Yes, there was.

Q And for what years was that back water bill assessed, what years did that cover?

A The documents that I reviewed were a set of 13 water bills that started from June of '89 through June of 2003, so the period would be approximately 14 years.

Q And that would reflect 14 years of non-payment of a water bill, is that correct?
A Well, I'm not sure -- I'm not sure any of the bills were paid. This shows the open bills relating to that 14 year period.
Q What was the amount of the open bills -- open water bills for that a period of time?
A Approximately $800,000.
Q And that would be a water bill for a condominium complex over 12, 13 years, is that correct?
A It was over a 14 year period.
Q Based on your expertise, was that water assessment legitimate?
A Well, the bills were prepared by the New York City Department of Environmental Protection, which is normally the City agency that bills for water usage in the five boroughs, so I assume the bills are proper. They were prepared by the agency.
Q And in your experience in reviewing condo documents and condo management, does the number $800,000 for a sizable condominium complex sound about right for a 14 or 15 year period?
A Sounds reasonable, yes.
MS. SHARKEY: Nothing further.
MR. NORRIS: No questions.

THE COURT: Thank you very much, sir.

Next witness, please.

MS. SHARKEY: The defense calls Mark Gioia.

M A R K G I O I A ,

called as a witness, having been duly sworn, was examined and testified as follows:

THE CLERK: State your full name and spell it for the record

THE WITNESS: State your full name and spell it for the record

THE WITNESS: Mark Gioia. 742 South Pecan Street, Lindenhurst, New York, 11757.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Mr. Gioia, how old are you?

A Going to be 51 on April 11th.

Q What do you do for a living?

A Mobile auto and marine mechanic.

Q What does that mean?

A I go to people's residences, their marinas and repair the autos and boats.

Q Are you married?

A Common law, yes, ma'am.

Q Where do you live?

A I live partially at 742 South Pecan Street -- 36

Virginia Avenue, Long beach, when I'm not fighting with my wife, 742 Pecan Street in Lindenhurst. Mostly Lindenhurst.
Q Where did you grow up?
A Howard Beach, ma'am.
Q Did you live in Howard Beach for your entire youth?
A Since 1960, ma'am, since I was two years old.
Q From 1960 to about when?
A Until I was around 27, 28 years old and mostly living out there my whole life.
Q How far did you get in school?
A I got a GED in the Marines at the age of around 17 years old, it's a little bit of a story.
Q Let's go into that story. Did you join the Marines?
A Yes, ma'am.
Q How old were you?
A I was 15 years old.
Q How did you join the Marines at 15 years old?
A I dropped out of my first three months of high school, freshman year, I went down to 42nd Street, got a fake birth certificate, changed my first name and date of birth in '73, applied for a new Security number, applied for the draft card and entered the Marine Corps in 1973.
Q Did you serve?
A Yes.
Q Active duty?

A Yes.

Q Where was your tour of duty?

A I started off Paris Island, from there to MCR San Diego for radio telegraph training, shipped overseas, I did time in Okinawa, Subic Bay in the Philippines, Guam, Pearl Harbor, Anchorage, Alaska, and I actually was involved in -- sent to the Port of Saigon and involved in the evacuation in 1975 of the South Vietnamese refugees and brought them over to Camp Pendleton, California.

Q That was during the Viet Nam war?

A During the clean-up of the Viet Nam War, the last day was April 30, 1975.

Q Were you discharged from the Marines?

A Yes, ma'am.

Q Honorable?

A Yes, ma'am.

Q Did you receive any citations while you were a Marine?

A The normal citations, Viet Nam campaign, national defense, good conduct.

Q How old were you when you left the Marines?

A I was 18 years old, ma'am.

Q And when you left the Marines, about what year was that?

A December 16, 1976.

Q And where did you go after you left the Marines?

A Back to Howard Beach, my parents' house.

Q And did you have a job?

A Not right away, but I did start hanging around body shops in East New York in Brooklyn, learning, I guess, the automotive trade.

Q And were you arrested?

A In 1979, I believe it was around sometime in 1979 I was arrested for sale of an automatic weapon.

Q What kind of automatic weapon were you arrested for?

A A Czechoslovian AK 47 machine gun.

Q Were there any other weapons that you sold in the course of that incident that led to your arrest?

A Yes, ma'am.

There were nine U.S. government 45 handguns and a number of pen guns.

Q What is a pen gun?

A It's a device that looks like a pen that fires a -- the ones that I had fired a 25 automatic shell.

Q Where did you get those guns?

A My father, ma'am.

Q Your father wasn't indicted with you, was he?

A No, ma'am.

Q You were indicted as a result of that, correct?

A Yes, ma'am.

Q Who did you sell those guns to?

A An alcohol, Tobacco, and Firearms agent, ma'am.

Q As a result of that sale did you go to trial or take a plea?

A I took a plea.

Q What did you receive as a sentence?

A Six months, MCC study and observation, six years suspended sentence and five years probation under the youthful correction act.

Q Did you successfully complete that probation?

A No, I did not, ma'am.

Q Were you arrested again?

A Yes, ma'am, I was.

Q And where were you arrested and for what?

A I was arrested in Ozone Park, Queens, Howard Beach area, you might say, where the arrest took place, I was arrested in 1983. I believe it was around August or September, I was arrested for Grand Larceny, stolen property and alteration of VIN numbers.

Q Did you say a you were also arrested in Nassau saw County?

A In Suffolk County.

Q Was that for the same charge?

A Yes, ma'am, I was arrested in three indictments in Queens for three automobiles in Queens and one in Suffolk County.

Q Were those stolen automobiles?

A Yes, ma'am.

Q And did you plead guilty on that?

A Yes, I did, ma'am.

Q And did you receive a sentence?

A Yes, I did.

Q What sentence did you receive?

A I received one and a half to three from the indictment in Suffolk and then three additional ones to run concurrent with the one from Suffolk.

Q You went to jail, right?

A Yes, ma'am. I did 25 months on a one to three, I did a month over my initial release date.

Q When were you released from jail?

A I was released from jail around, I think it was -- I went away September 1983, I was released, I guess, October of '86.

Q Where did you go back to live?

A Back to Howard Beach, ma'am.

Q Did -- when you went back to Howard Beach, were you on probation?

A I was on one year parole. I was reinstated, released from the state, I was -- I had to do the maximum time in the state, I was in maximum security prisons for my time in the state, I was released to the United States. Marshal detainer, I guess, in anticipation I was going to do federal

time after that.

Q That was for your violation --

A Of the machine gun sale, ma'am.

Q In 1989, were you arrested for something else?

A Yes, ma'am.

Q What was that?

A I was arrested for use -- I was arrested for conspiracy for marijuana trafficking.

Q What does that mean in lay language? What did you do?

A Sell pot, ma'am.

Q With whom did you sell pot?

A Myself, ma'am, I sold it -- I sold for myself to other individuals.

Q Were you arrested on an indictment with any other persons?

A Yes, ma'am. I was indicted with 31 other individuals on what I was -- understanding to believe an organized crime case, ma'am.

Q When you were -- where were you selling marijuana that led to your arrest?

A In Howard Beach, ma'am.

Q Prior to your arrest, did you know that you were partnering or buying marijuana from someone associated with organized crime?

A I didn't know, ma'am.

Q But you pled guilty to that, correct?
A Yes, ma'am.
Q And what was the extent of your marijuana sales, how much marijuana did you sell, where did you sell it from?
A Maybe over a period of a couple of years, I would say total maybe five, seven, eight pounds, I was selling ounces, quarter pounds. This sale that I actually got indicted for was supposed to be a big sale, I guess you call it, I was supposed to be selling 65 pounds of it for $1200 a pound -- get it for $1200 a pound and selling it for $1400 a pound, which the deal never went through. The call was made from an informant that was involved in this case that I was telling you about.
Q With the local pot dealer?
A I was a pot dealer in the local area.
Q Did you mostly sell ounces?
A Mostly, quarter pound tops.
Q How much jail time did you do result of that?
A I believe, it was around 15 or 18 months federal time.
Q Now, when did you get out of jail on the arrest and conviction for marijuana conspiracy?
A I believe it was around June 9TH, if I'm not mistaken, of 1992, ma'am.
Q And where did you go to live?
A Back to Howard Beach, ma'am.

Q And did you know Charles Carneglia?
A At that time I heard of him, ma'am.
Q When you say you heard of him?
A I knew of him, I knew his reputation, I knew Charles Carneglia, ma'am.
Q And did there come a point where you became sober?
A Sober.
Q Let me back it up. Did you have a marijuana problem, a drug problem, an alcohol problem?
A Yes, ma'am.
Q And over what course of years was that?
A I would say from the age of around 27, 28 until I was around until my daughter, more or less, was born, you know, just about when my daughter was born.
Q Now, when did you meet Charles Carneglia?
A For the first time around the year 2000, I believe 2000.
Q And how did you meet Charles Carneglia?
A I met Charles Carneglia through my best friend, Allen Meshanski.
Q And when you first met Charles Carneglia through Allen Meshanski, where was it?
A I believe it was at Carosella's.
Q What is Carosella's?
A It's a family restaurant in Howard Beach.
Q Have you eaten there?

A Yes.
Q Have you had family functions there?
A Yes, four of my daughters' birthdays were there.
Q And did you get to know Charles Carneglia?
A Yes, ma'am.
Q Now, you said you met him in 2000 through Allen Meshanski. How often would you see Charles Carneglia during that time period?
A I would say on average of about maybe three to four times a week, sometimes, ma'am.
Q And was Mr. Carneglia a drinker to your observation?
A Yes, ma'am.
Q When you say he was a drinker, what do you mean by that?
A He drank.
Q Did you see him drunk?
A Yes.
Q Did you see him drunk often?
A Yes, ma'am.
Q Now, Mr. Gioia, did there come a time when Mr. Carneglia was planning on going to jail in 2001?
A Yes, ma'am, there was.
Q And was that after a conviction in Suffolk County?
A Yes, ma'am. He was -- my friend Allen was going with him every day to the trial to Suffolk County court, the white elephant they call it.

Q Allen was not an individual who was charged in that matter, right?

A No, ma'am.

Q What was Allen's relationship to Charles Carneglia?

A Allen worked in his junk yard.

Q And what is Allen's physical condition?

A My best friend is disabled. His walking condition is getting less and less every day. He has a problem walking and functioning. Loses feeling in his body.

Q Does he have a spinal cord injury?

A Yes.

Q Has he had it for many years?

A Yes.

Q Mr. Gioia, when you said you met Charles in 2000, what sort of things -- what sort of events would cause you to see Mr. Carneglia two to three times a week?

A We normally just go down to hang out with Charles, you know, tell jokes, I guess you know Charles was, I guess, we got close to him in a way, he liked Allen, he liked being around Allen, my best friend was a straight up kind of guy and I guess he took to me too, we reminisced about neighborhood things in the past.

You know, in talk with Charles over a period of time he realized I was in the neighborhood and I knew of a lot of things, being older than Allen, he realized I knew things in

the neighborhood that happened in the past, knew the history of the neighborhood, I guess, you would say.

Q Howard Beach is a small community?

A I wouldn't call it a very large community.

Q Mr. Gioia, did you ever perform any functions for Charles Carneglia? Did you help him out at the junk yard or at his house prior to the incarceration?

A Not at the junk yard but I guess through watching him go through the courts, his mother is pretty old Jennie, and Allen had, I guess, obligated himself to take care of his mother and I stand behind my best friend, it would be my job also to take care of Jennie while Charles was away.

Q Prior to Mr. Carneglia going to jail in the fall of 2001, were you making plans with Mr. Carneglia for the care of his elderly mother?

A Yes, ma'am.

Q What sorts -- tell the members of the jury the sort of things you were doing?

A We interviewed care takers and nurses to make sure his mother was taken care of in the proper way and not abused 24 hours a day. Make sure her medications were getting taken properly. She was getting to see the doctors that she needed regularly. Making sure that the house was intact. I did a number of repairs between washes, dryers, fixing doors, tables in the house.

Just household things that broke in the house. The house wasn't all that new, did need chair repairs. Me, being a mechanic, and the only one that can handle that friend of Charles, friend of Allen along the way, would obligate myself to help out.

Q When you say obligate yourself, nobody was forcing you to do this?

A No.

Q When you say obligate, what do you mean by that?

A As a friend just do a friend what a friend would do for a friend. Just doesn't take much to look after someone's mother a few hours of my time a week. Whatever, if it takes an hour, half hour to fix something, at least Charles, wherever he's at, he's content his mother will be okay and I felt myself I was doing the right thing, you know.

Q Was prior to Mr. Carneglia going to jail in the fall of 2001, and in preparation of that incarceration, would you say it was a very emotional time for Mr. Carneglia in relationship to his mother?

A Very.

Q Was Mr. Carneglia concerned about his mother?

A I guess one of the few and only things he was probably concerned with, one of his main concerns.

Q And did you have any conversation with Mr. Carneglia prior to his going to jail about his life?

A Yes, a number of them.

Q Did you have any conversation with Mr. Carneglia prior to his going to jail as to the reasons why Mr. Carneglia was going to jail?

A Yes, I had conversations with Charles, a lot of conversations.

Q What did Mr. Carneglia tell you?

MR. BURLINGAME: Objection?

THE COURT: Only restrict the questions again to his present state of mind and intention for the future.

Q Prior to Mr. Carneglia going to jail, in the fall of 2001 and in preparation of his going to jail, what did Mr. Carneglia tell you about his relationship towards organized crime.

MR. BURLINGAME: Objection?

THE COURT: Reframe it as I suggested.

Q Prior to Mr. Carneglia going to jail, and prior to his leaving for jail, in the moment, was there a particular day or series of days prior to his going to jail where he told you what his intentions would be concerning his relationship to organized crime? Do you understand the question?

A Yes. What happened in his life he was very -- disrupted. He was tired, Charles was tired. He was tired of it all. He would sit with us for hours, sometimes at Carosella's and tell me and Allen he was done, he was finished with things,

he was disgusted with the -- I guess, the new generation of mob, the new generation of -- when I was in jail we didn't make up things or tell stories about other people, rat is what you say, he would say call it inmates of the new millennium. Charles was referring, he told us he was done with the new generation of what this has all become, how he was seeing friends of his just being, just sent away for like things that -- for things that other people would say to save their own assess from crimes they committed. It was just -- he was just fed up, so tired, you could see the tiredness in Charles' eyes every time he explained this to us. He was just, you could see Charles was done, he was exhausted, physically exhausted and just didn't want to be bothered anymore with anything.

Q Go ahead.

A He would turn around, I guess, curse a lot of individuals for what they had become and had done and he was just tired, he was done with it all. He was tired. He used to sit there for hours, we were in the back of Carosella's sitting on the benches next to a parking valet hut and just sitting there for two and a half hours, he would drink, you would see tears in Charles' eyes, there was nothing left of him. There was nothing left. He had a hollow spot that is basically what I saw and Charles from what he told us, you could sense he couldn't go on anymore. He was concerned with

his mother, his mother was the big reason for him being feeling the way he felt, you get to that age in life where you don't really -- like myself my children is what matter to me, there is nothing I would do to jeopardize seeing my children grow up and in Charles' case he just wanted to be at peace.

Q Did he make any direct comments to you about his intentions in relationship to organized crime?

A Say that again.

Q Did Mr. Carneglia tell you what he intended to do in regards to his connection to organized crime?

A He said he was done. He was finished. He told us he was done. He told me that he was just finished.

Q That's it?

A He told me he was finished. He was done with the mob. He doesn't want to be dealing with anybody that is going to get him in trouble. He has his old friends and that's all he valued his old friends and mother. Other than young people, me and Allen were the only two young people that he would be around at this point.

Q Mr. Gioia, when Mr. Carneglia did go to jail, in 2001, did you help take care of his mother?

A Yes.

Q What did you do?

A In 2001, brought her meals, almost every night, at least

five out of seven nights a week, delivered the meals, picked them up and delivered them right to the house. My friend Allen, wife Jodi, cooked the meals four out of five times and if you bag them up, Allen and I would get a chance to hang out, I would pick him up. We'd sit with Jenny and she would have a glass of wine and we'd give her her medication and after a few months we got an aide to come in and help and I think it was we went through two or three before we got this woman there, now Elsie.

Q Did that workout?

A She's the best. Before Elsie it took a while to find somebody right. There was a lot of mistrust in the individuals that we got.

Q Have you finished?

A Like take care of stuff around the house.

Q Did you fix things?

A A bathroom pipe broke. A number of things. Bathroom pipe, a door, shingled. A window came out of our house one time. There were so many.

Q Did you receive any payment for this?

A No.

Q Did you receive any benefit from this?

A Never, it wasn't about that.

Q When Mr. Carneglia came out of jail, in 2006, did you continue your friendship with him?

A Yes.

Q And how -- what did you with Mr. Carneglia when he came out of jail?

A I guess at that point I got a lot closer with him. We were on a knock around kind of social, whatever you want to call it.

Q Was he grateful to you for helping to care for his mother?

A Yes.

Q Did you socialize with him?

A Yes, we had dinner a couple of times. He wouldn't go further than Carosella's. We had dinner a couple of times. A few drinks. Him not really a drinker.

Q And is Carosella's the neighborhood restaurant?

A It's a restaurant in the neighborhood.

Q Is it a restaurant in the neighborhood that is popular with the people who live there?

A Yes, usually.

Q Family place?

A Yes, a lot of kids all of the time.

Q All types of people go to Carosella?

A From every neighborhood.

Q Did you ever have a conversation with Mr. Carneglia after he got out of jail about his intentions towards organized crime?

A Supposedly he wasn't, you know, he wasn't involved in it at that point. He told me any time you would state to him, I would tell Charles something to do with what is going on in the neighborhood, I would hear her say, he would tell me he's done. He's finished with all of that, didn't even concern him, to tell you the truth.
Q Did you observe an incident -- by the way, what did Mr. Carneglia look like after he got out of jail in 2006?
A Older.
Q Tired?
A Tired.
Q Was there ever an incident at Carosella where you were present with Mr. Carneglia and he had a confrontation with someone?
A Yes.
Q Would you tell the members about that?
A I was with Allen, I think, at that time we just got done checking a 17 foot runner that I had in the water and we checked out the boat, to make sure it was isn't sinking --
Q Could you tell us about the incident at the restaurant?
A We got a call from Charles, Allen got a call, asking us to come down to the restaurant. He was upset. Very upset. We-- Allen looks at me and says some big shots in Carosella's and came down from Staten Island in Brooklyn. Allen might have mentioned a name on or two, I don't remember if he did

or not, totally honest I don't remember if he mentioned a name.

Q What did he say happened or that you observed?

A When we got to Carosella, Charles came out storming, he was cursing, and fit to be tied and -- am I allowed to curse --

Q If you need to?

A It was these mother fuckers, these mother fuckers.

Q What did he say?

A After he said it 10 or 12 times, Charles, what is up, what's wrong.

Q What did he say?

A These mother fuckers think I'm going to shave my beard off. I'm not involved with them. They are not going to tell me what to do, no one is going to tell me how to run my life. There was like six of them to reprimand him and tell him he had to shave his beard off.

Q What was Mr. Carneglia's reaction to people telling him what to do?

MR. BURLINGAME: Objection?

THE COURT: I will allow it.

Q What did he say to you?

A Fuck them, they can't tell me what to do, I'm not involved with them.

Q After Mr. Carneglia was arrested in this case, in

February of 2008, have you continued to look in on his mom?
A Yes.
Q Have you continued to help Allen in regards to taking care of Charles' mom?
A Yes, but pretty much Elsie got things under control at this point.
Q Mr. Gioia, we talked about your prior contact with the criminal justice system, right?
A My prior --
Q Your prior contact with the criminal justice system, your prior conviction?
A Yes, ma'am.
Q You sold pot throughout your life to support yourself, right?
A Sold pot to support myself, no.
Q What years did you sell narcotics, sir?
A I would say, I don't remember the years.
(Followed on next page.)

DIRECT EXAMINATION

BY MS. SHARKEY: (Continued)

Q Well, when you pled guilty to conspiracy to distribute marijuana --

A Right.

Q -- was that the last time you sold marijuana?

A (No response.)

Q After you got out of jail on that?

A Is that the last time I sold marijuana? I might have sold an ounce or two since then, you know, but -- or got one for somebody or whatever. I'm not going to, you know, say that I didn't. Of course I, I definitely, you know.

Q After you got out of jail in, when did you -- when was the last time you got out of jail, Mr. Goia?

A Well, the last time I got out of jail was, I just had a domestic violence case with my wife. Last July of 2007.

Q And had you had prior domestic violence cases with your wife or your girlfriend?

A With my girlfriend.

Q How many times?

A I believe it was twice, I believe --

Q Could it have been three times?

A -- three girlfriends?

I think the third time was probably my wife?

Q And was, were those incidents the result of abuse of

alcohol and drugs?

A Oh, definitely. Without a doubt. I was big into coke and big into pills and pot and you name it. If I could do it -- I wasn't a big drinker, but other than alcohol I was doing a lot of stuff, yes, ma'am.

Q And as a result of that, were you arrested?

A Oh, yes, ma'am.

Q And did you participate in any sort of clean-up programs? Did you go to 12-step programs?

A Oh, yes, ma'am. In the past, I've come a long way. I've completed anger management, domestic violence. I go to therapy. I keep my life together now.

Q And are you with your wife now?

A Yes, ma'am.

MS. SHARKEY: Nothing further.

THE COURT: Why don't we -- how long will you be?

MR. BURLINGAME: Ten minutes maybe? Fifteen minutes?

THE COURT: I think we've gone some time.

Why don't you take a break for ten minutes.

(Jury is excused.)

(Continued on following page.)

(The following occurs outside the presence of the jury.)

THE COURT: All right.

You can take a break, but be back, please, in ten minutes on the witness stand.

THE WITNESS: All right.

(Recess taken.)

(In open court.)

THE COURT: Bring in the defendant.

Have the witness take the stand, please.

(Witness resumes stand.)

(Pause in the proceedings.)

(Continued on following page.)

(Jury enters.)

(The following occurs in the presence of the jury.)

THE COURT: Be seated, please.

Witness, keep your voice up and bring the microphone closer to you. Speak up so that the last juror can hear you without any problems.

MR. BURLINGAME: May I enquire, Judge?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. BURLINGAME:

Q Good afternoon, sir.

A How you doing.

Q All right. Now, you testified on direct that the defendant was tired of it all, he was done, he was finished.

What is "it?" What was he tired of?

A Just being involved with crime.

Q With any particular kind of crime?

A Crime in general. All crime, I would think. He's just tired of it.

Q You said that when you met him in '93 you were aware of his reputation?

A I didn't meet him in '93. I met him in 2000.

Q I'm sorry.

When you met him in 2000, you said you were aware of his reputation from the neighborhood?

A Yes.
Q What was that reputation?
A Tough guy, gangster, whatever you want to say.
Q Gangster? So, you're aware of him being involved in organized crime?

MS. SHARKEY: Objection. That's not what he testified to.

THE COURT: Overruled.

You may enquire.

A As a what?
Q Yes, you can answer.
A I'm sorry, just one more time.
Q Are you aware of him being involved in organized crime?
A I didn't know what actually, you know. As a young -- when I was young like that, I didn't really know what organized crime was. I know that he was supposed to be a tough guy from the neighborhood.
Q And what are we talking about; when you were young?
A I guess I really didn't realize anything about organized crime until I was 28, 30 years old.
Q Okay. And what years was that?
A Well, if I'm 51 now, I guess that would be the year of...
Q About 20 years ago? The early '80s?
A The early '80s, like that, right.
Q When did you testify you were aware of his reputation?

A As a young, you know, I realize I knew of his name when I was in my, 12, 13 years old, 14 years old.
Q Okay. And then you were back at Howard Beach on and off throughout the '90s.
You didn't hear anything about him then?
A Through the '90s, I didn't hear anything about him, no.
Q Oh, okay. You're not aware of him being a soldier in the Gambino Crime Family?
A No.
Q But when you met him in 2000, he said he was done with the life; is that fair?
A Yes, sir.
Q And what did you understand that to mean based on your experience in that neighborhood, to be done with the life?
A Well, I guess, in, you know, my best friend Allen's been my best friend my whole life. I really, my friend Allen, when was I aware, I guess, more what was going on than I was. I really wasn't the wise-guy type, you know.
I got involved with my what, do you call it, miss, mischievous, whatever you want, I don't know what the word I'm trying to use, but I got involved with deviancy as far as dealing pot. You know, I sold a machine gun. I tagged a few cars, you know, but I wasn't really up on who was who and all of that. I did hear of Charles Carneglia. I heard of his brother John Carneglia. I heard of John Gotti. You know, but

they, as far as the particulars of them, I guess all like related to was Mafia or, you know, like Godfather whatever, you know, didn't really get into the, you know --

Q So, you heard of all those guys being part of the Mafia?

A I never heard of word said that they were in the Mafia, but I guess I assumed it for myself.

Q And you said Allen Meshanski knew a little more about that life, the wise-guy life than you did?

A I think he did.

Q And do you know what's involved with being a member in organized crime?

A I've heard stories.

Q Do you know about the initiation ceremony?

A I've heard stories, yes.

Q So, did you ever hear it involves taking a blood oath to carry out murder at the direction of your superiors?

MR. FARBER: Objection.

THE COURT: I'll allow it.

A I've, I don't know about taking a blood oath at the directions -- I didn't hear -- I didn't know the particulars of that part, but you know. I know there was involvement from what I seen from the Godfather, burning of a card and the hand, things like that. That's what I know.

Q So, you're not aware of all the rules of organized crime?

A Not the real particulars, sir, no, sir.

Q Are you aware of any of the rules about how long you're in the Mob once you are inducted?

A Well, I think everybody knows that the saying goes is you don't leave. You leave dead; right?

MR. BURLINGAME: I couldn't have put it better myself.

MR. FARBER: Objection.

THE COURT: Yes.

Strike the comment.

Q And so, you, without knowing exactly what the defendant's affiliation was with organized crime, is it fair to say you're aware that there was some sort of organized crime affiliation there?

A I didn't know, to tell you the truth. If you want to say I assume? I could assume, but assume don't mean, you know.

Q Well, what was your understanding as to that? You told that story about some guys coming and telling him to shave his beard.

What was your understanding as to why they were coming to tell him to shave his beard?

A I believe that Charles might have been involved with something and they felt that maybe he was part of, you know, because he felt that he -- they made him part of this Mob or whatever it was, that he wasn't supposed to have facial hairs.

Q I see. So, he was part of the Mob now?

A I can't say he was or wasn't. That's what I'm saying.
Q But your understanding of that situation is the other mobsters came down --
A I don't know what Charles's position was as far as his position with the people that you knew. Maybe he was, you know, worked for them, maybe he did dealings with them, I don't know. But all I know is that what I could tell you for fact is that these people did come down and they demanded that he shave his beard off. And I can tell you what Charles said when he came out from that meeting, and he was upset, and he was pissed.
Q Right.
A And he was not shaving his beard off. And he insisted that he wasn't --
Q Well --

MS. SHARKEY: Objection. Let him finish.

THE COURT: Yes.

A And he was insistent that he wasn't involved in anything at this point in his life anymore. His, you know, his, you know, future meant his mother which he, I guess, he anticipated not living very long and, you know, just being peaceful. That's all that really Charles wanted.

I could see at this point he was insistent upon peace. He didn't want to be involved with any type of excitement, any type of -- he just wanted to go to the bar,

have a few drinks, go home. He was contented being at home. You know, when I talked to him, he would talk about movies, he was into watching movies, you know. That's what he was into doing. Just didn't want to be, you know, didn't want to be in the life no more. That he was happy with his Carosello's and going home. That's all Charles knew.

Q And I think you testified on direct you were totally honest when you talked about that information about the beard; right?

A Yes, I am honest, without a doubt.

Q You take your oath here seriously; correct?

A Yes, sir.

Q And have you violated any court orders recently?

A Any court orders?

Q Yes.

A I violated a contempt of my wife. Is that what you're talking about?

Q Was there a restraining order against you in relation to somebody named Tara Lamar?

A My wife.

Q Okay. And you violated that; right?

A I pled to the violation. That's what the --

Q You violated the court order to keep away from your wife; right?

A It wasn't a stay away order, sir. It was a do not harass

order.

Q The order wasn't to restrain you from assaulting, threatening, abusing, harassing, following, interfering, or stalking the protected person?

A That's called a do not harass order. I was given permission to live with her. I just wasn't to harass her.

Q But you violated that order.

A We had an argument and it got out of control, yes, sir.

Q What does that mean?

A I guess, in the heat of the moment, she like, you know, we had an argument. And I was re-arrested on a, on an assault charge.

Q Yes.

A She ripped my shirt, and as she was ripping my shirt off my back, trying to prevent me from leaving the house, I was trying to defuse the situation of argument. I was leaving, I went to elbow to get her off my shirt and she got hit in the face.

Q So, you elbowed your wife in the face?

A Not intentionally, sir.

Q But the Court found that was a violation of your restraining order.

A They were going to charge me with the assault, but before they went to the Grand Jury, they came to an agreement that if I plead guilty to the, to the contempt charge, they would drop

all other charges.

Q Okay. So, you're trying to avoid the assault charge.

MS. SHARKEY: Objection. Form.

A I wasn't trying to avoid. I took it to the Grand Jury. My wife begged me not to go to the Grand Jury. To just, you know, to get rid of this as much as we can.

I agreed to go to anger management and domestic violence, which I completed. I'm definitely in therapy. And there's been a big change in my life since then.

Q Now, you seem like you are happy to be here today and able to testify for your friend; correct?

A I'm happy to tell the truth.

Q Okay. Are you proud of your friendship with the defendant?

A I don't know what you mean by proud of him. I enjoyed my friendship with the defendant. I, you know, I had some good laughs with him. We had some nice dinners together. You know, he was never a bad guy to me.

Q And you testified that you weren't aware that membership in the Gambino Family entails killing on command; correct?

A I didn't realize that, I'm sorry. Definitely, I didn't, without a doubt.

Q So, that wouldn't factor into your decision as to whether or not you were proud of your friendship?

MS. SHARKEY: Objection.

THE COURT: I don't understand the question.

THE WITNESS: Neither do I, Your Honor.

Q Well, you testified on direct that you stand behind your friends; correct?

A I stand behind my friends?

Q Yes.

A Well, if my friends are wrong, I'm not going to stand behind them if they're wrong. I mean, they're going have to make their own decisions. We all have power over our own lifes.

Q I'm just asking you, yes or no, did you testify, "I stand behind my friends" on direct examination when Ms. Sharkey was asking you the questions on the defendant's behalf?

A I help my friends if I can.

(Pause in the proceedings.)

Q Now, you testified that you had a number of conversations with the defendant where he told you that he was disgusted by the new generation of the Mob?

A Yes, sir.

Q Okay. And you testified that he was disgusted because there was no honor in the new generation; correct?

A Absolutely, sir, yes, sir.

Q And he was upset that people were ratting on people; correct?

A Yes, sir.
Q And that his friends were getting put away in jail; correct?
A Yes, sir. Wasn't just that people ratted. It was that people were actually lying and getting away with crimes themselves, just to get out of crimes themselves, you know, saying what the Government wanted them to say. That's what the discussions we had.
Q So, the old Mob, what was your understanding of what was the thing that made the old Mob better?
A I don't understand, sir.
Q Why was the old Mob better than the new Mob?
A (No response.)
Q People didn't rat on each other; is that fair to say?
A Made the old Mob better. People -- where people would stand up and were accounted for their own crimes.
Q Stand up; right?
A Right, they would stand up for their own crimes, yes, sir.
Q And you know what that means; right? "Stand up;" right?
A If they committed a crime, they would do the time.
Q Right. And you don't rat on your friends; right?
A I, no, you don't rat on your friends, yes, sir.
Q Are you a stand-up guy?
A Am I a stand-up guy? Yes, sir, I would say, yes, sir,

without a doubt.

Q All right. Without a doubt?

MS. SHARKEY: Objection as to repeating the witness's answers.

THE COURT: Yes.

Don't repeat his answers, please.

MR. BURLINGAME: Sorry, Judge.

Q And now, you testified that you have a fair criminal history?

A A fair criminal history?

MR. FARBER: Objection to the characterization.

Q You testified you've been arrested and convicted of a number of crimes; correct?

A Yes, sir.

Q And you testified that you continued to deal marijuana since your last marijuana sentence; correct?

A I might have dealt marijuana since my last conviction, yes, sir.

Q Okay. And when? On what occasions did you deal marijuana?

A I can't recall, sir. I really don't, I don't remember the exact dates. It's been so long.

Q Just give me a ballpark.

A Ten years ago? I don't know, sir. I can't really, you know.

Q Ten years ago? Anything sooner than that?

A No, I would say no sooner than ten years ago.

Q How much pot were you dealing then, ten years ago?

A Like I said, sir, it might have been an ounce, get an ounce or a quarter pound for somebody. That would be about it sir.

THE COURT: Speak up so the last juror can ear you.

A I'm sorry. It might have been an ounce or a quarter pound. Getting it for somebody, not -- I wasn't a dealer. I would just have a connection to get it for somebody.

Q So, you weren't dealing. You were just buying pot?

A Being the middleman to get for somebody, yes, sir.

Q Right.

Do you know the owner of Carosello's restaurant?

A The owner of Carosello's? I think would be Frankie Russo who owns Russo's on the Bay, sir.

Q Do you know if he's an associate of the Gambino Family?

A Frankie Russo?

Q Yes.

A No, sir. I went to school with Frankie Russo, sir. He's not.

Q So, you didn't go to school with anyone who's a member of organized crime; right?

A No that I know of, sir.

Q And in that marijuana distribution case, there were no

organized crime members involved in that case; correct?
A In the, from what I understand, there was, sir.
Q Oh, so the people you were convicted with weren't in organized crime?
A You're talking about the 1990 arrest?
Q Yes.
A That was referred to as the "Tommy Karate" Pitera case, sir.
Q And you were part of that case?
A I was what they called what the tail-end of what my lawyer called the tail-end of the indictment.
Q So, you really didn't have anything to do with it.
You just happened to be indicted?
A I was a pot dealer who probably would have got killed by Tom cart if I would have ended up making that deal, which is what they wanted to set me up for, which was what that was about, really. That whole case.
Q So, is it fair to say it was just bad luck you got indicted with all those mobsters?
A It was bad luck?
Q For you.
A Well, it was good luck because if I didn't, I might have got killed by "Tommy Karate". So, I'm here today to say that I, you know.
Q Who is "Tommy Karate"?

A "Tommy Karate" Pitera is a guy on the stand who was involved with organized crime --
Q What family?
A -- who committed murders.
Q What family?
A I can just say what hearsay I heard. I don't know for sure.
MS. SHARKEY: Objection as to hearsay.
THE COURT: I'll allow it.
A I would say one of the Brooklyn families, sir.
Q What are those families?
A The Brooklyn families?
Q Yes?
A People from Brooklyn, Bonannos, I don't know. Genovese, Bonannos, one of them families.
Q What are the other families?
A Gambinos, Genovese, Bonannos, Luccheses. I guess that's about it, you know, right?
Q You don't know other any other ones?
A Gambino, Lucchese, Colombo. Colombos, Gambino, Lucchese, Genovese -- according to the books there's five families, right? So the five families are Gambinos, Genovese, Lucchese, Colombo and...
Q Do you spend a lot of time read about that?
A I guess when I was away I did read books about that, sir,

yes, sir.

Q Do you know this guy (indicating)?

A No, sir.

Q You don't know him?

A No, sir. Not at all, sir.

Q You've never seen him before in your life?

A Never seen him before in my life, sir.

Q So, if I said Joe Panzarella, Junior, would that mean anything to you?

A I didn't recognize him as that, but I do know Joe Panzarella.

Q You know Joe Panzarella, Junior?

A Yes, sir.

Q And do you know him to have any association with organized crime?

A Joe Panzarella? Not that I know of, sir.

Q Okay. And what about that guy (indicating)? Do you know that guy?

A No, sir.

Q Have you ever heard of somebody named Tommy "Sneakers" Cacciopoli?

A No, sir.

Q Okay. So, you're not aware of him being the defendant's Captain in the Gambino Family?

A No, sir.

Q Okay. Do you know that guy?
A He looks familiar, but I don't really know his name.
Q Does the name Angelo Ruggiero, Junior mean anything to you?
A Angelo Ruggiero, Junior. I believe he was on a case with another friend of mine, Vinny Saporito. That's what I know of him.
Q What kind of case was that?
A I think it was a pot case, sir.
Q Do you know of him having any Gambino Family association?
A He might. I don't know the particulars of his background.
Q You don't know.

(Pause in the proceedings.)

Q Do you know any of the other defendants in that drug case with Angelo Ruggiero and Viot Saporato [sic]?

What was the last?
A Vinny Saporito.
Q Vinny Saporito?
A Peter Zuccaro.
Q Peter Zuccaro.

Do you know of him having any organized crime affiliation?
A Peter, from my understanding, you know, from my knowing

Peter, which I knew Peter.

Q You liked him?

A No.

MS. SHARKEY: Objection. If he could finish his answer before being interrupted.

A Peter was a wild man who almost got me to kill somebody at a young age. All right? Peter was a lunatic. Peter was a crazy, crazy lunatic.

Q Did he have any organized crime affiliation you're aware of?

A I would think he did. I didn't know for sure what Peter did, you know? Peter was a cowboy.

Q What about that guy (indicating)? Do you recognize him?

A Don't know him at all, sir.

Q Jackie Cavallo?

A Don't know him, sir.

Q You don't know of him to be a soldier in the Gambino Family?

A No, sir.

Q What about that guy (indicating)?

A That's my best friend, Allen Meshanski.

Q Allen Meshanski.

And you said he know more about organized crime than you do, but do you know of him having any official relationship with organized crime?

A No, he does not. He knows everybody, but he's not any position or anything with them.

Q So, are you aware of the defendant receiving money from these two guys while he was in jail?

A No, I didn't know nothing about that.

MS. SHARKEY: Objection.

THE COURT: You're holding up what?

MR. BURLINGAME: Sorry.

Holding up a picture of Jackie Cavallo and Tom Cacciopoli.

MS. SHARKEY: Objection. He's also testifying in the course of his question.

THE COURT: No.

Overruled.

THE WITNESS: I don't know who they are anyway, Your Honor. I never seen them before in my life. Of those two pictures, the only things I ever know or met is Allen Meshanski and Joe Panzarella. And that picture doesn't even look like Joe Panzarella.

Q So, are you here pursuant to a cooperation agreement with the Government?

A To what?

Q A cooperation agreement?

A No.

Do you know what that is?

MS. SHARKEY: Objection. This a defense witness.

THE COURT: That's an inappropriate question.

MR. BURLINGAME: I'm just asking if he is, Judge.

THE COURT: Pardon me?

MR. BURLINGAME: I'm just asking if he is.

THE COURT: For me?

MR. BURLINGAME: I'm asking the Judge -- I mean, the witness -- if he is testifying pursuant to a cooperation agreement.

THE COURT: He said no.

MR. BURLINGAME: Okay.

THE WITNESS: Could you explain? I don't even know.

THE COURT: Well, explain your question.

THE WITNESS: Explain the question, please.

THE COURT: Or rephrase.

Q Sure, if I was to explain to you a cooperation agreement is something whereby someone who is facing time in jail agrees to tell the truth about all their criminal activity in exchange for the opportunity to, hopefully for them, get less time in jail, would that explain your situation now?

A Am I for that? No, I'm not.

Q So, you don't have a jail sentence hanging over your head right now?

A No, not at all.

Q Okay. And you're not going to go to jail for the rest of

your life if you tell a lie on the stand here today?
A I'm not telling a lie on the stand here today.
Q Answer the question.
You're not going to go to jail for the rest of your life if you tell a lie on the stand here today; correct?
MS. SHARKEY: Objection as to form.
THE COURT: Sustained.
Q Are you going to go to jail for the rest of your life if you tell a lie here on the stand today?
MS. SHARKEY: Objection.
A No, sir. I'm not worried about it. I'm not telling a lie.
MR. FARBER: Objection. This line of questioning is argumentative, Your Honor. It's of no relevance.
THE COURT: Yes.
Q Did you meet with the Government before you testified?
A No, sir.
Q And when -- did you meet with the defense investigator?
A A defense investigator, yes, sir.
Q Did they take notes when he interviewed you?
A No, sir.
Q Okay. So, did anyone take notes when they interviewed you?
A They asked me questions. They didn't take notes.
Q Okay. So, as far as you know, the Government wouldn't

have any notes of any of your prior interviews; right?

A The Government have any notes of my -- in other words, the Government --

Q Me.

A -- have notes of my, of my --

Q Of the prior times you've talked about what you're talking about today?

A You wouldn't have any, no.

Q Right. Okay.

So there's no way for is to check to make sure you're telling the same story?

MS. SHARKEY: Objection.

MR. FARBER: Objection.

MS. SHARKEY: As to form.

THE COURT: Sustained.

Q So, you were close to the defendant; right?

A I was friends with the defendant. I would say I was pretty close because he would allow me in his house to take care of his mother and be around his family.

Q Pretty close.

A I would say that pretty close, right?

Q Pretty close. But you don't know these two guys; right (indicating)?

A No, sir, never even seen them.

Q "These two guys" being Jackie Cavallo and Tommy

"Sneakers" Cacciopoli?

A No, sir. Never seen them before in my life. And I've heard of something to do with sneakers, but that's about as far as it went, sir.

Q What did you hear?

A "Sneakers."

Q Oh, okay. And so, if I was to tell you --

MR. FARBER: Objection to the form of the question.

THE COURT: Well, we haven't heard it.

Q If you learned these are the defendants oldest and closest friends, that would be news to you?

A If I were to learn that they were his oldest friends? That would being news to me, yes, sir.

(Pause in the proceedings.)

Q Now, you testified that the defendant told you that he was tired with it and done with it; right?

A Yes, sir.

Q Okay. Did you overhear him tell that to any police officers?

A To tell that to police officers? No, sir. I never seen him in the company of police officers.

Q Did you ever hear him tell that to any law enforcement people?

A No, sir. I never seen him in the company of any law

enforcement people.

Q How many people in your life have --

A I mean, I have seen while we were at Carosello's, I have seen Federal agents sitting there watching him in cars. I don't know if they were Federal agents. I can't say they were Federal agents, but they look like Government officials keeping on an eye on him for whatever reason.

Q And he didn't go up to those Federal agents and say, hey, just so you know, I'm not in the Gambino Family anymore; right?

A Not that I know of, sir.

Q All right. And are you aware of him taking any actions that would harm the Gambino Family? Telling on any of his friends?

A No, sir.

MS. SHARKEY: Objection as to form.

THE COURT: Overruled

Q One final question.

The times you went to -- you went to jail a couple of times?

A Yes, sir. I went to jail about several times, sir.

Q And was that a voluntarily thing when you went to jail?

A I pled guilty to my crimes and I served my time.

Q Would you have chosen not to go to jail if you could have?

A Would you say ratted? Is that what you're trying to say? Or turned somebody in?

Q When you went to jail, did you just voluntarily walk through the door, chose your bed and you could have left but you chose not to?

A Yes, I got sentenced and I turned myself in for sentencing, yes, sir.

Q And could you leave the jail any time you wanted to?

A Yes, there were jails yes, that I could have left that I was designated to.

Q So, when you were in jail, you could just leave the jail any time you wanted to and you stayed there?

A Well, I was in a corrective facility with New York State where I knew I had to go the to the Federal Government after that. The Federal facility was called called Hudson Federal facility and I was given an outside pass, outside the gate, to work at the powerhouse with a civilian.

And I did, I was doing welding with the civilian. And it was just me and the civilian. We walk out the jail and down the hill. And I knew that I had to go face my six-year possible sentence with the Federal Government after that because of my violation of Federal probation and I didn't go anywhere. I was ready to come back and do my six years of the Feds if I had to do that.

Q So, you're saying you had the opportunity to escape and

you chose not to?

A Of course, absolutely.

Q But when you're in jail, all of the jails you were in wasn't on a voluntary basis; right?

A No.

Q You couldn't just come and go?

A When you're put in jail, you're put in jail, right.

Q You're put in jail?

A Right.

Q And you're put in jail by the Government. You don't get to -- you don't put yourself in jail; correct?

A Who puts themselves in jail?

MR. BURLINGAME: That's all.

MS. SHARKEY: Briefly?

THE COURT: Yes. Redirect.

REDIRECT EXAMINATION

BY MS. SHARKEY:

MS. SHARKEY: Just to put this in context, sir.

Q You testified on direct examination that you had conversations, you first had conversations with Mr. Carneglia concerning his leaving the life prior to his going to jail in 2001; is that correct?

A Yes, ma'am, that's when he told me for the first time that he was out of it.

Q And you also had those conversations with Mr. Carneglia

after he was released from jail in 2005; is that right?

A Yes, ma'am. I had those conversations not only last summer with Mr. Carneglia.

MS. SHARKEY: Nothing further, thank you.

MR. BURLINGAME: One more question, Judge, please.

THE COURT: No, thank you. That will be all.

Thank you.

(Witness excused.)

THE COURT: Next witness, please.

Do you have another witness?

MS. SHARKEY: Yes, sir, I'm sorry.

The defense calls Jodi Ryan.

(Witness enters and takes stand.)

THE COURT: Swear the witness, please.

COURTROOM CLERK: Remain standing.

Please, raise your right hand.

**J O D I R Y A N**,

called by the Defense, having been first duly sworn, was examined and testified as follows:

THE COURTROOM CLERK: Please, be seated and state and spell your full name for the record.

A Okay. My full name is Jodi Ryan -- J-O-D-I, R-Y-A-N.

THE COURT: Now, ma'am, would you pull that

microphone closer.

THE WITNESS: I'm sorry.

THE COURT: And speak up so the last juror can hear you, please.

THE WITNESS: Okay. My name is Jodi Ryan -- J-O-D-I, R-Y-A-N.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Hi, Ms. Ryan.

A Hello.

Q Ms. Ryan, how old are you?

A I'm 40 years old.

Q Where do you live?

A I live in Green Tree Condos at Ozone Park.

Q Are you married?

A No, I am not legally married.

Q Are you married in a common-law relationship?

A Yes, I am.

Q To whom?

A To Allen J. Meshanski.

Q And do you and Allen Meshanski have any children together?

A Yes, we do. We have five children.

Q And how long have you been -- how long have you known Allen Meshanski?

A We started dating when we were fairly young, 1984. January 25th to be exact.

Q And where did you grow up?

A I grew up in Howard Beach.

Q How would you describe that community?

A Howard Beach is a relatively small neighborhood. Basically, everybody grew up together, you know, everybody's the same age; brothers are the same age, sisters are the same age. We all went to the same schools, the same functions. We had two schools in Howard Beach, one Catholic and one that was a public school, you know, so we were pretty close. You know, everybody was pretty close. We all knew each other.

Q Were there neighborhood parties?

A Yes.

Q Parties which most, if not all, of the entire neighborhood were invited to?

A Pretty much so, yeah.

Q And you testified that you knew many of your contemporaries; right?

A Yes.

Q Were you friends with Kim Albanese?

A Yes, I was. We were very good friends.

Q And when did you first meet Kim Albanese?

A I believe I was eight years old. It's when her family first moved into Howard Beach.

Q And did you remain friends with Kim Albanese?
A Yes, I did.
Q And who is Kim Albanese married to?
A She is married to John Gotti, Junior.
Q Now, what's your relationship, if any, with John Gotti, Junior?
A I have absolutely no relationship with him.
Q Were you invited to their wedding?
A No, I was not invited.
Q Why is that?
A I'm going to have to say, you know, I really don't know why. I'd say maybe he didn't approve of my friendship with Kimmy. You know, he was very possessive. He was a very possessive boyfriend prior and, you know, it wasn't just me. He was also very possessive with her family also. So, I didn't feel, I wasn't upset about not being invited to her wedding at all.
Q Do you like him?
A No, not on -- personally, no.
Q Why is that?
A Probably because of my friendship with my long-time girlfriend, you know, that he got in between, I guess, in a sense.
Q Now, when did you -- well, do you know Charles Carneglia?
A Yes, I do.

Q And when did you first meet Mr. Carneglia?
A '98, '99.
Q And how did you first meet Mr. Carneglia?
A My husband had gotten a job at the glass shop at the yard.
Q And when you say "the yard," what's that?
A Fountain Auto Mall.
Q And through whom did your husband get a job at the glass shop?
A Actually, when I moved into Green Tree Condos, my husband had met Kevin McMahon, who was somebody that I also grew up with. I had already known him and his wife from growing up in Howard Beach.
Q Now, Ms. Ryan, what year or what years, about, was it when you met Mr. Carneglia?
A '98, '99.
Q And you say your husband had a job at Mr. Carneglia's junkyard; right?
A Yes.
Q Is your husband disabled?
A Yes, yes.
Q And what's the nature of his Disability?
A He suffered a severe spinal compression which caused lesions on his spine. He has a permanent spinal cord injury.
Q How does that manifest in your daily life?

A It's very hard, you know. He's a man. He's, I'm going to say he was, when he really was bad, maybe 39. So, he's 49 now. He can't walk. You know, he walks with a cane. He can't dress himself. He can't sit on the toilet and get up without someone helping him or get into a bathtub. So, you know, it affects his life. Our lives, my whole family.

Q Ms. Ryan, has that been a degenerative sort of disease?

A Yes. I mean, he's not going to get better. His condition will only get worse. It would only get worse as he gets older.

Q What did your husband do for Charles Carneglia when he worked for him at the junkyard?

A At that time he was driving a glass truck. He was already starting to get sick. You know, he already knew that he was starting to get sick, so he was driving. He was driving. Someone else was installing glass and he was just driving.

Q And was the driving something that he could manage with his physical disability?

A Yes, definitely.

Q Now, as a result of your husband's being hired by Charles Carneglia, did you develop a friendship with him?

A Yes. Yes, we did.

Q And how did that develop?

A Actually, I mean, he lived across the street from us at

the time, you know. So, I seen him a lot. I was always outside with my kids. You know, he would stop, you know, stop by, say hello. You know, I used to stay with -- I was always outside a lot with Jill McMahon, who was also always outside with her kids.

In the beginning he would stop, say hello to us, the children, you know. And then I'd go to the yard to make sure my husband was okay, drop off lunch. So, of course, I would see him, he would be there, I would say hello to him. He would say hello to me, see the kids in the car. You know, he, a friendship pretty much like that at that point in the beginning.

Q Did the friendship grow and deepen?

A Yes, it did.

Q And how did that come about?

A Well, I mean, I don't even know how you to say this. You know, we became friendly like, you know, he would come over the house. He was around me and my children. We had conversations, you know, like sitting talking just about, you know, anything, his mother, you know, Allen, stuff at the yard. Just things like that in general was our relationship. You know, so my husband, you know, brought him home, you know. Like, I consider him to be like my adopted father-in-law.

Q By the way, has your husband ever been indicted for anything?

A No.

Q Was he arrested on this case?

A No. No, he was not.

Q Now, you said you lived at the Green Tree Condominium Complex; right?

A Yes, I do.

Q When did you move there?

A In 1996.

Q Who owns your unit?

A My father does.

Q And when you moved there in 1996, with whom did you move in?

A With Allen and my children. At the time I had two children.

Q And you've lived there for 12 years now; correct?

A Yes.

Q And in the beginning of 2000, 2001, 2002, 2003, did you have difficulty with the way the condominium complex was administered?

A Yes, I did. Very much, so.

Q Did you have difficulty with Robert Porto (phonetic)?

A Yes, I did. I have many, I had many disagreements with Mr. Porto.

Q And describe for the Members of the Jury,the reasons for your disagreements with Mr. Porto?

A I, my disagreements with Mr. Porter are based on the maintenance of the property that I lived in.

There was no maintenance being done. The garbage was piling up, no one was taking the garbage out. The halls were not being cleaned. The lawn was not being mowed. It got to a point where I literally mowed the lawn myself. My neighbors used to laugh at me because I got a roll-on mower and I used to mow down the block because I was embarrassed to have people come to my house. So, the maintenance was, it was really bad. It was bad.

Q Did you have arguments with Mr. Porter?

A Yes, I did.

Q And did you talk about these arguments with Charles Carneglia?

A Sure I did.

Q Did the condominium complex get fixed?

A Absolutely not.

Q What about the safety to you and your family? Was there an issue of safety?

A Oh, yes, there was a very big issue with safety.

Q Could you tell the Members of the Jury about that.

A Yes. It's a three-floor condo unit and I lived on the top. Underneath me was an apartment that was rented. It was like, in the process of being foreclosed which I didn't find out until the people were renting it. This woman who was

renting it was a drug abuser, very badly. You know, no one in the neighborhood, there was people coming in my house all hours of the night banging on my door, drunk, looking for her. People I -- parties, you know, everything.

We had one guy, you know, out in the back actually shot a shotgun, you know. It was like, it was really bad. The living arrangements there were unbelievable. It was bad.

Q Did you have arguments with Mr. Porto about this?

A Yes. My arguments with Mr. Porto were because the woman who lived downstairs was actually a friend of his, which on one of the occasions when someone knocked on my door, I got very upset and I went into the hall only to find him and his wife were fist-fighting in my hall downstairs. It's like, the stairs come up like this, and they were down on my flight literally fist-fighting and screaming and woke me and my children up.

Q And did you confront Mr. Porto about this?

A Yes, I did.

Q Did you confront Mr. Panzarella?

A Yes, I did. I, after getting nowhere, except for Rob Port was in a sense trying to threaten me because I was technically not an owner, you know, he said he could have me evicted because I wasn't an owner, I then went to Panzarella being that he was at the time, I believe, the president.

So, I went to Panzarella's office, you know. I

complained to Panzarella, explaned what was going on and from there, you know, it stayed pretty much the same until finally she was kicked out because the apartment was foreclosed. She had no choice but to leave. It wasn't that no one, you know, they came and emptied the apartment because it was foreclosed.

Q And did you tell Mr. Carneglia that you were going to speak to Panzarella about this?

A Of course I did, yes.

Q And why would you tell Mr. Carneglia about that?

A You know, we had conversations all day long, you know. So, I would tell him as if I would tell him I was going to school to pick up my kids.

Q And Mr. Carneglia was aware of this living condition; right?

A Oh, of course he was, yes.

Q And by the way, your issues with Mr. Porto, did you ever believe that Mr. Porto was threatening you as a member of the Gambino Family?

A No.

Q Was Mr. Porto a lousy condo board president?

A Oh, yes. Yes. He took, he believed he was the president of more than a condo board, I have to say, yes.

Q Did you ever believe that the condo board was administered in a manner that was administered by organized crime figures?

A No, absolutely not.

Q And you complained about the condo management to a number of people, right?

A Yes, I did. A number of my neighbors, you know. The Panzarellas who, you know, were on the board at the time. That's why I complained to them. They were part of the board.

Q And did you ever think the Panzarellas were administering the board on behalf of the Gambino Crime Family?

A No. No, I did not.

Q And by the way, you shared these concerns with Mr. Carneglia?

A Yes.

Q Right?

And I think you described Mr. -- well, how would you describe your relationship with Mr. Carneglia?

Carneglia?

A Well, I would say to me personally, he's like my father-in-law. That's how I would consider them.

Q And when you aired these grievances or shared with him your troubles, did they get better?

A No. No, they did not.

Q Now, do you remember Mr. Carneglia --

MS. SHARKEY: Withdrawn.

Q Did you receive financial statements from the condo management when you lived there?

A Yes, I did.

Q And was there a dispute over a water bill?

A Oh, yes there was.

Q And there was back water bills owed; correct?

A Yes.

Q And the individuals who lived at the condo association were assessed a portion of that bill past due; correct?

A Yes, we were all assessed money for the water bill.

Q And in your opinion as an owner or a derivative owner of one of those units, did you believe that you were being extorted to pay that water bill by the Gambino Crime Family?

A No. No, I did not.

Q Now, Ms. Ryan, do you remember when Mr. Carneglia went to jail in the fall of 2001?

A Yes, I do.

Q And prior to Mr. Carneglia going to jail in 2001, what was his greatest concern?

A His mother.

Q And did you have any conversations with Mr. Carneglia and your husband concerning the care of his mother?

A Yes, we did.

Q And what was the nature of those conversations?

MR. BURLINGAME: Objection.

THE COURT: I'll allow it.

A Just to make sure she's okay. Take care of her, you

know. Things to that nature --
Q And --
A -- to look after her.
Q I'm sorry, I cut you off.
A I'm sorry. To look after her. She was an older woman, you know, just to make sure that she was okay.
Q Did you like Jenny Carneglia?
A Yes, I definitely do like Jenny Carneglia.
Q Do you still see Jenny Carneglia to this day?
A Yes, I do. Not as much as I would like to, but yes. I still do see her.
Q And when Mr. --
MS. SHARKEY: Withdrawn.
Q Do you know Mark Goia?
A Yes, I do.
Q And who is he?
A A close friend of my husband's.
Q And is, did you, yourself --
MS. SHARKEY: Withdrawn.
Q Did you, your husband and Mark Goia take care of Jenny Carneglia?
A Yes, we did.
Q And were you paid for that?
A No, I was not.
Q Why did you do that?

A Because that's the kind of person I am. You know, I did it for him, for his mother. I take care of her to help him, ease him. Ease his mind.

Q Now, do you remember when he went to jail in 2001?

A Yes, I do.

Q And while Mr. Carneglia was in jail, what sort of things would you do for his mom?

A I, I, in the beginning, you know, I used to take her to the bank. She used to like to post her, her money in her books every month, you know. The, her interest on all her accounts. You know, so I would take her. She was elderly. When my kids were in school, I would make arrangements for the time that my kids were in school. I would take her in the bank, she would get her things marked. I took her to the 99 cents store. I took her to Kenny's shopping. Food shopping, you know.

She was still not as frail as she is now, you know, in 2001, you know. So, she was more mobile. You know, I've taken her to the doctors. You know, stuff like that. Brought her food, prepared food for her. You know, stuff in that nature.

Q Did, after Mr. Carneglia went to jail, did you visit him?

A I visited him when he was in Nassau Correctional Facility? Yeah.

Q Did you visit him when he was ever in any of the Federal

detention facilities?

A No.

Q Did you fill out a form requesting the right to visit?

A Yes, I did.

Q What address did you use?

A My address. 1505 95th street.

Q Do you know if your husband Allen visited him?

A Yes, he did.

Q In jail?

A He visited him, yes.

Q And what's Allen's -- Allen lives with you at Green Tree; right?

A Yes.

Q Does Allen have a driver's license?

A Yes, he does.

Q What address is on Allen's drives license?

A 149-42 83rd Street, I believe.

Q What is the point of that? Why is that address different?

A His license, he just never changed it. It was always there.

Q Now, when Mr. Carneglia went to jail in 2001, would you keep in contact with him?

A Yes, of course.

Q How so?

A Phone calls.

Q And he called you obviously; right?

A Yes.

Q How often would you get a call from Mr. Carneglia?

A Quite often. I would say at least four times a week.

Q And what were the nature of those phone calls?

A Hi, how are you, how are the children, how are the kids, how's Allen. At this time Allen is very sick so most of the phone calls are basically about Allen and his health.

Q Now, Ms. Ryan, when Mr. Carneglia got out of jail in 2005, did you guys continue your close relationship?

A Of course.

Q And how often would you see him?

A Very often.

Q Daily?

A Yeah, definitely.

Q And Mr. Carneglia lived where in 2005?

A 2005 he was living with his mother.

Q And if you didn't see him on a daily basis, did you speak with him on the phone?

A Yes.

Q Now, do you remember when he was arrested --

MS. SHARKEY: Withdrawn.

Q Your husband was a companion to?

A Yes.

Q To Mr. Carneglia; correct?
A Yes.
Q Friends?
A Yes.
Q He would go with Mr. Carneglia to see his parole officer; right?
A Yes, definitely.
Q They would go to doctor appointments together; correct?
A Yes.
Q Socialized on a regular basis?
A Yes, definitely.
Q How about Mark Goia? Do you remember Mr. Carneglia and your husband and Mark Goia going out for dinners?
A Yes.
Q Okay. And Mr. Goia, what relationship did he have with Mr. Carneglia?
A They were friends.
Q Was Mr. Goia good at fixing things?
A Yes, he was very -- he is good at fixing things.
Q Does he fix things for you?
A Yes, he does.
Q Does he help you out with your husband being disabled?
A Yes, he does.
Q What sorts of things?
A You know, he helps me fix my car, the things in the

house, you know, my husband's not able to do. You know, general stuff like that.

Q Since Mr. Carneglia has been incarcerated on this matter, since February of 2008, have you visited him in jail?

A No, I'm not able to.

Q And why is that?

A Because he's only allowed one visitor and Allen is down as his only visitor. And I'm not legally family. So, I'm not able to go.

Q And that would be you're not the one friend that could go; right?

A Yeah.

Q And your husband Allen continues to visit Mr. Carneglia; is that right?

A Yes.

Q And do you speak with Mr. Carneglia on the phone on a regular basis?

A Yes, we do. We stick to basically a lot now our Sunday calls. They're our calls.

Q And when you say your Sunday calls, do you speak to him every Sunday?

A Every Sunday.

Q And what do you guys talk about?

A The kids. Mostly my health. I've been very sick and he's been very concerned, so the calls are mostly about me

going to doctors, diagnosis, stuff like that.

Q And also about his mom?

A Yes.

Q Now, you and I have met before; right?

A Yes.

Q I've spoken to you about the charges against Mr. Carneglia; right?

A Yes, you did.

Q And I've spoken to you about a series of phone conversations from jail?

A Yes.

Q Is that correct?

A Yes.

Q Have I played some of those phone conversations for you?

A Yes.

Q Have I showed you transcripts of some of those phone conversations?

A Yes, you did.

Q Now, I'd like to ask you a couple of questions about those phone conversations.

A Okay.

Q When Mr. Carneglia was arrested in February of 2008, do you remember him calling you as soon as he was able?

A Yes, I do.

Q And did Mr. Carneglia ask you to do anything?

A Yes. He asked me to do quite a couple of things. His main thing was returning his car.

Q Was his car -- why would his car have to be returned?

A His car was leased and he was very afraid of his credit being ruined if it wasn't brought back without penalty.

Q And were you able to achieve the return of the car with the help of Mr. Farber?

A Yeah. It was a tough fight, but yes, we did.

Q Now, did Mr. Carneglia ask you to clean out the car?

A Yes, he did.

Q And when he talked to you on the phone, did he ask you to retrieve certain items?

A Yes.

Q He did.

Like what?

A The main things for him was his umbrella, a flashlight, his Cement for his teeth. The car was full of regular, a First-Aid kit, antifreeze, some cleaning products in the trunk. Paper towels, tons and tons of napkins, rubber bands. And junk. Like a lot of junk mail. You know, he had a lot of junk mail. And a ticket. A parking ticket that he had received.

Q Did he ask you to take care of that parking ticket for him?

A Yes. Yes, he did. He was very concerned about losing

his license.

Q Was the parking ticket --

MS. SHARKEY: Withdrawn.

Q Was the umbrella actually an umbrella?

A Yes, it was.

Q Can you describe it for the Members of the Jury.

A Yes, it was a large, they call it a doorman umbrella. It's like a very big umbrella that a doorman would use.

Q Now, who's Brian?

A Brian who?

Q Do you know of a young man who was friends with Charles --

A Brian Feeley (phonetic).

Q Yes.

A Yes, I do.

Q How old is Brian?

A I believe he's 18. Or turning 19.

Q What's Brian's relationship to Mr. Carneglia?

A Brian is a kid who used to work at Carosello's. He's a nice kid, a little misguided. Misfortunate family, problems, you know. He was living with his mother who he was taken away from. You know, he had a pretty, you know, bad -- very hard-life kid. That's what he was.

Q And what did Mr. Carneglia do on behalf of Brian?

A Charles had asked me, at this point he wasn't going to

school. He was attending a special education program at Beach Channel High School in Far Rockaway. Charles had asked me if I would mind, you know, trying the help the kid, which was fine. Charles knew the type of person I was. Mostly I would do anything to help anybody.

I then contacted his mother to see about, you know, transferring him because he wanted to transfer him to a better school, to a better Special-Ed program. I also went down to Beach Channel High School, where I met with special educators, the head of the IEP there. You know, I tried to transfer him. I tried to get him more help. You know, stuff like that.

Q And was that at the request of Mr. Carneglia?

A Yes. He asked if I would help him. I mean, I wasn't doing it for him. I was doing it for the kid, Brian.

Q Did you consider yourself indebted at all to Charles Carneglia?

A No. No, not at all.

Q Now, I want to direct your attention to phone calls that we talked about in April of 2008.

A Okay.

Q Did I show you some transcripts and play some tapes for you from phone calls in April of 2008?

A Yes, you did.

Q And did we talk about those phone calls?

A Yes, we did.

Q Now, Mr. Carneglia, when he would call you. Would he or when he would call your husband, would he ask your husband to do things for him?

A Yes.

Q What sort of things?

A Things for his mother. Things for Elsie. You know, random things.

Q Did many of those requests, the execution of those requests, fall on you?

A Yeah, the most of them did, yeah.

Q And would that be because of your husband's physical condition?

A Yes.

Q Did Mr. Carneglia ever ask your husband and you to retrieve anything from the attic?

A Yes, he did.

Q And did Mr. Carneglia have this conversation with you or your husband?

A The conversation was with my husband.

Q But were you included to make it actually happen?

A Yes, of course. I was aware. I would be the one who would have to go up in the attic and get it. My husband would never be able to go up in an attic.

Q And what is it that you were retrieving from the attic?

A There was a letter in a folder that Kevin McMahon had

given Charles when he was arrested in Florida, around that time.

Q Kevin McMahon was arrested in Florida.

A Yes. And he had given a letter --

MR. BURLINGAME: Objection. Foundation.

THE COURT: I'll allow it.

A It was actually a folder. And in the folder was his charges and a personal letter. And the letter was, you know, it was like, "dear Charles."

MR. BURLINGAME: Objection.

THE COURT: I'll allow it.

Q Go ahead.

A It just said like a whole bunch of random things and saying he was charged with all this stuff and, you know, all they want from me is you and your brother and if I gave them that they had's let me go and blah, blah, blah, and a whole bunch of other things.

And then it says that all he needs is $10,000 to put him up in a hotel in Florida while his trial is going on because he doesn't have the money.

THE COURT: I think that's enough. Hearsay.

MS. SHARKEY: Okay.

Q Ms. Ryan, did Mr. Carneglia express any concern about how that letter should be handled?

A Yes, he did.

Q What did he say?

A He didn't want, because it wasn't a letter signed with his signature, Kevin, it was like typed or printed off of a computer, he wanted me not to touch it because he wanted Kevin's prints on it. You know, I guess he felt that Kevin's prints would mean that he gave him the letter because to us it was almost Kevin was extorting him, in a sense.

Q But did that, were you going for that letter to give it to the attorneys?

A Yes.

Q And did you find that letter?

A No, I did not.

(Pause in the proceedings.)

Q Have you been to Carosello's?

A Yes, I have.

Q Have you been to Carosello's with Charles?

A Yes, I've been there while Charles was there, of course.

Q And what kind of restaurant is that?

A It's pretty much a family amusement restaurant.

Q And are there a bunch of older men who congregate at Carosello's?

A I mean, mostly I spend my time in the game room. I guess there's a lot of people that are in there. It's a pretty big restaurant.

Q And when you went out to dinner with Charles, did the restaurant comp. him or did he pay?
A No, he paid.
Q Now, when -- I want to go back to this letter in the attic.
Did Mr. Carneglia ask you or your husband to use a Ziploc bag in relation to that?
A Yes.
Q What was that about?
A To put it in a Ziploc bag so that it would preserve his prints.
Q And when you say "his prints," we're talking about?
A Kevin McMahon's.
Q And is that because Mr. Carneglia knew that Kevin McMahon was working with the Government at that point? Or suspected?
A I guess more or less. Or you know, just to prove that Kevin McMahon gave him the letter is the reason for all the, the rubber gloves and putting it in a Ziploc. It was just the way of proving that he was the one who handed him the letter.
Q By the way, who owns Carosello's? Do you know?
A I believe Bruno does. I'm not sure of his last name.
Q Is he an older gentleman?
A I guess so. Older than me.
Q And is that the gentleman that Brian worked for?
A Yes.

(Pause in the proceedings.)

Q Ms. Ryan, do you love Charles Carneglia?
A Yes, I do. Dearly.
Q And have you and I spoken about your testimony here today?
A Yes.
Q And has what you said been accurate?
A Yes, it has.
Q Truthful?
A Yes.
Q Do you know that if you don't testify truthfully, you could be charged with perjury?
A Of course I do.
Q Do you have five children?
A Yes, I do.
Q Do you have a disabled husband?
A Yes, I do.

MS. SHARKEY: Thank you, Ms. Ryan.

THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MR. BURLINGAME:

Q Good afternoon, ma'am.
A Good afternoon.
Q Now, you testified in some detail about the contents of

this letter?

A Yes.

Q In Charles Carneglia's attic?

A Yes.

Q But you never found the letter?

A No, I didn't find it.

Q Okay.

A The detail is because I did see it. I saw it.

Q Oh, you saw the letter?

A Yes, I did see it.

Q But you couldn't find it in the attic?

A No.

Q When did you see it?

A I would say probably a couple days after Kevin had given it to Charles.

Q When was that?

A Exactly do I know? No. The exact date I couldn't remember.

Q Did you handle it with rubber gloves back then?

A No.

Q Okay. And the defendant asked you to go find this letter in his attic; right?

A Yes.

Q And you went up there and you looked around for it and you couldn't find it?

A Yes.

Q So, we don't have access to it today?

A No, we don't.

Q Okay.

(Pause in the proceedings.)

Q And you testified you love that man dearly?

A Yes, I do.

Q You would do anything for him?

A Yeah, pretty much so.

MR. BURLINGAME: Nothing further.

THE COURT: Thank you.

MS. SHARKEY: Wait.

DIRECT EXAMINATION

BY MS. SHARKEY:

Q Would you lie for him?

A No. I wouldn't lie for anybody. Doing anything for someone dearly, he's a family member. I'm not lying for him.

THE COURT: Okay. Thank you very much.

THE WITNESS: I have nothing to lie about.

THE COURT: Thank you.

THE WITNESS: Thank you.

THE COURT: Do you have another witness?

MS. SHARKEY: I do. I want to ask the Court for some guidance on scheduling.

THE COURT: How many more witnesses do you have?

MS. SHARKEY: We have two more witnesses.

THE COURT: If you're going to put on more witnesses, it's a quarter to 5:00. We'll bring the jury in tomorrow.

MS. SHARKEY: Okay.

MR. FARBER: Judge?

THE COURT: Yes.

(Pause in the proceedings.)

THE COURT: We've got to have time for the direct and cross.

MS. SHARKEY: Right.

MR. FARBER: Right.

THE COURT: So, you'll have to be here tomorrow, at 9:30.

Good night.

(Jury exits.)

(Continued on following page.)

(The following occurs outside the presence of the jury.)

THE COURT: All right. The Counsel will meet with me at 9:00 a.m., as usual, for any motions or applications.

Good night.

MR. BURLINGAME: Do you know how long the witnesses are going to be tomorrow?

MS. SHARKEY: I think it depends on the length of cross. Probably a couple hours.

MR. BURLINGAME: Judge, we might -- we sort of built into our schedule the preparing for the day off.

So, and then, I think it would also make sense if we're not going to charge the jury on Friday to have maybe summations come closer to when they're going to get the charge.

Possibly it would make sense to do the summations on Monday.

THE COURT: There's a strong argument for that, but there's also a strong argument for letting the jury go and finishing the case. So, the charge will be Monday.

Your argument will be Thursday.

MR. BURLINGAME: We're just a little concerned about the timing given all the factors that Your Honor acknowledged yesterday about the complexity of the case. And if we're going to take up half the day tomorrow with the defense's

case --

THE COURT: We may have to bleed over into Monday with respect to argument, but be prepared Thursday to argue.

MR. BURLINGAME: Your Honor doesn't think there's any advantage to the jurors starting to deliberate a little closer to argument?

THE COURT: There are all kinds of advantages and disadvantages. It's time to close this case up.

MR. BURLINGAME: Very well, Judge.

MS. SHARKEY: Judge, would the Court consider argument on Friday?

THE COURT: I cannot.

MS. SHARKEY: You can't.

THE COURT: Because I have a very heavy calendar, which I could cancel, but the jurors don't want to come in on Friday because they've made other commitments. Medical and otherwise.

MR. FARBER: Judge, to the extent that it has any bearing on the Court's decision, I would not object to the Government's application. I, too, would welcome the opportunity to have the time to fully digest the testimony as it's being developed so I, too, can effectively represent Mr. Carneglia to the best of my abilities in summing up a trial.

I'm in a different position than the Government, but

they knew well in advance what the proof was going to be on the case in chief. So, I'm still in the process of preparing --

THE COURT: Why doesn't everybody sit down. Why are you all standing up?

MS. SHARKEY: Judge, we had anticipated that we would start at 9:30 and it got later --

THE COURT: I'm not going to do -- you know, I'll do everything I can for you, but there's a wise, old -- now long-dead -- trial attorney who once told me some 65 years ago that when you start your opening, you do it knowing exactly what your closing would be.

So, I assume you've prepared your closing from the time of your opening before. And therefore, you don't need much more time.

MR. FARBER: I'm sure --

THE COURT: I understand your problem.

Good night and I'll see you all at 9:00 a.m.

(WHEREUPON, the proceedings were adjourned to March 4th, 2009, at 9:00 a.m.)

* * *

I N D E X


WITNESS PAGE

letter of the defendant dated March 3rd is marked Court Exhibit 1 of today's date 4445

Exhibits Q and Q-1 4458

Court Exhibit 2 of today's date 4459

defense Exhibit S is in evidence for purposes of assisting the jury 4464

J O H N D W Y E R 4483

CROSS EXAMINATION

BY MR. BURLINGAME: 4488

J O H N W H I T E 4492

DIRECT EXAMINATION

BY MS. SHARKEY: 4492

J O H N W H I T E 4513

CROSS-EXAMINATION

BY MR. BURLINGAME: 4513

BY MR. BURLINGAME: 4513

REDIRECT EXAMINATION

BY MS. SHARKEY: 4527

J O H N H A Y E S 4528

DIRECT EXAMINATION

BY MS. SHARKEY: 4529

CROSS-EXAMINATION
BY MR. NORRIS: 4531
G A E T A N O M A R C O T R I G I
A N O 4532
DIRECT EXAMINATION
BY MS. SHARKEY: 4532
CROSS-EXAMINATION
BY MR. NORRIS: 4534
Exhibit 192 4536
A L E X L I N D E N 4537
DIRECT EXAMINATION
BY MS. SHARKEY: 4537
R O B E R T S C H I A V O 4556
M A R K G I O I A 4563
DIRECT EXAMINATION
BY MS. SHARKEY 4563
DIRECT EXAMINATION
BY MS. SHARKEY 4584
CROSS-EXAMINATION
BY MR. BURLINGAME 4587
REDIRECT EXAMINATION
BY MS. SHARKEY 4612
**J O D I R Y A N**
DIRECT EXAMINATION
BY MS. SHARKEY 4614

CROSS-EXAMINATION

BY MR. BURLINGAME 4640

DIRECT EXAMINATION

BY MS. SHARKEY 4642

# E X H I B I T S


| Exhibit | Page |
| --- | --- |
| Defendant's Exhibit T | 4466 |
| Defendant's Exhibit U | 4467 |
| Defendant's Exhibit V | 4468 |
| Defendant's Exhibit W | 4468 |
| Defendant's Exhibit X | 4468 |

## $

**$1,142** [2] - 4536:6; 4537:7
**$1,142.40** [1] - 4536:17
**$10,000** [1] - 4637:18
**$1142** [2] - 4536:5; 4537:1
**$1200** [2] - 4570:9
**$1400** [1] - 4570:10
**$15,000** [1] - 4497:5
**$54,000** [1] - 4537:7
**$54,289** [1] - 4536:24
**$77,000** [1] - 4496:9
**$800,000** [2] - 4562:8, 20

## '

**'05** [1] - 4472:1
**'08** [3] - 4488:6, 10
**'73** [1] - 4564:20
**'80s** [2] - 4588:23
**'86** [1] - 4568:16
**'89** [1] - 4561:24
**'90s** [2] - 4589:4, 6
**'93** [2] - 4587:20, 22
**'97** [2] - 4533:12, 23
**'98** [2] - 4617:2, 16
**'99** [2] - 4617:2, 16

## 0

**08** [1] - 4444:4

## 1

**1** [5] - 4445:4; 4543:4, 7; 4551:20; 4647:5
**10** [2] - 4549:4; 4582:10
**10,000** [1] - 4539:2
**10013** [1] - 4444:21
**10:00** [1] - 4460:5
**10:31** [1] - 4482:13
**11201** [1] - 4444:17
**11242** [1] - 4444:19
**1150-01** [1] - 4533:1
**11757** [1] - 4563:12
**11th** [3] - 4472:4; 4535:2; 4563:16
**12** [9] - 4469:17; 4502:19; 4543:23; 4549:4; 4562:10; 4582:10; 4589:2; 4620:15
**12-step** [1] - 4585:9
**13** [5] - 4543:24; 4545:7; 4561:23; 4562:10; 4589:2
**1325** [1] - 4556:3
**13th** [3] - 4466:22; 4468:4; 4471:16
**14** [10] - 4464:12; 4482:11, 19, 21; 4561:25; 4562:1, 4, 11, 21; 4589:2
**149-42** [1] - 4628:17
**14th** [2] - 4465:10; 4466:7
**15** [4] - 4562:21; 4564:16; 4570:19
**150-07** [1] - 4529:19
**1505** [1] - 4628:6
**16** [2] - 4447:12; 4565:23
**162-54** [1] - 4485:8
**16th** [1] - 4472:5
**17** [5] - 4447:14; 4494:7; 4527:17; 4564:11; 4581:18
**178** [2] - 4478:9, 13
**18** [7] - 4448:2, 6; 4495:20; 4565:21; 4570:19; 4634:17
**182** [3] - 4535:21; 4536:9, 13
**184** [1] - 4479:9
**19** [3] - 4493:24; 4495:21; 4634:17
**190** [1] - 4471:4
**192** [2] - 4536:14; 4648:9
**1960** [2] - 4564:6
**1973** [1] - 4564:22
**1975** [2] - 4565:7, 12
**1976** [2] - 4538:5; 4565:23
**1979** [2] - 4566:6
**1980** [1] - 4538:6
**1983** [2] - 4567:15; 4568:15
**1984** [1] - 4615:1
**1987** [1] - 4560:18
**1989** [1] - 4569:4
**1990** [1] - 4600:5
**1992** [1] - 4570:23
**1993** [1] - 4447:10
**1996** [2] - 4620:8, 11
**1997** [1] - 4533:4
**1998** [3] - 4529:23; 4530:23; 4531:14
**1999** [1] - 4531:18
**1:00** [1] - 4512:6
**1:31** [1] - 4465:10
**1st** [4] - 4447:15; 4449:17; 4486:7, 11

## 2

**2** [6] - 4459:12; 4533:6; 4543:4, 7; 4551:20; 4647:8
**2.104** [2] - 4537:3, 5
**20** [1] - 4588:23
**2000** [10] - 4497:2; 4548:13; 4571:16; 4572:6; 4573:14; 4587:22, 24; 4589:10; 4620:17
**2001** [23] - 4471:14, 16; 4531:21; 4533:4, 12; 4534:24; 4535:1; 4536:16; 4548:13; 4572:20; 4574:14; 4575:17; 4576:12; 4578:21, 25; 4612:22; 4620:17; 4625:14, 16; 4627:4, 18; 4628:22
**2002** [2] - 4548:14; 4620:17
**2003** [10] - 4447:13, 15; 4472:4; 4494:7; 4544:22; 4545:4; 4548:14; 4561:24; 4620:17
**2004** [8] - 4447:13; 4498:25; 4519:2, 7, 10; 4527:16; 4548:14
**2005** [7] - 4447:11; 4472:5; 4548:14; 4613:1; 4629:11, 17
**2006** [5] - 4520:18; 4527:17; 4548:14; 4579:24; 4581:8
**2007** [11] - 4445:18; 4482:12, 19, 21; 4488:13, 15, 18, 21-22; 4531:24; 4584:16
**2008** [15] - 4464:12; 4468:17; 4482:13, 24; 4483:10; 4489:8; 4516:25; 4520:8, 17; 4540:1; 4583:1; 4631:4; 4632:22; 4635:19, 22
**2009** [5] - 4444:8; 4447:5; 4449:17; 4646:21
**21** [1] - 4560:18
**22** [1] - 4560:18
**225** [2] - 4444:16, 23
**24** [1] - 4574:20
**25** [4] - 4488:17; 4492:18; 4566:17; 4568:11
**25th** [4] - 4468:16; 4484:8; 4615:2
**26** [1] - 4444:18
**27** [3] - 4447:6; 4564:8; 4571:12
**28** [3] - 4564:8; 4571:12; 4588:20
**29** [2] - 4560:7, 16

## 3

**3** [2] - 4444:8; 4551:20
**3,000** [1] - 4499:12
**30** [2] - 4565:12; 4588:20
**31** [3] - 4482:13; 4483:10; 4569:16
**31st** [1] - 4482:24
**343** [2] - 4451:5; 4453:13
**350** [1] - 4444:21
**3500** [3] - 4489:21, 24
**36** [1] - 4563:25
**39** [1] - 4618:2
**3rd** [5] - 4445:4; 4466:25; 4467:3, 13; 4647:5

## 4

**40** [1] - 4614:12
**42nd** [1] - 4564:19
**4445** [1] - 4647:6
**4458** [1] - 4647:7
**4459** [1] - 4647:8
**4464** [1] - 4647:10
**4466** [1] - 4650:4
**4467** [1] - 4650:6
**4468** [3] - 4650:8, 10, 12
**4483** [1] - 4647:11
**4488** [1] - 4647:13
**4492** [2] - 4647:14, 16
**45** [1] - 4566:13
**4513** [3] - 4647:17, 19
**4527** [1] - 4647:22
**4528** [1] - 4647:23
**4529** [1] - 4647:25
**4531** [1] - 4648:2
**4532** [2] - 4648:4, 6
**4534** [1] - 4648:8
**4536** [1] - 4648:9
**4537** [2] - 4648:10, 12
**4556** [1] - 4648:13
**4563** [2] - 4648:14, 16
**4584** [1] - 4648:18
**4587** [1] - 4648:20
**4612** [1] - 4648:22
**4614** [1] - 4648:25
**4640** [1] - 4649:2
**4642** [1] - 4649:4
**47** [1] - 4566:9
**49** [1] - 4618:2
**4:00** [1] - 4501:12
**4th** [3] - 4447:15; 4467:18; 4646:21

## 5

**5** [1] - 4545:5
**51** [3] - 4498:13; 4563:16; 4588:22
**54** [1] - 4536:22
**5:00** [1] - 4643:4
**5:38** [2] - 4482:12, 21
**5th** [1] - 4471:14

## 6

**60** [2] - 4450:1, 3
**612** [1] - 4483:1
**65** [2] - 4570:9; 4646:10
**6:11** [1] - 4468:5

## 7

**718-613-2509** [1] - 4444:24
**742** [3] - 4563:11, 25; 4564:2
**76** [1] - 4444:4
**7:17** [1] - 4466:7

## 8

**83rd** [1] - 4628:17
**8:20** [1] - 4467:13
**8:34** [1] - 4467:19

## 9

**95th** [3] - 4529:19; 4533:1; 4628:6
**99** [1] - 4627:15
**9:00** [4] - 4444:9; 4644:4; 4646:18, 21
**9:30** [2] - 4643:16; 4646:7
**9TH** [1] - 4570:22

## A

**a.m** [5] - 4444:9; 4482:13; 4644:4; 4646:18, 21
**AA** [3] - 4482:12, 24; 4483:10
**abilities** [1] - 4645:23
**ability** [3] - 4474:7; 4479:21; 4552:22
**able** [12] - 4461:1; 4476:25; 4478:15; 4480:4; 4546:18; 4595:11; 4631:1, 5, 9; 4632:23; 4633:6; 4636:23
**absolute** [2] - 4519:23; 4520:4
**absolutely** [8] - 4500:1; 4530:19; 4531:1; 4596:23; 4612:2; 4616:7; 4621:17; 4624:1
**abuse** [1] - 4584:25
**abused** [1] - 4574:20
**abuser** [1] - 4622:1
**abusing** [1] - 4594:3
**acceptable** [1] - 4553:24
**accepted** [3] - 4449:9; 4480:18; 4553:7
**access** [1] - 4642:2
**accession** [1] - 4450:8
**accommodate** [1] - 4453:4
**accommodations** [2] - 4473:8; 4474:11
**according** [1] - 4601:21
**account** [2] - 4479:6, 20
**Accountant** [1] - 4560:9
**accountant** [6] - 4538:2; 4551:24; 4552:15, 18; 4554:19; 4560:17
**accountant's** [1] - 4552:7
**accountants** [1] - 4554:17
**accounted** [1] - 4597:16
**accounting** [3] - 4538:4; 4550:5; 4560:25
**accounts** [1] - 4627:11
**accuracy** [2] - 4465:5
**accurate** [5] - 4472:18; 4485:14; 4491:20; 4561:14; 4640:8
**accurately** [1] - 4486:8
**achieve** [1] - 4633:6
**acknowledge** [2] - 4507:11
**acknowledged** [1] - 4644:23
**acknowledgment** [1] - 4503:11
**acquittal** [2] - 4445:10; 4447:17
**act** [3] - 4448:19; 4450:24; 4567:7
**Act** [6] - 4447:9, 12, 14; 4448:2, 6; 4538:12
**acted** [1] - 4448:19
**acting** [2] - 4448:24; 4514:15
**actions** [1] - 4610:12
**active** [1] - 4564:25
**activities** [1] - 4524:16
**activity** [4] - 4459:23; 4520:14; 4522:1; 4606:18
**acts** [4] - 4447:7; 4558:6, 10; 4559:6
**actual** [5] - 4475:18, 20, 23; 4476:1; 4553:7
**addendum** [1] - 4552:3
**additional** [3] - 4451:9; 4459:6; 4568:8
**address** [10] - 4452:5, 8; 4459:16; 4469:6; 4549:6; 4628:5, 16, 18
**addresses** [4] - 4452:1, 11, 14, 18
**adjourned** [1] - 4646:20
**administered** [3] - 4620:19; 4623:24
**administering** [1] - 4624:7
**administration** [2] - 4530:18; 4533:16
**admissibility** [1] - 4455:1
**admit** [1] - 4455:4
**admitted** [9] - 4457:5; 4466:15; 4467:12, 25; 4468:11, 22; 4482:16; 4542:2; 4547:22
**adopted** [1] - 4619:23
**adult** [1] - 4449:3
**advance** [1] - 4646:1
**advantage** [1] - 4645:5
**advantages** [1] - 4645:7
**advice** [3] - 4527:22; 4528:1
**advise** [2] - 4453:19, 22
**affected** [2] - 4506:17, 21
**affects** [1] - 4618:6
**affiliate** [2] - 4506:8, 11
**affiliation** [5] - 4525:16; 4591:11; 4603:24; 4604:9
**afraid** [4] - 4454:20; 4505:6; 4559:11; 4633:4
**afternoon** [18] - 4453:3; 4488:3; 4489:2; 4495:24; 4513:14; 4529:3; 4531:12; 4532:19; 4534:23; 4537:23; 4587:11; 4640:23
**age** [7] - 4564:11; 4571:12; 4578:2; 4604:7; 4615:8
**agency** [2] - 4562:16, 18
**agent** [1] - 4566:25
**agents** [5] - 4524:9; 4610:4-6, 8
**ago** [6] - 4588:23; 4598:24; 4599:1-3; 4646:10
**agreed** [2] - 4482:8; 4595:7
**agreement** [6] - 4454:14; 4594:24; 4605:20, 23; 4606:9, 16
**agreements** [1] - 4454:7
**agrees** [1] - 4606:17
**ahead** [3] - 4508:6; 4577:15; 4637:12
**Aid** [1] - 4633:18
**aid** [3] - 4538:7; 4540:3, 8
**aide** [1] - 4579:7
**air** [1] - 4496:2
**aired** [1] - 4624:19
**AK** [1] - 4566:9
**Alaska** [1] - 4565:6
**Albanese** [4] - 4615:21, 23; 4616:1, 3
**alcohol** [4] - 4566:25; 4571:9; 4585:1, 4
**alert** [1] - 4555:14
**Alex** [4] - 4453:2; 4490:4; 4537:16, 22
**Alight** [1] - 4454:13
**Allantown** [2] - 4497:2; 4498:18
**alleged** [1] - 4447:7
**Allen** [43] - 4476:16, 18; 4477:7; 4518:19; 4526:8; 4571:18, 20; 4572:6, 23; 4573:1, 5, 19-20, 25; 4574:10; 4575:4; 4576:25; 4578:19; 4579:3; 4581:17, 21, 23-24; 4583:3; 4589:16; 4590:7; 4604:21; 4605:17; 4614:20, 25; 4619:20; 4620:13; 4628:7, 11, 14; 4629:8; 4631:7, 13
**Allen's** [5] - 4573:4, 6; 4589:15; 4628:11, 16
**allow** [27] - 4475:2; 4487:4, 10; 4489:15; 4508:5, 11, 16; 4509:5, 13; 4510:2; 4511:11; 4519:6; 4520:12; 4521:23; 4531:7; 4544:16; 4546:3; 4553:19; 4559:1; 4582:21; 4590:18; 4601:9; 4608:18; 4625:24; 4637:6, 11
**allowed** [4] - 4461:15; 4467:3; 4582:5; 4631:7
**allowing** [2] - 4553:4; 4554:20
**almost** [4] - 4449:2; 4578:25; 4604:6; 4638:7
**alone** [1] - 4513:18
**alteration** [1] - 4567:16
**altogether** [1] - 4457:10
**Amendment** [6] - 4453:18, 20; 4555:17; 4556:22; 4557:19; 4559:10
**America** [1] - 4449:22
**AMERICA** [1] - 4444:3
**amount** [3] - 4536:24; 4537:1; 4562:6
**amusement** [1] - 4638:20
**Anchorage** [1] - 4565:6
**and..** [1] - 4601:23
**Angeles** [1] - 4449:22
**Angelo** [4] - 4516:21; 4603:3, 5, 17
**anger** [2] - 4585:11; 4595:7
**ANSON** [1] - 4444:14
**answer** [8] - 4521:2; 4526:22; 4527:24; 4558:1, 10; 4588:11; 4604:5; 4607:3

**answered** [2] - 4520:23; 4558:15
**answers** [4] - 4554:9; 4561:7; 4598:4, 6
**Anthony** [4] - 4506:12; 4524:19, 21; 4525:11
**anticipated** [2] - 4592:21; 4646:6
**anticipation** [1] - 4568:25
**antifreeze** [1] - 4633:18
**anyway** [1] - 4605:15
**apartment** [5] - 4533:6, 17; 4621:23; 4623:3, 5
**apologize** [1] - 4543:3
**appear** [5] - 4543:25; 4544:1; 4546:4; 4553:18; 4555:4
**appearance** [2] - 4507:13; 4556:2
**APPEARANCES** [1] - 4444:12
**appeared** [1] - 4448:25
**application** [3] - 4476:15; 4477:4; 4645:20
**applications** [1] - 4644:4
**applied** [3] - 4450:19; 4564:21
**apply** [2] - 4474:17; 4497:25
**applying** [1] - 4450:23
**appointment** [1] - 4462:5
**appointments** [1] - 4630:8
**approaches** [1] - 4456:16
**appropriate** [4] - 4450:18; 4453:19; 4454:17; 4459:18
**approve** [1] - 4616:12
**approved** [1] - 4464:18
**April** [11] - 4447:15; 4466:22, 25; 4467:3, 13, 18; 4468:4; 4563:16; 4565:12; 4635:19, 22
**area** [3] - 4486:25; 4567:13; 4570:15
**areas** [1] - 4470:21
**argue** [1] - 4645:3
**argument** [10] - 4455:20; 4594:8, 11, 16; 4644:18, 21; 4645:3, 6, 11
**argumentative** [1] - 4607:14
**arguments** [7] - 4541:4; 4545:3; 4548:19; 4621:11, 13; 4622:8
**arrangements** [2] - 4622:7; 4627:12
**arrest** [7] - 4494:7; 4566:11; 4567:14; 4569:20, 22; 4570:20; 4600:5
**arrested** [30] - 4493:21, 25; 4494:2, 4-5; 4496:10; 4498:2; 4566:5, 7-8; 4567:10, 12-14, 16, 18, 22; 4569:4, 7, 14; 4582:25; 4585:6; 4594:11; 4598:12; 4620:2; 4629:22; 4632:22; 4637:1, 3
**article** [2] - 4449:16; 4510:14
**ascertain** [1] - 4475:21
**aspect** [2] - 4451:15; 4461:18
**assault** [3] - 4594:11, 23; 4595:2
**assaulting** [1] - 4594:2
**assaults** [2] - 4500:20, 22
**assembled** [1] - 4462:4
**assess** [1] - 4577:9
**assessed** [5] - 4536:17; 4561:18, 21; 4625:7
**assessment** [1] - 4562:12
**assigned** [5] - 4448:18; 4469:24; 4472:19; 4484:7, 18
**assignment** [1] - 4469:18
**assist** [1] - 4555:2
**assistance** [1] - 4542:6
**Assistant** [1] - 4444:16
**assisting** [2] - 4465:1; 4647:10
**associate** [10] - 4446:17; 4450:6; 4514:21; 4516:17; 4518:15, 21; 4525:2; 4532:3; 4557:23; 4599:17
**associated** [3] - 4560:14, 21; 4569:23
**associates** [2] - 4450:23; 4558:8
**Association** [5] - 4548:2; 4549:20; 4550:21; 4551:18; 4554:6
**association** [6] - 4450:16; 4548:19; 4551:24; 4602:14; 4603:10; 4625:6
**assume** [5] - 4562:17; 4591:15; 4646:13
**assumed** [2] - 4450:17; 4590:6
**attached** [7] - 4543:19, 23; 4552:3, 10, 23, 25
**attaching** [1] - 4552:6
**attack** [1] - 4452:2
**attempted** [2] - 4448:4
**attending** [1] - 4635:1
**attention** [1] - 4635:18
**attic** [8] - 4636:15, 22-24; 4639:5; 4641:3, 11, 22
**Attorney** [1] - 4444:14
**attorney** [6] - 4453:23; 4459:14, 22; 4555:25; 4646:10
**attorneys** [3] - 4462:24; 4485:2; 4638:9
**Attorneys** [1] - 4444:16
**Audio** [6] - 4466:3, 18; 4467:16; 4468:2, 14; 4469:9
**August** [4] - 4488:10; 4535:4; 4567:15
**authentic** [3] - 4540:19; 4544:13; 4547:19
**authenticate** [3] - 4542:13; 4545:17, 25
**authenticated** [1] - 4547:11
**authenticating** [2] - 4545:15; 4553:3
**authentication** [2] - 4482:8; 4554:21
**authorized** [1] - 4538:14
**auto** [2] - 4497:3; 4563:18
**Auto** [1] - 4617:7
**automatic** [3] - 4566:7, 17
**automatically** [1] - 4450:13
**automobiles** [2] - 4567:23, 25
**automotive** [1] - 4566:4
**autos** [1] - 4563:21
**availability** [1] - 4559:10
**available** [4] - 4451:6; 4458:6; 4469:2; 4522:3
**Avenue** [2] - 4556:4; 4564:1
**average** [1] - 4572:9
**avoid** [2] - 4595:2, 4
**awaiting** [1] - 4450:4
**aware** [60] - 4491:6; 4519:3, 7, 9, 11, 15, 17-18, 20, 22; 4520:3, 6, 16, 18-19, 22; 4521:15, 18, 24; 4524:9, 11-12, 14-15, 18; 4525:2, 5, 8, 10-11, 14; 4526:4, 7-8, 10-11, 15-16, 23-24; 4527:3, 5-6; 4587:20, 24; 4588:4, 13, 25; 4589:7, 17; 4590:24; 4591:1, 12; 4595:19; 4602:23; 4604:9; 4605:3; 4610:12; 4623:13; 4636:21


## B


**Bacci** [1] - 4501:19
**Bachelor** [1] - 4538:4
**background** [2] - 4538:3; 4603:12
**backgrounds** [1] - 4500:10
**bad** [10] - 4559:6; 4595:18; 4600:18, 20; 4618:2; 4621:10; 4622:6; 4634:22
**badly** [1] - 4622:1
**bag** [3] - 4579:4; 4639:7, 10
**balance** [1] - 4449:6
**Ball** [1] - 4501:19
**ball** [1] - 4560:16
**ballpark** [1] - 4598:23
**bands** [1] - 4633:19
**banging** [1] - 4622:3
**bank** [16] - 4494:5, 8, 13, 17, 20, 23, 25; 4495:11, 14, 16, 25; 4496:10; 4497:11; 4627:9, 14
**bank's** [1] - 4494:23
**bar** [1] - 4592:25
**barrier** [1] - 4500:7
**base** [2] - 4499:5; 4551:1
**baseball** [1] - 4499:7
**based** [13] - 4445:12, 16; 4449:2; 4465:3; 4477:3; 4508:15; 4540:11; 4547:25; 4549:18; 4554:3; 4562:12; 4589:13; 4621:1
**basis** [8] - 4449:24; 4548:4; 4551:25; 4559:6; 4612:4; 4629:19; 4630:10; 4631:17
**Bassett** [1] - 4554:13
**bathroom** [2] - 4579:17
**bathtub** [1] - 4618:5
**Bay** [4] - 4485:8; 4565:5; 4599:16
**beach** [1] - 4564:1
**Beach** [19] - 4485:8; 4564:4; 4565:25; 4567:13; 4568:18; 4569:21; 4570:25; 4571:24; 4574:3; 4589:3; 4615:4, 6, 10, 25; 4617:13; 4635:1, 9
**beard** [8] - 4507:14; 4582:13, 17; 4591:18, 20; 4592:9, 13; 4593:8
**bearing** [1] - 4645:19
**became** [5] - 4484:14; 4505:22; 4519:18; 4571:6; 4619:17
**become** [2] - 4577:6, 17
**bed** [2] - 4496:21; 4611:4
**BEFORE** [1] - 4444:11
**begged** [1] - 4595:5
**beginning** [5] - 4468:5; 4619:6, 12; 4620:17; 4627:8
**behalf** [5] - 4559:8; 4596:13; 4624:8; 4634:24
**behavior** [1] - 4459:16
**behind** [5] - 4574:11; 4596:3, 5, 8, 12
**benches** [1] - 4577:20
**benefit** [1] - 4579:22
**BENTON** [1] - 4444:13
**best** [9] - 4571:18; 4573:7, 20; 4574:11; 4579:11; 4589:15; 4604:21; 4645:23
**better** [12] - 4505:22; 4520:23; 4524:1; 4591:5; 4597:10, 12, 15; 4618:8; 4624:20; 4635:7
**between** [7] - 4447:10, 13, 15; 4450:6; 4482:25; 4574:24; 4616:22
**beyond** [4] - 4445:14; 4447:25; 4489:14; 4528:7
**big** [14] - 4501:18, 25; 4506:3; 4513:23; 4570:8; 4578:1; 4581:23; 4585:2-4; 4595:9; 4621:20; 4634:8; 4638:24

**bill** [18] - 4535:13, 16, 24-25; 4536:3, 16, 20, 24; 4561:12, 18, 21; 4562:2, 9; 4625:2, 7-8, 11
**bills** [13] - 4539:18; 4544:5; 4545:8; 4561:15, 24; 4562:3, 6-7, 14, 16-17; 4625:4
**bipolar** [2] - 4497:18, 22
**birth** [2] - 4564:19
**birthdays** [1] - 4572:3
**bit** [7] - 4458:23; 4459:23; 4461:16; 4529:25; 4559:21, 23; 4564:12
**bitch** [1] - 4504:17
**black** [1] - 4457:6
**blacks** [1] - 4499:22
**blah** [3] - 4637:16
**bleed** [1] - 4645:2
**block** [1] - 4621:8
**blood** [5] - 4521:3, 6, 9; 4590:15, 19
**Bloods** [1] - 4449:22
**board** [17] - 4486:22; 4530:7, 11, 18; 4533:10, 13, 16; 4535:6; 4548:19; 4550:12; 4623:20, 22-23; 4624:5, 8
**boards** [1] - 4487:3
**boat** [1] - 4581:19
**boats** [1] - 4563:21
**Bobby** [6] - 4445:8, 21; 4453:16; 4490:10; 4516:16; 4555:19
**body** [2] - 4566:2; 4573:9
**Bonamolo** [1] - 4479:14
**Bonanno** [3] - 4525:9, 12, 17
**Bonannos** [3] - 4601:14, 17
**book** [2] - 4476:5, 13
**books** [3] - 4601:21, 25; 4627:10
**BOP** [7] - 4469:13, 19; 4480:8; 4504:12, 18, 25; 4505:6
**border** [1] - 4449:21
**borders** [1] - 4449:12
**born** [2] - 4571:13
**boroughs** [1] - 4562:16
**boss** [5] - 4514:16; 4515:14; 4519:18, 22; 4520:3
**boss'** [1] - 4521:7
**bothered** [1] - 4577:13
**bought** [3] - 4497:2; 4523:3; 4529:15
**Boulevard** [2] - 4485:8
**bounced** [1] - 4493:9
**box** [2] - 4459:15, 20
**boxes** [6] - 4538:21; 4539:3; 4540:13; 4552:2; 4554:3, 7
**boy** [1] - 4503:13
**boyfriend** [1] - 4616:14
**brand** [1] - 4504:19
**break** [10] - 4454:2; 4481:10, 13; 4512:6; 4541:3; 4555:15, 21; 4585:20; 4586:4
**breakdown** [1] - 4499:18
**breaking** [2] - 4451:20; 4522:6
**Brian** [9] - 4531:23; 4634:9, 13, 16, 19, 24; 4635:14; 4639:24
**Brian's** [1] - 4634:18
**brief** [4] - 4445:9; 4451:17; 4456:25; 4559:14
**briefly** [6] - 4445:5; 4446:8; 4451:3; 4527:11; 4531:14; 4612:14
**bright** [1] - 4450:17
**bring** [15] - 4451:3; 4454:23; 4461:7; 4482:1; 4513:3; 4516:1; 4525:24; 4555:9, 20, 24; 4559:18; 4586:10; 4587:4; 4643:4
**Broadway** [1] - 4444:21
**broke** [2] - 4575:1; 4579:17
**Brooklyn** [12] - 4444:6, 17, 19, 24; 4469:20; 4471:12; 4472:12; 4566:3; 4581:24; 4601:10, 12, 14
**brother** [6] - 4446:17; 4515:8; 4517:4, 22; 4589:25; 4637:15
**brothers** [1] - 4615:8
**brought** [9] - 4447:3; 4472:11; 4474:5; 4504:10; 4565:8; 4578:25; 4619:22; 4627:19; 4633:5
**Bruno** [1] - 4639:21
**buildings** [1] - 4499:6
**built** [1] - 4644:10
**bulletin** [2] - 4486:22
**bunch** [4] - 4458:2; 4637:13, 17; 4638:21
**bunkee** [1] - 4516:24
**Bureau** [12] - 4463:18, 22; 4469:13, 20; 4472:19; 4473:3, 22; 4474:17; 4475:4; 4476:11; 4478:14, 22
**Burlingame** [2] - 4518:3; 4527:18
**BURLINGAME** [90] - 4444:14; 4446:9; 4451:19; 4452:7; 4453:8, 15, 24; 4454:6, 10, 23; 4455:20; 4456:7, 20; 4457:2, 6, 9, 25; 4458:8, 12, 17, 23; 4459:6; 4460:3; 4465:2; 4467:5; 4468:24; 4474:25; 4481:7; 4486:18; 4487:2, 8; 4488:2; 4489:24; 4492:3; 4507:17, 21; 4508:4, 10, 14; 4509:4, 12; 4510:1, 16; 4511:10; 4513:13; 4515:22; 4518:5; 4520:11; 4521:13; 4526:21; 4527:9, 23, 25; 4528:9; 4531:5; 4540:15; 4541:3; 4542:1; 4559:19; 4561:3; 4576:8, 15; 4582:20; 4585:17; 4587:7, 10; 4591:5; 4598:7; 4605:8; 4606:3, 5, 7, 11; 4612:13; 4613:5; 4625:23; 4637:5, 10; 4640:22; 4642:11; 4644:6, 10, 22; 4645:4, 9; 4647:13, 19-20; 4648:20; 4649:2
**burning** [1] - 4590:22
**business** [1] - 4540:20
**buy** [1] - 4497:7
**buying** [2] - 4569:23; 4599:11
**BY** [39] - 4444:14; 4463:16; 4466:2; 4483:20; 4488:2; 4492:14; 4513:13; 4527:13; 4529:2; 4531:11; 4532:18; 4534:22; 4537:25; 4560:5; 4561:8; 4563:14; 4584:2; 4587:10; 4612:17; 4614:8; 4640:22; 4642:15; 4647:13, 16, 19-20, 22, 25; 4648:2, 6, 8, 12, 16, 18, 20, 22, 25; 4649:2, 4

## C

**Cacciopoli** [8] - 4475:12; 4517:9; 4519:8, 11; 4526:17; 4602:21; 4605:10; 4609:1
**Cadman** [2] - 4444:16, 23
**cakes** [2] - 4502:2, 4
**calendar** [2] - 4461:6; 4645:14
**calender** [1] - 4461:3
**California** [1] - 4565:9
**Camp** [1] - 4565:8
**campaign** [1] - 4565:18
**CAMPBELL** [1] - 4444:13
**cancel** [1] - 4645:15
**cane** [1] - 4618:3
**cannot** [2] - 4461:3; 4645:12
**Caponella** [4] - 4524:21; 4525:2, 5, 11
**captain** [10] - 4516:7, 12; 4517:5, 10, 12, 16; 4519:12, 16; 4525:5; 4526:25
**Captain** [1] - 4602:24
**car** [15] - 4455:25; 4458:20; 4459:3, 7; 4497:7; 4523:3; 4619:10; 4630:25; 4633:2-4, 6, 9, 17
**card** [2] - 4564:21; 4590:22
**cards** [3] - 4501:21; 4505:23; 4507:10
**care** [17] - 4483:5; 4555:20; 4574:10, 12, 14, 19-20; 4578:22; 4579:15; 4580:7; 4583:4; 4608:19; 4625:20, 25; 4626:20; 4627:2; 4633:23
**career** [1] - 4560:8
**CARNEGLIA** [1] - 4444:7
**Carneglia** [134] - 4445:22; 4446:24; 4447:4; 4459:14; 4461:19; 4463:18; 4464:3; 4471:2, 8; 4475:5, 13, 17; 4476:16, 18, 22; 4477:4; 4479:2, 17; 4482:22, 25; 4483:13; 4484:22, 25; 4485:3; 4488:15, 17; 4505:18, 20; 4506:8, 21; 4507:15, 19, 25; 4511:23; 4517:5; 4527:19, 22; 4528:3; 4534:16; 4558:23; 4559:8; 4571:1, 5, 15, 17-18, 20; 4572:4, 7, 11, 19; 4573:4, 16; 4574:6, 13-14; 4575:16, 18, 21, 24; 4576:2, 7, 11, 13, 17; 4578:10, 21; 4579:24; 4580:2, 23; 4581:8, 13; 4582:25; 4589:24; 4612:20, 25; 4613:3; 4616:24; 4617:1, 3, 15; 4618:11, 22; 4621:14; 4623:6, 9, 13; 4624:11, 15-16, 22; 4625:13, 16, 19; 4626:7-9, 21; 4627:6, 22; 4628:22; 4629:4, 10, 17; 4630:1, 5, 12, 16; 4631:3, 13, 16; 4632:7, 22, 25; 4633:9; 4634:18, 24; 4635:12, 16; 4636:1, 14, 17; 4637:23; 4639:6, 14; 4640:3; 4645:23
**Carneglia's** [3] - 4582:18; 4617:17; 4641:3
**Carosella** [4] - 4486:25; 4580:21; 4581:12; 4582:4
**Carosella's** [14] - 4485:5, 10; 4486:9; 4487:15; 4488:8, 11, 20; 4571:22; 4576:24; 4577:19; 4580:12, 14; 4581:23
**Carosello's** [9] - 4593:5; 4599:14; 4610:3; 4634:19; 4638:15, 17, 22; 4639:20
**carry** [1] - 4590:16
**cars** [3] - 4558:18; 4589:23; 4610:4
**cart** [1] - 4600:15
**Casciano** [2] - 4524:21; 4525:8
**case** [47] - 4447:16; 4458:16; 4461:2, 8, 12, 20; 4462:13, 17, 19, 23, 25; 4463:7; 4473:7, 9; 4474:1; 4480:7; 4481:10; 4483:9; 4484:15, 20; 4488:5; 4489:7; 4504:25; 4525:24; 4558:6, 10; 4569:18; 4570:12; 4578:5; 4582:25; 4584:16; 4599:25; 4600:1, 7, 9, 17; 4603:5, 8-9,

16; 4620:2; 4644:20, 24; 4645:1, 8; 4646:2
**cases** [6] - 4449:19; 4450:2; 4461:3, 6; 4474:12; 4584:17
**cash** [1] - 4551:16
**Casiano** [2] - 4453:6; 4490:16
**CAT** [1] - 4445:1
**Catholic** [2] - 4493:16; 4615:10
**caught** [1] - 4497:11
**caused** [3] - 4450:22; 4494:8; 4617:23
**Cavallo** [11] - 4475:13; 4479:3, 14; 4480:10; 4518:1; 4520:8, 17; 4527:3; 4604:15; 4605:9; 4608:25
**CC** [3] - 4485:19; 4486:1, 17
**CD** [1] - 4451:5
**CDs** [1] - 4461:10
**cell** [3] - 4472:25; 4473:1; 4504:15
**Cello** [1] - 4515:2
**cells** [2] - 4472:19; 4499:4
**Cement** [1] - 4633:17
**Center** [3] - 4472:12; 4473:8; 4493:20
**Central** [1] - 4449:21
**cents** [1] - 4627:15
**ceremony** [1] - 4590:13
**certain** [5] - 4478:15; 4490:24; 4491:4; 4556:23; 4633:12
**certainly** [2] - 4473:18; 4549:24
**certificate** [1] - 4564:20
**certified** [3] - 4538:2; 4560:24
**Certified** [1] - 4560:8
**chair** [1] - 4575:2
**chance** [1] - 4579:4
**change** [1] - 4595:9
**changed** [3] - 4486:15; 4564:20; 4628:20
**Channel** [2] - 4635:2, 9
**characterization** [2] - 4523:15; 4598:11
**charge** [14] - 4446:20; 4461:2, 5; 4462:4; 4463:6; 4567:21; 4594:12, 23, 25; 4595:2; 4644:13, 15, 20
**charged** [7] - 4447:18; 4448:9, 17; 4558:6; 4573:1; 4637:14; 4640:13
**charges** [6] - 4447:3, 9; 4474:5; 4595:1; 4632:6; 4637:8
**Charles** [80] - 4445:22; 4447:4; 4475:5; 4476:15, 22; 4482:22; 4504:10; 4505:11-13, 18; 4506:8, 16, 21; 4507:2, 6, 9, 25; 4508:21, 25; 4509:2, 14-15, 22; 4510:12, 24; 4511:7; 4515:18; 4525:1; 4534:16; 4558:22; 4571:1, 4, 15, 17-18, 20; 4572:4, 7; 4573:4, 14, 17-18, 23; 4574:6, 12; 4575:4, 13; 4576:5, 23; 4577:5, 12, 24; 4581:3, 21; 4582:4, 10; 4589:24; 4591:21; 4592:9, 22; 4593:6; 4616:24; 4618:11, 21; 4621:13; 4634:12, 25; 4635:2, 4, 15; 4637:1, 9; 4638:17; 4639:1; 4640:3; 4641:3, 15
**CHARLES** [1] - 4444:7
**Charles'** [4] - 4577:11, 22; 4578:5; 4583:4
**Charles's** [1] - 4592:4
**check** [6] - 4477:4, 9, 11, 20; 4542:14; 4608:10
**checked** [1] - 4581:19
**checking** [1] - 4581:18
**Chester** [1] - 4492:22
**Chi** [1] - 4448:5
**chief** [2] - 4447:16; 4646:2
**child** [1] - 4449:2
**childhood** [1] - 4493:10
**children** [11] - 4578:3, 5; 4614:21, 23; 4619:7, 18; 4620:13; 4622:16; 4629:7; 4640:15
**choice** [1] - 4623:4
**chose** [3] - 4611:4; 4612:1
**chosen** [1] - 4610:24
**Chris** [3] - 4504:2, 6, 10
**Chriss** [1] - 4504:5
**Christian** [2] - 4493:8, 12
**Christmas** [7] - 4445:22; 4446:13, 15, 19, 21; 4450:10
**circle** [1] - 4543:6
**citations** [2] - 4565:17
**City** [8] - 4484:3; 4532:22; 4543:25; 4547:20; 4555:4; 4556:4; 4562:14, 16
**civilian** [3] - 4611:17
**claim** [1] - 4557:19
**clarify** [2] - 4455:13; 4467:5
**class** [1] - 4492:24
**classification** [1] - 4472:13
**clean** [3] - 4565:11; 4585:8; 4633:9
**clean-up** [2] - 4565:11; 4585:8
**cleaned** [1] - 4621:5
**cleaning** [1] - 4633:18
**clear** [6] - 4450:3, 5; 4502:23; 4542:23; 4547:10; 4559:2
**CLERK** [9] - 4483:17; 4492:10; 4528:23; 4532:13; 4537:20; 4556:11; 4563:7; 4613:15, 22
**client** [2] - 4459:18, 24
**clients** [5] - 4470:16, 18; 4474:18; 4560:14, 19
**close** [11] - 4573:19; 4608:16, 18, 20-22; 4615:11; 4626:17; 4629:11; 4645:8
**closed** [5] - 4501:11; 4535:4, 12-13, 25
**closer** [6] - 4492:20; 4580:4; 4587:5; 4614:1; 4644:14; 4645:6
**closest** [3] - 4518:10; 4526:17; 4609:11
**closet** [2] - 4496:23; 4522:22
**closing** [2] - 4646:12
**clothes** [2] - 4508:9; 4522:24
**club** [1] - 4448:5
**co** [2] - 4474:13; 4544:9
**co-defendant** [1] - 4474:13
**co-ops** [1] - 4544:9
**coerced** [2] - 4450:11, 15
**coercion** [5] - 4450:7, 14, 17, 23
**coffee** [1] - 4502:2
**coke** [1] - 4585:2
**colleague** [1] - 4553:17
**collect** [1] - 4463:25
**collected** [2] - 4542:10, 14
**collective** [1] - 4540:23
**collectively** [1] - 4540:5
**college** [3] - 4493:17
**Colombo** [2] - 4601:20, 23
**Colombos** [1] - 4601:20
**coming** [7] - 4489:25; 4509:10; 4531:8; 4547:5; 4591:17, 20; 4622:2
**command** [2] - 4521:4; 4595:20
**comment** [1] - 4591:9
**comments** [4] - 4445:16; 4507:15, 19; 4578:7
**commit** [1] - 4494:8
**commitments** [1] - 4645:16
**committed** [3] - 4577:9; 4597:21; 4601:4
**committee** [1] - 4517:17
**committing** [1] - 4522:1
**common** [4] - 4474:21; 4476:11; 4563:23; 4614:17
**common-law** [1] - 4614:17
**community** [5] - 4448:20; 4450:22; 4574:3; 4615:5
**comp** [1] - 4639:2
**companion** [1] - 4629:24
**company** [2] - 4609:22, 25
**complained** [3] - 4623:1; 4624:2, 6
**complete** [2] - 4499:4; 4567:8
**completed** [2] - 4585:11; 4595:8
**completeness** [1] - 4461:16
**completion** [2] - 4461:17; 4483:12
**Complex** [4] - 4529:10; 4533:3; 4539:8; 4620:5
**complex** [7] - 4463:7; 4561:11, 19; 4562:9, 21; 4620:18; 4621:16
**complexes** [1] - 4533:17
**complexity** [1] - 4644:24
**comply** [2] - 4451:13; 4452:23
**composite** [1] - 4451:5
**compound** [11] - 4501:11, 13-14, 16; 4502:15; 4505:23; 4506:2-4, 23; 4507:10
**compression** [1] - 4617:23
**computer** [1] - 4638:4
**concern** [4] - 4558:12; 4581:5; 4625:17; 4637:23
**concerned** [7] - 4528:6; 4575:21, 23; 4577:25; 4631:25; 4633:25; 4644:22
**concerning** [12] - 4445:7; 4463:17; 4479:5; 4510:12; 4527:18; 4539:7; 4544:21; 4556:21; 4576:20; 4612:21; 4625:20
**concerns** [2] - 4575:23; 4624:10
**conclusion** [1] - 4447:16
**concurrent** [1] - 4568:8
**condition** [6] - 4547:9; 4573:6; 4618:9; 4623:13; 4636:12
**conditional** [2] - 4519:14; 4520:15
**conditionally** [1] - 4520:1
**Condo** [2] - 4538:22; 4548:2
**condo** [21] - 4530:18; 4533:10, 13, 16; 4534:13; 4538:8; 4548:19, 25; 4549:4; 4550:12; 4551:24; 4562:19; 4621:22; 4623:20, 22-23; 4624:2, 24; 4625:6
**Condominium** [11] - 4529:9; 4533:3; 4539:8; 4544:21; 4549:20; 4550:21; 4551:17; 4554:6; 4561:11, 19; 4620:4
**condominium** [11] - 4530:7, 11; 4560:12, 17, 19, 21, 25; 4562:9, 21; 4620:18; 4621:16
**Condominiums** [1] - 4539:18
**Condos** [6] - 4533:1; 4542:11; 4548:12; 4553:2; 4614:14; 4617:10
**condos** [2] - 4542:3; 4544:9

**conduct** [2] - 4488:17; 4565:19
**conducted** [1] - 4495:2
**confer** [2] - 4551:2; 4555:11
**confined** [1] - 4506:4
**conflict** [1] - 4458:23
**conflicts** [3] - 4458:4, 18
**confront** [2] - 4622:17, 19
**confrontation** [1] - 4581:13
**confusing** [1] - 4550:19
**congregate** [1] - 4638:21
**connection** [3] - 4558:3; 4578:11; 4599:10
**consequential** [3] - 4556:13, 16; 4557:5
**consider** [4] - 4619:23; 4624:18; 4635:15; 4645:10
**considered** [1] - 4522:3
**consiglieri** [1] - 4517:22
**consist** [1] - 4542:21
**consistent** [1] - 4508:12
**conspiracy** [10] - 4447:12, 14; 4448:3, 15-16, 22; 4449:5; 4569:7; 4570:21; 4584:3
**contact** [7] - 4448:21; 4484:24; 4485:2; 4503:10; 4583:7, 10; 4628:23
**contacted** [4] - 4452:20; 4453:2; 4538:7; 4635:6
**contained** [2] - 4457:14; 4479:8
**contains** [1] - 4455:23
**contemporaries** [1] - 4615:19
**contempt** [2] - 4593:16; 4594:25
**contends** [1] - 4557:2
**content** [1] - 4575:14
**contented** [1] - 4593:1
**contention** [1] - 4448:12
**contents** [1] - 4640:25
**context** [4] - 4527:19; 4528:3; 4556:21; 4612:18
**contiguous** [1] - 4449:13
**continue** [2] - 4579:25; 4629:11
**Continued** [4] - 4481:20; 4585:23; 4586:15; 4643:20
**continued** [8] - 4448:16; 4466:2; 4526:12; 4560:4; 4583:1, 3; 4584:2; 4598:15
**continues** [1] - 4631:13
**contradiction** [2] - 4459:3; 4546:7
**contributed** [1] - 4486:24
**control** [7] - 4448:24; 4449:2, 4, 14, 24; 4583:5; 4594:8
**controlled** [2] - 4533:13; 4534:14
**conversation** [10] - 4446:18; 4463:21; 4482:19; 4510:11; 4527:19; 4575:24; 4576:2; 4580:23; 4636:17, 19
**conversations** [24] - 4473:12; 4482:10; 4513:25; 4516:2; 4520:16, 19, 22; 4524:4, 6; 4576:5; 4596:17; 4612:20, 25; 4613:2; 4619:19; 4623:10; 4625:19, 22; 4632:10, 14, 17, 20
**converse** [1] - 4459:14
**conversing** [1] - 4459:18
**convicted** [2] - 4598:12; 4600:3
**conviction** [5] - 4447:20; 4570:21; 4572:22; 4583:11; 4598:17
**convictions** [1] - 4477:12
**cooked** [1] - 4579:3
**coop** [1] - 4560:19
**cooperation** [6] - 4454:7, 14; 4605:20, 23; 4606:8, 16
**cooperative** [1] - 4560:13
**coops** [1] - 4560:18
**copied** [1] - 4451:10
**copies** [2] - 4539:23; 4544:14
**copy** [6] - 4451:4; 4454:10; 4489:20; 4539:22, 25
**copying** [1] - 4552:24
**cord** [2] - 4573:10; 4617:24
**Corozzo** [3] - 4517:16, 21; 4520:20
**Corozzo's** [1] - 4517:21
**Corps** [1] - 4564:22
**correct** [70] - 4456:12; 4470:16; 4473:4; 4475:24; 4476:6; 4477:14; 4478:1, 3; 4479:3, 12, 18, 21; 4480:19; 4488:24; 4489:8; 4495:22; 4498:14; 4501:4; 4511:17; 4513:19, 23; 4514:4, 12, 17; 4516:3; 4517:13, 18, 23; 4518:22, 24; 4522:20, 22-23; 4523:2, 5; 4525:11; 4527:1, 7-8; 4534:24; 4535:13, 16, 18; 4544:12; 4549:17; 4551:21; 4555:5; 4562:2, 10; 4566:22; 4570:1; 4593:11; 4595:11, 20; 4596:4, 22, 25; 4597:3; 4598:13, 16; 4600:1; 4607:5; 4612:11, 22; 4620:15; 4625:4, 7; 4630:1, 8; 4632:12
**correction** [2] - 4470:3; 4567:7
**Correctional** [1] - 4627:23
**correctional** [2] - 4502:13, 15
**corrective** [1] - 4611:13
**correspondence** [1] - 4552:4
**counsel** [9] - 4490:22; 4491:3; 4536:12; 4538:14; 4539:4; 4540:12; 4555:22; 4557:21
**Counsel** [3] - 4556:2; 4558:1; 4644:3
**count** [5] - 4445:7; 4446:6; 4450:25; 4501:12; 4542:2
**Count** [2] - 4447:7; 4448:2
**counts** [3] - 4447:17; 4465:9
**County** [7] - 4492:22; 4498:17; 4567:19, 24; 4572:22, 24
**couple** [12] - 4489:16; 4523:3; 4542:3; 4570:5; 4580:11; 4610:19; 4632:19; 4633:1; 4641:14; 4644:9
**course** [30] - 4450:10; 4453:10; 4484:20; 4489:10; 4495:13; 4505:21; 4539:7; 4540:4, 9; 4546:1, 25; 4555:12; 4559:15; 4560:8, 15, 18; 4561:10; 4566:10; 4571:11; 4584:12; 4605:12; 4612:2; 4619:8; 4623:8, 15; 4628:24; 4629:12; 4636:21; 4638:18; 4640:14
**COURT** [298] - 4444:1; 4445:3; 4446:8; 4447:2; 4451:7, 18, 23; 4452:1, 10, 14, 18, 21, 23; 4453:7, 10, 12, 22; 4454:5, 9, 16; 4455:17; 4456:2, 4, 11, 13, 18, 22; 4457:12, 14, 16, 19, 22; 4458:7, 11, 15, 22; 4459:8, 11, 21; 4460:4; 4461:1, 11, 20, 22; 4462:1; 4464:16, 25; 4465:7; 4466:13, 15, 25; 4467:4, 7, 10, 12, 25; 4468:11, 13, 22; 4469:6; 4475:2; 4480:25; 4481:3, 6, 9, 13, 15; 4482:1, 5, 16, 20; 4483:1, 5, 9; 4485:22; 4486:19; 4487:4, 10, 13, 17, 20, 24; 4489:15, 25; 4491:2, 13, 18, 22; 4492:2, 4; 4507:18, 22, 24; 4508:5, 11, 16; 4509:5, 13; 4510:2, 17, 22; 4511:1, 4, 11; 4512:1, 6; 4513:3, 8; 4514:24; 4515:21; 4518:4, 6, 8; 4519:6, 14, 25; 4520:12, 23; 4521:12, 14, 23; 4522:16; 4525:21; 4526:20, 22; 4527:10, 24; 4528:1, 7, 10, 13, 17, 19; 4531:7; 4532:7; 4536:13; 4538:13; 4540:2, 5, 23; 4541:6; 4542:21; 4543:2, 4; 4544:6, 8, 10, 13, 16, 25; 4545:2, 7, 11, 13, 15, 18, 22, 24; 4546:3, 8, 11, 14, 16, 21; 4547:2, 8, 11, 15, 17; 4548:3, 6, 10, 16, 21; 4549:8, 11, 13, 15, 22, 24; 4550:3, 8, 10, 13, 16, 22, 25; 4551:4, 6, 9, 11, 14, 16, 19, 22, 25; 4552:6, 11, 15, 18; 4553:3, 9, 11, 13, 18, 25; 4554:10, 14, 18, 20, 24; 4555:8, 12, 16, 18, 20, 24; 4556:5, 13, 16, 19; 4557:4, 9, 12, 15, 18, 21; 4558:1, 6, 14, 21, 25; 4559:11, 14, 17; 4560:2; 4561:1, 6; 4563:1; 4576:9, 16; 4582:21; 4585:16, 19; 4586:3, 10; 4587:3, 8; 4588:8; 4590:18; 4591:8; 4592:17; 4596:1; 4598:5; 4599:7; 4601:9; 4605:7, 13; 4606:2, 4, 6, 10, 13, 15; 4607:7, 15; 4608:15; 4609:9; 4610:17; 4612:15; 4613:6, 9, 14, 25; 4614:3; 4625:24; 4637:6, 11, 21; 4642:12, 19, 21, 23; 4643:1, 3, 8, 11, 15; 4644:3, 18; 4645:2, 7, 12, 14; 4646:4, 8, 17
**court** [13] - 4449:7; 4451:12; 4456:10; 4487:25; 4498:14; 4539:6, 10; 4540:25; 4572:24; 4586:9; 4593:13, 23
**Court** [43] - 4444:18, 23; 4445:4, 6, 9; 4446:22; 4448:13; 4450:2, 5, 17; 4451:9; 4453:19; 4454:11, 13; 4455:14, 22; 4458:13; 4459:12; 4461:15; 4462:4; 4464:13, 18, 21; 4466:11; 4467:2; 4482:15; 4484:18; 4538:11, 15; 4547:6; 4549:1; 4550:7; 4551:5; 4552:20; 4553:24; 4555:14; 4556:21; 4594:21; 4642:24; 4645:10; 4647:5, 8
**Court's** [9] - 4447:5, 22; 4464:11; 4482:6; 4538:13; 4539:24; 4557:17; 4559:13; 4645:19
**Courthouse** [1] - 4444:5
**courtroom** [2] - 4459:23; 4541:7
**COURTROOM** [2] - 4613:15, 22
**courts** [2] - 4498:19; 4574:9
**cover** [1] - 4561:22
**cowboy** [1] - 4604:12
**CPA** [2] - 4538:6; 4560:6
**CR** [1] - 4444:4
**crazy** [2] - 4604:8
**credence** [1] - 4456:5
**credibility** [1] - 4452:3
**credit** [3] - 4447:10, 12; 4633:4
**crime** [42] - 4445:25; 4501:3; 4509:3; 4510:23; 4522:9, 19; 4525:16; 4533:15; 4534:7; 4557:24; 4558:4, 7; 4569:17, 24; 4576:14, 21; 4578:8, 11; 4580:25; 4587:16-18; 4588:5, 13, 16, 20; 4590:11, 24; 4591:11; 4597:21; 4599:23; 4600:1, 4; 4601:2; 4602:15; 4603:23; 4604:9, 23, 25; 4623:25
**Crime** [3] - 4589:8; 4624:8; 4625:11
**crimes** [10] - 4447:18; 4557:1; 4558:7;

4577:9; 4597:5, 16, 18; 4598:13; 4610:23
**criminal** [15] - 4448:15; 4477:12, 22, 25; 4478:3; 4522:1; 4523:7, 12; 4583:8, 10; 4598:8, 10; 4606:18
**Criminal** [1] - 4538:12
**criminality** [1] - 4449:25
**criminals** [1] - 4523:9
**Crips** [1] - 4449:22
**Cross** [2] - 4485:8
**cross** [15] - 4453:20; 4461:9, 11, 17; 4462:13; 4486:19; 4487:23; 4492:3; 4556:23; 4557:3; 4559:3, 6; 4643:12; 4644:9
**CROSS** [14] - 4463:15; 4466:1; 4488:1; 4513:12; 4531:10; 4534:21; 4587:9; 4640:21; 4647:12, 18; 4648:1, 7, 19; 4649:1
**CROSS-EXAMINATION** [11] - 4466:1; 4513:12; 4531:10; 4534:21; 4587:9; 4640:21; 4647:18; 4648:1, 7, 19; 4649:1
**cross-examination** [2] - 4487:23; 4559:6
**cross-examine** [3] - 4462:13; 4487:24; 4557:3
**Crowley** [16] - 4531:23; 4539:15; 4544:19, 22; 4545:4, 17, 21; 4546:4, 11, 13, 16, 19; 4547:1; 4548:17; 4549:6; 4552:16
**Crowley's** [4] - 4545:13, 18; 4549:2; 4552:4
**cruel** [1] - 4450:21
**current** [1] - 4469:18
**curse** [2] - 4577:16; 4582:6
**cursing** [1] - 4582:5
**CURTIS** [1] - 4444:20
**cut** [1] - 4626:4
**Czechoslovian** [1] - 4566:9

## D

**D'Amico** [1] - 4514:15
**DA's** [1] - 4493:7
**dad** [2] - 4493:6; 4511:24
**daily** [3] - 4617:25; 4629:15, 19
**damage** [1] - 4446:4
**danger** [1] - 4502:7
**database** [2] - 4477:11, 22
**date** [9] - 4445:4; 4452:2; 4459:12; 4471:10; 4564:20; 4568:12; 4641:17; 4647:6, 8
**date's** [1] - 4455:6
**dated** [4] - 4445:3; 4550:15; 4557:3; 4647:4
**dates** [1] - 4598:22
**dating** [3] - 4494:9, 13; 4615:1
**daughter** [2] - 4571:13
**daughters'** [1] - 4572:3
**David** [3] - 4455:12; 4457:2; 4458:8
**days** [2] - 4576:19; 4641:14
**DD** [1] - 4486:1
**dead** [4] - 4509:20; 4511:13; 4591:4; 4646:10
**deal** [6] - 4457:20; 4501:25; 4570:11; 4598:15, 19; 4600:15
**dealer** [4] - 4570:14; 4599:9; 4600:14
**dealing** [5] - 4450:6; 4578:16; 4589:22; 4599:3, 11
**dealings** [1] - 4592:6
**dealt** [2] - 4455:11; 4598:17
**dear** [1] - 4637:9
**dearly** [3] - 4640:4; 4642:7, 18
**deceased** [1] - 4529:16
**December** [5] - 4471:16; 4540:1; 4546:10, 14; 4565:23
**decide** [1] - 4490:20
**decision** [2] - 4595:23; 4645:19
**decisions** [1] - 4596:9
**declaration** [13] - 4455:8, 12, 21, 23; 4456:1, 5, 23; 4457:23; 4458:2, 25; 4459:1
**deemed** [2] - 4450:13, 15
**deepen** [1] - 4619:13
**Defendant** [2] - 4444:8, 18
**defendant** [60] - 4445:3; 4446:1, 17-18; 4447:8, 17, 25; 4448:14, 17, 22; 4449:6, 8; 4450:20; 4454:9, 16; 4461:7; 4462:10, 12-13, 17; 4464:4; 4474:12; 4478:19; 4482:1; 4513:17, 20; 4514:1, 21; 4515:22; 4516:1; 4518:23; 4519:4, 7; 4520:7, 13; 4523:21; 4524:5, 25; 4526:1, 5, 9, 12; 4527:4; 4556:14, 17; 4586:10; 4587:14; 4595:14, 16; 4596:18; 4605:3; 4608:16; 4609:16; 4641:21; 4647:4
**Defendant's** [17] - 4457:19; 4466:12, 17; 4467:15; 4468:1, 9, 12, 21, 23; 4469:8; 4547:12; 4650:4, 6, 8, 10, 12
**defendant's** [20] - 4446:17; 4447:6; 4448:8, 10; 4456:11; 4461:8, 20; 4462:19; 4516:24; 4517:4, 12; 4518:10; 4519:12, 15; 4520:14; 4526:17, 25; 4591:10; 4596:13; 4602:23
**defendants** [8] - 4450:1, 3; 4470:4, 24; 4474:18; 4518:2; 4603:16; 4609:10
**Defense** [7] - 4464:14; 4465:11; 4467:24; 4482:12; 4485:19; 4487:12; 4613:18
**defense** [41] - 4445:6; 4451:20; 4454:10; 4455:4; 4459:14; 4461:14; 4464:1, 11, 16, 22, 25; 4466:10; 4467:2; 4481:10; 4482:7, 11, 14, 24; 4483:13; 4485:2; 4490:22; 4491:3, 14; 4492:6; 4528:18; 4537:16; 4538:14; 4539:4; 4540:6; 4542:15; 4563:3; 4565:19; 4606:1; 4607:18; 4613:12; 4647:9
**defense's** [3] - 4557:1; 4559:4; 4644:25
**definitely** [12] - 4502:17; 4508:22; 4584:12; 4585:2; 4595:8, 21; 4618:20; 4626:8; 4629:16; 4630:7, 11
**defuse** [1] - 4594:16
**degenerative** [1] - 4618:7
**degree** [1] - 4538:4
**delay** [1] - 4454:20
**deleted** [1] - 4468:25
**deliberate** [1] - 4645:5
**deliberation** [1] - 4463:8
**delivered** [2] - 4579:1
**demanded** [1] - 4592:8
**denied** [2] - 4450:25; 4490:1
**Department** [8] - 4484:3; 4543:5, 25; 4544:2, 11; 4547:20; 4555:5; 4562:15
**deposition** [1] - 4471:8
**deposits** [4] - 4479:5, 14, 17, 20
**derivative** [1] - 4625:9
**DeSalles** [1] - 4493:20
**describe** [9] - 4499:1; 4501:8, 24; 4551:8; 4557:11; 4615:5; 4620:24; 4624:15; 4634:6
**described** [1] - 4624:14
**describing** [1] - 4510:17
**description** [1] - 4508:5
**designated** [1] - 4611:10
**desire** [1] - 4483:9
**detail** [2] - 4640:25; 4641:8
**detainer** [1] - 4568:25
**detention** [3] - 4471:3, 11; 4628:1
**Detention** [2] - 4472:12; 4473:8
**determine** [1] - 4477:1
**determined** [1] - 4445:10
**develop** [2] - 4618:22, 24
**developed** [1] - 4645:22
**deviancy** [1] - 4589:21
**device** [1] - 4566:16
**diagnosed** [2] - 4497:14, 18
**diagnosis** [2] - 4497:17; 4632:1
**Dickinson** [1] - 4538:5
**died** [5] - 4509:18; 4510:10
**Diego** [1] - 4565:3
**difference** [2] - 4458:22; 4493:9
**different** [10] - 4486:24; 4500:9; 4501:17; 4549:2, 6; 4554:12; 4560:19; 4628:19; 4645:25
**difficult** [1] - 4553:19
**difficulty** [4] - 4462:2; 4530:6; 4620:18, 21
**digest** [1] - 4645:21
**DiMaria** [1] - 4516:12
**diner** [1] - 4508:22
**dinner** [3] - 4580:11; 4639:1
**dinners** [2] - 4595:17; 4630:13
**dire** [1] - 4486:18
**direct** [19] - 4453:20; 4463:17; 4464:7; 4469:12; 4472:6; 4475:3; 4489:14; 4513:16; 4546:7; 4556:25; 4559:3; 4578:7; 4587:13; 4593:7; 4596:3, 12; 4612:19; 4635:18; 4643:11
**DIRECT** [18] - 4483:19; 4492:13; 4529:1; 4532:17; 4537:24; 4560:4; 4563:13; 4584:1; 4614:7; 4642:14; 4647:15, 24; 4648:5, 11, 15, 17, 24; 4649:3
**directed** [1] - 4473:15
**direction** [2] - 4473:22; 4590:16
**directions** [1] - 4590:20
**directly** [1] - 4459:15
**Disability** [1] - 4617:22
**disability** [1] - 4618:19
**disabled** [4] - 4573:7; 4617:20; 4630:22; 4640:17
**disadvantages** [1] - 4645:8
**disagreements** [3] - 4620:22, 25; 4621:1
**discharged** [1] - 4565:13
**discovery** [3] - 4473:9, 12; 4474:2
**discussed** [2] - 4520:19; 4536:4
**discussing** [1] - 4449:17

**discussions** [1] - 4597:8
**disease** [1] - 4618:7
**disgusted** [3] - 4577:1; 4596:18, 21
**dismiss** [2] - 4447:6; 4450:24
**dismissal** [1] - 4447:21
**dismissed** [3] - 4447:4, 9; 4448:7
**disorder** [1] - 4497:18
**dispatcher** [1] - 4532:22
**displeasure** [1] - 4548:18
**dispute** [1] - 4625:2
**disrupted** [1] - 4576:22
**distribute** [1] - 4584:3
**distributed** [3] - 4548:18, 24; 4550:14
**distribution** [1] - 4599:25
**DISTRICT** [3] - 4444:1, 11
**Dix** [23] - 4472:1, 3-4; 4498:20, 24-25; 4499:1, 3-4, 11, 13; 4501:15; 4502:6, 12; 4504:22; 4508:1; 4519:1; 4523:9, 14, 19; 4524:25; 4527:14, 16
**doctor** [1] - 4630:8
**doctor's** [1] - 4462:5
**doctors** [3] - 4574:22; 4627:19; 4632:1
**document** [18] - 4471:10; 4537:4; 4543:8, 10, 12, 14-17; 4544:10; 4546:12; 4547:2; 4549:15; 4550:20, 24; 4551:14; 4553:1, 9
**documentation** [2] - 4548:4; 4553:19
**documents** [74] - 4473:16; 4474:8; 4538:8, 18, 20-22; 4539:1-4, 11, 14-15, 17, 20, 22; 4540:1, 8, 11, 13, 16-17, 23; 4541:1; 4542:9, 19, 21; 4544:1, 3-4, 19-20, 23; 4545:20; 4546:3, 9, 14, 16, 19; 4547:4, 6, 12, 20, 24-25; 4548:6, 8, 11, 22; 4549:19, 23; 4550:11, 13, 16, 20; 4552:5, 22; 4553:4, 8, 11; 4554:3, 10-11; 4555:3; 4560:10, 14, 21, 25; 4561:11, 23; 4562:19
**Doe** [2] - 4447:10, 14
**Dom** [1] - 4515:2
**domestic** [4] - 4584:16; 4585:11; 4595:7
**Dominicans** [1] - 4499:21
**done** [19] - 4454:14; 4508:18, 24; 4525:23; 4576:25; 4577:5, 12, 17-18; 4578:12, 15; 4581:5, 17; 4587:14; 4589:10, 14; 4609:17; 4621:3
**door** [4] - 4579:18; 4611:4; 4622:3, 11
**doorman** [2] - 4634:7
**doors** [2] - 4499:4; 4574:24
**dorey** [1] - 4522:13
**doubt** [7] - 4445:14; 4448:1; 4585:2; 4593:10; 4595:22; 4598:1
**down** [18] - 4473:19; 4474:15; 4492:4; 4549:5, 7; 4560:2; 4564:19; 4573:17; 4581:22, 24; 4592:3, 8; 4611:20; 4621:8; 4622:14; 4631:7; 4635:8; 4646:4
**downstairs** [2] - 4622:10, 13
**dozen** [2] - 4489:16
**draft** [1] - 4564:21
**drank** [1] - 4572:14
**drawers** [1] - 4496:4
**drawing** [1] - 4447:23
**dress** [1] - 4618:4
**dresser** [2] - 4496:21; 4522:25
**drink** [1] - 4577:21
**drinker** [4] - 4572:11, 13; 4580:13; 4585:4
**drinks** [2] - 4580:13; 4593:1
**drive** [1] - 4455:25
**driver's** [1] - 4628:14
**drives** [1] - 4628:16
**driving** [6] - 4458:3; 4618:13, 15
**drop** [2] - 4594:25; 4619:8
**dropped** [1] - 4564:18
**drove** [4] - 4458:4, 17, 19; 4496:15
**drug** [6] - 4449:13, 19; 4505:3; 4571:9; 4603:16; 4622:1
**drugs** [1] - 4585:1
**drunk** [3] - 4572:15, 17; 4622:3
**dryers** [1] - 4574:24
**due** [2] - 4537:1; 4625:7
**duly** [10] - 4463:13; 4483:15; 4492:8; 4513:10; 4528:21; 4532:11; 4537:18; 4556:9; 4563:5; 4613:19
**during** [18] - 4459:18; 4489:10; 4495:13; 4501:11; 4505:21; 4508:21; 4509:2; 4533:12; 4534:12; 4539:7; 4540:3; 4554:6; 4555:21; 4560:8, 18; 4565:10; 4572:7
**duties** [1] - 4533:16
**duty** [3] - 4484:13; 4564:25; 4565:2
**Dwyer** [10] - 4451:25; 4483:13, 18, 21; 4485:17; 4486:4, 6, 20; 4487:14; 4488:3
**dying** [17] - 4455:8, 12, 21-23, 25; 4456:2, 5-6, 14, 23; 4457:22, 24; 4458:2, 25; 4521:10

## E

**e-mailed** [1] - 4451:8
**ear** [1] - 4599:7
**early** [8] - 4488:6; 4489:2, 9; 4588:23
**ease** [2] - 4627:3
**East** [4] - 4444:16, 23; 4484:8; 4566:3
**EASTERN** [1] - 4444:1
**Eastzer** [3] - 4455:12; 4457:3; 4458:8
**eat** [2] - 4505:24
**eaten** [1] - 4571:25
**Ed** [1] - 4635:8
**edge** [1] - 4470:15
**education** [1] - 4635:1
**educational** [1] - 4538:3
**educators** [1] - 4635:9
**EE** [1] - 4486:1
**effectively** [2] - 4450:9; 4645:22
**effort** [1] - 4542:13
**eight** [4] - 4543:16, 18; 4570:6; 4615:24
**either** [3] - 4463:25; 4502:25; 4521:8
**elaborate** [2] - 4501:22; 4502:3
**elbow** [1] - 4594:17
**elbowed** [1] - 4594:19
**elderly** [2] - 4574:15; 4627:11
**elements** [1] - 4445:25
**elephant** [1] - 4572:25
**eleven** [2] - 4543:21
**elicited** [1] - 4445:16
**Elsie** [4] - 4579:9, 11; 4583:5; 4636:6
**embarrassed** [1] - 4621:8
**emblems** [1] - 4487:6
**emotional** [1] - 4575:18
**emptied** [1] - 4623:5
**end** [2] - 4600:10
**ended** [1] - 4600:15
**enforcement** [5] - 4484:9, 11; 4524:13; 4609:23; 4610:1
**enforcer** [1] - 4448:18
**English** [1] - 4500:8
**enjoy** [1] - 4506:1
**enjoyed** [1] - 4595:15
**enormous** [2] - 4462:23; 4499:7
**enquire** [2] - 4587:7; 4588:9
**entails** [1] - 4595:20
**enter** [1] - 4476:4
**entered** [5] - 4445:24; 4446:2; 4475:21; 4564:22
**enterprise** [1] - 4450:15
**enters** [3] - 4482:9; 4587:1; 4613:13
**entire** [6] - 4468:20; 4475:7; 4537:6; 4564:5; 4615:15
**entry** [1] - 4476:12
**Environmental** [7] - 4543:5; 4544:1, 11; 4547:20; 4555:5; 4562:15
**equipment** [1] - 4495:13
**equivalent** [2] - 4449:11; 4457:23
**escapade** [1] - 4448:10
**escape** [1] - 4611:25
**ESQ** [2] - 4444:18, 20
**essential** [1] - 4445:24
**essentially** [3] - 4449:19, 23; 4457:24
**established** [5] - 4445:14; 4446:11, 16; 4447:21; 4540:22
**establishments** [2] - 4486:24; 4487:5
**ethnic** [1] - 4500:9
**evacuation** [1] - 4565:7
**EVAN** [1] - 4444:15
**event** [1] - 4446:23
**events** [1] - 4573:15
**evicted** [1] - 4622:23
**evidence** [33] - 4445:12, 19, 24; 4446:1, 20-21; 4447:19, 22; 4448:6, 14; 4453:15; 4458:7; 4462:23, 25; 4464:25; 4466:17; 4467:15; 4468:1, 12, 23; 4471:10; 4479:12; 4482:9; 4540:16; 4542:3, 17; 4547:18, 21; 4555:9; 4559:7; 4647:9
**exact** [4] - 4530:23; 4598:22; 4615:2; 4641:17
**exactly** [9] - 4451:21; 4454:12; 4476:24; 4488:9; 4503:21; 4536:18; 4591:10; 4641:17; 4646:11
**EXAMINATION** [36] - 4463:15; 4466:1; 4483:19; 4488:1; 4492:13; 4513:12; 4527:12; 4529:1; 4531:10; 4532:17; 4534:21; 4537:24; 4560:4; 4563:13; 4584:1; 4587:9; 4612:16; 4614:7; 4640:21; 4642:14; 4647:12, 15, 18, 21, 24; 4648:1, 5, 7, 11, 15, 17, 19, 21, 24; 4649:1, 3
**examination** [10] - 4463:17; 4464:7; 4469:12; 4472:6; 4475:3; 4487:23; 4556:23; 4559:6; 4596:12; 4612:19
**examine** [3] - 4462:13; 4487:24; 4557:3
**examined** [10] - 4463:14; 4483:15; 4492:8; 4513:11; 4528:22; 4532:12; 4537:19; 4556:10; 4563:6; 4613:19
**except** [4] - 4454:13; 4462:16; 4526:1;

4622:20
**exception** [3] - 4450:4; 4540:20; 4559:12
**exchange** [2] - 4503:2; 4606:19
**excitement** [1] - 4592:25
**excluded** [1] - 4548:10
**excuse** [9] - 4452:10, 21; 4469:6; 4483:1; 4543:2; 4546:8; 4547:15; 4557:4; 4558:14
**excused** [5] - 4481:5, 16; 4559:17; 4585:21; 4613:8
**execution** [1] - 4636:8
**exemplar** [1] - 4551:4
**exercise** [2] - 4449:14; 4506:5
**exhausted** [3] - 4520:24; 4577:12
**Exhibit** [43] - 4445:4; 4455:7; 4456:11; 4457:13; 4459:12; 4464:14, 16, 22, 25; 4465:11; 4466:12, 17; 4467:8, 15, 24; 4468:1, 10, 12, 21, 23; 4469:8; 4471:4; 4478:9, 13; 4479:9; 4482:11, 24; 4485:19; 4487:12; 4535:21; 4536:9, 14; 4540:6; 4647:5, 8-9; 4648:9; 4650:4, 6, 8, 10, 12
**exhibit** [1] - 4456:8
**exhibits** [1] - 4490:1
**Exhibits** [2] - 4458:7; 4647:7
**exits** [1] - 4643:18
**exorbitant** [1] - 4542:5
**expect** [2] - 4453:4; 4454:1
**expects** [1] - 4449:3
**expenses** [1] - 4551:17
**experience** [4] - 4473:18; 4560:9; 4562:19; 4589:14
**experienced** [1] - 4459:22
**expert** [17] - 4514:3; 4540:20; 4542:2, 5, 18; 4547:18; 4550:2-5, 19; 4551:3; 4555:3; 4560:24; 4561:4
**expertise** [2] - 4549:19; 4562:12
**explain** [9] - 4454:25; 4486:21; 4544:18; 4552:22; 4606:12-14, 16, 20
**explained** [1] - 4577:11
**explaned** [1] - 4623:1
**express** [1] - 4637:23
**extension** [2] - 4447:10, 12
**extent** [2] - 4570:3; 4645:18
**exterior** [2] - 4486:14; 4487:15
**extorted** [4] - 4530:24; 4534:1, 9; 4625:11
**extorting** [2] - 4533:20; 4638:7
**extortion** [7] - 4445:8, 13; 4446:6, 12; 4448:3; 4542:7
**extract** [1] - 4458:1
**extraneous** [1] - 4455:25
**extreme** [2] - 4497:23
**extremely** [1] - 4454:15
**extremes** [1] - 4497:22
**eye** [8] - 4502:20, 22; 4503:10, 16, 18; 4610:7
**eyes** [2] - 4577:11, 22

**F**

**F-1** [7] - 4455:5, 21; 4456:18; 4457:4, 9, 14, 19
**F-2** [14] - 4455:5, 15, 21, 23; 4456:8, 13, 18, 22-23; 4457:5, 8, 14, 19, 23
**face** [4] - 4496:4; 4594:18; 4611:20
**facial** [3] - 4507:16, 20; 4591:24
**facilitate** [1] - 4474:4
**facilities** [2] - 4476:8; 4628:1
**facility** [10] - 4469:19, 21; 4471:4, 8, 11; 4487:6; 4499:8; 4611:13, 15
**Facility** [1] - 4627:24
**facing** [1] - 4606:17
**fact** [16] - 4450:5; 4451:16; 4463:21; 4465:3; 4473:11; 4476:22; 4478:18; 4479:23; 4520:1; 4521:20; 4544:21; 4548:23; 4553:7; 4561:4; 4592:8
**factor** [1] - 4595:23
**factors** [1] - 4644:23
**facts** [1] - 4445:15
**failing** [1] - 4557:11
**failure** [1] - 4552:21
**fair** [17] - 4472:14; 4474:11; 4488:20; 4501:2; 4514:3; 4522:18; 4523:6, 15, 21, 25; 4589:11; 4591:11; 4597:14; 4598:8, 10; 4600:18
**fairly** [2] - 4486:8; 4615:1
**Fairly** [1] - 4538:5
**fake** [4] - 4495:5, 11; 4523:1; 4564:19
**fall** [10] - 4488:13, 15, 18, 21-22; 4574:13; 4575:16; 4576:11; 4625:14; 4636:9
**familiar** [3] - 4474:4; 4558:9; 4603:2
**familiarity** [1] - 4520:25
**familiarized** [1] - 4475:4
**families** [8] - 4510:23; 4601:10-12, 15-16, 21
**family** [67] - 4446:12, 22; 4470:13, 19; 4479:17; 4497:19; 4511:24; 4514:11, 16, 21; 4515:4, 10, 14; 4516:8, 13, 16, 22; 4517:5, 10, 17, 22; 4518:2, 9, 15, 21; 4519:12, 16, 19, 22; 4520:3; 4521:17, 19; 4522:4, 7; 4524:16; 4525:3, 6, 9, 12-13, 17; 4527:1, 7; 4529:16; 4530:24; 4532:4; 4533:13; 4534:1, 7; 4557:24; 4558:4, 7; 4571:24; 4572:2; 4580:19; 4601:3, 5; 4608:19; 4615:24; 4616:15; 4618:6; 4621:18; 4631:8; 4634:20; 4638:20; 4642:18
**Family** [11] - 4589:8; 4595:20; 4599:17; 4602:24; 4603:10; 4604:18; 4610:9, 13; 4623:18; 4624:8; 4625:11
**far** [11] - 4475:18; 4476:8; 4535:8; 4540:18; 4555:2; 4564:10; 4589:21; 4590:1; 4592:4; 4607:25; 4609:4
**Far** [1] - 4635:2
**FARBER** [29] - 4444:20; 4455:14; 4456:8, 12, 15, 19, 23; 4457:4, 8, 13, 15, 18, 21; 4459:2, 10, 17; 4460:2; 4514:22; 4553:16; 4590:17; 4591:7; 4598:11; 4607:13; 4608:13; 4609:8; 4643:7, 14; 4645:18; 4646:16
**Farber** [4] - 4459:14; 4484:20; 4553:23; 4633:7
**farmers** [1] - 4495:9
**father** [6] - 4509:17; 4566:19; 4619:23; 4620:10; 4624:18
**father-in-law** [2] - 4619:23; 4624:18
**favor** [1] - 4447:24
**favorable** [2] - 4445:11; 4447:23
**fear** [4] - 4446:3; 4525:23; 4530:11; 4558:23
**feared** [1] - 4450:22
**February** [10] - 4464:12; 4465:10; 4466:7; 4472:4; 4482:11, 19, 21; 4583:1; 4631:4; 4632:22
**fed** [1] - 4577:10
**federal** [8] - 4448:3; 4498:14, 18; 4524:9; 4538:24; 4568:25; 4570:19
**Federal** [14] - 4471:3, 8, 11; 4472:12; 4610:4-6, 8; 4611:14, 21-22; 4627:25
**Feds** [1] - 4611:24
**Feeley** [1] - 4634:13
**feelings** [1] - 4497:24
**fees** [1] - 4542:5
**felt** [7] - 4502:6; 4511:8; 4575:15; 4578:2; 4591:22; 4638:5
**fence** [2] - 4499:7; 4501:16
**few** [10] - 4451:2; 4481:10; 4502:13; 4505:5; 4575:12, 22; 4579:7; 4580:13; 4589:22; 4593:1
**FF** [1] - 4486:1
**field** [3] - 4547:19; 4560:24; 4561:2
**fields** [2] - 4499:7
**fifteen** [1] - 4585:18
**fifth** [1] - 4483:1
**Fifth** [12] - 4453:18; 4555:17; 4556:22; 4557:19, 25; 4558:16, 20, 24; 4559:3, 5, 10
**fight** [2] - 4507:8; 4633:8
**fighting** [3] - 4564:1; 4622:13, 15
**figure** [1] - 4536:23
**figures** [2] - 4551:20; 4623:25
**fill** [1] - 4628:3
**filled** [1] - 4478:18
**final** [2] - 4454:6; 4610:18
**finally** [1] - 4623:2
**financial** [10] - 4544:20; 4545:10; 4548:12; 4549:20; 4552:1; 4553:2, 8; 4554:8; 4560:9; 4624:24
**financials** [8] - 4539:18; 4545:6; 4548:1, 17, 24; 4551:16; 4560:20
**fine** [3] - 4457:21; 4513:6; 4635:4
**finish** [4] - 4462:14; 4525:21; 4592:16; 4604:4
**finished** [10] - 4462:15, 19; 4543:2; 4576:25; 4578:12, 15; 4579:14; 4581:5; 4587:14
**finishing** [1] - 4644:20
**Firearms** [1] - 4566:25
**fired** [2] - 4494:21; 4566:17
**fires** [1] - 4566:16
**First** [1] - 4633:18
**first** [39] - 4451:24; 4464:21; 4470:10; 4471:11; 4472:11, 13; 4482:11; 4483:15; 4484:7; 4486:20; 4488:8; 4492:8; 4498:16; 4502:17; 4504:13, 23; 4506:23; 4529:15; 4542:21; 4545:3, 9; 4551:12; 4556:13, 16; 4557:5; 4564:18, 20; 4571:16, 20; 4612:20, 23; 4613:19; 4615:23, 25; 4617:1, 3
**First-Aid** [1] - 4633:18
**fist** [2] - 4622:13, 15
**fist-fighting** [2] - 4622:13, 15
**fit** [1] - 4582:5

**five** [15] - 4484:1, 5; 4508:23; 4543:13; 4549:2, 6; 4562:16; 4567:6; 4570:6; 4579:1, 3; 4601:21; 4614:23; 4640:15
**Five** [1] - 4447:10
**fix** [4] - 4575:13; 4579:16; 4630:20, 25
**fixed** [1] - 4621:16
**fixing** [3] - 4574:24; 4630:18
**flashlight** [1] - 4633:16
**flight** [1] - 4622:14
**floor** [4] - 4470:10; 4529:19; 4535:10; 4621:22
**Florida** [4] - 4454:14; 4637:1, 3, 19
**flowed** [1] - 4446:12
**folder** [3] - 4636:25; 4637:7
**folic** [1] - 4448:10
**follow** [2] - 4521:6; 4546:6
**followed** [3] - 4465:14; 4543:17; 4583:18
**Followed** [4] - 4460:7; 4461:24; 4541:8; 4559:24
**following** [10] - 4465:9; 4481:20; 4549:21; 4585:23; 4586:1, 15; 4587:2; 4594:3; 4643:20; 4644:1
**follows** [10] - 4463:14; 4483:16; 4492:9; 4513:11; 4528:22; 4532:12; 4537:19; 4556:10; 4563:6; 4613:20
**food** [3] - 4627:15, 20
**foot** [1] - 4581:18
**forced** [1] - 4450:9
**forcing** [1] - 4575:6
**foreclosed** [3] - 4621:24; 4623:3, 5
**form** [11] - 4459:4; 4519:4, 8; 4520:15; 4526:19; 4595:3; 4607:6; 4608:14; 4609:8; 4610:16; 4628:3
**Fort** [23] - 4472:1, 3-4; 4498:20, 24-25; 4499:1, 3-4, 10, 13; 4501:15; 4502:6, 12; 4504:22; 4508:1; 4519:1; 4523:9, 14, 19; 4524:25; 4527:14, 16
**forward** [2] - 4462:10; 4555:25
**foundation** [3] - 4487:8; 4508:4; 4637:5
**Fountain** [1] - 4617:7
**four** [11] - 4463:7; 4508:23; 4533:23; 4543:11; 4545:20; 4553:14; 4572:3, 9; 4579:3; 4629:5
**Four** [2] - 4447:10; 4454:18
**frail** [1] - 4627:17
**Frank** [2] - 4453:5; 4490:12
**Frankie** [3] - 4599:15, 18, 20
**Franklin** [1] - 4556:3
**frequently** [2] - 4470:18; 4473:19
**freshman** [1] - 4564:19
**Friday** [8] - 4461:1, 6; 4462:4, 6; 4463:4; 4644:13; 4645:11, 16
**friend** [26] - 4446:22; 4507:8; 4518:2, 10; 4530:13; 4571:18; 4572:23; 4573:7, 20; 4574:11; 4575:3, 10-11; 4579:2; 4589:15; 4595:11; 4603:6; 4604:21; 4622:10; 4626:17; 4631:10
**friendly** [1] - 4619:17
**friends** [30] - 4447:1; 4450:23; 4524:22, 25; 4525:1; 4526:17; 4535:9, 16; 4537:11; 4577:7; 4578:17; 4596:4, 7, 12, 14; 4597:2, 22-23; 4608:17; 4609:11; 4610:14; 4615:21; 4616:1; 4630:3, 17; 4634:11
**friendship** [16] - 4450:12; 4505:18, 21; 4506:16, 20; 4509:2; 4521:25; 4579:25; 4595:13, 16, 24; 4616:12, 21; 4618:22; 4619:11, 13
**front** [1] - 4466:11
**frowned** [1] - 4449:7
**fuck** [1] - 4582:23
**fuckers** [3] - 4582:8, 13
**full** [16] - 4451:1; 4464:11, 13; 4466:10; 4467:22; 4468:8; 4483:17; 4492:10; 4528:23; 4532:13; 4537:20; 4563:7, 9; 4613:23; 4633:17
**fully** [1] - 4645:21
**fun** [1] - 4503:14
**functioning** [1] - 4573:9
**functions** [4] - 4487:6; 4572:2; 4574:5; 4615:9
**future** [4] - 4446:5; 4528:5; 4576:10; 4592:20

## G

**Gaetano** [2] - 4532:9, 15
**gain** [1] - 4476:12
**Gambino** [52] - 4514:10, 16, 21; 4515:4, 10, 14; 4516:8, 13, 16, 22; 4517:4, 10, 17, 22; 4518:2, 9, 15, 21; 4519:12, 16, 19, 22; 4520:3; 4521:17, 19; 4522:4, 7; 4524:15; 4525:17; 4527:1, 6; 4530:24; 4532:4; 4533:13; 4534:1, 7; 4557:23; 4558:4, 7; 4589:8; 4595:20; 4599:17; 4601:20; 4602:24; 4603:10; 4604:17; 4610:9, 13; 4623:18; 4624:8; 4625:11
**Gambinos** [2] - 4601:17, 22
**game** [2] - 4501:20; 4638:23
**gang** [3] - 4450:7, 13
**gangs** [1] - 4449:13
**Gangs** [1] - 4449:21
**gangster** [2] - 4588:3
**garbage** [2] - 4621:3
**Garden** [1] - 4556:4
**gate** [1] - 4611:16
**GED** [1] - 4564:11
**general** [5] - 4470:24; 4525:22; 4587:18; 4619:21; 4631:2
**generally** [2] - 4448:14; 4449:7
**generation** [5] - 4577:1, 6; 4596:19, 22
**generous** [1] - 4507:25
**genesis** [1] - 4548:18
**Genevese** [3] - 4525:3, 6, 12
**Genovese** [4] - 4601:14, 17, 21
**gentleman** [2] - 4639:22, 24
**gentlemen** [1] - 4483:6
**GG** [1] - 4486:1
**gifts** [1] - 4450:10
**gifts"** [1] - 4450:10
**gin** [1] - 4505:22
**Gioia** [10] - 4453:1; 4490:8; 4563:3, 11, 15; 4572:19; 4573:14; 4574:5; 4578:21; 4583:7
**girl** [1] - 4494:10
**girlfriend** [3] - 4584:18; 4616:22
**girlfriends** [1] - 4584:23
**given** [13] - 4450:11; 4487:6; 4542:20; 4545:7, 10; 4553:1; 4559:19; 4594:5; 4611:16; 4637:1, 4; 4641:14; 4644:23
**glass** [5] - 4579:6; 4617:4, 8; 4618:13, 16
**glasses** [3] - 4495:15; 4496:18, 20
**Glen** [1] - 4554:13
**gloves** [6] - 4495:15; 4496:18, 20; 4523:1; 4639:18; 4641:19
**Godfather** [2] - 4590:2, 22
**Goia** [7] - 4584:14; 4626:14, 20; 4630:12, 15, 18
**goodbye** [2] - 4507:1
**Gotti** [12] - 4509:11, 17; 4514:8; 4515:8, 12, 25; 4519:15, 18; 4589:25; 4616:4
**government** [40] - 4445:11; 4446:8, 11; 4447:23; 4451:8, 12, 17; 4452:2, 4, 9, 19; 4453:2; 4458:10; 4459:2; 4461:23; 4462:8; 4464:20; 4465:4; 4482:8, 15; 4485:18; 4536:8; 4538:25; 4539:12; 4540:1, 14; 4542:10, 13; 4548:23; 4550:9-11; 4554:6; 4556:21; 4557:2; 4558:13; 4566:13
**Government** [20] - 4467:6; 4469:1; 4475:10; 4478:25; 4481:8; 4535:21; 4536:8; 4597:7; 4605:21; 4607:16, 25; 4608:2; 4610:6; 4611:14, 21; 4612:10; 4639:15; 4645:25
**Government's** [5] - 4471:4; 4478:9, 13; 4479:8; 4645:20
**government's** [5] - 4445:17; 4447:16, 24; 4461:12; 4556:24
**graduate** [2] - 4493:1, 13
**graduated** [1] - 4493:16
**Grand** [5] - 4453:17; 4567:16; 4594:24; 4595:4
**grand** [1] - 4448:4
**grant** [1] - 4445:10
**granted** [3] - 4447:6, 22; 4482:7
**grateful** [3] - 4511:23; 4580:7
**gray** [1] - 4507:14
**greater** [1] - 4456:5
**greatest** [1] - 4625:17
**Green** [42] - 4451:15; 4453:3; 4529:9; 4530:6; 4531:3, 14; 4533:1; 4534:13, 23; 4535:6; 4536:1, 20; 4538:21; 4539:7, 18, 25; 4542:3, 11, 15, 20, 22; 4544:21, 23; 4545:5; 4548:1, 12; 4549:20; 4550:21; 4551:17; 4553:2, 10, 14; 4554:5, 15; 4561:11, 19; 4614:14; 4617:10; 4620:4; 4628:11
**grew** [4] - 4492:22; 4615:4, 7; 4617:11
**grievances** [1] - 4624:19
**ground** [1] - 4447:19
**grounds** [1] - 4500:18
**group** [9] - 4474:19; 4485:20; 4486:3; 4500:2; 4501:3, 8, 19; 4506:9; 4547:12
**groups** [9] - 4449:20; 4499:18, 24; 4500:5, 9, 14, 24; 4501:17; 4506:6
**grow** [5] - 4492:21; 4564:3; 4578:5; 4615:3; 4619:13
**growing** [2] - 4492:23; 4617:12
**Guam** [1] - 4565:5
**guards** [1] - 4524:7
**guess** [32] - 4535:24; 4537:9; 4543:21; 4566:3; 4568:15, 25; 4570:8; 4573:18, 21; 4574:2, 8, 10; 4575:22; 4577:1, 16; 4580:4; 4588:19, 22; 4589:15, 17; 4590:1, 6; 4592:20; 4594:10; 4601:17,

25; 4616:22; 4638:5, 23; 4639:16, 23
**guidance** [1] - 4642:25
**guilty** [9] - 4447:25; 4450:4; 4498:8; 4568:2; 4570:1; 4584:3; 4594:25; 4610:23
**gun** [13] - 4495:2, 4, 6, 9-10; 4496:1, 19, 21; 4523:1; 4566:9, 15; 4569:3; 4589:22
**guns** [3] - 4566:14, 18, 24
**Gus** [2] - 4516:7; 4526:4
**guy** [48] - 4497:2; 4502:10, 18-19; 4503:25; 4504:20, 23; 4505:1, 7, 12; 4506:9, 14, 25; 4514:13, 18, 25; 4515:6, 17; 4516:10, 14; 4517:2, 14, 19; 4518:12, 17; 4519:8; 4520:8; 4526:4, 8, 11; 4527:3; 4573:20; 4588:3, 17; 4589:18; 4590:8; 4595:18; 4597:24; 4601:1; 4602:2, 17-18; 4603:1; 4604:13, 20; 4622:5
**guys** [18] - 4457:6; 4502:1, 18; 4503:21; 4505:9; 4506:22; 4507:1, 4; 4508:12, 17; 4524:22; 4590:4; 4591:17; 4605:4; 4608:22, 25; 4629:11; 4631:23

## H

**had's** [1] - 4637:16
**hair** [3] - 4507:14, 16, 20
**hairs** [1] - 4591:24
**half** [8] - 4498:21; 4499:14; 4512:7; 4539:3; 4568:7; 4575:13; 4577:21; 4644:25
**hall** [3] - 4503:6; 4622:12
**halls** [1] - 4621:4
**hand** [3] - 4464:19; 4590:23; 4613:16
**Handed** [1] - 4536:12
**handed** [2] - 4482:14; 4639:19
**handguns** [1] - 4566:13
**Handing** [2] - 4471:7; 4478:12
**handle** [2] - 4575:3; 4641:19
**handled** [1] - 4637:24
**hands** [1] - 4496:2
**hang** [2] - 4573:17; 4579:4
**hanging** [3] - 4513:17; 4566:2; 4606:22
**hangout** [1] - 4501:17
**happy** [4] - 4561:1; 4593:5; 4595:10, 12
**harass** [3] - 4593:25; 4594:5
**harassing** [1] - 4594:3
**Harbor** [1] - 4565:5
**hard** [4] - 4503:9; 4523:19; 4618:1; 4634:23
**hard-life** [1] - 4634:23
**harkened** [1] - 4446:23
**Harlem** [1] - 4484:8
**harm** [2] - 4558:23; 4610:13
**hated** [1] - 4450:22
**Hayes** [4] - 4528:18, 25; 4529:3; 4531:14
**head** [4] - 4494:9; 4519:21; 4606:22; 4635:10
**health** [2] - 4629:9; 4631:24
**hear** [14] - 4445:5; 4446:8; 4452:21; 4553:25; 4581:4; 4587:5; 4589:5, 24; 4590:15, 20; 4609:5, 23; 4614:3
**heard** [14] - 4528:2; 4561:6; 4571:2; 4589:24; 4590:4, 12, 14; 4601:6; 4602:20; 4609:3, 9
**hearsay** [5] - 4487:2; 4527:25; 4601:6, 8; 4637:21
**heat** [1] - 4594:10
**heavy** [2] - 4461:2; 4645:14
**hello** [9] - 4483:21; 4507:1; 4531:13; 4614:10; 4619:3, 6, 9
**help** [17] - 4459:2; 4463:1; 4465:9; 4560:22; 4574:6; 4575:5; 4578:22; 4579:7; 4583:3; 4596:14; 4627:2; 4630:22; 4633:7; 4635:3, 5, 11, 13
**helping** [2] - 4580:7; 4618:5
**helps** [1] - 4630:25
**hem** [1] - 4480:16
**Henry** [1] - 4444:23
**HH** [2] - 4486:1
**hi** [4] - 4507:12; 4525:16; 4614:9; 4629:7
**hierarchial** [1] - 4449:24
**high** [4] - 4493:1, 13, 15; 4564:18
**High** [4] - 4493:16; 4498:17; 4635:2, 9
**highs** [2] - 4497:22
**hill** [1] - 4611:20
**himself** [11] - 4453:21; 4478:19; 4480:10, 12, 14; 4484:20; 4506:8, 11; 4511:12; 4574:10; 4618:4
**hired** [1] - 4618:21
**Hispanic** [3] - 4499:20; 4508:7, 13
**history** [8] - 4477:22; 4478:1, 3-4; 4497:19; 4574:1; 4598:9
**hit** [2] - 4542:4; 4594:17
**hits** [2] - 4477:9, 11
**hmm** [1] - 4471:21
**hold** [1] - 4537:4
**holding** [4] - 4498:19; 4504:13; 4605:7, 9
**holdup** [1] - 4486:20
**Hole** [2] - 4472:7, 13
**hollow** [1] - 4577:23
**home** [15] - 4494:16; 4496:15-17; 4501:25; 4502:5; 4510:7; 4523:16; 4560:10, 21; 4593:1, 6; 4619:22
**honest** [3] - 4582:1; 4593:8, 10
**honestly** [1] - 4558:10
**honkey** [1] - 4522:13
**honkey-dorey** [1] - 4522:13
**Honor** [21] - 4446:9; 4455:2, 7, 10; 4456:12; 4459:10; 4460:3; 4461:21; 4464:15, 17; 4481:2; 4482:3; 4558:5, 9; 4559:5; 4560:23; 4596:2; 4605:16; 4607:14; 4644:23; 4645:4
**honor** [1] - 4596:22
**honorable** [1] - 4565:15
**HONORABLE** [1] - 4444:11
**hope** [2] - 4462:7; 4463:8
**hopefully** [1] - 4606:19
**hospital** [2] - 4458:21; 4459:4
**hosted** [1] - 4446:24
**hotel** [1] - 4637:19
**hour** [4] - 4512:7; 4575:13
**hours** [8] - 4463:7; 4574:21; 4575:12; 4576:24; 4577:19, 21; 4622:3; 4644:9
**house** [17] - 4495:9; 4542:7; 4565:25; 4574:7, 23, 25; 4575:1; 4579:2, 15, 18; 4594:15; 4608:18; 4619:18; 4621:9; 4622:2; 4631:1
**household** [1] - 4575:1
**Housing** [1] - 4472:9
**Howard** [17] - 4485:8; 4564:4; 4565:25; 4567:13; 4568:18; 4569:21; 4570:25; 4571:24; 4574:3; 4589:3; 4615:4, 6, 10, 25; 4617:13
**Hudson** [1] - 4611:15
**huge** [1] - 4499:5
**hurt** [3] - 4496:12; 4504:8; 4505:3
**hurts** [1] - 4458:15
**husband** [24] - 4617:4, 8, 10, 17, 20; 4618:11; 4619:8, 22, 24; 4625:20; 4626:20; 4628:7; 4629:24; 4630:13, 22; 4631:13; 4636:2, 14, 18-19, 22; 4639:6; 4640:17
**husband's** [4] - 4618:21; 4626:17; 4631:1; 4636:11
**hut** [1] - 4577:20

## I

**ID** [1] - 4476:12
**identification** [4] - 4476:5; 4535:20; 4547:13, 17
**identified** [8] - 4480:8, 10, 12, 14, 16, 19; 4545:5; 4549:4
**identifies** [1] - 4458:17
**identify** [4] - 4462:11; 4464:23; 4480:2; 4543:1
**identifying** [1] - 4490:1
**IEP** [1] - 4635:10
**ignore** [1] - 4503:17
**II** [2] - 4486:1
**implicit** [1] - 4450:8
**implies** [1] - 4450:7
**important** [5] - 4448:21; 4449:3; 4510:7, 9
**inappropriate** [1] - 4606:2
**incarcerated** [8] - 4464:4; 4471:3; 4498:16; 4520:10, 14; 4631:3
**incarceration** [2] - 4574:7; 4575:17
**incident** [5] - 4504:12; 4566:11; 4581:7, 12, 20
**incidents** [1] - 4584:25
**included** [2] - 4448:3; 4636:20
**income** [1] - 4551:17
**inconvenience** [1] - 4559:19
**incorrect** [1] - 4554:24
**incredible** [1] - 4458:10
**indebted** [1] - 4635:15
**independent** [1] - 4448:11
**indicate** [1] - 4550:16
**indicated** [2] - 4466:16; 4554:8
**indicates** [1] - 4456:13
**indicating** [5] - 4602:2, 17; 4604:13, 20; 4608:23
**indication** [1] - 4445:17
**indicted** [9] - 4498:4, 6; 4566:20, 22; 4569:16; 4570:7; 4600:13, 19; 4619:24
**indictment** [5] - 4448:16; 4568:7; 4569:14; 4600:11
**indictments** [1] - 4567:22
**indirectly** [1] - 4549:24

**individual** [6] - 4456:16; 4474:4; 4476:4, 12; 4477:23; 4573:1
**individually** [2] - 4485:21, 23
**individuals** [14] - 4475:17, 19-21; 4476:22; 4478:15; 4480:7; 4499:24; 4500:13; 4569:13, 16; 4577:17; 4579:13; 4625:6
**inducted** [1] - 4591:2
**industry** [1] - 4493:8
**inferences** [1] - 4447:24
**influence** [2] - 4530:17; 4533:15
**informant** [1] - 4570:12
**information** [9] - 4452:8, 12; 4455:24; 4458:1; 4476:21; 4479:8; 4491:19; 4593:8
**initial** [1] - 4568:12
**initiation** [1] - 4590:13
**injured** [2] - 4484:10, 13
**injury** [4] - 4446:4; 4484:13; 4573:10; 4617:24
**ink** [1] - 4543:6
**inmate** [13] - 4463:21; 4472:15, 22, 25; 4474:8; 4478:14; 4479:6, 21, 23; 4480:1, 18; 4499:18; 4502:14
**inmate's** [1] - 4479:20
**inmates** [13] - 4470:12, 19; 4472:11, 18; 4473:6, 15, 18, 25; 4474:1; 4499:16, 18; 4502:3; 4577:4
**inside** [2] - 4475:19; 4485:15
**insisted** [1] - 4592:13
**insistent** [2] - 4592:18, 23
**installing** [1] - 4618:16
**instances** [1] - 4450:16
**instead** [1] - 4519:25
**instilling** [1] - 4446:3
**instruct** [1] - 4459:21
**instructed** [1] - 4491:10
**instruction** [1] - 4547:7
**instructs** [1] - 4491:3
**insufficient** [2] - 4447:19; 4448:6
**insured** [1] - 4494:23
**intact** [1] - 4574:23
**integrated** [1] - 4462:24
**intended** [2] - 4509:24; 4578:10
**intends** [1] - 4557:2
**intention** [3] - 4510:18; 4511:5; 4576:10
**intentionally** [1] - 4594:20
**intentions** [3] - 4576:20; 4578:8; 4580:24
**interaction** [2] - 4506:17, 21
**interest** [1] - 4627:10
**interfering** [1] - 4594:3
**interior** [2] - 4486:14; 4487:14
**interrupted** [1] - 4604:5
**interview** [5] - 4489:18; 4490:2, 6; 4491:14
**interviewed** [6] - 4489:10, 13; 4490:7; 4574:19; 4607:20, 22
**interviews** [1] - 4608:1
**intimate** [1] - 4520:13
**introduce** [1] - 4542:16
**introduced** [2] - 4445:19; 4540:19
**introduction** [1] - 4448:14
**investigation** [1] - 4489:11
**Investigations** [2] - 4469:23
**investigator** [7] - 4483:24; 4484:18; 4542:10; 4607:18
**invited** [4] - 4615:16; 4616:8, 16
**invoke** [2] - 4556:22; 4559:5
**invoked** [1] - 4453:18
**involved** [18] - 4484:14; 4565:6; 4570:12; 4581:1; 4582:14, 24; 4587:16; 4588:4, 13; 4589:19, 21; 4590:10; 4591:21; 4592:18, 24; 4600:1; 4601:2
**involvement** [1] - 4590:21
**involves** [1] - 4590:15
**invulnerability** [1] - 4497:24
**Irish** [2] - 4507:5; 4508:20
**irrational** [3] - 4448:25; 4449:1; 4450:21
**Island** [4] - 4529:8; 4532:24; 4565:3; 4581:24
**issue** [13] - 4453:16; 4454:2; 4455:1; 4503:8; 4542:6, 20; 4550:1; 4555:15, 17; 4561:4; 4621:19
**issues** [2] - 4556:23; 4623:16
**Italian** [4] - 4501:7, 20; 4508:19; 4515:2
**items** [2] - 4482:16; 4633:12
**itself** [1] - 4549:16

## J

**JACK** [1] - 4444:11
**Jackie** [9] - 4479:2; 4514:15; 4518:1; 4520:8, 16; 4527:3; 4604:15; 4605:9; 4608:25
**jail** [70] - 4498:10; 4499:4; 4508:13; 4509:25; 4524:1; 4526:6, 9, 13; 4568:10, 13-14; 4570:18, 20; 4572:20; 4574:13; 4575:16, 25; 4576:3, 11-12, 17-19; 4577:2; 4578:21; 4579:24; 4580:3, 24; 4581:8; 4584:8, 13-15; 4597:2; 4605:4; 4606:17, 20, 22, 25; 4607:4, 8; 4610:19, 21-22, 24; 4611:3, 8, 11, 19; 4612:3, 7-8, 10-12, 21; 4613:1; 4625:14, 16; 4627:4, 6, 22; 4628:9, 22; 4629:10; 4631:4; 4632:10
**jails** [2] - 4611:9; 4612:3
**Jamaica** [1] - 4454:3
**Jamaicans** [1] - 4499:21
**January** [2] - 4447:5; 4615:2
**Jason** [1] - 4506:13
**Jennie** [2] - 4574:9, 12
**Jenny** [5] - 4579:5; 4626:7-9, 20
**jeopardize** [1] - 4578:4
**Jetta** [1] - 4497:2
**Jill** [1] - 4619:4
**JJ** [2] - 4486:1
**job** [7] - 4484:11; 4566:1; 4574:11; 4617:4, 8, 17
**jobs** [1] - 4469:25
**JODI** [2] - 4613:24; 4614:6
**Jodi** [7] - 4453:5; 4477:16, 19; 4579:3; 4613:12, 24; 4614:5
**Jody** [1] - 4490:14
**Joe** [13] - 4451:25; 4483:13; 4520:20; 4526:11; 4534:5, 9; 4602:8, 10, 12, 16; 4605:18
**John** [29] - 4446:24; 4447:10, 14; 4451:25; 4452:5; 4454:13; 4461:18; 4475:13; 4482:22, 25; 4483:13; 4484:24; 4485:2; 4490:2; 4492:6, 12; 4509:10, 17; 4515:25; 4517:5; 4519:15, 18; 4528:18, 25; 4554:13; 4589:25; 4616:4
**Johnson** [1] - 4505:10
**join** [3] - 4521:4; 4564:13, 17
**jokes** [1] - 4573:18
**JORDAN** [1] - 4444:20
**Joseph** [5] - 4448:5; 4483:18; 4514:20; 4517:21; 4531:20
**Jr** [5] - 4515:25; 4516:21; 4519:15, 18; 4526:11
**Jr.'s** [1] - 4509:11
**JUDGE** [1] - 4444:11
**Judge** [31] - 4445:9, 12; 4452:22; 4453:25; 4457:21; 4460:2; 4466:9, 24; 4467:1, 5, 14, 21; 4468:19; 4507:23; 4510:21; 4511:3; 4527:25; 4536:14; 4548:5, 11; 4549:10; 4587:7; 4598:7; 4606:3, 7; 4613:5; 4643:7; 4644:10; 4645:9, 18; 4646:6
**judge** [19] - 4451:2; 4455:20; 4464:10; 4465:2; 4468:7; 4482:6; 4485:17; 4489:20; 4539:24; 4547:14, 23; 4551:2; 4552:14; 4553:6; 4554:2; 4556:20; 4557:11; 4559:16; 4645:10
**judgment** [1] - 4447:17
**July** [3] - 4535:3; 4584:16
**jumped** [1] - 4496:2
**June** [4] - 4494:7; 4561:24; 4570:22
**Junior** [6] - 4602:8, 12; 4603:3, 5; 4616:4, 6
**junior** [1] - 4509:17
**junk** [8] - 4510:5, 8; 4573:5; 4574:6, 8; 4633:20
**junkyard** [2] - 4617:18; 4618:12
**juror** [6] - 4447:25; 4454:18; 4460:4; 4587:5; 4599:7; 4614:3
**Juror** [3] - 4454:18; 4459:11; 4556:1
**jurors** [6] - 4459:13; 4469:1; 4487:22; 4559:20; 4645:5, 15
**JURY** [1] - 4481:14
**jury** [47] - 4444:11; 4445:12; 4446:7; 4450:19, 24; 4451:1; 4459:15, 20, 22; 4462:18; 4465:1; 4466:3, 18; 4467:16; 4468:2, 14; 4469:9; 4470:9; 4476:1; 4481:11; 4482:9, 14; 4487:12, 18; 4495:6, 23; 4499:2; 4501:24; 4502:11; 4508:3; 4513:3; 4541:5; 4542:5; 4554:1; 4555:9, 15; 4557:10; 4559:18; 4574:17; 4586:2; 4587:2; 4643:4; 4644:2, 13, 19; 4647:10
**Jury** [15] - 4453:17; 4461:25; 4481:16; 4482:4; 4513:7; 4541:7; 4560:1; 4585:21; 4587:1; 4594:24; 4595:4; 4621:21; 4634:6; 4643:18
**jury)** [1] - 4487:19
**Jury,the** [1] - 4620:24
**Justice** [1] - 4538:12
**justice** [2] - 4583:8, 10

## K

**Karate** [3] - 4600:7, 25; 4601:1
**Karate"** [1] - 4600:23

**keep** [8] - 4480:4; 4492:19; 4498:22; 4516:4; 4585:12; 4587:4; 4593:23; 4628:23
**keeping** [2] - 4449:4; 4610:7
**Kelley** [1] - 4454:3
**Kelly** [1] - 4490:18
**KELLY** [1] - 4444:18
**Kenny's** [1] - 4627:15
**kept** [3] - 4476:2; 4478:21; 4530:5
**Kevin** [10] - 4531:17; 4617:11; 4636:25; 4637:3; 4638:3, 7; 4639:13, 17; 4641:14
**Kevin's** [2] - 4638:5
**kicked** [1] - 4623:3
**kid** [6] - 4507:5; 4634:19, 23; 4635:3, 14
**kids** [12] - 4489:4; 4495:10; 4502:24; 4580:20; 4619:2, 5, 10; 4623:12; 4627:12; 4629:7; 4631:24
**kill** [4] - 4449:14; 4521:3, 20; 4604:6
**killed** [3] - 4521:16; 4600:14, 23
**killer** [2] - 4448:18, 23
**killers** [2] - 4522:3, 6
**killing** [3] - 4449:7; 4595:20
**killings** [1] - 4449:1
**Kim** [4] - 4615:21, 23; 4616:1, 3
**Kimmy** [1] - 4616:13
**kind** [13] - 4494:15; 4501:18; 4503:8; 4544:10; 4552:19; 4553:19; 4566:8; 4573:20; 4580:5; 4587:17; 4603:8; 4627:1; 4638:19
**kinds** [3] - 4462:23; 4548:3; 4645:7
**kit** [1] - 4633:18
**KK** [1] - 4486:2
**knock** [1] - 4580:5
**knocked** [1] - 4622:11
**knowing** [3] - 4591:10; 4603:25; 4646:11
**knowledge** [4] - 4485:4; 4487:9; 4500:13; 4534:6
**knowledgeable** [1] - 4522:18
**known** [2] - 4614:24; 4617:12
**knows** [6] - 4445:9; 4506:12; 4518:5; 4542:7; 4591:3; 4605:1
**Kurt** [1] - 4459:3

## L

**Lacey** [1] - 4449:16
**lack** [2] - 4448:7; 4449:2
**ladies** [1] - 4483:6
**Lamar** [1] - 4593:19
**land** [1] - 4499:6
**Langcaster** [3] - 4492:22; 4493:11, 16
**language** [3] - 4477:10; 4500:7; 4569:9
**larceny** [1] - 4448:4
**Larceny** [1] - 4567:16
**large** [2] - 4574:4; 4634:7
**last** [29] - 4451:8; 4455:2; 4456:25; 4461:11; 4462:8; 4471:22; 4503:14; 4511:15, 19; 4514:24; 4515:21; 4524:20; 4526:5; 4527:4; 4539:6; 4565:11; 4584:6, 9, 14-16; 4587:5; 4598:16; 4599:7; 4603:18; 4613:2; 4614:3; 4639:21
**late** [7] - 4451:20; 4452:2; 4454:19; 4465:4; 4489:9; 4559:20
**laugh** [1] - 4621:7
**laughing** [1] - 4459:15
**laughs** [1] - 4595:17
**laughter** [1] - 4459:24
**law** [11] - 4448:3; 4493:6; 4524:12; 4563:23; 4609:23, 25; 4614:17; 4619:23; 4624:18
**lawn** [2] - 4621:5
**lawyer** [2] - 4453:17; 4600:11
**lawyering** [1] - 4474:23
**lawyers** [5] - 4470:16, 18, 23-24; 4474:17
**lay** [3] - 4477:10; 4501:19; 4569:9
**league** [1] - 4486:25
**learn** [1] - 4609:12
**learned** [1] - 4609:10
**learning** [1] - 4566:3
**leased** [1] - 4633:4
**least** [5] - 4506:1; 4553:14; 4575:13; 4578:25; 4629:5
**leave** [7] - 4484:12; 4496:10; 4591:4; 4611:8, 11; 4623:4
**leaves** [1] - 4541:7
**leaving** [4] - 4576:18; 4594:15; 4612:21
**led** [2] - 4566:11; 4569:20
**Lee** [1] - 4498:17
**left** [12] - 4472:5; 4484:11; 4503:7; 4504:22; 4513:17; 4565:20, 22, 24; 4577:22; 4611:4, 9
**legally** [2] - 4614:16; 4631:8
**legible** [1] - 4546:5
**legitimate** [1] - 4562:13
**length** [1] - 4644:8
**Lenny** [1] - 4516:12
**lesions** [1] - 4617:24
**less** [7] - 4505:14; 4523:18; 4571:13; 4573:8; 4606:19; 4639:16
**letter** [21] - 4445:3; 4453:17; 4456:8; 4552:3; 4636:25; 4637:4, 8, 24; 4638:2, 6, 8, 11; 4639:4, 17, 19; 4641:1, 5, 9, 21; 4647:4
**letting** [1] - 4644:19
**level** [1] - 4533:20
**liar** [1] - 4458:24
**library** [3] - 4473:13, 16; 4499:7
**LIBRETT** [5] - 4556:3, 6; 4558:5, 9; 4559:16
**Librett** [1] - 4556:3
**license** [5] - 4538:6; 4628:14, 16, 20; 4634:1
**lie** [8] - 4607:1, 5, 9, 12; 4642:16, 20
**life** [35] - 4492:23; 4494:21; 4500:11; 4509:25; 4510:24; 4526:17; 4528:4; 4564:9; 4575:25; 4576:22; 4578:2; 4582:15; 4583:13; 4585:12; 4589:11, 14, 16; 4590:8; 4592:19; 4593:5; 4595:9; 4602:6; 4605:16; 4607:1, 5, 8; 4609:2; 4610:2; 4612:21; 4617:25; 4618:6; 4634:23
**lifes** [1] - 4596:10
**light** [2] - 4445:11; 4447:23
**limited** [7] - 4466:15; 4467:12; 4468:11, 22; 4482:17; 4489:25; 4559:5
**limiting** [1] - 4547:7
**Linden** [13] - 4453:2; 4490:4; 4537:16, 22-23; 4539:25; 4540:8; 4542:25; 4548:22; 4554:2; 4555:11; 4560:23; 4561:10
**Lindenhurst** [3] - 4563:12; 4564:2
**line** [7] - 4450:18; 4484:13; 4503:6; 4520:2, 24; 4553:23; 4607:13
**lines** [1] - 4503:7
**list** [2] - 4551:20, 22
**listed** [1] - 4451:16
**listening** [1] - 4469:2
**literally** [2] - 4621:6; 4622:15
**live** [17] - 4529:7, 18, 20, 22; 4532:23, 25; 4533:2, 22; 4563:24; 4564:5; 4568:17; 4570:24; 4580:17; 4594:6; 4614:13
**lived** [17] - 4529:9; 4530:6; 4533:10; 4534:23; 4535:6, 10-11; 4542:11; 4618:25; 4620:4, 15; 4621:2, 22; 4622:10; 4624:25; 4625:6; 4629:17
**lives** [2] - 4618:6; 4628:11
**living** [15] - 4483:23; 4493:5; 4496:17; 4502:19; 4529:5; 4532:21, 25; 4538:1; 4563:17; 4564:8; 4592:21; 4622:7; 4623:13; 4629:18; 4634:21
**LL** [2] - 4486:2, 17
**local** [2] - 4570:14
**located** [1] - 4485:7
**lock** [2] - 4471:11; 4472:12
**lock-up** [2] - 4471:11; 4472:12
**locked** [1] - 4504:15
**log** [6] - 4475:19; 4476:1, 23, 25; 4478:6, 14
**logs** [1] - 4475:24
**long-dead** [1] - 4646:10
**long-time** [1] - 4616:21
**look** [16] - 4459:15, 19; 4477:10; 4483:6; 4486:3; 4495:11; 4536:19; 4546:22; 4575:11; 4581:8; 4583:1; 4605:19; 4610:6; 4626:3, 5
**looked** [12] - 4476:25; 4477:8; 4488:20; 4495:4; 4499:1; 4501:7; 4503:18; 4505:2; 4507:5; 4513:20; 4550:4; 4641:24
**looking** [11] - 4455:4, 6; 4456:25; 4459:20; 4471:14; 4502:3; 4503:11, 13, 15; 4622:3
**looks** [4] - 4472:4; 4566:16; 4581:23; 4603:2
**Los** [1] - 4449:22
**loses** [1] - 4573:9
**losing** [1] - 4633:25
**lousy** [1] - 4623:20
**love** [3] - 4494:15; 4640:3; 4642:7
**lows** [1] - 4497:23
**Lucchese** [3] - 4601:20, 22
**Luccheses** [1] - 4601:17
**luck** [3] - 4600:18, 20, 22
**lunatic** [2] - 4604:7
**lunch** [4] - 4454:1; 4512:7; 4619:8
**Luncheon** [1] - 4512:9
**lying** [4] - 4458:10, 13; 4597:5; 4642:18

## M

**M-Gangs** [1] - 4449:21

**ma'am** [50] - 4563:23; 4564:4, 6, 14; 4565:14, 16, 21; 4566:12, 19, 21, 23, 25; 4567:9, 11, 22; 4568:1, 3, 11, 18; 4569:3, 5, 10, 12, 16, 18, 21, 25; 4570:2, 23, 25; 4571:2, 5, 10; 4572:5, 10, 12, 18, 21, 23; 4573:3; 4574:16; 4583:12; 4585:5, 7, 10, 14; 4612:23; 4613:2, 25; 4640:23
**machine** [3] - 4566:9; 4569:3; 4589:22
**Mafia** [9] - 4449:18; 4514:3; 4520:25; 4521:4, 10, 25; 4590:2, 4
**mafia** [1] - 4525:3
**magazine** [1] - 4497:3
**mail** [2] - 4633:20
**mailed** [1] - 4451:8
**main** [3] - 4575:23; 4633:2, 16
**maintain** [1] - 4448:22
**maintaining** [1] - 4449:3
**maintenance** [3] - 4621:2, 9
**majority** [1] - 4501:6
**male** [1] - 4482:25
**Mall** [1] - 4617:7
**man** [7] - 4456:6; 4502:19; 4509:18; 4604:6; 4618:1; 4634:11; 4642:7
**manage** [1] - 4618:18
**managed** [1] - 4504:15
**management** [5] - 4562:20; 4585:11; 4595:7; 4624:2, 25
**manager** [1] - 4504:25
**manic** [4] - 4497:11, 14, 20, 24
**manifest** [1] - 4617:25
**manifestation** [1] - 4448:10
**manner** [3] - 4448:25; 4450:21; 4623:24
**Marc** [1] - 4449:16
**March** [8] - 4444:8; 4445:3; 4449:17; 4486:7, 11; 4489:7; 4646:21; 4647:4
**Marcotrigiano** [3] - 4532:9, 15; 4534:23
**marijuana** [15] - 4569:8, 19, 23; 4570:3, 21; 4571:8; 4584:4, 6, 9; 4598:15-17, 20; 4599:25
**marinas** [1] - 4563:20
**Marine** [2] - 4564:22; 4565:17
**marine** [1] - 4563:18
**Marines** [7] - 4564:11, 13, 17; 4565:13, 20, 22, 24
**mark** [6] - 4457:19; 4459:11; 4490:8; 4547:12; 4551:19; 4563:11
**Mark** [6] - 4453:1; 4563:3; 4626:14, 20; 4630:12
**marked** [29] - 4445:4; 4464:14; 4466:12; 4467:23; 4468:9; 4485:21, 23; 4486:1; 4535:20; 4543:6-8, 10, 12, 14-19, 21, 23-24; 4547:17; 4548:9; 4627:14; 4647:5
**market** [1] - 4495:9
**marks** [1] - 4450:11
**married** [6] - 4563:22; 4614:15-17; 4616:3
**marshal** [1] - 4568:24
**MARSIA** [1] - 4444:15
**mask** [2] - 4495:15; 4523:1
**material** [5] - 4489:21, 24; 4551:6; 4559:7
**matter** [5] - 4449:17; 4464:4; 4573:2; 4578:3; 4631:3
**matters** [3] - 4451:2; 4463:4
**Maurice** [3] - 4454:3; 4490:18; 4505:10
**maximum** [2] - 4568:22
**MCC** [1] - 4567:5
**McMahon** [8] - 4446:25; 4531:17; 4617:11; 4619:4; 4636:25; 4637:3; 4639:14, 17
**McMahon's** [1] - 4639:13
**MCR** [1] - 4565:3
**MDC** [5] - 4469:20; 4470:10; 4471:12, 17; 4475:21
**meals** [3] - 4578:25; 4579:1, 3
**mean** [29] - 4466:25; 4497:21; 4500:3, 7-9; 4502:22; 4506:2; 4523:11; 4563:19; 4569:9; 4572:13; 4575:9; 4589:13; 4591:15; 4594:9; 4595:15; 4596:8; 4602:8; 4603:3; 4606:7; 4610:3; 4618:8, 25; 4619:16; 4635:13; 4638:6, 23
**means** [2] - 4502:24; 4597:20
**meant** [4] - 4502:23; 4503:21; 4505:13; 4592:20
**measure** [1] - 4477:14
**meat** [2] - 4505:24; 4506:1
**mechanic** [2] - 4563:18; 4575:3
**mechanical** [1] - 4445:1
**medical** [1] - 4645:16
**medication** [1] - 4579:6
**medications** [1] - 4574:21
**meet** [17] - 4462:6; 4463:5; 4470:16; 4474:18; 4484:24; 4511:19; 4526:12; 4571:15, 17; 4587:22; 4607:16, 18; 4615:23; 4617:1, 3; 4644:3
**meeting** [4] - 4470:18; 4474:13; 4592:10
**member** [16] - 4448:15; 4450:6; 4479:17; 4517:17; 4518:6, 8-9; 4525:8, 12; 4534:6; 4590:10; 4599:22; 4623:17; 4642:18
**Members** [3] - 4620:24; 4621:21; 4634:6
**members** [16] - 4448:21; 4449:5; 4450:13, 15-16; 4470:9; 4476:1; 4495:6; 4499:1; 4501:24; 4519:23; 4521:19; 4558:7; 4574:17; 4581:16; 4600:1
**membership** [4] - 4450:20; 4558:3; 4595:19
**memorandum** [1] - 4447:5
**men** [1] - 4638:21
**mentioned** [2] - 4581:25; 4582:1
**mere** [2] - 4450:5, 20
**Meshanski** [17] - 4476:16, 18; 4477:7; 4479:15; 4480:16; 4518:19; 4526:8; 4571:19, 21; 4572:7; 4590:7; 4604:21; 4605:18; 4614:20, 25
**mess** [3] - 4503:6; 4505:4, 16
**met** [16] - 4484:22; 4506:23; 4511:15; 4571:18, 20; 4572:6; 4573:14; 4587:20, 22, 24; 4589:10; 4605:17; 4617:11, 15; 4632:4; 4635:9
**method** [1] - 4446:12
**Metropolitan** [2] - 4472:11; 4473:8
**Mexican** [1] - 4449:21
**Mexico** [3] - 4449:12, 20
**Michael** [1] - 4492:12
**microphone** [2] - 4587:4; 4614:1
**middle** [1] - 4492:24
**middleman** [1] - 4599:12
**Midtown** [1] - 4484:7
**might** [13] - 4448:20; 4547:2, 4; 4567:14; 4581:24; 4584:9; 4591:21; 4598:17; 4599:4, 8; 4600:22; 4603:11; 4644:10
**military** [1] - 4499:5
**millennium** [1] - 4577:5
**mind** [6] - 4507:23; 4511:5; 4542:6; 4576:10; 4627:3; 4635:3
**minds** [1] - 4542:8
**mine** [1] - 4603:6
**minority** [1] - 4500:3
**minute** [1] - 4555:10
**minutes** [6] - 4481:10; 4541:6; 4585:17, 20; 4586:5
**mischievous** [1] - 4589:20
**misfortunate** [1] - 4634:20
**misguided** [1] - 4634:20
**misnumbered** [1] - 4536:14
**miss** [1] - 4589:19
**missed** [1] - 4445:22
**mistaken** [1] - 4570:22
**mistrust** [1] - 4579:12
**mix** [1] - 4456:19
**mixed** [1] - 4456:24
**MM** [1] - 4540:6
**MM-1** [7] - 4547:12, 17, 21; 4548:10; 4550:25; 4551:13; 4552:20
**MM-2** [5] - 4547:18, 21; 4555:1, 3, 8
**MM-3** [1] - 4551:20
**Mob** [9] - 4591:2, 23, 25; 4596:19; 4597:9, 12, 15
**mob** [35] - 4448:19, 21; 4449:6, 8, 18; 4450:20; 4499:22; 4500:25; 4501:2, 18; 4502:1; 4509:19; 4510:12, 25; 4511:6, 13; 4514:1; 4518:25; 4524:5, 10; 4526:2; 4527:20; 4530:17; 4534:13; 4577:2; 4578:15
**mob's** [4] - 4448:11, 23; 4449:4, 9
**mobile** [2] - 4563:18; 4627:18
**mobsters** [2] - 4592:3; 4600:19
**moe** [1] - 4505:10
**Moe** [5] - 4502:10, 18, 20; 4503:3; 4513:17
**mom** [5] - 4510:8; 4583:1, 4; 4627:7; 4632:2
**moment** [7] - 4453:11; 4511:8; 4513:16; 4536:19; 4553:16; 4576:18; 4594:10
**Monday** [7] - 4461:2, 6; 4463:6, 8; 4644:17, 20; 4645:2
**money** [24] - 4446:12; 4479:20, 23; 4480:1, 5, 7; 4496:6, 8, 22-24; 4508:8; 4522:22; 4523:3; 4526:5, 9; 4527:4; 4558:22; 4605:3; 4625:8; 4627:9; 4637:20
**monies** [1] - 4480:18
**month** [3] - 4530:23; 4568:12; 4627:10
**months** [6] - 4498:13; 4564:18; 4567:5; 4568:11; 4570:19; 4579:7
**moral** [1] - 4448:24
**Moriano** [2] - 4551:24; 4554:13
**morning** [8] - 4451:11; 4454:4; 4462:1, 3; 4483:22; 4492:15; 4559:21
**Morrow** [1] - 4531:20
**most** [8] - 4445:11; 4447:23; 4452:20;

4493:10; 4523:6; 4615:15; 4629:8; 4636:10

**mostly** [8] - 4564:2, 8; 4570:16; 4631:24; 4635:4; 4638:23

**mother** [27] - 4529:15; 4574:9, 11, 15, 20; 4575:12, 14, 19, 21; 4578:1, 18, 22; 4580:8; 4582:8, 13; 4592:20; 4608:19; 4619:20; 4625:18, 20; 4627:2; 4629:18; 4634:21; 4635:6; 4636:6

**motion** [6] - 4445:5, 10; 4447:6; 4448:13; 4450:24; 4456:9

**motions** [1] - 4644:4

**motives** [1] - 4449:2

**move** [5] - 4461:3; 4486:17; 4520:23; 4620:7, 11

**moved** [7] - 4447:17; 4498:18-20; 4615:25; 4617:10; 4620:11

**movies** [2] - 4593:2

**mow** [1] - 4621:8

**mowed** [2] - 4621:5

**mower** [1] - 4621:7

**multi** [1] - 4474:12

**multi-defendant** [1] - 4474:12

**multiple** [3] - 4491:15; 4549:3; 4561:14

**murder** [3] - 4447:14; 4455:3; 4590:16

**murders** [3] - 4448:9; 4601:4

**must** [3] - 4445:19; 4450:25; 4552:14

## N

**naked** [2] - 4446:6; 4447:1

**Nam** [3] - 4565:10, 18

**name** [31] - 4447:7; 4451:12; 4483:17; 4492:10; 4494:12; 4503:14; 4504:2; 4505:9; 4516:2; 4518:14; 4528:23; 4532:13; 4537:20; 4549:7, 9; 4556:11; 4557:16; 4563:7, 9; 4564:20; 4581:25; 4582:2; 4585:3; 4589:1; 4603:2; 4613:23; 4614:5; 4639:21

**named** [7] - 4485:5; 4502:10; 4531:17, 20, 23; 4593:19; 4602:20

**names** [3] - 4451:16, 23; 4524:20

**napkins** [1] - 4633:19

**narcotics** [2] - 4484:9; 4583:16

**Nassau** [2] - 4567:18; 4627:23

**national** [1] - 4565:18

**nationality** [1] - 4501:6

**natural** [3] - 4500:7, 9, 11

**nature** [6] - 4531:2; 4617:22; 4625:22; 4626:1; 4627:21; 4629:6

**NCIC** [4] - 4477:8, 11, 20

**near** [1] - 4495:9

**nearest** [1] - 4449:11

**necessary** [1] - 4449:9

**need** [9] - 4462:17; 4471:5, 9; 4478:10; 4494:12; 4542:1; 4575:2; 4582:7; 4646:14

**needed** [1] - 4574:22

**needs** [2] - 4542:5; 4637:18

**neglected** [2] - 4454:23; 4560:6

**neighborhood** [16] - 4573:22, 24; 4574:1; 4580:14-16, 22; 4581:4; 4587:25; 4588:17; 4589:14; 4615:6, 13, 16; 4622:2

**neighbors** [4] - 4530:3; 4621:7; 4624:4

**nervous** [2] - 4494:11; 4529:24

**never** [22] - 4451:3; 4475:18; 4490:7; 4501:19; 4504:20; 4505:1; 4544:20; 4570:11; 4579:23; 4590:5; 4595:18; 4602:6; 4605:16; 4608:24; 4609:2, 21, 25; 4628:20; 4636:23; 4641:5

**NEW** [1] - 4444:1

**new** [20] - 4504:19; 4509:20; 4510:12; 4511:14; 4514:1; 4518:25; 4519:21; 4524:5, 10; 4526:2; 4527:20; 4564:21; 4575:2; 4577:1, 4, 6; 4596:19, 22; 4597:12

**New** [21] - 4444:6, 17, 21, 24; 4449:16; 4484:3; 4508:25; 4509:8; 4510:24; 4511:6; 4529:8; 4532:22, 24; 4543:25; 4547:19; 4555:4; 4556:4; 4562:14; 4563:12; 4566:3; 4611:13

**news** [2] - 4609:11, 13

**newspaper** [4] - 4509:8; 4510:14; 4511:9; 4519:20

**next** [21] - 4453:1; 4460:7; 4461:18, 24; 4465:14; 4481:4; 4491:25; 4492:5; 4496:21; 4504:9; 4528:17; 4532:8; 4539:6; 4541:8; 4549:5; 4552:15; 4559:24; 4563:2; 4577:20; 4583:18; 4613:9

**nice** [2] - 4595:17; 4634:20

**Nicky** [2] - 4517:16, 21

**night** [13] - 4448:5; 4451:9; 4456:25; 4501:12; 4502:2; 4506:6; 4511:15, 19; 4578:25; 4622:3; 4643:17; 4644:5; 4646:18

**nights** [1] - 4579:1

**nine** [8] - 4450:25; 4529:17; 4538:21; 4539:3; 4543:17; 4554:3, 7; 4566:13

**nobody** [2] - 4526:1; 4575:6

**non** [3] - 4450:15; 4562:1

**non-members** [2] - 4450:15

**non-payment** [1] - 4562:1

**nonetheless** [1] - 4470:23

**normal** [2] - 4473:11; 4565:18

**normally** [2] - 4562:15; 4573:17

**Norris** [2] - 4453:2; 4454:24

**NORRIS** [18] - 4444:15; 4455:1, 18; 4456:25; 4457:5; 4482:3; 4531:11; 4532:6; 4534:22; 4536:8, 11, 14; 4537:14; 4554:11, 16; 4562:25; 4648:2, 8

**north** [1] - 4449:20

**Northport** [4] - 4532:24; 4535:3, 5

**note** [6] - 4454:18; 4459:11; 4468:24; 4541:1; 4545:1; 4561:3

**notes** [16] - 4489:18, 21, 23; 4490:2, 20-21, 23; 4491:3, 10, 23; 4607:20, 22, 24; 4608:1, 5

**nothing** [20] - 4459:10; 4460:2; 4480:23; 4481:2; 4527:9; 4528:11; 4531:6; 4534:20; 4544:17; 4552:6; 4555:9; 4562:24; 4577:22; 4578:4; 4585:15; 4605:5; 4613:4; 4642:11, 20

**notice** [2] - 4499:15; 4506:20

**noticed** [1] - 4503:12

**November** [5] - 4471:9, 14; 4472:1, 5; 4519:10

**nowhere** [1] - 4622:20

**number** [23] - 4446:11, 14; 4447:3; 4448:8; 4469:13; 4473:6, 25; 4502:14; 4520:7; 4540:2, 5; 4542:11; 4554:11; 4562:20; 4564:21; 4566:13; 4574:24; 4576:1; 4579:17; 4596:17; 4598:13; 4624:2, 4

**numbers** [5] - 4452:15; 4457:9; 4553:7; 4567:17

**numerous** [2] - 4474:7

**nurses** [1] - 4574:19

**NYPD** [1] - 4484:4

## O

**o'clock** [3] - 4444:9; 4501:12; 4512:6

**oath** [8] - 4463:10; 4521:3, 6, 9, 20; 4590:15, 19; 4593:11

**object** [4] - 4454:16; 4465:2; 4540:15; 4645:19

**objection** [63] - 4474:25; 4475:1; 4487:2, 8; 4489:14; 4491:1, 12, 16, 21; 4492:1; 4507:17, 21; 4508:4, 10, 14; 4509:4, 12; 4510:1, 16; 4511:10; 4514:22; 4518:3; 4519:5, 24; 4520:9, 21; 4521:11, 22; 4522:14; 4525:4; 4526:19; 4527:23; 4528:9; 4531:5; 4536:15; 4561:3; 4576:8, 15; 4582:20; 4588:6; 4590:17; 4591:7; 4592:16; 4595:3, 25; 4598:3, 11; 4601:8; 4604:4; 4605:6, 11; 4606:1; 4607:6, 10, 13; 4608:12; 4609:8; 4610:16; 4625:23; 4637:5, 10

**obligate** [3] - 4575:4, 6, 9

**obligated** [1] - 4574:10

**observation** [3] - 4499:24; 4567:5; 4572:11

**observations** [1] - 4508:15

**observe** [4] - 4488:15; 4499:16; 4506:20; 4581:7

**observed** [4] - 4455:24; 4459:25; 4547:25; 4582:3

**observes** [1] - 4459:22

**obstruct** [1] - 4524:16

**obtained** [1] - 4450:10

**obviously** [1] - 4629:2

**occasional** [1] - 4449:9

**occasions** [2] - 4598:19; 4622:11

**occurs** [3] - 4586:1; 4587:2; 4644:1

**October** [2] - 4527:17; 4568:15

**OF** [3] - 4444:1, 3, 10

**of..** [1] - 4588:22

**offer** [1] - 4559:7

**offered** [1] - 4507:23

**offering** [1] - 4545:16

**offers** [1] - 4536:8

**office** [6] - 4493:7; 4552:10; 4554:14, 16; 4622:25

**officer** [5] - 4449:7; 4470:3; 4484:3; 4502:15; 4630:5

**officers** [4] - 4502:13; 4609:20

**official** [3] - 4457:17; 4478:24; 4604:24

**officials** [2] - 4449:15; 4610:6

**often** [8] - 4508:21; 4522:9; 4572:7, 17; 4629:4, 13

**Okinawa** [1] - 4565:5

**Oklahoma** [1] - 4471:18

**old** [38] - 4492:17; 4493:23; 4495:19;

4499:5; 4509:19; 4510:12; 4511:13; 4514:1; 4518:25; 4524:5, 10; 4526:2; 4527:19; 4563:15; 4564:6, 8, 12, 15-17; 4565:20; 4574:9; 4578:17; 4588:20; 4589:2; 4597:9, 12, 15; 4614:11; 4615:24; 4634:16; 4646:9

**older** [9] - 4493:4; 4507:14; 4573:25; 4581:9; 4618:10; 4626:5; 4638:21; 4639:22

**oldest** [3] - 4518:2; 4609:10, 12

**once** [3] - 4493:22; 4591:2; 4646:10

**One** [3] - 4447:7; 4448:2; 4556:1

**one** [64] - 4449:3; 4450:25; 4453:16; 4454:23; 4456:20; 4457:13; 4462:5; 4464:19; 4491:24; 4495:11; 4500:24; 4501:18; 4502:12; 4503:7; 4510:11; 4515:14, 21; 4516:1; 4517:17; 4523:21; 4525:19, 24; 4526:17; 4538:22; 4543:6, 14, 19, 21, 23; 4547:3; 4550:18; 4551:4; 4552:5; 4553:3; 4555:10; 4567:23; 4568:7, 9, 11, 21; 4575:3, 22-23; 4579:18; 4582:15; 4584:10; 4588:12; 4601:10, 15; 4610:18; 4613:5; 4615:10; 4621:4; 4622:1, 5, 11; 4623:4; 4625:10; 4631:7, 10; 4636:21; 4639:19

**one-page** [1] - 4543:14

**ones** [3] - 4566:17; 4568:8; 4601:19

**open** [7] - 4496:4; 4501:13, 16; 4562:4, 6; 4586:9

**opening** [2] - 4646:11, 14

**operations** [1] - 4448:12

**opinion** [3] - 4551:25; 4561:1; 4625:9

**opportunity** [3] - 4606:19; 4611:25; 4645:21

**opposite** [1] - 4499:5

**ops** [1] - 4544:9

**order** [14] - 4447:5; 4449:14; 4452:21; 4464:11; 4538:11; 4555:2; 4593:18, 23, 25; 4594:1, 5, 7, 22

**orders** [3] - 4521:7; 4593:13

**organization** [1] - 4487:7

**organizations** [2] - 4449:23; 4487:1

**organized** [31] - 4501:3; 4509:3; 4522:9, 19; 4525:16; 4533:15; 4569:17, 24; 4576:14, 21; 4578:8, 11; 4580:25; 4588:5, 13, 16, 19; 4590:11, 24; 4591:11; 4599:23; 4600:1, 4; 4601:2; 4602:15; 4603:23; 4604:9, 23, 25; 4623:24

**originally** [1] - 4493:6

**otherwise** [2] - 4481:11; 4645:17

**ought** [1] - 4512:7

**ounce** [4] - 4584:10; 4599:4, 8

**ounces** [2] - 4570:6, 16

**outside** [10] - 4485:15; 4553:25; 4557:10; 4586:1; 4611:16; 4619:2, 4; 4644:1

**outstanding** [1] - 4536:20

**overhear** [2] - 4524:6; 4609:19

**Overruled** [2] - 4588:8; 4605:14

**overruled** [1] - 4610:17

**overseas** [1] - 4565:4

**owed** [2] - 4537:11; 4625:4

**own** [8] - 4505:17; 4506:6; 4529:12; 4577:9; 4596:9; 4597:16, 18

**owned** [2] - 4448:6; 4537:4

**owner** [6] - 4599:14; 4622:22; 4625:9

**owners** [8] - 4533:16; 4542:3, 22; 4548:25; 4549:4; 4553:10, 14

**ownership** [3] - 4560:10, 12, 21

**owns** [4] - 4542:7; 4599:16; 4620:9; 4639:20

**Ozone** [5] - 4548:12; 4550:22; 4553:2; 4567:13; 4614:14

## P

**p.m** [6] - 4465:10; 4466:7; 4467:13, 19; 4468:5; 4482:12

**PA** [1] - 4493:20

**pack** [2] - 4528:4

**packet** [1] - 4464:19

**page** [25] - 4460:7; 4461:24; 4481:20; 4483:1; 4541:8; 4543:7, 10, 12, 14-15, 19-21, 23; 4545:5; 4551:4, 11; 4559:24; 4583:18; 4585:23; 4586:15; 4643:20

**PAGE** [1] - 4647:2

**page)** [1] - 4465:14

**pages** [10] - 4539:1; 4543:4, 17-18, 21, 24; 4549:4; 4551:20

**paid** [6] - 4535:16; 4537:10, 13; 4562:4; 4626:23; 4639:3

**Panzarella** [16] - 4514:20; 4526:11; 4534:4-6, 10; 4602:8, 11-12, 16; 4605:18; 4622:19, 23; 4623:1, 7

**Panzarella's** [1] - 4622:25

**Panzarellas** [2] - 4624:5, 7

**paper** [3] - 4516:2; 4519:21; 4633:19

**papers** [2] - 4552:8, 19

**paperwork** [1] - 4504:21

**paragraph** [1] - 4551:12

**paralegal** [1] - 4451:10

**paralegals** [1] - 4464:19

**pardon** [1] - 4606:4

**parents** [7] - 4492:24; 4493:5; 4494:19; 4496:17; 4511:21

**parents'** [1] - 4565:25

**Paris** [1] - 4565:3

**park** [1] - 4560:16

**Park** [5] - 4548:13; 4550:22; 4553:2; 4567:13; 4614:14

**parked** [1] - 4473:13

**parking** [4] - 4577:20; 4633:21, 23; 4634:2

**parole** [2] - 4568:21; 4630:5

**part** [19] - 4446:13; 4456:5; 4458:5; 4461:7, 20; 4462:25; 4509:19; 4511:13; 4514:24; 4524:10; 4560:22; 4590:4, 21; 4591:22, 25; 4600:9; 4624:6

**partially** [1] - 4563:25

**participate** [1] - 4585:8

**particular** [5] - 4472:19; 4507:4; 4548:2; 4576:18; 4587:17

**particularly** [2] - 4450:20; 4513:23

**particulars** [4] - 4590:1, 20, 25; 4603:11

**parties** [4] - 4501:22; 4615:13, 15; 4622:4

**partnering** [1] - 4569:23

**parts** [1] - 4469:19

**party** [1] - 4489:4

**pass** [1] - 4611:16

**past** [5] - 4540:11; 4573:22; 4574:1; 4585:10; 4625:7

**Pause** [11] - 4471:24; 4553:21; 4555:13; 4586:13; 4596:15; 4603:14; 4609:14; 4638:13; 4640:1; 4642:5; 4643:9

**pay** [7] - 4446:15; 4502:3; 4535:12, 15; 4537:8; 4625:11; 4639:2

**payment** [3] - 4446:22; 4562:1; 4579:20

**payments** [2] - 4446:13, 15

**peace** [2] - 4578:6; 4592:24

**peaceful** [1] - 4592:22

**Pearl** [1] - 4565:5

**Pecan** [3] - 4563:11, 25; 4564:2

**pellet** [6] - 4495:5, 9; 4496:1, 19

**pen** [3] - 4566:14

**penalty** [1] - 4633:5

**Pendleton** [1] - 4565:9

**Pennsylvania** [3] - 4493:7; 4498:18; 4504:4

**people** [54] - 4445:24; 4450:18; 4459:6; 4499:20, 22; 4500:8, 10; 4501:18; 4503:14; 4504:6; 4505:15; 4506:5, 17, 21; 4507:3, 11; 4508:1, 8; 4511:14; 4522:9; 4523:18, 22; 4525:15; 4542:9, 11; 4577:3, 8; 4578:18; 4580:17, 21; 4582:18; 4592:5, 8; 4596:24; 4597:4, 14-15; 4600:3; 4601:14; 4609:24; 4610:1; 4621:9, 25; 4622:2, 4; 4624:3; 4638:24

**people's** [1] - 4563:20

**perceive** [1] - 4501:3

**percentage** [3] - 4536:25; 4537:2, 7

**perform** [1] - 4574:5

**perhaps** [1] - 4512:7

**period** [9] - 4561:17, 25; 4562:5, 7, 11, 22; 4570:5; 4572:8; 4573:23

**perjury** [2] - 4458:12; 4640:13

**permanent** [1] - 4617:24

**permission** [4] - 4482:7; 4486:18; 4539:24; 4594:6

**permit** [4] - 4546:21; 4549:22; 4552:19; 4554:25

**person** [11] - 4448:23; 4450:9; 4455:24; 4504:23; 4505:15; 4513:17; 4515:24; 4521:3; 4594:4; 4627:1; 4635:4

**personal** [3] - 4448:10; 4637:8

**personally** [2] - 4616:19; 4624:17

**persons** [2] - 4501:6; 4569:15

**Pete** [1] - 4515:12

**Peter** [11] - 4558:19; 4603:21, 25; 4604:1, 6-7, 11

**Philadelphia** [2] - 4493:9; 4498:19

**Philippines** [1] - 4565:5

**Philly** [2] - 4504:14, 22

**phone** [39] - 4445:18, 20; 4463:18, 21, 25; 4464:3, 8, 11, 13, 18; 4466:6, 10, 21; 4467:18; 4468:5, 8, 16, 20; 4469:11; 4478:6, 13, 15; 4479:2; 4482:10, 19; 4520:7; 4629:1, 6, 9, 20; 4631:16; 4632:9, 14, 16, 20; 4633:11; 4635:18, 22, 24

**phonetic** [1] - 4620:21

**phonetic)** [1] - 4634:13

**photograph** [1] - 4486:20

**photographers** [1] - 4485:10

**photographs** [3] - 4485:12, 18; 4487:22
**photos** [1] - 4486:6
**phrase** [1] - 4511:2
**physical** [5] - 4446:4; 4558:23; 4573:6; 4618:19; 4636:11
**physically** [1] - 4577:13
**pick** [5] - 4472:22, 25; 4503:7; 4579:5; 4623:12
**picked** [1] - 4579:1
**picture** [7] - 4509:16, 21; 4515:22; 4525:22; 4527:2; 4605:9, 18
**pictures** [10] - 4486:1; 4487:14; 4488:23; 4510:5, 23; 4511:6, 14; 4514:5; 4605:17
**piling** [1] - 4621:4
**pills** [1] - 4585:3
**pipe** [2] - 4579:17
**pissed** [1] - 4592:11
**Pitera** [2] - 4600:7; 4601:1
**place** [4] - 4498:19; 4504:13; 4567:14; 4580:19
**placed** [2] - 4472:13; 4552:4
**Plaintiff** [1] - 4444:13
**plan** [1] - 4462:14
**planning** [1] - 4572:20
**plans** [1] - 4574:14
**plaques** [1] - 4486:23
**play** [8] - 4464:11; 4465:10; 4466:10; 4467:3; 4468:13; 4483:7; 4507:10; 4635:21
**played** [25] - 4464:7; 4465:13; 4466:6, 18, 21; 4467:6, 16, 19, 22; 4468:2, 4, 8, 14, 17, 20-21; 4469:9; 4482:9, 19, 23; 4483:2, 11; 4501:21; 4505:22; 4632:14
**player** [1] - 4505:22
**playing** [2] - 4466:3; 4469:7
**Plaza** [2] - 4444:16, 23
**plea** [2] - 4567:2
**plead** [5] - 4498:8; 4559:3; 4568:2; 4594:25
**pleading** [1] - 4558:16
**pled** [5] - 4450:3; 4570:1; 4584:3; 4593:22; 4610:23
**point** [30] - 4459:14; 4463:1; 4464:10; 4467:2; 4468:7, 19; 4489:5; 4502:6; 4505:16; 4507:2, 9; 4509:16; 4511:14; 4523:25; 4557:17; 4558:11; 4559:23; 4571:6; 4578:20; 4580:4; 4581:2; 4583:6; 4592:19, 23; 4619:11; 4621:6; 4628:18; 4634:25; 4639:15
**pointed** [1] - 4509:21
**Police** [1] - 4484:3
**police** [7] - 4449:15; 4455:2; 4457:17; 4484:3; 4609:19, 21
**Polish** [1] - 4499:22
**popular** [1] - 4580:16
**Port** [2] - 4565:7; 4622:21
**porter** [2] - 4621:1, 11
**portion** [9] - 4462:16; 4466:6, 10, 21; 4467:18; 4468:4, 16, 25; 4625:7
**portions** [1] - 4464:7
**Porto** [23] - 4518:14; 4530:9; 4532:1, 3; 4533:7, 9, 19; 4535:8-10, 12; 4537:11; 4554:12, 16; 4620:21, 23, 25; 4622:8, 17; 4623:16, 20
**Porto's** [1] - 4530:13
**position** [10] - 4447:2; 4450:2, 14; 4556:24; 4557:1; 4559:4; 4592:4; 4605:2; 4645:25
**possessive** [3] - 4616:13
**possible** [1] - 4611:21
**possibly** [2] - 4450:17; 4644:16
**post** [1] - 4627:9
**Post** [4] - 4508:25; 4509:8; 4510:24; 4511:6
**pot** [12] - 4569:10; 4570:14; 4583:13, 15; 4585:3; 4589:22; 4599:3, 11; 4600:14; 4603:9
**pound** [6] - 4570:9, 17; 4599:5, 9
**pounds** [3] - 4570:6, 9
**power** [4] - 4449:10; 4519:23; 4520:4; 4596:9
**powerhouse** [1] - 4611:17
**practically** [1] - 4504:23
**practice** [2] - 4474:21; 4476:11
**Precinct** [2] - 4484:8, 10
**preparation** [2] - 4575:17; 4576:12
**prepare** [4] - 4452:2; 4461:4; 4550:10; 4560:22
**prepared** [12] - 4464:12; 4482:14; 4550:14; 4551:22; 4552:12; 4562:14, 17; 4627:20; 4645:3; 4646:13
**preparing** [2] - 4644:11; 4646:3
**presence** [5] - 4553:25; 4557:10; 4586:1; 4587:2; 4644:1
**present** [10] - 4461:25; 4462:7; 4482:4; 4511:5; 4513:7; 4541:5; 4560:1; 4576:10; 4581:13
**preserve** [1] - 4639:10
**preserved** [1] - 4463:22
**president** [6] - 4533:10; 4548:19; 4554:17; 4622:24; 4623:20
**pretty** [22] - 4473:11; 4494:9; 4501:13; 4502:23; 4508:17; 4513:20; 4530:4; 4574:9; 4583:5; 4608:18, 20-22; 4615:11, 17; 4619:11; 4623:2; 4634:22; 4638:20, 24; 4642:10
**prevent** [2] - 4448:24; 4594:15
**previous** [1] - 4468:25
**previously** [6] - 4454:13; 4463:13; 4466:12; 4467:23; 4482:7; 4513:10
**printed** [1] - 4638:3
**printout** [1] - 4475:20
**prints** [4] - 4638:5; 4639:11
**prison** [10] - 4469:25; 4475:7; 4498:17; 4501:15; 4505:14; 4509:18; 4510:9; 4524:7; 4525:15, 19
**prisoners** [2] - 4470:12; 4499:10
**prisons** [1] - 4568:23
**Prisons** [12] - 4463:19, 22; 4469:13, 20; 4472:20; 4473:3, 23; 4474:18; 4475:4; 4476:11; 4478:15, 22
**private** [5] - 4483:24; 4484:18; 4526:3
**probation** [4] - 4567:6, 8; 4568:20; 4611:22
**problem** [11] - 4455:19; 4503:24; 4504:14; 4505:14; 4523:22; 4571:8; 4573:8; 4646:17
**problems** [7] - 4494:16, 18; 4505:24; 4533:19; 4587:6; 4634:20
**proceed** [6] - 4446:7; 4463:11; 4469:7; 4482:20; 4487:20; 4560:2
**proceeding** [1] - 4540:9
**Proceedings** [1] - 4445:1
**proceedings** [11] - 4455:7; 4471:24; 4586:13; 4596:15; 4603:14; 4609:14; 4638:13; 4640:1; 4642:5; 4643:9; 4646:20
**process** [2] - 4621:24; 4646:2
**produced** [1] - 4445:1
**products** [1] - 4633:18
**proffer** [1] - 4446:10
**program** [3] - 4505:3; 4635:1, 8
**programs** [2] - 4585:8
**proof** [1] - 4646:1
**proper** [2] - 4562:17; 4574:20
**properly** [2] - 4542:16; 4574:22
**property** [5] - 4446:1, 3, 5; 4567:16; 4621:2
**prosecution** [5] - 4464:1, 14; 4473:12; 4541:2; 4557:20
**protected** [1] - 4594:4
**Protection** [7] - 4543:5; 4544:1, 11; 4547:20; 4555:5; 4562:15
**proud** [3] - 4595:13, 15, 24
**prove** [1] - 4639:16
**provide** [7] - 4463:25; 4474:8; 4485:25; 4491:20; 4539:25; 4556:20; 4558:22
**provided** [12] - 4453:17; 4464:13, 20; 4465:4; 4473:12; 4475:9, 22-23; 4476:23; 4485:18; 4548:23; 4554:6
**provides** [1] - 4554:9
**providing** [2] - 4485:17; 4551:5
**proving** [1] - 4639:19
**public** [4] - 4450:6; 4538:2; 4560:24; 4615:11
**Public** [1] - 4560:8
**published** [1] - 4487:11
**pull** [3] - 4463:1; 4613:25
**pulled** [1] - 4496:1
**Puma** [5] - 4455:3, 8, 15; 4458:20; 4459:4
**purport** [3] - 4554:4; 4555:4
**purported** [1] - 4548:1
**purportedly** [1] - 4546:4
**purpose** [7] - 4458:24; 4466:15; 4467:12, 25; 4468:11, 22; 4489:25
**purposes** [6] - 4448:13; 4449:25; 4456:9; 4465:1; 4552:23; 4647:10
**pursuant** [6] - 4464:10; 4466:24; 4482:6; 4530:1; 4605:20; 4606:8
**put** [32] - 4451:21; 4453:3; 4461:18; 4462:10, 13; 4485:20; 4496:20, 23; 4504:19; 4519:14, 20; 4520:1, 14; 4522:21, 25; 4547:2; 4549:2, 5, 7, 23; 4591:5; 4597:2; 4612:7, 10-11, 18; 4637:18; 4639:10; 4643:3
**puts** [2] - 4477:19; 4612:12
**putting** [5] - 4461:10, 14; 4473:25; 4554:22; 4639:18

## Q

**Q-1** [3] - 4457:23; 4458:7; 4647:7
**Q-2** [1] - 4457:20
**qualified** [2] - 4550:4; 4561:2

**qualify** [1] - 4550:1
**quarter** [6] - 4537:6; 4570:7, 17; 4599:5, 8; 4643:4
**Queens** [3] - 4567:13, 23
**questioning** [2] - 4553:24; 4607:13
**questions** [17] - 4487:21; 4513:5; 4520:13; 4527:18, 20; 4532:6; 4537:14; 4547:24; 4548:4; 4557:14; 4558:2; 4561:7; 4562:25; 4576:9; 4596:13; 4607:24; 4632:19
**quite** [2] - 4629:5; 4633:1
**quotation** [1] - 4450:11

## R

**R-Y-A-N** [2] - 4613:24; 4614:6
**racketeering** [3] - 4447:7, 12, 14
**Racketeering** [2] - 4447:9; 4448:2
**radio** [5] - 4493:8, 10, 12; 4565:4
**raise** [1] - 4613:16
**ran** [1] - 4496:1
**random** [2] - 4636:7; 4637:13
**rape** [1] - 4502:25
**rat** [4] - 4577:3; 4597:14, 22
**rather** [2] - 4537:10; 4542:17
**rational** [2] - 4445:12; 4447:24
**ratted** [2] - 4597:4; 4611:1
**ratting** [1] - 4596:24
**re** [2] - 4471:17; 4594:11
**re-arrested** [1] - 4594:11
**reached** [1] - 4452:5
**reaction** [1] - 4582:18
**read** [3] - 4536:23; 4601:24
**reading** [1] - 4487:2
**ready** [2] - 4481:12; 4611:23
**real** [2] - 4495:11; 4590:25
**realize** [3] - 4588:19; 4589:1; 4595:21
**realized** [2] - 4573:24
**really** [26] - 4471:19; 4495:25; 4500:3; 4502:21; 4510:8, 10; 4530:4; 4554:16; 4578:3; 4580:13; 4588:15, 19; 4589:16, 18, 23; 4590:3; 4592:22; 4598:21, 24; 4600:12, 17; 4603:2; 4616:11; 4618:2; 4621:10; 4622:6
**reason** [7] - 4455:22; 4458:5; 4462:22; 4549:3; 4578:1; 4610:7; 4639:17
**reasonable** [4] - 4445:14; 4447:24; 4448:1; 4562:23
**reasons** [8] - 4448:11; 4500:6, 12, 16; 4540:21; 4550:19; 4576:3; 4620:24
**receive** [13] - 4498:12; 4538:17, 20; 4539:1; 4554:3; 4558:18; 4565:17; 4567:4; 4568:4, 6; 4579:20, 22; 4624:24
**received** [24] - 4451:3, 11; 4466:17; 4467:15; 4468:1, 12, 23; 4498:13; 4538:4, 21, 23-24; 4539:11; 4540:1, 14; 4541:2; 4542:4, 22-23; 4544:20; 4552:2; 4568:7; 4633:22
**receiving** [2] - 4544:22; 4605:3
**recently** [1] - 4593:13
**Recess** [3] - 4460:6; 4481:18; 4586:7
**recess** [1] - 4512:9
**recognize** [15] - 4462:22; 4501:9; 4515:19, 24; 4516:5, 9, 12; 4517:8, 20, 25; 4527:2; 4535:22; 4545:24; 4602:10; 4604:13
**recognizes** [2] - 4545:18; 4547:19
**recollection** [4] - 4471:5, 9; 4477:8; 4478:10
**reconsider** [1] - 4445:7
**record** [23] - 4446:6; 4447:1; 4451:21; 4452:7; 4467:5; 4468:24; 4475:7; 4477:7; 4478:6, 14, 21, 24; 4480:4; 4492:11; 4525:11; 4528:24; 4532:14; 4537:21; 4548:13; 4551:8; 4563:8, 10; 4613:23
**recorded** [5] - 4445:1; 4463:18, 22; 4464:5; 4473:11
**records** [7] - 4475:5, 9, 16, 18, 22; 4477:4; 4554:5
**redact** [2] - 4454:15; 4459:8
**redacted** [3] - 4454:12; 4456:7; 4458:1
**redaction** [2] - 4454:6, 8
**redirect** [5] - 4481:1; 4482:2; 4527:10; 4612:15
**REDIRECT** [4] - 4527:12; 4612:16; 4647:21; 4648:21
**redwell** [1] - 4538:22
**refer** [1] - 4485:24
**reference** [1] - 4446:5
**referred** [3] - 4455:7, 10; 4600:7
**referring** [3] - 4471:4, 12; 4577:5
**reflect** [2] - 4471:11; 4562:1
**reflecting** [1] - 4549:20
**reflects** [4] - 4536:3, 16, 20; 4537:4
**reframe** [1] - 4576:16
**refresh** [3] - 4471:5, 9; 4478:10
**refugees** [1] - 4565:8
**regard** [1] - 4560:15
**regards** [2] - 4578:11; 4583:3
**regular** [3] - 4630:10; 4631:17; 4633:17
**regularly** [1] - 4574:23
**reinstated** [1] - 4568:21
**reject** [1] - 4479:21
**rejected** [1] - 4448:12
**related** [5] - 4448:5; 4449:19; 4450:2; 4458:1; 4590:2
**relates** [1] - 4456:22
**relating** [4] - 4538:21; 4539:15, 20; 4562:4
**relation** [4] - 4497:6; 4530:7; 4593:18; 4639:7
**relationship** [15] - 4528:3; 4573:4; 4575:19; 4576:13, 20; 4578:8; 4604:25; 4614:17; 4616:5, 7; 4619:21; 4624:15; 4629:11; 4630:15; 4634:18
**relatively** [1] - 4615:6
**release** [1] - 4568:12
**released** [11] - 4471:15, 18; 4472:1; 4520:18; 4568:13-15, 21, 24; 4613:1
**relevance** [8] - 4458:4; 4514:23; 4519:24; 4540:21; 4542:19; 4544:19; 4558:2; 4607:14
**relevant** [2] - 4540:18; 4559:3
**relying** [1] - 4548:7
**remain** [2] - 4613:15; 4616:1
**remember** [14] - 4488:9; 4527:20; 4535:2; 4581:25; 4582:1; 4583:17; 4598:21; 4624:22; 4625:13; 4627:4; 4629:22; 4630:12; 4632:23; 4641:18
**reminisced** [1] - 4573:21
**removed** [1] - 4552:23
**rented** [1] - 4621:23
**renting** [2] - 4621:25; 4622:1
**repair** [1] - 4563:20
**repairs** [2] - 4574:24; 4575:2
**repeat** [3] - 4506:18; 4511:12; 4598:6
**repeatedly** [1] - 4519:25
**repeating** [1] - 4598:3
**rephrase** [3] - 4510:21; 4523:24; 4606:15
**report** [9] - 4454:24; 4455:8, 11; 4457:17, 25; 4458:5; 4504:12; 4550:23
**Reporter** [1] - 4444:23
**reports** [8] - 4455:2, 4; 4457:17; 4545:10; 4548:12; 4552:6; 4553:2
**represent** [3] - 4486:8; 4544:5; 4645:22
**representation** [4] - 4485:14; 4553:8; 4558:13
**represented** [2] - 4464:22; 4548:23
**representing** [1] - 4556:5
**reprimand** [1] - 4582:16
**reputation** [8] - 4448:22; 4449:4; 4571:4; 4587:21, 25; 4588:2, 25
**request** [9] - 4462:12; 4467:21; 4477:16, 20; 4478:14, 18, 21; 4541:3; 4635:12
**requested** [4] - 4452:13; 4479:2; 4489:20; 4519:25
**requesting** [2] - 4553:6; 4628:3
**requests** [5] - 4464:11; 4475:13; 4539:20; 4636:8
**require** [2] - 4470:23; 4555:15
**requiring** [1] - 4561:4
**residences** [1] - 4563:20
**respect** [10] - 4448:2, 8; 4450:1; 4455:3; 4506:24; 4548:5; 4555:1; 4558:2; 4559:2; 4645:3
**respectfully** [10] - 4452:4, 24; 4453:25; 4464:17; 4467:21; 4544:18; 4548:11; 4550:6, 18; 4552:14
**respond** [1] - 4459:17
**response** [3] - 4445:17; 4584:7; 4597:13
**rest** [7] - 4456:7; 4462:9, 20; 4498:21; 4606:25; 4607:4, 8
**restaurant** [18] - 4448:5; 4485:5, 15; 4486:9, 12, 14, 23; 4571:24; 4580:14-16; 4581:20, 22; 4599:14; 4638:19, 25; 4639:2
**rested** [2] - 4461:23; 4481:9
**restrain** [1] - 4594:2
**restraining** [2] - 4593:18; 4594:22
**restrict** [1] - 4576:9
**rests** [1] - 4481:8
**result** [9] - 4538:17; 4539:10; 4560:20; 4566:22; 4567:1; 4570:18; 4584:25; 4585:6; 4618:21
**resumes** [1] - 4586:12
**retain** [1] - 4538:14
**retained** [4] - 4538:10, 17; 4560:17
**retention** [1] - 4540:12
**retribution** [2] - 4446:15; 4558:23
**retrieve** [2] - 4633:12; 4636:15
**retrieved** [1] - 4550:11

**retrieving** [1] - 4636:24
**return** [1] - 4633:6
**returned** [1] - 4633:3
**returning** [1] - 4633:2
**reversed** [1] - 4457:9
**review** [19] - 4465:4; 4473:9, 15, 19; 4475:7, 16, 23; 4539:4, 12, 14, 17; 4540:3; 4547:24; 4548:24; 4554:7; 4560:20, 22; 4561:12
**reviewed** [9] - 4454:13; 4475:9; 4540:11; 4548:20, 22; 4549:19; 4560:15; 4561:15, 23
**reviewing** [5] - 4540:8; 4560:9, 25; 4561:10; 4562:19
**Richard** [1] - 4556:3
**Richie** [2] - 4514:8; 4515:8
**rid** [1] - 4595:6
**rights** [2] - 4453:18, 20
**ripped** [1] - 4594:14
**ripping** [1] - 4594:14
**roam** [1] - 4501:18
**Rob** [1] - 4622:20
**rob** [3] - 4494:23, 25; 4495:11
**robbed** [1] - 4495:17
**robbery** [10] - 4494:5, 8; 4495:2, 14; 4497:6, 14; 4522:21, 24
**Robert** [16] - 4453:8; 4518:14; 4530:9, 13; 4532:1, 3; 4533:7, 9; 4535:8-10; 4537:11; 4554:12; 4556:12; 4620:21
**Rockaway** [1] - 4635:2
**ROGER** [1] - 4444:14
**role** [3] - 4448:19; 4560:22
**roll** [1] - 4621:7
**roll-on** [1] - 4621:7
**room** [12] - 4470:7, 9, 15, 25; 4473:19; 4474:15; 4476:4; 4502:18; 4503:21; 4507:10; 4638:23
**rooms** [1] - 4470:15
**Rosetta** [1] - 4459:3
**rubber** [5] - 4495:15; 4523:1; 4633:19; 4639:18; 4641:19
**Ruggiero** [4] - 4516:21; 4603:3, 5, 17
**ruined** [1] - 4633:5
**rule** [5] - 4447:21; 4450:19; 4517:17; 4521:1; 4540:20
**rules** [7] - 4497:25; 4520:25; 4521:1; 4522:6, 19; 4590:24; 4591:1
**ruling** [2] - 4445:7; 4559:13
**rummy** [1] - 4505:22
**run** [4] - 4477:4; 4494:24; 4568:8; 4582:15
**runner** [1] - 4581:18
**Russians** [1] - 4499:22
**Russo** [4] - 4459:3; 4599:15, 18, 20
**Russo's** [1] - 4599:16
**Ryan** [19] - 4453:5; 4477:17, 19, 25; 4479:15; 4480:14; 4490:14; 4613:12, 24; 4614:5, 9, 11; 4617:14; 4618:7; 4625:13; 4629:10; 4637:23; 4640:3, 19

## S

**sabotage** [1] - 4494:21
**sacred** [1] - 4521:20
**safe** [2] - 4500:17; 4502:17
**safety** [4] - 4500:13; 4621:18
**Saigon** [1] - 4565:7
**Sal** [10] - 4453:5; 4455:15; 4490:16; 4504:10; 4506:12, 14; 4507:8; 4524:19, 21; 4525:8
**sale** [8] - 4531:18, 21, 23; 4566:7; 4567:1; 4569:3; 4570:7
**sales** [1] - 4570:3
**Salvaggio** [2] - 4453:5; 4490:12
**Salvatore** [1] - 4455:3
**San** [1] - 4565:3
**sandwiches** [1] - 4505:25
**sanitation** [1] - 4529:6
**Saporato** [1] - 4603:17
**Saporito** [3] - 4603:6, 19
**Savannah** [5] - 4494:12, 16; 4495:16; 4496:3; 4498:6
**save** [1] - 4577:8
**saw** [8] - 4504:23; 4506:25; 4508:22; 4509:9; 4567:18; 4577:24; 4641:8
**scary** [2] - 4502:21; 4503:10
**scene** [2] - 4458:3, 19
**schedule** [2] - 4462:7; 4644:11
**scheduling** [1] - 4642:25
**Schiavo** [17] - 4445:13, 21; 4446:1, 3, 16, 19; 4453:8, 16; 4454:1; 4490:10; 4516:16; 4555:19, 25; 4556:1, 5, 12
**school** [14] - 4493:1, 6, 13, 15; 4564:10, 18; 4599:20, 22; 4615:11; 4623:12; 4627:12; 4635:1, 8
**School** [3] - 4493:16; 4635:2, 9
**schools** [2] - 4615:9
**Science** [1] - 4538:4
**Sclafani** [4] - 4479:15; 4480:12; 4516:7; 4526:4
**scope** [1] - 4489:14
**Scranton** [1] - 4504:4
**scrawls** [1] - 4546:22
**screaming** [1] - 4622:15
**sea** [1] - 4523:14
**search** [1] - 4445:17
**seat** [1] - 4556:1
**seated** [5] - 4462:1; 4482:5; 4513:8; 4587:3; 4613:22
**second** [7] - 4451:25; 4466:6; 4482:12; 4497:13; 4535:10; 4537:4; 4543:19
**seconds** [1] - 4550:2
**secret** [1] - 4478:24
**Section** [1] - 4469:23
**secure** [1] - 4499:9
**secured** [1] - 4499:8
**Security** [1] - 4564:21
**security** [1] - 4568:23
**see** [49] - 4456:4, 13; 4487:22; 4502:15; 4503:9, 16, 18-19; 4504:20; 4505:1, 15; 4506:16; 4507:1, 7; 4508:21; 4531:2; 4533:15; 4536:10; 4540:23; 4542:19; 4545:22; 4548:3, 6; 4551:9; 4554:7; 4559:1; 4572:7, 15, 17; 4573:15; 4574:22; 4577:10, 12, 22; 4591:25; 4592:23; 4619:9; 4626:9, 11; 4629:13, 19; 4630:5; 4635:6; 4641:8, 10, 13; 4646:18
**seeing** [4] - 4475:18; 4510:8; 4577:7; 4578:4
**seem** [1] - 4595:10
**sees** [1] - 4446:18
**Sefalo** [1] - 4504:2
**SEIFAN** [3] - 4444:15; 4475:1; 4481:2
**selected** [2] - 4473:3; 4538:15
**self** [1] - 4480:16
**sell** [12] - 4530:20, 22; 4533:24; 4542:4, 8; 4566:24; 4569:10; 4570:4, 16; 4583:16
**selling** [4] - 4569:19; 4570:6, 9
**send** [2] - 4479:23; 4502:1
**sender** [1] - 4480:2
**sending** [1] - 4480:7
**sends** [1] - 4480:1
**sense** [7] - 4519:14; 4577:25; 4616:23; 4622:21; 4638:7; 4644:12, 16
**senses** [1] - 4501:12
**sent** [9] - 4480:5; 4508:9; 4519:4, 7; 4526:5, 9; 4527:3; 4565:6; 4577:7
**sentence** [10] - 4450:5; 4498:12; 4545:10; 4567:4, 6; 4568:4, 6; 4598:16; 4606:22; 4611:21
**sentenced** [2] - 4450:4; 4611:6
**sentencing** [3] - 4450:3, 18; 4611:7
**separate** [3] - 4457:17; 4470:21; 4474:8
**separation** [2] - 4504:19, 24
**September** [6] - 4535:1; 4536:16; 4567:15; 4568:15
**series** [7] - 4464:18; 4485:18; 4486:1; 4542:21; 4557:14; 4576:19; 4632:9
**seriously** [1] - 4593:11
**serve** [1] - 4564:23
**served** [2] - 4451:14; 4610:23
**services** [1] - 4454:4
**set** [5] - 4474:8; 4539:23; 4552:5; 4561:23; 4600:16
**sets** [1] - 4552:1
**setup** [1] - 4459:19
**seven** [4] - 4543:15; 4560:19; 4570:6; 4579:1
**several** [3] - 4447:18; 4459:13; 4610:21
**severe** [1] - 4617:23
**sex** [2] - 4502:25; 4503:22
**sexual** [2] - 4500:22; 4504:16
**shapes** [1] - 4463:9
**Shapiro** [1] - 4444:23
**share** [1] - 4471:22
**shared** [2] - 4624:10, 19
**SHARKEY** [235] - 4444:18; 4445:6; 4446:21; 4451:2, 8, 24; 4452:4, 9, 12, 16, 19, 22, 25; 4453:9, 11, 13, 25; 4454:22; 4456:3; 4461:9, 13, 21; 4463:16; 4464:10, 17; 4465:12; 4466:2, 5, 9, 14, 20, 24; 4467:1, 9, 11, 14, 21; 4468:7, 19; 4469:4, 8, 11; 4480:23; 4481:11; 4482:6, 18, 21, 24; 4483:3, 7, 10, 12, 20; 4485:17, 25; 4486:17; 4487:11, 21; 4489:14, 20, 22; 4491:1, 12, 16, 21; 4492:1, 6, 14; 4507:23; 4511:2; 4512:5; 4513:5; 4514:23; 4516:4; 4518:3; 4519:5, 24; 4520:9, 21; 4521:11, 22; 4522:14; 4525:4; 4526:19; 4527:11, 13; 4528:11, 18; 4529:2; 4531:6, 8; 4532:9, 18; 4534:20; 4536:10, 15; 4537:16, 23, 25; 4538:16; 4539:24; 4540:3, 6; 4541:1; 4542:25; 4543:3;

4544:18; 4545:1, 4, 9, 12, 14, 16; 4546:1, 6, 10, 12, 15, 18, 24; 4547:6, 10, 14, 16, 23; 4548:5, 8, 11, 17, 22; 4549:10, 12, 14, 17, 23; 4550:1, 6, 9, 11, 15, 18, 24; 4551:2, 5, 8, 10, 12, 15; 4552:14, 17, 21; 4553:6, 10, 12, 23; 4554:2, 19, 22; 4555:10, 14, 17, 19, 23; 4556:15, 18, 20; 4557:8, 11, 14, 16, 20, 23; 4558:12, 18, 22; 4559:4, 12, 22; 4560:3, 5, 23; 4561:8; 4562:24; 4563:3, 14; 4584:2; 4585:15; 4588:6; 4592:16; 4595:3, 25; 4598:3; 4601:8; 4604:4; 4605:6, 11; 4606:1; 4607:6, 10; 4608:12, 14; 4610:16; 4612:14, 17-18; 4613:4, 11; 4614:8; 4624:23; 4626:13, 19; 4629:23; 4634:3; 4637:22; 4640:19; 4642:13, 15, 24; 4643:2, 6, 13; 4644:8; 4645:10, 13; 4646:6; 4647:16, 22, 25; 4648:6, 12, 16, 18, 22, 25; 4649:4
**Sharkey** [1] - 4596:12
**shave** [5] - 4582:13, 17; 4591:17, 20; 4592:9
**shaving** [1] - 4592:13
**sheet** [1] - 4549:5
**shell** [1] - 4566:17
**Shiavo** [1] - 4445:8
**shingled** [1] - 4579:18
**shipped** [1] - 4565:4
**shirt** [3] - 4594:14, 17
**shoot** [1] - 4495:10
**shop** [2] - 4617:4, 9
**shopping** [2] - 4627:15
**shops** [1] - 4566:3
**short** [2] - 4454:20; 4541:3
**shorter** [1] - 4507:14
**shortly** [1] - 4460:5
**shot** [1] - 4622:6
**shotgun** [1] - 4622:6
**shots** [1] - 4581:23
**show** [11] - 4454:9; 4458:24; 4476:5, 12; 4514:5; 4515:21; 4536:25; 4545:1; 4546:6; 4550:25; 4635:21
**showed** [4] - 4504:22; 4510:5; 4552:2; 4632:16
**showing** [7] - 4449:9; 4457:22; 4518:12; 4535:20; 4551:11, 19
**shown** [2] - 4487:19; 4547:14
**Shown** [5] - 4456:10; 4486:5; 4535:23; 4540:7, 25
**shows** [2] - 4537:2; 4562:4
**siblings** [1] - 4493:3
**sic** [1] - 4603:17
**Sicarro** [2] - 4446:25; 4558:19
**sick** [4] - 4618:14; 4629:8; 4631:24
**sign** [4] - 4476:5, 12; 4503:11; 4545:22
**signature** [13] - 4544:23; 4545:5, 11-13, 15, 19, 24; 4546:2, 25; 4547:3; 4552:4; 4638:3
**signatures** [2] - 4546:23; 4549:2
**signed** [10] - 4504:21; 4542:22; 4544:22; 4545:20; 4546:4; 4549:5, 7-8; 4553:13; 4638:2
**silence** [1] - 4487:25
**similar** [1] - 4454:15
**similarly** [5] - 4473:6; 4477:16, 25; 4480:18; 4507:25
**simple** [2] - 4542:7, 20
**sinking** [1] - 4581:19
**SIS** [2] - 4469:18, 22
**sisters** [2] - 4493:4; 4615:8
**sit** [9] - 4461:1; 4492:20; 4556:1; 4560:2; 4576:24; 4577:19; 4579:5; 4618:4; 4646:4
**sit-down** [1] - 4560:2
**sitting** [6] - 4501:21; 4539:6; 4577:20; 4610:4; 4619:19
**situation** [3] - 4592:2; 4594:16; 4606:20
**six** [9] - 4543:14; 4546:25; 4549:6; 4560:19; 4567:5; 4582:16; 4611:20, 23
**six-year** [1] - 4611:20
**sixty** [1] - 4450:18
**sizable** [1] - 4562:20
**small** [5] - 4500:4; 4505:23; 4535:12; 4574:3; 4615:6
**smiling** [2] - 4459:15, 24
**smitten** [1] - 4494:15
**Sneakers** [3] - 4517:9; 4602:20; 4609:1
**sneakers** [2] - 4609:3, 6
**so-called** [2] - 4449:21; 4450:23
**sober** [2] - 4571:6
**soccer** [1] - 4499:6
**social** [2] - 4446:23; 4580:5
**socialize** [1] - 4580:10
**socialized** [2] - 4499:19; 4630:10
**socializing** [1] - 4499:16
**sold** [12] - 4530:24; 4531:14; 4535:3; 4566:10; 4569:12; 4583:13, 15; 4584:6, 9-10; 4589:22
**soldier** [9] - 4514:10; 4515:10; 4516:21; 4518:1; 4525:16; 4527:6; 4589:7; 4604:17
**sole** [1] - 4458:24
**solve** [2] - 4494:22; 4523:22
**solved** [1] - 4523:23
**someone** [19] - 4494:13; 4501:25; 4503:11, 24; 4504:14; 4506:25; 4508:19; 4525:23; 4531:17, 20, 23; 4569:23; 4581:14; 4606:17; 4618:5, 16; 4622:11; 4642:18
**sometime** [1] - 4566:6
**sometimes** [7] - 4463:24; 4480:1; 4489:19; 4491:17; 4572:10; 4576:24
**somewhat** [1] - 4449:1
**sons** [1] - 4510:9
**soon** [2] - 4452:23; 4632:23
**sooner** [2] - 4599:1
**sophisticated** [3] - 4523:6, 9, 11
**sorry** [17] - 4471:22; 4494:10; 4498:23; 4536:11; 4547:16; 4552:20; 4556:15; 4587:23; 4588:12; 4595:21; 4598:7; 4599:8; 4605:8; 4613:11; 4614:2; 4626:4
**sort** [11] - 4489:4; 4533:15; 4573:15; 4574:17; 4585:8; 4591:12; 4618:7; 4627:6; 4636:5; 4644:10
**sorts** [3] - 4505:20; 4574:17; 4630:24
**sought** [2] - 4455:4; 4550:19
**sound** [1] - 4562:21
**sounds** [1] - 4562:23
**source** [1] - 4550:17
**sources** [1] - 4554:12
**South** [5] - 4449:22; 4484:7; 4563:11, 25; 4565:8
**southern** [1] - 4449:12
**speaking** [1] - 4549:16
**special** [4] - 4469:23; 4473:8; 4635:1, 9
**Special** [3] - 4469:24; 4472:9; 4635:8
**Special-Ed** [1] - 4635:8
**specific** [1] - 4521:1
**specifically** [5] - 4445:25; 4447:18; 4473:7; 4475:12; 4506:22
**spell** [9] - 4483:17; 4492:10; 4528:23; 4532:13; 4537:20; 4556:11; 4563:7, 9; 4613:23
**spend** [10] - 4496:24; 4497:1, 4; 4499:13; 4501:17; 4505:13; 4506:6; 4507:9; 4601:24; 4638:23
**spending** [1] - 4507:6
**spent** [3] - 4493:10; 4498:21; 4507:3
**spinal** [3] - 4573:10; 4617:23
**spine** [1] - 4617:24
**spoken** [4] - 4458:8; 4632:6, 9; 4640:5
**spot** [1] - 4577:23
**sprawling** [1] - 4462:23
**spread** [1] - 4499:6
**spring** [3] - 4488:6; 4489:9
**stairs** [1] - 4622:14
**stalking** [1] - 4594:4
**stand** [30] - 4458:13; 4461:22; 4513:4; 4546:11, 13, 17, 20; 4548:15; 4552:13; 4553:15; 4574:11; 4586:5, 11-12; 4596:3, 5, 7, 11; 4597:16-18, 20, 24-25; 4601:1; 4607:1, 5, 9; 4613:13
**stand-up** [2] - 4597:24
**standing** [2] - 4613:15; 4646:5
**stands** [1] - 4521:14
**staple** [1] - 4457:18
**stapled** [3] - 4457:12, 16; 4551:6
**staples** [1] - 4552:23
**start** [3] - 4566:2; 4646:7, 11
**started** [5] - 4488:5; 4513:16; 4561:24; 4565:3; 4615:1
**starting** [3] - 4618:14; 4645:5
**Stassi** [1] - 4448:5
**state** [19] - 4448:4; 4483:17; 4492:10; 4497:12, 14, 20, 24; 4507:23; 4511:5; 4528:23; 4532:13; 4556:11; 4563:7; 4568:22-24; 4576:10; 4581:2; 4613:22
**State** [3] - 4537:20; 4563:9; 4611:13
**statement** [8] - 4455:11, 15; 4456:15; 4457:1, 10; 4543:6; 4551:16
**statements** [6] - 4542:22; 4549:21; 4552:2; 4554:8; 4555:5; 4624:24
**Staten** [1] - 4581:24
**STATES** [3] - 4444:1, 3, 11
**States** [5] - 4444:5, 14, 16; 4449:13; 4568:24
**station** [3] - 4493:12; 4496:3, 15
**stations** [1] - 4493:10
**stay** [3] - 4457:10; 4593:25; 4619:3
**stayed** [2] - 4611:12; 4623:2
**stenography** [1] - 4445:1
**step** [1] - 4492:4
**steps** [1] - 4491:19
**stick** [5] - 4499:25; 4500:6, 9; 4505:15; 4631:18
**still** [8] - 4463:10; 4503:17; 4504:19;

4506:3; 4626:9, 11; 4627:17; 4646:2
**stink** [1] - 4537:10
**stole** [3] - 4446:1; 4523:3
**stolen** [3] - 4558:18; 4567:16, 25
**stop** [5] - 4497:13; 4520:2; 4619:2, 6
**store** [1] - 4627:15
**stories** [4] - 4494:20; 4577:3; 4590:12, 14
**storming** [1] - 4582:4
**story** [6] - 4504:11; 4505:11; 4564:12; 4591:17; 4608:11
**straight** [1] - 4573:20
**straightened** [1] - 4504:7
**Street** [8] - 4444:18; 4529:19; 4533:1; 4563:11, 25; 4564:2, 19; 4628:17
**street** [4] - 4484:8, 10; 4618:25; 4628:6
**stricken** [1] - 4556:25
**strike** [3] - 4505:18; 4514:24; 4591:9
**striking** [2] - 4445:7; 4450:21
**strong** [3] - 4494:9; 4644:18
**stubborn** [1] - 4458:12
**stuck** [3] - 4500:5, 13; 4508:17
**study** [1] - 4567:5
**stuff** [12] - 4486:25; 4487:7; 4509:10; 4579:15; 4585:5; 4619:20; 4627:19; 4631:2; 4632:1; 4635:11; 4637:14
**Subic** [1] - 4565:5
**subject** [1] - 4454:7
**submit** [1] - 4559:14
**submitted** [2] - 4454:7; 4475:13
**subpoena** [2] - 4451:13; 4530:1
**subscription** [2] - 4508:25; 4509:9
**successfully** [1] - 4567:8
**suffered** [1] - 4617:23
**sufficient** [2] - 4446:19; 4554:18
**sufficiently** [1] - 4547:11
**Suffolk** [6] - 4567:20, 23; 4568:8; 4572:22, 24
**suggested** [2] - 4553:23; 4576:16
**sum** [2] - 4461:5; 4463:4
**summation** [1] - 4461:5
**summations** [3] - 4462:24; 4644:14, 16
**summer** [9] - 4488:6; 4489:9; 4498:25; 4519:2, 7; 4527:16; 4613:3
**summing** [1] - 4645:23
**Sunday** [9] - 4486:7, 11; 4488:23; 4502:2; 4508:22; 4631:18, 20
**super** [2] - 4500:3; 4522:18
**superiors** [1] - 4590:16
**superman** [1] - 4498:1
**supply** [1] - 4544:10
**support** [2] - 4583:13, 15
**suppose** [1] - 4485:23
**supposed** [5] - 4504:24; 4570:8; 4588:16; 4591:24
**supposedly** [2] - 4455:25; 4581:1
**surprised** [1] - 4502:13
**surveillance** [3] - 4451:4; 4453:13; 4488:17
**survival** [2] - 4500:11
**suspected** [1] - 4639:15
**suspended** [1] - 4567:6
**sustain** [2] - 4446:20; 4447:19
**Sustained** [2] - 4607:7; 4608:15
**sustained** [9] - 4491:2, 13, 18, 22; 4492:2; 4507:18, 22, 24; 4528:10
**swear** [2] - 4528:19; 4613:14
**switch** [1] - 4461:6
**sworn** [10] - 4463:14; 4483:15; 4492:8; 4513:11; 4528:22; 4532:12; 4537:19; 4556:10; 4563:6; 4613:19
**system** [2] - 4583:8, 10

## T

**table** [1] - 4459:19
**tables** [1] - 4574:25
**tagged** [1] - 4589:22
**tail** [2] - 4600:10
**tail-end** [2] - 4600:10
**takers** [1] - 4574:19
**talks** [2] - 4455:15; 4550:4
**Tamper** [1] - 4454:14
**tape** [4] - 4465:8; 4467:3; 4473:11; 4483:8
**Tape** [3] - 4465:13; 4482:23; 4483:11
**tape-recorded** [1] - 4473:11
**tapes** [4] - 4467:6; 4473:19; 4474:7; 4635:21
**Tara** [1] - 4593:19
**targets** [1] - 4495:10
**tears** [1] - 4577:22
**tech** [1] - 4454:3
**technically** [1] - 4622:22
**techniques** [1] - 4449:18
**teeth** [2] - 4505:24; 4633:17
**telegraph** [1] - 4565:4
**telephone** [3] - 4452:15; 4467:22
**teller** [3] - 4494:13; 4495:16; 4496:4
**teller's** [1] - 4496:2
**tellers** [1] - 4496:3
**ten** [9] - 4541:6; 4543:19; 4585:17, 20; 4586:4; 4598:24; 4599:1
**Ten** [1] - 4447:9
**tenancy** [2] - 4533:12; 4534:12
**territories** [1] - 4449:14
**territory** [1] - 4448:23
**terrorist** [2] - 4449:23, 25
**terrorists** [1] - 4449:20
**terrorize** [1] - 4448:20
**testified** [53] - 4446:14; 4458:19; 4463:14, 17; 4469:12; 4471:2; 4472:6; 4475:3, 12; 4476:15; 4477:3; 4478:6; 4479:5, 11; 4483:16; 4488:23; 4492:9; 4513:11, 16, 25; 4519:1; 4522:21; 4523:2, 12, 14; 4524:4, 19, 22; 4526:24; 4528:22; 4532:12; 4537:19; 4544:20; 4552:13; 4556:10; 4563:6; 4587:13; 4588:7; 4593:7; 4595:19; 4596:3, 17, 21; 4598:8, 12, 15; 4607:16; 4609:16; 4612:19; 4613:19; 4615:18; 4640:25; 4642:7
**testify** [10] - 4465:5; 4491:11; 4554:25; 4559:1, 8-9; 4588:25; 4595:11; 4596:11; 4640:12
**testifying** [5] - 4511:21; 4518:3; 4552:16; 4605:11; 4606:8
**testimony** [18] - 4446:24; 4458:4, 9, 23; 4475:23; 4511:17; 4523:15; 4539:7; 4540:4, 9; 4546:7; 4549:25; 4551:1; 4556:24; 4561:5; 4640:5; 4645:21
**THE** [343] - 4444:11; 4445:3; 4446:8; 4447:2; 4451:7, 18, 23; 4452:1, 10, 14, 18, 21, 23; 4453:7, 10, 12, 22; 4454:5, 9, 16; 4455:17; 4456:2, 4, 11, 13, 18, 22; 4457:12, 14, 16, 19, 22; 4458:7, 11, 15, 22; 4459:8, 11, 21; 4460:4; 4461:1, 11, 20, 22; 4462:1; 4464:16, 25; 4465:7; 4466:13, 15, 25; 4467:4, 7, 10, 12, 25; 4468:11, 13, 22; 4469:6; 4475:2; 4480:25; 4481:3, 6, 9, 13-15; 4482:1, 5, 16, 20; 4483:1, 5, 9, 17-18; 4485:22; 4486:19; 4487:4, 10, 13, 17, 20, 24; 4489:15, 25; 4491:2, 13, 18, 22; 4492:2, 4, 10, 12; 4507:18, 22, 24; 4508:5, 11, 16; 4509:5, 13; 4510:2, 17, 22; 4511:1, 4, 11; 4512:1, 6; 4513:3, 8; 4514:24; 4515:21; 4518:4, 6, 8; 4519:6, 14, 25; 4520:12, 23; 4521:12, 14, 23; 4522:16; 4525:21; 4526:20, 22; 4527:10, 24; 4528:1, 7, 10, 13, 16-17, 19, 23, 25; 4531:7; 4532:7, 13, 15; 4536:13; 4537:15, 20, 22; 4538:13; 4540:2, 5, 23; 4541:6; 4542:21; 4543:2, 4; 4544:5-10, 12-13, 15-16, 25; 4545:2, 7, 11, 13, 15, 18, 20, 22-25; 4546:3, 8, 11, 14, 16, 21; 4547:2, 8, 11, 15, 17; 4548:3, 6, 10, 16, 21; 4549:8, 11, 13, 15, 22, 24; 4550:3, 8, 10, 13, 16, 22, 25; 4551:4, 6, 9, 11, 14, 16, 19, 21-23, 25; 4552:1, 6, 9, 11, 15, 18; 4553:3, 9, 11, 13, 18, 25; 4554:10, 14, 18, 20, 24; 4555:7, 12, 16, 18, 20, 24; 4556:5, 11-13, 16, 19; 4557:4, 9, 12, 15, 18, 21, 25; 4558:1, 6, 14, 20-21, 24-25; 4559:11, 14, 17; 4560:2; 4561:1, 6; 4563:1, 7, 9, 11; 4576:9, 16; 4582:21; 4585:16, 19; 4586:3, 6, 10; 4587:3, 8; 4588:8; 4590:18; 4591:8; 4592:17; 4596:1; 4598:5; 4599:7; 4601:9; 4605:7, 13, 15; 4606:2, 4, 6, 10, 12-15; 4607:7, 15; 4608:15; 4609:9; 4610:17; 4612:15; 4613:6, 9, 14, 22, 25; 4614:2, 5; 4625:24; 4637:6, 11, 21; 4640:20; 4642:12, 19-23; 4643:1, 3, 8, 11, 15; 4644:3, 18; 4645:2, 7, 12, 14; 4646:4, 8, 17
**theft** [1] - 4500:18
**themselves** [6] - 4480:8; 4487:17; 4553:5; 4597:6; 4612:12
**theory** [1] - 4448:7
**therapy** [2] - 4585:12; 4595:8
**therefore** [2] - 4450:24; 4646:14
**therewith** [1] - 4560:15
**they've** [1] - 4645:16
**thinks** [1] - 4455:22
**third** [2] - 4543:20; 4584:24
**Thomas** [1] - 4475:12
**thousand** [1] - 4536:22
**threaten** [1] - 4622:21
**threatened** [4] - 4502:10; 4530:9; 4534:9
**threatening** [4] - 4513:23; 4533:19; 4594:3; 4623:17
**threats** [1] - 4504:15
**three** [19] - 4447:6; 4457:6; 4463:7; 4488:12; 4508:23; 4543:9; 4544:22;

4564:18; 4567:22; 4568:7, 11; 4572:9; 4573:16; 4579:8; 4584:22; 4621:22
**three-floor** [1] - 4621:22
**throughout** [2] - 4583:13; 4589:4
**Thursday** [4] - 4461:5; 4463:3; 4644:21; 4645:3
**ticket** [4] - 4633:21, 23; 4634:2
**tied** [1] - 4582:5
**tier** [1] - 4472:22
**timing** [1] - 4644:23
**tired** [12] - 4576:23; 4577:10, 18; 4581:10; 4587:14, 19; 4609:17
**tiredness** [1] - 4577:10
**Tobacco** [1] - 4566:25
**today** [14] - 4449:11; 4462:14, 19; 4491:11; 4511:17; 4595:10; 4600:23; 4607:1, 5, 9; 4608:7; 4640:6; 4642:2
**today's** [4] - 4445:4; 4459:12; 4647:6, 8
**together** [28] - 4457:12, 16, 18; 4460:5; 4463:1, 3; 4473:19, 25; 4474:1; 4492:25; 4494:24; 4499:25; 4500:5, 10, 13; 4501:17; 4502:4; 4507:3; 4508:23; 4522:1; 4524:23; 4551:7; 4585:12; 4595:17; 4614:22; 4615:7; 4630:8
**toilet** [1] - 4618:4
**Tom** [3] - 4466:13; 4600:15; 4605:9
**Tommy** [10] - 4517:9; 4519:8, 11; 4526:16; 4600:7, 23, 25; 4601:1; 4602:20; 4608:25
**tomorrow** [10] - 4461:4; 4462:16, 20; 4559:21; 4643:5, 15; 4644:7, 25
**tonight** [1] - 4559:20
**tons** [2] - 4633:19
**took** [11] - 4458:20; 4459:4; 4529:16; 4567:3, 14; 4573:21; 4579:11; 4595:4; 4623:21; 4627:14
**top** [6] - 4529:19; 4543:6; 4545:4, 12; 4550:20; 4621:23
**tops** [1] - 4570:17
**torturer** [1] - 4448:18
**total** [3] - 4469:17; 4536:20; 4570:6
**totally** [2] - 4582:1; 4593:7
**touch** [1] - 4638:4
**tough** [3] - 4588:3, 17; 4633:8
**tour** [1] - 4565:2
**towards** [5] - 4486:25; 4507:15; 4533:16; 4576:13; 4580:24
**towels** [1] - 4633:19
**toy** [1] - 4495:10
**trade** [2] - 4497:3; 4566:4
**trafficking** [1] - 4569:8
**training** [1] - 4565:4
**transcribed** [1] - 4469:1
**TRANSCRIPT** [1] - 4444:10
**transcript** [12] - 4445:1, 16; 4455:6; 4464:12, 21, 23; 4466:11; 4467:23; 4468:9, 20, 25
**transcripts** [5] - 4464:20; 4465:3; 4482:13; 4632:16; 4635:21
**transfer** [2] - 4635:7, 10
**transferred** [1] - 4471:18
**transferring** [1] - 4635:7
**Transit** [1] - 4532:22
**treated** [1] - 4508:12
**Tree** [42] - 4451:15; 4453:3; 4529:9; 4530:6; 4531:3, 15; 4533:1; 4534:13, 24; 4535:6; 4536:1, 21; 4538:22; 4539:7, 18, 25; 4542:3, 11, 15, 20, 22; 4544:21, 23; 4545:5; 4548:2, 12; 4549:20; 4550:21; 4551:17; 4553:2, 10, 14; 4554:5, 15; 4561:11, 19; 4614:14; 4617:10; 4620:4; 4628:11
**trial** [13] - 4445:13; 4447:4; 4449:19; 4459:19; 4491:7; 4498:8; 4509:11; 4558:2; 4567:1; 4572:24; 4637:19; 4645:24; 4646:10
**TRIAL** [1] - 4444:10
**tribute** [2] - 4450:9
**tried** [3] - 4542:8; 4635:10
**tries** [1] - 4521:20
**trim** [1] - 4504:16
**trouble** [2] - 4453:21; 4578:17
**troubled** [1] - 4494:14
**troubles** [2] - 4494:20; 4624:20
**truck** [1] - 4618:13
**true** [4] - 4453:24; 4467:7; 4476:8; 4485:14
**trunk** [1] - 4633:19
**truth** [6] - 4512:3; 4581:6; 4591:14; 4595:12; 4606:18
**truthful** [1] - 4640:10
**truthfully** [1] - 4640:12
**trying** [13] - 4494:21; 4503:17; 4521:16; 4524:16; 4542:17; 4589:21; 4594:15; 4595:2, 4; 4611:1; 4622:21; 4635:3
**turn** [1] - 4577:16
**turned** [3] - 4542:15; 4611:2, 6
**turning** [2] - 4524:15; 4634:17
**TV** [1] - 4499:3
**twice** [1] - 4584:21
**Two** [1] - 4459:11
**two** [42] - 4450:4; 4455:3; 4456:20; 4457:17; 4459:6; 4482:10; 4492:24; 4493:4; 4496:3; 4497:8; 4498:21; 4499:14; 4503:7; 4510:9; 4513:5; 4542:9; 4543:7, 10, 12, 15, 17, 21, 24; 4550:2; 4560:17; 4564:6; 4573:16; 4577:21; 4578:19; 4579:8; 4581:25; 4584:10; 4605:4, 17; 4608:22, 25; 4615:10; 4620:13; 4643:2
**two-page** [4] - 4543:8, 10, 12, 15
**type** [5] - 4449:23; 4589:18; 4592:24; 4635:4
**typed** [2] - 4550:23; 4638:3
**types** [2] - 4499:23; 4580:21

## U

**U.S** [1] - 4566:13
**umbrella** [5] - 4633:16; 4634:4, 7
**unattached** [2] - 4552:7, 9
**unaware** [1] - 4488:20
**unbelievable** [1] - 4622:7
**unclear** [1] - 4454:24
**uncomfortable** [1] - 4459:13
**under** [9] - 4463:10; 4514:21; 4518:23; 4538:11; 4540:19; 4547:8; 4567:6; 4583:5
**underboss** [1] - 4515:4
**underneath** [1] - 4621:23
**understood** [1] - 4505:12
**unfortunately** [1] - 4459:19
**Unit** [1] - 4472:9
**unit** [22] - 4463:24; 4484:9, 11; 4529:12, 15, 18, 20, 22; 4530:20, 22, 25; 4531:14, 18, 21, 24; 4533:5, 24; 4534:2; 4535:25; 4537:1; 4620:9; 4621:22
**UNITED** [3] - 4444:1, 3, 11
**United** [5] - 4444:5, 14, 16; 4449:13; 4568:24
**units** [4] - 4470:4; 4472:19; 4484:6; 4625:10
**Univeristy** [1] - 4493:20
**University** [1] - 4538:5
**unknown** [1] - 4482:25
**unmarked** [2] - 4543:20
**unrelated** [1] - 4455:12
**unrestrained** [2] - 4449:1; 4459:24
**unsophisticated** [1] - 4523:12
**unsubstantiated** [1] - 4559:6
**up** [78] - 4446:12; 4448:15, 17; 4451:3; 4454:2, 21; 4456:19, 24; 4459:20; 4461:5; 4463:4, 9; 4471:11; 4472:12; 4492:19, 21-23; 4496:4; 4498:22; 4504:22; 4505:4, 16, 18; 4510:13, 23; 4511:6, 25; 4516:1, 4; 4529:23; 4558:12; 4564:3; 4565:11; 4571:8; 4573:20; 4577:3, 10; 4578:5; 4579:2, 4-5; 4582:10; 4585:8; 4587:4; 4589:23; 4597:16-18, 20, 24-25; 4599:7; 4600:15; 4605:7, 9; 4610:8; 4614:3; 4615:3, 7; 4617:11; 4618:4; 4621:4; 4622:14, 16; 4623:12; 4636:22; 4637:19; 4641:24; 4644:25; 4645:8, 23; 4646:5
**upbringing** [1] - 4492:24
**upset** [6] - 4581:22; 4592:10; 4596:24; 4616:16; 4622:12
**upstairs** [1] - 4533:11
**usage** [1] - 4562:16
**usual** [1] - 4644:4
**utilization** [1] - 4449:6

## V

**valet** [1] - 4577:20
**Valley** [1] - 4493:20
**valuable** [1] - 4462:25
**valued** [1] - 4578:18
**various** [1] - 4513:25
**vehicle** [3] - 4458:18
**veracity** [1] - 4542:14
**verify** [1] - 4491:19
**vicious** [1] - 4449:25
**victims** [1] - 4451:16
**video** [3] - 4446:23; 4451:4; 4453:14
**Viet** [3] - 4565:10, 18
**Vietnamese** [1] - 4565:8
**view** [4] - 4445:10; 4447:22; 4448:8; 4463:1
**VIN** [1] - 4567:17
**Vinnie** [1] - 4515:8
**Vinny** [3] - 4603:6, 19
**violated** [5] - 4593:13, 16, 21, 23; 4594:7
**violation** [4] - 4569:2; 4593:22;

4594:21; 4611:22
**violence** [4] - 4584:16; 4585:11; 4595:8
**Viot** [1] - 4603:17
**Virginia** [1] - 4564:1
**visibility** [1] - 4503:8
**visit** [16] - 4470:24; 4473:19; 4474:15; 4475:13, 20; 4476:4, 15, 18, 22; 4477:1, 4; 4627:22, 25; 4628:3; 4631:13
**visited** [6] - 4475:17; 4488:11; 4627:23; 4628:7, 10; 4631:4
**visiting** [3] - 4470:7, 9, 15
**visitor** [11] - 4475:18, 24; 4476:23, 25; 4477:16, 19; 4519:4, 8; 4631:7
**visitors** [1] - 4476:1
**visits** [2] - 4470:12, 23
**voice** [4] - 4492:19; 4498:22; 4516:4; 4587:4
**voir** [1] - 4486:18
**voluntarily** [2] - 4610:22; 4611:3
**voluntary** [1] - 4612:4
**VR** [1] - 4475:19

## W

**wagon** [1] - 4496:15
**wait** [2] - 4505:4; 4642:13
**waited** [2] - 4495:24
**waiting** [1] - 4454:19
**waives** [1] - 4453:19
**waiving** [1] - 4453:20
**walk** [9] - 4470:24; 4486:22; 4502:14; 4506:2, 4, 23; 4611:3, 19; 4618:3
**walked** [2] - 4505:23; 4507:10
**walking** [3] - 4501:21; 4573:7
**walks** [1] - 4618:3
**wall** [1] - 4496:5
**wants** [2] - 4481:11; 4542:15
**war** [1] - 4565:10
**War** [1] - 4565:11
**washes** [1] - 4574:24
**watching** [3] - 4574:8; 4593:3; 4610:4
**water** [24] - 4535:12, 16; 4536:3, 16, 20, 24; 4539:18; 4544:5; 4545:7; 4561:12, 15, 18, 21, 23; 4562:2, 6, 9, 12, 16; 4581:18; 4625:2, 4, 8, 11
**WDAC** [1] - 4493:12
**weapon** [2] - 4566:7
**weapons** [1] - 4566:10
**wedding** [2] - 4616:8, 17
**week** [8] - 4455:2; 4508:23; 4539:6; 4572:10; 4573:16; 4575:12; 4579:1; 4629:5
**weeks** [3] - 4497:8; 4505:5; 4523:3
**WEINSTEIN** [1] - 4444:11
**welcome** [2] - 4528:16; 4645:20
**welding** [1] - 4611:18
**Westchester** [1] - 4493:7
**whereby** [1] - 4606:17
**wherein** [1] - 4544:21
**WHEREUPON** [1] - 4646:20
**white** [12] - 4492:6, 15; 4499:21; 4500:4; 4502:24; 4503:2, 13, 15; 4507:14; 4510:11; 4527:14; 4572:24
**White** [4] - 4451:25; 4452:5; 4490:2; 4492:12
**whole** [9] - 4471:19; 4483:7; 4501:15; 4564:9; 4589:16; 4600:17; 4618:6; 4637:13, 16
**wife** [13] - 4564:2; 4579:3; 4584:16, 18, 24; 4585:13; 4593:16, 20, 23; 4594:19; 4595:5; 4617:12; 4622:13
**wild** [1] - 4604:6
**Willet** [1] - 4506:13
**willing** [1] - 4550:3
**window** [1] - 4579:18
**wine** [1] - 4579:6
**wise** [11] - 4506:8, 14, 22, 25; 4507:1, 4; 4508:12, 17; 4589:18; 4590:8; 4646:9
**wise-guy** [2] - 4589:18; 4590:8
**wishes** [1] - 4454:21
**withdraw** [3] - 4513:6; 4521:17, 21
**withdrawn** [8] - 4524:18; 4532:3; 4561:17; 4624:23; 4626:13, 19; 4629:23; 4634:3
**WITNESS** [37] - 4483:18; 4492:12; 4528:16, 25; 4532:15; 4537:15, 22; 4544:5, 7, 9, 12, 15; 4545:20, 23, 25; 4551:21, 23; 4552:1, 9; 4555:7; 4556:12; 4557:25; 4558:20, 24; 4563:9, 11; 4586:6; 4596:2; 4605:15; 4606:12, 14; 4614:2, 5; 4640:20; 4642:20, 22; 4647:2
**witness** [81] - 4446:23; 4451:9, 13, 25; 4453:1; 4454:3; 4458:6, 13, 18, 24; 4461:9, 11, 14, 22; 4462:8, 11; 4463:13; 4465:5; 4467:6; 4481:4; 4485:25; 4486:5; 4492:5; 4513:3, 10; 4528:17, 19, 21; 4532:8, 11; 4535:23; 4537:18; 4538:13-15; 4540:7; 4542:2; 4544:19; 4545:18; 4547:14, 18, 23; 4548:14, 16, 20-21; 4549:11, 13, 18; 4551:1; 4552:13; 4553:15; 4555:24; 4556:9, 18-19, 22; 4557:3, 6, 13; 4558:25; 4559:5, 7, 13; 4563:2, 5; 4586:5, 11-12; 4587:4; 4606:1, 8; 4613:9, 14; 4642:23
**Witness** [3] - 4481:5; 4613:8, 13
**witness'** [3] - 4540:15; 4546:7; 4549:25
**witness's** [4] - 4487:9; 4489:21, 24; 4598:4
**witnesses** [26] - 4446:11, 14; 4451:15, 20-21; 4453:3; 4462:10; 4481:6; 4489:10, 13, 17-18, 23; 4490:20, 24; 4491:4, 6, 9-10, 14; 4643:1, 4; 4644:6
**WL-185727** [1] - 4447:5
**woke** [1] - 4622:15
**woman** [4] - 4579:9; 4621:25; 4622:9; 4626:5
**word** [2] - 4589:20; 4590:5
**words** [2] - 4502:24; 4608:2
**wore** [1] - 4495:15
**worker** [1] - 4529:6
**workout** [1] - 4579:10
**works** [2] - 4520:5
**world** [1] - 4523:7
**worried** [2] - 4503:15; 4607:11
**worse** [2] - 4618:9
**worth** [1] - 4544:23
**wrap** [2] - 4542:6, 8

## Y

**yard** [9] - 4510:5, 8; 4573:5; 4574:6, 8; 4617:5; 4619:7, 21
**year** [18] - 4446:19; 4486:7; 4498:20; 4526:5; 4527:4, 14-15; 4530:23; 4562:4, 11, 21; 4564:19; 4565:22; 4568:21; 4571:16; 4588:22; 4611:20; 4617:14
**years** [61] - 4469:13, 16-17; 4484:1, 5; 4498:21; 4499:14; 4529:14, 17; 4531:2; 4533:2, 23; 4534:12; 4542:12; 4544:22; 4546:2, 6, 25; 4548:2, 13; 4549:3, 7, 21; 4554:9; 4560:7, 16, 18; 4561:21, 25; 4562:1, 10; 4564:6, 8, 11, 16-17; 4565:21; 4567:5; 4570:5; 4571:11; 4573:12; 4583:16; 4588:20, 23; 4589:2; 4598:24; 4599:1-3; 4611:23; 4614:12; 4615:24; 4617:14; 4620:15; 4646:10
**yesterday** [16] - 4445:15; 4446:10; 4454:19; 4463:17; 4464:7; 4466:6, 21; 4467:18; 4468:4, 16; 4471:2; 4472:7; 4475:3; 4477:3; 4479:5; 4644:24
**YORK** [1] - 4444:1
**York** [21] - 4444:6, 17, 21, 24; 4449:16; 4484:3; 4508:25; 4509:8; 4510:24; 4511:6; 4529:8; 4532:22, 24; 4543:25; 4547:19; 4555:4; 4556:4; 4562:14; 4563:12; 4566:3; 4611:13
**young** [14] - 4494:15; 4500:3; 4502:24; 4507:5; 4515:22; 4578:18; 4588:14, 18; 4589:1; 4604:7; 4615:1; 4634:11
**younger** [1] - 4493:4
**yourself** [6] - 4475:4; 4575:6; 4583:13; 4612:11; 4626:18; 4635:15
**youth** [1] - 4564:5
**youthful** [1] - 4567:7

## Z

**Ziploc** [3] - 4639:7, 10, 18
**Zuccaro** [2] - 4603:21