```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - X
 3
     UNITED STATES OF AMERICA,  :
 4                                        08 CR 76
 5          -against-                United States Courthouse
 6                               :   Brooklyn, New York
 7   CHARLES CARNEGLIA,
 8            Defendant.
                                 :   March 4, 2009
 9                                   9:00 o'clock a.m.
     - - - - - - - - - - - - - - X
10
                          TRANSCRIPT OF TRIAL
11               BEFORE THE HONORABLE JACK B. WEINSTEIN
                 UNITED STATES DISTRICT JUDGE, and a jury.
12
     APPEARANCES:
13
     For the Plaintiff:      BENTON CAMPBELL
14                           United States Attorney
                             BY:  ROGER ANSON BURLINGAME
15                           MARISA M. SEIFAN
                             EVAN NORRIS
16                           Assistant United States Attorneys
                             225 Cadman Plaza East
17                           Brooklyn, New York 11201
18   For the Defendant:      KELLY J. SHARKEY, ESQ.
                             26 Court Street
19                           Brooklyn, N. Y. 11242
20
                             CURTIS JORDAN FARBER, ESQ.
21                           350 Broadway
                             New York, N. Y. 10013
22
23   Court Reporter:         Henry R. Shapiro
                             225 Cadman Plaza East
24                           Brooklyn, New York
                             718-613-2509
25
```

1    Proceedings recorded by mechanical stenography, transcript
     produced by CAT.

2

3              THE COURT:  Any applications?

4              MS. SHARKEY:  Yes, Judge.

5              THE COURT:  Yes.

6              MS. SHARKEY:  Your Honor, the defense has subpoenaed

7    a Lieutenant Hanlon to appear in court this morning.  Kevin

8    McMahon testified and I'm showing the Court one of the

9    photographs in evidence on the DiBono murder, Government

10   Exhibit 40 C.

11             The gist and the testimony of Mr. McMahon was that

12   these were -- this was a unique opportunity that Mr. McMahon

13   was able to see the odd way in which Mr. DiBono was depicted

14   inside the car and that he in fact pushed Mr. DiBono's legs

15   back.

16             When I asked the crime scene officer whether or not

17   he testified at a prior trial and put these photographs in

18   evidence he had no -- he said, no, I didn't.  I don't have

19   any memory of that.

20             Lieutenant Hanlon actually testified and put this

21   photo into evidence at the Patsey Conti and Francesco

22   Graziano trial in '93, the John Gotti trial in '92, and I

23   showed him this photograph this morning.

24             He says, yes, I don't remember what exhibit number

25   it was, but I was a beat cop in a lower Manhattan precinct, I

1  responded to the scene, I remember DiBono's body being

2  depicted that way, I put that photograph into evidence.

3       We want to call him to say that this photograph was

4  put in evidence at a trial, at two trials in the early  90's,

5  and I will tell you the link, the relevant link is McMahon

6  like I said has put himself at the scene. Said he was an

7  eyewitness to the incident and the picture in the jury's mind

8  is, he must really know, because he was the one that moved

9  the legs here.

10      McMahon also testified that he was jury fixing

11  during those times, he was present at the trials, so McMahon

12  would have presumably had the opportunity to see this

13  photograph, so our testimony with Lieutenant Hanlon is in and

14  out, were you a precinct cop in the early  90's --

15      THE COURT:  I don't understand what this has to do

16  with this case.  Maybe you can make it clear to me.

17      MS. SHARKEY:  I apologize.  My failure. The DiBono

18  murder is one of the racketeering acts.  Kevin McMahon was

19  the eyewitness to the DiBono murder and plead guilty.  Kevin

20  McMahon testified that he placed Louie DiBono's legs in that

21  position.

22      THE COURT:  I recall.

23      MS. SHARKEY:  Our contention is that Kevin McMahon

24  was never there to view it.

25      THE COURT:  What is that based on?

1          MS. SHARKEY:  Kevin McMahon never came forward with

2   any testimony or has ever been implicated over the course of

3   decades --

4          THE COURT:  What does that have to do with this

5   case?

6          MS. SHARKEY:  It has everything to do with the case.

7          THE COURT:  McMahon can be called or not called by a

8   prosecutor in any other case. What is the difference that

9   McMahon was not called in another case have to do this

10  case?

11         MS. SHARKEY:  I guess, I'm failing to explicate it

12  correctly.

13         McMahon says he's at the scene and the reason -- one

14  of the reasons the jury could infer he's at the scene is

15  because he testified that he turned the deceased legs back

16         THE COURT:  I know that.

17         MS. SHARKEY:  Our position is and has been -- I

18  crossed McMahon, he's a liar. He wasn't at the scene, and

19  he's making this up.

20         THE COURT:  What does the fact that this picture was

21  used in another trial --

22         MS. SHARKEY:  Because he had the ability, he was at

23  this trial. He was jury rigging this trial in the early

24  90's --

25         THE COURT:  What does that have to do with the fact

1 that this was or was not used in another case.  I don't see

2 it.

3          MR. FARBER:  The government went to great length to

4 have Mr. McMahon demonstrate, if you recall --

5          THE COURT:  I know all about that.

6          MR. FARBER:  They did that for the purpose of

7 bolstering the credibility.

8          THE COURT:  Because he then described what this

9 picture shows.

10          MR. FARBER:  By describing it he was placing himself

11 or the government was allowing him to -- it was bolstering

12 his statement, yes, I was in the garage.

13          THE COURT:  I described this and this picture is

14 consistent with my description is what the government

15 contends.

16          What has that got to do with the fact that this

17 picture was or was not used in another case?

18          MR. FARBER:  He could have been free to see this

19 picture back in the 1990s, when he's going on today or when

20 he testified at this trial and demonstrating the legs curled

21 up, he's saying the only way he knows that because he was

22 there as opposed to --

23          THE COURT:  That he might have. There is no evidence

24 that he was there.

25          MS. SHARKEY:  He testified that he fixed the jury's,

1  he was present and followed the jurors in two cases where the

2  picture was put in evidence.

3          THE COURT:  There is no evidence that he saw any of

4  at that trial.

5          You had him for cross-examination.

6          MS. SHARKEY:  He was crossed rigorous low.

7          THE COURT:  Did you show him the picture and say,

8  did you see this before?

9          MS. SHARKEY:  No, I did not.

10          THE COURT:  Why do I have to listen to this

11  irrelevant testimony of a police officer who says it was used

12  in another trial?

13          MS. SHARKEY:  Because the defense has a

14  constitutional right to present a defense.  If I dropped the

15  ball and didn't show this to McMahon on cross--.

16          THE COURT:  You want McMahon recalled, so that you

17  can ask him.  You can.  That is the only basis, was he

18  present at the trial did he see it.

19          MS. SHARKEY:  He testified on direct he was present

20  at the trial and followed the jurors.

21          THE COURT:  I don't remember present at the trial. I

22  recall followed the jurors.  Look at the transcript, did he

23  say I was at the trial or I followed the jurors from

24  outside?

25          MS. SHARKEY:  I will ask Ms. Borge to do a

1 transcript search on that right now.

2         Respectfully, that should not be the dispositive

3 point, and the defense -- if you think it's weak evidence, so

4 be it

5         THE COURT:  It is not evidence at all.

6         MS. SHARKEY:  Yes, it is respectfully.

7         THE COURT:  Respectfully, it isn't any evidence at

8 all.

9         MS. SHARKEY:  Direct impeachment or impeachment, if

10 it's not direct of an eyewitness --

11         THE COURT:  It's not evidence at all.

12         MS. SHARKEY:  Respectfully it is.  Reasonable minds

13 can disagree.

14         THE COURT:  Where is he?

15         MR. BURLINGAME:  The only purpose was to testify the

16 DiBono murder was charged previously, which your Honor ruled

17 time and time again --

18         THE COURT:  This is a little different.  You can

19 make a record.  Bring him in, put him on.

20         MS. SHARKEY:  In front of you or the jury?

21         THE COURT:  In front of me.  Unless you have some

22 indication that this McMahon was present and saw these

23 pictures, it's of no concern that it was used at another

24 trial.

25         MS. SHARKEY:  If I could finish?

1          MR. BURLINGAME:  I think I started. We provided the

2    pictures to defense on August 27, of 2008 --

3          THE COURT:  I know that.

4          MR. BURLINGAME:  It was obvious throughout the

5    McMahon testimony that we were relying on this picture --

6          THE COURT:  I understand that.  I saw you lineup the

7    seats which were used to demonstrate it before the trial and

8    everybody in the courtroom knew what you were going to do,

9    including defense counsel.

10         MR. BURLINGAME:  McMahon's 302's, which was

11   provided, show that he was involved in the jury tampering for

12   the prior trial and he put the body in this position.

13   Defense Counsel had every opportunity to do this --

14         THE COURT:  I'm not interested in opportunity, I'm

15   interested in relevancy.

16         MS. SHARKEY:  I will get the lieutenant and ask the

17   paralegal to do the search.

18         THE COURT:  Is McMahon available?

19         MR. BURLINGAME:  They can call him.

20         THE COURT:  Where is he?

21         MR. BURLINGAME:  He's in a Woodsec facility out of

22   state.

23         THE COURT:  If you want him, we will recall him.

24         MR. FARBER:  While we're waiting, there is another

25   matter.

1          THE COURT:  I was addressing defense counsel.  If

2    you want the witness recalled because your co-counsel

3    indicates she may have not fully conformed to her obligation

4    by questioning the witness about whether he saw this picture,

5    you can recall him.  I'll have the government produce him.

6          MR. FARBER:  I will ask Ms. Sharkey what she wishes

7    to do.

8          My concern, the note that juror number two had sent

9    to the Court yesterday morning.  I went home yesterday still

10   very troubled by what she said to the Court about believing

11   after consulting Mr. Carneglia she perceived and he and I

12   would look up at the jury box and smile.

13         This has been a very lengthy trial. There has been a

14   lot of evidence.  I'm concerned that the juror, despite all

15   that has come forward in terms of evidence, may have formed

16   some sort of opinion based on other things than evidence that

17   may affect her ability to sit and judge this case fairly.

18         If the Court would, I would appreciate an inquiry of

19   the entire panel, not that juror in particular, to ask them

20   if there is anything that they observed in the courtroom

21   regarding, from either table to make it more balanced, that

22   would affect their ability to sit fairly here, maybe advise

23   them there is not only a right but a duty for an attorney to

24   consult with his client during the course of the trial and

25   that the jury should perceive no negative inference this from

1 the fact that the two of them would talk during the course of

2 the trial.

3           THE COURT:  Denied.

4           The jury observes everything that goes on and it's

5 expected to.

6           The fact that the defendant's demeanor is observed

7 is not the basis for a new trial or for any objection. If it

8 were, there could never be a case tried in this country in

9 which the defendant has a right to sit during the trial.

10          MR. FARBER:  I'm not asking for a new trial. I'm

11 more concerned about juror number two.

12          THE COURT:  Juror number two, is not going to be

13 questioned separately.

14          I told them in the charge they are to consider all

15 of the evidence in making their decision.  I'm not going to

16 tell them, ignore what you have seen happen in the Court.

17 They observe everybody's demeanor.

18          MS. SHARKEY:  Can I jump in. That is not evidence.

19 I've been sitting --

20          THE COURT:  It's an interesting point.  Make that

21 point and you can argue it on appeal. It's a fascinating

22 point that I raised when I was a teaching repeatedly with my

23 class and if we exclude it, what the sharp eyed jury is

24 observing, we could never have a trial because they are

25 observing what the defendant reacts to when somebody

1   testifies, they are observing how the defendant dresses, they

2   are observing how the defendant has his hair combed, as this

3   defendant has changed his whole demeanor by trimming his

4   beard and coming well coiffured and appearing to be as he has

5   every right to, perfectly calm and consulting rationally with

6   his attorney.

7        You, as experienced Counsel, have dressed him

8   appropriately. I'm sure that you told him not to react and to

9   a large measure these trials are play acting in which you

10   control this kind of thing.

11        I'm not going to get involved in this moras by

12   saying this is excluded and they can't do whatever a jury

13   does.

14        MS. SHARKEY:  But I think --

15        THE COURT:  Your motion for whatever, a new trial--.

16        MS. SHARKEY:  No.

17        THE COURT:  Motion to tell the jury that they

18   shouldn't consider what the defendant and counsel were doing,

19   are you making that motion?

20        MS. SHARKEY:  No.

21        THE COURT:  What is your motion?

22        MS. SHARKEY:  For the Court to bring in juror two --

23        THE COURT:  I will not single out a juror. Juror two

24   was not speaking for herself, but other jurors.

25        MS. SHARKEY:  Respectfully, I have had this happen a

1   number of times and frequently when a -- you don't have to

2   have counsel present. We'd prefer to be present --

3           THE COURT:  I will not do it with or without

4   counsel.

5           MS. SHARKEY:  She's sending out notes --

6           THE COURT:  One note.

7           MS. SHARKEY:  Mr. Farber is a very the nice guy --

8           THE COURT:  I'm not interested in Mr. Farber or

9   anything about him.  I'm only interested in the ability of

10  the jury to observe the interaction between counsel and

11  defendant.  They do it and they have to do it.

12          MS. SHARKEY:  Obviously-- obviously it's having an

13  affect on her --

14          THE COURT:  It's not obviously --

15          MS. SHARKEY:  It's having a negative affect.

16          THE COURT:  It's not obvious at all.

17          MS. SHARKEY:  With all the testimony about jury

18  tampering in this case this kind of note is a live wire. It

19  is --

20          THE COURT:  Not to me.

21          MS. SHARKEY:  To me it is.

22          THE COURT:  I'm making the decision.

23          MS. SHARKEY:  A bad sign from the defenses point of

24  view.

25          THE COURT:  I will not make the inquiry.

1          MR. FARBER:  Could I note one of my observations,

2     after that note came out I made a conscious effort, and I

3     asked Mr. Carneglia not to make eye contact, I would glance

4     up once in a while to see if I could read what juror number

5     two was doing, and I don't believe I was paranoid when I say

6     I believe she was staring intently over at defense table at a

7     repeated basis scowling.

8          THE COURT:  If you have found a method of describing

9     what is in the mind of any single juror, or the jury panel

10    generally, I commend you. You have a bright career ahead of

11    you.  Nobody I know in practice or on the bench has ever been

12    able to do that. I will not do it.

13         I put in my charge that they are to base their

14    decision on the evidence and the evidence only.  I will

15    repeat that to them.  That is as far as I will go.  It's a

16    fascinating point. If you can get the Court of Appeals and

17    there are, I think, a couple of judges up there who are

18    amenable to this argument, to reverse on the ground, I

19    congratulate you.  I take my hat off to you.

20         It's a point that I have been wondering about for 65

21    years now. Thank you very much.

22         MS. SHARKEY:  Judge, we have the lieutenant in the

23    courtroom.

24         THE COURT:  Swear the lieutenant.

25         (Followed on next page.)

1  M I C H A E L    H A N L O N,

2        having been first duly sworn, was examined

3        and testified as follows:

4           THE CLERK:  State your full name pan spell it

5           THE WITNESS:  Lieutenant Michael Hanlon,

6  H A N L O N.

7           THE COURT:  Good morning, Lieutenant.

8           Ask the Lieutenant the questions about this

9  photograph, please, so that we can get on with it.

10  DIRECT EXAMINATION

11  BY MS. SHARKEY:

12  Q    I want to show you a photograph that I showed you

13  earlier this morning when you came in pursuant to subpoena?

14  A    Thank you.

15  Q    Government Exhibit 40-C in evidence.  Lieutenant, on

16  October 4th of 1990, you were a patrol cop in a precinct in

17  lower Manhattan, right?

18  A    Yes, I was.

19  Q    And as part of your normal course of duties, you

20  responded to the basement of the World Trade Center, correct?

21  A    Yes.

22  Q    And you participated in activities concerning securing

23  the scene, right?

24  A    Correct.

25  Q    And you were present when the car in which -- you were

1  present when Louie DiBono's body was discovered, correct?

2  A    Not when the body was discovered, the body was

3  discovered by Port Authority Police, I believe.

4  Q    You were present when NYPD responded and I think ESU

5  responded to open the car, right?

6  A    I don't recall ESU responding, but I did respond.

7  Q    And did you recall observing Mr. DiBono in the car?

8  A    Yes, I do.

9  Q    And did you subsequently -- is this how Mr. DiBono was

10  depicted in the car?

11  A    Yes.

12  Q    And you subsequently were called to testify in two

13  trials in the early '90s, right?

14  A    Yes.

15  Q    And one of those times was for John Gotti, Sr., right?

16  A    Correct.

17  Q    And one of those trials was for Pascal Conti, Anthony

18  Vinsulo and Francisco Graziano?

19  A    I don't recall those names, but from reviewing my

20  previous testimony, that's what is written in there.

21  Q    Your memory is refreshed you were called to testify at

22  two previous trials?

23  A    Yes.

24  Q    One of the things you did during the course of that

25  testimony was enter this photograph into evidence, right?

1   A    Yes.

2        MR. BURLINGAME:  Brief voir dire, Judge.

3        MS. SHARKEY:  That would be the length and breath.

4            THE COURT:  Be brief.

5   VOIR DIRE EXAMINATION

6   BY MR. BURLINGAME:

7   Q    Do you recall when you entered the photograph into

8   evidence what form it came in, just a crime scene photograph?

9   A    Yes.

10  Q    And were you aware if Kevin McMahon was in the courtroom

11  at the time?

12  A    No.

13  Q    Were you aware if he had an opportunity to view these

14  photographs?

15  A    No.

16  Q    Your recollection is about a sheet of paper sized

17  photograph was entered into evidence?

18  A    Yes.

19           THE COURT:  Usual four by eleven or eight by eleven

20  glossy?

21           THE WITNESS:  I believe.

22           THE COURT:  Was it eight by eleven?

23           THE WITNESS:  Yes.

24           THE COURT:  But not a black card like this?

25           THE WITNESS:  No.

1        THE COURT:  Thank you.

2        MS. SHARKEY:  You can go outside, but you cannot

3   leave the building.

4        THE COURT:  Why not?

5        MS. SHARKEY:  Have you decided that he can't

6   testify?

7        THE COURT:  There is no basis for his testimony.

8        MS. SHARKEY:  Respectfully, the defendant has a

9   right, whether or not it's strong evidence in the Court's

10  opinion, but he has a constitutional right to present a

11  defense.  This case has been on trial by the government for

12  about four months.  Their man -- main cooperating witness,

13  Kevin McMahon, testified --

14        THE COURT:  You wish McMahon recalled so you can ask

15  him if he saw the picture, then if you do, I will allow this

16  testimony or read to the jury.

17        MS. SHARKEY:  Can I speak to McMahon under oath on

18  the record outside of the presence of the jury, just as this

19  inquiry was done?

20        THE COURT:  I don't think so.

21        MS. SHARKEY:  Respectfully, Judge, why would that

22  be?

23        THE COURT:  Let me think about it. Okay you can.

24        MS. SHARKEY:  Then I would ask McMahon to come in.

25  We have an inquiry outside the presence of the jury.

1    THE COURT:  We'll have to meet tomorrow.  Today is

2  Wednesday.

3    MR. BURLINGAME:  I don't understand. If you want to

4  call a witness, you don't get a preview of the witness'

5  testimony.  If they want --

6    THE COURT:  She hasn't had an opportunity to examine

7  the witness.

8    MR. BURLINGAME:  They had two hours.

9    THE COURT:  Outside of the presence of the jury.

10    MR. BURLINGAME:  Why is she entitled to examine the

11  witness outside of the presence of the jury?

12    THE COURT:  She's entitled to prepare.

13    MR. BURLINGAME:  Which is why we provided the

14  photograph and McMahon's 302s detailing what his testimony

15  would be.

16    THE COURT:  How long will it take for McMahon to get

17  here, can we do it today or maybe come in tomorrow?

18    MR. BURLINGAME:  I would think tomorrow would be the

19  best case scenario.

20    It's impossible to make the BOP move that quickly.

21  You should order them to do it immediately.

22    MS. SHARKEY:  My suggestion would be that, we

23  don't have to drag the jury back and forth and put the

24  Marshal service on that, if McMahon is recalled, then we

25  do that Monday morning, take five minutes, prior to

1  summations

2          THE COURT:  Okay.

3          MR. BURLINGAME:  Why don't we let defense counsel

4  call all of the cooperating witnesses and put them back on

5  the stand, interrogate them under oath without the jury

6  present, and see if they can figure out some stuff that they

7  didn't catch the first time.

8          THE COURT:  It's an interesting suggestion. Let me

9  reflect on it overnight.

10          MR. BURLINGAME:  I understand defense counsel --

11          THE COURT:  Have McMahon here at 9:00 Monday.

12          MR. BURLINGAME:  When?

13          THE COURT:  9:00.

14          MR. BURLINGAME:  Monday.

15          THE COURT:  Correct.

16          MR. FARBER:  If I could just, I know the Court made

17  a ruling regarding the juror. Something else came to my mind.

18          THE COURT:  Brief it.

19          Bring in the jury.

20          MS. SHARKEY:  This is the electronic video link.

21          THE COURT:  Bring in the jury.

22          MS. SHARKEY:  I think Mr. Carneglia will be -- the

23  jury has to see this, I think the parties in the courtroom

24  kind of need to move away so that they can see this.

25          THE COURT:  Yes.

1        MS. SHARKEY:  Can Mr. Carneglia move to the end of

2   the table?

3        THE COURT:  Yes.

4        MR. BURLINGAME:  If the television can be moved

5   there, if it's possible.

6        THE COURT:  He has a connection.

7        MS. SHARKEY:  Could we move?

8        THE COURT:  Yes, everybody will separate so that we

9   can all see.

10       Bring in the jury.

11       MR. BURLINGAME:  Just to redress the other issue, I

12  would be happy to arrange a phone call with McMahon where he

13  can be placed under oath and we can do it by phone call.

14       THE COURT:  I think that would be very good. Talk to

15  the defendant.  If we have a confrontation problem, I need a

16  waiver.

17       MR. BURLINGAME:  Would you be willing to have him on

18  the phone?

19       MS. SHARKEY:  I would like to have him present.

20       MR. BURLINGAME:  I don't think Your Honor is bound

21  by a confrontation problem --

22       THE COURT:  I want to make a decision outside the

23  presence of the jury.

24       MR. BURLINGAME:  This, I imagine, would be quick,

25  could we do it Friday morning rather than getting in the way

1   of summation on Monday.

2           THE COURT:  I'm willing to do it if counsel are

3   willing to do it.

4           (Followed on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present.)

2          THE COURT:  Good morning, everybody. Be seated,

3     please. We're going to have what I understand will be a TV

4     presentation.

5          MS. SHARKEY:  This is examination of a witness from

6     Jamaica who is not present in court and we will explain the

7     reasons why he's not present in court today.  He has been

8     requested by defense counsel to appear and testimony on

9     behalf of Mr. Carneglia.

10    BY MS. SHARKEY:

11

12    Q    Can you hear me, sir?

13    A    Yes, ma'am.

14    Q    Can you see myself and the members of the jury?

15    A    Yes, ma'am.

16         THE COURT:  Swear him please.

17    M A U R I C E    K E L L Y ,

18         called as a witness, having been duly

19         sworn, was examined and testified as follows:

20         THE CLERK:  State your name for the record

21         THE WITNESS:  My name is Maurice Kelly.

22    DIRECT EXAMINATION

23    BY MS. SHARKEY:

24    Q    Where are you testifying --

25         THE COURT:  Have him spell it, please.

1    Q    Could you spell your name, please?

2    A    M A U R I C E; K E L L Y.

3    Q    Where are you testifying from, Mr. Kelly?

4    A    Kingston, Jamaica.

5    Q    How old are you, sir?

6    A    51.

7    Q    Where did you grow up?

8    A    Kingston.

9    Q    And are you married?

10   A    No, I'm not.

11   Q    Do you have any children?

12   A    Yes, I have two boys.

13   Q    How old are they, sir?

14   A    20 and 13.

15   Q    Mr. Kelly, so the members of the jury know, what

16   facility are you at, what's the name of the place you are at

17   giving your testimony here in New York?

18   A    It's a --

19   Q    I'm sorry.

20       Is it a commercial facility where you can give testimony

21   via electronic transmittal?

22   A    Yes, ma'am.

23   Q    Is it at the University in Jamaica?

24   A    No, ma'am.

25   Q    Is it at a business building, an office building in

1    Jamaica?

2    A    Yes, ma'am.

3    Q    Mr. Kelly, you can't talk to anybody during the course

4    of this testimony.  Are there other people in the room with

5    you?

6    A    The technician, yes.

7    Q    I think the Court would direct you if you had a question

8    to ask us but that you can't confer with somebody because

9    it's your testimony that the jury wants to hear, okay?

10   A    Yes, ma'am.

11   Q    How far did you go in school, sir?

12   A    Ninth grade.

13   Q    And where was that?

14   A    In Kingston.

15   Q    And what was it like growing up in Kingston?

16   A    Well, I grew up very quiet, I grew up in a poor family

17   so, you know, it wasn't really ups and downs.

18   Q    Mr. Kelly, after you left school in ninth grade what did

19   you do for a living?

20   A    I started doing cabinet making.

21   Q    For how long did you do that, sir?

22   A    Approximately ten years.

23   Q    Was that in Kingston or was it in the country?

24   A    In the country.

25   Q    Now, did you ever travel out of Jamaica prior today?

1  A    Yes, ma'am.

2  Q    And did you ever come to the United States?

3  A    Yes, ma'am.

4  Q    And when was the first time that you came to the United

5  States?

6  A    Sometime in 1990.

7  Q    And was that a pleasure trip, was that to visit family?

8  A    Yes, ma'am.

9  Q    Now, you came to the United States again, right?

10 A    Yes, ma'am.

11      MR. BURLINGAME:  Objection; leading.

12 Q    Did you come to the United States again after that trip?

13 A    Please repeat.

14 Q    Sure.  After you made that pleasure trip did you return

15 to the United States?

16 A    Yes, ma'am.

17 Q    And in 1994, did you come to Miami International

18 Airport?

19      MR. BURLINGAME:  Objection; leading.

20 A    Yes, ma'am.

21      THE COURT:  I will allow it.

22 Q    Tell the members of the jury what happened when you came

23 to Miami International Airport in 1994?

24 A    I was arrested for trafficking cocaine.

25 Q    And did you bring cocaine into the country?

1  A    Yes, ma'am.

2  Q    Was that the first time?

3  A    Yes, ma'am -- no, not the first time, sorry.

4  Q    How many times had you done it before?

5  A    Around four times.

6  Q    When you were arrested in 1994, were you indicted?

7  A    Yes, ma'am.

8  Q    Did you -- were you indicted for trafficking in cocaine?

9  A    Yes, ma'am.

10 Q    And did you plead guilty or go to trial?

11 A    I pled guilty.

12 Q    And that was in Florida State Court?

13 A    Yes, ma'am.

14 Q    Did you go to jail?

15 A    Yes, I get seven years sentence.

16 Q    Mr. Kelly, I'm ask you to slow down a little bit.  How

17 much time did you do in jail?

18 A    Approximately three and a half years.

19 Q    Were you deported?

20 A    Yes, ma'am.

21 Q    Were you told that you were not allowed to return to the

22 United States?

23 A    Yes, ma'am.

24 Q    Mr. Kelly, did you return to the United States?

25 A    Yes, I returned to the United States in 1999.

1   Q    And what date, sir?

2   A    January of 1999.

3   Q    And through what airport?

4   A    Philadelphia International Airport.

5   Q    And why were you coming back to the United States,

6   Mr. Kelly?

7   A    I was also trafficking drugs again.

8   Q    How much cocaine did you bring into Philadelphia

9   International Airport in 1999, sir?

10  A    Maybe two kilos.

11  Q    Were you arrested?

12  A    I was arrested.

13  Q    And Mr. Kelly, were you indicted?

14  A    Yes, ma'am.

15  Q    Did you plead guilty or go to trial?

16  A    I pled guilty.

17  Q    And what crimes did you plead guilty to, sir?

18  A    Trafficking.

19  Q    Did you also plead guilty to entering the country

20  illegally?

21  A    Yes, ma'am.

22  Q    And that would be because you had been previously

23  convicted of a felony, right?

24  A    Yes, ma'am.

25  Q    Where did you do your time?

Kelly-Sharkey/direct

1    A     Fort Dix, New Jersey.

2    Q     What year did you go to Fort Dix, New Jersey?

3    A     2000.  I think it was June 16th, I think, yes, 2000.

4    Q     And how many years, Mr. Kelly, did you spend at Fort

5    Dix?

6    A     Approximately seven years.

7    Q     And what is Fort Dix?

8    A     It's a federal institution.

9    Q     Now, when you went to Fort Dix, Mr. Kelly, did you have

10   a job?

11   A     Yes, ma'am, I did have a job in a carpenter shop.

12   Q     Would you tell the members of the jury what you did in

13   the carpenter shop?

14   A     Well, one of my jobs was to ---.

15   Q     Could you repeat that, the reporter did not pick it up.

16   A     One of jobs was unit maintenance.

17   Q     When you say unit maintenance, was it one of your jobs

18   to perform repair tasks on the different units?

19   A     Yes, ma'am.

20   Q     And did your position as a carpenter cause you to meet

21   new inmates coming into the facility?

22   A     Yes, ma'am.

23   Q     Now, in your seven years at Fort Dix, did you notice how

24   the inmates socialized?

25   A     Yes, ma'am.

1  Q    And how did the inmates, if they did, break out into

2  groups, into social groups?

3  A    They break out in ethnic groups.

4  Q    Do you know why that would be?

5  A    Like I would explain the Dominicans would speak to the

6  Dominicans, the Colombians would stick to the Colombians, the

7  Jamaicans a would stick to the Jamaicans and the Italian mob

8  would stick to the Italian mob.

9  Q    Was every Italian at Fort Dix part of the Italian mob?

10 A    No, ma'am.

11 Q    When you say the Italian mob sticks with the Italian

12 mob, describe for the jurors what you observed about that

13 group of inmates?

14 A    They were a very strong group and very cocky, they think

15 their money can buy everybody and just about anything, their

16 building was different, whenever they group together they are

17 noticeable because they would have coffee and snacks, you

18 know, entertain each other.

19 Q    Did they mix with individuals who were non-white very

20 often?

21 A    No, ma'am.

22 Q    Now, you said they had coffee.  Was there a particular

23 thing that that group of individuals did when one of their

24 own was about to get out of jail?

25 A    Then they get out of jail they would have a massive

1   party, you know, party for them. Other groups would do party

2   but not as large as theirs.

3   Q    Was there some resentment by individuals who weren't in

4   the Italian mob group of them?

5   A    Yes, ma'am.

6   Q    Why would that be, sir?

7   A    Because some people just don't like their behavior, so

8   they would resent them, they think they are better than

9   everybody else.

10  Q    Did there come a time when you met Charles Carneglia?

11  A    I met Charles Carneglia the very first day he came in.

12  Q    And under what --

13  A    I was brought in by a Jewish guy to fix his locker, for

14  repairs, because it was torn up, they strip the locker when

15  the inmate leaves, there were no sheets or nothing, so I had

16  to repair the locker.

17  Q    Would that be a normal thing for individuals, you

18  repaired their lockers?

19  A    Yes, ma'am.

20  Q    Mr. Kelly, did you become friends with Charles

21  Carneglia?

22  A    Yes, ma'am.

23  Q    Tell the members of the jury the sort of things you and

24  Charles would do?

25  A    We'd play a game of chess sometimes and play pinochle

1  and go inside and sit on the bench outside and sometimes we'd

2  walk, because he used to walk the track, I am not the walking

3  type, sometimes walking down --

4  Q    I will ask you to slow down. We can't hear you that

5  well.  Tell us again.  What kind of things you guys did?

6  A    We play chess together and pinochle and sit outside and

7  talk and after a couple of hours, and sometimes walk down to

8  his job to sign out.

9  Q    Mr. Kelly, in your seven years at Fort Dix, would you

10  see which individuals hung out or congregated with their

11  group?

12  A    Yes, ma'am.

13  Q    Did Charles Carneglia, during the course of his

14  incarceration, congregate with the Italian -- what is going

15  on over there?

16  A    I never seen --

17  Q    Mr. Kelly, I'm going to stop you. Who is talking to you

18  off camera?

19  A    Nobody is talking to me.

20  Q    We're hearing a voice.  It's my voice bouncing.  Sorry,

21  it's a little weird.

22        Mr. Kelly, when you were at Fort Dix with Charles

23  Carneglia, did you see him socialize with the Italian mob?

24  A    No, ma'am.

25  Q    Who did he hang out with?

1    A    He hung out with me, and another guys.

2    Q    Now --

3    A    I never seen him --

4    Q    Go ahead?

5    A    I never seen him with the mob.

6    Q    When you say you never seen him hang out, what do you

7    mean?

8    A    He just didn't hang out with them, he wasn't round them.

9    He was the opposite of them.

10   Q    What do you mean by them?

11   A    He was a quiet guy, he don't even talk that much, he was

12   an extremely a nice guy, just completely opposite the mob

13   guys. They always pushing themselves around, make themselves

14   be seen and Charles was the complete opposite of them, I

15   thought.

16   Q    Would you repeat that so the court reporter can hear?

17   A    Like I said, for a couple of years I thought Charles was

18   a Jew, because he wore this long beard and he was introduced

19   to me by a Jewish guy and it's customary for a Jew to

20   introduce their people and take care of them.

21   Q    Did the mob group at the prison throw Charles a going

22   away party?

23   A    No, ma'am.

24   Q    Now, Mr. Kelly, it has been a bit of an ordeal for you

25   to get to Kingston and testify electronically, right?

1   A    Yes, ma'am.

2   Q    Are you telling the truth?

3   A    I am telling the truth.

4   Q    Why have you put yourself out to testify for Charles

5   Carneglia?

6   A    Because Charles is truly a nice guy, I have never seen

7   him hang out with the mob guys. I see Charles basically every

8   day, every day, so I know in fact he has never hung out with

9   them, he never associated with them, because he's the

10  complete opposite of them.  If he had been with them, we

11  would not have been friends in the first place, because I

12  personally resent the mob guys because of their behavior.

13  Q    Are you receiving any money for this testimony,

14  Mr. Kelly?

15  A    No, ma'am.

16       MS. SHARKEY:  Thank you, sir.  The prosecutor is going

17  to ask you questions so you have to stay there, okay?

18            THE WITNESS:  No problem.

19            MS. SHARKEY:  Thank you, sir.

20  CROSS-EXAMINATION

21  BY MR. BURLINGAME:

22  Q    Good morning, sir.  Can you see me okay?

23  A    Yes, sir.

24  Q    Now, you say -- you testified you know for a fact that

25  Charles Carneglia was never associated with the mob, right?

1    A    Yes, sir.

2         MS. SHARKEY:  Objection.

3    Q    You testified that you knew for a fact that Charles

4    Carneglia was never associated with the mob, correct?

5    A    Yes, sir.

6    Q    And you said there was a mob group in the prison, right?

7    A    Yes, sir.

8    Q    What were the names of the guys in the mob group?

9    A    I never socialize with them, I wouldn't know that.

10   Q    And you said that the defendant hung out with a guy

11   named Sal?

12   A    Yes, sir.

13   Q    What was his last name?

14   A    Casciano.

15   Q    Do you know if he was a member of the Bonanno family or

16   associate of the Bonanno family?

17   A    Nobody ever told me that.  He didn't hang out with the

18   mob neither.

19   Q    You are not part of the mob, correct?

20   A    No, I'm not part of the mob.

21   Q    And Sal Casciano never told you that he was part of the

22   mob, right?

23   A    No, never come up.

24   Q    You don't know about him being part of the mob?

25   A    No.

1    Q    And was there a guy named Anthony who the defendant hung

2    around with?

3    A    I can't recall that name.

4    Q    Anthony Caponella?

5    A    I might have seen him, but I can't recall the name.

6    Q    You don't recall an Anthony Caponella?

7    A    No.

8    Q    You don't remember him hanging around with any Genovese

9    associates?

10   A    Can you repeat it?

11   Q    You don't remember him hanging around with any

12   associates of the Genovese family?

13   A    I don't know the Genovese family, if he hang around, he

14   never hang out with people who are mob guys.

15   Q    As far as you know?

16   A    Most of the guys -- what?

17   Q    As far as you know, correct?

18   A    As far as I know, yes.

19   Q    Have you ever heard the word Genovese family before?

20   A    No.

21   Q    Can you tell the jury what the five organized crime

22   families in New York are?

23   A    The what.

24   Q    The five organized crime families in New York, can you

25   tell the jury what those are?

1    A    I don't know.

2    Q    Can you name one of them?

3    A    I never associated with the mob, I wouldn't know that.

4    Q    Could you name one of the five families?

5    A    Can you speak up?

6    Q    Can you name one of the five organized crime families?

7    A    I told you I don't know. I never associate with mobs.

8    Q    You don't know who Tommy "Sneakers" Cacciopoli is?

9    A    No, I never associated with them.

10   Q    You didn't know that he was the defendant's captain in

11   the Gambino family?

12        MS. SHARKEY:  Objection.

13   A    Can you please repeat?

14        THE COURT:  Repeat the question.

15   Q    Is it correct to state that you didn't know that Thomas

16   Cacciopoli was the defendant's captain in the Gambino family?

17        THE COURT:  If.

18   Q    Did you know if Thomas Cacciopoli was the defendant's

19   captain in the Gambino family?

20   A    I don't know who you are talking about.  I have no clue.

21   Q    Do you know if Thomas Cacciopoli of the -- if the

22   defendant sent Thomas Cacciopoli a visitor's form in 2004?

23   A    I don't know what you are talking about, sir.

24   Q    Do you know --

25   A    We never discuss anything about the mob family.  Charles

1   never talk about the mob.

2   Q    He didn't talk about the --

3   A    I would have no --

4   Q    He didn't talk about the old mob versus the new mob?

5   A    He never -- we never spoke about the mob.  He has never

6   talked about the mob. He don't associate with them period.

7       I never seen him. If he had I wouldn't have talked to

8   him, he would be different.

9   Q    Your testimony is that you wouldn't --

10      MS. SHARKEY:  Could he finish his answer?

11      THE COURT:  Yes.

12      MS. SHARKEY:  Finish your answer, Mr. Kelly.

13  A    The mobs are very cocky, he was the complete opposite of

14  them.  He was a very humble old man.  He hardly spoke.

15  Moreover, everyone has a job, the mobs don't work, they get

16  the easiest job in the compound, they were in the housing

17  unit and pay somebody to do their job.

18      Charles had the nastiest job in the compound. He'd go to

19  his job every day. I walk with him sometimes to sign out. He

20  was the complete opposite of them.

21  Q    Your testimony, fair to say, if Charles Carneglia had

22  anything to do with the mob you would have had nothing to do

23  with him, correct?

24  A    Any time he was in prison with me, he did not associate

25  with them.

1  Q    You have no -- you have no idea whether he associated

2  with the mob before he got into prison, correct?

3  A    Before he got out?

4  Q    Before he got into prison?

5  A    I don't know anything about Charles before he got into

6  prison. I can't speak about before he got into prison.

7  Q    And you say he did hang out were a Sal Casciano guy,

8  right?

9  A    Sal was my friend too.  We all hung around --

10  Q    If you could answer my question.

11      MS. SHARKEY:  Objection; if he could finish the answer.

12      THE COURT:  No. Ask the question?

13  Q    Yes or no, Sal Casciano was one of the people that the

14  defendant hung out with while he was in jail?

15  A    Could you repeat?

16  Q    Yes or no, Sal Casciano was someone that the defendant

17  hung out with while you were in jail?

18  A    Yes, yes.

19  Q    And are you familiar with a person named Jackie Cavallo?

20  A    No, sir.

21  Q    Do you know if he is a soldier in the Gambino family?

22  A    I don't know who the Gambino family is.

23  Q    You don't know if he sent money to the defendant --

24  A    Excuse me, sir. Let me finish my answer. The Gambino

25  family never hung around there, so I never heard about them.

1   Just sitting down and talk.

2   Q    Is it fair to say you don't know anything about

3   organized crime, correct?

4   A    No. Can I repeat something?

5   Q    No, answer the question that I'm asking?

6        THE COURT:  I don't know why you keep objecting.  We

7   have a difficult situation and you are compounding it for the

8   defendant. Proceed with your questioning, please.

9   Q    If you could answer the questions that I'm asking, I

10  would appreciate it?

11  A    That's what I'm doing, sir.

12  Q    Is it fair to say you don't know anything about

13  organized crime, is that fair or not fair?

14  A    No, I don't.

15  Q    And do you know anything about the rules that govern

16  organized crime?

17  A    I just told you I don't know anything about organized

18  crime, so I wouldn't know.

19  Q    Are you aware if there is a rule when you join organized

20  crime you are a part of organized crime until you're dead.

21  Are you aware or not aware?

22  A    You're just telling me.

23  Q    Please answer the question, sir, aware or not aware?

24  A    I don't know.  I don't know anything about the organized

25  crime.

1   Q    Are you aware or not aware that as part of that oath,

2   you swear to kill anyone who tries to extricate themselves

3   from organized crime, aware or not aware?

4   A    I am not aware.  I don't know anything about organized

5   crime.

6   Q    And are you aware of a fellow named August Sclafani?

7   A    No, sir.  I don't know where you get those names from.

8   Q    If you could answer the question.

9   A    I never talk about --

10  Q    You can answer the question with a simple yes or no.

11  A    I want to explain so that you can understand.  You ask

12  me the same question over and over again.

13  Q    I'm asking you a new question, are you aware, do you

14  know of an individual name August Sclafani, yes or no?

15  A    I wouldn't know, no.

16  Q    That is a no.  Are you aware of whether -- if an

17  individual named August Sclafani is a captain in the Gambino

18  family, yes or no?

19  A    I don't know, sir.

20  Q    Are you aware if August Sclafani sent money to the

21  defendant in the last year while he was in prison, are you

22  aware of that, yes or no?

23  A    No.

24  Q    Now, sir, you are not testifying here today because you

25  are not allowed in the country, correct?

1    A    Yes, sir.

2    Q    And you were thrown out of the country in 1997,

3    correct -- correct?

4    A    I was deported in 2000 -- yes, I was charged in '97,

5    yes.

6    Q    When you were deported, did you sign a document saying

7    you understood you were not allowed to return to the United

8    States?

9    A    Yes, sir, I did.

10   Q    And you did return in '99, correct?

11   A    Yes, sir, I did.

12   Q    To traffic cocaine, correct?

13   A    Yes, I did.

14   Q    And you said in addition to the two times you got

15   arrested for trafficking in cocaine there were four times

16   that you got away with it, correct?

17   A    Yes, sir.

18   Q    Now, those four times, did you have to lie to get away

19   with it?

20   A    Repeat.

21   Q    How did you import the cocaine those four times?

22   A    How I import it?

23   Q    Yes.  The times that you were successful, tell the jury

24   how you imported the cocaine into the United States?

25   A    I brought it in.

1    Q    You smuggled it on your person?

2    A    Yes, I did.

3    Q    Now, did they ask you at customs whether or not you had

4    illicit materials on you?

5    A    No.

6    Q    Did you tell them that you were -- had some cocaine on

7    you?

8    A    I didn't do that.

9    Q    You didn't do that.

10        Did you travel under your own name?

11   A    The first time, yes.

12   Q    What about the other times?

13   A    I came back, I came back in a different name.

14   Q    You used a fake name.  When you told that fake name to

15   the person when you were leaving Jamaica did they know you

16   were lying?

17   A    I gave passports I didn't have to tell them anything, I

18   gave them a passport.

19   Q    Could they tell it was a fake passport?

20   A    They couldn't know unless I tell them.

21   Q    You don't consider that a lie to give somebody a fake

22   passport, that is not a lie to you?

23   A    It couldn't be a lie, I was not asked.  If you tell a

24   lie then I tell a lie. Nobody asked me anything about if that

25   is my real name.

Kelly-Burlingame/cross

1   Q    Your testimony is that in your mind traveling to the

2   United States with cocaine under a fake passports doesn't

3   involve any lying, is that your testimony?

4   A    I didn't testify, nobody asked me the question, this is

5   my name.  If I had been asked me is it your real name and I

6   said, yes, then I would be lying.  I did not tell a lie.  I

7   traveled under a fake passport and got away with it because

8   nobody suspects me of who I am.

9   Q    Right.  Your testimony is that in your mind that is not

10  a lie, that is what you just explained?

11  A    It's not a lie.  Nobody asked me the question. I think

12  you are lying, sir. I don't think you are traveling in your

13  right name.  Give them a passport and nobody say anything to

14  me, have a nice day, enjoy yourself.

15  Q    Did you think there was deceit involved there?

16  A    That has nothing to with lying.

17  Q    You were able to pass off a fake passport and no one

18  knew you were using a fake passport, right?

19  A    Still didn't say I'm lying. I have a fake passport that

20  doesn't mean I'm lying. I was not asked the question.  A lie

21  is something direct, you deceive somebody by when asking you

22  a question.

23  Q    Now, we've moved from lying and we're into deceiving

24  your word. Is it your testimony that it's not deceiving

25  somebody to give them a fake passport and pretend you are

1    somebody else when traveling with cocaine into the United

2    States, is that your testimony?

3    A    I can't understand I'm breaking the law.

4    Q    By --

5    A    But I did not lie.

6         THE COURT:  You made your point, moving to something

7    else.

8         MR. BURLINGAME:  Just to clarify this.

9    Q    That does or does not involve deceit, yes or no?

10   A    Repeat.

11   Q    In your mind does that involve deceit, handing somebody

12   a fake passport and pretending to be somebody else, yes or

13   no?

14   A    Nobody asked me, I gave a fake passport, which is

15   illegal, I didn't tell a lie, they didn't ask me if it was a

16   fake passport.  Nobody asked me.  They take my passport.

17   Have a nice day and I go on.

18        THE COURT:  Move to something else, please.

19   Q    Fair to say when you gave -- how many different people

20   did you give that passport to while traveling to the United

21   States on those four occasions that you were successful?

22   A    Jamaican immigration and American immigration and

23   customs.

24   Q    No one knew that you were deceiving them, correct?

25   A    Can you remember repeat, speak up.

1          MS. SHARKEY:  Objection.

2              THE COURT:  Move to something else.

3              MR. BURLINGAME:  This is a different point, Judge.

4              THE COURT:  It's essentially the same point.  Get on

5   with it.

6              MR. BURLINGAME:  He's good at it.

7              MS. SHARKEY:  Objection; move to strike.

8              THE COURT:  Move ahead.

9   BY MR. BURLINGAME:

10  Q    Were you never arrested the four times you were

11  successful, correct?

12  A    No, I never arrested.  Arrested --

13  Q    Arrested?

14             THE COURT:  Ask him if he knew he was committing a

15  crime when he came in and imported cocaine.

16  Q    Did you know you were committing a crime when you

17  entered the United States with cocaine on you?

18  A    Yes, that's why I conceal because I know I was

19  committing a crime.

20             THE COURT:  Did he know it was a crime to use a fake

21  passport?

22  Q    Did you know it was a crime to use a fake passport?

23  A    I said it's a crime.  I know it's a crime.

24  Q    And the times you were successful, no one was able to

25  detect you were committing a crime?

1    A    No.

2    Q    Now, sir, do you know if there's an extradition treaty

3    between the United States and Jamaica?

4    A    Yes, they do have one.

5    Q    So you took an oath you were to testify truthfully here

6    today, correct?

7    A    I can't hear, could you repeat?

8    Q    Hold on a second.

9         THE COURT:  Note for the record the witness is laughing

10   when no question is being asked.

11   Q    I just wanted to summarize your testimony, is it an a

12   fair characterization of your testimony you know absolutely

13   nothing about organized crime?

14   A    No, I don't know, I never hang around people who are in

15   organized crime.

16        MR. BURLINGAME:  Nothing further.

17        MS. SHARKEY:  Briefly, Judge.

18   REDIRECT EXAMINATION

19   BY MS. SHARKEY:

20   Q    Can you see me, Mr. Kelly.

21   A    Yes, ma'am.

22   Q    Did you know who were the organized crime inmates at

23   Fort Dix.

24        MR. BURLINGAME:  Objection, Judge, he testified.

25   A    Yes, I know them as a group.

1      THE COURT:  Sustained.

2      MS. SHARKEY:  Nothing further.

3      Thank you.

4      MR. BURLINGAME:  Move to strike his answer.

5      THE COURT:  Denied.

6      MR. BURLINGAME:  Can I recross?

7      THE COURT:  No.

8      Close the TV.

9      Call your next witness.

10      MS. SHARKEY:  The defense calls Frank Selvaggio.

11  F R A N K    S E L V A G G I O  ,

12      called as a witness, having been duly

13      sworn, was examined and testified as follows:

14      THE CLERK:  State your full name and spell it for

15  the record

16      THE WITNESS:  Frank Selvaggio; S E L V A G G I O.

17  DIRECT EXAMINATION

18  BY MS. SHARKEY:

19  Q    Good morning.  How old are you?

20  A    40.

21  Q    Are you married?

22  A    Yes.

23  Q    Do you have children?

24  A    I have two.

25  Q    How old are they?

1  A    My son Giovanni is four and my daughter Mabelina is

2  eight.

3  Q    Where did you grow up?

4  A    Howard Beach, Queens; born and raised.

5  Q    Where do you live now?

6  A    Howard Beach, Queens.

7  Q    Who did you live with growing up?

8  A    My mom and dad upstairs and grandparents downstairs.

9  Q    Who raised you Mr. Selvaggio?

10 A    My mom left when I was eight and I haven't seen her

11 since and my dad stayed in the house, but basically my

12 grandmother raised me since I am eight years old.  She has

13 been my confidant and mother.

14 Q    Is she alive now?

15 A    Yes, she's 88 years old.

16 Q    What do you do for a living?

17 A    I am a hairdresser.

18 Q    How long have you been a hairdresser?

19 A    Since approximately 19 years old.

20 Q    And where did you first start cutting hair?

21 A    One of my first jobs was on 101st Avenue in Ozone Park,

22 Queens.

23 Q    And would that be near what was known as the Bergen Hunt

24 and Fish Club?

25 A    Yes.

1   Q    Was there a sign on the Bergen Hunt and Fish Club?

2   A    No.

3   Q    Did you ever meet Charles Carneglia in the course of

4   your career as a hair cutter?

5   A    Yes.

6   Q    When did you first meet Charles?

7   A    He had come in for a haircut back in about 1992.

8   Q    And where was that?

9   A    That was in the hair salon on 101st Avenue in Ozone

10  Park, Queens.

11  Q    What was the name?

12  A    I don't recall.  It's such a long time ago, probably

13  some silly name.

14  Q    How long did you cut hair there?

15  A    For approximately, I would say, maybe little more than a

16  year and from there moved on, got a better job to make more

17  money to another salon.

18  Q    During your 20 years as a haircutter, have you moved

19  among different salons?

20  A    All boroughs, Brooklyn, Queens, Manhattan, Long Island.

21  Q    You said that you met Mr. Carneglia in 1992. That was as

22  his haircutter, correct?

23  A    Yes.

24  Q    Have you been cutting his hair ever since?

25  A    Ever since, yes.

Selvaggio-Sharkey/direct

1  Q    Now, when you first started cutting his hair, in the
2  early '90s, was that at the salon?
3  A    Yes, in the early '90s.  In the very beginning.
4  Q    Where did your connection as his haircutter continue
5  after you left that salon?
6  A    Well, when I had left the salon I approached Charles
7  afterwards we had built a kind of relationship, and asked him
8  if you would like me to still cut your hair, I could come to
9  your house if you would like and he said of course. He says,
10 you know, here's my address I'll give you a call on your day
11 off or when it's appropriate for you that you have time to do
12 it.
13 Q    That wasn't unusual, you did that with other customers?
14 A    Of course, especially family members.
15 Q    Now, Mr. Selvaggio, in early '90s, did Charles Carneglia
16 ever change his hair color?
17 A    Oh, yes, quite a few times.
18 Q    Could you tell the members of the jury what different
19 color hair Mr. Carneglia had and the circumstances of that?
20 A    Sure. The first time was in early part that I met him in
21 '92 on 101st Avenue a young girl had come into the salon and
22 says you will never believe it, Charles is walking down the
23 block, you cut his hair, and his hair is purple and I said,
24 you've got to be kidding, his hair was purple.  I ran outside
25 and here's Charles with the brightest purple, like the Joker

Selvaggio-Sharkey/direct

1   in Batman, it was hilarious, we joked about it.  I said what

2   happened, he said I used the box color that was left in the

3   closet, it probably expired and he says I put it on, you know

4   what, he says it's fine, people won't look at me and nobody

5   will talk to me they will just leave me alone, I won't have

6   to socialize with anybody.  I said you keep it like that you

7   will get your wish.  But on numerous occasions he seemed to

8   try different colors on his hair and would walk in the street

9   with different colors in his hair.

10  Q    Mr. Selvaggio, you said that you have been cutting

11  Mr. Carneglia's hair since '92?

12  A    Yes.

13  Q    Now, and you continued cutting hair throughout the '90s,

14  right?

15  A    Yes.

16  Q    How often would you see Charles Carneglia in connection

17  with that?

18  A    Approximately every two weeks, it would vary, depending

19  on my schedule or if he was busy.

20  Q    There would be times when he was away, correct?

21  A    Yes.

22  Q    Now, you cut his hair at his apartment after you left

23  that salon?

24  A    Yes.

25  Q    And where was that?

1  A    That was on Albert Road, I guess on the borderline of

2  Ozone Park.

3  Q    Modest apartment?

4  A    Very small modest apartment, yes.

5  Q    And did Charles Carneglia drink during that period

6  according to your observations?

7  A    Yes, during that time I had observed him drinking quite

8  often.

9  Q    When you say quite often, was he drunk?

10 A    Basically, yes, yes.

11 Q    And can you describe that a little bit for the members

12 of the jury, Mr. Selvaggio?

13 A    I could tell a person's personality when they are not

14 drinking, once you get to know someone, you can see

15 immediately when they are drinking.  He became more quiet,

16 more reserved, more to himself, opposed to the stereotyping

17 of someone drinking and being loud, just the opposite.

18 Q    Withdrawn?

19 A    Withdrawn, yes that would be a better word, yes.

20 Q    Now, you testified earlier that it wasn't unusual to cut

21 hair for family?

22 A    Yes.

23 Q    When you say family, are you referring to organized

24 crime?

25 A    No.

Selvaggio-Sharkey/direct

1   Q    What did you mean by that answer?

2   A    My family, immediate family and Charles' mother.

3   Q    Now, I would like to talk about that. Over the years,

4   did you develop a close relationship with Mr. Carneglia?

5   A    Yes, definitely, yes.

6   Q    And what did you do in relation to his mother, what did

7   he ask you to do in relation to his mother?

8   A    He asked me during the period of time he was not there

9   to go to his mother's house and cut her hair. I was more than

10  happy to do it and refused any payment to do it.

11  Q    Why would that be?

12  A    His mom reminded me of my grandmother, approximately,

13  not to far in age, and she was a very nice woman, I liked her

14  a lot. I still do.

15  Q    Mr. Selvaggio, how did your relationship Charles

16  Carneglia develop over the years?

17  A    It developed more into, obviously, he's a little older

18  than I am, more of he became more of an elder for me,

19  considering my father passed away in 2002 and a period of

20  time when he came back and earlier times he had always given

21  me advice when it came to immediate family matters, my

22  family, my grandmother and my dad, and other, you know things

23  in life, just things in general and I would speak to him, of

24  course, every two weeks and I would tell him what is going on

25  and he would ask me and he would give advice basically and I

1  felt that was -- made a closer relationship.

2  Q   Mr. Selvaggio, in the fall of 2001, were you aware of

3  any event that was happening in Charles' life?

4  A   Yes.

5  Q   What was that?

6  A   For my knowledge something was going on with another

7  gentleman, I wouldn't really call him a gentleman, that he

8  was going away to prison.

9  Q   Who is the gentleman you wouldn't call a gentleman?

10 A   Kevin McMahon, who I grew up with as a child in the

11 neighborhood.

12 Q   What did you know about Kevin McMahon?

13     MR. BURLINGAME:  Objection; foundation?

14        THE COURT:  I'll allow it.

15 Q   What did you know about Kevin McMahon?

16 A   He wasn't more or less like the guys that I grew up

17 with.  We were more first generation Italians, more into hard

18 working, and proving ourselves to be part of society and he

19 was more just a troublemaker and a liar basically. I didn't

20 like staying near him and he always had a story and I wasn't

21 into that.

22 Q   Have you ever been affiliated with organized crime?

23 A   No.

24 Q   Now, Mr. Selvaggio, in the fall of 2001, was Charles

25 drinking a lot?

1    A    Yes.

2    Q    Was that prior to his going to prison?

3    A    Yes.

4    Q    And did he discuss with you arrangements he was making

5    for his mom prior to being incarcerated?

6    A    Yes, of course.

7    Q    And what did he ask of you before he went to jail in

8    relation to his mom?

9    A    To take care of his mother's hair.

10   Q    Did you do that?

11   A    Of course, with pleasure.

12   Q    And did you ask anything of Charles in 2001 prior to him

13   going to jail?

14   A    Yes, I did.

15   Q    Would you tell the jury about that.

16        MR. BURLINGAME:  Objection?

17        THE COURT:  Let's hear what it was.

18        THE WITNESS:  Thank you, Your Honor.  I was working

19   in a salon in Staten Island.  I had made friends with a young

20   girl that was another hairdresser, she was pregnant at the

21   time, and she was also engaged. I became friends -- I would

22   say more of an acquaintance with her fiancee and we had gone

23   out to dinner and he was saying it was rough getting married,

24   she's having a baby, and push came to shove, he asked to

25   borrow money. I felt kind of sad.

Selvaggio-Sharkey/direct

1    I knew how it felt to get married, stressful, I lent

2  him the money, without any verbal agreement, without a

3  contract, without a paper signing, assuming that the girl

4  worked with me.

5    Well, I never got the money back over a period of

6  time he basically didn't answer phone calls, changed his

7  phone, she then left the job and there was always an excuse,

8  a week after week, and $1,200, believe or not, is quite a bit

9  of money for me supporting a family also and I didn't receive

10  the money, and I didn't know where to go.  Legally I felt I

11  had no obligation with no contract to get the money.  It was

12  my word against his.

13  Q    What did you do, who did you turn to for help?

14  A    I turned to Charles.

15  Q    Tell the members of the jury what happened.

16    MR. BURLINGAME:  Objection?

17    THE COURT:  I'll allow it.

18  A    I would go every two weeks and cut Charles' hair and I

19  mentioned what transpired and I was hoping I could take

20  advantage of my friendship with Charles at that time and he

21  kind of got drawn back a little bit when I asked him.

22  Q    What did you ask him to do and what did he say to you?

23    MR. BURLINGAME:  Objection?

24    THE COURT:  I will allow it.

25  A    I felt that maybe he could possibly talk to this person,

1 find this person at least, and at least speak to this person

2 to get my money back, because no other way was working and at

3 that point he seemed to get drawn back and he seemed to get

4 upset.

5 Q    What did he say to you at that time?

6      MR. BURLINGAME:  Objection; hearsay?

7      THE COURT:  I will allow it.

8 A    Well, there were quite a few things said.  He said

9 Frank, like, Frank, I'm upset with you, that you would think,

10 you know, that I could just go -- what did you think I was

11 going to do?  It went on where, Frank, I can't help you and I

12 kind of was like I said drawn back, I thought he could help

13 me, but he didn't.

14 Q    What words did you use about helping you with that on

15 that day that you had the conversation?

16 A    To be honest, words as if, he got up out of the chair

17 and says to me, everyone thinks I'm this gangster and I'm not

18 anymore, and I'm not part of what you might think things

19 could be done and he basically said I'm done with everything

20 and he raised his hands, you know, at that time and said I

21 was done.

22 Q    Was he mad at you?

23 A    He was mad, but Charles had a tendency to get a little

24 mad but five minutes later it was over and basically taught

25 me a lesson because then he turned an around and said, Frank,

1  you should not lend this bum the money, learn your lesson

2  from it. It's gone, it's lost, next time don't lend a dime to

3  anyone and don't feel sorry, because obviously he doesn't

4  feel sorry for you and your family.  Until this day I did not

5  get this money back from this person and I learned a lesson

6  that day, I never lent money in that excess to anyone ever

7  again.

8  Q    When Mr. Carneglia was incarcerated from the fall of '01

9  to the fall of '05.  How often did you see his mother?

10 A    Almost every month, month, two months, depending on how

11 his mother felt.

12 Q    When Mr. Carneglia came out of jail in the fall of '05,

13 did you resume cutting his hair?

14 A    Of course.

15 Q    Where did that take place?

16 A    That took place at his home.

17 Q    And is that where Jennie Carneglia, his mother, has a

18 house?

19 A    Yes, we'd go in the garage. Basically on a stool and a

20 stepping stool if you could say it was just a full garage

21 we'd do our thing in there.

22 Q    And is that a modest home or elaborate?

23 A    Very, very modest.

24 Q    And Mr. Selvaggio, was Charles drinking in the way he

25 was drinking before he went to jail?

1  A    No.  He -- as time went on, when he had come out, I

2  observed that he was a totally different person.

3  Q    What do you mean by that?

4  A    More organized, more -- even more concerned of every day

5  things that were going on in my life than before. He seemed

6  to be more family oriented than he was before, in my personal

7  opinion.

8  Q    Did you impose on your friendship again in '05?

9  A    Yes.  I had a condominium on Staten Island that I

10 purchased, a three bedroom, and at that time I moved back out

11 of the condo and rented it out.  I had gotten this gentleman

12 to come in there, once again another man that is not a

13 gentleman.  He was Russian descent, it was a client in the

14 salon, said I know this couple they need a home, and before

15 you knew it, the person came in, like you got a place, this

16 and that and so forth, and once again I made a big mistake by

17 letting this person in the house. He only gave me one month

18 security. Within three months to that time he made up more

19 excuses.  He had more stories than anything about not paying

20 the rent.  I didn't make an agreement, it was a client of

21 mine in the salon, I thought this woman would recommend

22 someone that was dependable and he turned out not to be and

23 at the same time he started threatening me. He was telling

24 me, you know, because I said eventually I'm going to have to

25 find a way to evict you or doing something, he says to me, he

1   says, he confronted me at my job and I made a police report,

2   he says call me outside my business to tell me you can't

3   evict me out, if you do, you know, I will beat you up and so

4   forth.  I made a police report with that, but I couldn't get

5   this guy out of the house.

6   Q    So what did you do?

7   A    I was destroyed.  I couldn't pay the mortgage.  I was

8   taking care of my family in Howard Beach, and I didn't know

9   where to go, so I felt this was a very serious matter because

10  I would lose this home, that could possibly be retirement for

11  me in my old age and I could lose this if this guy doesn't

12  get out.  Once again I had went to Charles.

13  Q    What did you ask Charles to do and what did he say to

14  you?

15  A    The same scenario transpired as cutting his hair, I told

16  him the situation, and immediately responded the same way,

17  and said that I made a big mistake in what I was doing and if

18  I'm going to go down any road it's going to have to go to

19  court and get this guy out, because it's not worth it any

20  other way.

21  Q    What words did Mr. Carneglia say to you when you asked

22  him to help you with this?

23  A    I said maybe Charles you may know somebody in Staten

24  Island and you could maybe send somebody there or something

25  to talk to this guy or scare this guy, I didn't know, and he

Selvaggio-Sharkey/direct

1    says, no, I don't do that anymore.  I don't understand what

2    you can't get through your F'in head that I don't do that

3    anymore.  I really needed help, I really needed help I was

4    going to lose the home and he didn't help me and I was upset

5    with him.  I was very upset this was a piece of property that

6    he couldn't do anything at all, nothing, and then I was done,

7    whatever business he did before. I said fine, our friendship

8    would be as is.  Of course, as I walked away and went into my

9    car, I thought to myself, I could see where Charles is coming

10   from and once again he told me, you are a moron for taking

11   this guy in without a contract, you should have gotten three

12   months security on this person and you should have did it

13   right away and checked his credentials out and so forth.

14   Q    Mr. Selvaggio, if Mr. Carneglia had appeared to you so

15   different when he came out of jail in '05, why did you go to

16   him with this request?  What made you think that you would

17   get help?

18   A    I didn't -- I had no other road to go down. I thought

19   there was another possibility.  I thought anything -- this

20   was my last chance to do anything and if anyone could do it

21   it would be him.  Why?  He was my friend.

22   Q    What did he tell you?

23   A    No, no.  I just said before that I'm so sick and tired

24   of people thinking -- professing who I am. I'm tired of it,

25   I'm done.  And I said, okay, and we resumed our friendship

HENRY SHAPIRO          OFFICIAL COURT REPORTER

1    and I learned another lesson in renting homes.

2    Q    Mr. Selvaggio, do you know that you are under oath,

3    right?

4    A    Of course.

5    Q    You know that if you were not telling the truth you

6    could be indicted for perjury?

7    A    Of course.

8    Q    Why are you here today?

9    A    I'm here today to basically tell the truth of what

10   transpired between me and Charles Carneglia.

11   Q    Do you get any benefit out of testifying here today?

12   A    No, not at all. The only benefit is my friendship with

13   him and I want to prove to everyone, you know, I'm an every

14   day working person and here is an example of how this person,

15   in my opinion, is being persecuted in my personal opinion,

16   and I knew this person well and I still do, and I hope--

17   willing that I can.

18   Q    Did the conversation that you had with Charles occur

19   before and after jail?

20   A    Yes.

21   Q    Did you socialize with Charles at all after he got out

22   of jail in '05?

23   A    Yes, at a restaurant right near the house, called

24   Carosella's.  It's a family restaurant, it's got like circus

25   figures in there, a game room for kids.  It's a family place.

1    I was actually there last night with my family and

2    grandmother and Charles would go there for dinner, and he

3    would sit and have his spaghetti and meatballs and I would go

4    there after work just for five minutes to say hello, that's

5    it, and we'd talk, not long.

6        MS. SHARKEY:  Thank you.

7    CROSS-EXAMINATION

8    BY MR. NORRIS:

9    Q    Good morning, sir.

10   A    Good morning.

11   Q    You testified that you believe the defendant is being

12   persecuted, is that correct?

13   A    Yes.

14   Q    And you testified that you knew Charles Carneglia very

15   well, correct?

16   A    Yes.

17   Q    Also you testified that in 2001, before he went to

18   prison, you asked him for some help collecting a debt, he

19   said why does everyone think I'm a gangster, I'm not doing

20   that anymore, something like that, fair to say?

21   A    Yes.

22   Q    Is that the first time the defendant told you anything

23   like that?

24   A    Is that the first time?

25   Q    Yes.

1    A    I could see for myself that the defendant wasn't.  In my

2    own mind, yes.

3    Q    Were you surprised when he said, why does everyone think

4    I'm a gangster?

5    A    50-50 I was surprised. Yes.

6    Q    At that time did you think he was a gangster?

7    A    Yes.

8    Q    Tell the jury what you mean?

9    A    Well, I hate to use that word gangster, I think -- I

10   think it's more of a word of he would -- knows a lot of

11   people.

12   Q    Gangster is someone who knows people?

13   A    In my opinion, yes. He could talk to different people

14   and different areas and different business, in my opinion.

15   Q    Do you know whether the defendant was affiliated with

16   any organized crime family?

17   A    Do I know, you mean someone saying to me, that

18   Mr. Carneglia belonged to this family, no, no one ever said

19   that to me personally, no. This was something, growing up as

20   a child, growing up in the neighborhood from newspapers,

21   reading the garbage that is in the Daily News, in the

22   neighborhood.

23   Q    When you went to the defendant in 2001 and asked him for

24   help in collecting a debt, you believed he was a gangster,

25   correct?

1    A    Once again, if that's the word you want to use, fine.

2    Q    Sir, I don't want to use any word. You said the

3    defendant told you why does everyone think I'm a gangster.  I

4    said do you think he was a gangster and you said, correct?

5    A    At that given time, yes.

6    Q    It's not my word, it's your word, his word, correct?

7    A    Yes.

8    Q    What family was he with?

9    A    I have no idea.

10   Q    No idea. You said he knew a lots of people, what people

11   did he know?

12   A    I don't know.

13   Q    Name some?

14   A    I don't know.

15   Q    Why did you think he could help you collect a debt in

16   2001?

17   A    Why?

18   Q    Yes.

19   A    I mean from what I was reading in the paper over time,

20   people would say in the neighborhood that Charles was a well

21   respected person in the neighborhood.

22   Q    An elder?

23   A    Yes.

24   Q    Now, you said that Kevin McMahon, you didn't have a high

25   opinion of him, correct?

1    A    I don't think many people do, no.

2    Q    And you know the defendant since the early 1990s, is

3    that correct?

4    A    Yes.

5    Q    How long have you known Kevin McMahon?

6    A    Since I'm 12 years old, 11 to 12 years old.

7    Q    And you testified your opinion of him was low because he

8    wasn't hard working, correct?

9    A    Yes.

10   Q    And because -- and I'm paraphrasing -- you also

11   testified he wasn't part of society, correct, at least that

12   is what a good person would be?

13   A    A hard working person who contributed to society. I was

14   working at 13 years old as a bus boy in a restaurant.  He was

15   running around in the streets.

16   Q    Okay. You testified that he was a troublemaker as well?

17   A    Yes.

18   Q    Do you know who he hung around with?

19   A    Not -- at what time, sir, what age are we talking about?

20   Q    You met him when he was 12 and you were 13?

21   A    I think he's a little older than me.

22   Q    How old was he when you met him?

23   A    I don't know his age, I was 12, maybe he was 14, 15.

24   Q    At that time who was he hanging around with?

25   A    I don't remember.

1    Q    Did you observe him hanging around with anyone at any

2    time during his life?

3    A    Guys in the neighborhood, we were all kids.

4    Q    What about the defendant?

5    A    At that time.

6    Q    At any time?

7    A    You mean throughout Kevin's entire life?

8    Q    Yes.

9    A    Yeah, I saw him with Kevin, yes.

10   Q    You saw the defendant with Kevin McMahon?

11   A    Yes.

12   Q    This disreputable Kevin McMahon?

13   A    Yes.

14   Q    How many times did you see them hangout?

15   A    At times I would cut his hair he would step in and step

16   out, he would stay, hi, Frank, and basically walk away. This

17   was something that we did as kids. He knew that I didn't like

18   him, and he didn't like me.

19   Q    How often did you see Kevin McMahon hanging out with

20   Charles Carneglia?

21   A    When cutting his hair.

22   Q    Did you say to the defendant, why are you hanging out

23   with that irreputable person Kevin McMahon?

24   A    Yes.

25   Q    What did he say?

1   A    He felt sorry for him, everyone in the neighborhood did.

2   I didn't.

3   Q    Who else did you know the defendants to hangout with?

4   A    Who are we talking about now, sir?

5   Q    Anyone else, named people?

6        MS. SHARKEY:  Objection.

7   A    What do you mean named people?

8   Q    At any time between 1992 and 2008?

9   A    Yeah.

10  Q    Name any other people that you ever observed the

11  defendant hanging out with, anyone?

12  A    His nephew.

13  Q    What's his name?

14  A    Christopher.

15  Q    Christopher Carneglia?

16  A    Yep.

17  Q    Anyone else?

18  A    His mom at the house. Most of time when I cut his hair

19  just me and him in the room.

20  Q    For the most part it's fair to say you know the

21  defendant from the hair salon?

22  A    The hair salon, as I said before, was only about a year,

23  after that I cut his hair in that apartment on Albert Road

24  and then after that it was at his mom's house in his garage,

25  whenever I came by the house, his mom was there, the

1   apartment was just me and him. The other times at the

2   restaurant when I stop by he would be sitting alone and I

3   would walk over, say hello, how you doing, sit down and that

4   was it.

5   Q    Did the defendant ever tell you in his role as being a

6   gangster whether he had a captain?

7   A    No, we never discussed that.

8   Q    Are you familiar with Tommy Cacciopoli, also known as

9   Tommy Sneakers?

10  A    No.

11  Q    Do you know if he is the defendant's captain in the

12  Gambino crime family?

13  A    No, these things -- this was never discussed with me.

14  Q    Do you believe, sir, that the Gambino crime family

15  exists?

16  A    Do I believe it exists?

17  Q    Yes.

18  A    Me personally, no.

19  Q    You don't believe it exists?

20  A    I don't.

21  Q    Do you believe there is a boss of the Gambino crime

22  family?

23  A    I don't believe these things that I read in the paper,

24  I'm sorry, I don't. I'm very sorry.  I think it's just a

25  blown up thing.

1  Q    This will be quick I will ask you a series of yes or no

2  yes, sir. Are you ready?

3       Do you believe there's a boss of Gambino crime family?

4  A    No.

5  Q    Do you believe there has ever been one?

6  A    When you watch the History Channel, yes.

7  Q    Do you believe John Gotti was ever the boss --

8  A    According to the History Channel, yes.

9  Q    Do you in you heart of hearts believe that John Gotti

10  was the boss --

11  A    What do you mean heart of hearts?  I don't understand.

12  It's just history.

13  Q    I'm asking you to tell the jury what you believe. I'm

14  asking you what you heard in the History Channel, what you

15  believe?

16  A    From the facts that I have gotten, yes, he supposedly

17  was the head of this Gambino crime family.

18  Q    I don't want you to tell the jury what you believe

19  supposedly was TV.  I'm asking you a question.  Do you,

20  Mr. Selvaggio, believe John Gotti was the boss of the Gambino

21  crime family?

22  A    Do I believe that?

23  Q    Yes.

24  A    As a fact, yes.

25  Q    You just testified a moment ago that you don't believe

1    the Gambino crime family exists, correct.

2         MS. SHARKEY:  Objection; argumentative?

3    A    You didn't hear what I said, as a fact. It's a fact in

4    history, but you are asking me do I believe this exists in my

5    heart, isn't that what you just said to me, no, I don't

6    believe it, I really don't.

7    Q    At any time?

8    A    Myself, no. I never seen it. I never talked about it

9    with Mr. Carneglia, he never talked about it with me, from

10   watching TV and the papers, this is what is out there.  This

11   is what they are saying is.

12   Q    Is it fair to say, I want to get your testimony clear

13   for the jury, you don't believe the Gambino crime family

14   exists?

15   A    Factually, yes. It exists according to the History

16   Channel.

17   Q    Sir, just trying to get your opinion I'm not trying to

18   argue with you.

19   A    I'm not trying to argue with either.

20   Q    Please put aside the History Channel.  Do you believe

21   that the Gambino crime family exists?

22   A    Yes.

23   Q    Do you believe that John Gotti was once, was once the

24   boss of the Gambino crime family?

25   A    Yes.

1  Q    Do you believe that the Gambino crime family currently

2  exists?

3  A    No.

4  Q    When did it stop existing?

5  A    Ever since, all the things you see in the paper, all of

6  these people going to jail --

7  Q    Sir.

8      MS. SHARKEY:  Could he finish his answer without being

9  interrupted?

10      THE COURT:  Yes.

11  A    All of these people supposedly in jail.

12  Q    When do you believe the Gambino crime family ceased to

13  exist?

14  A    I'm not an expert on something like that. That is for

15  people that are experts to know what is going on, I only go

16  by what I read in the pan ear.

17  Q    You just testified that you believed the Gambino crime

18  family exists, correct?

19  A    According from what I read, yes. I don't understand what

20  you are getting at.  That's what I read, how I get educated

21  and that's what I read, it exists, according to what I read.

22  Do I believe it exists no, I think it's blown up with these

23  other things in California, all of these different things

24  with these different gangs and everything, I don't know. Have

25  I seen it myself, how could I believe something if I have not

1   seen it from my own eyes.

2   Q   In 2001 you went to the defendant Charles Carneglia and

3   you said someone owes me money, help me get it.  Why did you

4   do that?

5   A   Because of what you just said he's an elder, a well

6   respected person.  I'm not disputing, you know --

7       MS. SHARKEY:  Objection.

8   Q   Answer my question.

9       MS. SHARKEY:  Could he finish his answer?

10      THE COURT:  Did you finish your answer?

11      THE WITNESS:  Yes.

12      THE COURT:  Ask the next question, please.

13  Q   You went to the defendant in 2001 for help in collecting

14  a debt because you believed he was an elder in the community,

15  is that your testimony, in the community?

16  A   Yes.

17  Q   And the defendant got upset at you and said why does

18  everyone think I'm a gangster, I'm not with them, I don't do

19  that anymore. Is that fair paraphrasing?

20  A   Yes.

21  Q   After he got out of prison in 2005 or 2006 you went to

22  him again to help in collecting a debt?

23  A   Yes, my father was dead.  I had no one to go to and he

24  was my elder.

25  Q   You went to the defendant for help in collecting a debt

1   because he is an elder in the community?

2   A    Could you say that again.

3   Q    Is your testimony to this jury after the defendant got

4   out of prison in 2005 or 2006 you went to him for a second

5   time for help in collecting a debt -- is your testimony to

6   this jury in 2005 or 2006 you went to the defendant a second

7   time for help in collecting a debt because you believed him

8   to be an elder in the community?

9   A    Yes, a well respected individual, yes.

10  Q    Do you know if the defendant is a soldier in the Gambino

11  crime family, yes or no?

12  A    No one ever told me that.  I'm telling the truth here.

13  This is why I'm here. No one ever said that to me.

14  Q    At any time?

15  A    No, this is from what I read.

16  Q    You testified about the defendant dying his hair purple

17  at one time?

18  A    Yes.

19  Q    That was in the 199os, is that correct?

20  A    Yes, '93 probably because that was -- yeah, '93. I was

21  still on 101st Avenue, yes.

22  Q    And when he died his hair purple your testimony is that

23  the defendant said to you, it's okay, people will leave me

24  alone, I won't have to socialize?

25  A    Yes, that's what I said.

1  Q    It's fair to say that the defendant was somewhat

2  anti-social?

3  A    No, it's fair to say that the person didn't want to talk

4  to anyone.

5  Q    He didn't like socializing were people?

6  A    Yes.

7  Q    The fact that he had purple hair he thought that was an

8  okay thing because it would cause people not to socialize

9  with him and he didn't mind?

10  A    Yes.

11  Q    This was about 1993, correct?

12  A    Yes.

13  Q    You testified that you were close to the defendant.  Did

14  he ever tell you what he did for a living?

15  A    He told me quite a few things he did, since he was

16  younger.

17  Q    What did he tell you?

18  A    He learned how to fix ovens, he told me how to fix my

19  oven in my house.  I went to try to clean it and I went to

20  the house, because he had the same year oven in his mom's

21  house from 1972 was the oven and, yeah, okay that was one

22  thing of working, yeah.

23  Q    Oven repairman?

24  A    Oven repairman?

25  Q    Yes.

1  A    I'm assuming he did some work in oven repair, yeah.

2  Q    What else?

3  A    Then he had his junkyard business there.

4  Q    Where was that?

5  A    Fountain Avenue.

6  Q    Did he tell you what he did there?

7  A    I went there to go cut his hair, I used to go there too

8  and he would sit at the front thing, it was like one of those

9  houses on wheels.

10 Q    Trailer?

11 A    Yeah. That was in the front of the junkyard and there

12 were, you know, all of these junk cars and people would come

13 in looking for, you know, rearview mirror, these different

14 parts as I was cutting his hair and he would sit there and as

15 I was cutting his hair he would help people and tell whoever

16 was working there to get a part for that car or whatever.  I

17 think it was a good business.  He was always there.  Every

18 time I went there he was always there. He seemed somebody

19 very involved in running that junkyard business.

20 Q    Did you ever cut his hair in a barn on Pine Street, a

21 couple of streets away?

22 A    No.

23 Q    Never been there?

24 A    No, no.

25 Q    Aside from working at the junkyard and oven repairman,

1    what else did the defendant tell you that he did?

2    A    That's it.  That's all I can remember.

3    Q    You testified you are not familiar with the name Thomas

4    Cacciopoli?

5    A    No.

6    Q    Are you familiar with the name Jackie Cavallo?

7    A    No.

8    Q    August Sclafani?

9    A    No.

10   Q    Are you familiar with the name Angelo Ruggiero, Jr.?

11   A    Yes.

12   Q    Who is he?

13   A    He grew up in the neighborhood.

14   Q    Do you know if he has any affiliation with organized

15   crime?

16   A    As far as I know, no.

17   Q    Familiar with Joseph Panzarella, Jr.?

18   A    I grew up with him also.

19   Q    Jr.?

20   A    Yes and his father I knew also.

21   Q    That is also a Joseph?

22   A    Yes.

23   Q    Do you know whether Joseph Panzarella, Jr. and the

24   defendant are friends?

25   A    Yes, at the junkyard one time Joseph had come by and he

1  had -- he wanted some type of piece for a car and he came by

2  and Charles was talking with him while I was cutting his

3  hair.

4  Q    They appeared to have a close relationship and you saw

5  them together?

6  A    It seems to be acquaintances, more than your part, here

7  you go, how you feeling, how's your dad doing, that was the

8  conversation.

9  Q    What about Allen Meshanski?

10 A    Yes, he worked in the yard there, if I wasn't mistaken,

11 he helped out.

12 Q    At the junkyard?

13 A    I remember Allen when I was a child, 12, 13 years old,

14 usually our parents let you go play in the street.

15 Q    Do you know if he is friends with the defendant?

16 A    Yeah.

17 Q    He is?

18 A    Allen, he did quite -- he did some work in the junkyard,

19 he seemed to know where everything was in the junkyard when I

20 was there.

21 Q    Do you know if Joe Panzarella and Allen Meshanski have

22 ties to organized crime?

23 A    No.

24 Q    Do you know who the defendant's best friends are?

25 A    Best friends?

1    Q    Yes.

2    A    His mother.

3    Q    Do you know if the defendant's best friends are Tommy

4    "Sneakers" Cacciopoli and Jackie Cavallo?

5    A    No.

6    Q    Do you know if he knows them since 1970, for about 40

7    years?

8    A    Say it again.

9    Q    Thomas Cacciopoli and Jackie Cavallo, you don't know if

10   the defendant knows them for 40 years?

11   A    No.

12   Q    And you don't know if they have any affiliation with

13   organized crime?

14   A    No.

15   Q    You don't know if Thomas Cacciopoli is the defendant's

16   captain in the Gambino family?

17   A    No.

18   Q    And you don't know if Jackie Cavallo is a fellow soldier

19   in the Gambino family?

20   A    No.

21   Q    Do you know if while he was in prison the defendant sent

22   a visitor request form to Thomas Cacciopoli in 2004?

23   A    Could you say that one more name.

24   Q    You testified that the defendant was in prison for a

25   period of time, correct?

1    A    Yes.

2    Q    Do you know if the defendant while he was in prison sent

3    a visitor request form to Thomas Cacciopoli?

4    A    No.  Why would I know that?

5    Q    Do you know if the defendant sent -- withdrawn.

6         Do you know a man named William Victor?

7    A    No.

8    Q    Do you know if he has affiliation with organized crime?

9    A    No.

10   Q    Do you know if the defendant sent him a request form,

11   visitor form in 2005?

12   A    No.

13   Q    Do you know if the defendant has been in jail for the

14   last year?

15   A    Yes, I haven't being cutting his hair.

16   Q    While in jail do you know if the defendant received

17   commissary money from Jackie Cavallo?

18   A    No.

19   Q    From Gus Sclafani?

20   A    No.

21   Q    Do you know if the defendant -- no?

22   A    No, yes, no.

23   Q    Fair to say when you went to the defendant for help in

24   collecting a debt in 2001 that you knew his reputation at

25   that time?

1    A    I knew he could probably help me, yeah.

2    Q    Fair to say that you knew his reputation at that time?

3    A    Yes.

4    Q    What did you know it to be?

5    A    Talk a lot better than me.

6    Q    Anything else?

7    A    His vocabulary, the way he would speak was a lot better

8    than me, I thought he was older than me, like I said my

9    father was gone and I really needed help.

10    Q    Your prior testimony that the defendant was a gangster

11    had nothing to do with the fact that you went to him for help

12    in collecting a debt?

13    A    Can you say that again?

14    Q    Your prior testimony that the defendant was a gangster

15    had nothing to do with you're going to him for help in

16    collecting a debt?

17    A    I'm not understanding the question really. Can you

18    explain it a little differently?

19    Q    Sure.

20            THE COURT:  Do you want a break?

21            JUROR:  Yes.

22            THE COURT:  Yes.

23            (Jury leaves courtroom.)

24            THE COURT:  The witness is to be back on the witness

25    stand in ten minutes.

1          (Recess taken.)

2          THE COURT:  Do you still want to call the

3     lieutenant?

4          MS. SHARKEY:  Yes, we have him here.

5          MR. BURLINGAME:  What testimony is he going to

6     have?

7          THE COURT:  He'll give essentially the testimony

8     that he gave.

9          MR. BURLINGAME:  That now introduces the issue of

10    the prior trial on the DiBono charge.

11         THE COURT:  I will not allow it to come in.  He'll

12    be able to say that was available at the prior trial.

13         MR. BURLINGAME:  If they are going to link it up to

14    Kevin McMahon, it will have to be, which prior trial.

15         THE COURT:  Not necessarily. Just that it was at a

16    prior public trial.  I don't want anything further.

17         MR. BURLINGAME:  Based on an eight by twelve picture

18    that was at a prior trial, your Honor, correctly ruled

19    earlier the relevance of the testimony, whether Kevin McMahon

20    had an opportunity --

21         THE COURT:  Yes.

22         (Jury present.)

23         THE COURT:  Be seated, please.

24         MR. BURLINGAME:  I renew on 403 grounds.

25         (Followed on next page.)

Selvaggio-Norris/cross

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CROSS-EXAMINATION (Continued.)

2  BY MR. NORRIS:

3  Q    I want to clarify the record on a few things, sir.  Your

4  testimony to this jury is that in 2001 you believed the

5  defendant was a gangster, correct?

6  A    Yes.

7  Q    And the guy owed you twelve hundred dollars and you

8  wanted the defendant to find him and talk to him for you,

9  correct?

10  A    Yes.

11  Q    Your testimony to this jury because you believed the

12  defendant was a good talker, correct?

13  A    Yes.

14  Q    And you hoped that the defendant would just give that

15  guy a good talking to, correct?

16  A    Yes.

17  Q    And the defendant was upset when you asked him to go

18  talk to this guy for you, correct?

19  A    Yes.

20  Q    And he said, I'm not a gangster anymore, correct?

21  A    Yes.

22  Q    Did you think it was odd that when you asked him to go

23  talk to someone for you, his response would be, I'm not a

24  gangster?

25  A    The first words, why would everyone think I'm a gangster

1    and I'm not anymore.  That's what he said.

2    Q    Listen to my question:

3        Did you think it was odd that when you asked Charles

4    Carneglia to go talk to someone for you, that his response

5    was everyone thinks I'm a gangster, I'm not a gangster

6    anymore

7    A    Yes.

8    Q    After jail -- withdrawn.

9        After the defendant got out of jail were it not strange

10   the fact that you thought the defendant was a gangster? Your

11   testimony to this jury, you asked him to go find and talk to

12   someone for you had nothing to do with the fact that he was a

13   gangster, correct?

14   A    Because of his reputation that is why I went to him.

15   Q    Because of his reputation as a gangster, correct?

16   A    Yes.

17   Q    You went to the defendant, you knew to be a gangster,

18   and you asked him to go find and talk to someone for you and

19   get your money, correct?

20   A    Yes.

21   Q    Your previous testimony to this jury that you went and

22   did that because you just thought the defendant was a good

23   talker, that wasn't true?

24   A    It is true.

25   Q    You went to the defendant because he was a gangster,

1    correct?

2    A    That's part of it, yes.

3    Q    Yes or no?

4    A    Yes.

5    Q    And he said, no, I'm out of the life, he goes to prison

6    and in 2005 or 2006, a Russian guy owes you money and you ask

7    him again, help me get my money back, correct?

8    A    Yes.

9    Q    And so you didn't believe him back in 2001 when he told

10    you, I'm not a gangster anymore, did you?

11    A    No.

12        MR. NORRIS:  No further questions.

13    REDIRECT EXAMINATION

14    BY MS. SHARKEY:

15    Q    Mr. Selvaggio, you are a live long resident of Howard

16    breach, right?

17    A    Yes.

18    Q    You have been sparing back and forth with the prosecutor

19    about the existence of organized crime?

20    A    Yes.

21    Q    Right?

22    A    Yes.

23    Q    Why are you sparing with him about that?

24    A    It's quite a few things.  Number one, I have never been

25    in any conversation with someone that has told me what he

1   says of all of these different names of these different men

2   and I never ever heard someone say to me that Charles

3   Carneglia is, you know -- I'm going by what is in the paper

4   unfortunately -- a Gambino soldier.

5       I'm also -- I don't know. I also take offense to it

6   because of the neighborhood and everything that Italian

7   people are gangsters and if they have a lot of friends, they

8   are gangsters.

9   Q    Howard Beach is a small community, right?

10  A    Yes, ten block by 12 blocks.

11  Q    Most people know each growing up, correct?

12  A    Yes.

13  Q    From your opinion and perhaps the people you grew up

14  with, has Howard Beach been portrayed unfairly in the media?

15  A    Yes.

16  Q    Do you know who John Gotti is, right?

17  A    Yes.

18  Q    And would you agree that John Gotti is deemed to be the

19  boss of a crime family?

20  A    Yes.

21  Q    When you were sparing with the prosecutor over the

22  existence of --

23      MR. NORRIS:  Objection to the question?

24  Q    -- of the existence of crime families, do you

25  acknowledge their existence?

1        THE COURT:  Sustained.  Reframe it.

2    Q    Do you acknowledge the existence of the crime family?

3    A    Yes.

4    Q    Are you offended as an Italian because everybody who is

5    considered to be Italian as part of a crime family?

6    A    Yes.

7    Q    Do you know who John Gotti is?

8    A    Yes.

9    Q    In 2001, when you had been cutting Mr. Carneglia's hair

10   for almost a decade, you testified on direct examination that

11   you prevailed on your friendship before he went to jail,

12   right?

13   A    Yes.

14   Q    You knew that in 2001, Mr. Carneglia had a reputation in

15   the neighborhood, right?

16   A    Yes.

17   Q    What was that reputation?

18   A    Reputation was that this person was not someone that you

19   play games with, this person is not a person -- excuse my

20   language -- to bullshit to and not a person to fool around

21   with.

22   Q    Now, Mr. Selvaggio, when you asked Charles Carneglia to

23   go speak with someone in Staten Island about a debt, what did

24   he say to you?

25        THE COURT:  We've been through that.

1       Sustained.

2  Q    You testified on cross examination that you didn't

3  believe Mr. Carneglia when he said he left the life in 2001?

4  A    Yes.

5  Q    Why is that?

6  A    I thought I could take another chance.  Why I didn't

7  believe it, I think it was more of an issue that I had my

8  alternative was only him.

9  Q    Did he do anything or did you see him do anything or say

10 anything that made you believe in 2005 that he was a

11 gangster?

12 A    No, because he did nothing.

13 Q    Mr. Selvaggio, you testified also on cross-examination

14 that Mr. Carneglia repaired ovens.  A decide from your oven,

15 whose oven did you see him repair?

16 A    Nobody, that was in a conversation.

17 Q    Now, what was his business when you met him -- what was

18 his source of income according to your relationship with him

19 when you met him in the 90's?

20 A    I don't know.

21 Q    Did you see that he had a junk yard?

22 A    Yes.

23 Q    Did you ever question Mr. Carneglia about his background

24 or his activities associated with organized crime?

25 A    No, never.

1    Q    Would you ever do that?

2    A    No.  It's none of my business.

3    Q    But in '06, when you asked him for help concerning your

4    tenant in Staten Island --

5    A    Yes.

6    Q     -- did you think he was a gangster then?

7    A    No.

8    Q    So why of everything that you could do, did you turn to

9    him?

10   A    I didn't know who else to turn to.  Solely of what I

11   read of his reputation and growing up in the neighborhood.

12   Q    Did you think that he would make a phone call for you?

13   A    I hoped, I really did.

14   Q    And what did he tell you--.

15        MR. NORRIS:  Objection?

16   Q    -- in 2006?

17        THE COURT:  We've been through that.

18        MS. SHARKEY:  Respectfully, I would like-- he has

19   been cross-examined--.

20        THE COURT:  We have had that asked a number of

21   times.

22   Q    Did you have a conversation with him in 2006.

23        MR. NORRIS:  Objection.

24   A    Yes.

25   Q    Did he deny your request?

1    MR. NORRIS:  Objection.

2  A    Yes.

3    MS. SHARKEY:  Nothing further.

4    THE COURT:  Next witness, please.

5    THE WITNESS:  Thank you.

6    MS. SHARKEY:  I believe, the lieutenant, who was

7  outside, I thought he was under the impression that he could

8  leave.

9    THE COURT:  See if you could have him come in. We'll

10  have to have a break.

11    Probably be an hour or so.  We're trying to get a

12  witness in.

13    (Jury leaves courtroom.)

14    THE COURT:  Would you try to get him.  Get a car to

15  bring him in.

16    MR. BURLINGAME:  Given the Court's prior ruling

17  about keeping out evidence of the prior --

18    THE COURT:  Is there any reason why everybody is

19  standing around?

20    MR. BURLINGAME:  Given the Court's ruling about the

21  keeping out the prior trial of the DiBono murder, prior

22  trials on 403 grounds, if, your Honor, is inclined to let

23  Lieutenant Hanlon testify, I would like a prefer as to his

24  bounds.

25    THE COURT:  Yes.  I don't want the nature of trials

1  to come in, is that clear?

2          MS. SHARKEY:  Yes, Judge.

3          I think it's would be fair to note though that Mr.

4  Carneglia was not a defendant in those cases.

5          THE COURT:  I know that.

6          MS. SHARKEY:  That is okay.

7          I don't want the jury to come away with the

8  impression that Carneglia was previously tried for

9  this.

10          Did you testify at on some trials, Mr. Carneglia was

11  not a defendant?

12          THE COURT:  This defendant was not then a defendant.

13          MS. SHARKEY:  I don't want to leave a impression

14  that it was -- that he was previously on trial for this.  I'm

15  not seeking to get in who the defendants were.

16          THE COURT:  All right.

17          MR. BURLINGAME:  Judge, why else would these photos

18  be coming into a trial if not it was a prior murder trial of

19  Louie DiBono?

20          THE COURT:  The reason is because the contention is

21  that McMahon saw these photos and that his testimony, that he

22  folded the deceased into the front seat was not true, that

23  his testimony was based on what he saw in those

24  photographers.

25          I take it that is your analysis.

1          MS. SHARKEY:  Yes.

2          MR. BURLINGAME:  If that is what the admissibility

3     hinges on it should go Kevin McMahon then Hanlon.

4          THE COURT:  McMahon will say either I was present in

5     the courtroom and I saw the photos--.

6          MR. BURLINGAME:  Correct, in which case Hanlon's

7     testimony comings in or --

8          THE COURT: -- or I didn't see the photos and I

9     wasn't in the courtroom.  In which case you may have been

10    lying, so whatever he says is not going to be of very much

11    help.

12         MR. BURLINGAME:  Judge, respectfully, I think under

13    a 403 analysis --

14         THE COURT:  I could keep it out.

15         MR. BURLINGAME:  -- the probative value is minimal.

16         THE COURT:  Minute is the word that I would use.

17         MR. BURLINGAME:  The prejudicial value is

18    substantial certainty, there was this other trial, why wasn't

19    the defendant tried back in 1991, why wasn't the defendant

20    tried in 1992.

21         THE COURT:  They will not be able to argue that. In

22    fact, this is such a mouse of a way --

23         MS. SHARKEY:  Such a--.

24         THE COURT:  Mouse, M O U S E, to finish this trial

25    after what I consider to be fairly successful series of

1   witnesses that the affect will be probably zero or

2   negative.

3           I have here two our most prominent--

4           MR. FARBER:  Preeminent I would use

5           MS. SHARKEY:  I would use nothing

6           THE COURT: -- prominent defense attorneys and I will

7   allow them to make this mouse of an argument.

8           MS. SHARKEY:  Thank you.

9           MR. BURLINGAME:  Just to make the record clear

10  they'll not be allowed to argue the case was tried

11  previously?

12          THE COURT:  Absolutely not.

13          MR. BURLINGAME:  How will that if -- they are not

14  allowed to make the link this was the trial that Kevin

15  McMahon was supposedly at.

16          THE COURT:  They haven't shown that at all.

17          MS. SHARKEY:  From McMahon's testimony --

18          THE COURT:  You were to look it up.

19          MS. SHARKEY:  I think Ms. Borge is getting it -- I'm

20  trying to get the cop.  Ms. Borge -- from Mr. McMahon's

21  testimony that he fixed previous trials, he, in fact,

22  testified --

23          THE COURT:  I heard that he testified that he

24  was outside and followed them, not that he was in the

25  courthouse

1          MR. BURLINGAME:  Correct

2          MS. SHARKEY:  Mr. Farber is a going to give the

3     summation. I am sure that he'll track the testimony

4     accurately

5          THE COURT:  I would like to see it.

6          MR. BURLINGAME:  Could we get the testimony, if he

7     was not in the courtroom, then there is no reason to call

8     this witness.

9          MS. SHARKEY:  I think the Court has ruled on that.

10         MR. BURLINGAME:  I think, the Court actually ruled

11    earlier you were supposed to get the testimony and we'd make

12    the decision.

13         MS. SHARKEY:  I could ask Ms. Borge. I thought the

14    Court's ruling, you would allow us to put it in.

15         THE COURT:  But not to say anything whether he was

16    in the courtroom or not, because there is no such proof.

17         MS. SHARKEY:  Fair enough.

18         THE COURT:  Or to say anything about the nature of

19    what that trial was, because that has been excluded.

20         MS. SHARKEY:  That is fine.

21         (Pause.)

22

23         THE COURT:  We will convene again at 12:30.

24         I will ask Ms. Lowe to take up with the jury if they

25    want to stay for lunch, that the next witness should be here

1   at 12:30, and we should be able to close the case at 1:00.

2   Do they want lunch or to go home before we proceed further

3   with the lunch.

4               (Recess taken.)

5               (Followed on next page.).

1    MR. BURLINGAME:  If we could just.  I had gotten

2   confused in my mind the first Gotti senior trial, which

3   McMahon testified that he did tamper with, which took place

4   in 1985, five years before DiBono was killed.

5    McMahon then testified that he tampered with three

6   trials of John Carneglia and one trial involving -- one trial

7   involving Eddie Lino.

8    He did not tamper with either of the Louie DiBono

9   trials.

10    I think, the Court was basing its ruling on -- the

11   defense can correct me if I'm wrong -- there is no testimony

12   of his tampering with the DiBono trial. There is no reason to

13   believe that he nor any other member of the public -- I think

14   the basis that there was for relevance is gone and I'm

15   apologizing that I didn't bring it out early.

16    I heard John Gotti Senior. I know he said that he

17   tampered with one of those. I realized it was the first one

18   and not the second one.

19    MS. SHARKEY:  Judge, I'm checking something.

20    MR. BURLINGAME:  I have the transcript highlighted

21   with his testimony about the different juries he tampered

22   with.

23    THE COURT:  There is nothing about his being present

24   when these photographs were published.

25    MR. BURLINGAME:  He did not tamper with either of

1   the DiBono trials.

2            THE COURT:  There is nothing in the record of his

3   being present at any of the trials in which the photographs

4   were published.

5            MR. BURLINGAME:  Correct.  Zero that we can find.

6            If defense counsel has found something they can

7   bring it to my attention.

8            MS. SHARKEY:  I need a minute. I didn't know this

9   point.

10           Again, Judge, I see the point that Mr. Burlingame is

11  making.  We have some of the transcript.  I would like -- if

12  the Court is going to preclude the introduction, I would like

13  a moment to look for more.

14           I would note -- I spoke with the lieutenant outside.

15  The lieutenant said he testified at trials in the Eastern

16  District.  We have his transcript, if the Court wants to

17  review it, where that photograph -- whatever size it was, was

18  entered.

19           The witness, so the record is clear, the witness on

20  cross at this trial-- and the witness I'm referring to is

21  Kevin McMahon-- he testified -- I know that I crossed, I

22  asked Ms. Borge to pull this part out, that he testified that

23  his coverage for jury tampering.  I'm referring right now to

24  the cooperation agreement, involved the period from '83 to

25  2006 involving jury tampering.

1          The reference that Mr. Burlingame is making, I don't

2     think goes to the Court's point.  I mean he said jury

3     tampered, we're not going to ask -- I didn't bring out

4     exactly which jury he tampered with.

5          THE COURT:  I was under the impression from what you

6     said -- probably my fault-- that your position was the

7     pictures were shown at a trial where he jury was tampered

8     with and, therefore, was probably in the courtroom at some

9     point.

10         MS. SHARKEY:  That's my understanding.

11         I know that the transcript that Mr. Burlingame is

12    referencing, and we just pulled that also --

13         THE COURT:  The fact is there is no evidence

14    whatsoever that he was at any trial where the pictures were

15    published.

16         MS. SHARKEY:  I don't know that is true. I would ask

17    for a couple of more minutes.

18         THE COURT:  Take a few more minutes.

19         MR. BURLINGAME:  I could offer the record. The first

20    time he is asked about jury tampering he says that he

21    tampered with the '85, '86 trial of John Gotti Senior.  Then

22    he says, after John Gotti's acquittal, did you tamper with

23    anymore jurors for the Gambino family.

24         "ANSWER:  Yes.

25         "QUESTION:  How many more did you tamper with.

1    "ANSWER:  Three more," and he talks about the two

2 other John Carneglia cases and the Eddie Lino case and that

3 is it.

4        MS. SHARKEY:  Judge, I think --

5        THE COURT:  Take a few minutes..

6        MR. BURLINGAME:  Actually, he testifies that the

7 Eddie Lino case, which was the last one that he tampered with

8 was in 1990 and the two DiBono trials were in 1993 and 1992,

9 which is the case of this officer's testimony.

10        MS. SHARKEY:  I don't see that in the record.  If I

11 could leave for a minute.

12        (Pause.)

13

14        MR. BURLINGAME:  Would your Honor like to review the

15 transcript while we wait?

16        THE COURT:  No, thank you.

17        (Pause.)

18

19        MS. SHARKEY:  Judge, there wasn't a specific

20 question as to which trial on cross the witness McMahon

21 tampered with.  I didn't lay that foundation through the

22 witness.

23        Mr. Farber has an application, a point that we'd

24 hope that the Court would still allow the photograph into

25 evidence

1          THE COURT:  What photograph?

2          MS. SHARKEY:  I mean the testimony of the

3     lieutenant.

4          MR. FARBER:  I was thinking it through.  As the

5     Court pointed out, the fact that McMahon plead guilty to jury

6     tampering does not indicate whether he was in the courtroom

7     as opposed to waiting outside the courthouse to follow the

8     jurors.

9          What would be served by having the testimony of

10    Lieutenant Hanlon testify is the fact there was a public

11    trial and that it was open to the general public.

12         THE COURT:  It is tenuous.  I will allow it. The

13    government will argue you are grasping for straws.

14         MR. BURLINGAME:  If I could just respond?  We've

15    been dealing with this issue about the prior DiBono murder

16    trials for months.  Ms. Sharkey represented on the record

17    this morning that McMahon tampered with both of the DiBono

18    trials --

19         THE COURT:  She was mistaken.

20         MS. SHARKEY:  I was.

21         MR. BURLINGAME:  She was mistaken.

22         Your Honor has acknowledged that this is irrelevant

23    to the vanishing point.  I think it's an unfair place for the

24    government to be put in, the trial ends on this note. If they

25    want to call McMahon here and say whether or not he ever saw

1    any of these pictures that is appropriate.

2          As your Honor has time and time again recognized the

3    prejudice that this case has been tried before and the jury

4    can infer that it was tried before if the murder photos are

5    in place, there is a potential for prejudice -- a potential.

6          THE COURT:  We'll have a record of over five

7    thousand pages, which is a mountain, and now we have a little

8    mouse.

9          MR. BURLINGAME:  How does this possibly clear a 403

10   balancing test --

11         THE COURT:  Because he might have seen the pictures

12   when it was flashed.

13         MR. BURLINGAME:  There is no evidence that he was in

14   the courtroom.

15         THE COURT:  He was a member of the public.

16         MR. BURLINGAME:  I think --

17         THE COURT:  I am confident you can deal with it.

18   Bring in the lieutenant.  Bring in the jury.

19         MR. BURLINGAME:  We can make McMahon available by

20   telephone this afternoon.

21         THE COURT:  I don't want McMahon.  It will not do a

22   bit of good one way or the other. The defendant does not want

23   to call him.  He's not here.

24         If you want to call him on rebuttal, I don't know

25   why you would--.

Selvaggio-redirect/Sharkey

1          MR. BURLINGAME:  Of course, we don't want to call

2    him on rebuttal.

3          THE COURT:  Bring the jury in.

4          (Followed on next page.)

1        (jury present).

2        THE COURT:  Sit-down, please.

3        Swear the witness, please

4   M I C H A E L        H A N L O N,

5        having been first duly sworn, was examined

6        and testified as follows:

7        THE CLERK:  State your full name and spell it for

8   the record

9        THE WITNESS:  Lieutenant Michael Hanlon,

10  H A N L O N.

11  DIRECT EXAMINATION

12  BY MS. SHARKEY:

13  Q    Good afternoon, Lieutenant.  Thank you for coming back.

14  A    Good afternoon.

15  Q    Lieutenant, your currently in Brooklyn North?

16  A    Brooklyn South Task Force.

17  Q    When did you first became a police officer, sir?

18  A    July of 1986.

19  Q    On October 4, of 1990, what was the -- what was your

20  affiliation with the NYPD, what was your tour and precinct?

21  A    I was assigned to the First Precinct in lower Manhattan,

22  I was performing a 3:00 o'clock in the afternoon to 11:30 at

23  night tour.  I was assigned as the patrol supervisor

24  operator

25  Q    Did you respond to the World Trade Center parking lot on

1    October 4th of 1990?

2    A    Yes, ma'am, the sergeant came out of the station house,

3    got into the car and said, we had to go down there for that

4    reason and we responded down to the World Trade Center.

5    Q    Was the body of Louis DiBono found in a car in the World

6    Trade Center parking lot on that afternoon?

7    A    Yes, ma'am.

8    Q    And you responded to the scene?

9    A    Yes, ma'am.

10   Q    And were you part of the detail that opened the car

11   door?

12   A    Yes, ma'am.

13   Q    And you were also present when individuals from crime

14   scene or other units took photographs, right?

15   A    Yes, ma'am.

16   Q    Now, I would like to show you a photograph that has been

17   put in evidence and if you could come down so that we can put

18   the photograph up for the jury and you could see it at the

19   same time.  It's Government Exhibit 40 C.

20        Can you see that okay?

21   A    Yes, ma'am.

22   Q    Lieutenant, that is how Mr. DiBono appeared when you

23   were able to open the car door?

24   A    Yes, ma'am.

25   Q    And did you testify at two trials in the early '90s

1    concerning this incident?

2    A    Yes, ma'am.

3    Q    And Charles Carneglia was not a defendant then, right?

4    A    Not to my knowledge, ma'am.

5    Q    He wasn't a defendant at trial trials?

6    A    No.

7    Q    And were these photographs put in evidence at those

8    trials by you?

9    A    Yes, ma'am.

10        MS. SHARKEY:  Nothing further.

11        Thank you.

12   CROSS EXAMINATION

13   BY MR. BURLINGAME:

14   Q    Just a couple of quick questions.

15        When you introduced these photographers into evidence at

16   that trial, how big were the photographers that were

17   introduced?

18   A    About eight and a half by eleven.

19   Q    And do you know if they were shown to the jury after you

20   introduced them?

21   A    I honestly don't recall.

22   Q    Do you know if they were shown to the general public in

23   any way?

24   A    Not to my knowledge.

25        MR. BURLINGAME:  Thank you.

1          Nothing further.

2          MS. SHARKEY:  Nothing further.

3              THE COURT:  Thank you, sir.

4              You heard all of the evidence in the case now,

5     ladies and gentlemen --

6              MR. BURLINGAME:  Actually, if I could have five

7     minutes. We may have one brief rebuttal witness. Very brief.

8     I just need to see.

9              THE COURT:  Why don't you go out and wait.  You had

10    your lunch I take it.

11             (Recess taken.)

12

13             THE COURT:  The defendant having rested does the

14    government have rebuttal?.

15             MR. BURLINGAME:  We have a brief witness.

16             THE COURT:  Who is the witness?

17             MS. SHARKEY:  Special Agent Paul Tambrino of the

18    FBI

19             MS. SHARKEY:  Judge, could we ask for an

20    offer of proof as to Agent Tambrino's scope of his

21    testimony

22             THE COURT:  Yes.  What is he going to say?

23             MR. BURLINGAME:  He'll testify about the two

24    individuals who some of the defense witnesses testified were

25    the defendants friends in jail, Anthony Campelo and Sal

1  Casiano, that they are under investigation by the FBI as

2  being associates of two organized crime families.

3        MS. SHARKEY:  I would object to that.

4        THE COURT:  What is the basis of his knowledge?

5        MR. BURLINGAME:  Performing routine checks on their

6  database.

7        THE COURT:  That's not enough.

8        MR. BURLINGAME:  Talking with other FBI agents.

9        THE COURT:  That is not enough.

10       MR. BURLINGAME:  They have been convicted in cases

11  with other Genovese members.

12       THE COURT:  That you can use.

13       MS. SHARKEY:  Mr. Casiano and I don't have his wrap

14  sheet with me, Mr. Casiano was indicted and then he took a

15  plea agreement where he was not named. I could call his

16  lawyer, but I believe his plea agreement, where he entered a

17  plea of guilty to the case in the Southern District, he was

18  not named as a member.  I believe he was indicted with

19  Cavelcanti family.

20       THE COURT:  If you want to show what they have been

21  convicted of, I will allow that.

22       MS. SHARKEY:  I have no objection to that.  I do

23  have an objection to the suggesting he was a member of

24  organized crime. I don't believe he plead guilty to that.

25       THE COURT:  What was he convicted of?

1      MS. SHARKEY:  Bank robbery.

2      MR. BURLINGAME:  He was charged in a RICO with a

3 bunch of Genovese members and associates and he plead guilty

4 to a non-RICO Hobbs Act robbery.

5      THE COURT:  What he pled to is what counts.  What

6 else?

7      MR. BURLINGAME:  Your Honor, my position is just

8 simply -- we've gotten this in through a number of witnesses:

9      Does the FBI have, you know, a Genovese squad?

10      Yes.

11      Does that squad keep track of the various people

12 that it's investigating?

13      Yes.

14      Is this person one of those individuals?

15      Yes.

16      Is that available on the data basis?

17      THE COURT:  If you have pictures of him associating,

18 I'll allow it.  If you have wiretaps, I'll allow it, but

19 because he's just on a database --

20      MR. BURLINGAME:  It wouldn't make any difference if

21 we had agents from the squad?

22      THE COURT:  If you have an agent from the squad that

23 could testify that he saw these people with, talking to,

24 their haunts, whatever you have that ties them in, you can

25 use.  But the mere fact that they are in the FBI database is

1  not enough.

2      MR. BURLINGAME:  Because it's not as relevant as the

3  picture.

4      THE COURT:  No, because it's not proof. It's based

5  on hearsay. If you want time to go through your voluminous

6  files to show pictures and wiretaps and ease drops and

7  videos--.

8      MR. BURLINGAME:  May we have one moment to confer?

9      THE COURT: -- ballistic evidence and DNA evidence

10  and convictions, all of the usual paraphernalia, you can do

11  so.

12      MR. BURLINGAME:  I don't think we'll do that. I'm

13  not sure that we are very much in DNA evidence.

14      THE COURT:  The defendant has rested.  Are you

15  resting?

16      MR. BURLINGAME:  We are.

17      THE COURT:  Bring in the jury.

18      We're allowing you to take the rest of the

19  afternoon, all day Thursday, all day Friday, all day Saturday

20  and all day Sunday to prepare your summations on the theory

21  that you'll be here 9:00 o'clock and 9:30 the summations will

22  start, yes.

23      MR. BURLINGAME:  We'll try and do that.

24      THE COURT:  And defendant's counsel?

25      MR. FARBER:  Yes.

1      THE COURT:  Bring in the jury.

2      (Jury present.)

3      THE COURT:  Be seated, please.

4      You heard all of the evidence.  I am going to let

5  you go home now or wherever you would like to go and

6  tomorrow, Thursday and Friday, we won't be meeting with the

7  jury because there are other things that have to be done to

8  tie together the case.

9      Monday you'll be here at 9:30, we'll have what will

10  probably be a full day of summation.  Tuesday we plan to have

11  the charge and you can begin deliberating probably Tuesday

12  afternoon.  Do not discuss the case with anybody.  Do not

13  read anything about it. Don't indicate to anybody how you

14  feel.  Don't do any research of your own.  You all understand

15  that?

16      You will decide the case solely on the evidence and

17  the law as I give it to you, correct.  Have a pleasant break.

18  Good night.

19      (Jury leaves courtroom.)

20      THE COURT:  I will hear motions at the ends of the

21  defendant's case and at the end of the whole case.

22      MR. FARBER:  We'd renew our previously made Rule 29

23  application made at the end of the government's case.

24      Furthermore, based on the credible testimony

25  presented by the defense, it's clear that the defendant has

1    withdrew from any conspiracy that he may have been a part of

2    by the period of time, in excess of the statute of

3    limitations period, not only was it borne out by the defense

4    witnesses, but I believe it was also borne out by the

5    testimony of the government's own witnesses.

6        The only allegation that pushes into the statute of

7    limitation period, with regard to the alleged extortion of

8    Hunter, also, the indictment charges 2005, however, I believe

9    the testimony by Mr. Adams himself has it ending sometime in

10   the period of the year 2001, so there is that discrepancy

11   between proof of the -- what was borne out at trial versus

12   the indictment.

13       The sufficiency of the indictment against Mr.

14   Carneglia relating to the extortion of Bobby Schiavo is, I

15   submit, nil at best using the Court's word a "mouse",

16   Racketeering Act Nine, therefore, it would be insufficient to

17   move it forward to the jury.

18       The extortion had already been dismissed, and the

19   Green Tree extortion, again the evidence I think taken most

20   favorably to the prosecution, would bear out that this was --

21   now that we add three defense witnesses talking about Green

22   Tree and the forensic evidence, the four, this was a dispute

23   concerning the management of the way the condo was operated

24   and not extortion connected to the Gambino family, let alone

25   anything tying Mr. Carneglia into any extortion, if the jury

1  was to believe there was extortion at all.  For all of those

2  reasons.

3          THE COURT:  Thank you.

4          The government?

5          MR. BURLINGAME:  Judge, I believe, the government

6  has provided sufficient proof for all the counts in the case.

7          If your Honor wants any further details on that I'm

8  happy to explain further.

9          THE COURT:  Motion denied.

10         Thank you. I will see you 9:00 o'clock Monday.

11         (Court adjourned to 9:00 a.m., March 9, 2009.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  M I C H A E L    H A N L O N ........................... 4664

2  DIRECT EXAMINATION

3  BY MS. SHARKEY: .......................................

4  4664

5  M A U R I C E    K E L L Y ........................... 4672

6  CROSS-EXAMINATION

7  BY MR. BURLINGAME: ....................................

8  4683

9  F R A N K    S E L V A G G I O ...................... 4697

10  DIRECT EXAMINATION

11  BY MS. SHARKEY: .......................................

12  4697

13  REDIRECT EXAMINATION

14  BY MS. SHARKEY:.......................................

15  4735

16  REDIRECT EXAMINATION

17  BY MS. SHARKEY:.......................................

18  4735

19  DIRECT EXAMINATION

20  BY MS. SHARKEY: .......................................

21  4751

22  CROSS EXAMINATION

23  BY MR. BURLINGAME: ....................................

24  4753

25

## $

**$1,200** [1] - 4706:8

## '

**'01** [1] - 4708:8
**'05** [5] - 4708:9, 12; 4709:8; 4711:15; 4712:22
**'06** [1] - 4740:3
**'83** [1] - 4748:24
**'85** [1] - 4749:21
**'86** [1] - 4749:21
**'90s** [4] - 4665:13; 4700:2, 15; 4701:13; 4755:25
**'92** [3] - 4652:22; 4700:21; 4701:11
**'93** [3] - 4652:22; 4724:20
**'97** [1] - 4691:4
**'99** [1] - 4691:10

## 0

**08** [1] - 4651:4

## 1

**10013** [1] - 4651:21
**101st** [4] - 4698:21; 4699:9; 4700:21; 4724:21
**11** [1] - 4716:6
**11201** [1] - 4651:17
**11242** [1] - 4651:19
**11:30** [1] - 4754:22
**12** [6] - 4716:6, 20, 23; 4728:13; 4737:10
**12:30** [2] - 4745:23; 4746:1
**13** [4] - 4673:14; 4716:14, 20; 4728:13
**14** [1] - 4716:23
**15** [1] - 4716:23
**16th** [1] - 4678:3
**19** [1] - 4698:19
**1970** [1] - 4729:6
**1972** [1] - 4725:21
**1985** [1] - 4747:4
**1986** [1] - 4754:18
**1990** [5] - 4664:16; 4675:6; 4750:8; 4754:19; 4755:1
**1990s** [2] - 4655:19; 4716:2
**1991** [1] - 4743:19
**1992** [5] - 4699:7, 21; 4718:8; 4743:20; 4750:8
**1993** [2] - 4725:11; 4750:8
**1994** [3] - 4675:17, 23; 4676:6
**1997** [1] - 4691:2
**1999** [3] - 4676:25; 4677:2, 9
**199os** [1] - 4724:19
**1:00** [1] - 4746:1

## 2

**20** [2] - 4673:14; 4699:18
**2000** [3] - 4678:3; 4691:4

**2001** [15] - 4704:2, 24; 4705:12; 4713:17; 4714:23; 4715:16; 4723:2, 13; 4730:24; 4734:4; 4736:9; 4738:9, 14; 4739:3; 4762:10
**2002** [1] - 4703:19
**2004** [2] - 4686:22; 4729:22
**2005** [7] - 4723:21; 4724:4, 6; 4730:11; 4736:6; 4739:10; 4762:8
**2006** [7] - 4723:21; 4724:4, 6; 4736:6; 4740:16, 22; 4748:25
**2008** [2] - 4658:2; 4718:8
**2009** [2] - 4651:8; 4763:11
**225** [2] - 4651:16, 23
**26** [1] - 4651:18
**27** [1] - 4658:2
**29** [1] - 4761:22

## 3

**302's** [1] - 4658:10
**302s** [1] - 4668:14
**350** [1] - 4651:21
**3:00** [1] - 4754:22

## 4

**4** [2] - 4651:8; 4754:19
**40** [5] - 4652:10; 4697:20; 4729:6, 10; 4755:19
**40-C** [1] - 4664:15
**403** [4] - 4732:24; 4741:22; 4743:13; 4752:9
**4664** [2] - 4764:1, 4
**4672** [1] - 4764:5
**4683** [1] - 4764:8
**4697** [2] - 4764:9, 12
**4735** [2] - 4764:15, 18
**4751** [1] - 4764:21
**4753** [1] - 4764:23
**4th** [2] - 4664:16; 4755:1

## 5

**50-50** [1] - 4714:5
**51** [1] - 4673:6

## 6

**65** [1] - 4663:20

## 7

**718-613-2509** [1] - 4651:24
**76** [1] - 4651:4

## 8

**88** [1] - 4698:15

## 9

**9** [1] - 4763:11
**90's** [4] - 4653:4, 14; 4654:24; 4739:19
**9:00** [6] - 4651:9; 4669:11, 13; 4760:21; 4763:10
**9:30** [2] - 4760:21; 4761:9

## A

**a.m** [2] - 4651:9; 4763:11
**ability** [4] - 4654:22; 4659:17, 22; 4662:9
**able** [8] - 4652:13; 4663:12; 4693:17; 4695:24; 4732:12; 4743:21; 4746:1; 4755:23
**absolutely** [2] - 4696:12; 4744:12
**according** [6] - 4702:6; 4720:8; 4721:15; 4722:19, 21; 4739:18
**accurately** [1] - 4745:4
**acknowledge** [2] - 4737:25; 4738:2
**acknowledged** [1] - 4751:22
**acquaintance** [1] - 4705:22
**acquaintances** [1] - 4728:6
**acquittal** [1] - 4749:22
**Act** [2] - 4759:4; 4762:16
**acting** [1] - 4661:9
**activities** [2] - 4664:22; 4739:24
**acts** [1] - 4653:18
**Adams** [1] - 4762:9
**add** [1] - 4762:21
**addition** [1] - 4691:14
**address** [1] - 4700:10
**addressing** [1] - 4659:1
**adjourned** [1] - 4763:11
**admissibility** [1] - 4743:2
**advantage** [1] - 4706:20
**advice** [2] - 4703:21, 25
**advise** [1] - 4659:22
**affect** [5] - 4659:17, 22; 4662:13, 15; 4744:1
**affiliated** [2] - 4704:22; 4714:15
**affiliation** [4] - 4727:14; 4729:12; 4730:8; 4754:20
**afternoon** [7] - 4752:20; 4754:13, 22; 4755:6; 4760:19; 4761:12
**afterwards** [1] - 4700:7
**age** [4] - 4703:13; 4710:11; 4716:19, 23
**Agent** [2] - 4757:17, 20
**agent** [1] - 4759:22
**agents** [2] - 4758:8; 4759:21
**ago** [2] - 4699:12; 4720:25
**agree** [1] - 4737:18
**agreement** [5] - 4706:2; 4709:20; 4748:24; 4758:15
**ahead** [3] - 4663:10; 4682:4; 4695:8
**Airport** [4] - 4675:18, 23; 4677:4, 9
**airport** [1] - 4677:3
**Albert** [2] - 4702:1; 4718:23
**alive** [1] - 4698:14
**allegation** [1] - 4762:6
**alleged** [1] - 4762:7
**Allen** [4] - 4728:9, 13, 18, 21
**allow** [14] - 4667:15; 4675:21; 4704:14;

4706:17, 24; 4707:7; 4732:11; 4744:7;
4745:14; 4750:24; 4751:12; 4758:21;
4759:18

**allowed** [5] - 4676:21; 4690:25; 4691:7;
4744:10, 14

**allowing** [2] - 4655:11; 4760:18

**almost** [2] - 4708:10; 4738:10

**alone** [4] - 4701:5; 4719:2; 4724:24;
4762:24

**alternative** [1] - 4739:8

**amenable** [1] - 4663:18

**AMERICA** [1] - 4651:3

**American** [1] - 4694:22

**analysis** [2] - 4742:25; 4743:13

**Angelo** [1] - 4727:10

**ANSON** [1] - 4651:14

**answer** [17] - 4687:10, 12; 4688:10, 24;
4689:5, 9, 23; 4690:8, 10; 4697:4;
4703:1; 4706:6; 4722:8; 4723:8

**ANSWER** [2] - 4749:24; 4750:1

**Anthony** [5] - 4665:17; 4685:1, 4, 6;
4757:25

**anti** [1] - 4725:2

**anti-social** [1] - 4725:2

**apartment** [5] - 4701:22; 4702:3;
4718:23; 4719:1

**apologize** [1] - 4653:17

**apologizing** [1] - 4747:15

**appeal** [1] - 4660:21

**Appeals** [1] - 4663:16

**appear** [2] - 4652:7; 4672:8

**APPEARANCES** [1] - 4651:12

**appeared** [3] - 4711:14; 4728:4;
4755:22

**appearing** [1] - 4661:4

**application** [2] - 4750:23; 4761:23

**applications** [1] - 4652:3

**appreciate** [2] - 4659:18; 4689:10

**approached** [1] - 4700:6

**appropriate** [2] - 4700:11; 4752:1

**appropriately** [1] - 4661:8

**areas** [1] - 4714:14

**argue** [6] - 4660:21; 4721:18; 4743:21;
4744:10; 4751:13

**argument** [2] - 4663:18; 4744:7

**argumentative** [1] - 4721:2

**arrange** [1] - 4670:12

**arrangements** [1] - 4705:4

**arrested** [9] - 4675:24; 4676:6; 4677:11;
4691:15; 4695:10, 12

**aside** [2] - 4721:20; 4726:25

**assigned** [2] - 4754:21, 23

**Assistant** [1] - 4651:16

**associate** [4] - 4684:16; 4686:7;
4687:6, 24

**associated** [7] - 4683:9, 25; 4684:4;
4686:3, 9; 4688:1; 4739:24

**associates** [4] - 4685:9, 12; 4758:2;
4759:3

**associating** [1] - 4759:17

**assuming** [2] - 4706:3; 4726:1

**attention** [1] - 4748:7

**attorney** [2] - 4659:23; 4661:6

**Attorney** [1] - 4651:14

**attorneys** [1] - 4744:6

**Attorneys** [1] - 4651:16

**August** [4] - 4658:2; 4690:6, 14, 17, 20;
4727:8

**Authority** [1] - 4665:3

**available** [4] - 4658:18; 4732:12;
4752:19; 4759:16

**Avenue** [5] - 4698:21; 4699:9; 4700:21;
4724:21; 4726:5

**aware** [18] - 4666:10, 13; 4689:19, 21,
23; 4690:1, 3-4, 6, 13, 16, 20, 22; 4704:2

---

# B

**baby** [1] - 4705:24

**background** [1] - 4739:23

**bad** [1] - 4662:23

**balanced** [1] - 4659:21

**balancing** [1] - 4752:10

**ball** [1] - 4656:15

**ballistic** [1] - 4760:9

**bank** [1] - 4759:1

**barn** [1] - 4726:20

**base** [1] - 4663:13

**based** [6] - 4653:25; 4659:16; 4732:17;
4742:23; 4760:4; 4761:24

**basement** [1] - 4664:20

**basing** [1] - 4747:10

**basis** [7] - 4656:17; 4660:7; 4663:7;
4667:7; 4747:14; 4758:4; 4759:16

**Batman** [1] - 4701:1

**Beach** [5] - 4698:4, 6; 4710:8; 4737:9,
14

**bear** [1] - 4762:20

**beard** [2] - 4661:4; 4682:18

**beat** [2] - 4652:25; 4710:3

**became** [4] - 4702:15; 4703:18;
4705:21; 4754:17

**become** [1] - 4680:20

**bedroom** [1] - 4709:10

**BEFORE** [1] - 4651:11

**begin** [1] - 4761:11

**beginning** [1] - 4700:3

**behalf** [1] - 4672:9

**behavior** [2] - 4680:7; 4683:12

**belonged** [1] - 4714:18

**bench** [2] - 4663:11; 4681:1

**benefit** [2] - 4712:11

**BENTON** [1] - 4651:13

**Bergen** [2] - 4698:23; 4699:1

**best** [5] - 4668:19; 4728:24; 4729:3;
4762:15

**better** [5] - 4680:8; 4699:16; 4702:19;
4731:5, 7

**between** [5] - 4662:10; 4696:3;
4712:10; 4718:8; 4762:11

**big** [3] - 4709:16; 4710:17; 4756:16

**bit** [6] - 4676:16; 4682:24; 4702:11;
4706:8, 21; 4752:22

**black** [1] - 4666:24

**block** [2] - 4700:23; 4737:10

**blocks** [1] - 4737:10

**blown** [2] - 4719:25; 4722:22

**Bobby** [1] - 4762:14

**body** [6] - 4653:1; 4658:12; 4665:1;
4755:5

**bolstering** [2] - 4655:7, 11

**Bonanno** [2] - 4684:15

**BOP** [1] - 4668:20

**borderline** [1] - 4702:1

**Borge** [5] - 4656:25; 4744:19; 4745:13;
4748:22

**born** [1] - 4698:4

**borne** [3] - 4762:3, 11

**boroughs** [1] - 4699:20

**borrow** [1] - 4705:25

**boss** [7] - 4719:21; 4720:3, 7, 10, 20;
4721:24; 4737:19

**bouncing** [1] - 4681:20

**bound** [1] - 4670:20

**bounds** [1] - 4741:24

**box** [2] - 4659:12; 4701:2

**boy** [1] - 4716:14

**boys** [1] - 4673:12

**breach** [1] - 4736:16

**break** [5] - 4679:1, 3; 4731:20; 4741:10;
4761:17

**breaking** [1] - 4694:3

**breath** [1] - 4666:3

**brief** [6] - 4666:2, 4; 4669:18; 4757:7,
15

**briefly** [1] - 4696:17

**bright** [1] - 4663:10

**brightest** [1] - 4700:25

**bring** [5] - 4659:19; 4661:22; 4669:19,
21; 4670:10; 4675:25; 4677:8; 4741:15;
4747:15; 4748:7; 4749:3; 4752:18;
4753:3; 4760:17; 4761:1

**Broadway** [1] - 4651:21

**Brooklyn** [7] - 4651:6, 17, 19, 24;
4699:20; 4754:15

**brought** [2] - 4680:13; 4691:25

**building** [4] - 4667:3; 4673:25; 4679:16

**built** [1] - 4700:7

**bullshit** [1] - 4738:20

**bum** [1] - 4708:1

**bunch** [1] - 4759:3

**BURLINGAME** [90] - 4651:14; 4657:15;
4658:1, 4, 10, 19, 21; 4666:2, 6; 4668:3,
8, 10, 13, 18; 4669:3, 10, 12, 14; 4670:4,
11, 17, 20, 24; 4675:11, 19; 4683:21;
4694:8; 4695:3, 6, 9; 4696:16, 24;
4697:4, 6; 4704:13; 4705:16; 4706:16,
23; 4707:6; 4732:5, 9, 13, 17, 24;
4741:16, 20; 4742:17; 4743:2, 6, 12, 15,
17; 4744:9, 13; 4745:1, 6, 10; 4747:1,
20, 25; 4748:5; 4749:19; 4750:6, 14;
4751:14, 21; 4752:9, 13, 16, 19; 4753:1;
4756:13, 25; 4757:6, 15, 23; 4758:5, 8,
10; 4759:2, 7, 20; 4760:2, 8, 12, 16, 23;
4763:5; 4764:7, 23

**Burlingame** [3] - 4748:10; 4749:1, 11

**bus** [1] - 4716:14

**business** [9] - 4673:25; 4710:2; 4711:7;
4714:14; 4726:3, 17, 19; 4739:17;
4740:2

**busy** [1] - 4701:19

**buy** [1] - 4679:15

**BY** [21] - 4651:14; 4664:11; 4666:6;
4672:10, 23; 4683:21; 4695:9; 4696:19;
4697:18; 4713:8; 4734:2; 4736:14;
4754:12; 4756:13; 4764:3, 7, 11, 14, 17,

20, 23

## C

cabinet [1] - 4674:20
Cacciopoli [12] - 4686:8, 16, 18, 21-22; 4719:8; 4727:4; 4729:4, 9, 15, 22; 4730:3
Cadman [2] - 4651:16, 23
California [1] - 4722:23
calm [1] - 4661:5
camera [1] - 4681:18
CAMPBELL [1] - 4651:13
Campelo [1] - 4757:25
cannot [1] - 4667:2
Caponella [2] - 4685:4, 6
captain [7] - 4686:10, 16, 19; 4690:17; 4719:6, 11; 4729:16
car [13] - 4652:14; 4664:25; 4665:5, 7, 10; 4711:9; 4726:16; 4728:1; 4741:14; 4755:3, 5, 10, 23
card [1] - 4666:24
care [3] - 4682:20; 4705:9; 4710:8
career [2] - 4663:10; 4699:4
Carneglia [49] - 4659:11; 4663:3; 4669:22; 4670:1; 4672:9; 4680:10, 21; 4681:13, 23; 4683:5, 25; 4684:4; 4687:21; 4699:3, 21; 4700:15, 19; 4701:16; 4702:5; 4703:4, 16; 4708:8, 12, 17; 4710:21; 4711:14; 4712:10; 4713:14; 4714:18; 4717:20; 4718:15; 4721:9; 4723:2; 4735:4; 4737:3; 4738:14, 22; 4739:3, 14, 23; 4742:4, 8, 10; 4747:6; 4750:2; 4756:3; 4762:14, 25
CARNEGLIA [1] - 4651:7
Carneglia's [2] - 4701:11; 4738:9
Carosella's [1] - 4712:24
carpenter [1] - 4678:11, 13, 20
cars [1] - 4726:12
Casciano [5] - 4684:14, 21; 4688:7, 13, 16
case [30] - 4653:16; 4654:5, 8-10; 4655:1, 17; 4659:17; 4660:8; 4662:18; 4667:11; 4668:19; 4743:6, 9; 4744:10; 4746:1; 4750:2, 7, 9; 4752:3; 4757:4; 4758:17; 4761:8, 12, 16, 21, 23; 4763:6
cases [4] - 4656:1; 4742:4; 4750:2; 4758:10
Casiano [3] - 4758:1, 13
CAT [1] - 4652:1
catch [1] - 4669:7
Cavallo [6] - 4688:19; 4727:6; 4729:4, 9, 18; 4730:17
Cavelcanti [1] - 4758:19
ceased [1] - 4722:12
Center [4] - 4664:20; 4754:25; 4755:4, 6
certainty [1] - 4743:18
chair [1] - 4707:16
chance [2] - 4711:20; 4739:6
change [1] - 4700:16
changed [2] - 4661:3; 4706:6
Channel [5] - 4720:6, 8, 14; 4721:16, 20
characterization [1] - 4696:12
charge [1] - 4660:14; 4663:13; 4732:10;

4761:11
charged [3] - 4657:16; 4691:4; 4759:2
charges [1] - 4762:8
CHARLES [1] - 4651:7
Charles [50] - 4680:10, 20, 24; 4681:13, 22; 4682:14, 17, 21; 4683:4, 6-7, 25; 4684:3; 4686:25; 4687:18, 21; 4688:5; 4699:3, 6; 4700:6, 15, 22, 25; 4701:16; 4702:5; 4703:15; 4704:24; 4705:12; 4706:14, 20; 4707:23; 4708:24; 4710:12, 23; 4711:9; 4712:10, 18, 21; 4713:2, 14; 4715:20; 4717:20; 4723:2; 4728:2; 4735:3; 4737:2; 4738:22; 4756:3
Charles' [2] - 4703:2; 4704:3; 4706:18
checked [1] - 4711:13
checking [1] - 4747:19
checks [1] - 4758:5
chess [2] - 4680:25; 4681:6
child [3] - 4704:10; 4714:20; 4728:13
children [2] - 4673:11; 4697:23
Christopher [2] - 4718:14
circumstances [1] - 4700:19
circus [1] - 4712:24
clarify [2] - 4694:8; 4734:3
class [1] - 4660:23
clean [1] - 4725:19
clear [7] - 4653:16; 4721:12; 4742:1; 4744:9; 4748:19; 4752:9; 4761:25
CLERK [4] - 4664:4; 4672:20; 4697:14; 4754:7
client [3] - 4659:24; 4709:13, 20
close [5] - 4697:8; 4703:4; 4725:13; 4728:4; 4746:1
closer [1] - 4704:1
closet [1] - 4701:3
Club [2] - 4698:24; 4699:1
clue [1] - 4686:20
co [1] - 4659:2
co-counsel [1] - 4659:2
cocaine [13] - 4675:24; 4676:8; 4677:8; 4691:12, 15, 21, 24; 4692:6; 4693:2; 4694:1; 4695:15, 17
cocky [2] - 4679:14; 4687:13
coffee [2] - 4679:17, 22
coiffured [1] - 4661:4
collect [1] - 4715:15
collecting [10] - 4713:18; 4714:24; 4723:13, 22, 25; 4724:5, 7; 4730:24; 4731:12, 16
Colombians [2] - 4679:6
color [3] - 4700:16, 19; 4701:2
colors [2] - 4701:8
combed [1] - 4661:2
coming [6] - 4661:4; 4677:5; 4678:21; 4711:9; 4742:18; 4754:13
comings [1] - 4743:7
commend [1] - 4663:10
commercial [1] - 4673:20
commissary [1] - 4730:17
committing [4] - 4695:14, 16, 19, 25
community [5] - 4723:14; 4724:1, 8; 4737:9
complete [4] - 4682:14; 4683:10; 4687:13, 20
completely [1] - 4682:12

compound [2] - 4687:16, 18
compounding [1] - 4689:7
conceal [1] - 4695:18
concern [2] - 4657:23; 4659:8
concerned [3] - 4659:14; 4660:11; 4709:4
condone [4] - 4664:22; 4740:3; 4756:1; 4762:23
condo [2] - 4709:11; 4762:23
condominium [1] - 4709:9
confer [2] - 4674:8; 4760:8
confidant [1] - 4698:13
confident [1] - 4752:17
conformed [1] - 4659:3
confrontation [2] - 4670:15, 21
confronted [1] - 4710:1
confused [1] - 4747:2
congratulate [1] - 4663:19
congregate [1] - 4681:14
congregated [1] - 4681:10
connected [1] - 4762:24
connection [3] - 4670:6; 4700:4; 4701:16
conscious [1] - 4663:2
consider [4] - 4660:14; 4661:18; 4692:21; 4743:25
considered [1] - 4738:5
considering [1] - 4703:19
consistent [1] - 4655:14
conspiracy [1] - 4762:1
constitutional [2] - 4656:14; 4667:10
consult [1] - 4659:24
consulting [2] - 4659:11; 4661:5
contact [1] - 4663:3
contends [1] - 4655:15
contention [2] - 4653:23; 4742:20
Conti [2] - 4652:21; 4665:17
continue [1] - 4700:4
Continued [1] - 4734:1
continued [1] - 4701:13
contract [2] - 4706:3, 11; 4711:11
contributed [1] - 4716:13
control [1] - 4661:10
convene [1] - 4745:23
conversation [6] - 4707:15; 4712:18; 4728:8; 4736:25; 4739:16; 4740:22
convicted [4] - 4677:23; 4758:10, 21, 25
convictions [1] - 4760:10
cooperating [2] - 4667:12; 4669:4
cooperation [1] - 4748:24
cop [4] - 4652:25; 4653:14; 4664:16; 4744:20
correct [54] - 4664:20, 24; 4665:1, 16; 4669:15; 4684:4, 19; 4685:17; 4686:15; 4687:23; 4688:2; 4689:3; 4690:25; 4691:3, 10, 12, 16; 4694:24; 4695:11; 4696:6; 4699:22; 4701:20; 4713:12, 15; 4714:25; 4715:4, 6, 25; 4716:3, 8, 11; 4721:1; 4722:18; 4724:19; 4725:11; 4729:25; 4734:5, 9, 12, 15, 18, 20; 4735:13, 15, 19; 4736:1, 7; 4737:11; 4743:6; 4745:1; 4747:11; 4748:5; 4761:17
correctly [2] - 4654:12; 4732:18

**counsel** [13] - 4658:9; 4659:1; 4661:18; 4662:2, 4, 10; 4669:3, 10; 4671:2; 4672:8; 4748:6; 4760:24

**Counsel** [2] - 4658:13; 4661:7

**country** [7] - 4660:8; 4674:23; 4675:25; 4677:19; 4690:25; 4691:2

**counts** [2] - 4759:5; 4763:6

**couple** [7] - 4663:17; 4681:7; 4682:17; 4709:14; 4726:21; 4749:17; 4756:14

**course** [18] - 4654:2; 4659:24; 4660:1; 4664:19; 4665:24; 4674:3; 4681:13; 4699:3; 4700:9, 14; 4703:24; 4705:6, 11; 4708:14; 4711:8; 4712:4, 7; 4753:1

**court** [5] - 4652:7; 4672:6; 4682:16; 4710:19

**COURT** [186] - 4651:1; 4652:3, 5; 4653:15, 22, 25; 4654:4, 7, 16, 20, 25; 4655:5, 8, 13, 23; 4656:3, 7, 10, 16, 21; 4657:5, 7, 11, 14, 18, 21; 4658:3, 6, 14, 18, 20, 23; 4659:1; 4660:3, 12, 20; 4661:15, 17, 21, 23; 4662:3, 6, 8, 14, 16, 20, 22, 25; 4663:8, 24; 4664:7; 4666:4, 19, 22, 24; 4667:1, 4, 7, 14, 20, 23; 4668:1, 6, 9, 12, 16; 4669:2, 8, 11, 13, 15, 18, 21, 25; 4670:3, 6, 8, 14, 22; 4671:2; 4672:2, 16, 25; 4675:21; 4686:14, 17; 4687:11; 4688:12; 4689:6; 4694:6, 18; 4695:2, 4, 8, 14, 20; 4696:9; 4697:1, 5, 7; 4704:14; 4705:17; 4706:17, 24; 4707:7; 4722:10; 4723:10, 12; 4731:20, 22, 24; 4732:2, 7, 11, 15, 23; 4738:1, 25; 4740:17, 20; 4741:4, 9, 14, 18, 25; 4742:5, 12, 16, 20; 4743:4, 8, 14, 16, 21, 24; 4744:6, 12, 16, 18, 23; 4745:5, 15, 18, 23; 4747:23; 4748:2; 4749:5, 13, 18; 4750:5, 16; 4751:1, 12, 19; 4752:6, 11, 15, 17, 21; 4753:3; 4754:2; 4757:3, 9, 13, 16, 22; 4758:4, 7, 9, 12, 20, 25; 4759:5, 17, 22; 4760:4, 9, 14, 17, 24; 4761:1, 3, 20; 4763:3, 9

**Court** [20] - 4651:18, 23; 4652:8; 4659:9, 18; 4660:16; 4661:22; 4663:16; 4669:16; 4674:7; 4676:12; 4745:9; 4747:10; 4748:12, 16; 4750:24; 4751:5; 4763:11

**Court's** [6] - 4667:9; 4741:16, 20; 4745:14; 4749:2; 4762:15

**courthouse** [2] - 4744:25; 4751:7

**Courthouse** [1] - 4651:5

**courtroom** [15] - 4658:8; 4659:20; 4663:23; 4666:10; 4669:23; 4731:23; 4741:13; 4743:5, 9; 4745:7, 16; 4749:8; 4751:6; 4752:14; 4761:19

**coverage** [1] - 4748:23

**CR** [1] - 4651:4

**credentials** [1] - 4711:13

**credibility** [1] - 4655:7

**credible** [1] - 4761:24

**crime** [55] - 4652:16; 4666:8; 4685:21, 24; 4686:6; 4689:3, 13, 16, 18, 20, 25; 4690:3, 5; 4695:15, 19-20, 22-23, 25; 4696:13, 15, 22; 4702:24; 4704:22; 4714:16; 4719:12, 14, 21; 4720:3, 17, 21; 4721:1, 13, 21, 24; 4722:1, 12, 17; 4724:11; 4727:15; 4728:22; 4729:13; 4730:8; 4736:19; 4737:19, 24; 4738:2, 5;

**crimes** [1] - 4677:17

**cross** [6] - 4656:5, 15; 4739:2, 13; 4748:20; 4750:20

**CROSS** [6] - 4683:20; 4713:7; 4734:1; 4756:12; 4764:6, 22

**cross-examination** [2] - 4656:5; 4739:13

**CROSS-EXAMINATION** [4] - 4683:20; 4713:7; 4734:1; 4764:6

**cross-examined--** [1] - 4740:19

**crossed** [3] - 4654:18; 4656:6; 4748:21

**curled** [1] - 4655:20

**CURTIS** [1] - 4651:20

**customary** [1] - 4682:19

**customers** [1] - 4700:13

**customs** [2] - 4692:3; 4694:23

**cut** [12] - 4699:14; 4700:8, 23; 4701:22; 4702:20; 4703:9; 4706:18; 4717:15; 4718:18, 23; 4726:7, 20

**cutter** [1] - 4699:4

**cutting** [13] - 4698:20; 4699:24; 4700:1; 4701:10, 13; 4708:13; 4710:15; 4717:21; 4726:14; 4728:2; 4730:15; 4738:9

## D

**dad** [4] - 4698:8, 11; 4703:22; 4728:7

**Daily** [1] - 4714:21

**data** [1] - 4759:16

**database** [3] - 4758:6; 4759:19, 25

**date** [1] - 4677:1

**daughter** [1] - 4698:1

**dead** [2] - 4689:20; 4723:23

**deal** [1] - 4752:17

**dealing** [1] - 4751:15

**debt** [12] - 4713:18; 4714:24; 4715:15; 4723:14, 22, 25; 4724:5, 7; 4730:24; 4731:12, 16; 4738:23

**decade** [1] - 4738:10

**decades** [1] - 4654:3

**deceased** [2] - 4654:15; 4742:22

**deceit** [3] - 4693:15; 4694:9, 11

**deceive** [1] - 4693:21

**deceiving** [3] - 4693:23; 4694:24

**decide** [2] - 4739:14; 4761:16

**decided** [1] - 4667:5

**decision** [5] - 4660:15; 4662:22; 4663:14; 4670:22; 4745:12

**deemed** [1] - 4737:18

**Defendant** [2] - 4651:8, 18

**defendant** [78] - 4660:9, 25; 4661:1-3, 18; 4662:11; 4667:8; 4670:15; 4684:10; 4685:1; 4686:22; 4688:14, 16, 23; 4689:8; 4690:21; 4713:11, 22; 4714:1, 15, 23; 4715:3; 4716:2; 4717:4, 10, 22; 4718:11, 21; 4719:5; 4723:2, 13, 17, 25; 4724:3, 6, 10, 16, 23; 4725:1, 13; 4727:1, 24; 4728:15; 4729:10, 21, 24; 4730:2, 5, 10, 13, 16, 21, 23; 4731:10, 14; 4734:5, 8, 12, 14, 17; 4735:9, 17, 22, 25; 4742:4, 11-12; 4743:19; 4752:22; 4756:3, 5; 4757:13; 4760:14; 4761:25

**defendant's** [10] - 4660:6; 4686:10, 16, 18; 4719:11; 4728:24; 4729:3, 15;

**defendants** [2] - 4718:3; 4742:15; 4757:25

**defense** [21] - 4652:6; 4656:13; 4657:3; 4658:2, 9, 13; 4659:1; 4663:6; 4667:11; 4669:3, 10; 4672:8; 4697:10; 4744:6; 4747:11; 4748:6; 4757:24; 4761:25; 4762:3, 21

**defenses** [1] - 4662:23

**definitely** [1] - 4703:5

**deliberating** [1] - 4761:11

**demeanor** [2] - 4660:6, 17; 4661:3

**demonstrate** [2] - 4655:4; 4658:7

**demonstrating** [1] - 4655:20

**denied** [3] - 4660:3; 4697:5; 4763:9

**deny** [1] - 4740:25

**dependable** [1] - 4709:22

**depicted** [3] - 4652:13; 4653:2; 4665:10

**deported** [3] - 4676:19; 4691:4, 6

**descent** [1] - 4709:13

**describe** [2] - 4679:12; 4702:11

**described** [2] - 4655:8, 13

**describing** [2] - 4655:10; 4663:8

**description** [1] - 4655:14

**despite** [1] - 4659:14

**destroyed** [1] - 4710:7

**detail** [1] - 4755:10

**detailing** [1] - 4668:14

**details** [1] - 4763:7

**detect** [1] - 4695:25

**develop** [2] - 4703:4, 16

**developed** [1] - 4703:17

**DiBono** [19] - 4652:9, 13; 4653:17, 19; 4657:16; 4665:7, 9; 4732:10; 4741:21; 4742:19; 4747:4, 8, 12; 4748:1; 4750:8; 4751:15, 17; 4755:5, 22

**DiBono's** [4] - 4652:14; 4653:1, 20; 4665:1

**died** [1] - 4724:22

**difference** [2] - 4654:8; 4759:20

**different** [22] - 4657:18; 4678:18; 4679:16; 4687:8; 4692:13; 4694:19; 4695:3; 4699:19; 4700:18; 4701:8; 4709:2; 4711:15; 4714:13; 4722:23; 4726:13; 4737:1; 4747:21

**differently** [1] - 4731:18

**difficult** [1] - 4689:7

**dime** [1] - 4708:2

**dinner** [2] - 4705:23; 4713:2

**dire** [1] - 4666:2

**DIRE** [1] - 4666:5

**DIRECT** [7] - 4664:10; 4672:22; 4697:17; 4754:11; 4764:2, 10, 19

**direct** [6] - 4656:19; 4657:9; 4674:7; 4693:21; 4738:10

**disagree** [1] - 4657:13

**discovered** [3] - 4665:1

**discrepancy** [1] - 4762:10

**discuss** [3] - 4686:25; 4705:4; 4761:12

**discussed** [2] - 4719:7, 13

**dismissed** [1] - 4762:18

**dispositive** [1] - 4657:2

**dispute** [1] - 4762:22

**disputing** [1] - 4723:6

**disreputable** [1] - 4717:12

**DISTRICT** [3] - 4651:1, 11

**District** [2] - 4748:16; 4758:17

**Dix** [10] - 4678:1, 5, 7, 9, 23; 4679:9; 4681:9, 22; 4696:23

**DNA** [2] - 4760:9, 13

**document** [1] - 4691:6

**dollars** [1] - 4734:7

**Dominicans** [1] - 4679:5

**done** [8] - 4667:19; 4676:4; 4707:19, 21; 4711:6, 25; 4761:7

**door** [2] - 4755:11, 23

**down** [13] - 4676:16; 4681:3, 7; 4689:1; 4700:22; 4710:18; 4711:18; 4719:3; 4754:2; 4755:3, 17

**downs** [1] - 4674:17

**downstairs** [1] - 4698:8

**drag** [1] - 4668:23

**drawn** [3] - 4706:21; 4707:3, 12

**dressed** [1] - 4661:7

**dresses** [1] - 4661:1

**drink** [1] - 4702:5

**drinking** [7] - 4702:7, 14-15, 17; 4704:25; 4708:24

**dropped** [1] - 4656:14

**drops** [1] - 4760:6

**drugs** [1] - 4677:7

**drunk** [1] - 4702:9

**duly** [4] - 4664:2; 4672:18; 4697:12; 4754:5

**during** [12] - 4653:11; 4659:24; 4660:1, 9; 4665:24; 4674:3; 4681:13; 4699:18; 4702:5, 7; 4703:8; 4717:2

**duties** [1] - 4664:19

**duty** [1] - 4659:23

**dying** [1] - 4724:16

---

## E

**ear** [1] - 4722:16

**early** [11] - 4653:4, 14; 4654:23; 4665:13; 4700:2, 15, 20; 4716:2; 4747:15; 4755:25

**ease** [1] - 4760:6

**easiest** [1] - 4687:16

**East** [2] - 4651:16, 23

**Eastern** [1] - 4748:15

**EASTERN** [1] - 4651:1

**Eddie** [3] - 4747:7; 4750:2, 7

**educated** [1] - 4722:20

**effort** [1] - 4663:2

**eight** [7] - 4666:19, 22; 4698:2, 10, 12; 4732:17; 4756:18

**either** [5] - 4659:21; 4721:19; 4743:4; 4747:8, 25

**elaborate** [1] - 4708:22

**elder** [7] - 4703:18; 4715:22; 4723:5, 14, 24; 4724:1, 8

**electronic** [2] - 4669:20; 4673:21

**electronically** [1] - 4682:25

**eleven** [4] - 4666:19, 22; 4756:18

**end** [3] - 4670:1; 4761:21, 23

**ending** [1] - 4762:9

**ends** [2] - 4751:24; 4761:20

**engaged** [1] - 4705:21

**enjoy** [1] - 4693:14

---

**enter** [1] - 4665:25

**entered** [5] - 4666:7, 17; 4695:17; 4748:18; 4758:16

**entering** [1] - 4677:19

**entertain** [1] - 4679:18

**entire** [2] - 4659:19; 4717:7

**entitled** [2] - 4668:10, 12

**especially** [1] - 4700:14

**ESQ** [2] - 4651:18, 20

**essentially** [2] - 4695:4; 4732:7

**ESU** [2] - 4665:4, 6

**ethnic** [1] - 4679:3

**EVAN** [1] - 4651:15

**event** [1] - 4704:3

**eventually** [1] - 4709:24

**evict** [2] - 4709:25; 4710:3

**evidence** [39] - 4652:9, 18, 21; 4653:2, 4; 4655:23; 4656:2; 4657:3, 5, 7, 11; 4659:14-16; 4660:15, 18; 4663:14; 4664:15; 4665:25; 4666:8, 17; 4667:9; 4741:17; 4749:13; 4750:25; 4752:13; 4755:17; 4756:7, 15; 4757:4; 4760:9, 13; 4761:4, 16; 4762:19, 22

**exactly** [1] - 4749:4

**examination** [5] - 4656:5; 4672:5; 4738:10; 4739:2, 13

**EXAMINATION** [18] - 4664:10; 4666:5; 4672:22; 4683:20; 4696:18; 4697:17; 4713:7; 4734:1; 4736:13; 4754:11; 4756:12; 4764:2, 6, 10, 13, 16, 19, 22

**examine** [2] - 4668:6, 10

**examined** [4] - 4664:2; 4672:19; 4697:13; 4754:5

**example** [1] - 4712:14

**excess** [2] - 4708:6; 4762:2

**exclude** [1] - 4660:23

**excluded** [2] - 4661:12; 4745:19

**excuse** [3] - 4688:24; 4706:7; 4738:19

**excuses** [1] - 4709:19

**exhibit** [1] - 4652:24

**Exhibit** [3] - 4652:10; 4664:15; 4755:19

**exist** [1] - 4722:13

**existence** [5] - 4736:19; 4737:22, 24-25; 4738:2

**existing** [1] - 4722:4

**exists** [12] - 4719:15, 19; 4721:1, 4, 14-15, 21; 4722:2, 18, 21

**expected** [1] - 4660:5

**experienced** [1] - 4661:7

**expert** [1] - 4722:14

**experts** [1] - 4722:15

**expired** [1] - 4701:3

**explain** [5] - 4672:6; 4679:5; 4690:11; 4731:18; 4763:8

**explained** [1] - 4693:10

**explicate** [1] - 4654:11

**extortion** [7] - 4762:7, 14, 18-19, 24-25; 4763:1

**extradition** [1] - 4696:2

**extremely** [1] - 4682:12

**extricate** [1] - 4690:2

**eye** [1] - 4663:3

**eyed** [1] - 4660:23

**eyes** [1] - 4723:1

**eyewitness** [3] - 4653:7, 19; 4657:10

---

## F

**F'in** [1] - 4711:2

**facility** [4] - 4658:21; 4673:16, 20; 4678:21

**fact** [22] - 4652:14; 4654:20, 25; 4655:16; 4660:1, 6; 4683:8, 24; 4684:3; 4720:24; 4721:3; 4725:7; 4731:11; 4735:10, 12; 4743:22; 4744:21; 4749:13; 4751:5, 10; 4759:25

**facts** [1] - 4720:16

**factually** [1] - 4721:15

**failing** [1] - 4654:11

**failure** [1] - 4653:17

**fair** [17] - 4687:21; 4689:2, 12-13; 4694:19; 4696:12; 4713:20; 4718:20; 4721:12; 4723:19; 4725:1, 3; 4730:23; 4731:2; 4742:3; 4745:17

**fairly** [3] - 4659:17, 22; 4743:25

**fake** [9] - 4692:14, 19, 21; 4693:2, 7, 17-19, 25; 4694:12, 14, 16; 4695:20, 22

**fall** [5] - 4704:2, 24; 4708:8, 12

**familiar** [6] - 4688:19; 4719:8; 4727:3, 6, 10, 17

**families** [6] - 4685:22, 24; 4686:4, 6; 4737:24; 4758:2

**family** [54] - 4674:16; 4675:7; 4684:15; 4685:12, 19; 4686:11, 16, 19, 25; 4688:21, 25; 4690:18; 4700:14; 4702:21, 23; 4703:2, 21-22; 4706:9; 4708:4; 4709:6; 4710:8; 4712:24; 4713:1; 4714:16, 18; 4715:8; 4719:12, 14, 22; 4720:3, 17, 21; 4721:1, 13, 21, 24; 4722:1, 12, 18; 4724:11; 4729:16, 19; 4737:19; 4738:2, 5; 4749:23; 4758:19; 4762:24

**far** [6] - 4663:15; 4674:11; 4685:15, 17-18; 4703:13; 4727:16

**Farber** [4] - 4662:7; 4745:2; 4750:23

**FARBER** [14] - 4651:20; 4655:3, 6, 10, 18; 4658:24; 4659:6; 4660:10; 4663:1; 4669:16; 4744:4; 4751:4; 4760:25; 4761:22

**fascinating** [2] - 4660:21; 4663:16

**father** [5] - 4703:19; 4723:23; 4727:20; 4731:9

**fault** [1] - 4749:6

**favorably** [1] - 4762:20

**FBI** [5] - 4757:18; 4758:1, 8; 4759:9, 25

**federal** [1] - 4678:8

**fellow** [2] - 4690:6; 4729:18

**felony** [1] - 4677:23

**felt** [8] - 4704:1; 4705:25; 4706:1, 10, 25; 4708:11; 4710:9; 4718:1

**few** [7] - 4700:17; 4707:8; 4725:15; 4734:3; 4736:24; 4749:18; 4750:5

**fiancee** [1] - 4705:22

**figure** [1] - 4669:6

**figures** [1] - 4712:25

**files** [1] - 4760:6

**fine** [4] - 4701:4; 4711:7; 4715:1; 4745:20

**finish** [9] - 4657:25; 4687:10, 12; 4688:11, 24; 4722:8; 4723:9; 4743:24

**First** [1] - 4754:21

**first** [22] - 4664:2; 4669:7; 4675:4; 4676:2; 4680:11; 4683:11; 4692:11; 4698:20; 4699:6; 4700:1, 20; 4704:17; 4713:22, 24; 4734:25; 4747:2, 17; 4749:19; 4754:5, 17
**Fish** [2] - 4698:24; 4699:1
**five** [10] - 4668:25; 4685:21, 24; 4686:4, 6; 4707:24; 4713:4; 4747:4; 4752:6; 4757:6
**fix** [3] - 4680:13; 4725:18
**fixed** [2] - 4655:25; 4744:21
**fixing** [1] - 4663:10
**flashed** [1] - 4752:12
**Florida** [1] - 4676:12
**folded** [1] - 4742:22
**follow** [1] - 4751:7
**followed** [5] - 4656:1, 20, 22-23; 4744:24
**Followed** [5] - 4663:25; 4671:4; 4732:25; 4746:5; 4753:4
**follows** [4] - 4664:3; 4672:19; 4697:13; 4754:6
**fool** [1] - 4738:20
**Force** [1] - 4754:16
**forensic** [1] - 4762:22
**form** [6] - 4666:8; 4686:22; 4729:22; 4730:3, 10
**formed** [1] - 4659:15
**Fort** [10] - 4678:1, 4, 7, 9, 23; 4679:9; 4681:9, 22; 4696:23
**forth** [5] - 4668:23; 4709:16; 4710:4; 4711:13; 4736:18
**forward** [3] - 4654:1; 4659:15; 4762:17
**foundation** [2] - 4704:13; 4750:21
**fountain** [1] - 4726:5
**four** [10] - 4666:19; 4667:12; 4676:5; 4691:15, 18, 21; 4694:21; 4695:10; 4698:1; 4762:22
**Francesco** [1] - 4652:21
**Francisco** [1] - 4665:18
**Frank** [7] - 4697:10, 16; 4707:9, 11, 25; 4717:16
**free** [1] - 4655:18
**frequently** [1] - 4662:1
**Friday** [3] - 4670:25; 4760:19; 4761:6
**friend** [2] - 4688:9; 4711:21
**friends** [11] - 4680:20; 4683:11; 4705:19, 21; 4727:24; 4728:15, 24-25; 4729:3; 4737:7; 4757:25
**friendship** [6] - 4706:20; 4709:8; 4711:7, 25; 4712:12; 4738:11
**front** [5] - 4657:20; 4726:8, 11; 4742:22
**full** [5] - 4664:4; 4697:14; 4708:20; 4754:7; 4761:10
**fully** [1] - 4659:3
**furthermore** [1] - 4761:24

## G

**Gambino** [26] - 4686:11, 16, 19; 4688:21, 24; 4690:17; 4719:12, 14, 21; 4720:3, 17, 20; 4721:1, 13, 21, 24; 4722:1, 12, 17; 4724:10; 4729:16, 19; 4737:4; 4749:23; 4762:24
**game** [2] - 4680:25; 4712:25

**games** [1] - 4738:19
**gangs** [1] - 4722:24
**gangster** [27] - 4707:17; 4713:19; 4714:4, 6, 9, 12, 24; 4715:3; 4719:6; 4723:18; 4731:10, 14; 4734:5, 20, 24-25; 4735:5, 10, 13, 15, 17, 25; 4736:10; 4739:11; 4740:6
**gangsters** [2] - 4737:7
**garage** [4] - 4655:12; 4708:19; 4718:24
**garbage** [1] - 4714:21
**general** [3] - 4703:23; 4751:11; 4756:22
**generally** [1] - 4704:17
**generation** [1] - 4704:17
**Genovese** [7] - 4685:8, 12-13, 19; 4758:11; 4759:3, 9
**gentleman** [6] - 4704:7, 9; 4709:11, 13
**gentlemen** [1] - 4757:5
**Giovanni** [1] - 4698:1
**girl** [3] - 4700:21; 4705:20; 4706:3
**gist** [1] - 4652:11
**given** [4] - 4703:20; 4715:5; 4741:16, 20
**glance** [1] - 4663:3
**glossy** [1] - 4666:20
**Gotti** [13] - 4652:22; 4665:15; 4720:7, 9, 20; 4721:23; 4737:16, 18; 4738:7; 4747:2, 16; 4749:21
**Gotti's** [1] - 4749:22
**govern** [1] - 4689:15
**government** [10] - 4655:3, 11, 14; 4659:5; 4667:11; 4751:13, 24; 4757:14; 4763:4
**Government** [3] - 4652:9; 4664:15; 4755:19
**government's** [2] - 4761:23; 4762:5
**grade** [2] - 4674:12, 18
**grandmother** [4] - 4698:12; 4703:12, 22; 4713:2
**grandparents** [1] - 4698:8
**grasping** [1] - 4751:13
**Graziano** [2] - 4652:22; 4665:18
**great** [1] - 4655:3
**Green** [2] - 4762:19, 21
**grew** [7] - 4674:16; 4704:10, 16; 4727:13, 18; 4737:13
**ground** [1] - 4663:18
**grounds** [2] - 4732:24; 4741:22
**group** [10] - 4679:13, 16, 23; 4680:4; 4681:11; 4682:21; 4684:6, 8; 4696:25
**groups** [4] - 4679:2; 4680:1
**grow** [2] - 4673:7; 4698:3
**growing** [6] - 4674:15; 4698:7; 4714:19; 4737:11; 4740:11
**guess** [2] - 4654:11; 4702:1
**guilty** [11] - 4653:19; 4676:10; 4677:15-17, 19; 4751:5; 4758:17, 24; 4759:3
**Gus** [1] - 4730:19
**guy** [19] - 4662:7; 4680:13; 4682:11, 19; 4683:6; 4684:10; 4685:1; 4688:7; 4710:5, 11, 19, 25; 4711:11; 4734:7, 15, 18; 4736:6
**guys** [10] - 4681:5; 4682:1, 13; 4683:7, 12; 4684:8; 4685:14, 16; 4704:16; 4717:3

## H

**hair** [40] - 4661:2; 4698:20; 4699:4, 9, 14, 24; 4700:1, 8, 16, 19, 23-24; 4701:8, 11, 13, 22; 4702:21; 4703:9; 4705:9; 4706:18; 4708:13; 4710:15; 4717:15, 21; 4718:18, 21-23; 4724:16, 22; 4725:7; 4726:7, 14-15, 20; 4728:3; 4730:15; 4738:9
**haircut** [1] - 4699:7
**haircutter** [2] - 4699:18, 22; 4700:4
**hairdresser** [3] - 4698:17; 4705:20
**half** [2] - 4676:18; 4756:18
**handing** [1] - 4694:11
**hands** [1] - 4707:20
**hang** [9] - 4681:25; 4682:6, 8; 4683:7; 4684:17; 4685:13; 4688:7; 4696:14
**hanging** [7] - 4685:8, 11; 4716:24; 4717:1, 19, 22; 4718:11
**hangout** [2] - 4717:14; 4718:3
**Hanlon** [8] - 4652:7, 20; 4653:13; 4664:5; 4741:23; 4743:3; 4751:10; 4754:9
**Hanlon's** [1] - 4743:6
**happy** [3] - 4670:12; 4703:10; 4763:8
**hard** [2] - 4704:17; 4716:8, 13
**hardly** [1] - 4687:14
**hat** [1] - 4663:19
**hate** [1] - 4714:9
**haunts** [1] - 4759:24
**head** [2] - 4711:2; 4720:17
**hear** [8] - 4672:12; 4674:9; 4681:4; 4682:16; 4696:7; 4705:17; 4721:3; 4761:20
**heard** [8] - 4685:19; 4688:25; 4720:14; 4737:2; 4744:23; 4747:16; 4757:4; 4761:4
**hearing** [1] - 4681:20
**hearsay** [2] - 4707:6; 4760:5
**heart** [3] - 4720:9, 11; 4721:5
**hearts** [2] - 4720:9, 11
**hello** [2] - 4713:4; 4719:3
**help** [26] - 4706:13; 4707:11; 4710:22; 4711:3, 17; 4713:18; 4714:24; 4715:15; 4723:3, 13, 22, 25; 4724:5, 7; 4726:15; 4730:23; 4731:1, 9, 11, 15; 4736:7; 4740:3; 4743:11
**helped** [1] - 4728:11
**helping** [1] - 4707:14
**Henry** [1] - 4651:23
**herself** [1] - 4661:24
**hi** [1] - 4717:16
**high** [1] - 4715:24
**highlighted** [1] - 4747:20
**hilarious** [1] - 4701:1
**himself** [4] - 4653:6; 4655:10; 4702:16; 4762:9
**hinges** [1] - 4743:3
**History** [5] - 4720:6, 8, 14; 4721:15, 20
**history** [2] - 4720:12; 4721:4
**Hobbs** [1] - 4759:4
**hold** [1] - 4696:8
**home** [8] - 4659:9; 4708:16, 22; 4709:14; 4710:10; 4711:4; 4746:2; 4717:3

**homes** [1] - 4712:1
**honest** [1] - 4707:16
**honestly** [1] - 4756:21
**Honor** [11] - 4652:6; 4657:16; 4670:20; 4705:18; 4732:18; 4741:22; 4750:14; 4751:22; 4752:2; 4759:7; 4763:7
**HONORABLE** [1] - 4651:11
**hope** [2] - 4712:16; 4750:24
**hoped** [2] - 4734:14; 4740:13
**hoping** [1] - 4706:19
**hour** [1] - 4741:11
**hours** [2] - 4668:8; 4681:7
**house** [14] - 4698:11; 4700:9; 4703:9; 4708:18; 4709:17; 4710:5; 4712:23; 4718:18, 24-25; 4725:19-21; 4755:2
**houses** [1] - 4726:9
**housing** [1] - 4687:16
**Howard** [6] - 4698:4, 6; 4710:8; 4736:15; 4737:9, 14
**humble** [1] - 4687:14
**hundred** [1] - 4734:7
**hung** [10] - 4681:10; 4682:1; 4683:8; 4684:10; 4685:1; 4688:9, 14, 17, 25; 4716:18
**Hunt** [2] - 4698:23; 4699:1
**Hunter** [1] - 4762:8

## I

**idea** [3] - 4688:1; 4715:9
**ignore** [1] - 4660:16
**illegal** [1] - 4694:15
**illegally** [1] - 4677:20
**illicit** [1] - 4692:4
**imagine** [1] - 4670:24
**immediate** [2] - 4703:2, 21
**immediately** [3] - 4668:21; 4702:15; 4710:16
**immigration** [2] - 4694:22
**impeachment** [2] - 4657:9
**implicated** [1] - 4654:2
**import** [1] - 4691:21
**imported** [2] - 4691:24; 4695:15
**impose** [1] - 4709:8
**impossible** [1] - 4668:20
**impression** [4] - 4741:7; 4742:8, 13; 4749:5
**incarcerated** [2] - 4705:5; 4708:8
**incarceration** [1] - 4681:14
**incident** [2] - 4653:7; 4756:1
**inclined** [1] - 4741:22
**including** [1] - 4658:9
**income** [1] - 4739:18
**indicate** [2] - 4751:6; 4761:13
**indicates** [1] - 4659:3
**indication** [1] - 4657:22
**indicted** [6] - 4676:6, 8; 4677:13; 4712:6; 4758:14, 18
**indictment** [3] - 4762:8, 12
**individual** [3] - 4690:14, 17; 4724:9
**individuals** [8] - 4679:19, 23; 4680:3, 17; 4681:10; 4755:13; 4757:24; 4759:14
**infer** [2] - 4654:14; 4752:4
**inference** [1] - 4659:25
**inmate** [1] - 4680:15

**inmates** [5] - 4678:21, 24; 4679:1, 13; 4696:22
**inquiry** [4] - 4659:18; 4662:25; 4667:19, 25
**inside** [2] - 4652:14; 4681:1
**institution** [1] - 4678:8
**insufficient** [1] - 4762:16
**intently** [1] - 4663:6
**interaction** [1] - 4664:10
**interested** [4] - 4658:14; 4662:8
**interesting** [2] - 4660:20; 4669:8
**International** [3] - 4675:17, 23; 4677:4, 9
**interrogate** [1] - 4669:5
**interrupted** [1] - 4722:9
**introduce** [1] - 4682:20
**introduced** [4] - 4682:18; 4756:15, 17, 20
**introduces** [1] - 4732:9
**introduction** [1] - 4748:12
**investigating** [1] - 4759:12
**investigation** [1] - 4758:1
**involve** [3] - 4693:3; 4694:9, 11
**involved** [5] - 4658:11; 4661:11; 4693:15; 4726:19; 4748:24
**involving** [3] - 4747:6; 4748:25
**irrelevant** [2] - 4656:11; 4751:22
**irreputable** [1] - 4717:23
**Island** [6] - 4699:20; 4705:19; 4709:9; 4710:24; 4738:23; 4740:4
**issue** [4] - 4670:11; 4732:9; 4739:7; 4751:15
**Italian** [12] - 4679:7-9, 11; 4680:4; 4681:14, 23; 4737:6; 4738:4
**Italians** [1] - 4704:17

## J

**JACK** [1] - 4651:11
**Jackie** [6] - 4688:19; 4727:6; 4729:4, 9, 18; 4730:17
**jail** [21] - 4676:14, 17; 4679:24; 4688:14, 17; 4705:7, 13; 4708:12, 25; 4711:15; 4712:19, 22; 4722:6, 11; 4730:13, 16; 4735:4; 4738:11; 4757:25
**Jamaica** [7] - 4672:6; 4673:4, 23; 4674:1, 25; 4692:15; 4696:3
**Jamaican** [1] - 4694:22
**Jamaicans** [2] - 4679:7
**January** [1] - 4677:2
**Jennie** [1] - 4708:17
**Jersey** [2] - 4678:1
**Jew** [2] - 4682:18
**Jewish** [2] - 4680:13; 4682:19
**job** [11] - 4678:10; 4681:8; 4687:15-19; 4699:16; 4706:7; 4710:1
**jobs** [4] - 4678:14, 16-17; 4698:21
**Joe** [1] - 4728:21
**John** [14] - 4652:22; 4665:15; 4720:7, 9, 20; 4721:23; 4737:16, 18; 4738:7; 4747:6, 16; 4749:21; 4750:2
**join** [1] - 4689:19
**joked** [1] - 4701:1
**Joker** [1] - 4700:25
**JORDAN** [1] - 4651:20

**Joseph** [4] - 4727:17, 21, 23, 25
**Jr** [4] - 4727:10, 17, 19, 23
**judge** [9] - 4659:17; 4663:22; 4742:17; 4743:12; 4747:19; 4750:4, 19; 4757:19; 4763:5
**Judge** [8] - 4652:4; 4666:2; 4667:21; 4695:3; 4696:17, 24; 4742:2; 4748:10
**JUDGE** [1] - 4651:11
**judges** [1] - 4663:17
**July** [1] - 4754:18
**jump** [1] - 4660:18
**June** [1] - 4678:3
**junk** [2] - 4726:12; 4739:21
**junkyard** [8] - 4726:3, 11, 19, 25; 4727:25; 4728:12, 18
**juries** [1] - 4747:21
**juror** [5] - 4659:8, 14, 19; 4660:11; 4661:22; 4663:4, 9; 4669:17
**JUROR** [1] - 4731:21
**jurors** [8] - 4656:1, 20, 22-23; 4661:24; 4679:12; 4749:23; 4751:8
**jury** [71] - 4651:11; 4653:10; 4654:14, 23; 4657:20; 4658:11; 4659:12, 25; 4660:4, 23; 4661:12, 17; 4662:10, 17; 4663:9; 4667:16, 18, 25; 4668:9, 11, 23; 4669:5, 19, 21, 23; 4670:10, 23; 4672:14; 4673:15; 4674:9; 4675:22; 4678:12; 4680:23; 4685:21, 25; 4691:23; 4700:18; 4702:12; 4705:15; 4706:15; 4714:8; 4720:13, 18; 4721:13; 4724:3, 6; 4734:4, 11; 4735:11, 21; 4741:13; 4742:7; 4745:24; 4748:23, 25; 4749:2, 4, 7, 20; 4751:5; 4752:3, 18; 4753:3; 4754:1; 4755:18; 4756:19; 4760:17; 4761:1, 7; 4762:17, 25
**Jury** [4] - 4672:1; 4731:23; 4732:22; 4761:2, 19
**jury's** [2] - 4653:7; 4655:25

## K

**keep** [4] - 4689:6; 4701:6; 4743:14; 4759:11
**keeping** [2] - 4741:17, 21
**KELLY** [1] - 4651:18
**Kelly** [19] - 4672:21; 4673:3, 15; 4674:3, 18; 4676:16, 24; 4677:6, 13; 4678:4, 9; 4680:20; 4681:9, 17, 22; 4682:24; 4683:14; 4687:12; 4696:20
**Kevin** [22] - 4652:7; 4653:18, 23; 4654:1; 4666:10; 4667:13; 4704:10, 12, 15; 4715:24; 4716:5; 4717:9, 12, 19, 23; 4732:14, 19; 4743:3; 4744:14; 4748:21
**Kevin's** [1] - 4717:7
**kidding** [1] - 4700:24
**kids** [3] - 4712:25; 4717:3, 17
**kill** [1] - 4690:2
**killed** [1] - 4747:4
**kilos** [1] - 4677:10
**kind** [8] - 4661:10; 4662:18; 4669:24; 4681:5; 4700:7; 4705:25; 4706:21; 4707:12
**kingston** [1] - 4673:4
**Kingston** [5] - 4673:8; 4674:14, 23; 4682:25

**knowledge** [4] - 4704:6; 4756:4, 24; 4758:4

**known** [3] - 4698:23; 4716:5; 4719:8

**knows** [5] - 4655:21; 4714:10, 12; 4729:6, 10

## L

**ladies** [1] - 4757:5

**language** [1] - 4738:20

**large** [2] - 4661:9; 4680:2

**last** [6] - 4684:13; 4690:21; 4711:20; 4713:1; 4730:14; 4750:7

**laughing** [1] - 4696:9

**law** [2] - 4694:3; 4761:17

**lawyer** [1] - 4758:16

**lay** [1] - 4750:21

**leading** [2] - 4675:11, 19

**learn** [1] - 4708:1

**learned** [3] - 4708:5; 4712:1; 4725:18

**least** [3] - 4707:1; 4716:11

**leave** [6] - 4667:3; 4701:5; 4724:23; 4741:8; 4742:13; 4750:11

**leaves** [4] - 4680:15; 4731:23; 4741:13; 4761:19

**leaving** [1] - 4692:15

**left** [8] - 4674:18; 4698:10; 4700:5; 4701:2, 22; 4706:7; 4739:3

**legally** [1] - 4706:10

**legs** [5] - 4652:14; 4653:9, 20; 4654:15; 4655:20

**lend** [2] - 4708:1

**length** [2] - 4655:3; 4666:3

**lengthy** [1] - 4659:13

**lent** [2] - 4706:1; 4708:6

**less** [1] - 4704:16

**lesson** [4] - 4707:25; 4708:1, 5; 4712:1

**letting** [1] - 4709:17

**liar** [2] - 4654:18; 4704:19

**lie** [12] - 4691:18; 4692:21-24; 4693:6, 10-11, 20; 4694:5, 15

**Lieutenant** [8] - 4652:7, 20; 4653:13; 4664:7; 4741:23; 4751:10; 4754:13

**lieutenant** [14] - 4658:16; 4663:22, 24; 4664:5, 15; 4732:3; 4741:6; 4748:14; 4751:3; 4752:18; 4754:9, 15; 4755:22

**life** [7] - 4703:23; 4704:3; 4709:5; 4717:2, 7; 4736:5; 4739:3

**limitation** [1] - 4762:7

**limitations** [1] - 4762:3

**lineup** [1] - 4658:6

**link** [5] - 4653:5; 4669:20; 4732:13; 4744:14

**Lino** [3] - 4747:7; 4750:2, 7

**listen** [2] - 4652:10; 4735:2

**live** [4] - 4662:18; 4698:5, 7; 4736:15

**living** [3] - 4674:19; 4698:16; 4725:14

**locker** [3] - 4680:13, 16

**lockers** [1] - 4680:18

**look** [5] - 4656:22; 4659:12; 4701:4; 4744:18; 4748:13

**looking** [1] - 4726:13

**lose** [3] - 4710:10; 4711:4

**lost** [1] - 4708:2

**loud** [1] - 4702:17

**Louie** [4] - 4653:20; 4665:1; 4742:19; 4747:8

**Louis** [1] - 4755:5

**low** [2] - 4656:6; 4716:7

**lowe** [1] - 4745:24

**lower** [3] - 4652:25; 4664:17; 4754:21

**lunch** [4] - 4745:25; 4746:2; 4757:10

**lying** [9] - 4692:16; 4693:3, 6, 12, 16, 19-20, 23; 4743:10

## M

**ma'am** [47] - 4672:13, 15; 4673:22, 24; 4674:2, 10; 4675:1, 3, 8, 10, 16, 20; 4676:1, 3, 7, 9, 13, 20, 23; 4677:14, 21, 24; 4678:11, 19, 22, 25; 4679:10, 21; 4680:5, 19, 22; 4681:12, 24; 4682:23; 4683:1, 15; 4696:21; 4755:2, 7, 9, 12, 15, 21, 24; 4756:2, 4, 9

**Mabelina** [1] - 4698:1

**mad** [3] - 4707:22

**main** [1] - 4667:12

**maintenance** [2] - 4678:16

**man** [3] - 4667:12; 4687:14; 4709:12; 4730:6

**management** [1] - 4762:23

**Manhattan** [4] - 4652:25; 4664:17; 4699:20; 4754:21

**March** [2] - 4651:8; 4763:11

**MARISA** [1] - 4651:15

**married** [4] - 4673:9; 4697:21; 4705:23; 4706:1

**Marshal** [1] - 4668:24

**massive** [1] - 4679:25

**materials** [1] - 4664:2

**matter** [2] - 4658:25; 4710:9

**matters** [1] - 4703:21

**Maurice** [1] - 4672:21

**McMahon** [53] - 4652:8, 11-12; 4653:5, 10-11, 18, 20, 23; 4654:1, 7, 9, 13, 18; 4655:4; 4656:15; 4657:22; 4658:5, 18; 4666:10; 4667:13, 17, 24; 4668:16, 24; 4669:11; 4670:12; 4704:10, 12, 15; 4715:24; 4716:5; 4717:10, 12, 19, 23; 4732:14, 19; 4742:21; 4743:3; 4744:15; 4747:3, 5; 4748:21; 4750:20; 4751:5, 17, 25; 4752:19, 21

**McMahon's** [4] - 4658:10; 4668:14; 4744:17, 20

**mean** [13] - 4682:7, 10; 4693:20; 4703:1; 4709:3; 4714:8, 17; 4715:19; 4717:7; 4718:7; 4720:11; 4749:2; 4751:2

**measure** [1] - 4661:9

**meatballs** [1] - 4713:3

**mechanical** [1] - 4652:1

**media** [1] - 4737:14

**meet** [4] - 4668:1; 4678:20; 4699:3, 6

**meeting** [1] - 4761:6

**member** [5] - 4684:15; 4747:13; 4752:15; 4758:18, 23

**members** [11] - 4672:14; 4673:15; 4675:22; 4678:12; 4680:23; 4700:14, 18; 4702:11; 4706:15; 4758:11; 4759:3

**memory** [2] - 4652:19; 4665:21

**men** [1] - 4737:1

**mentioned** [1] - 4706:19

**mere** [1] - 4759:25

**Meshanski** [2] - 4728:9, 21

**met** [8] - 4680:10; 4699:21; 4700:20; 4716:20, 22; 4739:17, 19

**method** [1] - 4663:8

**Miami** [2] - 4675:17, 23

**Michael** [2] - 4664:5; 4754:9

**might** [4] - 4655:23; 4685:5; 4707:18; 4752:11

**mind** [9] - 4653:7; 4663:9; 4669:17; 4693:1, 9; 4694:11; 4714:2; 4725:9; 4747:2

**minds** [1] - 4657:12

**mine** [1] - 4709:21

**minimal** [1] - 4743:15

**minute** [3] - 4743:16; 4748:8; 4750:11

**minutes** [7] - 4668:25; 4707:24; 4713:4; 4731:25; 4749:17; 4757:7

**minutes.** [1] - 4750:5

**mirror** [1] - 4726:13

**mistake** [2] - 4709:16; 4710:17

**mistaken** [3] - 4728:10; 4751:19, 21

**mix** [1] - 4679:19

**mob** [31] - 4679:7-9, 11-12; 4680:4; 4681:23; 4682:5, 12, 21; 4683:7, 12, 25; 4684:4, 6, 8, 18-20, 22, 24; 4685:14; 4686:3, 25; 4687:1, 4-6, 22; 4688:2

**mobs** [3] - 4686:7; 4687:13, 15

**modest** [4] - 4702:3; 4708:22

**mom** [7] - 4698:8, 10; 4703:12; 4705:5, 8; 4718:18, 25

**mom's** [2] - 4718:24; 4725:20

**moment** [3] - 4720:25; 4748:13; 4760:8

**Monday** [6] - 4668:25; 4669:11, 14; 4671:1; 4761:9; 4763:10

**money** [20] - 4679:15; 4683:13; 4688:23; 4690:20; 4699:17; 4705:25; 4706:2, 5, 9-11; 4707:2; 4708:1, 5-6; 4723:3; 4730:17; 4735:19; 4736:6

**month** [3] - 4708:10; 4709:17

**months** [5] - 4667:12; 4708:10; 4709:18; 4711:12; 4751:16

**moras** [1] - 4661:11

**moreover** [1] - 4687:15

**morning** [13] - 4652:7, 23; 4659:9; 4664:7, 13; 4668:25; 4670:25; 4672:2; 4683:22; 4697:19; 4713:9; 4751:17

**moron** [1] - 4711:10

**mortgage** [1] - 4710:7

**most** [6] - 4685:16; 4718:18, 20; 4737:11; 4744:3; 4762:19

**mother** [8] - 4698:13; 4703:2, 6-7; 4708:9, 11, 17; 4729:2

**mother's** [2] - 4703:9; 4705:9

**motion** [5] - 4661:15, 17, 19, 21; 4763:9

**motions** [1] - 4761:20

**mountain** [1] - 4752:7

**mouse** [5] - 4743:22, 24; 4744:7; 4752:8; 4762:15

**move** [10] - 4668:20; 4669:24; 4670:1, 7; 4694:18; 4695:2, 7-8; 4697:4; 4762:17

**moved** [5] - 4653:8; 4670:4; 4693:23; 4699:16, 18; 4709:10

**moving** [1] - 4694:6

**murder** [8] - 4652:9; 4653:18; 4657:16; 4741:21; 4742:18; 4751:15; 4752:4
**must** [1] - 4653:8

## N

**N.............................** [1] - 4764:1
**name** [31] - 4664:4; 4672:20; 4673:1, 16; 4684:13; 4685:3, 5; 4686:2, 4, 6; 4690:14; 4692:10, 13-14, 25; 4693:5, 13; 4697:14; 4699:11, 13; 4715:13; 4718:10, 13; 4727:3, 6, 10; 4729:23; 4754:7
**named** [10] - 4684:11; 4685:1; 4688:19; 4690:6, 17; 4718:5, 7; 4730:6; 4758:15, 18
**names** [4] - 4665:19; 4684:8; 4690:7; 4737:1
**nastiest** [1] - 4687:18
**nature** [2] - 4741:25; 4745:18
**near** [3] - 4698:23; 4704:20; 4712:23
**necessarily** [1] - 4732:15
**need** [6] - 4669:24; 4670:15; 4709:14; 4748:8; 4757:8
**needed** [3] - 4711:3; 4731:9
**negative** [2] - 4659:25; 4662:15; 4744:2
**neighborhood** [11] - 4704:11; 4714:20, 22; 4715:20; 4717:3; 4718:1; 4727:13; 4737:6; 4738:15; 4740:11
**nephew** [1] - 4718:12
**never** [44] - 4653:24; 4654:1; 4660:8, 24; 4681:16; 4682:3, 5-6; 4683:6, 8-9, 25; 4684:4, 9, 21, 23; 4685:14; 4686:3, 7, 9, 25; 4687:1, 5, 7; 4688:25; 4690:9; 4695:10, 12; 4696:14; 4700:22; 4706:5; 4708:6; 4719:7, 13; 4721:8; 4726:23; 4736:24; 4737:2; 4739:25
**NEW** [1] - 4651:1
**new** [6] - 4660:7, 10; 4661:15; 4678:21; 4687:4; 4690:13
**New** [9] - 4651:6, 17, 21, 24; 4673:17; 4678:1; 4685:22, 24
**News** [1] - 4714:21
**newspapers** [1] - 4714:20
**next** [10] - 4663:25; 4671:4; 4697:9; 4708:2; 4723:12; 4732:25; 4741:4; 4745:25; 4746:5; 4753:4
**nice** [6] - 4662:7; 4682:12; 4683:6; 4693:14; 4694:17; 4703:13
**night** [3] - 4713:1; 4754:23; 4761:18
**nil** [1] - 4762:15
**Nine** [1] - 4762:16
**ninth** [1] - 4674:12, 18
**nobody** [12] - 4663:11; 4681:19; 4684:17; 4692:24; 4693:4, 8, 11, 13; 4694:14, 16; 4701:4; 4739:16
**non** [2] - 4679:19; 4759:4
**non-RICO** [1] - 4759:4
**non-white** [1] - 4679:19
**none** [1] - 4740:2
**normal** [2] - 4664:19; 4680:17
**NORRIS** [8] - 4651:15; 4713:8; 4734:2; 4736:12; 4737:23; 4740:15, 23; 4741:1
**North** [1] - 4754:15
**note** [9] - 4659:8; 4662:6, 18; 4663:1; 4696:9; 4742:3; 4748:14; 4751:24

**notes** [1] - 4662:5
**nothing** [18] - 4660:15; 4687:22; 4693:16; 4696:13, 16; 4697:2; 4711:6; 4731:11, 15; 4735:12; 4739:12; 4741:3; 4744:5; 4747:23; 4748:2; 4756:10; 4757:1
**notice** [1] - 4678:23
**noticeable** [1] - 4679:17
**number** [6] - 4652:24; 4659:8; 4660:11; 4662:1; 4663:4; 4736:24; 4740:20; 4759:8
**numerous** [1] - 4701:7
**NYPD** [2] - 4665:4; 4754:20

## O

**o'clock** [4] - 4651:9; 4754:22; 4760:21; 4763:10
**oath** [4] - 4667:17; 4669:5; 4670:13; 4690:1; 4696:5; 4712:2
**object** [1] - 4758:3
**objecting** [1] - 4689:6
**objection** [23] - 4660:7; 4675:11, 19; 4684:2; 4686:12; 4688:11; 4695:1, 7; 4696:24; 4704:13; 4705:16; 4706:16, 23; 4707:6; 4718:6; 4721:2; 4723:7; 4737:23; 4740:15, 23; 4741:1; 4758:22
**obligation** [2] - 4659:3; 4706:11
**observations** [2] - 4663:1; 4702:6
**observe** [3] - 4660:17; 4662:10; 4717:1
**observed** [6] - 4659:20; 4660:6; 4679:12; 4702:7; 4709:2; 4718:10
**observes** [1] - 4660:4
**observing** [5] - 4660:24; 4661:1; 4665:7
**obvious** [2] - 4658:4; 4662:16
**obviously** [5] - 4662:12, 14; 4703:17; 4708:3
**occasions** [2] - 4694:21; 4701:7
**occur** [1] - 4712:18
**October** [3] - 4664:16; 4754:19; 4755:1
**odd** [3] - 4652:13; 4734:22; 4735:3
**OF** [3] - 4651:1, 3, 10
**offended** [1] - 4738:4
**offense** [1] - 4737:5
**offer** [2] - 4749:9; 4757:20
**office** [1] - 4673:25
**officer** [3] - 4652:16; 4656:11; 4754:17
**officer's** [1] - 4750:9
**often** [6] - 4679:20; 4701:16; 4702:8; 4708:9; 4717:19
**old** [15] - 4673:5, 13; 4687:4, 14; 4697:19, 25; 4698:12, 15, 19; 4710:11; 4716:6, 14, 22; 4728:13
**older** [3] - 4703:17; 4716:21; 4731:8
**once** [6] - 4693:4; 4702:14; 4709:12, 16; 4710:12; 4711:10; 4715:1; 4721:23
**one** [44] - 4652:8; 4653:8, 18; 4654:13; 4662:6; 4663:1; 4665:15, 17, 24; 4678:14, 16-17; 4679:23; 4686:2, 4, 6; 4688:13; 4693:17; 4694:24; 4695:24; 4696:4; 4698:21; 4709:17; 4714:18; 4720:5; 4723:22; 4724:12, 17; 4725:21; 4726:8; 4727:25; 4729:23; 4736:24; 4747:6, 17-18; 4750:7; 4752:22; 4757:7; 4761:14; 4760:8

**open** [3] - 4665:5; 4751:11; 4755:23
**opened** [1] - 4755:10
**operated** [1] - 4762:23
**operator** [1] - 4754:24
**opinion** [11] - 4659:16; 4667:10; 4709:7; 4712:15; 4714:13; 4715:25; 4716:7; 4721:17; 4737:13
**opportunity** [7] - 4652:12; 4653:12; 4658:13; 4666:13; 4668:6; 4732:20
**opposed** [2] - 4655:22; 4702:16; 4751:7
**opposite** [7] - 4682:9, 12, 14; 4683:10; 4687:13, 20; 4702:17
**ordeal** [1] - 4682:24
**order** [1] - 4668:21
**organized** [27] - 4685:21, 24; 4686:6; 4689:3, 13, 16-17, 19-20, 24; 4690:3; 4696:13, 15, 22; 4702:23; 4704:22; 4709:4; 4714:16; 4727:14; 4728:22; 4729:13; 4730:8; 4736:19; 4739:24; 4758:2, 24
**oriented** [1] - 4709:6
**ourselves** [1] - 4704:18
**outside** [15] - 4656:24; 4667:2, 18, 25; 4668:9, 11; 4670:22; 4681:1, 6; 4700:24; 4710:2; 4741:7; 4744:24; 4748:14; 4751:7
**oven** [9] - 4725:19-21, 23-24; 4726:1, 25; 4739:14
**ovens** [2] - 4725:18; 4739:14
**overnight** [1] - 4669:9
**owed** [1] - 4734:7
**owes** [2] - 4723:3; 4736:6
**own** [6] - 4679:24; 4692:10; 4714:2; 4723:1; 4761:14; 4762:5
**Ozone** [3] - 4698:21; 4699:9; 4702:2

## P

**page** [4] - 4663:25; 4671:4; 4732:25; 4753:4
**page.)** [1] - 4746:5
**pages** [1] - 4752:7
**pan** [2] - 4664:4; 4722:16
**panel** [2] - 4659:19; 4663:9
**Panzarella** [3] - 4727:17, 23; 4728:21
**paper** [4] - 4666:16; 4706:3; 4715:19; 4719:23; 4722:5; 4737:3
**papers** [1] - 4721:10
**paralegal** [1] - 4658:17
**paranoid** [1] - 4663:5
**paraphernalia** [1] - 4760:10
**paraphrasing** [2] - 4716:10; 4723:19
**parents** [1] - 4728:14
**Park** [3] - 4698:21; 4699:10; 4702:2
**parking** [2] - 4754:25; 4755:6
**part** [20] - 4664:19; 4679:9; 4684:19-21, 24; 4689:20; 4690:1; 4700:20; 4704:18; 4707:18; 4716:11; 4718:20; 4726:16; 4728:6; 4736:2; 4738:5; 4748:22; 4755:10; 4762:1
**participated** [1] - 4664:22
**particular** [2] - 4659:19; 4679:22
**parties** [1] - 4669:23
**parts** [1] - 4726:14
**paper** [4] - 4680:1; 4682:22

**Pascal** [1] - 4665:17
**pass** [1] - 4693:17
**passed** [1] - 4703:19
**passport** [16] - 4692:18, 22; 4693:7, 13, 17-19, 25; 4694:12, 14, 16, 20; 4695:21
**passports** [2] - 4692:17; 4693:2
**patrol** [2] - 4664:16; 4754:23
**Patsey** [1] - 4652:21
**Paul** [1] - 4757:17
**Pause** [3] - 4745:21; 4750:12, 17
**pay** [2] - 4687:17; 4710:7
**paying** [1] - 4709:19
**payment** [1] - 4703:10
**people** [32] - 4674:4; 4680:7; 4682:20; 4685:14; 4688:13; 4694:19; 4696:14; 4701:4; 4711:24; 4714:11-13; 4715:10, 20; 4716:1; 4718:5, 7, 10; 4722:6, 11, 15; 4724:23; 4725:5, 8; 4726:12, 15; 4737:7, 11, 13; 4759:11, 23
**perceive** [1] - 4659:25
**perceived** [1] - 4659:11
**perfectly** [1] - 4661:5
**perform** [1] - 4678:18
**performing** [2] - 4754:22; 4758:5
**perhaps** [1] - 4737:13
**period** [11] - 4687:6; 4702:5; 4703:8, 19; 4706:5; 4729:25; 4748:24; 4762:2, 7, 10
**perjury** [1] - 4712:6
**persecuted** [2] - 4712:15; 4713:12
**person** [25] - 4688:19; 4692:1, 15; 4706:25; 4707:1; 4708:5; 4709:2, 15, 17; 4711:12; 4712:14, 16; 4715:21; 4716:12; 4717:23; 4723:6; 4725:3; 4738:18-20; 4759:14
**person's** [1] - 4702:13
**personal** [2] - 4709:6; 4712:15
**personality** [1] - 4702:13
**personally** [3] - 4683:12; 4714:19; 4719:18
**Philadelphia** [2] - 4677:4, 8
**phone** [6] - 4670:12, 18; 4706:6; 4740:12
**photo** [1] - 4652:21
**photograph** [16] - 4652:23; 4653:2, 13; 4664:9, 12; 4665:25; 4666:7, 17; 4668:14; 4748:17; 4750:24; 4751:1; 4755:16, 18
**photographers** [2] - 4742:24; 4756:15
**photographs** [7] - 4652:9, 17; 4666:14; 4747:24; 4748:3; 4755:14; 4756:7
**photos** [5] - 4742:17, 21; 4743:5, 8; 4752:4
**pick** [1] - 4678:15
**picture** [13] - 4653:7; 4654:20; 4655:9, 13, 17, 19; 4656:2, 7; 4658:5; 4659:4; 4667:15; 4732:17; 4760:3
**pictures** [8] - 4657:23; 4658:2; 4749:7, 14; 4752:1, 11; 4759:17; 4760:6
**piece** [2] - 4711:5; 4728:1
**Pine** [1] - 4726:20
**pinochle** [2] - 4680:25; 4681:6
**place** [9] - 4673:16; 4683:11; 4708:15; 4709:15; 4712:25; 4747:3; 4751:23; 4752:5

**placed** [2] - 4653:20; 4670:13
**placing** [1] - 4655:10
**Plaintiff** [1] - 4651:13
**plan** [1] - 4761:10
**play** [6] - 4661:9; 4680:25; 4681:6; 4728:14; 4738:19
**Plaza** [2] - 4651:16, 23
**plea** [3] - 4758:15
**plead** [8] - 4653:19; 4676:10; 4677:15, 17, 19; 4751:5; 4758:24; 4759:3
**pleasant** [1] - 4761:17
**pleasure** [3] - 4675:7, 14; 4705:11
**pled** [3] - 4676:11; 4677:16; 4759:5
**point** [17] - 4657:3; 4660:20-22; 4662:23; 4663:16, 20; 4694:6; 4695:3; 4707:3; 4748:9; 4749:2, 9; 4750:23; 4751:23
**pointed** [1] - 4751:5
**Police** [1] - 4665:3
**police** [4] - 4656:11; 4710:1, 4; 4754:17
**poor** [1] - 4674:16
**Port** [1] - 4665:3
**portrayed** [1] - 4737:14
**position** [6] - 4653:21; 4654:17; 4658:12; 4678:20; 4749:6; 4759:7
**possibility** [1] - 4711:19
**possible** [1] - 4670:5
**possibly** [3] - 4706:25; 4710:10; 4752:9
**potential** [1] - 4752:5
**practice** [1] - 4663:11
**precinct** [4] - 4652:25; 4653:14; 4664:16; 4754:20
**Precinct** [1] - 4754:21
**preclude** [1] - 4748:12
**preeminent** [1] - 4744:4
**prefer** [2] - 4662:2; 4741:23
**pregnant** [1] - 4705:20
**prejudice** [2] - 4752:3, 5
**prejudicial** [1] - 4743:17
**prepare** [2] - 4668:12; 4760:20
**presence** [5] - 4667:18, 25; 4668:9, 11; 4670:23
**present** [24] - 4653:11; 4656:1, 14, 18-19, 21; 4657:22; 4662:2; 4664:25; 4665:1, 4; 4667:10; 4669:6; 4670:19; 4672:1, 6-7; 4732:22; 4743:4; 4747:23; 4748:3; 4755:13; 4761:2
**present)** [1] - 4754:1
**presentation** [1] - 4672:4
**presented** [1] - 4761:25
**presumably** [1] - 4653:12
**pretend** [1] - 4693:25
**pretending** [1] - 4694:12
**prevailed** [1] - 4738:11
**preview** [1] - 4668:4
**previous** [4] - 4665:20, 22; 4735:21; 4744:21
**previously** [6] - 4657:16; 4677:22; 4742:8, 14; 4744:11; 4761:22
**prison** [17] - 4682:21; 4684:6; 4687:24; 4688:2, 4, 6; 4690:21; 4704:8; 4705:2; 4713:18; 4723:21; 4724:4; 4729:21, 24; 4730:2; 4736:5
**probative** [1] - 4743:15
**problem** [3] - 4670:15, 21; 4683:18

**proceed** [2] - 4689:8; 4746:2
**Proceedings** [1] - 4652:1
**produce** [1] - 4659:5
**produced** [1] - 4711:24
**professing** [1] - 4711:24
**prominent** [2] - 4744:3, 6
**proof** [5] - 4745:16; 4757:20; 4760:4; 4762:11; 4763:6
**property** [1] - 4711:5
**prosecution** [1] - 4762:20
**prosecutor** [4] - 4654:8; 4683:16; 4736:18; 4737:21
**prove** [1] - 4712:13
**provided** [4] - 4658:1, 11; 4668:13; 4763:6
**proving** [1] - 4704:18
**public** [6] - 4732:16; 4747:13; 4751:10; 4752:15; 4756:22
**published** [3] - 4747:24; 4748:4; 4749:15
**pull** [1] - 4748:22
**pulled** [1] - 4749:12
**purchased** [1] - 4709:10
**purple** [5] - 4700:23-25; 4724:16, 22; 4725:7
**purpose** [2] - 4655:6; 4657:15
**pursuant** [1] - 4664:13
**push** [1] - 4705:24
**pushed** [1] - 4652:14
**pushes** [1] - 4762:6
**pushing** [1] - 4682:13
**put** [19] - 4652:17, 20; 4653:2, 4, 6; 4656:2; 4657:19; 4658:12; 4663:13; 4668:23; 4669:4; 4683:4; 4701:3; 4721:20; 4745:14; 4751:24; 4755:17; 4756:7

## Q

**Queens** [5] - 4698:4, 6, 22; 4699:10, 20
**QUESTION** [1] - 4749:25
**questioned** [1] - 4660:13
**questioning** [2] - 4659:4; 4689:8
**questions** [5] - 4664:8; 4683:17; 4689:9; 4736:12; 4756:14
**quick** [3] - 4670:24; 4720:1; 4756:14
**quickly** [1] - 4668:20
**quiet** [3] - 4674:16; 4682:11; 4702:15
**quite** [8] - 4700:17; 4702:7, 9; 4706:8; 4707:8; 4725:15; 4728:18; 4736:24

## R

**Racketeering** [1] - 4762:16
**racketeering** [1] - 4653:18
**raised** [5] - 4660:22; 4698:4, 9, 12; 4707:20
**ran** [1] - 4700:24
**rather** [1] - 4670:25
**rationally** [1] - 4661:5
**react** [1] - 4661:8
**reacts** [1] - 4660:25
**read** [11] - 4663:4; 4667:16; 4719:23; 4726, 19-21; 4724:15; 4740:11;

4761:13

**reading** [2] - 4714:21; 4715:19
**ready** [1] - 4720:2
**real** [2] - 4692:25; 4693:5
**realized** [1] - 4747:17
**really** [9] - 4653:8; 4674:17; 4704:7; 4711:3; 4721:6; 4731:9, 17; 4740:13
**rearview** [1] - 4726:13
**reason** [6] - 4654:13; 4741:18; 4742:20; 4745:7; 4747:12; 4755:4
**reasonable** [1] - 4657:12
**reasons** [3] - 4654:14; 4672:7; 4763:2
**rebuttal** [3] - 4752:24; 4753:2; 4757:7
**rebuttal?** [1] - 4757:14
**recalled** [4] - 4656:16; 4659:2; 4667:14; 4668:24
**receive** [1] - 4706:9
**received** [1] - 4730:16
**receiving** [1] - 4683:13
**Recess** [3] - 4732:1; 4746:4; 4757:11
**recognized** [1] - 4752:2
**recollection** [1] - 4666:16
**recommend** [1] - 4709:21
**record** [14] - 4657:19; 4667:18; 4672:20; 4696:9; 4697:15; 4734:3; 4744:9; 4748:2, 19; 4749:19; 4750:10; 4751:16; 4752:6; 4754:8
**recorded** [1] - 4652:1
**recross** [1] - 4697:6
**REDIRECT** [4] - 4696:18; 4736:13; 4764:13, 16
**redress** [1] - 4670:11
**reference** [1] - 4749:1
**referencing** [1] - 4749:12
**referring** [3] - 4702:23; 4748:20, 23
**reflect** [1] - 4669:9
**reframe** [1] - 4738:1
**refreshed** [1] - 4665:21
**refused** [1] - 4703:10
**regard** [1] - 4762:7
**regarding** [2] - 4659:21; 4669:17
**relating** [1] - 4762:14
**relation** [3] - 4703:6; 4705:8
**relationship** [6] - 4700:7; 4703:4, 15; 4704:1; 4728:4; 4739:18
**relevance** [2] - 4732:19; 4747:14
**relevancy** [1] - 4658:15
**relevant** [2] - 4653:5; 4760:2
**relying** [1] - 4658:5
**remember** [9] - 4652:24; 4653:1; 4656:21; 4685:8, 11; 4694:25; 4716:25; 4727:2; 4728:13
**reminded** [1] - 4703:12
**renew** [2] - 4732:24; 4761:22
**rent** [1] - 4709:20
**rented** [1] - 4709:11
**renting** [1] - 4712:1
**repair** [4] - 4678:18; 4680:16; 4726:1; 4739:15
**repaired** [2] - 4680:18; 4739:14
**repairman** [3] - 4725:23; 4726:25
**repairs** [1] - 4680:14
**repeat** [13] - 4663:15; 4675:13; 4678:15; 4682:16; 4685:10; 4686:13; 4688:15; 4689:4; 4691:20; 4694:10, 25; 4696:7

**repeated** [1] - 4663:7
**repeatedly** [1] - 4660:22
**report** [2] - 4710:1, 4
**reporter** [2] - 4678:15; 4682:16
**Reporter** [1] - 4651:23
**represented** [1] - 4751:16
**reputation** [8] - 4730:24; 4731:2; 4735:14; 4738:14, 17-18; 4740:11
**request** [5] - 4711:16; 4729:22; 4730:3, 10; 4740:25
**requested** [1] - 4672:8
**research** [1] - 4761:14
**resent** [2] - 4680:8; 4683:12
**resentment** [1] - 4680:3
**reserved** [1] - 4702:16
**resident** [1] - 4736:15
**respected** [3] - 4715:21; 4723:6; 4724:9
**respectfully** [9] - 4657:2, 6-7, 12; 4661:25; 4667:8, 21; 4740:18; 4743:12
**respond** [2] - 4665:6; 4751:14; 4754:25
**responded** [7] - 4653:1; 4664:20; 4665:4; 4710:16; 4755:4, 8
**responding** [1] - 4665:6
**response** [2] - 4734:23; 4735:4
**rest** [1] - 4760:18
**restaurant** [4] - 4712:23; 4716:14; 4719:2
**rested** [1] - 4757:13; 4760:14
**resting** [1] - 4760:15
**resume** [1] - 4708:13
**resumed** [1] - 4711:25
**retirement** [1] - 4747:10
**return** [5] - 4675:14; 4676:21, 24; 4691:7, 10
**returned** [1] - 4676:25
**reverse** [1] - 4663:18
**review** [2] - 4748:17; 4750:14
**reviewing** [1] - 4665:19
**RICO** [2] - 4759:2, 4
**rigging** [1] - 4654:23
**rigorous** [1] - 4656:6
**Road** [2] - 4702:1; 4718:23
**road** [2] - 4710:18; 4711:18
**robbery** [2] - 4759:1, 4
**ROGER** [1] - 4651:14
**role** [1] - 4719:5
**room** [3] - 4674:4; 4712:25; 4718:19
**rough** [1] - 4705:23
**round** [1] - 4682:8
**routine** [1] - 4758:5
**Ruggiero** [1] - 4727:10
**rule** [1] - 4669:19
**Rule** [1] - 4761:22
**ruled** [4] - 4657:16; 4732:18; 4745:9
**rules** [1] - 4689:15
**ruling** [5] - 4669:17; 4741:16, 20; 4745:14; 4747:10
**running** [2] - 4716:15; 4726:19
**Russian** [2] - 4709:13; 4736:6

---

## S

**sad** [1] - 4705:25
**Sal** [7] - 4684:11, 21; 4688:7, 9, 13, 16;

4757:25

**salon** [12] - 4699:9, 17; 4700:2, 5-6, 21; 4701:23; 4705:19; 4709:14, 21; 4718:21
**salons** [1] - 4699:19
**Saturday** [1] - 4760:19
**saw** [13] - 4656:3; 4657:22; 4658:6; 4659:4; 4667:15; 4717:9; 4728:4; 4742:21, 23; 4743:5; 4751:25; 4759:23
**scare** [1] - 4710:25
**scenario** [2] - 4668:19; 4710:15
**scene** [10] - 4652:16; 4653:1, 6; 4654:13, 18; 4664:23; 4666:8; 4755:8, 14
**schedule** [1] - 4701:19
**Schiavo** [1] - 4762:14
**school** [2] - 4674:11, 18
**Sclafani** [6] - 4690:6, 14, 17, 20; 4727:8; 4730:19
**scope** [1] - 4757:20
**scowling** [1] - 4663:7
**search** [2] - 4657:1; 4658:17
**seat** [1] - 4742:22
**seated** [3] - 4672:2; 4732:23; 4761:3
**seats** [1] - 4658:7
**second** [4] - 4696:8; 4724:4, 6; 4747:18
**securing** [1] - 4664:22
**security** [2] - 4709:18; 4711:12
**see** [37] - 4652:13; 4653:12; 4655:1, 18; 4656:8, 18; 4663:4; 4669:6, 23-24; 4670:9; 4672:14; 4681:10, 23; 4683:7, 22; 4696:20; 4701:16; 4702:14; 4708:9; 4711:9; 4714:1; 4717:14, 19; 4722:5; 4739:9, 15, 21; 4741:9; 4743:8; 4745:5; 4748:10; 4750:10; 4755:18, 20; 4757:8; 4763:10
**seeking** [1] - 4742:15
**SEIFAN** [1] - 4651:15
**Selvaggio** [16] - 4697:10, 16; 4698:9; 4700:15; 4701:10; 4702:12; 4703:15; 4704:2, 24; 4708:24; 4711:14; 4712:2; 4720:20; 4736:15; 4738:22; 4739:13
**send** [1] - 4710:24
**sending** [1] - 4662:5
**senior** [1] - 4747:2
**Senior** [2] - 4747:16; 4749:21
**sent** [8] - 4659:8; 4686:22; 4688:23; 4690:20; 4729:21; 4730:2, 5, 10
**sentence** [1] - 4676:15
**separate** [1] - 4670:8
**separately** [1] - 4660:13
**sergeant** [1] - 4755:2
**series** [2] - 4720:1; 4743:25
**serious** [1] - 4710:9
**served** [1] - 4751:9
**service** [1] - 4668:24
**seven** [4] - 4676:15; 4678:6, 23; 4681:9
**Shapiro** [1] - 4651:23
**SHARKEY** [113] - 4651:18; 4652:4, 6; 4653:17, 23; 4654:1, 6, 11, 17, 22; 4655:25; 4656:6, 9, 13, 19, 25; 4657:6, 9, 12, 20, 25; 4658:16; 4660:18; 4661:14, 16, 20, 22, 25; 4662:5, 7, 12, 15, 17, 21, 23; 4663:22; 4664:11; 4666:3; 4667:2, 5, 8, 17, 21, 24; 4668:22; 4669:20, 22; 4670:1, 7, 19; 4672:5, 10, 23; 4683:16, 19; 4684:2;

---

4686:12; 4687:10, 12; 4688:11; 4695:1,
7; 4696:17, 19; 4697:2, 10, 18; 4713:6;
4718:6; 4721:2; 4722:8; 4723:7, 9;
4732:4; 4736:14; 4740:18; 4741:3, 6;
4742:2, 6, 13; 4743:1, 23; 4744:5, 8, 17,
19; 4745:2, 9, 13, 17, 20; 4747:19;
4748:8; 4749:10, 16; 4750:4, 10, 19;
4751:2, 20; 4754:12; 4756:10; 4757:2,
17, 19; 4758:3, 13, 22; 4759:1; 4764:3,
11, 20

**Sharkey** [2] - 4659:6; 4751:16
**SHARKEY:........................................**
[2] - 4764:14, 17
**sharp** [1] - 4660:23
**sheet** [2] - 4666:16; 4758:14
**sheets** [1] - 4680:15
**shop** [2] - 4678:11, 13
**shove** [1] - 4705:24
**show** [7] - 4656:7, 15; 4658:11;
4664:12; 4755:16; 4758:20; 4760:6
**showed** [2] - 4652:23; 4664:12
**showing** [1] - 4652:8
**shown** [4] - 4744:16; 4749:7; 4756:19,
22
**shows** [1] - 4655:9
**sick** [5] - 4711:23
**sign** [5] - 4662:23; 4681:8; 4687:19;
4691:6; 4699:1
**signing** [1] - 4706:3
**silly** [1] - 4699:13
**simple** [1] - 4690:10
**simply** [1] - 4759:8
**single** [2] - 4661:23; 4663:9
**sit** [10] - 4659:17, 22; 4660:9; 4681:1, 6;
4713:3; 4719:3; 4726:8, 14; 4754:2
**sit-down** [1] - 4754:2
**sitting** [3] - 4660:19; 4689:1; 4719:2
**situation** [2] - 4689:7; 4710:16
**size** [1] - 4748:17
**sized** [1] - 4666:16
**slow** [2] - 4676:16; 4681:4
**small** [2] - 4702:4; 4737:9
**smile** [1] - 4659:12
**smuggled** [1] - 4692:1
**snacks** [1] - 4679:17
**Sneakers** [3] - 4686:8; 4719:9; 4729:4
**social** [2] - 4679:2; 4725:2
**socialize** [6] - 4681:23; 4684:9; 4701:6;
4712:21; 4724:24; 4725:8
**socialized** [1] - 4678:24
**socializing** [1] - 4725:5
**society** [3] - 4704:18; 4716:11, 13
**soldier** [4] - 4688:21; 4724:10; 4729:18;
4737:4
**solely** [2] - 4740:10; 4761:16
**someone** [15] - 4688:16; 4702:14, 17;
4709:22; 4714:12, 17; 4723:3; 4734:23;
4735:4, 12, 18; 4736:25; 4737:2;
4738:18, 23
**sometime** [2] - 4675:6; 4762:9
**sometimes** [5] - 4680:25; 4681:1, 3, 7;
4687:19
**somewhat** [1] - 4725:1
**son** [1] - 4698:1
**sorry** [8] - 4673:19; 4676:3; 4681:20;

4708:3; 4718:1; 4719:24
**sort** [2] - 4659:16; 4680:23
**source** [1] - 4739:18
**South** [1] - 4758:17
**Southern** [1] - 4758:17
**spaghetti** [1] - 4713:3
**sparing** [3] - 4736:18, 23; 4737:21
**speaking** [1] - 4661:24
**special** [1] - 4757:17
**specific** [1] - 4750:19
**spell** [5] - 4664:4; 4672:25; 4673:1;
4697:14; 4754:7
**spend** [1] - 4678:4
**squad** [4] - 4759:9, 11, 21
**Sr** [1] - 4665:15
**stand** [2] - 4669:5; 4731:25
**standing** [1] - 4741:19
**staring** [1] - 4663:6
**start** [2] - 4698:20; 4760:22
**started** [4] - 4658:1; 4674:20; 4700:1;
4709:23
**State** [1] - 4676:12
**state** [6] - 4658:22; 4664:4; 4672:20;
4686:15; 4697:14; 4754:7
**statement** [1] - 4655:12
**Staten** [5] - 4705:19; 4709:9; 4710:23;
4738:23; 4740:4
**STATES** [3] - 4651:1, 3, 11
**States** [13] - 4651:5, 14, 16; 4675:2, 5,
9, 12, 15; 4676:22, 24-25; 4677:5;
4691:8, 24; 4693:2; 4694:2, 21; 4695:17;
4696:3
**station** [1] - 4755:2
**statute** [2] - 4762:2, 6
**stay** [3] - 4683:17; 4717:16; 4745:25
**stayed** [1] - 4698:11
**staying** [1] - 4704:20
**stenography** [1] - 4652:1
**step** [2] - 4717:15
**stepping** [1] - 4708:20
**stereotyping** [1] - 4702:16
**stick** [3] - 4679:6
**sticks** [1] - 4679:11
**still** [8] - 4659:9; 4693:19; 4700:8;
4703:14; 4712:16; 4724:21; 4732:2;
4750:24
**stool** [2] - 4708:19
**stop** [3] - 4681:17; 4719:2; 4722:4
**stories** [1] - 4709:19
**story** [1] - 4704:20
**strange** [1] - 4735:9
**straws** [1] - 4751:13
**street** [2] - 4701:8; 4728:14
**Street** [2] - 4651:18; 4726:20
**streets** [2] - 4716:15; 4726:21
**stressful** [1] - 4706:1
**strike** [2] - 4695:7; 4697:4
**strip** [1] - 4680:14
**strong** [2] - 4667:9; 4679:14
**stuff** [1] - 4669:6
**submit** [1] - 4762:15
**subpoena** [1] - 4664:13
**subpoenaed** [1] - 4652:6
**subsequently** [2] - 4665:9, 12
**substantial** [1] - 4743:18

**successful** [5] - 4691:23; 4694:21;
4695:11, 24; 4743:25
**sufficiency** [1] - 4762:13
**sufficient** [1] - 4763:6
**suggesting** [1] - 4758:23
**suggestion** [2] - 4668:22; 4669:8
**summarize** [1] - 4696:11
**summation** [3] - 4671:1; 4745:3;
4761:10
**summations** [3] - 4669:1; 4760:20
**Sunday** [1] - 4760:20
**supervisor** [1] - 4754:23
**supporting** [1] - 4706:9
**supposed** [1] - 4745:11
**supposedly** [4] - 4720:16, 19; 4722:11;
4744:15
**surprised** [2] - 4714:3, 5
**suspects** [1] - 4693:8
**sustained** [4] - 4697:1; 4738:1; 4739:1
**swear** [4] - 4663:24; 4672:16; 4690:2;
4754:3
**sworn** [4] - 4664:2; 4672:19; 4697:13;
4754:5

## T

**table** [3] - 4659:21; 4663:6; 4670:2
**talker** [2] - 4734:12; 4735:23
**talks** [1] - 4750:1
**Tambrino** [1] - 4757:17
**Tambrino's** [1] - 4757:20
**tamper** [5] - 4747:3, 8, 25; 4749:22, 25
**tampered** [10] - 4747:5, 17, 21; 4749:3,
7, 21; 4750:7, 21; 4751:17
**tampering** [7] - 4658:11; 4662:18;
4747:12; 4748:23, 25; 4749:20; 4751:6
**Task** [1] - 4754:16
**tasks** [1] - 4678:18
**taught** [1] - 4707:24
**teaching** [1] - 4660:22
**technician** [1] - 4674:6
**telephone** [1] - 4752:20
**television** [1] - 4670:4
**ten** [3] - 4674:22; 4731:25; 4737:10
**tenant** [1] - 4740:4
**tendency** [1] - 4707:23
**tenuous** [1] - 4751:12
**terms** [1] - 4659:15
**test** [1] - 4752:10
**testified** [41] - 4652:8, 17, 20; 4653:10,
20; 4654:15; 4655:20, 25; 4656:19;
4664:3; 4667:13; 4672:19; 4683:24;
4684:3; 4696:24; 4697:13; 4702:20;
4713:11, 14, 17; 4716:7, 11, 16;
4720:25; 4722:17; 4724:16; 4725:13;
4727:3; 4729:24; 4738:10; 4739:2, 13;
4744:22; 4747:3, 5; 4748:15, 21-22;
4754:6; 4757:24
**testifies** [2] - 4661:1; 4750:6
**testify** [14] - 4657:15; 4665:12, 21;
4667:6; 4682:25; 4683:4; 4693:4;
4696:5; 4741:23; 4742:10; 4751:10;
4755:25; 4757:23; 4759:23
**testifying** [4] - 4672:24; 4673:3;
4690:24; 4712:11

**testimony** [58] - 4652:11; 4653:13; 4654:2; 4656:11; 4658:5; 4662:17; 4665:20, 25; 4667:7, 16; 4668:5, 14; 4672:8; 4673:17, 20; 4674:4, 9; 4683:13; 4687:9, 21; 4693:1, 3, 9, 24; 4694:2; 4696:11; 4721:12; 4723:15; 4724:3, 5, 22; 4731:10, 14; 4732:5, 7, 19; 4734:4, 11; 4735:11, 21; 4742:21, 23; 4743:7; 4744:17, 21; 4745:3, 6, 11; 4747:11, 21; 4750:9; 4751:2, 9; 4757:21; 4761:24; 4762:5, 9

**THE** [201] - 4651:11; 4652:3, 5; 4653:15, 22, 25; 4654:4, 7, 16, 20, 25; 4655:5, 8, 13, 23; 4656:3, 7, 10, 16, 21; 4657:5, 7, 11, 14, 18, 21; 4658:3, 6, 14, 18, 20, 23; 4659:1; 4660:3, 12, 20; 4661:15, 17, 21, 23; 4662:3, 6, 8, 14, 16, 20, 22, 25; 4667:1, 4, 7, 14, 20, 23; 4668:1, 6, 9, 12, 16; 4669:2, 8, 11, 13, 15, 18, 21, 25; 4670:3, 6, 8, 14, 22; 4671:2; 4672:2, 16, 20-21, 25; 4675:21; 4683:18; 4686:14, 17; 4687:11; 4688:12; 4689:6; 4694:6, 18; 4695:2, 4, 8, 14, 20; 4696:9; 4697:1, 5, 7, 14, 16; 4704:14; 4705:17; 4706:17, 24; 4707:7; 4722:10; 4723:10-12; 4731:20, 22, 24; 4732:2, 7, 11, 15, 21, 23; 4738:1, 25; 4740:17, 20; 4741:4, 9, 14, 18, 25; 4742:5, 12, 16, 20; 4743:4, 8, 14, 16, 21, 24; 4744:6, 12, 16, 18, 23; 4745:5, 15, 18, 23; 4747:23; 4748:2; 4749:5, 13, 18; 4750:5, 16; 4751:1, 12, 19; 4752:6, 11, 15, 17, 21; 4753:3; 4754:2, 7, 9; 4757:3, 9, 13, 16, 22; 4758:4, 7, 9, 12, 20, 25; 4759:5, 17, 22; 4760:4, 9, 14, 17, 24; 4761:1, 3, 20; 4763:3, 9

**theirs** [1] - 4680:2
**themselves** [3] - 4682:13; 4690:2
**theory** [1] - 4760:20
**therefore** [2] - 4749:8; 4762:16
**thinking** [2] - 4711:24; 4751:4
**thinks** [2] - 4707:17; 4735:5
**Thomas** [9] - 4686:15, 18, 21-22; 4727:3; 4729:9, 15, 22; 4730:3
**thousand** [1] - 4752:7
**threatening** [1] - 4709:23
**three** [7] - 4676:18; 4709:10, 18; 4711:11; 4747:5; 4750:1; 4762:21
**throughout** [3] - 4658:4; 4701:13; 4717:7
**throw** [1] - 4682:21
**thrown** [1] - 4691:2
**Thursday** [2] - 4760:19; 4761:6
**tie** [1] - 4761:8
**ties** [2] - 4728:22; 4759:24
**tired** [2] - 4711:23
**today** [10] - 4655:19; 4668:1, 17; 4672:7; 4674:25; 4690:24; 4696:6; 4712:8, 11
**together** [4] - 4679:16; 4681:6; 4728:5; 4761:8
**Tommy** [4] - 4686:8; 4719:8; 4729:3
**tomorrow** [4] - 4668:1, 17-18; 4761:6
**took** [5] - 4696:5; 4708:16; 4747:3; 4755:14; 4758:14

**torn** [1] - 4680:14
**totally** [1] - 4709:2
**tour** [2] - 4754:20, 23
**track** [3] - 4681:2; 4745:3; 4759:11
**Trade** [4] - 4664:20; 4754:25; 4755:4, 6
**traffic** [1] - 4691:12
**trafficking** [5] - 4675:24; 4676:8; 4677:7, 18; 4691:15
**trailer** [1] - 4747:11
**transcript** [8] - 4652:1; 4656:22; 4657:1; 4747:20; 4748:11, 16; 4749:11; 4750:15
**TRANSCRIPT** [1] - 4651:10
**transmittal** [1] - 4673:21
**transpired** [3] - 4706:19; 4710:15; 4712:10
**travel** [2] - 4674:25; 4692:10
**traveled** [1] - 4693:7
**traveling** [4] - 4693:1, 12; 4694:1, 20
**treaty** [1] - 4696:2
**Tree** [2] - 4762:19, 22
**TRIAL** [1] - 4651:10
**trial** [55] - 4652:17, 22; 4653:4; 4654:21, 23; 4655:20; 4656:4, 12, 18, 20-21, 23; 4657:24; 4658:7, 12; 4659:13, 24; 4660:2, 7, 9-10, 24; 4661:15; 4667:11; 4676:10; 4677:15; 4732:10, 12, 14, 16, 18; 4741:21; 4742:14, 18; 4743:18, 24; 4744:14; 4745:19; 4747:2, 6, 12; 4748:20; 4749:7, 14, 21; 4750:20; 4751:11, 24; 4756:5, 16; 4762:11
**trials** [21] - 4653:4, 11; 4661:9; 4665:13, 17, 22; 4741:22, 25; 4742:10; 4744:21; 4747:6, 9; 4748:1, 3, 15; 4750:8; 4751:16, 18; 4755:25; 4756:5, 8
**tried** [7] - 4660:8; 4742:8; 4743:19; 4744:10; 4752:3
**tries** [1] - 4690:2
**trimming** [1] - 4661:3
**trip** [3] - 4675:7, 12, 14
**troubled** [1] - 4659:10
**troublemaker** [2] - 4704:19; 4716:16
**true** [4] - 4735:23; 4742:22; 4749:16
**truly** [1] - 4683:6
**truth** [5] - 4683:2; 4712:5, 9; 4724:12
**truthfully** [1] - 4696:5
**try** [4] - 4701:8; 4725:19; 4741:14; 4760:23
**trying** [5] - 4721:17, 19; 4741:11; 4744:20
**Tuesday** [2] - 4761:10
**turn** [3] - 4706:13; 4740:8, 10
**turned** [4] - 4654:15; 4706:14; 4707:25; 4709:22
**TV** [4] - 4672:3; 4697:8; 4720:19; 4721:10
**twelve** [2] - 4732:17; 4734:7
**two** [26] - 4653:4; 4656:1; 4659:8; 4660:1, 11-12; 4661:22; 4663:5; 4665:12, 22; 4668:8; 4673:12; 4677:10; 4691:14; 4697:24; 4701:18; 4703:24; 4706:18; 4708:10; 4744:3; 4750:1, 8; 4755:25; 4757:23; 4758:2
**tying** [1] - 4762:25
**type** [2] - 4681:3; 4728:1

**U**

**under** [12] - 4667:17; 4669:5; 4670:13; 4680:12; 4692:10; 4693:2, 7; 4712:2; 4741:7; 4743:12; 4749:5; 4758:1
**understood** [1] - 4691:7
**unfair** [1] - 4751:23
**unfairly** [1] - 4737:14
**unfortunately** [1] - 4737:4
**unique** [1] - 4652:12
**unit** [3] - 4678:16; 4687:17
**UNITED** [3] - 4651:1, 3, 11
**United** [19] - 4651:5, 14, 16; 4675:2, 4, 9, 12, 15; 4676:22, 24-25; 4677:5; 4691:7, 24; 4693:2; 4694:1, 20; 4695:17; 4696:3
**units** [2] - 4678:18; 4755:14
**University** [1] - 4673:23
**unless** [2] - 4657:21; 4692:20
**unusual** [2] - 4700:13; 4702:20
**up** [34] - 4654:19; 4655:21; 4659:12; 4663:4, 17; 4673:7; 4674:15; 4678:15; 4680:14; 4684:23; 4686:5; 4694:25; 4698:3, 7; 4704:10, 16; 4707:16; 4709:18; 4710:3; 4714:19; 4719:25; 4722:22; 4727:13, 18; 4732:13; 4737:11, 13; 4740:11; 4744:18; 4745:24; 4755:18
**ups** [1] - 4674:17
**upset** [6] - 4707:4, 9; 4711:4; 4723:17; 4734:17
**upstairs** [1] - 4698:8
**usual** [2] - 4666:19; 4760:10

**V**

**value** [2] - 4743:15, 17
**vanishing** [1] - 4751:23
**various** [1] - 4759:11
**vary** [1] - 4701:18
**verbal** [1] - 4706:2
**versus** [2] - 4687:4; 4762:11
**via** [1] - 4673:21
**Victor** [1] - 4730:6
**video** [1] - 4669:20
**videos** [1] - 4760:7
**view** [3] - 4653:24; 4662:24; 4666:13
**Vinsulo** [1] - 4665:18
**visit** [1] - 4675:7
**visitor** [3] - 4729:22; 4730:3, 11
**visitor's** [1] - 4686:22
**vocabulary** [1] - 4731:7
**voice** [1] - 4681:20
**voir** [1] - 4666:2
**VOIR** [1] - 4666:5
**voluminous** [1] - 4760:5

**W**

**wait** [2] - 4750:15; 4757:9
**waiting** [2] - 4658:24; 4751:7
**waiver** [1] - 4670:16
**walk** [7] - 4681:2, 7; 4687:19; 4701:8; 4717:16; 4719:3

walked [1] - 4711:8
walking [3] - 4681:2; 4700:22
wants [3] - 4674:9; 4748:16; 4763:7
watch [1] - 4720:6
watching [1] - 4721:10
weak [1] - 4657:3
Wednesday [1] - 4668:2
week [2] - 4706:8
weeks [3] - 4701:18; 4703:24; 4706:18
WEINSTEIN [1] - 4651:11
weird [1] - 4681:21
whatsoever [1] - 4749:14
wheels [1] - 4726:9
white [1] - 4679:19
whole [2] - 4661:3; 4761:21
William [1] - 4730:6
willing [4] - 4670:17; 4671:2; 4712:17
wire [1] - 4662:18
wiretaps [2] - 4759:18; 4760:6
wish [2] - 4667:14; 4701:7
wishes [1] - 4659:6
withdrawn [4] - 4702:18; 4730:5; 4735:8
withdrew [1] - 4762:1
WITNESS [11] - 4664:5; 4666:21, 23, 25; 4672:21; 4683:18; 4697:16; 4705:18; 4723:11; 4741:5; 4754:9
witness [26] - 4659:2, 4; 4667:12; 4668:4, 7, 11; 4672:5, 18; 4696:9; 4697:9, 12; 4731:24; 4741:4, 12; 4745:8, 25; 4748:19; 4750:20, 22; 4754:3; 4757:7, 15
witness' [1] - 4668:4
witnesses [7] - 4669:4; 4744:1; 4757:24; 4759:8; 4762:4, 21
woman [2] - 4703:13; 4709:21
wondering [1] - 4663:20
Woodsec [1] - 4658:21
word [13] - 4685:19; 4693:24; 4702:19; 4706:12; 4714:9; 4715:1, 6; 4743:16; 4762:15
words [4] - 4707:14, 16; 4710:21; 4734:25
wore [1] - 4682:18
World [4] - 4664:20; 4754:25; 4755:4
worth [1] - 4710:19
wrap [1] - 4758:13
written [1] - 4665:20

## Y

Y............................ [1] - 4764:5
yard [2] - 4728:10; 4739:21
year [7] - 4678:2; 4690:21; 4699:16; 4718:22; 4725:20; 4730:14; 4762:10
years [22] - 4663:21; 4674:22; 4676:15, 18; 4678:4, 6, 23; 4681:9; 4682:17; 4698:12, 15, 19; 4699:18; 4703:3, 16; 4716:6, 14; 4728:13; 4729:7, 10; 4747:4
yesterday [2] - 4659:9
YORK [1] - 4651:1
York [7] - 4651:6, 17, 21, 24; 4673:17; 4685:22, 24
young [2] - 4700:21; 4705:19
younger [1] - 4725:16

yourself [2] - 4683:4; 4693:14

## Z

zero [2] - 4744:1; 4748:5

14