1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

----------------------------------X
3                                  :
UNITED STATES OF AMERICA,          :   CR-08-76
4                                  :
        v.                         :   U.S. Courthouse
5                                  :   Brooklyn, New York
CHARLES CARNEGLIA,                 :
6                                  :
                Defendant.         :   TRANSCRIPT OF TRIAL
7                                  :   February  10, 2009
----------------------------------X   9:30 a.m.
8

9   BEFORE:

10           HONORABLE JACK B. WEINSTEIN, U.S.D.J.
                         and a Jury.
11

12  APPEARANCES:

13  For the Government:    BENTON J. CAMPBELL,
                                United States Attorney
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                         BY:  ROGER BURLINGAME,
                                EVAN NORRIS,
16                              MARISA M. SEIFAN,
                                Assistant U.S. Attorneys
17
For the Defendant:         KELLY SHARKEY, ESQ.
18                              26 Court Street
                                Brooklyn, New York 11201
19
                                CURTIS J. FARBER, ESQ.
20                              350 Broadway
                                New York, New York 10013
21
Court Reporter:            Mickey Brymer, RPR
22                              Official Court Reporter
                                United States District Court
23                              225 Cadman Plaza East
                                Brooklyn, New York  11201
24                              (718) 613-2255

25           Proceedings recorded by mechanical stenography.
        transcript produced by Computer-Assisted Transcription.

1

2          THE COURT:  Mark the transcript pages 1519 to 1614,

3    today's date, Court Exhibit 1 with respect to the testimony

4    on direct of Mr. Ruggiano that I referred to in the record

5    yesterday to be handed to the U.S. Attorney to use his

6    judgment.

7          MS. SHARKEY:   Judge, I don't think there are any

8    legal applications.

9          MR. BURLINGAME:  I have a couple minor things.

10          MS. SHARKEY:   After you.

11          MR. BURLINGAME:   Judge, just a few things.  I think

12    we're now in agreement that the transcripts are accurate, so

13    I would like to -- or at least to be made clear the defense's

14    only objection is to the one portion of the transcript when

15    the transcripts were given to the jury.

16          MS. SHARKEY:   I don't think Mr. Farber is going to

17    raise any objection.

18          MR. FARBER:   No objection.

19          THE COURT:  Only your transcript will go to the

20    jury.

21          MR. BURLINGAME:  So this we don't -- I don't want to

22    have argument about what's on the transcript at a later date.

23    I would like instructions that the parties agree the

24    transcripts are fair and accurate transcripts.

25          THE COURT:  They are not agreeing to that.  They are

1 | agreeing that your transcript goes to the jury, you will make

2 | a statement on their behalf that there is disagreement about

3 | that, those four words, or they can make the statement,

4 | either one.

5 | MR. FARBER:  Judge, I don't believe I can make that

6 | statement at the time they present that.  We will reserve

7 | argument for summation as to what the actual transcript

8 | means.

9 | THE COURT:  Just put it in.  That's all.

10 | MR. BURLINGAME:  One of the surveillance witnesses

11 | who we anticipate calling today was an NYPD detective.  He

12 | lost his job with NYPD because he tested positive for cocaine

13 | use.  He's going to testify about the surveillance photos and

14 | we will show him a board of photos.  I ask that the defense

15 | not get into his drug use with him.

16 | THE COURT:  When did he take the drugs?  I think it

17 | is best not to say anything.  Why embarrass the guy?  It is

18 | just for authentication?

19 | MR. BURLINGAME:  Yeah.

20 | MS. SHARKEY:  You know, at this point, Judge, I

21 | know you don't like side-bars, I don't see any reason why we

22 | would cross him on that.  This witness has no 3500 material.

23 | THE COURT:  Excuse me, if you insist on

24 | cross-examining him, you can do it on credibility.

25 | MS. SHARKEY:  Okay.

1          THE COURT:  I suggest to you that there's nothing to

2     be gained by destroying a witness when your client doesn't

3     benefit.  You do what you want.

4          MS. SHARKEY:   I agree with you, Judge.  We don't

5     have any 3500.  I didn't know what to anticipate.

6          MR. BURLINGAME:  He will just say these are the

7     photos I took.

8          THE COURT:  If you want to cross-examine him, you

9     can on that issue.

10          MR. BURLINGAME:  We spend a long time in the

11     courtroom last night playing with the various means of

12     playing these tapes we're going to play this morning and

13     figuring out how the audio sounds best.  We tried with

14     headphones which turn out to be no good and over the Court's

15     loudspeaker which are no good.  What we discovered is the

16     best is there are these two fairly good speakers here and

17     what we're planning on doing is having our paralegal set the

18     TV -- initially we will play it without the TV.  The

19     paralegal will sit here, put the speakers in front of the

20     jury box.  We sat in their seats.  You can hear it pretty

21     well.  It will have to be quiet in the courtroom, but I think

22     it is the best way to play the audio, so I just want to alert

23     the Court and maybe if we can get a ten-minute break to set

24     up before the witness.

25          THE COURT:  When you need the break to set up for

1    that, you'll get it.  Just ask for it and that sounds

2    appropriate.  Go ahead, what else?

3         MS. SEIFAN:   Your Honor, one more thing.  We

4    previously disclosed that one of the witnesses who's going to

5    testify today, Matt Ucci, had heard years after the

6    murder of Michael Cotillo, he heard in the neighborhood

7    someone named Brown did it.   He doesn't remember who said

8    it, when.  He wasn't involved in the investigation.  All he

9    did was take Michael Cotillo in a car to the hospital.  We're

10   asking that you preclude them from asking any questions about

11   it.  It is according to him just scuttlebutt.  In excess of

12   caution we disclosed it to the defense

13        THE COURT:  What do you want to do?

14        MS. SHARKEY:   I think Mr. Farber will elicit that.

15        THE COURT:  I will allow it.

16        MR. BURLINGAME:  Judge, it is clearly inadmissible

17   hearsay.  The only purpose of asking the question would be to

18   draw the hearsay objection which would be sustained.

19        THE COURT:  I will not sustain it.  I will allow it.

20        MR. BURLINGAME:  What happened was the detective who

21   in 1978 arrived at the scene where Michael Cotillo had been

22   stabbed and drove him to the hospital, years and years later,

23   while he was at a social function --

24        MS. SEIFAN:  He doesn't recall when it occurred, who

25   he heard it from.

1           MR. BURLINGAME:  He knows at some point he heard

2     that the guy named -- that a guy named Phil Brown did it.

3           MS. SEIFAN:   Not even Phil Brown.  Just Brown.

4           MR. BURLINGAME:  Just Brown.  There is -- I don't

5     understand under what theory the hearsay would come in.

6           THE COURT:  It comes in under the general

7     discretionary function of the Judge in view of the age of the

8     case to allow the jury to hear that because of the difficulty

9     of tracing down various witnesses in the community so many

10    years later.

11          However, I will allow you to elicit from the

12    detective, if the defendants want to put it in, that in his

13    professional capacity, that's where he heard it, right?

14          MR. BURLINGAME:  No.

15          MS. SEIFAN:   I don't think he remembers that.

16          MR. BURLINGAME:  We are not investigating the case

17    in any way.

18          THE COURT:  But he heard it.  You can ask him

19    whether in his professional capacity he gave any weight to

20    that, requiring the reopening of the case, but, as you

21    suggest, it's rather trivial and not very probative.  I will

22    allow it.

23          MS. SHARKEY:   Judge, I have an application.

24          THE COURT:   Excuse me, I haven't finished with the

25    U.S. Attorney.

1          MS. SHARKEY:   I'm sorry, Judge.

2          MR. BURLINGAME:  Your Honor, I understand you want

3    to give the defendant wide leeway on any possible statements

4    that he wasn't involved in one of the charged crimes, but I

5    believe the only way this would come in would be under the

6    catchall exception of the hearsay rule and I believe that the

7    main balancing test that the Court has to do there is if

8    there's any indicia of veracity --.

9          THE COURT:  Give me the Federal Rules, I'll tell you

10   what rules it comes under.  Rule 102 of the Federal Rules of

11   Evidence, it has not been changed since it was proposed and

12   adopted.  The fact that I sat on the committee that wrote the

13   rulings is not being relied upon by the Court.  The rule

14   reads:  These rules shall be construed to secure fairness in

15   administration to the end that the truth may be ascertained

16   and proceedings justly determined.  That's the rule that

17   applies.

18         MR. BURLINGAME:  The Court's position is that

19   overrules hearsay, is not admissible except as provided by

20   these rules?

21         THE COURT:  I'm not going to have a discussion with

22   you on the theory of the Rules of Evidence.

23         MR. BURLINGAME:  Very well, Judge.

24         THE COURT:  If you want to brief it, you may.

25         MR. BURLINGAME:  I think we'll probably not brief

1   it.

2           THE COURT:  Anything further?

3           MS. SHARKEY:   Yes.  Judge, the government gave us

4   the lineup of the witnesses in the order -- thank you -- and

5   this afternoon I believe we're going to have some testimony

6   concerning condominium fraud, extortion.  The Court

7   authorized the defense to have an expert witness.  I would

8   request that because you know we move pretty quickly that the

9   expert witness, Mr. Linden, whom they have notice of be

10  allowed to sit at defense table.

11          THE COURT:  Sure.

12          MR. BURLINGAME:  I missed the beginning.  Expert on

13  what?

14          MS. SHARKEY:   The Green Tree.

15          MR. BURLINGAME:  Okay.

16          THE COURT:  Anything further?  Excuse me.

17          MS. SHARKEY:   I'm sorry.

18          THE COURT:  Anything further?

19          MR. BURLINGAME:  No, Judge.

20          THE COURT:  All right, ten o'clock we start.  Thank

21  you.

22          MS. SHARKEY:   Thank you.

23          (Recess.)

24          THE COURT:  Bring in the witness please, bring in

25  the jury.

1    MS. SHARKEY:  Judge, Ms. Seifan just informed us --

2   thank you -- that they're seeking to introduce hospital

3   records through this particular witness, which would not be a

4   proper authentication through this witness.  I want to raise

5   the objection before the jury comes in and request a

6   preliminary ruling on it, I guess, or if he could object at

7   the time.  This is a detective from the NYPD.

8    MS. SEIFAN:  Your Honor, we will introduce it

9   subject to connection.  He was involved in subpoenaing the

10  records.  He received them.  These are the records that he

11  subpoenaed and we're going to put on a witness from the

12  hospital.

13   THE COURT:  You're going to what?

14   MS. SEIFAN:  Put a witness from the hospital.

15   THE COURT:  All right.

16   MS. SHARKEY:  I didn't know you were subject to

17  connection.

18   THE COURT:  All right.

19   (The jury enters the courtroom.)

20   THE COURT:  Good morning, everybody.  Be seated,

21  please.  Did you take care of that license matter?

22   A JUROR:  Yes.

23   THE COURT:  Who had the problem?

24   A JUROR:  (Raising hand) Yes.  Thank you.

25   THE COURT:  Good.  Swear the witness, please

1  M A R L I N   H O P K I N S ,   called as the witness

2  herein, having been first duly sworn/affirmed, testified as

3  follows:

4        THE CLERK:  You may be seated.  Please state and

5  spell your name.

6        THE WITNESS:  Marlin Hopkins M-a-r-l-i-n

7  H-o-p-k-i-n-s.

8  DIRECT EXAMINATION

9  BY MS. SEIFAN:

10  Q.   Good morning.

11  A.   Good morning.

12  Q.   How old are you?

13  A.   Sixty-nine.

14  Q.   What do you do for a living?

15  A.   I'm retired.

16  Q.   What did you do prior to retiring?

17  A.   I was a private investigator.

18  Q.   How long were you a private investigator?

19  A.   About 24 years.

20  Q.   What kinds of private investigative work did you do?

21  A.   Variety of types.  Workmen's Compensation

22  investigations, lawsuits against the City, also private

23  individuals.

24  Q.   Prior to being a private investigator, what did you do?

25  A.   I was with the New York City Police Department.

Hopkins-direct/Seifan

1   Q.   And what year did you begin working for the New York

2   City Police Department?

3   A.   1965.

4   Q.   What was your first assignment after graduating from the

5   academy?

6   A.   I was assigned to 81st Precinct in Brooklyn, on patrol.

7   Q.   Where were you assigned after that?

8   A.   I went into -- into vice, plainclothes for about

9   two-and-a-half years.

10  Q.   What year did you retire from NYPD?

11  A.   1983.

12  Q.   Why don't you just briefly walk us through the different

13  assignments you had after that until your retirement in 1983.

14  A.   After I was in plainclothes I went into -- back into the

15  precinct for about a year and then at that point I became a

16  detective and I was assigned to the Chief of Detectives

17  Office, conducting investigations, and I was assigned to the

18  Fifth Homicide Squad in Manhattan, conducting homicide

19  investigations.  I was there about a year.  Then I was

20  assigned to the 16th Homicide Zone in Queens as a homicide

21  investigator.  That was about a year.  Then I was assigned to

22  the 15th Homicide Zone, also in Queens, as a homicide

23  investigator.

24  Q.   What rank were you when you retired from the New York

25  City Police Department?

1    A.   Detective second grade.

2    Q.   Let me direct your attention to November 6th, 1977.

3    Where were you assigned at that time?

4    A.   I was assigned to the 15th Homicide Zone in Queens.

5    Q.   What parts of Queens are encompassed in the 15th

6    Homicide Zone?

7    A.   There's five precincts.  Two were in Rockaway, 100 and

8    101, and the other part of Queens would be the 102, 104 and

9    the 106.  That would encompass Ozone Park, Howard Beach,

10   Woodhaven.

11   Q.   In your experience was organized crime active in the

12   15th Homicide Zone?

13   A.   Yes, it was.

14   Q.   While working in the 15th Homicide Zone, did you

15   investigate any mob related crimes?

16   A.   Yes, I did.

17   Q.   In your experience were people living in the 15th

18   Homicide Zone willing to assist the police in investigating

19   organized crime cases?

20         MR. FARBER:   Objection.

21         MS. SEIFAN:   Based on his experience.

22         THE COURT:  I will allow it.

23   A.   In my experience at that time there was a great

24   reluctance of people to come forward.

25   Q.   How long were you in the 15th Homicide Zone?

1    A.    Close to four years.

2    Q.    Do you recall working on November 6th, 1977?

3    A.    Yes, I do.

4    Q.    Do you recall whether you became involved in any

5    criminal investigations on that day?

6    A.    Yes, I do.

7    Q.    What type of investigation?

8    A.    A homicide investigation that took place in 106th

9    Precinct.

10    Q.    What type of investigation was it?

11    A.    Homicide investigation that took place in the 106th

12    Precinct.

13    Q.    Were you assigned to investigate that case?

14    A.    Yes, I was.

15    Q.    What was your role in the investigation?

16    A.    I was lead investigator.

17    Q.    What was your role as a lead investigator?

18    A.    To maintain the continuity of the investigation, to

19    control the flow of information and to siphon information

20    from other detectives that are also participating.

21    Q.    How did you get assigned to this case?

22    A.    I was assigned because I was assigned to the 15th

23    Homicide Zone.  It was that point in time where I was next to

24    catch a case and I was working that particular night and I

25    was assigned at that point.

1  Q.   What case was this?

2  A.   That was Michael Cotillo.

3  Q.   And you responded -- you received a call while you were

4  on night watch?

5  A.   Yes, I was on night watch, which is 12 to eight in the

6  morning.  You cover the borough office and any serious crimes

7  that take place, you respond and so on, and I received a call

8  from a dispatcher that there was an individual in -- in

9  Interboro Hospital and he was likely going to die.  Under the

10 circumstances I responded to the hospital.

11 Q.   Do you recall what time approximately you received this

12 call?

13 A.   Sometime around 5 a.m. or shortly afterwards.

14 Q.   What happened when you got to the hospital -- you said

15 you went to Interboro Hospital?

16 A.   Interboro Hospital.

17 Q.   When you got to the hospital, were you able to speak to

18 the victim, Michael Cotillo?

19 A.   No, I wasn't.

20 Q.   Why not?

21 A.   He was in the emergency room, he was unconscious and he

22 was on a -- on the table and the doctors were treating him.

23 Q.   Were you able to speak to any other individual at the

24 hospital?

25 A.   There were several individuals who I learned at the time

1  were friends of Michael Cotillo's.

2  Q.   Do you recall how many people you spoke to?

3  A.   There were four.

4  Q.   Do you recall the names of any of the people you

5  interviewed at the hospital?

6  A.   I would have to check my records to recall the names.

7  Q.   Would looking at your -- copy of your memo book help

8  refresh your recollection of who you interviewed?

9  A.   Yes, it would.

10  Q.   I ask you to take a look at what's in front of you

11  marked 3500 MHO72.  I think it is -- sorry.  This binder.  If

12  you want to turn to Bates number page three?

13  Q.   Take a moment to review that.

14  A.   I recall this.

15  Q.   Who did you interview at the hospital?

16  A.   It was four individuals:  Anthony Moro, Gary Miliante,

17  Stephen Pastor and Paul Forgione.

18  Q.   Did they provide you with any helpful information in

19  your investigation?

20  A.   No.

21  Q.   How did the victim's friends behave towards you?

22  A.   As I recall it, there was a reluctance for them to

23  divulge any information to me at the time.

24  Q.   Did you talk to them?

25  A.   I spoke to each one of them individually and there was a

1    reluctance for them to give me any information as to what

2    transpired earlier.

3    Q.    Is it fair to say they were uncooperative?

4    A.    Definitely.

5    Q.    What did you do next?

6    A.    I responded to the scene, the Blue Fountain Diner on

7    Cross Bay Boulevard, and I spoke to the uniformed officer

8    that was present there and at that point he advised me as to

9    what transpired earlier, what he knew of, and basically what

10   it was was a large fight that had taken place and it stemmed

11   inside from the diner out onto the sidewalk.

12        He also directed me to the area where there were blood

13   stains on the sidewalk.

14   Q.    I'm showing you what's in evidence as Government's

15   Exhibit 26.  Do you recognize this photo?

16   A.    Yes, I do.

17   Q.    What is it?

18   A.    That's the Blue Fountain Diner on Cross Bay Boulevard in

19   Queens.

20   Q.    That's where you responded?

21   A.    Yes.

22   Q.    And you indicated that -- you indicated that you talked

23   to the officer -- an officer who was at the scene?

24   A.    Yes.  He was standing on the sidewalk in front of the

25   diner.

1  Q.   He directed you to blood on the sidewalk?

2  A.   Yes, he did.

3  Q.   Do you recall where approximately that blood was?

4  A.   It was fairly close to the curb on the -- there is a

5  left entrance to the diner and, so, it is between that left

6  entrance and the curb.

7       THE COURT:  You can have the witness come down and

8  indicate.

9       MS. SEIFAN:   Okay.

10 Q.   If you just want to point out where approximately you

11 recall.

12 A.   It would be about this location (indicating).

13      THE COURT:  Any objection to marking that exhibit?

14      Let him mark it, put his initials down.

15      THE WITNESS:  My initials?

16      THE COURT:  Mark it, put your initials down and

17 write "blood spot" .

18      (Witness complies.)

19      THE COURT:  Thank you.

20 Q.   Do you know how Michael Cotillo got to the hospital?

21 A.   Excuse me.

22 Q.   Do you recall how Michael Cotillo got to the hospital?

23 A.   I was told by the uniformed officer that was on the

24 scene that he was driven by police car, radio motor patrol

25 car.

1  Q.   Did you interview any witnesses at the diner?

2  A.   Yes, I did.

3  Q.   Who do you recall interviewing?

4  A.   Initially I spoke to the two owners of the diner and two

5  waitresses.

6  Q.   Anyone else?

7  A.   There was a couple of other individuals.  I don't recall

8  the names at the moment and, also, people out on the

9  sidewalk.

10  Q.   Did you also speak to other individuals who did not wish

11  to identify themselves?

12  A.   Yes.

13  Q.   How did the witnesses at the diner appear to you?

14  A.   Well, the people that were inside the diner, the owners

15  and the waitresses were obviously upset.  Couple reasons,

16  because the altercation that had taken place inside the diner

17  disrupted the business and they were agitated.

18  Q.   How did the other witnesses you interviewed appear?

19  A.   Well, there was a reluctance on the part of people that

20  I spoke to on the sidewalk, on the street who were basically

21  hanging around at that point.

22  Q.   What do you mean by a reluctance?

23  A.   I can only best describe it as a code of silence in the

24  sense that it's -- it's a matter of fear, fear to speak out,

25  fear of retaliation and fear of possibly being called a rat.

1  That was the overall feeling.

2  Q.   And was that your general experience working in the 15th

3  Homicide Zone in the neighborhood?

4  A.   Yes.

5  Q.   What did you do with the information you learned from

6  the people you spoke to at the diner?

7  A.   Well, as each person I did speak to I was able to gain

8  some names and that led me into locating those individuals,

9  speaking to them and, also, gaining some more names and going

10  on from there.

11  Q.   How long were you involved in the investigation into the

12  murder of Michael Cotillo?

13  A.   Approximately five months.

14  Q.   And over the course of the investigation, how many

15  individuals did you interview?

16  A.   In excess of two dozen, possibly three dozen.

17  Q.   Who did you focus your efforts on interviewing?

18  A.   Basically, people who were at the scene who gave some

19  information.  I was trying to develop leads at that point and

20  -- with each person I spoke to they were able to give me

21  enough information about somebody else and basically that's

22  how the investigation went.  It went from one to the other.

23  Q.   I now want to take a moment and ask you whether you

24  interviewed -- you recall interviewing certain people.  You

25  can use your notes to refresh your recollection if you need.

1    Do you recall interviewing someone named Robert Engel?

2  A.   Yes.  The name is familiar at this point.

3  Q.   Carl Amato?

4  A.   Yes.

5  Q.   Phil Brown?

6  A.   Yes.

7  Q.   Paul Forgione?

8  A.   Yes.

9  Q.   George Licastro?

10 A.   Yes.

11 Q.   Do you recall how many times you interviewed George

12 Licastro?

13 A.   George Licastro was twice.

14 Q.   Joy Giovi?

15 A.   Yes.

16 Q.   Do you recall what you did after you interviewed George

17 Licastro the first time?

18 A.   Upon my interview with him I went to Jamaica Hospital

19 and looked at the records for that morning or the morning of

20 November 6th to see if there were any individuals that were

21 treated for any kind of injuries and as a result I saw the

22 record of Joseph Gallo with a Queens address that was treated

23 for a cut on his finger.

24 Q.   What did you do after learning this information?

25 A.   With the address that was supplied by the hospital, I

1    went to that location and found it to be nonexistent.

2    Q.    So, what did you do next, after learning that that

3    address was nonexistent?

4    A.    Well, subsequently I spoke to Licastro again, but prior

5    to that I went to the District Attorney's Office, received a

6    subpoena.  With that subpoena I went back to the Jamaica

7    Hospital and recovered those records of that incident with

8    Joseph Gallo.

9    Q.    I'm going to show you what's been marked for

10   identification as Government's Exhibit 27.  Can you take a

11   look at this.

12   A.    Yes.

13   Q.    Do you recall what this document is?

14   A.    This document is a copy of the Jamaica Hospital

15   emergency room records.  It is dated November 6th, 1977, at

16   5:43 a.m.

17   Q.    Those are the records that you received?

18   A.    Yes.

19   Q.    Thank you.

20          MS. SEIFAN:    Your Honor, I offer to admit them

21   subject to connection.

22          THE COURT:  Yes, admitted subject to connection.

23          MS. SEIFAN:    Thank you.

24   Q.    Through your investigation, how many people did you

25   determine were in or around the diner at the time Michael

Hopkins-direct/Seifan

1   Cotillo was stabbed?

2   A.   Start of the altercation that took place at the diner

3   until the police arrived, it was probably around 40 people.

4   Q.   No one -- not one person you interviewed identified who

5   stabbed Michael Cotillo?

6   A.   That's correct.

7   Q.   Through the course of your investigation did you ever

8   develop any solid leads as to who killed Michael Cotillo?

9   A.   No solid leads, no.

10  Q.   What kind of difficulties did you face in investigating

11  the murder of Michael Cotillo?

12  A.   Well, it is an area that from what I recall -- it is a

13  matter of reluctance on the part of people to give you

14  information, at least to the police.  It is fear of

15  retaliation, fear of being called a rat.  That was the air at

16  the time.

17  Q.   You testified -- I'm sorry, I don't remember.  How long

18  did you investigate the case of Michael Cotillo?

19  A.   About five months.

20  Q.   Why did you stop working on the case?

21  A.   At that time, I believe it was around May or June that

22  the homicide units were disbanded and each of the detectives

23  were assigned to precinct squads and that particular case was

24  assigned back to the 106th Precinct and it would be handled

25  by precinct squad detectives.

1   Q.   Where were you assigned?

2   A.   I was assigned to the 103rd Precinct squad.

3   Q.   So, the case went to a different precinct?

4   A.   Yes.

5   Q.   Do you know what happened to the investigation into the

6   murder of Michael Cotillo?

7   A.   No, I don't.

8           MS. SEIFAN:   No further questions.

9   CROSS-EXAMINATION

10  BY MR. FARBER:

11  Q.   Good morning, sir.

12  A.   Good morning.

13  Q.   You said you were a detective with the New York City

14  Police Department, various homicide squads for many years?

15  A.   For about seven years, yes.

16  Q.   And you were assigned to the confines of the 15th

17  Homicide Zone?

18  A.   Yes.

19  Q.   And the homicides you were assigned to investigate,

20  sometimes you were the lead detective, as you indicated you

21  were with respect to the death of Michael Cotillo?

22  A.   Yes.

23  Q.   And sometimes you were a detective working on the

24  homicide case, but you were more of a supporting role?

25  A.   Correct.

1   Q.   In either scenario is it accurate to state you undertook

2   the responsibilities seriously?

3   A.   Yes.

4   Q.   You knew there was no such thing as an insignificant

5   detail?

6   A.   Yes.

7   Q.   And you made it your duty to become familiar with the

8   cases you worked on it?

9   A.   Yes.

10  Q.   And that would enable you to fulfill your role as an

11  investigator, correct?

12  A.   Yes.

13  Q.   And you fully briefed yourself on the crime scene

14  details?

15  A.   Generally speaking?

16  Q.   Yes.

17  A.   Yes.

18  Q.   And you familiarized yourself with witness statements?

19  A.   Yes.

20  Q.   Now, one year earlier to the death of Michael Cotillo,

21  you were actually working on the homicide of Albert Gelb; is

22  that correct?

23  A.   I vaguely remember that, yes.

24  Q.   And this homicide investigation took on some additional

25  significance because the victim was a court officer?

1  A.   Yes.

2  Q.   There was a lot of press attention?

3  A.   As I recall, yes.

4  Q.   And, in fact, there was an eyewitness to this homicide,

5  correct?

6  A.   I don't recall that.

7  Q.   Do you recall the name Charles Ball?

8        MS. SEIFAN:   Objection, your Honor, beyond the

9  scope of direct.

10        THE COURT:  You may inquire.

11        MR. FARBER:   Thank you, your Honor.

12  Q.   Do you recall the name Charles Ball?

13  A.   No, I don't.

14        MR. FARBER:   One moment, please.

15  Q.   I'm going to show you a document which is dated March

16  13th, 1976.

17        MR. FARBER:   I don't have a 3500 number on it.  It

18  was in the police department file.

19        MS. SHARKEY:   Discovery from the government.

20        MS. SEIFAN:   I have a copy.

21        THE COURT:  Mark it 3500-1.

22        MS. SEIFAN:   It is already marked.  It is 3500-MHO

23  21.

24        THE COURT:  Thank you.

25  Q.   I ask you to take a look at that document and read it

1   and tell me when you're done.

2         (Witness reading.)

3   Q.   Does that refresh your recollection as to whether or not

4   you interviewed Mr. Ball?

5   A.   I recall it.

6   Q.   And is it a fact that Mr. Ball -- the murder of officer

7   Gelb took place right in front of Mr. Ball's home?

8   A.   According to my report here, yes.

9   Q.   And, in fact, isn't it correct that Mr. Ball was

10  interviewed either by yourself or your fellow detectives on

11  five separate occasions?

12  A.   I don't recall it.

13  Q.   I'll ask you to take a look at the rest of these

14  documents.

15        THE COURT:  You're showing him what?

16        MR. FARBER:   These are -- sorry, Judge -- New York

17  City Police Department DD5 reports.  The numbers circled in

18  the corner would be DD5 number four, 64, 70.

19        THE COURT:  Four, 64, 70.

20        MR. FARBER:   And 75.

21        THE COURT:  They are not marked as 3500.

22        MR. BURLINGAME:   They are not these witness'

23  reports.

24        THE COURT:  Mark them collectively as a defendant's

25  exhibit.

1      MR. FARBER:   Defendant's Exhibit A for

2  identification.

3      THE COURT:  Number or letter?

4      MR. FARBER:   A.

5      THE COURT:  Defendant's A.  Okay.

6      MR. FARBER:   Thank you.

7      (Witness reading.)

8      MS. SEIFAN:   Can we have a read-back of the

9  question.

10      (Record read.)

11      MR. BURLINGAME:   Was there an answer?

12      (Record read.)

13  Q.   Having looked at the exhibits I handed you as Defense

14  Exhibit A for identification, does that refresh your

15  recollection as to whether or not between yourself and your

16  fellow detectives, Mr. Ball in fact was interviewed five

17  separate times?

18  A.   According to what I have in front of me, I have --.

19      MS. SEIFAN:   Objection.

20      THE COURT:  I will allow it.

21  A.   I have four DD5s and it shows that there was an

22  interview on four occasions.

23  Q.   In fact, the fifth one was the one I handed you earlier,

24  correct?

25  A.   Yes.

1  Q.   And took back?

2  A.   Yes.

3  Q.   Is it fair to state that your squad considered Mr. Ball

4  to be a crucial witness?

5          THE COURT:  Excuse me.

6          MS. SEIFAN:   Objection.

7          THE COURT:  Sustained.

8  Q.   Following the death of Mr. Gelb, isn't it correct that

9  an all points bulletin was put out by the police department

10 for Officer Gelb's murder?

11 A.   I don't recall it.

12         MR. FARBER:   I ask these three documents be marked

13 collectively as Defendant's Exhibit B for identification.

14         THE COURT:  So marked.

15         MR. BURLINGAME:  These are for purposes of

16 refreshing recollection.

17         MR. FARBER:   That's what I said.

18         MR. BURLINGAME:  Not for the witness to read the

19 document.

20         THE COURT:  I haven't heard the question.

21         MR. FARBER:   Question was was an all points

22 bulletin issued.  He said he doesn't recall.

23 Q.   Look over Defense Exhibit B and tell me if that

24 refreshes your recollection as to whether or not an all

25 points bulletin was put out for the individual suspected in

1   the involvement in the shooting of Officer Gelb.

2          (Witness reading.)

3   A.   I vaguely remember this without getting into detail on

4   it.

5   Q.   Isn't it a fact, sir, that the -- there was a

6   description put out for a man five foot eleven, 175 pounds,

7   Afro style hair, moustache, wearing a dungaree jacket and

8   dungaree pants as the person who was observed as the shooter?

9          MS. SEIFAN:   Objection, your Honor.

10         THE COURT:  Do you recall that, sir?

11         THE WITNESS:  No, I don't.

12         THE COURT:  Sustained.  Refreshment.

13  Q.   You spoke to your fellow detectives regarding this case

14  when you were assigned to it or working on it?

15         THE COURT:  Which case?

16         MR. FARBER:   Gelb murder.

17  A.   It was not my case.

18  Q.   I understand, but you were working on it?

19  A.   There were times when I -- I was involved, yes.

20  Q.   And, in fact, you were involved in the very beginning

21  because you interviewed Mr. Ball shortly after the murder?

22  A.   Yes.

23  Q.   Isn't it a fact, sir, that you learned that the shooter

24  was five foot eleven, Afro style hair, 175 pounds and in his

25  twenties and wearing a moustache?

1    MS. SEIFAN:  Objection.

2    THE COURT:  Learned it from whom?

3  Q.  Did you learn from any of your fellow detectives?

4  A.  I don't recall.

5    MS. SEIFAN:  Objection.

6  Q.  Sir, looking over at the police report that's before

7  you, does that refresh your recollection as to your

8  understanding of what the suspect looked like?

9  A.  No, it doesn't.

10  Q.  Sir, do you recall that the suspect was described as

11  having driven a Chevy Nova with a defective muffler that

12  night?

13    MS. SEIFAN:  Objection.

14    THE COURT:  Overruled.

15  A.  I just don't recall the details on this.

16  Q.  Sir, this was one year before the death of Mr. Cotillo,

17  correct?

18  A.  Yes.

19  Q.  This was a high profile murder?

20    THE COURT:  When you say "this,"which one are you

21  referring to?

22    MR. FARBER:  Officer Gelb.

23  A.  I would say so.

24  Q.  Prior to your testifying here today, did you meet with

25  the U.S. Attorney's Office?

Hopkins-cross/Farber

1  A.   Yes, I did.

2  Q.   Did they go over with you in detail the murder of

3  Michael Cotillo?

4  A.   Yes, we discussed it.

5  Q.   Did they review your police reports with you?

6  A.   Yes.

7  Q.   Did they review with you police reports regarding the

8  death of Officer Gelb?

9  A.   Did not.

10  Q.   They did not.

11       Did they ask you anything about the murder of Albert

12  Gelb?

13  A.   No.

14  Q.   Did they ask you at all about the fact that the

15  description of the shooter of Officer Gelb did not match that

16  of Mr. Carneglia?

17            MS. SEIFAN:   Objection.

18            THE COURT:  Overruled.   But remember what I said,

19  ladies and gentlemen, don't take an unanswered question as

20  suggesting a fact.  You may answer.

21  A.   I just don't recall.

22  Q.   Sir, isn't it a fact that Mr. Ball told one of your

23  fellow detectives that the shooter was five foot eleven.

24  A.   I don't recall.

25  Q.   Do you recall the fact, sir, that both cars -- well,

1 Mr. Ball observed two cars on the night of the shooting?

2          MS. SEIFAN:   Objection.

3          THE COURT:  He may answer, if he recalls it.

4 A.   I don't recall.

5 Q.   Sir, as part of your investigation did you review this

6 police file?

7          THE COURT:  Investigation of what?

8          MR. FARBER:   Investigation of Officer Gelb.

9 A.   No, I did not.

10 Q.   I thought you said when you were working on the file

11 that you took it as your responsibility to familiarize

12 yourself with all the police reports within that file.

13 A.   I'm not quite sure where you're coming from, what you're

14 saying.

15 Q.   When you were working together with your brother

16 officers on the Albert Gelb homicide investigation, this was

17 all within the same squad, correct?

18 A.   This would have been, yes.

19 Q.   And this was a significant investigation based on the

20 fact that the murder involved that of a court officer?

21 A.   Yes.

22 Q.   And you were helping each other out?

23 A.   Yes.

24 Q.   Is it a fact, sir, that as part of the investigation you

25 pursued the fact that the suspect had pulled alongside Albert

1  Gelb's vehicle, both facing the same direction?

2  A.   According to the report, yes.

3  Q.   And, in fact, sir, is it correct that you were pursuing

4  the fact that it appeared that Officer Gelb had voluntarily

5  stopped his vehicle, rolled down the driver's window to speak

6  to the person who pulled alongside of him?

7        MS. SEIFAN:   Objection.

8        THE COURT:   If he recalls it.

9  A.   I don't recall.

10 Q.   Sir, isn't it a fact the vehicle Officer Gelb was found

11 in had its headlights running?

12 A.   I don't recall that.

13 Q.   I'm going to ask you to take a look at what I'll deem

14 marked as Defense Exhibit C for identification.

15       MR. FARBER:   Again, these are the documents that

16 contain the homicide file by the New York City Police

17 Department.

18       THE COURT:   On what case?

19       MR. FARBER:   Again, of Albert Gelb.

20       THE COURT:   Are you through with A and B?

21       MR. FARBER:   Yes, Judge.  I'm sorry.

22       THE COURT:   May I see them, please.

23       MR. FARBER:   Yes, your Honor.  The numbers on the

24 side were my own reference, the orange tabs.

25       THE COURT:   Mark them physically, sir, so there's no

1  question about what we're talking about and staple them

2  together as A and B, and then give them back to me, please.

3        THE COURT:  You're handing --.

4        MR. FARBER:   I'm handing the witness Defense

5  Exhibit C for identification.

6        (Witness reading.)

7  Q.   Sir, did you have an opportunity to look over those

8  documents?

9  A.   Yes, I have.

10 Q.   Does it refresh your recollection as to whether or not

11 the vehicle that Mr. Gelb was driving was in fact facing the

12 same direction as that of the suspect?

13 A.   The contents of this report here, I just don't recall

14 it.

15 Q.   Does it refresh your recollection as to the facts that

16 the headlights were running on Officer Gelb's car?

17 A.   No.

18 Q.   Does it refresh your recollection to the fact that

19 Mr. Gelb's windows on his driver's side were rolled down?

20 A.   No.

21 Q.   Sir, do you recall whether or not there was any indicia

22 that Mr. Gelb had tried to run away or otherwise avoid

23 anyone?

24 A.   No.

25 Q.   You have no recollection at all?

1    A.    Not to those details, no.

2    Q.    Do you have any recollection as to whether or not

3    Officer Gelb's service revolver was observed anywhere within

4    the car?

5    A.    No.

6    Q.    Isn't it a fact, sir, that Officer Gelb's service

7    revolver was not found on the seat or in his hand, in fact,

8    it was still in his holster?

9          THE COURT:  Don't answer that, unless you recall it

10   from your observation.

11         THE WITNESS:  I don't recall.

12   Q.    Sir, I'm going to ask you to take a look again -- one

13   second, please -- at what has been collectively marked as

14   Defense Exhibit B.

15         THE COURT:  B?

16         MR. FARBER:   B, as in boy, for identification.

17         THE COURT:  We already have a B.

18         MR. FARBER:   I will ask him to look at it again.

19         THE COURT:  Okay.

20         Contains two pages?

21         MR. FARBER:   Yes.

22         THE COURT:  Staple it and mark it again.

23   Q.    The documents that you have before you marked as B,

24   those police reports, are those documents -- were they

25   prepared in the normal course of business by the New York

1    City Police Department?

2    A.    Yes, they were.

3    Q.    Was it the normal course of business that these records

4    were maintained by the New York City Police Department?

5    A.    Yes.

6    Q.    Do those documents appear to be accurate?

7    A.    Yes, they do.

8              MR. FARBER:    Your Honor, I would offer Exhibit B

9    into evidence at this point.

10             MS. SEIFAN:    Objection, your Honor.  I'm not even

11   clear -- are those his reports?  Just general police reports?

12             THE COURT:    I will allow him to testify based on his

13   general knowledge of police practice based upon what purports

14   to be police documents.

15             MS. SEIFAN:    We object to the admission of the

16   report into evidence, your Honor.

17             THE COURT:    What ground?

18             MS. SEIFAN:    They're hearsay.

19             THE COURT:    The reports themselves?

20             MS. SEIFAN:    Yes.

21             THE COURT:    Contents of the reports?

22             MS. SEIFAN:    The contents of the reports are

23   hearsay.  They're not his reports.  They are just random

24   reports that have been handed to him.  Based on that any

25   report from the police department can come in.

1    THE COURT:  It may be double hearsay, but they come

2 in as police reports.  However, the information may be

3 hearsay.  What is your objection?  Your objection is to the

4 information?

5    MS. SEIFAN:  Yes.

6    THE COURT:  May I see the reports?  They are being

7 offered as a business record?

8    MR. FARBER:  Yes, your Honor.

9    THE COURT:  As recorded recollection and they're

10 being offered as 807, under the residual exception, correct?

11    MR. FARBER:  That's correct.

12    THE COURT:  Let me see the documents.

13    MS. SEIFAN:  Your Honor, this witness did not draft

14 these reports.

15    THE COURT:  I'm sorry.

16    MS. SEIFAN:  This is not the witness' reports.

17    THE COURT:  I understand that.  Look at the rules

18 I've just mentioned, please.  You're talking about the

19 reports and what is in the reports?

20    MS. SEIFAN:  Yes.

21    THE COURT:  You're objecting now to the admission of

22 the reports, not what's in the reports?

23    MS. SEIFAN:  No, I'm objecting to what's in the

24 reports.

25    THE COURT:  Then we have a double hearsay problem.

Hopkins-cross/Farber

1  Let me see it.  Let me see each one of the reports.

2          (Handing.)

3          THE COURT:  We'll take a short recess.

4          (The jury exits the courtroom.)

5          THE COURT:   I have here three documents without a

6  number on them.  Could you, please, mark them as I've

7  directed you to mark them.

8          MR. FARBER:   Judge, they were marked on the back.

9          THE COURT:  Let me see each one of these, A, B and

10 C, please.

11         MR. FARBER:   The tags are on the back.

12         MR. BURLINGAME:  Judge, we have an objection on

13 authentication grounds.

14         MS. SHARKEY:   Judge, if I could add something to

15 this?

16         THE COURT:  Excuse me.  When I wish you to be heard,

17 I will tell you.

18         MS. SHARKEY:   Okay.

19         THE COURT:  Sit down, please.

20         MS. SHARKEY:   Okay.

21         (Pause in the proceedings.)

22         THE COURT:  I have A, B and C.  You have no

23 recollection of any of these matters?

24         THE WITNESS:  Just the format of those type of

25 reports.

M. BRYMER, RPR, OCR

1    THE COURT:  They appear to be based on your long

2  experience authentic reports?

3    THE WITNESS:  Those are the type of reports we would

4  be using.

5    THE COURT:  Do you recognize any of the signatures?

6    THE WITNESS:  I do.

7    THE COURT:  They are of then extant police

8  officials?

9    THE WITNESS:  Yes, they are.

10    MR. BURLINGAME:  Brief voir dire, Judge?

11    THE COURT:  You can cross-examine him when you get a

12  chance.  You find that they're authentic documents of the

13  police department.  The witness has exhausted.  You can try

14  further for the defendant and you can try on cross, if you

15  wish to get into it.  The question of whether they come in

16  will be fully briefed by the parties.  It may be that the

17  defendants will have to provide a further basis for

18  admissibility.  With respect to the contents of the reports,

19  because there's hearsay in it, what others said, correct?

20    THE WITNESS:  Correct.

21    MR. BURLINGAME:  Judge, if I could voir dire on

22  authentication?

23    THE COURT:  You can do that on cross-examination.

24    MR. BURLINGAME:  The Court already ruled they are

25  authentic.  I would like to ask questions to further the

1  Court's knowledge of the document.

2          THE COURT:  You can cross-examine and I'll

3  reconsider my ruling.  They are now ruled as authentic.

4          Anything further on this issue from this witness?

5          MR. FARBER:   Judge, would I be able to have the

6  witness read the --.

7          THE COURT:  I can't hear you.

8          MR. FARBER:   Could I have the witness read the

9  documents that are in evidence?

10          THE COURT:  Absolutely not.  That's why I want you

11  to brief it.  It is critical to your case, I take it, and

12  this witness can't give us anything else that I know of.

13          MR. FARBER:   Understood, Judge.

14          THE COURT:  Do you agree?

15          MR. FARBER:   There is one report this actual

16  witness actually did write out himself.  With regard to that

17  one, it is page two, I believe, of Exhibit A.

18          THE COURT:  What can this witness tell you about it?

19          MR. FARBER:   He should be able to recall his own

20  statements within the report.

21          THE COURT:  This witness?

22          MR. FARBER:   This witness.

23          MR. BURLINGAME:  He already testified he can't.

24          MR. FARBER:   I don't believe that's what he said.

25          THE COURT:  This is page?

1     MR. FARBER:   Page two of Exhibit A.  This report

2  was prepared by this detective.

3     THE COURT:  Is this page your report, sir?

4     Hand it to him, please.

5     MR. FARBER:   Yes (handing).

6     THE WITNESS:  This was prepared by me.

7     THE COURT:  Excuse me.  It was?

8     THE WITNESS:  I prepared it, yes.

9     THE COURT:  May I see it.

10     But you don't recall any of these details?

11     THE WITNESS:  Vaguely, your Honor.

12     THE COURT:  When you did write the report, did you

13  have knowledge of what Mr. Ball said?  Was this what you've

14  obtained from Ball at the time you interviewed him, what's on

15  this page?

16     THE WITNESS:  Yes.

17     THE COURT:  Did you have knowledge at that time,

18  although you have insufficient recollection now, of the

19  accuracy of your report?  When your report was made, did you

20  have accurate knowledge of what you here reported the witness

21  said to you?

22     THE WITNESS:  What he said to me, yes.

23     THE COURT:  The report was made how long after the

24  shooting?

25     THE WITNESS:  3/12/76.

1      THE COURT:   The shooting was on what date?

2      MS. SEIFAN:   March 11th.

3      THE COURT:  So, this is one day after the shooting.

4      MS. SEIFAN:   I think it is -- if I'm looking at the

5  right one, it is two days, March 13th.

6      THE COURT:  It says on 3/12/76 Mr. Ball was

7  reinterviewed.  That's one day after the shooting.

8      MS. SEIFAN:   No, the date of the report is at the

9  top left, it says 3/13.

10      THE COURT:  The interview was one day after the

11  shooting.

12      MS. SEIFAN:   Yes.  Yes, it was, your Honor.

13      THE COURT:  At the time you wrote the report, would

14  you have adopted your report as accurate?

15      THE WITNESS:  At the time of preparing that report?

16      THE COURT:  Yes.

17      THE WITNESS:  Yes.

18      THE COURT:  Well, if you want to ask the witness

19  anything else, you may.  803 5 has a limitation:  If

20  admitted, memorandum of record may be read into evidence but

21  may not itself be received as an exhibit unless offered by an

22  adverse party.  I suppose the adverse party here would be the

23  government.

24      So, consider all of that in your briefing, but while

25  the witness is here, I want you to exhaust whatever you need

1   to exhaust in order to brief it.

2        Do you have a question you want to ask in the

3   absence of the jury.

4        MR. BURLINGAME:  I have just a brief -- I think we

5   might be able to save a little briefing.

6        THE COURT:  You can examine.

7        MR. BURLINGAME:  As to him, on the authentication

8   issue.

9   VOIR DIRE

10  BY MR. BURLINGAME:

11  Q.   Did you review the originals of these reports?

12  A.   The original?

13  Q.   Yeah.

14  A.   No, I did not.

15  Q.   Do you have any idea whether the copies you have been

16  shown are true and accurate copies of the original reports?

17  A.   As a matter of fact?

18  Q.   Yeah.

19  A.   No.

20       THE COURT:  These were obtained by the defendant in

21  answer to the subpoena he signed for the police department,

22  correct?

23       MR. FARBER:   By the government.  The government

24  personally delivered.

25       THE COURT:  But they were subpoenaed pursuant to my

```
1   signed subpoena; is that right?

2              MR. FARBER:   That's correct, Judge.

3              THE COURT:  Did you modify these documents at all

4   after you received them from the government?

5              MR. FARBER:   No, your Honor.

6              THE COURT:  Did the government modify them before

7   they transmitted them to the defendant?

8              MR. BURLINGAME:  No, Judge.

9              THE COURT:  I will consider them authentic records.

10             MR. BURLINGAME:  As to the other point, aside from

11  the report that the witness wrote himself, the one you were

12  just discussing, your Honor was pointing out the briefing

13  should focus on Rule 80 --.

14             THE COURT:  Excuse me.  You can focus on anything

15  you want.  Brief it and give me briefs on it and the

16  defendants will offer it as part of their case, not yours.

17             All I want done at this moment is I want this

18  witness' contribution to the case exhausted so that he can

19  leave the courtroom and go about his business.  Do you have

20  any questions you want to ask him?

21             MR. BURLINGAME:  We do.  If I could have 30 seconds

22  of the Court's time to make one point that will save us hours

23  of briefing?

24             THE COURT:  You can have all the time you wish.

25             MR. BURLINGAME:  Thank you, Judge.
```

1       The residual exception I believe is the only means

2  by which these documents can come in and it specifically

3  states a statement may not be admitted under the exception

4  --.

5       THE COURT:  Excuse me. I do not wish to hear

6  argument on it.  I want it fully briefed.

7       MR. BURLINGAME:  Very well, Judge.

8       THE COURT:  I don't have a complete recollection of

9  all cases and everything on evidence.

10       MR. BURLINGAME:  I understand.

11       THE COURT:  Excuse me.  This is a critical piece of

12  evidence because it will be used by the defendant to suggest

13  that there's a reasonable doubt about whether this defendant

14  killed the deceased officer.  And I don't want to have

15  anything superficial with respect to the briefing, because it

16  may be the critical document on the issue.  All I want is to

17  have this witness --.

18       MR. BURLINGAME:  We'll brief it.

19       THE COURT:  Do you have any questions you want him

20  --.

21       MR. BURLINGAME:  Very brief redirect.

22       THE COURT:  Do that on your redirect.

23       Do you have anything you want to add on your cross?

24       MR. FARBER:   Yes, Judge.  I'm only halfway through

25  with the witness.

1    THE COURT:  On these documents?

2    MS. SHARKEY:  Yes.  May I ask a few questions of

3 the witness?

4    THE COURT:  No.  I don't want to switch attorneys on

5 the same witness.

6    MR. BURLINGAME:  One question, please?

7    THE COURT:  I want to hear from the defendant and

8 then I'll hear from you.

9    MR. FARBER:  Judge --.

10    THE COURT:  Attach the documents to your briefs.

11    MR. FARBER:  I will.

12    THE COURT:  Yes.

13    MR. BURLINGAME:  Judge, should we also brief under

14 the same -- by this theory any police report comes in through

15 this witness and, so, can the government seek to admit the

16 dozens of police reports that identify the defendant as the

17 lead suspect in the murder?

18    THE COURT:  You have a double hearsay problem.  One,

19 the authentication of the police document, that can be

20 accomplished to identify the document.  The other hearsay

21 step is what is in the document.  The document itself is

22 useless.  It is what is in the document.

23    MR. BURLINGAME:  Correct.

24    THE COURT:  We're now dealing with what's in the

25 document.  It has to be briefed.  If you expect a blanket

1  ruling that anything the government has in its possession can

2  be used, forget it.  Brief it and don't make any wild

3  arguments in your brief.  They won't help you.

4        MR. FARBER:  Judge, I would ask the witness a few

5  extra questions.

6        THE COURT:  You may do so as soon as the jury comes

7  back and complete your cross and redirect and then we'll let

8  the witness go.

9        MR. BURLINGAME:  Then the next witness is the one we

10  will have to set up the courtroom for which will take five

11  minutes.

12        THE COURT:  Let's finish.

13        MR. FARBER:  Judge, my questions would be

14  foundational purposes.  Do you want that in front of the

15  jury?

16        THE COURT:  Not necessary.  Ask it right now.

17  CROSS-EXAMINATION (Cont.'d)

18  BY MR. FARBER:

19  Q.  Detective, these documents that you were shown earlier,

20  these are DD5s, correct?

21  A.  Yes.

22  Q.  Sir, you conducted interviews as part of the homicide

23  detective investigation?

24  A.  Yes.

25  Q.  And your fellow officers did the same?

1  A.   Yes.

2  Q.   And you would interview witnesses?

3  A.   Yes.

4  Q.   And you would memorialize what was learned from the

5  witnesses in these DD5s?

6  A.   Yes.

7  Q.   These DD5s were part of the normal course of business

8  for the homicide squad to record all parts of the

9  investigation?

10  A.   Yes, they are.

11  Q.   That would be witness statements?

12  A.   Yes.

13  Q.   And other parts of the investigation?

14  A.   Yes.

15  REDIRECT EXAMINATION

16  BY MR. BURLINGAME:

17  Q.   Are you aware if the officers other than yourself wrote

18  accurate reports?

19  A.   I can't answer for them.

20          THE COURT:  All right.  Is that the end of your

21  cross?

22          MR. FARBER:   In front of the jury.

23          THE COURT:  I can't hear you.

24          MR. FARBER:   In front of the jury, outside the

25  jury.

1          THE COURT:  Outside the jury I take it you exhausted

2     it.

3          MR. FARBER:  Yes.

4          THE COURT:  Do you want the jury brought in for the

5     rest of the cross and redirect?

6          MR. FARBER:  Yes, Judge.

7          THE COURT:  Bring in the jury, please.

8          (The jury enters the courtroom.)

9          THE COURT:  Be seated, please.

10         MR. FARBER:   May I continue?

11         THE COURT:  Please.

12    CROSS-EXAMINATION (Cont.'d)

13    BY MR. FARBER:

14    Q.   Detective, after the death of Albert Gelb his vehicle

15    was secured as evidence?

16    A.   That would have been the procedure at that time, yes.

17    Q.   And, in fact, after it was secured, the car was dusted

18    for fingerprints; is that correct?

19    A.   That would have been part of the investigation, yes.

20    Q.   And, in fact, five latent fingerprints were recovered

21    from Albert Gelb's vehicle?

22    A.   I don't recall that.

23    Q.   With the Court's permission, I would like to show you

24    what's been marked as Defense Exhibit D, as in David, for

25    identification.

1    THE COURT:  Yes.

2   Q.   Consisting of three pages.

3    THE COURT:  For identification.

4    Now, when I say it is for identification, ladies and

5   gentlemen, it means that we want to keep track of the

6   documents so we all understand what is involved, but it is

7   not yet in evidence and it may never be in evidence.

8    Proceed.

9   Q.   I show you what's been marked as Defense Exhibit D for

10   identification.  I ask you, does that refresh your

11   recollection as to whether or not five latent fingerprints

12   were recovered from Albert Gelb's vehicle?

13    (Witness reading.)

14   A.   It indicates that, but I have no recollection.

15    THE COURT:  Strike that "it indicates that" .

16   Q.   Sir, do you recall whether or not any of the

17   fingerprints that were recovered were those of Charles

18   Carneglia?

19   A.   I don't recall that.

20   Q.   Sir, do you recall whether or not a photo array was put

21   together in this case and shown to any prospective witnesses?

22   A.   No, I do not.

23   Q.   Do you recall whether or not a phone tap or other trace

24   was put on Albert Gelb's telephone to determine whether or

25   not he had received any phone calls of a threatening nature?

1    A.   No, I don't recall it.

2         MR. FARBER:   Your Honor, I would offer, going back

3    to Defense Exhibit D, for identification, I would offer it

4    into evidence subject to briefing.

5         THE COURT:  B?

6         MR. FARBER:   D, as in David.

7         THE COURT:  No.  Brief it.  Establish anything you

8    wish to establish with this witness.

9    Q.   Take a look at D, for identification, the three pages

10   you have before you.  Do those appear to be New York City

11   Police Department documents?

12   A.   It is the same format that was normally used at that

13   time.

14   Q.   And would those police department documents be used in

15   the course of homicide investigations?

16   A.   Yes.

17   Q.   Would it be used to determine whether or not

18   fingerprints were found from a piece of evidence?

19   A.   There would be.

20   Q.   Would it also be used to show whether or not the

21   fingerprint came back as a match for any particular suspect?

22   A.   Yes, it would be.

23   Q.   Do those documents appear to be authentic?

24   A.   They appear to be.

25   Q.   And is it the normal course of business for these

1  documents to be both produced by the New York City Police

2  Department?

3  A.   Yes.

4  Q.   And maintained by the New York City Police Department?

5  A.   Yes.

6       MR. FARBER:   I will brief the issue, your Honor,

7  but I would like to move it into evidence subject to

8  briefing.

9       THE COURT:   No.  We'll take it for identification

10 but not in evidence.  You will have to brief it.

11      MR. FARBER:   Understood.

12 Q.   Did you learn at some point during your investigation

13 that Albert Gelb was scheduled to testify as a witness in a

14 criminal proceeding?

15 A.   Relative to which investigation?

16 Q.   Relative to anything prior to his death?

17 A.   No.

18 Q.   Did you interview any of the colleagues of Albert Gelb

19 after his death?

20 A.   I don't believe so.

21 Q.   Do you recall the name of the person who -- let me

22 rephrase that.

23      From your investigation, did you learn that an

24 individual by the name of David Vartian found Albert Gelb's

25 body right after the shooting?

1  A.   I don't recall that.

2  Q.   Do you learn David Vartian indicated Albert Gelb had not

3  been threatened in any form?

4        THE COURT:  Sustained.  He's already answered.

5  Q.   Am I correct, sir, based on your knowledge, there are no

6  eyewitness accounts linking Charles Carneglia to the death of

7  Albert Gelb?

8        MS. SEIFAN:   Objection.

9        THE COURT:  Do you have any recollection?

10       THE WITNESS:  No, your Honor.

11 Q.   Sir, are you aware of the fact that as of today there

12 remains outstanding a reward for any information leading to

13 the arrest and conviction of the person who murdered Albert

14 Gelb?

15       MS. SEIFAN:   Objection.

16       THE COURT:  Sustained.

17 Q.   The following year you indicated you investigated the

18 murder of Michael Cotillo?

19 A.   Yes.

20 Q.   And at this time you were the lead detective?

21 A.   Yes.

22 Q.   And is it fair to state you made it your personal

23 responsibility and duty to fully -- to be fully familiar with

24 the facts of the case?

25 A.   Yes.

1  Q.   And again this was to enable and enhance your role as an

2  investigator?

3  A.   Yes.

4  Q.   Fully briefed yourself on the crime scene details?

5  A.   Yes.

6  Q.   As well as the witness statements?

7  A.   Yes.

8  Q.   You learned, am I correct, that this was a -- started as

9  a brawl outside the Blue Fountain Diner?

10  A.   No.

11  Q.   Did you not learn, sir, that there was a fight between

12  20 to 30 or 40 young men outside the diner?

13  A.   It originated inside the diner.

14  Q.   The fight started inside the diner?

15  A.   Yes.

16  Q.   It spilled out into the streets?

17  A.   Yes, it did.

18  Q.   It involved between 20 and 40 individuals fighting?

19  A.   About two dozen, yes.

20  Q.   Do you recall saying it could have been up to three

21  dozen on direct examination?

22  A.   The ones that I understand at that time was about two

23  dozen that were involved in the brawl.  However, there were

24  people that were -- patrons that were hanging around viewing

25  what was going on, and so on, so, that brought it up to

1  somewhere near 40.

2  Q.   Now, the brawl took place somewhere between three and

3  four o'clock in the morning, am I correct?

4  A.   Somewhere around that time.

5  Q.   And the Blue Fountain Diner was within the confines of

6  your assigned investigative area?

7  A.   Yes.

8  Q.   And you were familiar with the Blue Fountain Diner?

9  A.   I recall being in it once or twice prior to that.

10  Q.   Were you also aware that the Blue Fountain Diner was

11  known as a regular hangout for young people after the bars

12  and local clubs closed for the evening?

13  A.   I wasn't fully aware of that, no.

14  Q.   Isn't it a fact, sir, there had been previous fights at

15  the Blue Fountain Diner of various natures between groups at

16  the early morning hours?

17  A.   Not familiar with that.

18  Q.   You said you were aware of the fact this is an area that

19  had a -- had certain organized crime element to it, the

20  neighborhood?

21       THE COURT:  I don't remember him saying that.

22       MR. FARBER:   I will rephrase the question.  I

23  withdraw that.

24  Q.   Describe this area.  Was there a certain amount of

25  organized crime activity in the area?

1  A.   Organized crime figures resided in the area.  There was

2  predominance of their activity in the area and there was

3  definite influence of organized crime.

4  Q.   And is it fair to state that the Blue Fountain Diner

5  attracted a certain number of young men who considered

6  themselves either wise guy wannabes or in fact were

7  associated with various organized crime families?

8  A.   I learned that afterwards, yes.

9  Q.   And they didn't always get along with each other?

10 A.   They don't usually.

11 Q.   I'm sorry.

12 A.   They don't usually.

13 Q.   They don't usually.

14      They could get a little bit into a bravado, pushing and

15 shoving with each other?

16 A.   That would be part of it.

17 Q.   In fact, on the night in question, this was between a --

18 a fight between two rather large groups, the Cityline boys

19 and the boys from Howard Beach?

20 A.   Two groups were identified, yes.

21 Q.   And these two groups of about two dozen young men all

22 had organized crime connections?

23 A.   I don't know if that's a fact or not.

24 Q.   Well, is it fair to state from your investigation after

25 the death of Michael Cotillo, you learned that most of the

1    individuals you spoke with who participated in the fight had

2    criminal records?

3    A.    I wouldn't say most, but certain portions.

4    Q.    A fair number?

5    A.    Fair number.

6    Q.    And they had committed various crimes?

7    A.    Yes.

8    Q.    Crimes involving gambling offenses?

9    A.    I don't remember exactly what the crimes were.

10   Q.    You did learn, sir, that these individuals were

11   considered associates of organized crime, the ones with the

12   criminal records, for the most part?

13   A.    Related to individuals, yes.

14   Q.    Now, you indicated that the fight started inside the

15   diner?

16   A.    Yes.

17   Q.    And, in fact, it started over a perceived disrespect of

18   a young woman, am I correct?

19   A.    That was one of the reports, yes.

20   Q.    And, in fact, you were informed that an individual by

21   the name of Robert Engel was upset his girlfriend Phyllis had

22   been disrespected by a guy named Vito Giariputo?

23   A.    Yes.

24   Q.    And am I correct that you learned from your

25   investigation that Michael Cotillo was sent inside the diner

1  by Robert Engel to tell Vito to come outside and settle it?

2  A.    I vaguely remember that.

3  Q.    In fact, based on Robert Engel's direction, Mr. Cotillo

4  went inside the diner and told Vito, you better get your ass

5  outside?

6  A.    I have some recollection of that, after I read the

7  report.

8  Q.    And you learned this from speaking to various witnesses?

9  A.    Yes.

10 Q.    These are the same witnesses you described as being very

11 closed lipped and not wanting to tell you what happened?

12 A.    Yes.

13 Q.    You did learn about what I just testified to?

14 A.    Yes.

15 Q.    Excuse me, I didn't testify.  I just questioned you

16 about it.

17       You indicate Michael Cotillo was brought to Interboro

18 Hospital?

19 A.    Yes.

20 Q.    You went to the hospital and conducted interviews of

21 four individuals there?

22 A.    Yes.

23 Q.    You described those interviews as very limited in how

24 much information was provided to you?

25 A.    At that time it was considered an informal speaking of

1  these individuals.

2  Q.   One of the names you gave was the name Gary Miliante?

3  A.   Yes.

4  Q.   And, in fact, Mr. Miliante gave you a rather detailed

5  statement, am I correct?

6  A.   Not that night, no.

7  Q.   I'm going to show you what I'm going to mark as Defense

8  Exhibit E for identification, consisting of four pages.

9       Do you recognize what's been handed to you as Defense

10 Exhibit E?

11 A.   You have to give me a moment.

12 Q.   Yes, go ahead.

13      (Witness reading.)

14 Q.   Do you recognize that?

15 A.   There are certain parts of this that I do recognize, but

16 I can't say for sure when this took place, when the interview

17 took place.

18 Q.   Does it refresh your recollection -- do you see on the

19 top of that document where it says "Hospital interviews"?

20 A.   Yes.

21 Q.   Does it refresh your recollection as to the interviews

22 that were conducted by yourself at the hospital?

23 A.   Yes.

24 Q.   And am I correct that you actually did get some detailed

25 descriptions from some of the people you testified to you

1    spoke with?

2    A.   I wouldn't consider this a detailed interview or

3    description.

4    Q.   Well, in fact -- Mr. Gary Miliante I believe is the

5    name?

6    A.   Yes.

7    Q.   He pretty much described for you his actions that

8    evening, am I correct?

9         MR. BURLINGAME:   Judge, objection.  It is his

10   recollection, not reading the report.

11   Q.   If it refreshes your recollection as to what --?

12        THE COURT:  Sustained.

13   A.   My recollection was --.

14        THE COURT:  Sustained.  Ask him whether he has any

15   direct knowledge, not from the document.

16   Q.   Do you have any independent knowledge as to what was

17   said to you that night at the hospital?

18   A.   My recollection was that there was a reluctance to even

19   speak to me.

20   Q.   No one refused to speak to you, correct?

21   A.   No, considering the -- the confines of where we were,

22   they had to speak to me, but there was a reluctance.

23   Q.   You were working on this case for a period of five

24   months?

25   A.   Yes.

1  Q.   You were able to interview you said about three dozen

2  individuals?

3  A.   Approximately, yes.

4  Q.   And from these interviews you were able to put together

5  a pretty detailed -- form a pretty detailed understanding of

6  the events of that night?

7  A.   I would say so.

8  Q.   You were able to -- you actually did a drawing of who

9  was where, correct?

10 A.   Yes.

11 Q.   And you were able to figure out who was fighting who to

12 an extent?

13 A.   As I recall that drawing, it was pinpointing within that

14 area of where the incident took place, where each individual

15 was either standing or involved in -- involved in the fight.

16 Q.   Am I correct, sir, in that drawing the name Charles

17 Carneglia appears nowhere?

18 A.   I believe so.

19 Q.   You believe so it does or you believe so it doesn't?

20 A.   I believe it doesn't.

21 Q.   When you were interviewing the young men who were

22 involved in the fight, you observed bruises and cuts on some

23 of them?

24 A.   If I did, I don't recall it now.

25 Q.   Well, this had been a brawl, correct?

1    A.    Somewhat.

2    Q.    Some of these guys had black eyes?

3    A.    I don't recall.

4    Q.    You don't recall seeing ripped clothing?

5    A.    Don't recall.

6    Q.    You did investigate an individual by the name of George

7    Licastro?

8    A.    Yes.

9    Q.    This was an individual who had a sizeable gash to his

10   hand?

11   A.    Yes.

12   Q.    And had gone to a different hospital than the one

13   Cotillo went to and used a false name?

14   A.    Correct.

15   Q.    And you considered him a suspect, correct?

16   A.    I considered him a -- I can only describe it as a person

17   of interest.

18   Q.    And is it fair to state another person of interest was

19   an individual by the name of Phil Brown?

20   A.    Might have been.  I don't remember.

21   Q.    Do you recall the fact that an individual by the name of

22   Phil Brown fled the jurisdiction for a few months right after

23   the stabbing?

24   A.    I don't know about that.

25   Q.    Do you recall also being informed that a blond haired

1 individual was seen fleeing the jurisdiction -- fleeing the

2 crime scene right after the stabbing?

3 A.   I don't remember that.

4 Q.   Fair to state the investigation sort of petered out

5 after a period of time?

6 A.   Well, the leads were not forthcoming as much.

7 Q.   Sir, you were still working on this case in October of

8 1979, weren't you?

9 A.   October of '79.

10 Q.   Uh-huh.

11 A.   No.

12 Q.   Sir, isn't it a fact you were informed in October of

13 1979 that an individual by the name of Robert Ianucci had

14 been arrested and wanted to give information about the fact

15 that Phil Brown had done the stabbing of Michael Cotillo?

16 A.   I have no recollection of that.

17 Q.   I'm going to ask you to take a look at Defense Exhibit F

18 for identification?

19        MR. BURLINGAME:  Judge, I ask you to remind the

20 witness it again goes to refresh your recollection.

21        THE COURT:  I'm sorry.

22        MR. BURLINGAME:  This is for a purpose of whether or

23 not his recollection is refreshed.

24        (Witness reading.)

25 A.   I have no knowledge of this.

Hopkins-cross/Farber

1  Q.   Did it refresh your recollection, sir, as to whether or

2  not this Mr. Ianucci was in fact arrested and you were

3  notified of the same?

4        MS. SEIFAN:   Objection, your Honor.

5        THE COURT:  I will allow the question.

6  A.   No.

7  Q.   Sir, do you recognize this document that has been handed

8  to you as Defense Exhibit F?

9  A.   No, I don't.

10  Q.   Sir, do you know in fact that this was part of the

11  original homicide file for the murder of Michael Cotillo?

12  A.   No.

13  Q.   Do you have the original homicide file for Michael

14  Cotillo?

15  A.   Do I have it, no.

16  Q.   Was any effort made to bring it to court today?

17  A.   By myself?

18  Q.   Yes.

19  A.   No.

20  Q.   Do you know if the government made any effort to bring

21  in the original homicide file?

22  A.   No.

23        THE COURT:  Don't answer.

24  Q.   What about the original homicide file for Albert Gelb,

25  do you have that present here today?

1  A.   No.

2  Q.   Do you know if any effort was made by anyone to bring

3  that --?

4            MS. SEIFAN:   Objection, your Honor.

5            THE COURT:  Sustained.

6  Q.   Sir, do you recall that back on November 17, 1977 around

7  eleven o'clock there was a shooting at Mike's B&G, located at

8  92nd Street and Liberty Avenue in an effort to resolve the

9  Cotillo murder; do you recall that?

10  A.   Vaguely I remember an incident took place there, yes.

11  Q.   In fact, an individual by the name of Anthony Frobuccino

12  was shot as retaliation?

13  A.   I'm not familiar with that.

14            MR. FARBER:   I have no further questions.  Thank

15  you.

16            THE COURT:  Thank you.

17  REDIRECT EXAMINATION

18  BY MS. SEIFAN:

19  Q.   Mr. Hopkins, based on your participation in the Albert

20  Gelb investigation, do you recall whether Albert Gelb was

21  threatened by the defendant for a year before his murder?

22  A.   No, I don't.

23  Q.   Based on your participation in the Albert Gelb

24  investigation, were you aware that the defendant was the lead

25  suspect?

1    A.    No, I was not.

2    Q.    You were not the lead detective on Albert Gelb's

3    investigation?

4    A.    No.

5    Q.    You testified before that you arrived -- the call came

6    in around 5 a.m. -- I'm turning now to the Michael Cotillo

7    murder.  Call came in around 5 a.m.?

8    A.    Around about.

9    Q.    You testified that -- that the stabbing had occurred

10   somewhere between three and 4:00 a.m.?

11   A.    It was prior to the call, yes.

12   Q.    After receiving the call, you went to Interboro

13   Hospital?

14   A.    Yes.

15   Q.    So, by the time you got to the diner, after you had

16   visited the victim at the hospital --?

17   A.    Yes.

18   Q.    -- and conducted those interviews, was it a couple

19   hours after the incident?

20   A.    As I recall it had to be somewhere about an hour.

21   Q.    You said that you -- let's clarify.

22         You said the call came in around 5 a.m.?

23   A.    Yes.

24   Q.    The stabbing had occurred around?

25   A.    It was about an hour earlier.

1  Q.   An hour earlier?

2  A.   Right.

3  Q.   And after receiving the call, you went to Interboro

4  Hospital?

5  A.   Yes.

6  Q.   And you spoke to some people there?

7  A.   Yes.

8  Q.   Then you went to the diner?

9  A.   Yes.

10 Q.   Okay.  By the time you got to the diner, do you recall

11 approximately what time that was?

12 A.   I'm -- probably about an hour after receiving the call.

13 Q.   Fair to say that the people who had been involved in the

14 fight were no longer -- who had actually been involved in the

15 punching and hitting were no longer at the scene?

16 A.   Good portion were gone already.

17 Q.   You indicated before you recalled interviewing someone

18 named Joy Giovi?

19 A.   Yes.

20 Q.   Do you recall her telling you that Charles Carneglia was

21 on the sidewalk in front of the diner --

22 A.   The name --.

23 Q.    -- on the night Michael Cotillo was murdered?

24 A.   The name was mentioned, yes.

25       THE COURT:  Which name?  Ask him which name.

1    Q.    The name Charles Carneglia?

2    A.    Yes.

3    Q.    She indicated he was at the diner?

4    A.    Yes.

5    Q.    Do you recall her telling you that when Cotillo fell to

6    the ground, a few people yelled "Where did Charlie go"?

7    A.    Yes.

8    Q.    When you testified before that people were reluctant to

9    talk to you, did you mean to say nobody gave you any

10   information?

11   A.    No.

12   Q.    People talked to you?

13   A.    Certain information was given.  Particularly some

14   individuals that were there that had left already without

15   giving an address of where they could be located and that was

16   part of the investigation, locating these people.

17   Q.    Is it fair to say some of the people you interviewed in

18   your investigation lied to you?

19   A.    Yes.

20   Q.    The map that Mr. Farber referred to that he said that

21   you created --?

22   A.    Yes.

23   Q.    -- did that contain the names of the people that you

24   had interviewed?

25   A.    For the most part, yes.

1  Q.  Had you interviewed Charles Carneglia?

2  A.  No.

3  Q.  You testified before that after speaking with George

4  Licastro you went to Jamaica Hospital?

5  A.  Yes.

6  Q.  And you reviewed the records of Jamaica Hospital for

7  November 6th, 1977?

8  A.  Yes.

9  Q.  And the records revealed that an individual named Joseph

10 Gallo had been treated for a laceration on his index finger?

11 A.  Yes.

12 Q.  Based on that information -- and the medical records

13 indicated there was an address?

14 A.  Yes.

15 Q.  Associated with Joseph Gallo?

16 A.  Yes.

17 Q.  You went to that address?

18 A.  Yes.

19 Q.  When you got to that address what happened?

20 A.  Nonexistent.

21 Q.  Based on that information, you assumed that George

22 Licastro and Joseph Gallo were one in the same person?

23 A.  That was the presumption at the time.

24 Q.  Did you confront George Licastro with this information?

25 A.  Yes, I did.

1  Q.   And did you learn that George Licastro and Joseph Gallo

2  were one in the same person?

3  A.   Yes they are -- they were.

4  Q.   I'm showing you what's been marked for identification as

5  Government Exhibit 3500 MHO 72.  Do you recognize that?

6  A.   Yes, I do.

7  Q.   What is that?

8  A.   It's information that was supplied to me by --.

9  Q.   Generally, what are we looking at?  What is that?

10  A.   This was a memo book that I used at the start of the

11  investigation.

12  Q.   The investigation into the murder of Michael Cotillo?

13  A.   Correct.

14  Q.   Turning to the page I showed you which has been marked

15  82, you have some red underlining on that page?  I will

16  approach, I think it will be easier for us to talk about it.

17       THE COURT:  Don't whisper to the witness.  What did

18  you say as you were approaching the witness?

19       MS. SEIFAN:   I said I thought it would be better if

20  I stood closer to him.  His pages are not labeled with

21  numbers.

22       THE COURT:  Go ahead.

23       MS. SEIFAN:   Okay.

24  Q.   Can you turn to the beginning of that interview.  Who is

25  -- who did you interview?

1          MS. SHARKEY:   Objection.

2    A.   Joy Giovi.

3          THE COURT:  Do you have a Xerox of those pages

4    you're now questioning him about?

5          MS. SEIFAN:   Yes, I do, your Honor.

6          THE COURT:  Mark them so we'll know what you're

7    talking about.  These are 3500 MHO?

8          MS. SEIFAN:   72 A.  Interview of Joy Giovi.

9    Q.   What is the date of this interview?

10   A.   March 18th, 1978.

11   Q.   Can you turn to the fourth page with the asterisk.  Do

12   you see that?

13   A.   Yes.

14   Q.   Is there underlining on that page?

15   A.   Yes, there is.

16   Q.   What is underlined on that page?

17         MR. FARBER:   Objection.

18         THE COURT:  Sustained.

19         THE COURT:  What is the date of that interview, sir?

20         THE WITNESS:  March 18, 1978.

21   Q.   You testified before that Joy Giovi indicated Charles

22   Carneglia was on the sidewalk in front of the diner?

23         MR. FARBER:   Objection, asked and answered.

24         THE COURT:  Overruled.

25   Q.   Is it fair to say the red underlining that appears --?

1      MR. FARBER:  Objection.

2      THE COURT:  Sustained.

3   Q.   Detective Hopkins, did you ever use a red underline or

4   red pen --?

5      MR. FARBER:  Objection.

6   Q.    -- when you were interviewing witnesses?

7      MR. FARBER:  Objection.

8      THE COURT:  Sustained.  May I see the document,

9   please.

10     MS. SEIFAN:  Yes.

11     THE COURT:  You're showing me a copy which is 3500

12  MHO 72A.

13     MS. SEIFAN:  Yes, your Honor.

14     THE COURT:  All right, you can ask him what he

15  recollects, whether this was accurate, and then we'll

16  establish -- and whether it is an authentic copy and we'll

17  establish whether it is admissible based on your briefs and

18  argument.

19     The fact that I take briefs or hear argument outside

20  your presence is of no significance to you.  I just don't

21  want to waste your time.  You'll only consider the evidence

22  that is admitted.

23  Q.   Detective Hopkins, when you interviewed witnesses did

24  you take notes?

25  A.   Yes, I did.

1  Q.   Is it fair to say that the notes that you took were

2  accurate at the time you took them?

3          THE COURT:  Why don't you establish that these are

4  his notes first.

5  Q.   Detective Hopkins --?

6          THE COURT:  The document.

7  Q.    -- are the notes that are in front of you your notes?

8  A.   They are.

9  Q.   Your handwriting?

10 A.   Yes.

11 Q.   You wrote them at the time you interviewed Joy Giovi?

12 A.   Yes.

13 Q.   They were accurate at the time you took them?

14         MR. FARBER:   Objection.

15         THE COURT:  I will allow that.

16 A.   Yes.

17 Q.   What color pen did you usually take notes in?

18 A.   Usually?  Either blue or black.

19 Q.   Did you ever use any other color pen?

20 A.   Red.

21 Q.   Did you underline anything on that page?

22 A.   Yes, I did.

23 Q.   What color did you underline it?

24         MR. FARBER:   Objection.

25         THE COURT:  Just whether he made the underlining

1  marks.

2  Q.   Detective Hopkins, did you make the underlying marks

3  that appear on the pages?

4  A.   Yes, I did.

5  Q.   You underlined it in three different places on that

6  page?

7  A.   Yes.

8  Q.   You underlined "Where did Charlie go"?

9          MR. FARBER:   Objection.

10         THE COURT:  Sustained.  Strike it.  Please, don't do

11  that again.

12         MS. SEIFAN:   No further questions.

13         THE COURT:  Any recross?

14         MR. FARBER:   Nothing further, Judge.

15         THE COURT:  Thank you very much, sir.  You remain,

16  please, remain in the section.

17         You want to set up.

18         MR. BURLINGAME:  We do.  If the Court is breaking at

19  12:15, I believe you said yes?

20         THE COURT:  Yes.

21         MR. BURLINGAME:  It might make sense to break for

22  lunch.

23         THE COURT:  Let's do that.  Get back here at five

24  after one, we want to set it up for broadcast.  Counsel,

25  remain.

1          Before the witness is released, is there anything

2     you want to ask him outside the presence of the jury?

3     Anybody?

4          MR. BURLINGAME:  There actually is one other

5     foundational question.

6          THE COURT:  All right.  Would the witness come back

7     on the stand.  I cautioned counsel when I'm trying to keep

8     out -- and it is obvious what I'm trying to keep out is

9     written on a page and you try to circumvent my ruling, as you

10    just did, I consider that sharp practice.  I don't want it.

11         MR. BURLINGAME:  We apologize, Judge.

12         MS. SEIFAN:   I'm sorry.

13         THE COURT:  No reason to apologize.  I don't want

14    any corner cutting with respect to documents that may be

15    crucial to the case.

16         MR. BURLINGAME:  It was more a matter of

17    inexperience than --.

18         THE COURT:  It wasn't a matter of inexperience.

19    There's no such matter.

20         MR. NORRIS:   Judge, it was my recommendation --.

21         THE COURT:  There's no such matter of inexperience.

22    When you do something in the courtroom, you take

23    responsibility for it.  Don't ever tell me somebody else told

24    me to do it.  The matter is closed.

25         Thank you.  All counsel here are wonderful and

1    highly professional, but occasionally they need instruction.

2         MR. BURLINGAME:  Thank you, Judge.

3         THE COURT:  Sit down.  Bring in the witness.  Where

4    is the witness?  I thought I told him to remain.  Where is

5    the last witness?

6         MR. BURLINGAME:  Judge, just to clarify, I was

7    talking about my inexperience, not Ms. Seifan.

8         THE COURT:  I don't care about your inexperience.

9    You are not inexperienced.  Once you take the bar exam and

10   you're admitted, you are considered at the same level as

11   those of us who have been in for more than a half a century.

12   Better, because you remember everything we forgot.

13        The witness is taking the stand outside the presence

14   of the jury.  Do you have a question?

15        MR. BURLINGAME:  We do.

16   REDIRECT EXAMINATION

17   BY MR. BURLINGAME:

18   Q.   You testified you took the notes in that memo book?

19   A.   Yes.

20        THE COURT:  Describe it by number, please.

21        MR. BURLINGAME:  Government Exhibit?

22        MS. SEIFAN:   MHO 72.

23   Q.   At the time that you took these, did you adopt them as a

24   -- as a fair and accurate statement of your -- your

25   statements at the time?

1    A.    Yes.

2    Q.    Including 72 A, the notes that we were just discussing

3    involving the interview of Joy Giovi?

4    A.    Yes.

5    RECROSS-EXAMINATION

6    BY MR. FARBER:

7    Q.    The statements you wrote down were attributed to Joy

8    Giovi, she was reporting to you statements she heard from

9    other individuals, correct?

10   A.    Without going over that statement, that would be

11   probably a fair statement.

12   Q.    Could you take a look at the page in particular, the one

13   with the red underlining.

14         Do you see that?

15   A.    Yes.

16   Q.    Those were statements Ms. Girard reported to you she

17   heard other people say?

18   A.    I would have to read the statement in its entirety.  I

19   can't answer that right now.

20   Q.    Please, go ahead, read whatever you need to read.

21   A.    Okay.

22         (Witness reading.)

23   A.    My impression at this time reading the statement, it was

24   her own recollection of what she saw.

25   Q.    Well, when it says that people were calling out, "Where

1  did Charlie go," she wasn't referring to herself, am I

2  correct?

3  A.   Yes.

4  Q.   And when she said further in that page that a few people

5  had said Phil Brown had done it, and then a young woman said

6  it wasn't Brown, but a thin curly haired guy, again, that was

7  not her stating it, but rather repeating what she overheard?

8  A.   Yes.

9  Q.   Is it fair to state, sir, you don't know how accurately

10  Ms. Girard reported what was said by others to you?

11  A.   Yes.

12        MR. FARBER:   Thank you.

13  REDIRECT EXAMINATION

14  BY MR. BURLINGAME:

15  Q.   Just to make the record clear, the first part next to

16  the asterisk when it says Charles Carneglia was on the

17  sidewalk in front of the diner, that would be Joy Giovi's

18  statement to you?

19  A.   Yes.

20  Q.   Charles Carneglia is underlined in red -- the statement

21  "Where did Charlie go" is underlined in red?

22  A.   Yes.

23  Q.   The words "thin," "curly" and"brown" are underlined in

24  red?

25  A.   Yes.

1  Q.   Your understanding was when she told you "Where did

2  Charlie go," that was what she heard with her own ears at the

3  scene?

4  A.   Yes.

5        THE COURT:  Who put that asterisk in the margin?

6        THE WITNESS:  I did, your Honor.

7        THE COURT:  When?

8        THE WITNESS:  At the time of his interview.

9  Q.   When you would review your -- is it fair to say that you

10  used the red pen to underline this information at a different

11  time than when you originally took the notes?

12  A.   I had a habit of underlining, particularly in red, if it

13  was a person of interest and I thought I would pursue it

14  further.

15  Q.   Just flipping to the cover, could you just read the

16  information that's on the cover?

17  A.   It is my name, 15th Homicide Zone, phone number, Michael

18  Cotillo, case number 124, 1977.

19  Q.   Does that appear to be the same notebook you used in the

20  homicide investigation?

21  A.   Yes, it is.

22        MR. BURLINGAME:  Nothing further.

23        THE COURT:  Anything?

24        MR. FARBER:   Nothing further, Judge.

25        THE COURT:  Thanks very much, Officer.  All right.

1    Be back, please, at one o'clock.

2              MR. BURLINGAME:  Thanks, Judge.

3              (Lunch recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A F T E R N O O N   S E S S I O N

2         (The following takes place out of the presence of

3    the jury.)

4         THE COURT:  Where is counsel for the government?

5         (Pause.)

6         THE COURT:  I have to see a juror first.

7         (Government counsel enter the courtroom.)

8         THE COURT:  We have a problem with Juror Five, she's

9    sick.  She has a doctor's appointment tomorrow.  She's

10   coughing and I don't want her to infect the rest of the

11   jurors.  I want to dismiss her.

12        MS. SHARKEY:  Well, Judge, we would object to her

13   being dismissed.

14        THE COURT:  I can't hear you.

15        MS. SHARKEY:  We would object to her being

16   dismissed.  I mean it's 1:00 in the afternoon.  She's a

17   sitting juror --

18        THE COURT:  Bring in Juror Five.  She wants to sit.

19        MS. SHARKEY:  Maybe with the Court's help she could

20   get a doctor's appointment this afternoon, you know what I

21   mean.  There's ways to ameliorate the schedule issue.

22        THE COURT:  I don't want to break this afternoon, I

23   want to try the case this afternoon.

24        MS. SHARKEY:  Respectfully, I understand that but

25   prospectively --.

1          THE COURT:  Bring in the juror please.

2          THE CLERK:  She's being brought in, Judge.

3          (Juror enters courtroom.)

4          THE COURT:  Juror Five, would you mind sitting down

5    in the first seat please.

6          I understand you're not feeling well.

7          JUROR FIVE:  Yeah, I feel a little bit under the

8    weather today.  I made an appointment to see my doctor for

9    early tomorrow morning.

10         THE COURT:  Where is your doctor?

11         JUROR FIVE:  My doctor is where I live, on Staten

12   Island.

13         THE COURT:  I can't hear you.

14         JUROR FIVE:  Staten Island.  It's an early morning

15   appointment.

16         THE COURT:  Well, if you see your doctor tomorrow,

17   you probably won't get her until about 11 or so.

18         JUROR FIVE:  I'll do my best to rush.

19         THE COURT:  I'm not --  you're a very fine juror and

20   I'm not blaming you, I'm just trying to get our schedule set.

21         JUROR FIVE:  I understand.

22         THE COURT:  Have you got a flu-like symptom?

23         JUROR FIVE:  It is a bit of a cough and my ears are

24   starting to bother me.  I felt it yesterday while I was

25   sitting here during the --

1          THE COURT:  Are you coughing?

2          JUROR FIVE: Yes.

3          THE COURT:  Well, you might infect the other jurors.

4          JUROR FIVE:  Well, I've been taking medication since

5    last night.

6          THE COURT:  Since what?

7          JUROR FIVE:  Since last night.

8          THE COURT:  What kind of medication?

9          JUROR FIVE:  Cough syrup to --

10         THE COURT:  Well, the cough syrup doesn't --

11         JUROR FIVE:  And I'm picking up some medication, I

12   just spoke to my doctor.

13         THE COURT:  All right.  Would you mind --  don't

14   discuss this with the other jurors please.

15         JUROR FIVE:  Thank you.

16         (Juror leaves courtroom.)

17         THE COURT:  Well, counsel, what does the government

18   want to do?

19         MR. BURLINGAME:  If we could just have a second to

20   confer, Judge?

21         THE COURT:  Yes.

22         (Pause in the proceedings.)

23         MR. BURLINGAME:  Do we know what her original juror

24   number is?

25         THE CLERK:  I do.

1       THE COURT:  Ms. Lowe will get it for you.

2       THE CLERK:  Juror Five is 26.

3       (Pause.)

4       MR. BURLINGAME:  Judge, we have no objection if the

5  court wants to replace her with the first alternate.

6       MS. SHARKEY:  But we do respectfully, Judge.  This

7  is a sitting juror.  She's made efforts to sit.  She hasn't

8  asked to be excused.  We don't consent to her excusal.  With

9  all due respect, we have about three hours left in the day,

10  three and a half hours left in the day.  I bet that the juror

11  might be able to see her doctor this afternoon and start

12  tomorrow morning in a timely way.  I know the Court is

13  concerned about its schedule --

14       THE COURT:  Would ask you her if she can --  take

15  her out in the hallway, Ms. Lowe, and ask her if it is

16  possible to reschedule today if she explains.

17       THE CLERK:  No, she said this was her first

18  appointment she could get.  I asked her that.

19       THE COURT:  Tomorrow.

20       MS. SHARKEY:  I didn't hear that.

21       THE CLERK:  She said, no, she couldn't, this was the

22  first appointment she could get.

23       MS. SHARKEY:  Okay.  I, in my experience with other

24  judges, I've had them call --  never mind.

25       MR. FARBER:  Judge, I would just note that the juror

1    did come in here, she did not seem to be -- although she

2    told you she had been coughing, she was not coughing when she

3    was in here.  She did not seem to be in any physical stress.

4    She expressed a desire to continue sitting this afternoon.

5         THE COURT:  What have we got on this afternoon?

6    You're playing this material?

7         MR. BURLINGAME:  We're playing the tape and we --

8    this is probably the single most important piece of evidence

9    in the government's case so we want to make sure --

10        THE COURT:  How long is this going to take?

11        MR. BURLINGAME:  About an hour to an hour and a

12   half.

13        THE COURT:  What do you have scheduled after that?

14        MR. BURLINGAME:  We have some surveillance

15   witnesses.  We have the gentleman who testified at the

16   suppression hearing about entering in the notes that were

17   seized.

18        THE COURT:  We could put that off until 11 tomorrow.

19   All right.  Let's proceed this afternoon and see how it goes

20   and we'll set it for 11 for tomorrow.

21        MR. BURLINGAME:  So, you'd like us to break early

22   this afternoon?

23        THE COURT:  Yes.  I think that makes sense.

24        MR. BURLINGAME:  Okay.  So, perhaps we can just put

25   on this, I mean if we're going to --  if we're not going to

HOLLY DRISCOLL, CSR

1   excuse the juror, then it seems like it is a fine time to --

2   we could either play the tape or we could break right now.

3          THE COURT:  No, I think we'll play it.

4          MR. BURLINGAME:  I just would want to then if we can

5   get her back in and make sure she is feeling well enough to

6   follow the evidence.  This is the single most important piece

7   of evidence in the government's case.

8          MS. SHARKEY:  Judge, if that's the only piece of

9   evidence, I'd like to release our witness until tomorrow

10  morning, is that okay?

11         THE COURT:  Your witness?

12         MS. SHARKEY:  Our expert who is going to sit at

13  counsel table.

14         THE COURT:  You can do whatever you wish.

15         MS. SHARKEY:  Witness was the wrong term.

16         (Juror Five enters courtroom.)

17         THE COURT:  Do you feel well enough, madame, to

18  listen to the evidence for about an hour and a half or so?

19         JUROR FIVE:  Yes.

20         THE COURT:  And take it all in?

21         JUROR FIVE: Yes.

22         THE COURT:  All right.  Thank you.

23         JUROR FIVE:  Thank you.

24         THE COURT:  We'll proceed then.

25         Bring in the jury.

1    MR. BURLINGAME:  So, just to be clear, so I'll

2    instruct the rest of our witnesses to leave, we'll put on

3    this one witness and then we'll end for the day?

4    THE COURT:  Correct.

5    MS. SHARKEY:  Can I have one minute to do the same.

6    (Pause.)

7    THE COURT:  We'll start tomorrow at 11:00 with the

8    jury and the parties will be here at 10:30.

9    MR. FARBER: 10:30?

10   THE COURT:  10:30 for the parties, for all the

11   parties and the attorneys.  11:00 for the jury tomorrow.

12   MR. BURLINGAME:  Judge, would you like the witness

13   to come in or do you like it when we call the witness?  Bring

14   him in.

15   MS. SHARKEY:  Judge, thank you.

16   THE COURT:  You're welcome.

17   (Witness takes the stand.)

18   MR. BURLINGAME:  Judge, sorry, before the jury comes

19   in, the CD that we're going to introduce that we're going to

20   play the conversation off of, last night we were having some

21   trouble cuing it to exactly the right spot so the paralegal

22   made a copy of it onto her hard drive which is easier to play

23   back off.  Is it okay if she plays off the hard drive

24   instead, the identical --.

25   THE COURT:  Yes.  Bring in the jury.

1    (Jury enters courtroom.)

2    (Time noted:  1:20 p.m.)

3    THE COURT:  Sit down please.  One of the jurors

4  isn't feeling too well so we're going to work for about an

5  hour and a half today and then tomorrow bring you in at 11

6  because she has a doctor's appointment, okay.

7    A JUROR:  11?

8    THE COURT:  11 and we'll break early today because

9  she's not feeling well.  I don't want any of you getting

10  sick.

11    A JUROR:  Thank you.

12    THE COURT:  That's an order.

13    Swear the witness.

14    (Witness sworn by the clerk.)

15  R O B E R T   A.   V A N D E T T E, having been first duly

16  sworn was examined and testified as follows:

17    THE CLERK:  You may be seated.  Please state and

18  spell your name for the reporter.

19    THE WITNESS:  Robert A.  Vandette, V A N D E T T E.

20  DIRECT EXAMINATION

21  BY MR. BURLINGAME:

22  Q.   Mr. Vandette, if you could bring the microphone over, if

23  you could position it in front of yourself.

24    Good afternoon, sir.

25  A.   Good afternoon.

HOLLY DRISCOLL, CSR

1    Q.    What do you do for a living?

2    A.    I work for the Federal Bureau of Investigation.

3    Q.    What is your title?

4    A.    Special agent.

5    Q.    What is your current assignment?

6    A.    I'm signed to the National Security Division.

7    Q.    How long have you been with the FBI?

8    A.    Twenty-two years.

9    Q.    When did you join?

10   A.    In 1987.

11   Q.    What was your first assignment in the FBI?

12   A.    I was assigned to the National Security Division for

13   four years.

14   Q.    What did you do after that?

15   A.    I was transferred to the Organized Crime Branch.

16   Q.    Any special squad in the Organized Crime Branch?

17   A.    Gambino Organized Crime.

18   Q.    And after organized crime what did you do?

19   A.    Back to the National Security Division.

20   Q.    So, that takes you up through what you're doing now?

21   A.    Yes.

22   Q.    So, how long were you with the Gambino squad?

23   A.    Ten years.

24   Q.    And during that time what were your primary duties?

25   A.    To collect evidence on soldiers and associates in the

1 Gambino family.

2 Q.   Did any of your investigations involve eavesdropping

3 either using a hidden recording device or a bug or wiretaps?

4 A.   Yes.

5 Q.   Approximately how many times during your career did you

6 participate in eavesdropping investigations?

7 A.   Maybe up to a dozen assisting in other cases and so

8 forth.

9 Q.   What's a wiretap?

10 A.   Generally referred to as an intercept of a telephone

11 conversation, commonly referred to as that.

12 Q.   What's a bug?

13 A.   That would be more along the lines of a microphone that

14 would capture conversations in a room or some other place.

15 Q.   So, a bug could be placed anywhere and record

16 conversations and a wiretap is specifically of a telephone?

17 A.   Yes, generally speaking, yes.

18 Q.   How do you receive permission to start on a wiretap or

19 bug?

20 A.   You collect evidence and probable cause and make an

21 application to the Court to conduct a wiretap of a telephone

22 or to put a microphone in a location to intercept

23 conversations and if you have sufficient probable cause, the

24 Court will approve the intercept, or if you don't, they'll

25 deny it.

HOLLY DRISCOLL, CSR

1   Q.   Just in very basic terms, what's your understanding of

2   what that means, probable cause?

3           MS. SHARKEY:  Objection.

4           THE COURT:  Sustained.

5   Q.   What sorts of information do you present to the Court

6   when you're seeking to obtain a wiretap or bug?

7   A.   You could take information from informants that tell you

8   criminal conversations that are taking place on a specific

9   telephone.  The use of the phone would be an indicator, the

10  toll records from that phone, things of that nature that

11  begin to show a history or a pattern.

12  Q.   So, generally speaking, you're trying to show the Court

13  that the location or telephone that you're seeking to

14  eavesdrop on is being used in criminal conduct?

15  A.   Yes.

16  Q.   Once you receive authorization from the Court, how long

17  is that authorization good for?

18  A.   30 days.

19  Q.   What happens at the end of 30 days?

20  A.   At the end of 30 days you evaluate what you've

21  intercepted and if you have enough evidence of criminal

22  activity, you go back to the Court and seek an additional 30

23  day order.

24  Q.   Are you familiar with the term "minimization"?

25  A.   Yes.

HOLLY DRISCOLL, CSR

1  Q.   What does that mean in the context of a wiretap or bug?

2  A.   It means that you have to be aware that there are

3  certain conversations that you're not prohibited (sic) to

4  intercept, could be conversations between an attorney and a

5  client or a doctor and a patient or simply conversations that

6  have no relevance, no obvious criminal activity, at that

7  point you would minimize or not listen to the conversation if

8  it was clear.

9  Q.   So, minimizing means you would turn off the bug and you

10 don't listen to it?

11 A.   That's correct.

12 Q.   Now, are these conversations that were being recorded

13 monitored while they're being recorded?

14 A.   Yes.

15 Q.   Who monitors them?

16 A.   People that are authorized, generally special agents.

17 Q.   And what steps, if any, are taken to record what's being

18 picked up by the bug?

19 A.   You'll have a recording device that captures the audio

20 as it comes in.  As you listen to it live, you're also

21 recording it simultaneously.

22 Q.   So, you make a recording of it as the signal is coming

23 in?

24 A.   Yes.

25 Q.   Do the agents do anything to record what they're

HOLLY DRISCOLL, CSR

1  listening to while they're monitoring it?

2  A.   Yes, you have line sheets and you would generally

3  summarize a conversation as you're listening to it, generally

4  just summarize the highlights as best you can.

5  Q.   Did you participate in the eavesdropping of a visiting

6  room at the McKean Federal Correctional Institution?

7  A.   Yes.

8  Q.   Where is the McKean Federal Correctional Institution?

9  A.   In Pennsylvania, northwest Pennsylvania.

10 Q.   And what is the McKean Federal Correctional Institution?

11 A.   It is a federal prison.

12 Q.   Who was the target of that eavesdropping investigation?

13 A.   Gene Gotti and people who would visit him.

14 Q.   So, Gene Gotti was an inmate at McKean Federal

15 Correctional Institution?

16 A.   Yes.

17 Q.   Did a judge approve of the FBI placing a bug in the

18 visiting room at the jail?

19 A.   Yes, he did.

20 Q.   Why were you able to get permission from a court to bug

21 the visiting room at the McKean jail.

22        MS. SHARKEY:  Objection.

23        MR. FARBER:  Objection.

24        THE COURT:  Sustained.

25        Anything that is admitted you can assume was

HOLLY DRISCOLL, CSR

1   obtained legally.

2        MR. BURLINGAME:  Thank you, Judge.

3   Q.   Were all the recordings picked up from the bug in the

4   visiting room at the McKean jail monitored?

5   A.   Yes.

6   Q.   Did you take place in the monitoring?

7   A.   Yes.

8   Q.   How long did the Court approve of the monitoring of Gene

9   Gotti's visits at the jail in McKean?

10  A.   I think approximately two years.

11  Q.   And the Court approved of the use of the bug for every

12  single conversation recorded throughout that period?

13  A.   Yes.

14  Q.   Did you stay in northwestern Pennsylvania the entire

15  time the bug was up?

16  A.   No.

17  Q.   How would you and other agents know to go to the jail in

18  time to conduct the monitoring?

19        MS. SHARKEY:  Objection.

20        THE COURT:  I don't understand the question.

21  Q.   You testified that you would go to McKean to monitor the

22  conversations that were taking place?

23  A.   Yes.

24  Q.   And you also testified that you weren't stationed there

25  the entire time that the bug was up?

HOLLY DRISCOLL, CSR

1   A.   That's correct.

2   Q.   When would you travel to McKean?

3   A.   When we would learn of an impending visit.

4   Q.   Based on your experience, do prisoners have to inform --

5   seek permission for visits in advance?

6   A.   Yes.

7   Q.   When you and other agents monitored the conversations

8   did you monitor them in realtime as they were taking place?

9   A.   Yes.

10  Q.   So, you'd listen to a conversation as it is actually

11  happening?

12  A.   That's correct.

13  Q.   Would multiple agents frequently monitor a conversation?

14  A.   Yes.

15  Q.   And you and the other agents you said would take line

16  sheets of what's taking place in the conversation?

17  A.   Yes.

18  Q.   And is that a verbatim transcript of every word?

19  A.   No.

20  Q.   What would you generally take down?

21  A.   You would just try and summarize the conversation as it

22  was developing, you'd try and get the highlights, things that

23  you thought were important so that when you went back to

24  listen to the tape you would know what parts to key in on.

25  Q.   What do you call that process, taking those notes?

1  A.   It was just filling out the line sheets and --

2  summarization.

3  Q.   Line sheets.  And recordings were also made of these

4  conversations on the McKean bug?

5  A.   Yes.

6  Q.   What would happen to the recordings after the

7  conversations ended?

8  A.   They would be placed into an evidence envelope and

9  brought to the ELSUR (ph) unit in the FBI.

10 Q.   What is the ELSUR unit?

11 A.   Electronic surveillance.

12 Q.   What would happen to them when they get back to that

13 unit?

14 A.   They would be put in secure space, logged in.

15 Q.   Were you monitoring the bug of the visiting room at the

16 McKean jail on November 18th, 1999?

17 A.   Yes.

18 Q.   How did you come to be working on the bug that day?

19 A.   I was assigned to go up and assist in the intercept.

20 Q.   Why were you selected to go up that day?

21 A.   At that time I was a senior agent on the squad and I was

22 familiar with some of the parties who were intending to

23 visit, I was assigned to go up and assist in the intercept.

24 Q.   Was it your understanding it was a significant visit?

25 A.   Yes.

1    MS. SHARKEY:  Objection to form.

2    MR. FARBER:  Objection.

3    THE COURT:  Strike that answer.

4  Q.   So, you had information that Gene Gotti would be getting

5  a visit that day?

6  A.   Yes.

7  Q.   And did he get a visit that day?

8  A.   Yes, he did.

9  Q.   Who visited him?

10 A.   Sal Scala and Charlie Carneglia.

11 Q.   At the time were you familiar with Charles Carneglia

12 based on your investigative experience with the Gambino

13 squad?

14 A.   Yes.

15 Q.   Do you see him here in the courtroom?

16 A.   Yes.

17 Q.   Could you please identify him?

18 A.   Seated at the table with the white sweater.

19    MR. BURLINGAME:  Identifying the defendant.

20    THE COURT:  Yes.

21 Q.   I'm showing you what's been marked as Government

22 Exhibit 318.

23 A.   Thank you.

24 Q.   Do you recognize that?

25 A.   Yes.

1    Q.    What is it?

2    A.    It's an inmate visiting log.

3    Q.    From where?

4    A.    McKean.

5    Q.    Have you reviewed it prior to your testimony?

6    A.    Yes.

7    Q.    Does it include --  what is an inmate visiting log?

8    A.    It records the visitor's name, their signature, the

9    person that they intend to visit.  It is a record of who's

10   coming to the prison to see who.

11   Q.    Does it include November 18th, 1999?

12   A.    Yes.

13        MR. BURLINGAME:  Your Honor, I'd move to admit

14   Government Exhibit 318 subject to connection.

15        MS. SHARKEY:  No objection, subject to connection.

16        THE COURT:  318 flat?  You don't have it on your --

17   there's no letter attached?

18        MR. BURLINGAME:  No.

19        THE COURT:  Okay.

20        MR. BURLINGAME:  Sorry, Judge, we'll get you an

21   updated exhibit list.

22        THE COURT:  All right.

23        ( Government Exhibit 318 received in evidence.)

24   Q.    Special Agent, can you find the log entry date for

25   November 18th, 1999?

HOLLY DRISCOLL, CSR

1  A.   Yes.

2  Q.   Can you tell me who Gene Gotti's visitors were that day?

3  A.   Salvatore Scala and Charles Carneglia.

4       MR. BURLINGAME:  Your Honor, permission to publish

5  318 to the jury?

6       THE COURT:  Yes.

7       MS. SHARKEY:  Judge, I thought it was admitted

8  subject to connection, respectfully.

9       THE COURT:  It's connected.

10      MS. SHARKEY:  Okay.

11      (Exhibit published to the jury.)

12      THE COURT:  All right, go ahead.

13      MR. BURLINGAME:  Thank you, Judge.

14 Q.   So, Special Agent, you testified that a visit did in

15 fact take place on --

16      THE COURT:  Just pass that down.

17 Q.   -- on November 18th, 1999 between Gene Gotti, Charles

18 Carneglia and Salvatore Scala?

19 A.   Yes.

20 Q.   Were you able to eavesdrop on their conversation?

21 A.   Yes.

22 Q.   Approximately how long was their conversation?

23 A.   In excess of three hours.

24 Q.   Did you personally monitor that conversation?

25 A.   Yes.

1  Q.  Were you assisted by another agent?

2  A.  Yes.

3  Q.  During the course of the conversation did the defendant

4  admit to a stabbing?

5  A.  Yes.

6        MR. FARBER:  Objection.

7        THE COURT:  We'll have the transcript.  I'd prefer

8  to get it through the transcript if we have it.

9        MR. BURLINGAME:  We will, Judge, it is just --  it

10 is an admission, I thought it was fine.  Sorry.

11 Q.  You listened to this as it was happening?

12 A.  Yes.

13 Q.  I'm showing you what's been marked as Government

14 Exhibits 318b-1 through b-5?

15 A.  Thank you.

16      (Pause.)

17 Q.  Have you had an opportunity to look at those?

18 A.  Yes, I have.

19 Q.  What are they?

20 A.  They're the original recordings taken from the prison

21 that day of the visit.

22 Q.  From the November 18th, 1999 visit?

23 A.  Yes.

24 Q.  Those are recordings of the conversation?

25 A.  Those are.

HOLLY DRISCOLL, CSR

1   Q.   Those are the original tapes?

2   A.   Yes, they are.

3   Q.   How do you know those are the tapes of that visit?

4   A.   My initials are on the tape.

5   Q.   When did you put your initials on the tape?

6   A.   When the intercept occurred.

7   Q.   Did you listen to these tapes in advance of your

8   testimony here today?

9   A.   Yes.

10  Q.   And are they true and accurate recordings of the visit

11  you monitored between Gene Gotti, Charles Carneglia and Sal

12  Scala?

13  A.   Yes.

14        MR. BURLINGAME:  I'd move to admit Government

15  Exhibits 318b-1 through 5.

16        THE COURT:  Admitted.

17        ( Government Exhibits 318b-1 through b-5 received in

18  evidence.)

19  Q.   Special Agent, just to clarify, did you initial the

20  tapes at the time they were made or did you initial them

21  after you listened to them in preparation for your testimony?

22  I just want to make sure the record is clear.

23  A.   After they were unsealed in preparation.

24  Q.   Okay.  So, the tapes were unsealed in preparation for

25  trial, you listen to them, after you listen to them you put

1  your initials on them?

2  A.    That's correct.  They were first sealed and then

3  reopened for preparation for trial, yes.

4  Q.    Now, I'm showing you what's been marked as Government

5  Exhibit 318e which is a compact disk.

6  A.    Yes.

7  Q.    Do you recognize that compact disk?

8  A.    Yes, I do.

9  Q.    What is that compact disk?

10  A.    It is a copy of 318b-4, of the tape recording that was

11  taken.

12  Q.    So, it is a copy of one of the original tapes that day?

13  A.    Yes, it is.

14  Q.    And did you review that CD in preparation for your

15  testimony?

16  A.    Yes.

17  Q.    Listened to the whole thing?

18  A.    Uh-huh.

19  Q.    What did you do after you listened to it, did you put

20  your initials on it?

21  A.    Initialed it, sure.

22  Q.    And you recognize that to be the same CD that you

23  listened to?

24  A.    It is.

25  Q.    Is it a fair and accurate copy of the tape that's

1   already in evidence?

2   A.   Yes.

3        MR. BURLINGAME:  Move to admit, Judge.

4        THE COURT:  This is 318c?

5        THE WITNESS:  E.

6        MR. BURLINGAME:  E.

7        THE COURT:  That's added, 318e is added to your

8   list?

9        MR. BURLINGAME:  Yes, Judge.

10        THE COURT:  All right.  Admitted.

11        ( Government Exhibit 318e received in evidence.)

12   Q.   Now, I'm showing you what's been marked as Government

13   Exhibit 318d as in David.  Do you recognize that?

14   A.   Yes.

15   Q.   What is that?

16   A.   It's a transcript.

17   Q.   And is that a transcript of a portion of the CD and the

18   tape that were just entered into evidence?

19   A.   Yes, it is.

20   Q.   Did you review that transcript while you were listening

21   to the record?

22   A.   Yes.

23   Q.   And is it a fair and accurate transcript of a portion of

24   that recording?

25   A.   Yes.

1    Q.   How many times did you review that transcript while

2    listening to the recording?

3    A.    Two or three times.

4            MR. BURLINGAME:  Move to admit the transcript,

5    Judge.

6            THE COURT:  Admitted.

7            ( Government Exhibit 318d received in evidence.)

8            THE COURT:  Now, let me say this to the jurors, the

9    evidence is actually what you see and hear.  The transcript

10   is given to you to assist you.  During your deliberations if

11   you want to hear anything, you'll probably be brought in to

12   listen or see, you can hold the transcript but you won't be

13   able to bring the transcript into the jury room, do you

14   understand?

15           So, listen carefully to what you see and watch what

16   you see and hear and use this only to assist yourselves.

17   Thank you.

18           MR. BURLINGAME:  Thank you, Judge.

19   Q.   Special Agent, I'm going to ask the Court for permission

20   to play the short segment of the recording from

21   November 18th, 1999 that matches up with that transcript but

22   before I do I'd like to ask you just a few questions about

23   the transcript.

24        First, the transcript identifies who's speaking at

25   certain times.  How do you know that the transcript correctly

1   identifies the speaker?

2   A.   You can see them speaking on the video and I also know

3   Charles' voice from speaking to him in the past but as you

4   watch the video, you can see them speak.

5   Q.   So, there was also --  there's also video tapes that

6   were made of the same conversation?

7   A.   Yes.

8   Q.   Were those also pursuant to a court authorization?

9   A.   Yes.

10  Q.   And so, you testified when you're able to watch the

11  video while listening to the tape it is obvious who is

12  speaking?

13  A.   Yes.

14  Q.   Are you also familiar with the voices of the

15  participants in the conversation?

16  A.   Mostly Charles, yes.

17  Q.   So, you're confident that when the transcript says it is

18  the defendant who is speaking, it is indeed the defendant who

19  is speaking?

20  A.   Yes.

21       MS. SHARKEY:  Objections as to form.

22       THE COURT:  I'll allow it.

23  Q.   Now, there's some notations on the transcript that I'd

24  like you to explain.

25       What do capital U, capital I mean?

1  A.   That's unintelligible.

2  Q.   What does that mean?

3  A.   There are portions of the conversation that cannot be

4  distinguished, you don't exactly know what they're saying so

5  UI is used to designate those portions of the conversation

6  where the words can't be made out.

7  Q.   So, UI is placed where there's a part of the

8  conversation where you can't hear what's being said?

9  A.   Yes.

10 Q.   Is that used when there's a brief period when you can't

11 hear what's being said or if there's a longer period when you

12 can't hear what's being said?

13 A.   Both.

14 Q.   In your experience in reviewing transcripts, when you

15 hit an UI is it best to just pause and wait until the next

16 line of the transcript until you pick it back up?

17          MR. FARBER:  Objection.

18          MS. SHARKEY:  Objection.

19 A.   Yes.

20          THE COURT:  I'll allow it.

21 Q.   Finally, in your experience, what is the quality of the

22 recording that we're about to listen to?

23          MS. SHARKEY:  Objection.

24          THE COURT:  I'll allow it.

25 A.   It is good given the environment that it was taken from.

Q.   Can you explain what you mean by that?
A.   There was a lot of background noise, it is a visiting room, chairs moving, doors opening, a lot of people talking over each other as opposed to a different type of intercept that might come over a telephone line where you don't have that sort of background noise or multiple conversations occurring.  So, given the circumstances under which it was captured, it's pretty good.
          MR. BURLINGAME:  Judge, at this time I'd like permission to distribute a copy of the transcript to the jurors and play the tape.
          THE COURT:  You may.
          This is without the video?
          MR. BURLINGAME:  This is without the video.
          THE COURT:  Don't look at it until you're told to do so please.
          (Pause.)
          MR. BURLINGAME:  Judge, the recording starts right when the transcript starts so I'd ask permission when we play for the jurors to be permitted to open up to the first page of the transcript.
          THE COURT:  Yes, you may do so.
Q.   One more question, Special Agent Vandette, before we get started on the transcript, there are various initials down the left-hand side, what does that designate?

1   A.   Those are my initials.

2   Q.   No, no, no, if you could open to page one.

3   A.   Oh, I'm sorry.  Those are the initials of the people

4   that are speaking at that time.

5   Q.   And what does CC stand for?

6   A.   Charles Carneglia.

7   Q.   What does EG stand for?

8   A.   Eugene, Gene Gotti.

9   Q.   And what does SS stand for?

10  A.   Sal Scala.

11       MR. BURLINGAME:  I think we're ready to play the

12  tape now.

13       (Whereupon, the tape is played.)

14  Q.   Special Agent, you can keep that out of its sleeve.

15       Now, Special Agent, did we just listen to the tape

16  played back at exactly the speed it was recorded?

17  A.   Yes.

18  Q.   So, that was real life speed?

19  A.   Yes.

20  Q.   And in your experience in listening to recordings made

21  from bugs, is it often easier to make out what's being said

22  when the tape is played back at a slightly slower speed?

23  A.   Yes, it is.

24  Q.   What is the ideal speed for listening to recordings from

25  bugs while reviewing transcripts?

1  A.   Probably around 90 percent of the actual speed.

2  Q.   Why is that helpful?

3  A.   Because it slows down the cadence of the conversation

4  and people often talk over each other and talk very quickly,

5  run sentences together, so by slowing it down it is a lot

6  easier to understand what's being said.

7  Q.   Is it also easier to follow along on the transcript?

8  A.   Yes.

9  Q.   Does playing this tape at 90 percent of its normal speed

10 change the contents of the tape in any way whatsoever?

11 A.   No.

12      MR. BURLINGAME:  With the Court's permission, we ask

13 that the jury be permitted to hear the tape at 90 percent of

14 normal speed for the reasons the agent just explained.

15      THE COURT:  Yes, you may.

16      (Whereupon, the tape is played.)

17 Q.   Now, Special Agent, you testified that one of the ways

18 you knew who was speaking on the transcript is that you were

19 able to monitor the conversation on video and how were you

20 able to do that?

21 A.   We had a live video feed that we would watch along with

22 the live audio feed.

23 Q.   And you testified you needed a court order for

24 permission to have that video feed?

25 A.   Yes.

HOLLY DRISCOLL, CSR

1    Q.    And you had that order?

2    A.    Yes.

3    Q.    Did the video cameras themselves record audio?

4    A.    No.

5    Q.    So, the original videos have no sound on them?

6    A.    That's correct.

7    Q.    Was a radio shot of the portion of the meeting that we

8    just listened to?

9    A.    Yes.

10   Q.    In fact, was a video shot of the entire conversation?

11   A.    Yes.

12   Q.    Did you watch that video as it was being recorded?

13   A.    Yes.

14   Q.    Have you watched the original video that was shot that

15   day in preparing to testify here today?

16   A.    Yes.

17   Q.    I'm showing you what's been marked as Government

18   Exhibit 318a.

19   A.    Thank you.

20   Q.    Do you recognize that?

21   A.    Yes, I do.

22   Q.    What is that?

23   A.    It's VHS recording of the visiting room that day.

24   Q.    Is it a fair and accurate depiction of what you saw

25   while the conversation was taking place?

HOLLY DRISCOLL, CSR

1    A.    Yes.

2    Q.    On November 18th, 1999?

3    A.    Yes.

4    Q.    Conversation between the defendant, Sal Scala and Eugene

5    Gotti?

6    A.    Yes.

7              MR. BURLINGAME:  Move to admit Government

8    Exhibit 318a.

9              THE COURT:  Admitted.

10             ( Government Exhibit 318a received in evidence.)

11   Q.    Special Agent, in preparing for your testimony was a

12   video created in which the audio recordings we just listened

13   to were synchronized with the video recordings that matched

14   the portion of the conversation we just listened to?

15   A.    Yes.

16   Q.    So, that created a segment in which the audio and video

17   recordings of the tapes were perfectly matched together?

18   A.    Yes.

19             MS. SHARKEY:  Objection.

20             THE COURT:  Overruled.

21   Q.    Did you watch that synchronized video?

22   A.    Yes, I did.

23   Q.    Does it confirm the attributions made on the transcript?

24   A.    Yes.

25   Q.    Is it extremely clear watching the video who is speaking

HOLLY DRISCOLL, CSR

1 when?

2 A.   Yes, it is.

3        MR. FARBER:  Objection.

4        THE COURT:  I'll allow it.  Take out the word

5 extremely.

6 Q.   How is it clear who is speaking when you're watching the

7 video?

8 A.   You can see them speaking as you're listening to them.

9 Q.   Does the video also explain why certain portions of the

10 conversation are hard to hear?

11 A.   Yes.

12 Q.   Why?

13 A.   At some points in the conversation some of the subjects

14 may place a hand over their mouth or lower their voices or

15 speak downward.

16 Q.   When you say "some of the subjects,"  who are you

17 talking about?

18 A.   The participants in the conversation.

19 Q.   I'm showing you what's been marked as Government

20 Exhibit 318c-1.

21 A.   Thank you.

22 Q.   Do you recognize that?

23 A.   Yes.

24 Q.   What is that?

25 A.   This is the compilation or synchronized audio and video

HOLLY DRISCOLL, CSR

1   conversation.

2   Q.   And that's the synchronized audio and video for the

3   segment of the conversation that we just heard?

4   A.   That's correct.

5   Q.   How do you know that that's what you're looking at?

6   A.   I initialed this.

7   Q.   You watched it and initialed it?

8   A.   And watched it, yes.

9   Q.   Is the audio portion of the recording contained on that

10  DVD identical to the two recordings that are already in

11  evidence?

12  A.   Yes, it is.

13  Q.   It is a true and accurate copy?

14  A.   Yes.

15  Q.   Is the video portion of that DVD identical to the

16  portions of the video that are already in evidence?

17  A.   Yes.

18  Q.   It is a true and accurate copy?

19  A.   Yes.

20          MR. BURLINGAME:  Your Honor, I'd move to admit

21  Government Exhibit 318 --  I lost the number.

22          THE COURT:  C.

23          MR. BURLINGAME:  C-1.

24          THE COURT:  C-1.

25          MR. BURLINGAME:  Yes.

1       THE COURT:  Okay.

2       ( Government Exhibit 318c-1 received in evidence.)

3       MR. BURLINGAME:  And now, with Your Honor's

4  permission, I'd like to publish that exhibit for the jury.

5       THE COURT:  You may.

6       MR. BURLINGAME:  And if we could turn down the

7  lights.

8       THE COURT:  Please.

9  Q.   One more question for the agent.

10      Special Agent, in your experience of watching this

11 video, is it difficult to review the transcript and watch the

12 video at the same time?

13 A.   You can do both but, yeah, you have to pay attention to

14 it.

15 Q.   Okay.  So --  good.

16      (Pause.)

17      MR. BURLINGAME:  Too close?

18      A JUROR:  No.

19      MR. BURLINGAME:  Everybody can see?

20      A JUROR:  Yes.

21      (Pause.)

22      MR. BURLINGAME:  Sorry, Your Honor, we did dry-runs

23 all through lunch.

24      (Pause.)

25      MR. BURLINGAME:  Judge, maybe we could have a

1  ten-minute break and we can get our tech guy to run over

2  here.  It is playing on the monitors.

3          THE COURT:  It is playing on the monitors.

4          MR. BURLINGAME:  It is on the small monitors so it

5  should be coming across the TV.

6          THE COURT:  Well, we have two small monitors.

7          MR. BURLINGAME:  Hold on, we might have it, Your

8  Honor.

9          (Pause.)

10         THE COURT:  Have the witness identify, if you can,

11 the parties on the screen before we start.

12         MR. BURLINGAME:  Thank you, Judge.

13         (Witness steps down.)

14 Q.   Just come up and point right to it.

15 A.   Thank you.

16      On the left is Charles Carneglia, seated on the left.

17 In the center is Gene, Eugene Gotti.  And on the far right is

18 Salvatore Scala.

19      (Witness resumes the stand.)

20         MR. BURLINGAME:  Thank you, Special Agent.  Thank

21 you, Judge.

22         (Whereupon, the tape is played.)

23 Q.   Special Agent, have you watched a number of surveillance

24 videos during the course of your time on the Gambino squad?

25 A.   Yes.

1    Q.   And I notice that at certain points during the video

2    sometimes the speakers would cover their mouths;  is that

3    something that you observed frequently during the course of

4    your investigations?

5    A.   Yes.

6    Q.   And why would people typically cover their mouths when

7    speaking?

8              MS. SHARKEY:  Objection.

9              THE COURT:  I'll allow it.

10   A.   To further muffle or prevent somebody who may be

11   listening from understanding what is being said.

12   Q.   So, that would be --  your understanding would be that

13   the speakers would have an awareness that they would possibly

14   be being monitored or recorded in some way?

15   A.   As a precaution they might take that action, yeah.

16   Q.   And at what point in the conversation, based on your

17   experience, would people typically cover their mouth?

18             MR. FARBER:  Objection.

19             MS. SHARKEY:  Objection.

20             THE COURT:  I'll allow it.

21   A.   Probably the most damning part of the conversation.

22   Q.   And that would be to make it more difficult to hear in

23   case anyone was conducting surveillance?

24   A.   Yes.

25   Q.   I notice that the defendant or, rather, Gene Gotti

1  covered his mouth when he said, "Well, you stabbed somebody,

2  Charles, you stabbed one of their guys."

3  A.   Yes.

4  Q.   You observed that?

5  A.   Yes.

6  Q.   Would that be in fitting with your experience of the

7  sort of statement that someone would cover their mouth when

8  they were making?

9  A.   Yes.

10 Q.   Moving on from the video and from November 18th at

11 McKean, did you conduct interviews during the course of your

12 time on the Gambino squad?

13 A.   Yes, I did.

14 Q.   And following those interviews would you typically

15 prepare reports?

16 A.   Yes.

17 Q.   Now, I'd like to ask you some questions about some

18 interviews you conducted.

19       MR. BURLINGAME:  And with the Court's permission,

20 I'd ask that the witness be allowed to refer back to his

21 reports as needed to refresh his recollection.

22 A.   Yes.

23 Q.   I believe there's a binder in front of you with your

24 reports in it.

25       THE COURT:  When you do that would you indicate what

1  you're looking at please.

2        THE WITNESS:  Yes, sir.

3        MR. BURLINGAME:  I'll try to remember it too as

4  well, Judge.

5  Q.   Special Agent, during the course of your time on the

6  Gambino squad did you have occasion to interview the

7  defendant?

8  A.   Yes, I did.

9  Q.   How many times did you interview him?

10  A.   Three times.

11  Q.   When did you interview him for the first time?

12  A.   On January 31st, 1994.

13  Q.   Where did you interview him for the first time?

14  A.   Near Albert Road in Ozone Park, Queens, New York.

15  Q.   During the interview did he mention Sammy Gravano?

16  A.   Yes, he did.

17  Q.   Was Sammy Gravano a cooperating witness at that time?

18  A.   Yes, he was.

19  Q.   Was he a significant cooperating witness?

20  A.   Yes.

21  Q.   What did the defendant tell you about Sammy Gravano

22  during that interview?

23  A.   He alleged that Gravano was probably behind lies and

24  rumors about him and was basically probably bad mouthing him.

25  Q.   When was the next time you interviewed the defendant?

1  A.   That was on April 13th, 1995.

2  Q.   And what was the topic of the interview that day?

3  A.   I questioned him about his brother's loanshark business.

4  Q.   Did the defendant offer to kill anyone for you during

5  that interview?

6  A.   He had mentioned that, yes.

7  Q.   What did he say?

8  A.   "Is there anybody you want me to whack for you?"

9  Q.   Did he again bring up Sammy Gravano?

10  A.   Yes.

11  Q.   What did he say?

12  A.   He said that if we would tell him where Sammy Gravano

13  was, he would speak to the FBI once a week.

14  Q.   And, again, Sammy Gravano was a significant cooperating

15  witness at the time?

16  A.   Yes.

17  Q.   Did he talk to you about chopping a car?

18  A.   Yes, he did.

19  Q.   What does that mean, to chop a car?

20  A.   To disassemble it and sell the parts.

21  Q.   What did he tell you about chopping a car?

22  A.   Basically he saw my vehicle and he said he'd show me how

23  to chop that vehicle if I wanted to know how to do it.

24  Q.   What was your understanding, how did you interpret these

25  various comments that the defendant was making to you?

HOLLY DRISCOLL, CSR

1  A.   It is street talk, bravado, that kind of stuff.

2  Q.   Was he aware that you were an FBI agent when you were

3  interviewing him?

4  A.   Yes.

5  Q.   How did the interview end?

6  A.   He just --  he basically said he didn't have anything to

7  worry about.

8  Q.   What did you understand that to mean?

9  A.   In terms of prosecution or the law.

10 Q.   When did you interview the defendant for the third time?

11 A.   That was May 20th, 1997.

12 Q.   Where did that interview take place?

13 A.   At the Fountain Auto Mall in Brooklyn, a junkyard in

14 Brooklyn.

15 Q.   What was the Fountain Auto Mall?

16 A.   That was basically a junkyard that Charlie ran.

17 Q.   When you say Charlie --

18 A.   Charles Carneglia.

19 Q.   The defendant?

20 A.   Yes.

21 Q.   Did you question him about the business?

22 A.   Yes.

23 Q.   What did he say?

24 A.   He said that he threw out the previous --  the person

25 that operated the junkyard with the approval of his brother

1    John, they threw that guy out and they were paying him a

2    thousand dollars a month or so but Charlie was now running

3    it.

4    Q.    Did he again mention Sammy Gravano?

5    A.    Yes.

6    Q.    And, again, this is the cooperating witness?

7    A.    Yes.

8    Q.    What did he say about Sammy Gravano?

9    A.    He twice asked for me to provide him Sammy's address.

10   Q.    How did you interpret that comment?

11   A.    Again, it was that kind of street talk, you know, wanted

12   to know maybe where Gravano is or definitely inferring

13   that -- inferring --  flat out stating it.

14   Q.    He was aware that you were an FBI agent?

15   A.    Yes.

16   Q.    And Sammy Gravano was an FBI cooperator?

17   A.    Yes, he was.

18   Q.    Did you take it to mean that the defendant wasn't afraid

19   of you?

20          MR. FARBER:  Objection.

21          MS. SHARKEY:  Objection.

22          THE COURT:  Sustained.

23   Q.    During the 1990's did you speak to an individual named

24   Kevin McMahon on various occasions?

25   A.    Yes, I did.

HOLLY DRISCOLL, CSR

1   Q.   When in the 1990's did those conversations take place?

2   You don't have to give me the exact dates, just a range.

3   A.   From early 1991 through '95 roughly, through the mid

4   90's.

5   Q.   In what context did you come to have conversations with

6   Kevin McMahon?

7           MS. SHARKEY:  Objection.

8           THE COURT:  I'll allow it.

9   A.   As an associate of the Gambino family.

10  Q.   He was an individual you were investigating?

11  A.   Yes.

12  Q.   When was the first time you spoke with McMahon?

13  A.   October 23, 1991.

14  Q.   Did you approach him or did he approach you that day?

15  A.   He approached me.

16  Q.   Did you find that odd?

17  A.   Yes.

18          MS. SHARKEY:  Objection.

19          THE COURT:  I'll allow it.

20  Q.   Explain.

21  A.   Yes, I did.  Normally people would avoid you, you know,

22  not go out of their way to come and talk to you.

23  Q.   Was McMahon a cooperating witness when you spoke with

24  him in the 1990's?

25  A.   No.

HOLLY DRISCOLL, CSR

1  Q.   Was he a target of your investigations?

2  A.   Yes.  He was one of many people we had been looking at.

3  Q.   When you say "we," you're talking about the Gambino

4  squad of the FBI?

5  A.   Yes.

6  Q.   Are you aware whether McMahon lied to you during those

7  interviews?

8          MS. SHARKEY:  Objection.

9          THE COURT:  Sustained.

10 Q.   Did you believe that McMahon lied to you during those

11 interviews?

12 A.   Probably.

13         MS. SHARKEY:  Objection.

14         THE COURT:  Sustained.

15 Q.   Based on your understanding of your interviews with

16 McMahon did you think that he was being truthful with you?

17 A.   No.

18         MS. SHARKEY:  Objection.

19         THE COURT:  Sustained.  Strike the answer.

20 Q.   Did he accuse you of misconduct at any point?

21         MS. SHARKEY:  Objection.

22         THE COURT:  Sustained.

23 Q.   Can you explain what Kevin McMahon's demeanor was like

24 during these interviews?

25         MS. SHARKEY:  Objection, relevance.

1    THE COURT:  Sustained.

2  Q.   Based on your observations of McMahon while you were

3  talking to him, how did you observe him to be?

4    MS. SHARKEY:  Objection.

5    THE COURT:  Sustained.

6    MS. SHARKEY:  Relevance.

7  Q.   Have you conducted surveillance of the defendant?

8  A.   Yes.

9  Q.   Have you conducted surveillance of McMahon?

10  A.   Yes.

11  Q.   Are you aware of any connection between the two?

12  A.   I know that Kevin McMahon is an associate of the

13  Carneglias.

14    MR. BURLINGAME:  Judge, I'm not sure if the

15  relevance objection was what was the problem.

16    THE COURT:  It's strictly hearsay.  He's making an

17  admission outside of the need to further the conspiracy.

18    MR. BURLINGAME:  I'm asking the agent what he

19  observed about Mr. McMahon's demeanor.

20    THE COURT:  That's a form of communication, demeanor

21  is a form of communication.

22    MR. BURLINGAME:  Very well.  Sorry, Judge.

23  Q.   During the course of the time you were investigating the

24  Gambino family did you ever speak with an individual named

25  John Alite?

1   A.   Yes.

2   Q.   When did that conversation take place?

3   A.   Bear with me --  November 10th, 1995.

4   Q.   Who initiated the conversation?

5   A.   I did.

6   Q.   Why did you seek out Alite that day?

7        MS. SHARKEY:  Objection.

8        THE COURT:  Sustained.

9   Q.   Did you have an investigative purpose to talk to Alite?

10  A.   Yes.

11       MS. SHARKEY:  Objection.

12       THE COURT:  Sustained.

13  Q.   Special Agent, you testified that during your time with

14  the Gambino squad you conducted surveillance; is that

15  correct?

16  A.   Yes.

17  Q.   What sort of surveillance did you conduct?

18  A.   Physical surveillance and photo surveillance.

19  Q.   And what is physical surveillance?

20  A.   Where you physically observe the movements of

21  individuals.

22  Q.   What is photo surveillance?

23  A.   You take photos when the opportunity arises.

24  Q.   So, would it be fair to say that during the course of

25  physical surveillance you sometimes take photos and then it

HOLLY DRISCOLL, CSR

1    is photo surveillance?

2    A.    Yes.

3    Q.    What is the purpose of conducting surveillance?

4    A.    Well, to learn their --  learn of other people that they

5    want to meet with, you know, capture meetings and stuff like

6    that and learn about other associates that they might be

7    hanging around with or traveling with.

8    Q.    If that's the purpose, why wouldn't you always take

9    pictures of every surveillance?

10   A.    You attempt to but there are times when it is not

11   possible to photograph, take photographs of every

12   surveillance.

13   Q.    What are some examples of that?

14   A.    You might have inclement weather, you might have --  the

15   photos aren't readily available because people enter a

16   building and you're busy writing down who is going in and by

17   the time you complete that task they've already entered the

18   building.  Similarly, they might be getting in a vehicle and

19   as you're recording the plate or who is getting in a car,

20   they've gone before you can get the camera on them.  So, it

21   was often a trade-off.

22   Q.    Do weather conditions or the time of day also affect

23   whether or not --

24   A.    Certainly, it is difficult at night, more difficult,

25   back then it was.

1  Q.   Now, you said that you would take notes;  what did you

2  call those notes that you would take, what would you enter

3  them on?

4  A.   Oh, a surveillance log.

5       (Continued on next page.)

6  DIRECT EXAMINATION

7  BY MR. BURLINGAME: (Continuing)

8  Q.   Have you reviewed the contents of that binder that's in

9  front of you prior to your testimony today?

10 A.   Yes.

11 Q.   And are a number of your surveillance logs contained in

12 that binder?

13 A.   Yes, they are.

14      MR. BURLINGAME:  Judge, I again ask if the witness

15 needs to refer to his surveillance logs during the course of

16 the questioning that he be permitted to.

17      THE COURT:  You may, just let us know what he's

18 looking at.

19 Q.   Before we get started on your surveillance, are you

20 familiar with a place called Bergin Hunt and Fish Club?

21 A.   Yes, I am.

22 Q.   What was that place?

23 A.   John Gotti's social club.

24 Q.   Where was it located?

25 A.   Ozone Park in Queens.

1  Q.   Did you conduct surveillance of that club?

2  A.   Yes.

3  Q.   Did you conduct surveillance of the Bergin Hunt and Fish

4  Club on June 8th, 1991?

5  A.   Yes.

6  Q.   Were you able to take photos that day as part of your

7  surveillance?

8  A.   Yes.

9  Q.   Are you looking at Government Exhibit 3500 RV 10?  Is

10  that the log for this date?

11  A.   Yes, I am.

12  Q.   Were agents able to locate the photos you took in

13  advance of your testimony?

14  A.   No.

15  Q.   In your experience how does that happen, how could the

16  FBI lose photos?

17  A.   My understanding is that a lot of these surveillances

18  have been used at several trials over the years and that a

19  lot of the photos that were used were apparently not

20  collected or recovered on the conclusion of the trials.

21  Q.   What time did you conduct surveillance on June 8th,

22  1991?

23  A.   Surveillance was initiated at 1:21 p.m. and it was

24  concluded at 2:50 p.m.

25  Q.   If you could let me know -- you can refer back to your

1    log if you need to -- if you observed the following people

2    that day --?

3              MR. BURLINGAME:  Actually, Judge, if I could just

4    put up a board, first.

5    Q.   Did you observe Iggy Alogna, Ignazio Alogna that day?

6    A.   Yes.

7    Q.   Skinny Dom Pizzonia?

8    A.   Yes.

9    Q.   John Gotti, Jr.?

10   A.   Yes.

11   Q.   Peter Gotti?

12   A.   Yes.

13   Q.   Jackie Cavallo?

14   A.   Yes.

15   Q.   Charles Carneglia?

16   A.   Yes.

17   Q.   Jackie D'Amico?

18   A.   Yes.

19   Q.   All those people were at the Bergin Hunt and Fish during

20   the hour and a half you conducted surveillance that day?

21   A.   That's correct.

22   Q.   What was the Our Friends social club?

23   A.   That is a Gambino social club around the corner from the

24   Bergin Hunt and Fish Club that was run by John Gotti Jr.

25   Q.   And did you conduct surveillance there?

1  A.   Yes.

2  Q.   Did you conduct surveillance on July 20, 1993?

3  A.   Yes.

4  Q.   Was it a photo surveillance?

5  A.   Yes.

6  Q.   Were agents able to locate those photos prior to your

7  testimony here today?

8  A.   Yes.

9  Q.   Would you let me know if you observed the following

10  people that day:  Peter Gotti?

11  A.   Yes.

12  Q.   Iggy Alogna?

13  A.   Yes.

14  Q.   John Gotti, Jr.?

15  A.   Yes.

16  Q.   Joe Scopo?

17  A.   Yes.

18  Q.   Charles Carneglia?

19  A.   Yes.

20  Q.   Tommy Sneakers Cacciopoli?

21  A.   Yes.

22  Q.   JoJo Corozzo?

23  A.   Yes.

24  Q.   All those people were at Our Friends social club during

25  the hour and a half you conducted surveillance that day?

1  A.   That's correct, or in the vicinity.  On the street,

2  immediate vicinity.

3  Q.   You said the photos were locateed for that surveillance.

4  I'm showing you what's already in evidence as Government's

5  Exhibit 269.  Do you recognize that?

6  A.   Yes, I do.

7  Q.   If you could just step down and run through this board

8  for the jury.  Go ahead.

9  A.   This is a -- this is 101st Avenue and this is the front

10  of the Bergin Hunt and Fish Club.  Charles Carneglia is

11  seated there.  Again, another picture of the front of the

12  Bergin Hunt and Fish Club on 101st Avenue.  Joseph Corozzo is

13  out front, William Victor is standing against the front of

14  the building.

15      Here is another picture of 101st Avenue.  This would be

16  the club, Bergin Hunt and Fish Club, and up the street from

17  it you have Peter Gotti and JoJo Corozzo standing in the

18  street.

19      And this is a picture of the Our Friends social club.

20  This is just around the corner and here is a picture of

21  Thomas -- Tommy Sneakers Cacciopoli near the doorway, the

22  front of the Our Friends social club.

23  Q.   Now, you testified that that is Peter Gotti in the lower

24  left-hand corner of the picture?

25  A.   That is correct.

1  Q.   What is his relationship to Gene Gotti, the person in

2  the video who the defendant was meeting with?

3  A.   That's his brother.

4  Q.   Actually, if you were to stay up here I'll ask you a few

5  questions more.

6       Did you conduct surveillance of the Our Friends social

7  club on August 19, 1993?

8  A.   Yes, I did.

9  Q.   Was this a photo surveillance?

10 A.   Yes.

11 Q.   Were you able to locate those photos?

12 A.   Yes.

13 Q.   You're going to need your binder.  This is August 19th,

14 1993.  What time did you conduct surveillance that day?

15 A.   It was initiated at 2:04 p.m. and it --.

16 Q.   I think you might still be on July 20.

17 A.   I beg your pardon.

18 Q.   We are up to August 19, 1993.

19 A.   August 19, 1993, initiated at 1:48 p.m. and discontinued

20 at 3:06 p.m.

21 Q.   Could you let me know if you observed the following

22 people that day:  Kevin McMahon?

23 A.   Yes.

24 Q.   Charles Carneglia?

25 A.   Yes.

1    Q.    Tommy Sneakers Cacciopoli?

2    A.    Yes.

3    Q.    JoJo Corozzo?

4    A.    Yes.

5    Q.    Richie Ingardia?

6    A.    Yes.

7    Q.    Showing you what's already in evidence as Government's

8    Exhibit 270.  Are these photos from your surveillance that

9    day?

10   A.    Yes, they are.

11   Q.    If you can explain the board?

12   A.    Here is a picture of the Bergin Hunt and Fish Club right

13   on 101st Avenue and this is Charles Carneglia with his back

14   to us and Richie -- Richard Ingardia standing just to his

15   right.

16        The second picture and in from the left is a picture of

17   Charles Carneglia with the black shirt and sunglasses on

18   walking with an individual.  The picture on the far right is

19   Charles Carneglia with his back to us on the right and Richie

20   Ingardia on the left back in front of the Bergin Hunt and

21   Fish Club.

22        This is on 101st Avenue.  Here is Joseph Corozzo

23   standing in the street.  Here he is in the second picture.

24   In from the left in the center is Joseph Corozzo with his

25   back to us.  And in the far right there's a picture of --

1  last picture on the right, Charles Carneglia and Joseph

2  Corozzo.

3  Q.   You could retake the stand.  Thank you.

4       Special Agent, did you also conduct a surveillance of

5  the Our Friends social club on May 2nd, 1994?

6  A.   Yes, I did.

7  Q.   Was this a photo surveillance?

8  A.   It was a physical surveillance.

9  Q.   What time did you conduct surveillance that day?

10 A.   The surveillance was initiated at 3:00 p.m. and

11 discontinued at 3:28.

12 Q.   Just 28 minutes?

13 A.   That's correct.

14 Q.   Did you observe the following people that day:  Charles

15 Carneglia?

16 A.   Yes.

17 Q.   Tommy Sneakers Cacciopoli?

18 A.   Yes.

19 Q.   Jackie Cavallo?

20 A.   Yes.

21 Q.   And, finally, did you conduct a surveillance of the Our

22 Friends social club on September 22nd, 1993?

23          MS. SHARKEY:   Could I have the date again please?

24          MR. BURLINGAME:   September 22nd, '93.

25          MS. SHARKEY:    Thank you.

1    A.    Yes.

2    Q.    Was it a photo surveillance?

3    A.    Physical surveillance.

4    Q.    What time did you conduct surveillance that day?

5    A.    Surveillance was initiated at 6:20 p.m. and it was

6    terminated at 10:00 p.m.

7    Q.    I just want to make sure we're talking about the same

8    day, September 22nd, 1993.

9    A.    Oh, pardon me.  I had November 22.

10   A.    Yes, September 22nd, 1993 it was initiated at 8:12 p.m.

11   and it was discontinued at 11:30 p.m.

12   Q.    That also was not a photo surveillance?

13   A.    That's correct.

14   Q.    Why would that be?

15   A.    It was evening, dark.

16   Q.    Can you let me know if you observed the following people

17   that night:  John Gotti Jr.?

18   A.    Yes.

19   Q.    Charles Carneglia?

20   A.    Yes.

21   Q.    Tommy Sneakers Cacciopoli?

22   A.    Yes.

23   Q.    Jackie Cavallo?

24   A.    Yes.

25   Q.    Vinny Corrao?

1    A.    Yes.

2    Q.    Johnny Boy Ruggerio?

3    A.    Yes.

4    Q.    Peter Gotti?

5    A.    Yes.

6    Q.    Couple final questions.

7          John Gotti Jr., is he any relation to the Gene Gotti we

8    watched in the video?

9    A.    Yes.  Gene Gotti would be his uncle.

10   Q.    Who would his father be?

11   A.    John Gotti.

12   Q.    John Gotti Jr.'s father is the brother of Gene Gotti who

13   we watched in the video?

14   A.    Yes.

15            MR. BURLINGAME:  I have nothing further.

16            THE COURT:  How long will your cross be?

17            MS. SHARKEY:   Five minutes.

18            Can I have the board taken down?

19            THE COURT:  Yes.

20   CROSS-EXAMINATION

21   BY MS. SHARKEY:

22   Q.    Good afternoon, Agent Vandette.

23   A.    Good afternoon.

24   Q.    Agent Vandette, when you spoke with Mr. Carneglia on

25   February -- excuse me, on January 31st of 1994, you

1    identified yourself as a federal agent, right?

2    A.    Yes.

3    Q.    And the tenor of your conversation with Mr. Carneglia

4    was one of joking, correct?

5    A.    I wouldn't say that, no.

6    Q.    Well, respectfully, when Mr. Carneglia says to you that

7    Sammy Gravano is behind all the lies and the rumors about him

8    and there's no truth to any of it, you engaged in further

9    conversation with him?

10   A.    The conversation concluded with me reminding him that

11   whoever is talking about him probably isn't Sammy because he

12   has been off the street for several years.

13   Q.    Then, when you spoke with Mr. Carneglia in April of

14   1995, you again identified yourself, right?

15   A.    Yes.

16   Q.    And you testified on direct examination that

17   Mr. Carneglia said something to you along the lines of is

18   there anyone you want me to whack for you, right

19   A.    Yes.

20   Q.    Did you cause him to be charged with obstruction of

21   justice?

22   A.    No.

23            MR. BURLINGAME:  Objection.

24   Q.    Did you bring any charges against Mr. Carneglia or refer

25   any charges against Mr. Carneglia as a result of that

1  comment?

2  A.    No.

3  Q.    Mr. Carneglia was kidding around with you on the street;

4  isn't that true, Agent Vandette?

5  A.    I can't speak to his state of mind when he said that,

6  whether he's kidding or not.

7  Q.    Now, in 1997, when you spoke with Mr. Carneglia, you had

8  a similar conversation, right?

9  A.    Bear with me, please, I'm trying to find it.  Yes, we

10  spoke.

11  Q.    And you spoke with Mr. Carneglia at a junk yard where he

12  was working, right?

13  A.    Yes.

14  Q.    And when you identified yourself throughout these three

15  different conversations, Mr. Carneglia didn't turn you away,

16  he answered your questions, right?

17  A.    Yes.  We conversed.

18  Q.    He spoke with you, right?

19  A.    We conversed, yes.

20  Q.    Kidding around with you, right?

21  A.    I don't know if there's kidding around.  I summarized

22  the conversation, but I didn't summarize anything about

23  kidding.

24  Q.    When he said to you you want me to chop up your car, did

25  you cause him to be charged with any crime?

1  A.   No.

2          MS. SHARKEY:   Nothing further.

3          MR. BURLINGAME:  Very briefly, Judge.

4          THE COURT:  Yes.

5  REDIRECT EXAMINATION

6  BY MR. BURLINGAME:

7  Q.   Special Agent, did you typically have a friendly, joking

8  relationship with the targets of your investigations?

9  A.   No.

10 Q.   Did you have a friendly, joking relationship with the

11 defendant?

12 A.   No.

13         MR. BURLINGAME:  Nothing further.

14         THE COURT:  Thank you, sir.  Eleven o'clock

15 tomorrow, please.  Good night.  Just leave them on the seat.

16         Juror five, if you are prevented from being

17 comfortable, call Ms. Lowe immediately.

18         JUROR:  Absolutely.  Thank you.

19         (The jury exits the courtroom.)

20         THE COURT:  All right, the witness is discharged.

21 Thank you.

22         Any applications, motions?

23         MS. SHARKEY:   No.

24         THE COURT:  10:30 tomorrow, please.

25         MR. BURLINGAME:  Thank you.

Vandette-redirect/Burlingame

1  THE COURT:  Thank you.

2  (An adjournment was taken to Wednesday, February 11,

3  2009, at 10:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    I N D E X

2

3    Government Exhibit 318 received in evidence.............. 1925
     Government Exhibits 318b-1 through b-5 received in
4    evidence............................................... 1928
5    Government Exhibit 318e received in evidence............ 1930
6    Government Exhibit 318d received in evidence............ 1931
7    Government Exhibit 318a received in evidence............ 1938
8    Government Exhibit 318c-1 received in evidence.......... 1940

9
             M A R L I N   H O P K I N S

10
     DIRECT EXAMINATION
11   BY MS. SEIFAN:......................................... 1838
12   Government's Exhibit 27............................... 1849
13   CROSS-EXAMINATION
     BY MR. FARBER: ....................................... 1850
14
     VOIR DIRE
15   BY MR. BURLINGAME: ................................... 1870
16   CROSS-EXAMINATION (Cont.'d)
     BY MR. FARBER: ....................................... 1875
17
     REDIRECT EXAMINATION
18   BY MR. BURLINGAME: ................................... 1876
19   CROSS-EXAMINATION (Cont.'d)
     BY MR. FARBER: ....................................... 1876
20
     REDIRECT EXAMINATION
21   BY MS. SEIFAN: ....................................... 1892
22   REDIRECT EXAMINATION
     BY MR. BURLINGAME: ................................... 1903
23   RECROSS-EXAMINATION
     BY MR. FARBER: ....................................... 1904
24
     REDIRECT EXAMINATION
25   BY MR. BURLINGAME: ................................... 1905

1          R O B E R T   A.   V A N D E T T E

2   DIRECT EXAMINATION
    BY MR. BURLINGAME.....................................
3   1915
    CROSS-EXAMINATION
4   BY MS. SHARKEY: ......................................
    1963
5   REDIRECT EXAMINATION
    BY MR. BURLINGAME: ...................................
6   1965

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25