```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
    --------------------------------X
 3                                  :
    UNITED STATES OF AMERICA,        :  CR-08-76
 4                                   :
              v.                     :  U.S. Courthouse
 5                                   :  Brooklyn, New York
    CHARLES CARNEGLIA,               :
 6                                   :
                     Defendant.      :  TRANSCRIPT OF TRIAL
 7                                   :  February 11, 2009
    --------------------------------X  11:00 a.m.
 8

 9  BEFORE:

10            HONORABLE JACK B. WEINSTEIN, U.S.D.J.
                           and a Jury.
11

12  APPEARANCES:

13  For the Government:     BENTON J. CAMPBELL,
                                United States Attorney
14                              271 Cadman Plaza East
                                Brooklyn, New York 11201
15                          BY:  ROGER BURLINGAME,
                                EVAN NORRIS,
16                              MARISA M. SEIFAN,
                                Assistant U.S. Attorneys
17
    For the Defendant:          KELLY SHARKEY, ESQ.
18                              26 Court Street
                                Brooklyn, New York 11201
19
                                CURTIS J. FARBER, ESQ.
20                              350 Broadway
                                New York, New York 10013
21
    Court Reporter:             Mickey Brymer, RPR
22                              Official Court Reporter
                                United States District Court
23                              225 Cadman Plaza East
                                Brooklyn, New York  11201
24                              (718) 613-2255

25          Proceedings recorded by mechanical stenography.
        transcript produced by Computer-Assisted Transcription.
```

1

2          THE COURT:  Good morning, everybody.  Are there any

3    applications?

4          MS. SHARKEY:   Judge, I have one brief application.

5    My understanding is Hunter Adams, cooperating witness, is

6    being called this morning, and in Mr. Adams'302s and

7    specifically Hunter Adams 3500 11 at page six there's a

8    purported conversation between Mr. Adams and Mr. Carneglia

9    concerning the potential murder that was noticed in the

10   404(b).  I would request that the Court preclude the

11   government from bringing that information out through this

12   witness.

13         MR. NORRIS:  Can I just have one moment?

14         MS. SHARKEY:   Page six.

15         MR. NORRIS:   Which one?

16         MS. SHARKEY:   3500 11.  This is the third paragraph

17   down.

18         MR. NORRIS:   Judge, we're not planning on bringing

19   that up.

20         MS. SHARKEY:   Thank you.

21         THE COURT:  Granted on consent.

22         Now, with respect to juror five, it is reported that

23   she has sinusitis.  The doctor requested that she rest all

24   day today, but that she may be able to come in tomorrow.

25   What's the view of counsel?

1    MS. SHARKEY:   Judge --.

2    THE COURT:  Defense first.

3    MS. SHARKEY:   Thank you, Judge.  Judge, we would

4  request that the Court wait to proceed with this juror.

5  She's a sitting juror.  She's been selected purposely,

6  strategically by both sides.  Certainly we don't consent to

7  the Court excluding her.  It is only a one-day delay and we

8  would request that the Court give her an opportunity to

9  return to her service.  I think the case has proceeded pretty

10  quickly.  I don't believe that it would cause any problems

11  and we only have five alternates at this point.  So,

12  therefore, Judge, I request that you wait for this juror.

13    THE COURT:  Government.

14    MR. BURLINGAME:  Judge, my understanding is we

15  actually have six alternates and the reason why your Honor

16  kept so many alternates is so we wouldn't have to have delays

17  in case someone got sick or for another reason.  We've

18  already delayed a couple of hours this morning and a few

19  hours yesterday afternoon for this juror.  We have six

20  alternates who have been sitting and paying attention

21  throughout the trial.  We have a holiday week next week where

22  we will lose a day.  I think the government's position is

23  we're ready to go forward.  We have the witness here and we

24  would like to proceed.

25    THE COURT:  All right, juror five is excused.  We

have no assurance she'll be here tomorrow, even thereafter, since she has a serious problem. We've delayed a great deal on her behalf. The witnesses who are scheduled to appear today and tomorrow have put themselves out in order to be here and they should not be further inconvenienced. The jurors are all here and they should not be inconvenienced.

I disagree respectfully with defense counsel's view that this proceeding has gone swiftly, without criticizing anyone. It is just lagging. I don't expect you to put sneakers on your witnesses, but I expect this to move more quickly.

Bring in the jury.

Where is your witness?

MR. NORRIS: He is behind us.

THE COURT: Bring in the witness and have him seated and then bring in the jury.

(Witness enters courtroom.)

(The jury enters the courtroom.)

THE COURT: Be seated everybody, please. Good morning, everyone.

Juror five is excused. She's ill and I want to proceed. Alternate one, take that seat five, please.

Swear the witness, please.

H U N T E R   A D A M S ,    called as the witness herein, having been first duly sworn/affirmed, testified as

1  follows:

2          THE CLERK:   Please be seated.   State and spell your

3  full name for the court reporter.

4          THE WITNESS:   Hunter Adams, H-u-n-t-e-r A-d-a-m-s.

5  DIRECT EXAMINATION

6  BY MR. NORRIS:

7  Q.   Please speak slowly and clearly.

8       Are you a part of organized crime?

9  A.   Yes.

10  Q.   What was your affiliation?

11  A.   Associate.

12  Q.   What family?

13  A.   Gambino family.

14  Q.   When did you become an associate in the Gambino family?

15  A.   1991.

16  Q.   How long were you an associate with the Gambino family?

17  A.   Till the end of 2004.

18  Q.   What happened then?

19  A.   I decided to cooperate.

20  Q.   Looking around the courtroom, do you see anyone else

21  here who's also affiliated with the Gambino family?

22  A.   Yes.

23  Q.   Who?

24  A.   Charles Carneglia.

25  Q.   Identify him by something he's wearing.

1   A.   A sweater, green sweater.

2        MR. NORRIS:   Let the record reflect the witness

3   identified the defendant.

4        THE COURT:  Yes.

5   Q.   How long have you known the defendant?

6   A.   Since the late eighties.

7   Q.   How old are you now?

8   A.   41.

9   Q.   41?

10  A.   Yes.

11  Q.   You've known him pretty much your entire adult life?

12  A.   Yes.

13  Q.   Was the defendant affiliated with the Gambino family the

14  whole time you knew him?

15  A.   Yes.

16  Q.   What was the defendant's position in the Gambino family?

17  A.   Soldier.

18  Q.   Did you have an official relationship with him in the

19  Gambino family?

20  A.   Yes.

21  Q.   What?

22  A.   I was with him, on record with him.

23  Q.   You were on record with him?

24  A.   Yes.

25  Q.   Starting when?

Adams-direct/Norris

1    A.    1991.

2    Q.    How often did you see him?

3    A.    Once a week.

4    Q.    To do what?

5    A.    To pay him protection money.

6    Q.    Protection money?

7    A.    Yes.

8    Q.    How much did you pay him?

9    A.    $400 a week.

10   Q.    How long did you pay the defendant $400 a week in

11   protection money?

12   A.    Ten years.

13   Q.    Why did you stop?

14   A.    I was indicted.

15   Q.    What were you indicted for?

16   A.    Stock fraud and money laundering.

17   Q.    Did you continue to pay the defendant when you could,

18   even after you were indicted?

19   A.    Yes.

20   Q.    Why did you pay him all those years?

21   A.    For protection from him and other mobsters like him.

22   Q.    Did you have a choice?

23   A.    No.

24   Q.    Did the defendant ever assault you?

25   A.    No.

Adams-direct/Norris

1 Q. Ever put a gun to your head?

2 A. No.

3 Q. Did he ever threaten you?

4 A. Yes.

5 Q. Did he ever threaten you to your face?

6 A. No.

7 Q. What did you think would have happened if you refused to

8 pay him every week?

9 A. That I would be hurt.

10 Q. You would be hurt?

11 A. Physically hurt.

12 Q. Any doubt in your mind?

13 A. No.

14 MS. SHARKEY: Objection.

15 THE COURT: Overruled.

16 Q. Any doubt in your mind?

17 A. No.

18 Q. Where were you born?

19 A. Queens, New York.

20 Q. Where did you grow up?

21 A. Long Island.

22 Q. What did your father do?

23 A. He was a liquor salesman.

24 Q. Liquor salesman?

25 A. Yes.

Adams-direct/Norris

1   Q.   What did your mother do?

2   A.   Homemaker.

3   Q.   Do you have any brothers or sisters?

4   A.   Yes.

5   Q.   What were their names?

6   A.   Greg and Hope.

7   Q.   How far did you go in school?

8   A.   High school and two weeks of college.

9   Q.   What kind of college?

10  A.   Community.

11  Q.   Are you living now in an undisclosed location?

12  A.   Yes.

13  Q.   Why?

14  A.   For my safety.

15  Q.   How many times have you been arrested in your life?

16  A.   Twice.

17  Q.   When was the first time?

18  A.   Late eighties.

19  Q.   What were you arrested for?

20  A.   Driving under the influence.

21  Q.   What happened to the case?

22  A.   It was dismissed.

23  Q.   Had you been driving drunk?

24  A.   Yes.

25  Q.   When was the second time you were arrested?

Adams-direct/Norris

1   A.   2001.

2   Q.   What month?

3   A.   March.

4   Q.   What were you arrested for?

5   A.   Stock fraud and money laundering.

6   Q.   Did you plead guilty or go to trial?

7   A.   Pled guilty.

8   Q.   Did you serve any time in prison?

9   A.   Yes.

10  Q.   How much?

11  A.   47 months.

12  Q.   Almost four years?

13  A.   Yes.

14  Q.   When were you released?

15  A.   January of '08.

16  Q.   2008?

17  A.   Yes.

18  Q.   Have you engaged in a lot of criminal activity over your

19  lifetime?

20  A.   Yes.

21  Q.   What types of crimes have you engaged in?

22  A.   Gambling, drug dealing, stock fraud, money laundering,

23  loansharking.

24  Q.   Other crimes as well?

25       (No response.)

1   Q.   Did you engage in any assaults?

2   A.   Yes, assaults.

3   Q.   Income tax evasion?

4   A.   Yes.

5   Q.   You mentioned drug dealing.  What types of drugs?

6   A.   Cocaine and marijuana.

7   Q.   How much marijuana did you sell in terms of total

8   quantity?

9   A.   About a thousand pounds.

10  Q.   When did you sell marijuana?

11  A.    '91 to '94.

12  Q.   How much money would you estimate you made from selling

13  marijuana?

14  A.   A million dollars.

15  Q.   What about cocaine, when did you sell cocaine?

16  A.   Late eighties.

17  Q.   How much cocaine did you sell?

18  A.   About $1,000 worth.

19  Q.   $1,000?

20  A.   Yeah.

21  Q.   How many times?

22  A.   Once.

23  Q.   Did you ever use drugs?

24  A.   Yes.

25  Q.   What drugs?

1   A.   Cocaine and marijuana.

2   Q.   How many times have you used marijuana?

3   A.   Twice.

4   Q.   How many times did you use cocaine?

5   A.   Once.

6   Q.   When did you use cocaine and marijuana?

7   A.   In high school.

8   Q.   You said you were involved in an assault?

9   A.   Yes.

10  Q.   How many times?

11  A.   Twice.

12  Q.   Who did you assault the first time?

13  A.   It was a drug dealer in Manhattan.

14  Q.   What was his name?

15  A.   Dave.

16  Q.   Dave?

17  A.   Yes.

18  Q.   When did you assault Dave?

19  A.   The early nineties.

20  Q.   The early nineties?

21  A.   Yes.

22  Q.   Where did the assault take place?

23  A.   In Manhattan outside his apartment.

24  Q.   Were you alone or with others?

25  A.   With others.

1  Q.   Explain what happened.

2  A.   He was extorting the supplier of our drug dealer and we

3  went to his apartment and he came into our car and he was

4  physically assaulted.

5  Q.   Who physically assaulted him?

6  A.   Todd Grama (ph.).

7  Q.   Todd Grama?

8  A.   Yes.

9  Q.   There were other people in the car as well?

10  A.   Yes.

11  Q.   Was anyone armed?

12  A.   Yes.

13  Q.   Who?

14  A.   Todd Grama.

15  Q.   With what?

16  A.   A gun.

17  Q.   Was it loaded?

18  A.   I don't know.

19  Q.   Did he brandish it?

20  A.   Yes.

21  Q.   What did Todd do to Dave?

22  A.   He punched him.

23  Q.   What happened after he punched him?

24  A.   Punched him several times and took a ride and he was let

25  out of the car.

1   Q.   Was the problem with the marijuana business resolved?

2   A.   Yes.

3   Q.   What was the second assault?

4   A.   Over stock fraud in -- it was in a house in Roslyn.

5   Q.   Where?

6   A.   A house in Roslyn.

7   Q.   Briefly what happened?

8   A.   One of the brokers were threatened by Todd Grama as

9   well.

10  Q.   One of whose brokers?

11  A.   One of First United Equities brokers.

12  Q.   Is that the firm where you worked?

13  A.   Yes.

14  Q.   What happened after he was threatened by Todd Grama?

15  A.   He basically just quit and left.

16  Q.   Were you involved in that assault?

17  A.   Yes.

18  Q.   What did you do?

19  A.   I went downstairs, listened for a couple minutes and

20  left?

21  Q.   Who actually assaulted him?

22  A.   He wasn't physically assaulted, he was threatened.

23  Q.   You mentioned illegal gambling.  What kind of illegal

24  gambling did you participate in?

25  A.   Gambling machines.

1   Q.   What types of gambling machines?

2   A.   Joker Pokers and Eight Lines.

3   Q.   What is a Joker Poker machine?

4   A.   It is the gambling machine that is put in a bodega.

5   Q.   What is an Eight Line machine?

6   A.   It is more of a slot machine put inside a bodega.

7   Q.   Are those machines legal or illegal?

8   A.   Illegal.

9   Q.   Does part of your business include legitimate machines

10  as well?

11  A.   Yes.

12  Q.   When were you involved in the gambling machine business?

13  A.   From the late eighties to around '95.

14  Q.   You mentioned your brother Greg before.  Did he ever

15  participate in your gambling machine business?

16  A.   Yes.

17  Q.   We'll come back to that later.

18       Securities fraud, when did you commit securities fraud?

19  A.   From the mid nineties, '95 till 2001.

20  Q.   How did you commit securities fraud?

21  A.   We manipulated stocks, pump and dump.

22  Q.   When you say "we," you mean you and others at First

23  United?

24  A.   Yes.

25  Q.   Other firms as well?

1  A.   Yes.

2  Q.   Explain to the jury what it means to engage in a pump

3  and dump scheme?

4  A.   A pump and dump scheme is when a group of individuals

5  all buy the same stock to get it to as high a level as

6  possible and then dump it on unsuspecting investors.

7  Q.   Are they forced to hold onto it?

8  A.   Yes.  They -- basically it is a one-way street.  They

9  can only buy the stock and they are inexplicitly not to sell

10 it.

11 Q.   How do you make money from pump and dump scheme?

12 A.   Friends or family members or -- the trading firm takes

13 in the stock as cheap as possible and when the stock goes as

14 high as possible, they sell it out to these unsuspecting

15 investors.

16 Q.   Are you familiar with the term "boiler room"?

17 A.   Yes.

18 Q.   First United and the other firms you worked at, were

19 those boiler rooms?

20 A.   Yes.

21 Q.   Explain to the jury what a boiler room is.

22 A.   Boiler room is a group of individuals using very high

23 pressure sales tactics in order to get the investor to invest

24 in the stock that is basically worthless.

25 Q.   How many of these boiler rooms did you physically work

1  at?

2  A.   I was at one and I was behind two others, so, three.

3  Q.   The first one where you physically worked at, that was

4  First United?

5  A.   Yes.

6  Q.   What were the others you were behind?

7  A.   Lexington Capital and Stock Equity.

8       MS. SHARKEY:   I'm sorry, I couldn't hear that.

9  A.   Lexington Capital and Stock Equity.

10 Q.   When you say you were behind, what do you mean?

11 A.   Meaning we invested there and manipulated stocks with

12 them.

13 Q.   When you say "we," who do you mean?

14 A.   I and the others there.

15 Q.   You continued to manipulate stocks until the date you

16 were arrested in 2001?

17 A.   Yes.

18 Q.   Can you estimate how many people you defrauded in total?

19 A.   Hundreds.

20 Q.   Did your brother Greg participate in stock fraud with

21 you as well?

22 A.   Yes.

23 Q.   Did he get arrested with you in 2001 as well?

24 A.   Yes.

25 Q.   And he ultimately pled guilty to stock fraud, correct?

1   A.   Yes.

2   Q.   And as part of your sentence, you were ordered to pay

3   restitution; is that right?

4   A.   Yes.

5   Q.   How much?

6   A.   One hundred million.

7   Q.   One hundred million dollars?

8   A.   Yes.

9   Q.   Are you paying that restitution obligation alone or with

10  others?

11  A.   With 38 others.

12  Q.   How much of that have you paid back to date?

13  A.   15,000.

14  Q.   Does the government have any liens on your property?

15  A.   Yes.

16  Q.   On what?

17  A.   A home in Atlantic Beach.

18  Q.   Do you own it?

19  A.   No.

20  Q.   Did you used to own it?

21  A.   Yes.

22  Q.   Who owns it now?

23  A.   It is owned by a trust that my wife controls for my

24  children.

25  Q.   Are you with your wife now?

1  A.   No.

2  Q.   Did you buy that home using criminal proceeds?

3  A.   No.

4  Q.   In part?

5  A.   Yes, yes.  Sorry.  Yes.

6  Q.   Did you buy that home in part using your criminal

7  proceeds?

8  A.   Yes.

9  Q.   How long will you be paying back the hundred million

10 dollar restitution to the innocent people you stole money

11 from?

12 A.   Probably for the rest of my life.

13 Q.   You also mentioned money laundering.  What illegal

14 proceeds did you launder first?

15 A.   Drug and gambling money.

16 Q.   By drug money, you mean from the marijuana business?

17 A.   Yes.

18 Q.   And the gambling money is from the Joker Poker machines?

19 A.   Yes.

20 Q.   How did you launder that money?

21 A.   It was paid to me from First United Equities.

22 Q.   Explain how that worked.

23 A.   That First United Equities, the other owners gave me my

24 money back through a settlement saying it was First United

25 Equities.

1  Q.   Had you put the money into the firm when you started

2  working there?

3  A.   Yes.

4  Q.   When you left you got it out?

5  A.   Yes.

6  Q.   Did you also commit money laundering in connection with

7  the money you made at the brokerage business itself?

8  A.   Yes.

9  Q.   How did you do that?

10 A.   We basically used the investor's certificate as our own

11 personal like piggy bank and whenever we needed money we just

12 took it.

13 Q.   Did you also invest any of the illegal proceeds you made

14 from the stock business into any other business?

15 A.   Yes.

16 Q.   What kind?

17 A.   A friend of mine's meat business.

18 Q.   A meat business?

19 A.   Yes.

20 Q.   You ultimately pled guilty to money laundering in

21 addition to stock fraud; is that right?

22 A.   Yes.

23 Q.   You mentioned loansharking as well.  First, can you

24 explain to the jury what loansharking is?

25 A.   Loansharking is lending somebody money at a usurious

1    rate, a tremendous interest rate that's illegal.

2    Q.    Is there another name on the street for loansharking?

3    A.    Shylocking.

4    Q.    Generally what can happen if a person who takes the loan

5    shark loan doesn't pay it back?

6    A.    He can get hurt.

7    Q.    How many times did you engage in loansharking?

8    A.    Twice.

9    Q.    When was the first time?

10    A.    2002.

11    Q.    When was the second time?

12    A.    2003 to 2004.

13    Q.    Did you do it alone or with other people?

14    A.    With others.

15    Q.    Who?

16    A.    Vincent Dragonetti and Steven Iaria.

17    Q.    Both times?

18    A.    Yes.

19    Q.    Who are Vincent Dragonetti and Steven Iaria?

20    A.    They would be Gambino family.

21    Q.    What is Dragonetti's rank in the family?

22    A.    Soldier in the Gambino family.

23    Q.    Iaria?

24    A.    Associate.

25    Q.    Whose crew are they in?

1    A.    Nicky Corozzo's.

2    Q.    Who is Nicky Corozzo?

3    A.    Captain in the Gambino family.

4    Q.    Is Dragonetti related to Nicky?

5    A.    Yes, he is a son-in-law.

6    Q.    Does Nicky have a partner?

7    A.    Yes.

8    Q.    Who?

9    A.    Lenny DiMaria.

10   Q.    What is his rank?

11   A.    Captain.

12   Q.    Of these individuals you just mentioned, Corozzo,

13   Dragonetti, Iaria and DiMaria, are they in the same part of

14   the family as the defendant?

15   A.    No.

16   Q.    What part of the family are they in?

17   A.    Brooklyn.

18   Q.    Brooklyn?

19   A.    Yes.

20   Q.    What part of the family is the defendant in?

21   A.    Queens.

22   Q.    You committed crimes with people in the Brooklyn crew

23   even though you were with the defendant in the Queens crew?

24   A.    Yes.

25   Q.    Showing you what's in evidence as Government's Exhibit

1  2C 1.  Who's this

2  A.    Charles Carneglia.

3  Q.    What is the highest rank in the Gambino family he

4  attained?

5  A.    Soldier.

6  Q.    Showing you what's in evidence as Government's Exhibit

7  2 G.  Who's that

8  A.    Nicky Corozzo.

9  Q.    What is the highest rank in the family he attained?

10  A.    Captain.

11  Q.    Showing you what's in evidence as Government's Exhibit

12  2 K.  Who's that

13  A.    Lenny DiMaria.

14  Q.    What is the highest rank in the family he attained?

15  A.    Captain.

16  Q.    That's Nicky Corozzo's partner?

17  A.    Yes.

18  Q.    Showing you what's in evidence as Government's Exhibit

19  2 S.  Who is that

20  A.    Steve Iaria.

21  Q.    What is the highest rank in the family Steven Iaria

22  attained?

23  A.    Associate.

24  Q.    You said that you were involved in loansharking with a

25  guy name Vincent Dragonetti and Steven Iaria, correct?

Adams-direct/Norris

1   A.   Yes.

2   Q.   What was their involvement in the loansharking?

3   A.   They took the money from me and they put it out at much

4   higher rates.

5   Q.   In essence, you invested it with them?

6   A.   Yes.

7   Q.   What was the exact arrangement you had with them?

8   A.   That I received one point on my money.

9   Q.   That you would receive?

10  A.   One point.

11  Q.   How often?

12  A.   A week.

13  Q.   What is a point?

14  A.   It means one percent of the total loan.

15  Q.   Did you have an understanding as to how much they would

16  in turn loan it out for?

17  A.   Five, six points.

18  Q.   If you got one point per week, what percentage is that

19  over the course of a year?

20  A.   50 percent.

21  Q.   50 percent?

22  A.   Yes.

23  Q.   For 50 weeks?

24  A.   52 percent.

25  Q.   And if they in turn loaned it out for five or six

1  percent, roughly what percentage would they get after they

2  paid you back your one percent a week?

3  A.   200 to 250 percent.

4  Q.   When you gave Dragonetti and Iaria money to put out on

5  the street, did you have an understanding how they would

6  ensure they would get paid back?

7  A.   Through physical violence.

8  Q.   Do you know if they ever committed physical violence in

9  fact to get paid back on the money you gave them?

10  A.   No.

11  Q.   When you were arrested in 2001, were you released on

12  bail?

13  A.   Yes.

14  Q.   Did you have conditions of your bail?

15  A.   Yes.

16  Q.   Did you violate them?

17  A.   Yes.

18  Q.   Which one?

19  A.   Not to commit crimes.

20  Q.   What crime did you commit while you were out on bail?

21  A.   Loansharking.

22  Q.   Do you know what a Pretrial Services officer is?

23  A.   Yes.

24  Q.   Who is that?

25  A.   Someone you report to once a week.

1   Q.   While you're a bail?

2   A.   Yes.

3   Q.   Did you have a Pretrial Services officer?

4   A.   Yes.

5   Q.   Did you ever tell him you were engaged in loansharking?

6   A.   No.

7   Q.   When was the first time you filed an income tax return?

8   A.   Late eighties.

9        MS. SHARKEY:   I'm sorry.

10  Q.   Late eighties?

11  A.   Yes.

12       MS. SHARKEY:   Thank you.

13  Q.   Did you report all of your income?

14  A.   No.

15  Q.   What didn't you report at that time?

16  A.   Gambling money.

17  Q.   The illegal money you made from your gambling machine

18  business?

19  A.   Yes.

20  Q.   Did you continue to file every year after that?

21  A.   Yes.

22  Q.   Did you continue to fail to report illegal income every

23  year after that?

24  A.   Yes.

25  Q.   Approximately how much income did you make from dealing

1   marijuana?

2   A.   A million dollars.

3   Q.   Approximately how much income did you make from the

4   gambling machine business?

5   A.   700,000.

6   Q.   Now, approximately how much total income did you make

7   from your work in stock fraud?

8   A.   Two million dollars.

9   Q.   And approximately how much of that did you make through

10  fraud?

11  A.   Around a million dollars.

12  Q.   Around a million of it?

13  A.   Yes.

14  Q.   And approximately how much illegal income did you make

15  from loansharking?

16  A.   70,000.

17  Q.   You made close to three million dollars in illegal

18  income over the course of your criminal career?

19  A.   Yes.

20  Q.   Did you ultimately pay any taxes on any of that money?

21  A.   Yes.

22  Q.   Which portion?

23  A.   On the First United settlement and on my personal stock

24  business.

25  Q.   The First United settlement, was that the money from the

1  gambling and drug money you laundered through the brokerage?

2  A.    Yes.

3  Q.    After you laundered it you paid taxes on it, correct?

4  A.    Yes.

5  Q.    And you also paid taxes on some of the legitimate income

6  you made from the securities work, didn't you?

7  A.    Yes.

8  Q.    But you failed to pay taxes on the illegal income?

9  A.    Yes.

10  Q.    How much of that money do you have now?

11  A.    None.

12  Q.    Have you ever owned a house?

13  A.    Yes.

14  Q.    How many?

15  A.    One.

16  Q.    When did you buy it?

17  A.    In '94.

18  Q.    It is the house in Atlantic Beach that your wife has?

19  A.    Yes.

20  Q.    Is that on the water?

21  A.    Yes.

22  Q.    Nice house?

23  A.    Yes.

24  Q.    How much did you pay for it?

25  A.    700,000.

1    Q.   Do you have a mortgage?

2    A.   Yes.

3    Q.   Were you truthful on your mortgage application?

4    A.   No.

5    Q.   What did you lie about?

6    A.   My income.

7    Q.   Total income?

8    A.   Yes.

9    Q.   Sources of income?

10   A.   Yes.

11   Q.   Did you overstate or understate your total income?

12   A.   Understate.

13   Q.   Why?

14   A.   Because I was making illegal money.

15   Q.   You have committed crimes your entire adult life,

16   haven't you?

17   A.   Yes.

18   Q.   You continued to commit crimes after you were

19   incarcerated in 2004; is that right?

20   A.   Yes.

21   Q.   That was the loansharking; that continued even after you

22   went to prison, correct?

23   A.   Yes.

24   Q.   Many of the crimes you were involved in involved lying;

25   isn't that right?

1   A.   Yes.

2   Q.   And when you ran boiler rooms and pump and dump schemes

3   you lied every day to steal money from unsuspecting

4   investors, didn't you?

5   A.   Yes.

6   Q.   Did you ever hold any legitimate job?

7   A.   Yes.

8   Q.   When is the first time?

9   A.   After high school.

10  Q.   Who did you work for?

11  A.   My uncle.

12  Q.   What did you do?

13  A.   I worked in a warehouse in Florida for a few months.

14  Q.   After high school, when was the next time you had a

15  legitimate job?

16  A.   I worked in an Italian ice store for a few weeks.

17  Q.   When?

18  A.   After I was indicted.

19  Q.   2001?

20  A.   Yes.

21  Q.   Did you have any other legitimate jobs after you were

22  indicted?

23  A.   Yes.

24  Q.   What?

25  A.   I worked in a mortgage company.

1  Q.   Now, apart from the securities fraud and the money

2  laundering crimes that you were arrested for in 2001 and pled

3  guilty to, how did the government learn about all the crimes

4  you committed?

5  A.   I told them.

6  Q.   That includes the drug dealing, the assaults, the

7  illegal gambling, the loansharking, tax evasion and all the

8  other crimes you just told the jury about?

9  A.   Everything.

10  Q.   Why did you tell the government about those crimes?

11  A.   Because I signed a cooperation agreement to tell the

12  government everything.

13  Q.   Did you grow up around organized crime figures?

14  A.   No.

15  Q.   Did you aspire to be a gangster growing up?

16  A.   No.

17  Q.   When did you first become aware of organized crime?

18  A.   When my father had some problems.

19  Q.   I'm sorry, I didn't hear that.

20  A.   When my father had some problems.

21  Q.   Was your father himself affiliated with organized crime?

22  A.   He knew one guy.  It wasn't an associate or anything.

23  Q.   I'm sorry, I can't hear you.

24  A.   He knew one mobster.

25  Q.   What mobster did he know?

1   A.   Ricky DiBernardo.

2   Q.   Ricky DiBernardo?

3   A.   Yes.

4   Q.   Who is he?

5   A.   He was a captain in the Gambino family.

6   Q.   How did he know him?

7   A.   He had known his daughter and then he was introduced to

8   the father.

9   Q.   Did he have a nickname?

10  A.   DB.

11  Q.   Did DB ever help your father with any problems?

12  A.   Yes.

13  Q.   How many times?

14  A.   Twice.

15  Q.   When was the first time?

16  A.   He had a problem with the guy that Vic Arena --.

17  Q.   Who is Vic Arena?

18  A.   Also the Colombo family.

19  Q.   What was the problem?

20  A.   One of his associates was involved with my father's

21  wife.

22  Q.   What did DB do?

23  A.   He told Vic not to hurt my father.

24  Q.   Did you ever come to have any ties of your own to Vic

25  Arena later on in life?

1    A.    I'm brother-in-laws with his son.

2    Q.    What is his son's name?

3    A.    Peter Arena.

4    Q.    What was the second problem DB helped your father with?

5    A.    A guy named Bart was threatening my father.  DB got in

6    touch with them to leave him alone.

7    Q.    How did your father have a problem with Bart?

8    A.    It was in a bar, over some type of bar argument.

9    Q.    What bar?

10   A.    Montanas.

11   Q.    Where is Montana?

12   A.    Hewlett, Long Island.

13   Q.    Is it in business now?

14   A.    No.

15   Q.    Do you know who the owner of the bar was?

16   A.    Yes.

17   Q.    Who?

18   A.    Gino Mandarino.

19   Q.    Did he have any relationship with DB?

20   A.    Yes.

21   Q.    What?

22   A.    He was with him.

23   Q.    What do you mean by "with him"?

24   A.    Meaning he's on record with DB.

25   Q.    Do you know if Mandarino was later with anyone else?

1   A.   Yes.

2   Q.   Who?

3   A.   Charles Carneglia.

4   Q.   How do you know?

5   A.   Because he told me.

6   Q.   The defendant told you?

7   A.   Yes.

8   Q.   What do you mean that Mandarino was with the defendant?

9   A.   Meaning that if he has any problems with any other

10  gangsters, Charles would take care of it.

11  Q.   To your knowledge, did Mandarino pay the defendant?

12  A.   No.

13  Q.   Did he give him anything of value?

14  A.   Yes.

15  Q.   What?

16  A.   Free drinks and food.

17  Q.   Did you ever eat or drink for free with the defendant at

18  Montanas?

19  A.   Yes.

20  Q.   Who told you you didn't have to pay?

21  A.   Charles.

22  Q.   Did Mandarino ever later own any other restaurants?

23  A.   Yes.

24  Q.   What?

25  A.   Viva Loco.

1  Q.   Did you ever eat or drink there with the defendant?

2  A.   Yes.

3  Q.   Did you have to pay?

4  A.   No.

5  Q.   So, is it fair to say growing up, aside from your

6  father's interactions with DB, you yourself weren't heavily

7  influenced by organized crime?

8  A.   Yes.

9  Q.   When did organized crime start to play an important role

10 in your life?

11 A.   When I went into the gambling machine business.

12 Q.   How old were you then?

13 A.   18 or 19.

14 Q.   You mentioned the Gambino family a number of times.

15 What is the Gambino family?

16 A.   One of the five families in New York.

17 Q.   What are the others?

18 A.   Bonanno, Colombo, Luchese and Genovese.

19 Q.   Are there any New Jersey based families?

20 A.   Yes.

21 Q.   What?

22 A.   DeCalvacante.

23 Q.   DeCalvacante?

24 A.   Yes.

25 Q.   When were you first associated with the Gambino family?

1    A.    1991.

2    Q.    Had you been affiliated with the family prior to that?

3    A.    Yes, the late eighties.

4    Q.    Who were you originally affiliated with?

5    A.    Michael Reiter.

6    Q.    What was his position in the family?

7    A.    Associate.

8    Q.    Whose crew was he in at the time?

9    A.    Charles Carneglia.

10   Q.    Did there come a time that you began being affiliated

11   with anyone else?

12   A.    Yes.

13   Q.    That was the defendant?

14   A.    Yes.

15   Q.    Did the defendant have a brother?

16   A.    Yes.

17   Q.    Who?

18   A.    John Carneglia.

19   Q.    Is John Carneglia affiliated with organized crime?

20   A.    Yes.

21   Q.    What family?

22   A.    Gambino.

23   Q.    What is the highest rank he ever reached?

24   A.    Captain.

25   Q.    Who was the boss of the family when you began reporting

1   to the defendant?

2   A.    John Gotti.

3   Q.    Showing you what's in evidence as Government's Exhibit

4   2 P, who is that

5   A.    John Gotti.

6   Q.    What is the position he attained in the family?

7   A.    Boss.

8   Q.    Showing you what's in evidence as Government's Exhibit

9   2 LL.  Who's that

10  A.    John Carneglia.

11  Q.    John Carneglia?

12  A.    Yes.

13  Q.    The highest rank he attained?

14  A.    Captain.

15  Q.    Showing you what's in evidence as Government's Exhibit

16  2 JJJ.  Who's that

17  A.    Michael Reiter.

18  Q.    That's the first person in the Gambino family you were

19  affiliated with?

20  A.    Yes.

21  Q.    What is the highest rank he attained?

22  A.    Associate.

23  Q.    He was in the defendant's crew?

24  A.    Yes.

25  Q.    Have you heard of the term La Cosa Nostra?

1    A.    Yes.

2    Q.    What does it mean?

3    A.    It means the Mafia.

4    Q.    The Gambino family is part of La Cosa Nostra?

5    A.    Yes.

6    Q.    You testified you began reporting to the defendant in

7    1991.  When did you first meet him?

8    A.    Late eighties.

9    Q.    Do you recall where you met him?

10   A.    One time at a funeral.  One time in -- at his brother's

11   going away party in the Hamptons.

12   Q.    Who introduced you?

13   A.    Michael Reiter.

14   Q.    You --?

15        THE COURT:  Excuse me.  Did you clarify for the jury

16   what a going away party is?

17        MR. NORRIS:   I was about to.   Thank you, Judge.

18   Q.    You say that Michael Reiter introduced you to the

19   defendant at a going away party, correct?

20   A.    Yes.

21   Q.    That was in the Hamptons?

22   A.    Yes.

23   Q.    What is a going away party?

24   A.    This going away party was for his brother to go do 50

25   years in prison.

Adams-direct/Norris

1  Q.   John Carneglia was going to prison?

2  A.   Yes.

3  Q.   Do you recall what time of year the party was?

4  A.   Summer.

5  Q.   How do you recall?

6  A.   Because we took my boat there.

7  Q.   What type of boat did you have?

8  A.   A Baha speedboat.

9  Q.   A Baha speedboat?

10 A.   Yes.

11 Q.   Who did you go with?

12 A.   Michael Reiter.

13 Q.   Who else was there when you arrived?

14 A.   Charles Carneglia, Angelo Ruggerio, Peter Zuccaro, Kevin

15 McMahon and several others.

16 Q.   John Carneglia?

17 A.   John Carneglia.

18 Q.   Who is Angelo Ruggerio?

19 A.   He was a captain in the Gambino family.

20 Q.   While you were there, did anyone else arrive by boat?

21 A.   Yes.

22 Q.   Who?

23 A.   A guy named Carlo.

24 Q.   Carlo?

25 A.   Yes.

1  Q.   Do you remember his last name?

2  A.   I think Vaccaro (ph.).

3  Q.   You're not sure?

4  A.   I'm sure it is Vaccaro.

5  Q.   Who is Carlo?

6  A.   He was an associate in the Gambino family.

7  Q.   Do you remember what kind of boat he arrived in?

8  A.   Yes.

9  Q.   What kind?

10 A.   Fountain.

11 Q.   A Fountain?

12 A.   Yes.

13 Q.   Is that another speedboat?

14 A.   Yes.

15 Q.   Do you recall what the name was?

16 A.   Not Guilty.

17 Q.   Showing you what's in evidence as Government's Exhibit

18 NN.  Who is that?

19 A.   Angelo Ruggiero.

20 Q.   Senior?

21 A.   Yes.

22 Q.   What is the highest position in the family he attained?

23 A.   Captain.

24 Q.   He was at the Hamptons that day?

25 A.   Yes.

Adams-direct/Norris

1   Q.   Showing you what's in evidence as Government's Exhibit

2   2 BB-1.  Who's that

3   A.   Peter Zuccaro.

4   Q.   What is the highest position he attained in the family?

5   A.   Associate.

6   Q.   He was there that day?

7   A.   Yes.

8   Q.   Showing you what's in evidence as Government's Exhibit

9   2 T.  Who's that

10  A.   Kevin McMahon.

11  Q.   What is the position he attained in the family?

12  A.   Associate.

13  Q.   He was also there that day in the Hamptons?

14  A.   Yes.

15  Q.   Did the Gambino family have an organizational structure?

16  A.   Yes.

17  Q.   Did you learn about it?

18  A.   Yes.

19  Q.   From who?

20  A.   Charles.

21  Q.   The defendant?

22  A.   Yes.

23  Q.   What are the top leadership positions in the Gambino

24  family?

25  A.   Boss, underboss and consigliere.

1  Q.  What is under boss, underboss and consigliere?

2  A.  Captain.

3  Q.  What is under captain?

4  A.  Soldier.

5  Q.  And what's under soldier?

6  A.  Associate.

7  Q.  Typically, who do associates report to?

8  A.  Soldiers.

9  Q.  Do they ever report to anyone else?

10 A.  Yes.

11 Q.  Who?

12 A.  Captains.

13 Q.  Can associates also report to other associates?

14 A.  Yes.

15 Q.  Please keep your voice up.

16 A.  Yes.

17 Q.  You mentioned the term "crew"a few times.  What is a

18 crew?

19 A.  A group of guys who are with the made guy.

20 Q.  Did you consider yourself a part of the defendant's

21 crew?

22 A.  No.

23 Q.  Why not?

24 A.  Because I was a businessman.  I wasn't involved in --

25 with his friends or the day-to-day stuff, whatever they did.

1  Q.  You are a businessman or you're a criminal?

2  A.  I was a criminal.

3  Q.  Why weren't you a part of his crew?

4  A.  I wasn't a thug, I wasn't a tough guy.

5  Q.  Do you know if anyone else in the defendant's crew paid

6  him protection money?

7      MS. SHARKEY:  Objection as to form.

8  A.  No.

9      THE COURT:  I will allow it.

10  Q.  You can answer.

11  A.  No.

12  Q.  You testified that the defendant is a soldier.  Do you

13  know when he was inducted into the family?

14  A.  I believe late eighties.

15  Q.  Who told you he was a soldier?

16  A.  Michael Reiter.

17  Q.  Was the defendant always a soldier during the time you

18  reported to him?

19  A.  Yes.

20  Q.  Are you familiar with how an associate becomes a made

21  member of an organized crime family?

22  A.  By killing someone.

23  Q.  Any other way?

24  A.  Not that I know of.

25  Q.  Were you familiar with the defendant's reputation in the

1  Gambino crime family at the time you first began reporting to

2  him?

3          MS. SHARKEY:   Objection.

4          THE COURT:  You may answer.

5  A.   Yes.

6  Q.   From who?

7  A.   Michael Reiter.

8  Q.   Anyone else?

9  A.   Peter Zuccaro.

10  Q.   Michael Reiter and Peter Zuccaro?

11  A.   Yes.

12  Q.   What did they tell you?

13  A.   That he's a dangerous guy.

14  Q.   Were there rules in organized crime?

15  A.   Yes.

16  Q.   Did you learn about them?

17  A.   Yes.

18  Q.   From who?

19  A.   Reiter, Charles.

20  Q.   Michael Reiter and the defendant?

21  A.   Yes.

22  Q.   What are some of the rules you learned about?

23  A.   Not to hit a made man, not to sleep with his wife, and

24  the most important was not to cooperate.

25  Q.   Was there any rule about dealing drugs?

1    A.    Not to deal drugs as well.

2    Q.    Did you have an understanding as to who could become a

3    member of an organized crime family, what ethnic background

4    they had to have?

5    A.    Italian.

6    Q.    Were you eligible?

7    A.    No.

8    Q.    Why not?

9    A.    I'm Jewish.

10   Q.    You said a most important rule was don't cooperate with

11   the government; is that right?

12   A.    Yes.

13   Q.    Why not?

14   A.    Because you can get killed.

15   Q.    Because what?

16   A.    You can get killed.

17   Q.    Did you ever have a conversation with the defendant

18   about cooperating with the government?

19   A.    Yes.

20   Q.    When?

21   A.    In the mid nineties.

22   Q.    How did the conversation arrive?

23   A.    We were in his apartment and he told me that he heard

24   there was some heat or maybe -- so I might be getting in

25   trouble, and he said you don't want to cooperate because then

1  you have to move to China.

2  Q.   What kind of heat was it that the defendant thought you

3  might be getting into?

4  A.   Stock fraud.

5  Q.   He said if you ever cooperate you'll have to move to

6  China?

7  A.   Yes.

8  Q.   What did you understand him to mean?

9  A.   That means run or get killed.

10  Q.   Were there any rules in organized crime --?

11      THE COURT:  Excuse me.  Read back the last few

12  questions and answers.

13      (Record read.)

14      THE COURT:   Cooperate with whom?

15  Q.   Cooperate with whom?

16  A.   The government.

17  Q.   Your understanding was if you cooperate with the

18  government you better go to China or you're going to get

19  hurt?

20  A.   Yes.

21  Q.   Are there any rules in organized crime about physical

22  appearance?

23  A.   Yes.

24  Q.   What?

25  A.   Not to have a beard or moustache.

Adams-direct/Norris

1  Q.   Did you ever see anyone in organized crime with a

2  moustache or beard?

3  A.   No.

4  Q.   Did you ever see the defendant with facial hair before

5  today?

6  A.   No.

7  Q.   Did you ever see him change his physical appearance in

8  any way?

9  A.   Once.

10  Q.   When?

11  A.   In the -- it was the mid nineties.

12  Q.   What did you see?

13  A.   He had red hair.

14  Q.   What was his natural hair color at the time?

15  A.   Jet black with a little bit of gray.

16  Q.   Where did you see him with red hair?

17  A.   Walking on Cross Bay Boulevard.

18  Q.   How did you react to seeing the defendant with red hair?

19  A.   I was very surprised.

20  Q.   Did you laugh?

21  A.   A little bit.

22  Q.   Did the defendant say anything to you at the time about

23  why he died his hair?

24  A.   No.

25  Q.   Did he ever say anything to you later on?

1    A.    Yes.

2    Q.    What did he tell you?

3    A.    He said that he changed his appearances and that he was

4    on the run for a long time and that he had changed his

5    appearance before.

6    Q.    Did he tell you why he had died his hair at that time?

7    A.    No.

8              MS. SHARKEY:    Objection.

9              THE COURT:  Overruled.

10   A.    No.

11   Q.    You mentioned a rule against drug dealing.  Is that rule

12   always followed?

13   A.    No.

14   Q.    Can you think of any examples of anyone in organized

15   crime who dealt drugs?

16   A.    Yes.

17   Q.    Who?

18   A.    Charles' brother.

19   Q.    Anyone else?

20   A.    Gene Gotti.

21   Q.    Is Gene Gotti related to John Gotti?

22   A.    Yes.

23   Q.    How?

24   A.    His brother.

25   Q.    Do you know what drugs John Gotti and Gene Gotti dealt?

1    A.    Yes.

2    Q.    What?

3    A.    Heroin.

4    Q.    When?

5    A.    In the eighties.

6    Q.    What was their status at that time?

7    A.    Captains.

8    Q.    You testified before that John Gotti got a 50-year

9    prison sentence.  Was that for heroin?

10   A.    Yes.

11   Q.    Withdrawn.

12         You testified before John Carneglia got a 50-year

13   sentence.  Was that for heroin?

14   A.    Yes.

15   Q.    Do you know what prison sentence Gene Gotti got?

16   A.    Same.

17   Q.    Same case?

18   A.    Yes.

19   Q.    Do you know if the defendant ever visited either Gene

20   Gotti or his brother John Carneglia in prison?

21   A.    Yes.

22   Q.    Did he ever tell you that?

23   A.    Yes.

24   Q.    Did he ever tell you whether he visited anyone else?

25   A.    No.

Adams-direct/Norris

1  Q.   To your knowledge, were John Carneglia or Gene Gotti

2  ever punished by the Gambino family for dealing drugs?

3  A.   No.

4  Q.   Who decides how the rules are enforced in an organized

5  crime family?

6  A.   The boss.

7  Q.   Who was the boss at the time John Carneglia and Gene

8  Gotti were dealing drugs?

9  A.   John Gotti.

10  Q.   From your experience are organized crime rules enforced

11  consistently?

12  A.   No.

13  Q.   In your experience are organized crime rules enforced

14  differently depending on who violates them?

15  A.   Yes.

16  Q.   In all the time you knew him, have you ever known the

17  defendant to be disciplined for anything?

18  A.   No.

19  Q.   Do you know what it means to be put on the shelf?

20  A.   Yes.

21  Q.   What?

22  A.   Inactive as a gangster.

23  Q.   Is it temporary or permanent?

24  A.   Could be both.

25  Q.   In all the years you knew him, did you ever hear the

1  defendant had been put on the shelf?

2  A.   No.

3  Q.   You mentioned the name Michael Reiter a few times.

4  That's the individual you identified in Government's Exhibit

5  2 JJJ, the individual with black hair

6  A.   Yes.

7  Q.   Did you and Michael Reiter commit crimes together?

8  A.   Yes.

9  Q.   What crimes?

10 A.   Gambling, drug dealing, stock fraud.

11      MR. NORRIS:   Can you read that answer back, please.

12      (Record read.)

13 Q.   What drugs did you deal with him?

14 A.   Marijuana.

15 Q.   How did you meet Michael Reiter?

16 A.   In a bar.

17 Q.   What bar?

18 A.   Montanas.

19 Q.   That's the bar owned by Gino Mandarino you testified

20 about earlier?

21 A.   Yes.

22 Q.   Whose crew was Michael Reiter in when you met him?

23 A.   Charles'.

24 Q.   Do you know if he was ever in John Carneglia's crew as

25 well?

1   A.   If Mike Reiter was?  I don't know.

2   Q.   At the time you met him, Michael Reiter was reporting to

3   the defendant, correct?

4   A.   Yes.

5   Q.   Were you aware at the time you met Michael Reiter as to

6   whether anyone else -- withdrawn.

7       Now, you mentioned you were involved in the Joker Poker

8   business with Michael Reiter, correct?

9   A.   Yes.

10   Q.   Explain a bit more about that.  What does it mean to be

11   in that business?

12   A.   It means we put gambling machines in different locations

13   to get a percent of the profit from those locations.

14   Q.   You mentioned bodegas before.  Is that one type of

15   location where you put the machines?

16   A.   Yes.

17   Q.   Are there any other types of locations?

18   A.   Yes.

19   Q.   What?

20   A.   Bars, numbers spots, pizza places.  Anywhere on the

21   street that would take them.

22   Q.   What is a numbers spot?

23   A.   Numbers spot is a location, small location that takes

24   bets, I believe, for horses.

25         THE COURT:  Some of the jurors may not know what a

1  bodega is.

2  Q.   Can you explain to the jury what a bodega is?

3  A.   A bodega is a Spanish grocery store where we put the

4  gambling machines in.

5       Excuse me, I believe when I first met Michael Reiter he

6  was with John Carneglia.  That was a few questions back.

7  Q.   When you first met Michael Reiter he was with John

8  Carneglia?

9  A.   Yes.

10 Q.   He later was transferred to Charles Carneglia?

11 A.   Yes.

12 Q.   When was he transferred to Charles Carneglia?

13 A.   When John went to prison.

14 Q.   Do you know if any other members of John Carneglia's

15 crew were transferred when Charles and John went to prison?

16 A.   Yes.

17 Q.   Who?

18 A.   Peter Zuccaro, Kevin McMahon.

19 Q.   Now, returning to the Joker Poker business, you used the

20 word "location"  is that one word you would use to describe

21 the type of place you would put a machine?

22 A.   Yes.

23 Q.   Is there another word you used?

24 A.   Spots.

25 Q.   You testified that the arrangement with the owner of the

1  location or spot was 50/50; is that right?

2  A.   Yes.

3  Q.   Explain what you mean.

4  A.   Meaning that we would put the machine inside a location.

5  He would receive 50 percent of the profits, we would receive

6  50 percent of the profits after the payout to the customer.

7  Q.   Typically, were Joker Poker or Eight Line machines

8  located in these locations or spots in an obvious place?

9  A.   No.

10 Q.   Where were they?

11 A.   In a very discreet location or hidden in a back room.

12 Q.   Why is that?

13 A.   Because they're illegal.

14 Q.   Now, did you start out in the gambling machine business

15 with Michael Reiter?

16 A.   No.

17 Q.   Who did you start out with?

18 A.   A guy named Bruce.

19 Q.   When did you start out in the gambling machine business

20 with Bruce?

21 A.   Late eighties.

22 Q.   You were about 18 or 19?

23 A.   Yes.

24 Q.   When you started working with Michael Reiter, what was

25 your arrangement with him?

1  A.   50/50.

2  Q.   I can't hear you.

3  A.   50/50.

4  Q.   You and Michael Reiter would share with the location

5  owners 50/50, and then you and Michael Reiter as between

6  yourselves would also share 50/50?

7  A.   Yes.

8  Q.   What was your role in the gambling operation?

9  A.   To get the locations.

10 Q.   Were you also involved in servicing the machines?

11 A.   And service them.

12 Q.   Did the gambling machines break down frequently?

13 A.   Sometimes.

14 Q.   You said get the locations.  What do you mean?

15 A.   I mean I acted as a salesman and would go door to door

16 to the bodega, grocery store, numbers spot, bar, and try to

17 get the owner to put the machine inside of the location.

18 Q.   At that time what was Michael Reiter's role?

19 A.   He was supposed to get spots as well, but basically

20 protection.

21 Q.   What do you mean by "protection"?

22 A.   Meaning he was with the mob.

23 Q.   How did that help in the machine business?

24 A.   If you weren't with the mob and you had a problem with

25 somebody inside a spot, he would take your spot because you

1    had no one to sit down and talk to you.

2    Q.   At the time you got involved in the business, was the

3    mob heavily involved in the Joker Poker machine business?

4    A.   Very.

5    Q.   Did there come a time when your arrangement with Michael

6    Reiter changed?

7    A.   Yes.

8    Q.   What happened?

9    A.   He went to get a job in a union and I went on my own.

10   Q.   How many spots did you have with him at the time?

11   A.   Around 15.

12   Q.   Did you continue to share the proceeds from those spots

13   with him?

14   A.   Yes.

15   Q.   When you went out on your own, what do you mean?

16   A.   Meaning we would maintain the spots together and I would

17   go out and try to get my own locations and he would go out

18   and try to get his own.

19   Q.   Why when he started with his union job did you want to

20   go off on your own?

21   A.   Well, basically, he was doing nothing to help me and I

22   just wanted to go out on my own because he had a full-time

23   job now.  I thought that would be fair.

24   Q.   Is it fair to say you thought you were doing most of the

25   work and you didn't want to share your profits with him

1  anymore?

2  A.   Yes.

3  Q.   Do you know if Michael Reiter continued in the machine

4  business after you went out on your own?

5  A.   Yes.

6  Q.   Did he ever acquire additional spots on his own?

7  A.   Yes.

8  Q.   Where did he have additional spots?

9  A.   Queens and Brooklyn.

10  Q.   What kind of spots in Queens?

11  A.   Number spots.

12  Q.   Did you ever go with him to one of his number spots?

13  A.   Yes.

14  Q.   Do you recall who you met there?

15  A.   Yes.

16  Q.   Who?

17  A.   Guy named Carl.

18  Q.   Carl?

19  A.   Yes.

20  Q.   And did Michael Reiter tell you whose numbers spot it

21  was?

22  A.   Yes.

23  Q.   Who?

24  A.   Tommy DeSousa's.

25  Q.   Tommy DeSousa?

1   A.   Yes.

2   Q.   Were they affiliated, Carl and Tommy DeSousa, with

3   organized crime?

4   A.   Yes.

5   Q.   What family?

6   A.   Gambino family.

7   Q.   What were their positions?

8   A.   Associates.

9   Q.   Do you know whose crew they were in?

10  A.   Tony Lee and Mikey Gow's.

11  Q.   Do you know Tony Lee's and Mikey Gow's last names?

12  A.   No.

13  Q.   Do you know if they had any relationship?

14  A.   Brothers.

15  Q.   Do you know what their positions were in the Gambino

16  family?

17  A.   Mikey Gow was a soldier, Tony Lee was captain.

18  Q.   Did you know at the time anyone else in their crew?

19  A.   No -- one guy named Anthony.

20  Q.   Anthony?

21  A.   Yes.

22  Q.   Do you know who Anthony was?

23  A.   He was Fat Andy's son.

24  Q.   Do you know Fat Andy's full name?

25  A.   No.

1  Q.   Do you know what Fat Andy's position was in the Gambino

2  family?

3  A.   Captain.

4  Q.   What was his son Anthony's position?

5  A.   Associate.

6  Q.   Now, did there come a time after you struck out on your

7  own in the gambling business that your apartment was robbed?

8  A.   Yes.

9  Q.   When?

10  A.   Late eighties.

11  Q.   Where were you at the time?

12  A.   I was in Florida.

13  Q.   Where was your apartment?

14  A.   Manhattan.

15  Q.   What street?

16  A.   York Avenue.

17  Q.   What happened?

18  A.   I went to Florida and I received a phone call.

19  Q.   From who?

20  A.   From my friend who was staying in my apartment.

21  Q.   What was his name?

22  A.   Cliff.

23  Q.   What did he tell you?

24  A.   That -- I called.  He said the doorman said that I had

25  called to let some people in the apartment to move a mirror.

Adams-direct/Norris

1   Q.   Had you?

2   A.   No.

3   Q.   Why did Cliff call you to tell you that?

4   A.   Because the doorman told him and I guess the mirror was

5   moved in the apartment, stuff was moved around.

6   Q.   What did you say to Cliff?

7   A.   Check the safe.

8   Q.   The safe?

9   A.   The safe.

10  Q.   You had a safe in your apartment?

11  A.   Yes.

12  Q.   What was in it?

13  A.   Cash and a gun.

14  Q.   Where did the cash come from?

15  A.   Gambling proceeds.

16  Q.   What about the gun, where did that come from?

17  A.   Greg Reiter.  Yes.

18  Q.   Is he related to Michael Reiter?

19  A.   Yes.

20  Q.   How?

21  A.   Brothers.

22  Q.   Why did he give you a gun?

23  A.   I don't know.

24  Q.   Is it a new gun?

25  A.   No.  Very old.

1  Q.  Was it loaded?

2  A.  I don't know.

3  Q.  You didn't know?

4  A.  No, I never checked.  Actually, I didn't know how to

5  check.

6  Q.  Did Cliff go and check the safe when you asked him to?

7  A.  Yes.

8  Q.  What happened?

9  A.  It was turned around.

10  Q.  He managed to turn it back around?

11  A.  Yes.

12  Q.  What was in it?

13  A.  Nothing.

14  Q.  Did you suspect who robbed you?

15  A.  Yes.

16  Q.  Who?

17  A.  Michael Reiter.

18  Q.  Same person you had been partners with in the gambling

19  machine business?

20  A.  Same person, yes.

21  Q.  Why did you suspect Michael Reiter?

22  A.  Because he had come to meet me in Florida.  Actually, he

23  called me when I was in Florida and said he was in Florida.

24  I said okay.  He said they wanted to come by.

25  Q.  Who is "they"?

1   A.   Him and Johnny Boy Ruggerio.

2   Q.   Who is he?

3   A.   Angelo Ruggiero's son.

4   Q.   Angelo Ruggiero is the captain up on the board?

5   A.   Yes.

6   Q.   Did you meet Michael Reiter and Johnny Boy Ruggerio in

7   Florida?

8   A.   Yes.

9   Q.   How long before the robbery was it?

10  A.   A day.  Maybe that night.  A day, actually.

11  Q.   The day before?

12  A.   Yes.

13  Q.   Did it strike you as odd they had come to see you?

14  A.   Yes.

15  Q.   Why?

16  A.   Because they had come in and I figured they were coming

17  to meet me, okay, what's going on, you're in Florida, we're

18  going to go out to diner or get a drink and all of a sudden,

19  two seconds later they had to run, they had to go somewhere.

20  Q.   So, what did you do when you found out your apartment

21  had been robbed?

22  A.   I went home.  I --.

23  Q.   What did you do when you got home?

24  A.   I called Michael Reiter.

25  Q.   What did you tell him?

1   A.   I told him I wanted to meet him.  I was frantic and

2   upset and he said he would meet me.  I went to go meet him in

3   Great Neck and he had brought Johnny Boy Ruggerio with him.

4   Q.   They had come back from Florida?

5   A.   Yes.

6   Q.   What happened when you met with them?

7   A.   I told him what happened.

8   Q.   How did they react?

9   A.   Like surprised, and, you know, couldn't believe it.

10  Surprised.

11  Q.   Had they ever been to your apartment before?

12  A.   Michael had.  Johnny --.

13  Q.   When?

14  A.   What?

15  Q.   When?

16  A.   He was there a couple of times.  Johnny Boy had never

17  been there, except once.

18  Q.   When?

19  A.   About a week prior or two prior I went out with Michael

20  Reiter and Johnny Boy was with him and then when they were

21  dropping me off we went in a grocery store across the street

22  to get a bagel or something and all of a sudden they wanted

23  to come upstairs.

24  Q.   Did that strike you as odd?

25  A.   Very.

1  Q.   Did you ever confront Michael Reiter or Johnny Boy

2  Ruggerio with your suspicion they robbed you?

3  A.   No.

4  Q.   Why not?

5  A.    'Cause I knew -- first of all, I was afraid.  Second of

6  all, that could be a problem for me, accusing people like

7  that.

8  Q.   What do you mean "people like that"?

9  A.   Dangerous people.

10 Q.   Did you report the robbery to the police?

11 A.   No.

12 Q.   Why not?

13 A.   Because it was illegal proceeds in the safe that Michael

14 Reiter had bought me.

15 Q.   Later on did there ever come a point in time you learned

16 what had happened?

17 A.   Yes.

18 Q.   When?

19 A.   Charles told me many years later.

20 Q.   When?

21 A.   Around the -- around the late nineties.

22 Q.   About ten years later?

23 A.   Yeah.

24 Q.   Where were you when he told you?

25 A.   In his apartment.

1  Q.   Was anyone else there?

2  A.   Yes.

3  Q.   What did the defendant tell you?

4  A.   That Michael Reiter had robbed me.

5  Q.   Did he tell you why he told you that then?

6  A.   Well, Kevin McMahon was there and he basically said he

7  told him to tell me and that he was just telling me to let me

8  know he wasn't my friend and --.

9  Q.   That Michael wasn't your friend?

10  A.   Correct.

11  Q.   Had you been pressing the issue around that time?

12  A.   Not at all.

13  Q.   Going back to 1988, the time of the robbery, what

14  happened to your relationship with Reiter after the robbery?

15  A.   I didn't really want to be around him at all.

16  Q.   Notwithstanding that, did you continue to have dealings

17  with him in the gambling machine business and the 15 spots

18  you still shared?

19  A.   Yes.

20  Q.   After you went out on your own in the gambling machine

21  business, did you acquire additional spots over time?

22  A.   Yes.

23  Q.   Approximately how many did you ultimately acquire?

24  A.   About 150.

25  Q.   About 150?

1  A.   Yes.

2  Q.   How long did you stay in the gambling business?

3  A.   Until '95.

4  Q.   At the peak of your business, how much were you making?

5  A.   About $10,000 a week.

6  Q.   Gross or net?

7  A.   Net.

8  Q.   That was pure profit?

9  A.   Pretty much, yeah.  Sometimes there were bills for

10  mechanics and machines, but that was it for a short period,

11  yes.

12  Q.   $10,000 a week?

13  A.   Yes.

14  Q.   Did there come a time that the defendant had any

15  involvement in your gambling business?

16  A.   Yes.

17  Q.   Was that before you were on record with him or after?

18  A.   Before.

19  Q.   How did he get involved?

20  A.   I had a couple problems and Michael Reiter went to him.

21  Q.   Why did Michael Reiter go to the defendant?

22  A.   Because he was with him at the time.

23  Q.   What was the first time that the defendant got involved

24  in a problem that you had in your gambling machine business?

25  A.   We had a spot in Washington Heights -- I had a spot,

1  actually, in Washington Heights.

2  Q.   This is one of the spots you had that you weren't

3  sharing with Michael Reiter at the time?

4  A.   Yes. I had a spot in Washington Heights and some --

5  someone had come into the spot and put their machine and they

6  weren't getting out.

7  Q.   Is there a term for someone putting a machine into your

8  spot?

9  A.   They jumped my spot.

10  Q.   Did you have an understanding at the time as to why they

11  jumped your spot?

12  A.   I didn't -- it was my spot had gotten broken up by the

13  police and somebody knew about the spot so he went to some

14  wise guys in Brooklyn and they tried to jump the spot being I

15  wasn't around anymore.

16  Q.   So, after the police had come and broken up your spot it

17  was temporarily empty, there were no machines, correct?

18  A.   Yes.

19  Q.   Someone from some other family or some other wise guys

20  tried to move into your spot, correct?

21  A.   Yes.

22  Q.   What did you do when you found out?

23  A.   I went to Michael Reiter when I realized the guy was a

24  connected guy.

25  Q.   By "connected" what do you mean?

1   A.   With the mob.

2   Q.   What did Michael Reiter do?

3   A.   He went to Charles.

4   Q.   Anyone else?

5   A.   Pete Gotti.

6   Q.   Who is Pete Gotti at the time?

7   A.   Captain or boss of the family.

8   Q.   And was Pete Gotti related to John Gotti and Gene Gotti?

9   A.   Yes.

10   Q.   How?

11   A.   Brother.

12   Q.   What happened after Michael Reiter went to the defendant

13  and Pete Gotti?

14   A.   I ended up getting the spot back.

15   Q.   Did you have to pay someone else?

16   A.   I split the spot with Michael Reiter.

17   Q.   Meaning you went 50/50 with him on that spot from then

18  on?

19   A.   Yes.

20   Q.   Was this a surprise to you?

21   A.   Yes.

22   Q.   You hadn't expected him to take half the spot?

23   A.   No.

24   Q.   Did there come a time when the defendant again got

25  involved in your machine business?

1    A.    Yes.

2    Q.    This, too, was before you began reporting to him?

3    A.    Yes.

4    Q.    What happened?

5    A.    We had a problem -- I had a problem in The Bronx in a

6    spot that I had.  Somebody had picked up my machine and said

7    it was their spot.

8    Q.    And what did you do?

9    A.    I called Michael again.  He went to Charles.  They found

10   out whose spot it was.  Charles sat down with the wise guy

11   whose spot it was.

12   Q.    What do you mean "sat down," what does that mean?

13   A.    It means they had a sit-down to discuss the gambling

14   location.

15   Q.    Sit-down is a meeting to resolve a dispute?

16          MS. SHARKEY:   Objection.

17          THE COURT:  I will allow it.

18   Q.    You may answer.  A sit-down is a meeting to resolve a

19   dispute?

20   A.    A sit-down is between two mobsters to decide who wins,

21   who's right.

22   Q.    Do sit-downs take place between people in different

23   Mafia families?

24   A.    Yes.

25   Q.    Do they also take place between people who are all

Adams-direct/Norris

1   within the same family?

2   A.   Yes.

3   Q.   Did Michael Reiter tell you who the defendant sat down

4   with that day?

5   A.   Yes.

6   Q.   Who?

7   A.   Vinny Artuso.

8   Q.   Who is he?

9   A.   Captain in the Gambino family.

10  Q.   What was the resolution?

11  A.   It was Vinny's spot.

12  Q.   So, what happened?

13  A.   They gave my machine back and we left the spot.

14  Q.   Are there rules relating to gambling spots?

15  A.   Yes.

16  Q.   Explain.

17  A.   Meaning if you have your machine inside a spot, it is

18  yours for life if you're there first.

19  Q.   It is yours for life?

20  A.   Yes.

21  Q.   What if you leave temporarily, do you lose the spot?

22  A.   No.

23  Q.   Who recognizes these rules?

24  A.   The mob.

25  Q.   Is everyone involved in the gambling machine business

1 | connected to the mob?

2 | A.    No.

3 | Q.    What happens if someone without mob connections has a

4 | dispute with another person who is?

5 | A.    You can have a problem, generally lose the spot quickly.

6 | Q.    Now, did you have any personal interaction with the

7 | defendant relating to these two sit-downs?

8 | A.    No.

9 | Q.    How long after the sit-downs did you go on record with

10 | him?

11 | A.    A year or two.

12 | Q.    You testified earlier that you went on record with the

13 | defendant in 1991?

14 | A.    1991.

15 | Q.    How old were you at the time?

16 | A.    24.

17 | Q.    And that's when you began paying him $400 a week in

18 | protection money?

19 | A.    Yes.

20 | Q.    Can you explain how it first came about that you went on

21 | record with the defendant?

22 | A.    He had -- some of his associates were calling for me to

23 | come to a nightclub --                                          .

24 | Q.    What club?

25 | A.    Montanas.

1      -- one night and that Charles wanted to see me.

2   Q.   Which associates of his told you that?

3   A.   Joe Panzarella and Dean Mandarino.

4   Q.   Dean Mandarino, is he related to Gino Mandarino, the

5   owner of Montanas?

6   A.   His son.

7   Q.   What did you think when you heard that you had been

8   summoned by the defendant?

9   A.   I have a problem.

10  Q.   Explain why.

11  A.   By his reputation and by now I was on his radar that he

12  wanted to see me, he knew I was in an illegal business and

13  basically I thought that he wanted his piece.

14  Q.   His piece?

15  A.   Yes.

16  Q.   What does that mean?

17  A.   Meaning protection money.

18  Q.   Part of your illegal business?

19  A.   Yes.

20  Q.   Did you tell anyone that you had been summoned by the

21  defendant to go to Montanas?

22  A.   Yes.

23  Q.   Who did you tell?

24  A.   Chris McMahon.

25  Q.   Did you tell anyone else?

1   A.   Yes.

2   Q.   Who?

3   A.   Michael Reiter.

4   Q.   What did you tell Michael Reiter?

5   A.   That I had been summoned to go -- Charles sent for me.

6   Q.   What did he say?

7   A.   Don't go.

8   Q.   Now, apart from being partners in the gambling machine

9   business with Michael Reiter at the time, were you paying

10  him?

11  A.   No.

12  Q.   What did you tell Michael Reiter after he told you don't

13  go see the defendant?

14  A.   I said I was scared and that if he kept sending for me I

15  would have to go see him.

16  Q.   But you agreed at least for the time being not to go?

17  A.   Yes.

18  Q.   Why were you scared?

19  A.   By his reputation.

20  Q.   The defendant's reputation?

21  A.   Yes.

22  Q.   Did you have an understanding as to what you're supposed

23  to do when you're summoned by a made member of an organized

24  crime family?

25  A.   You're supposed to come.

1  Q.  What happens if you don't?

2  A.  You can get killed.

3  Q.  You mentioned that you also spoke to Chris McMahon about

4  the fact that you had been summoned; is that right?

5  A.  Yes.

6  Q.  Who's Chris McMahon?

7  A.  A friend of mine.

8  Q.  Was he affiliated with organized crime?

9  A.  No.

10  Q.  Is he any relation to Kevin McMahon?

11  A.  No.

12  Q.  What did you tell Chris McMahon?

13        MS. SHARKEY:   Objection, hearsay.

14        MR. NORRIS:   It is not offered for the truth.

15        THE COURT:  You may answer.

16  Q.  What did you tell Chris McMahon?

17  A.  That they had sent for me to come there and, basically,

18  not to go.

19  Q.  What did he say?

20  A.  Okay, but he might check it out, but okay.

21  Q.  He said he might check it out?

22  A.  Yeah.

23  Q.  Did you go to Montanas that night?

24  A.  No.

25  Q.  Did he?

1    A.    Yes.

2    Q.    Did he later tell you why he went?

3          THE COURT:  Sustained.

4          MS. SHARKEY:   Thank you.

5    Q.    Did he tell you what happened at Montanas that night?

6    A.    Yeah.

7          MS. SHARKEY:   Objection.

8          THE COURT:  Sustained.

9          THE COURT:  Make an offer in the absence of the

10   jury.  Be back at one o'clock, please.  You'll have your

11   lunch.

12         (The jury exits the courtroom.)

13         THE COURT:  Remove the witness, please.

14         Where are we going with this witness now?  Sit down,

15   everybody.

16         MR. NORRIS:   This witness, your Honor, is

17   testifying in particular with respect to one predicate of

18   extortion, that he was extorted by the defendant for a period

19   of time, and, also, he will testify with respect to a

20   securities fraud count, that the defendant and among others

21   Lenny DiMaria engaged in.

22         With respect to the extortion count, the line of

23   questioning I'm asking him goes to his state of mind and why

24   he felt that he had to start paying the defendant protection

25   money.

1        THE COURT:  Why he felt what?

2        MR. NORRIS:  That he had to start paying the

3   defendant protection money.

4        At the bar what happened was some associates of the

5   defendant's threatened the witness' friend with a bottle over

6   his head.  Didn't hit him, but threatened him and said where

7   is Hunter, where is Hunter, where's Hunter?  When the witness

8   later found out what had happened he decided he had to come

9   in and see the defendant and thereafter he was on record with

10  him for about 14 years.

11       THE COURT:  What's the defendant's view on that

12  point?

13       MS. SHARKEY:  I think it is not admissible.  The

14  witness has testified that he was associated prior to the

15  time he met Mr. Carneglia.  I think the Court should preclude

16  the introduction of that testimony.

17       THE COURT:  Well, offer it only to prove the

18  defendant's state of mind and not to prove that the event

19  actually happened.

20       MR. NORRIS:  The witness' state of mind.

21       THE COURT:  The witness' then state of mind.

22       MR. NORRIS:  Okay.

23       THE COURT:  To explain what the witness did, but not

24  to use it to prove that the event actually happened.

25       What else do you have coming from the witness that

1  may be creating a problem?

2          MR. NORRIS:   Nothing else, your Honor.  He's

3  already testified to his understanding of the defendant's

4  reputation.

5          THE COURT:  Yes, I've let that in.

6          MR. NORRIS:   Those are the essential events.  There

7  is no violence that comes later.

8          THE COURT:  This is the only critical evidentiary

9  point?

10          MR. NORRIS:  Yes, there's nothing else anticipated

11  that would cause a problem.

12          THE COURT:  Anything defendant wants to raise based

13  on 3500 material?

14          MS. SHARKEY:   No.   I did this morning, Judge.

15          I would like to add the Chris McMahon he's referring

16  to is not the same McMahon that has been referenced through

17  other witnesses.  The Chris McMahon he's referring to in the

18  conversation he's with is not alleged to be a member of

19  organized crime.  It shouldn't be admissible under 802.

20          THE COURT:  Yes.

21          MR. NORRIS:  We're not offering it as a

22  coconspirator statement.  We're offering it, as your Honor

23  said, to show the jury the witness' state of mind.

24          THE COURT:  You'll say that when you ask him the

25  question, that this is being offered only for that limited

1  purpose.

2       MR. NORRIS:   Should I say that with respect to one

3  question -- how should I -- how would you like me to say it

4  to the witness?

5       THE COURT:  Just say it that way, that the following

6  testimony is offered only to show the state of mind, but not

7  to show that the bottle brandishing actually took place.

8       MR. NORRIS:   We'll do that.

9       THE COURT:  Apparently it is the only issue that the

10 defendants are complaining about.

11      Anything further?

12      MS. SHARKEY:   No, Judge.

13      THE COURT:  Thank you.

14      MS. SHARKEY:   Judge, does the Court have an issue

15 in mind that you think the defense has missed?  I certainly

16 don't want to abandon any of Mr. Carneglia's interests or

17 rights and if I have overlooked something --.

18      THE COURT:  Well, I'm not assuming the

19 responsibility for the defense, but at this point I did see

20 -- which is why I sent the jury out, I didn't think you had

21 raised it with sufficient precision to appeal, so there will

22 be an appeal.  That is why I sent them out and addressed the

23 parties, to assist defense counsel, but I generally do not

24 assume that responsibility.  I assume when you don't object

25 or do anything you have a good tactical reason to not object

1   or do whatever you're doing.  We've taken the precautions of

2   appointing two of the most eminent counsel of the Eastern

3   District and therefore the Court is appropriately relying on

4   their judgment.

5           Thank you.

6           MS. SHARKEY:    Thank you.

7           (Lunch recess.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        A F T E R N O O N   S E S S I O N

2

3            MR. NORRIS:  Judge, before the witness comes, we

4    just have one brief application.

5            THE COURT:  Yes.

6            THE COURT:  We had drafted some language with

7    respect to the effect of the testimony that is about to

8    occur.

9            THE COURT:  Yes.

10            MR. NORRIS:  And wondered if the Court would

11    consider reading it.

12            THE COURT:  Yes.  Let me see it.  It's marked Court

13    Exhibit 1 of today's date.

14            (So marked Court Exhibit 1 in evidence.)

15            THE COURT:  Any objection?

16            MS. SHARKEY:  No.

17            THE COURT:  It's Court Exhibit 1 and you'll read it

18    yourself.

19            MR. NORRIS:  I could.  I was asking if the Court

20    would consider giving it.

21            THE COURT:  No, you can do it,.

22            MR. BURLINGAME:  Judge, I think it would have more

23    force if it came from the Court.

24            THE COURT:  All right, then I'll do it.  Alert me

25    when I should do that, please, when the question is about to

1  come.

2          MR. NORRIS:  Okay.

3          (Witness resumed the stand.)

4          (Jury in at 1:05 p.m.)

5          THE COURT:  Be seated, please.

6  DIRECT EXAMINATION (Continued)

7  BY MR. NORRIS: HEADER

8  Q.   Now, Mr. Adams, before we broke you were telling the

9  jury that there came a time that you were summoned by the

10  defendant?

11  A.   Yes.

12  Q.   And you spoke about the fact that the defendant had

13  summoned you with Michael Reiter and Chris McMahon, do you

14  recall that?

15  A.   Yes.

16  Q.   And Michael Reiter told you not to go, do you recall

17  that?

18  A.   Yes.

19  Q.   And when you told your friend Chris McMahon, he said

20  that he might go, is that fair to say?

21  A.   Yes.

22  Q.   And you were also about to tell the jury about what

23  happened--withdrawn.

24          And you were also about to tell the jury about the fact

25  that after Chris McMahon went to the bar that night, he later

1  told you what happened, do you recall that?

2  A.   Yes.

3        THE COURT:  Now, I'm allowing this testimony in

4  about what was told but it's being offered only to show the

5  state of mind of the person to whom it was told, that is,

6  what effect it would have on his state of mind but not to

7  show that the events actually occurred in the bar as

8  described.

9        Is that clear?

10 Q.   What did Chris McMahon tell you happened the bar that

11 night?

12 A.   He told me he went to Montana's and he was standing by

13 the bar having a drink and two men approached him.

14 Q.   Who?

15 A.   Joe Panzarella and one other.  And they said come back

16 to the table where Charles was at.

17 Q.   He said that the defendant was there?

18 A.   Yes.

19 Q.   And that the men who approached him were Joe Panzarella

20 and another individual?

21 A.   Yes.

22 Q.   Do you recall who the second man was?

23 A.   I'm not sure.

24 Q.   And what happened?

25 A.   He went back to the table where Charles was sitting with

1    several others.  He sat down.  A guy name Michael Finnerty

2    said to him:  Where's Hunter?  What is a Hunter.

3    Q.   Let me stop you right there.

4         He said:  Where's Hunter?  What's a Hunter?

5    A.   Yes.

6    Q.   And do you know who Michael Finnerty is related to?

7    A.   Kevin McMahon.

8    Q.   How were they related?

9    A.   Brother-in-laws.

10   Q.   And Kevin McMahon was in the defendant's crew at the

11   time?

12   A.   Yes.

13   Q.   And what did Chris McMahon say happened after Michael

14   Finnerty said:  Where's Hunter?  What's a Hunter?

15   A.   He lifted up a bottle up as to hit him in the head with

16   it.

17   Q.   Did he hit him?

18   A.   No.

19   Q.   Did Chris McMahon tell you whether he said anything in

20   response?

21   A.   No.

22   Q.   When did Chris McMahon tell you about what had happened?

23   A.   The next day.

24   Q.   What was your reaction when you learned about what had

25   happened at Montana's that night?

1   A.   That I had a serious problem.

2   Q.   You testified that there came a time when you learned

3   about the defendant's reputation from Peter Zuccaro and

4   Michael Reiter?

5   A.   Yes.

6   Q.   And that they told you that the defendant was a

7   dangerous person, is that correct?

8   A.   Yes.

9   Q.   At the time that Chris McMahon went to Montana's and

10  Michael Finnerty put a bottle to his head, were you already

11  familiar with the defendant's reputation?

12  A.   Yes.

13  Q.   What specifically had Michael Reiter told you about the

14  defendant's reputation?

15           MS. SHARKEY:   Objection.

16           THE COURT:   I'll allow that again for the same

17  purpose, to show the state of mind, what effect that might

18  have had on his state of mind.

19  A.   That he was dangerous.

20  Q.   Anything else?

21  A.   No.

22  Q.   What specifically did Peter Zuccaro tell you about the

23  defendant's reputation?

24  A.   He was a dangerous guy, a bad guy.

25  Q.   Do you recall where that conversation took place?

1    A.   In Michael Reiter's kitchen in his house.

2    Q.   You were with Peter Zuccaro there?

3    A.   I was there and Peter Zuccaro was there with Michael

4    Reiter.

5    Q.   Where was that house?

6    A.   Merrick, Long Island.

7    Q.   What street?

8    A.   Hewlett Avenue.

9    Q.   Michael Reiter and Peter Zuccaro close?

10   A.   Yes.

11   Q.   Do you know if they committed crimes together?

12   A.   Yes.

13   Q.   What crimes?

14   A.   Pot dealing, marijuana distribution.

15   Q.   I'll just ask you to keep your voice up so the jury can

16   hear you.

17   A.   All right.

18   Q.   After you spoke with Chris McMahon about the incident at

19   Montana's, did anyone contact you?

20   A.   Yes.

21   Q.   Who?

22   A.   Joe Panzarella and Chris Carneglia.

23   Q.   Who is Chris Carneglia?

24   A.   John Carneglia's son.

25   Q.   The defendant's nephew?

1   A.   Yes.

2   Q.   Where was John Carneglia at the time?

3   A.   Prison.

4   Q.   How did Joe Panzarella contact you?

5   A.   By phone.

6   Q.   What did he say?

7   A.   Come meet him.  They wanted--that he wanted to discuss

8   what was going on.

9   Q.   What exactly did he say to you?

10  A.   To come meet him at New Park Pizza.

11  Q.   How long after the incident at Montana's did Joe

12  Panzarella tell you to come meet him at New Park Pizza?

13  A.   The next day.

14  Q.   Did you come and meet him?

15  A.   Yes.

16  Q.   What did you discuss?

17  A.   About being with Charles and going over what the

18  situation was.

19  Q.   What did he say to you exactly?

20  A.   Come meet--I was going to meet Charles at a diner in

21  Queens to discuss what was going on.

22  Q.   What did Joe Panzarella say to you when you met him at

23  New Park Pizza, just so the record is clear?

24  A.   They were discussing if I was with anybody and that he

25  wanted me to meet Charles.

1  Q.   What did you say if anything?

2  A.   Okay.

3  Q.   Anything else?

4  A.   I described to Joe Panzarella and Chris Carneglia that I

5  was a businessman, not a thug, and that I was not into being

6  a gangster, I was a businessman.

7  Q.   Why did you tell them that?

8  A.   Because I didn't want them thinking that I wanted to be

9  a gangster and join the crew and try to a aspire to be a

10 tough guy.

11 Q.   What did they say in response?

12 A.   They understood.

13 Q.   Did they say that you still had to meet with the

14 defendant?

15         MS. SHARKEY:  Objection.

16         THE COURT:  You may answer.

17 A.   Yes.

18 Q.   Did you agree?

19 A.   Yes.

20 Q.   I'm showing you what--I'm showing you what is in

21 evidence as Government's Exhibit 2 CCCC.

22     Who is that?

23 A.   Michael Finnerty.

24 Q.   That is the person who put the bottle --who you told the

25 jury put the bottle to Chris McMahon'  head?

1      MS. SHARKEY:  Objection.

2      THE COURT:  I'll allow it.

3  A.   Yes.

4  Q.   What is the highest rank in the Gambino Family he

5  attained?

6  A.   Associate.

7  Q.   That is Kevin McMahon's brother?

8  A.   In-law.

9  Q.   Brother-in-law?

10  A.   Yes.

11  Q.   I'm showing you what is in evidence as Government's

12  Exhibit 2 U.

13      Who is that?

14  A.   Joe Panzarella.

15  Q.   What is the highest rank he obtained?

16  A.   Associate.

17  Q.   And Joe Panzarella is the one would meet at the New Park

18  Pizza with Chris Carneglia to discuss you coming to meet with

19  the defendant?

20  A.   Yes.

21  Q.   Did that meeting between you and the defendant take

22  place?

23  A.   Yes.

24  Q.   Where?

25  A.   At a diner on Cross Bay Boulevard.

Adams/Direct/Norris

1  Q.   Who else attended?

2  A.   Me, Charles, Joe Panzarella.

3  Q.   What happened?

4  A.   We sat down in a booth, started talking.  I explained

5  that I didn't have a problem being with him, I just didn't

6  need any problems and that I was a businessman and we spoke a

7  couple of minutes then he intimated to me he thought there

8  was surveillance on him.  He was like looking around.  He

9  thought he was being watched.

10  Q.   You testified that you told the defendant you didn't

11  have a problem being with him, is that right?

12  A.   Yes.

13  Q.   Why did you tell him that?

14  A.   Because he was threatening--I took it as a threat to my

15  friend when someone puts a bottle to their head to come see

16  them that I'm not with anybody. I was not looking to fight.

17  Q.   At that point, did you feel you had a choice?

18  A.   No.

19         MS. SHARKEY:  Objection.

20         THE COURT:  I'll permit it.

21  Q.   You said that the --you said that the defendant

22  intimated there might be surveillance.

23       How did he intimate that?

24       Did he tell you something?

25  A.   Yes, he looked around and he was like the British are

1  coming.

2  Q.   He said the British are coming?

3  A.   Yes, as he looked he behind him and around him.

4  Q.   What did he do?

5  A.   He got up and left.

6  Q.   Had he said anything else to that point?

7  A.   Just that I would be with him and that he would take

8  care of any mob problems I had; what am I doing with Michael

9  Reiter; you come direct to the source.

10  Q.   Did you observe any surveillance at the diner that day?

11  A.   No.

12  Q.   Was there a subsequent meeting you had with the

13  defendant?

14  A.   Yes.

15  Q.   Where did that meeting take place?

16  A.   New Park Pizza.

17  Q.   Who did you meet with on that occasion?

18  A.   Charles and Joe Panzarella.

19  Q.   And what was the purpose of that meeting?

20  A.   To discuss that I had a problem with another associate

21  in the family.

22  Q.   But that problem--withdrawn.

23       At that time did you already consider yourself with the

24  defendant?

25  A.   Yes.

1   Q.   You were now on record with him as far as you understood

2   it?

3          MS. SHARKEY:  Objection.

4          THE COURT:  I'll allow it.

5   A.   Yes.

6   Q.   So you came to him with a problem you had.

7        Who was the associate that you had the problem with?

8   A.   John Beno.

9   Q.   Do you know if that is his real last name?

10  A.   No.  I don't believe it is.  I'm not sure.

11  Q.   What kind of problem did you have with John Beno?

12  A.   I had a machine in a spot, a poolhall in Far Rockaway

13  and one of his people were trying to jump the spot.

14  Q.   And do you know who Johnny Beno was with at the time?

15  A.   Yes.

16  Q.   Who?

17  A.   JoJo Corozzo.

18  Q.   And is JoJo Corozzo related to Nicky Corozzo?

19  A.   Yes, his brother.

20  Q.   What was JoJo Corozzo's, the highest rank that he

21  attained in the Gambino Family?

22  A.   Captain.

23  Q.   I'm showing you what is in evidence as Government's

24  Exhibit 2 F.

25       Who is that?

Adams/Direct/Norris

1  A.    JoJo Corozzo.

2  Q.    So what happened after you told the defendant and Joe

3  Panzarella about your problem with Johnny Beno?

4  A.    Charles said Joe Panzarella would go to meet Beno

5  regarding the spot.

6  Q.    And did you and Joe Panzarella go and meet with him?

7  A.    Yes.

8  Q.    What happened?

9  A.    We went back and forth discussing it and Beno basically

10  said he was going to talk to Charles about it.

11  Q.    He wanted to talk to the defendant directly?

12  A.    Yes.

13  Q.    Did Johnny Beno say anything else to you at that

14  meeting?

15  A.    Yes.

16  Q.    What?

17  A.    He suggests, he said I should pay Charles $500 a week.

18  Q.    How did that come up?  You were having a dispute with

19  him about a gambling machine location, right?

20  A.    Yes.

21  Q.    How did that come up?

22  A.    That Charles was taking care of, protecting me in this

23  matter, what am I doing for him.  Like he just through it out

24  there, you should just pay Charles $500 a week.

25  Q.    Beno just threw it out there that you should start

1    paying him?

2    A.    Yes.

3    Q.    Had you brought up the subject of your paying the

4    defendant at that point?

5    A.    No.

6    Q.    What did you say when Beno suggested that you should pay

7    the defendant 500 dollars a week?

8    A.    I'll discuss it with Charles.

9    Q.    Prior to your conversation with Johnny Beno, did you

10   have any understanding as to whether you would have to start

11   paying the defendant?

12   A.    Yes.

13   Q.    What was that understanding?

14   A.    Typically for protection, you pay.

15   Q.    What ultimately happened with that spot?

16   A.    I kept it.

17   Q.    Did you then discuss with the defendant how much you

18   would pay him?

19   A.    Yes.

20   Q.    Where did that conversation take place?

21   A.    Outside New Park Pizza.

22   Q.    Once again?

23   A.    Yes.

24   Q.    Who else was there?

25   A.    Joe Panzarella.

1   Q.   Once again?

2   A.   Yes.

3   Q.   How long after the meeting that you and Panzarella had

4   with Johnny Beno?

5   A.   The next day.

6   Q.   What did you say?

7   A.   I told him that I lost a couple of spots and if he could

8   do $400 a week.

9   Q.   What did he say, the defendant?

10  A.   Okay.

11  Q.   Did you subsequently meet with the defendant to bring

12  him money?

13  A.   Yes.

14  Q.   Where?

15  A.   Several places.

16  Q.   Where was the first time?

17  A.   New Park Pizza.

18  Q.   In what form was the money?

19  A.   Cash.

20  Q.   Who did you give it to?

21  A.   Joe Panzarella.  I wanted to give it to Charles and then

22  I gave it to Joe Panzarella.

23  Q.   What happened when you tried to give it to the

24  defendant?

25  A.   You should give it to him.

1    Q.   I don't understand what you mean.  What did the

2    defendant do when you tried to give it directly to the

3    defendant?

4    A.   He didn't take it.

5    Q.   What did he say?

6    A.   You want to give me a gift, it's okay, give it to Joey.

7    Q.   Did you think you were giving him a gift?

8    A.   No.

9    Q.   Did Joe Panzarella take the $400?

10   A.   Yes.

11   Q.   That was standing right in front of New Park Pizza and

12   Cross Bay Boulevard right in the middle of the daytime?

13   A.   Yes.

14   Q.   You've used the term protection money.  Can you remind

15   the jury your understanding what does the term mean?

16   A.   The protection money I paid to Charles Carneglia was

17   basically to protect me from him bothering me or from others

18   like him bothering me, extorting me or hurting me.

19   Q.   The time that you began paying the defendant protection

20   money you were in the gambling machine business, correct?

21   A.   Yes.

22   Q.   And he had already --the defendant had already helped

23   you with some problems had you in the gambling machine

24   business, correct?

25   A.   Yes.

1  Q.   Was it your understanding after you went on record with

2  him--withdrawn.

3       After you went on record with him, did you decide you

4  were going to continue to use him to help you with problems

5  in that business?

6  A.   Yes.

7  Q.   Did he?

8  A.   Yes.

9  Q.   You testified before that you never heard of any

10  other--withdrawn.

11       You testified before that you never heard of any of the

12  defendant's crew members paying him protection money, is that

13  accurate?

14  A.   Yes.

15  Q.   Did you ever know anyone else to pay anyone protection

16  money?

17  A.   Yes.

18  Q.   Who?

19  A.   Other people in the vending machine business.

20  Q.   And at that point forward after that day in front of New

21  Park Pizza, did you pay the defendant every week?

22  A.   Yes.

23  Q.   For how long?

24  A.   10 years.

25  Q.   Did the figure ever change?

1   A.   No.

2   Q.   Did the defendant ever ask you to start paying him more?

3   A.   No.

4   Q.   He appeared content with what you were paying him?

5   A.   Yes.

6   Q.   If you were paying him $400 a week, approximately how

7   much is that a year?

8   A.   20,800.

9   Q.   And how much is 20,800 over 10 years?

10   A.   208,000.

11   Q.   Mr. Adams, would you say that you profited from your

12   relationship with the defendant?

13   A.   Yes.

14   Q.   How?

15   A.   He provided me protection whereas people wouldn't bother

16   me in certain situations.  If I had a machine spot that was

17   going to get jumped, he would help me save it.

18   Q.   Did he ever hurt you?

19   A.   No.

20   Q.   After the events at Montana's, did he ever threaten you?

21   A.   No.

22        MS. SHARKEY:  Objection.

23        THE COURT:  I'll allow it.

24   Q.   Did you feel like you had a choice whether or not to pay

25   him?

1  A.   I had no choice.

2  Q.   Why not?

3  A.   Because that was the agreement.  Protection money just

4  wouldn't go for three weeks and then it's over.  In my mind,

5  it was forever.

6  Q.   In your mind, what would have happened if you stopped

7  paying?

8        MS. SHARKEY:  Objection.

9        THE COURT:  I'll allow it.

10 A.   I would have been hurt.

11       THE COURT:  Help him define what hurt meant.

12 Q.   What do you mean by hurt?

13 A.   Beat up, beat up or killed.

14 Q.   Over the decade that you were paying the defendant

15 weekly, did you ever miss a week?

16 A.   No.

17 Q.   Were there ever occasions where you went for a week

18 without paying him and then made it up?

19 A.   Yes.

20 Q.   Did you always catch up?

21 A.   Yes.

22 Q.   What is the longest you ever went without paying?

23 A.   Four, five weeks.  I'm not even sure.

24 Q.   Do you know if the defendant kept records to know

25 whether or not you had paid him?

1  A.    Yes.

2  Q.    How do you know?

3  A.    In his apartment he had a small calendar on the wall

4  where he had some type of markings on the date that I saw him

5  last.

6  Q.    So he kept track?

7  A.    Yes.

8  Q.    Why would you go to his apartment?

9  A.    To pay him.

10 Q.    What kind of apartment did he have?

11 A.    Very modest.

12 Q.    Did you ever pay him anywhere else?

13 A.    Yes.

14 Q.    Where?

15 A.    At a bait store on Cross Bay Boulevard.

16 Q.    Do you know who owned the bait store?

17 A.    A guy named Phil.

18 Q.    Did Phil have a relationship with the defendant that you

19 could see?

20 A.    He was with him.

21 Q.    When you went to Phil's bait store at Cross Bay

22 Boulevard to give the defendant money, did you go there to

23 give it directly to the defendant or did you give it to Phil?

24 A.    Both.

25 Q.    Did the defendant hang out there?

1    A.   Yes.

2    Q.   Did you ever have any other involvement with Phil?

3    A.   Yes.

4    Q.   What?

5    A.   Put gambling machines in his store.

6    Q.   You installed gambling machines there?

7    A.   Yes.

8    Q.   How did you come to install those there?

9    A.   Upon Charlie's request.

10   Q.   Did you ever pay the defendant through anyone else aside

11   from Phil?

12   A.   Yes.

13   Q.   Who?

14   A.   Joe Panzarella.

15   Q.   Where would you give Joe Panzarella the money?

16   A.   By his office on Cross Bay Boulevard.

17   Q.   What kind of office did he have?

18   A.   Real estate.

19   Q.   A real estate office?

20   A.   Yes, a mortgage and real estate office.

21   Q.   Did he own the office?

22   A.   His mother and father did.

23   Q.   Do you know what his father's name is?

24   A.   Joe Senior.

25   Q.   Did you ever give the weekly payments to any other

1  members of the defendant's crew?

2  A.    No.

3  Q.    Did you ever pay the defendant anywhere else aside from

4  his apartment and Phil's bait store?

5  A.    We met a couple of times on the street but basically

6  that was it.

7  Q.    Did you ever know the defendant to hang out anywhere

8  else aside from Phil's bait store?

9  A.    He went to --it was by 101st Avenue, a club.

10  Q.    Did you ever know him to hang out in the junkyard?

11  A.    Yes, I actually paid him there a couple of times.

12  Q.    Where was the junk yard?

13  A.    Off of Fountain Avenue.

14  Q.    Did you ever know him to hang out at any diners?

15  A.    Yes.

16  Q.    What diners?

17  A.    The Lindenwood Diner I also paid him at.

18  Q.    Do you recall any particular occasion that you paid the

19  defendant at the Lindenwood Diner?

20  A.    Yes.

21  Q.    What happened on that occasion?

22  A.    They were having a--eating breakfast and --.

23  Q.    Who is they?

24  A.    Charles, Tommy Sneakers, a guy named Brother.

25  Q.    Who is Tommy Sneakers?

1  A.   Charles' captain.

2  Q.   Do you know his real last name?

3  A.   Caccapolo, I think.

4  Q.   And Brother, that is a nickname?

5  A.   Yes.

6  Q.   Do you know his real name?

7  A.   No.

8  Q.   Do you know Tommy Sneakers'--withdrawn.

9       You said that Tommy Sneakers was the defendant's

10 captain?

11 A.   Yes.

12 Q.   Do you know what Brother's affiliation was with the

13 Gambino Family?

14 A.   Yes.

15 Q.   What was it?

16 A.   He was a soldier with Nicky Corozzo.

17 Q.   I'm showing you what is in evidence as Government's

18 Exhibit 2 Z.

19      Who is that?

20 A.   Brother.

21 Q.   I'm showing you what is in evidence as Government's

22 Exhibit 2 B.

23      Who is that?

24 A.   Tommy Sneakers.

25 Q.   When you went to the Lindenwood Diner to pay the

1   defendant, he was already sitting down having breakfast with

2   Tommy Sneakers and Brother, is that correct?

3   A.   Yes.

4   Q.   And did you sit down with him?

5   A.   Yes.

6   Q.   And were they having a conversation?

7   A.   Yes.

8   Q.   What were they discussing?

9   A.   They were discussing that Charles had had a problem with

10  Junior Ruggiero.

11  Q.   Do you know what Junior Ruggiero's full name is?

12       MS. SHARKEY:  Objection to the line, not this

13  particular question.

14       THE COURT:  I couldn't hear you.

15       MS. SHARKEY:  To this line, not this particular

16  question.

17       THE COURT:  Overruled.

18  Q.   Can you read back the last answer.

19       (Record read.)

20  A.   Angelo.

21  Q.   And any relation to Angelo Ruggiero, Sr.?

22  A.   His son.

23  Q.   And that conversation with the defendant, his captain

24  Tommy Sneakers and Brother, what were they discussing about

25  the problem the defendant had with Junior Ruggiero?

Adams/Direct/Norris

1      MS. SHARKEY:  Objection.

2      THE COURT:  Try to fix the time, please, and.

3   Q.   You said this was a conversation that was taking place

4   at the Lindenwood Diner?

5   A.   Yes.

6   Q.   And it was a conversation where the defendant and the

7   others were having breakfast, is that correct?

8   A.   Yes.

9   Q.   Where is the Lindenwood Diner?

10  A.   Queens.

11      THE COURT:  Can you fix the date, approximately,

12  please.

13  Q.   Do you recall approximately how long after you began

14  reporting to the defendant that this conversation took place?

15  A.   At the late '90s.

16  Q.   The late '90s?

17  A.   Yes.

18  Q.   So some long time had passed after you had began

19  reporting?

20  A.   Yes.

21  Q.   What was the problem that the defendant, his captain

22  Tommy Sneakers and Brother were discussing?

23      MS. SHARKEY:  Objection.

24      THE COURT:  Overruled.

25  A.   Tommy Sneakers said that Pete had told him to leave

1  Angelo, Junior Ruggiero alone, that Charles had --Charles had

2  stun-gunned him and --.

3          THE COURT:  Charles had stun-gunned who?

4          THE WITNESS:  Junior Ruggiero.

5          MS. SHARKEY:  Objection.

6          THE COURT:  Overruled.

7  Q.  And Tommy Sneakers was saying that Pete had told the

8  defendant to leave Junior Ruggiero alone?

9  A.  Yes.

10 Q.  Who did you understand Pete to be?

11 A.  Pete Gotti.

12 Q.  And what was Pete Gotti's rank in the family?

13 A.  Boss.

14 Q.  Did they discuss what the origin of the dispute the

15 defendant was having with Junior Ruggiero?

16          MS. SHARKEY:  Objection.

17          THE COURT:  Overruled.

18 A.  Charles and Junior Ruggiero were partners in the

19 junkyard and Junior Ruggiero was beating everybody and not

20 paying anybody the money.  He was taking it, spending it and

21 whatever he was doing with it.

22 Q.  Do you recall what the defendant said in that

23 discussion?

24 A.  He said he'll leave him alone after he gets him again.

25          THE COURT:  I didn't hear that.

1          I'm sorry.

2   A.   He will leave him alone after he gets him again.

3          THE COURT:  Who will leave him alone?

4          THE WITNESS:  Charles will leave him alone.

5          THE COURT:  Who is he?

6          THE WITNESS:  Charles will leave Junior Ruggiero

7   alone after he he hurts him again.

8   Q.   I'm showing you what is in evidence as Government's

9   Exhibit 2 MMM.

10         Who is that?

11  A.   Junior Ruggiero.

12  Q.   What is the highest rank in the Gambino Family he

13  attained?

14  A.   Associate.

15  Q.   In addition to making the weekly protection payments to

16  the defendant, did you ever make any other kinds of payments

17  to him?

18  A.   Yes.

19  Q.   What?

20  A.   Christmas gifts.

21  Q.   Explain to the jury what a Christmas gift is?

22  A.   A Christmas gift is something that is given to the

23  wiseguy that you are with on Christmastime out of a form of

24  respect to them as protection.

25  Q.   How did you come to understand that you should pay the

1  defendant a Christmas gift?

2  A.    It was common knowledge.

3  Q.    Had you ever given anyone a Christmas given before you

4  gave a Christmas gift to the defendant?

5  A.    No.

6  Q.    Did you remember in your life giving anyone else a

7  Christmas gift aside from the defendant?

8  A.    No.

9  Q.    What year was the first year that you gave the defendant

10  a Christmas gift?

11  A.    The first year I was with him, '91.

12  Q.    What did you tell him when you--withdrawn.

13        Did you have a conversation with him about the Christmas

14  gift?

15  A.    Yes.

16  Q.    What did you say to him?

17  A.    What did he want me to get him for Christmas.

18  Q.    What did he say to you?

19  A.    An exercise boat, a kayak.

20  Q.    A kayak?

21  A.    Yes.

22  Q.    How did you respond when the defendant told you that he

23  wanted a kayak?

24  A.    I found it as odd, strange, and I said okay.

25  Q.    What did you do?

1   A.   I got him a kayak.

2   Q.   Where?

3   A.   At a sporting goods store.

4   Q.   How much did it cost?

5   A.   Around $400.

6   Q.   Did you give it to him?

7   A.   Yes.

8   Q.   Did you think you were required to give him a Christmas

9   gift?

10  A.   Yes.

11  Q.   Did you ever know him to use the kayak?

12  A.   No.

13  Q.   Did you give the defendant a Christmas gift in

14  subsequent years?

15  A.   Yes.

16  Q.   Every year?

17  A.   Until 2000.

18  Q.   What kind of gifts did you give in subsequent years?

19  A.   Cash.

20  Q.   What day would you give the defendant Christmas gifts?

21  A.   The day before Christmas.

22  Q.   Were you ever late?

23  A.   No.

24  Q.   How much did you give him the second year you were with

25  him, 1992?

Adams/Direct/Norris

1   A.   2500.

2   Q.   Did the amount go up after that?

3   A.   Yes.

4   Q.   Did the amount vary in subsequent years?

5   A.   Yes.

6   Q.   Generally, how much would you give him?

7   A.   5,000 and 10,000 then 20,000 and back down to 10,000.

8   Q.   What was the most you ever gave him?

9   A.   $20,000.

10  Q.   When was that?

11  A.   The late '90s.

12  Q.   And you said it came back down after that?

13  A.   Yes.

14  Q.   What did it come back down to?

15  A.   $10,000 the next year.

16  Q.   How did the defendant react when the amount of the

17  Christmas gift came down?

18  A.   I believe he wasn't happy.

19  Q.   How could you tell?

20  A.   By the way he looked at me.

21  Q.   Was the Christmas Eve that you saw him for

22  Christmas--withdrawn.

23       Was the Christmas Eve in 2000 that you gave him a

24  Christmas gift the last time you ever gave him a Christmas

25  gift?

1  A.   Yes.

2  Q.   Can you estimate for the jury how much you gave the

3  defendant in Christmas gifts over all the time you were with

4  him?

5  A.   Estimate $90,000.

6  Q.   That is on top of the over $200,000 you paid him in

7  protection payments?

8  A.   Yes.

9  Q.   All totaled, you paid him over a quarter of a million

10 dollars?

11 A.   Yes.

12 Q.   Did the defendant attend sit-downs for you in the

13 Joker-Poker machine business after you started reporting to

14 him?

15 A.   Yes.

16 Q.   Approximately how many times?

17 A.   Three.

18 Q.   Three?

19 A.   Yes.  Twice.  Twice.

20 Q.   Do you recall the exact number?

21 A.   Yes, it was twice.

22 Q.   How would you characterize how you used him in your

23 Joker-Poker machine business?

24 A.   For protection.

25 Q.   What do you mean?

1   A.   That I was with the mob, that my spots could not be

2   jumped because I was with Charles Carneglia.

3   Q.   Did you ever try to use him to jump new spots of your

4   own?

5   A.   No.

6   Q.   Why not?

7   A.   I used it as a defensive mechanism when I was going to

8   be approached or extorted.

9   Q.   When you asked the defendant to participate in sit-downs

10  on your behalf, did he agree?

11  A.   Yes.

12  Q.   Was he effective?

13  A.   Yes.

14  Q.   You testified that at its height, you were netting about

15  $10,000 a week from your gambling business, is that right?

16  A.   Yes.

17  Q.   Did the business stay that profitable for long?

18  A.   No.

19  Q.   What happened?

20  A.   Major Guiliani came in and he started with the

21  enforcement of breaking up the gambling machines inside of

22  the spots throughout the city.

23  Q.   Did you decide to get out of the business after that?

24  A.   Yes.

25  Q.   Back in 1991 when you went on record with the defendant,

1  who was in his crew?

2  A.   Kevin McMahon, Joe Panzarella--Kevin McMahon, Joe

3  Panzarella, a guy named Johnny Borelli for a little bit.

4  Q.   Anyone else?

5  A.   I believe Peter Zuccaro.

6  Q.   What kind of crimes did Peter Zuccaro commit if you

7  know?

8  A.   Drug dealing.

9  Q.   He was a drug dealer?

10  A.   Yes.

11  Q.   Did he ever have any run-ins with your friends?

12  A.   Yes.

13  Q.   Which friend?

14  A.   Chris McMahon.

15  Q.   Briefly tell the jury what happened.

16  A.   He--one time he approached him in a parking lot and one

17  of his friends hit him in the head with a gun.

18  Q.   Peter Zuccaro hit one of your friend with a gun?

19  A.   Peter Zuccaro's friend hit my friend with a gun.

20  Q.   Then what happened?

21  A.   The second time he called my friend to go to his yard.

22  Q.   Who is he?

23  A.   Peter Zuccaro.

24  Q.   What happened?

25  A.   He went to the yard and he was punched--he was

1   threatened and punched in the face.

2   Q.   By Peter Zuccaro?

3   A.   By one of his friends.

4   Q.   Do you know which?

5   A.   A guy named Andre.

6   Q.   Which friend was this?

7   A.   Chris McMahon.

8   Q.   How would you describe Peter Zuccaro?

9   A.   Dangerous guy, drug dealer.

10  Q.   Did he stay in the defendant's crew?

11  A.   No.

12  Q.   Do you know if he was switched to someone else?

13  A.   Yes.

14  Q.   Who?

15  A.   A guy named Iggy.

16  Q.   Iggy?

17  A.   Yes.

18  Q.   Who told you that?

19  A.   Charles.

20  Q.   You mentioned Kevin McMahon before.  How long did you

21  know him to be in the defendant's crew?

22  A.   Until 2000.

23  Q.   How would you describe Kevin McMahon?

24  A.   He was a character, he was funny.

25  Q.   Did there come a time that his relationship with the

1   defendant deteriorated?

2   A.   Yes.

3   Q.   In what year was that?

4   A.   2000.

5   Q.   John Panzarella, how long did you know him to be in the

6   defendant's crew?

7   A.   Always.

8   Q.   How would you describe Joe Panzarella?

9   A.   A wanna be muscle, tough guy.

10  Q.   Muscle?

11  A.   Yes.

12  Q.   Who was the defendant's captain at the time you began

13  reporting to him?

14  A.   I believe Pete Gotti or John Jr.

15  Q.   Pete Gotti or who?

16  A.   Or John Gotti, Jr.

17  Q.   And later on, did you ever know him to report to anyone

18  else?

19  A.   Tommy Sneakers.

20  Q.   Do you know if the defendant and Tommy Sneakers were

21  close?

22  A.   Yes.

23  Q.   Do you know if the defendant was close to anyone else in

24  the family?

25  A.   Yes.

1  Q.   Who?

2  A.   Jackie Cavallo.

3  Q.   I'm showing you what is in evidence as Government's

4  Exhibit 2 O.

5       Who is that?

6  A.   John Jr.

7  Q.   John Gotti, Jr.?

8  A.   Yes.

9  Q.   What is the highest rank in the family he attained?

10  A.   Boss.

11  Q.   I'm showing you Government's Exhibit 2 E.

12       Do you know who that is?

13  A.   I believe it's Jackie Cavallo.

14  Q.   Are you sure?

15            MS. SHARKEY:  Objection.

16  A.   I'm not 100 percent sure but I believe it's him.

17  Q.   What is the highest rank in the family Jackie Cavallo

18  attained?

19  A.   Soldier.

20  Q.   I'm showing you what is in evidence as Government's

21  Exhibit 2 Q.

22       Who is that?

23  A.   Pete Gotti.

24  Q.   What is the highest rank in the family he attained?

25  A.   Boss.

1   Q.   Do you know where the defendant grew up?

2   A.   East New York.

3   Q.   Do you know if he was ever married?

4   A.   Yes.  He was not married.

5   Q.   Aside from John, did he have any other siblings?

6   A.   No.

7   Q.   Was John married?

8   A.   Yes.

9   Q.   And he had kids, right, you talked to the jury about

10  Chris Carneglia?

11  A.   Yes.

12  Q.   Do you know if he had any other kids?

13  A.   Another son John.

14  Q.   You mentioned before--withdrawn.

15       You mentioned before going to the defendant's apartment

16  to pay him.  Where was his apartment?

17  A.   In Queens.

18  Q.   What neighborhood?

19  A.   Howard Beach, either Howard Beach or Ozone Park.

20  Q.   At the time you were with the defendant, did you ever

21  start hanging out with the people in his crew?

22  A.   No.

23  Q.   Over the 13 or 14 years that you were with him, how many

24  times did you go out to dinner with the defendant?

25  A.   Three times, two, three times.

1  Q.   When was the first time?

2  A.   Three times I went with him.  We went to Vida Loca once

3  for dinner.  We went to Carosella's twice.

4  Q.   Carosella's twice?

5  A.   Yes.

6  Q.   When was the first time you went to diner with him?

7  A.   I think Vida Loca.

8  Q.   What year was that?

9  A.   Late '90s.

10 Q.   So you didn't go out to dinner with the defendant until

11 seven, eight years after you started reporting to him?

12 A.   Yes.

13 Q.   When was the last time you went to diner with him?

14 A.   Carosella's.

15 Q.   What was the occasion?

16 A.   He was going to prison.

17 Q.   Did there come a time when you were on record with the

18 defendant that you got married?

19 A.   Yes.

20 Q.   What year?

21 A.   1993.

22 Q.   You'd been on record with him for a couple of years at

23 that point?

24 A.   Yes.

25 Q.   Did you invite the defendant to your wedding?

1   A.   Yes.

2   Q.   You just testified the first time you ever went out with

3   the defendant was years later, is that right?

4   A.   Yes.

5   Q.   Fair to say you didn't regularly socialize with him?

6   A.   Never.

7   Q.   Why did you invite him to your wedding?

8   A.   Because I was with him and out of respect.

9   Q.   Did you invite anyone else in his crew?

10  A.   No, I gave him a table.  He said to give him a table

11  with whoever he was going to invite in his crew.

12  Q.   Did you get him a table?

13  A.   Yes.

14  Q.   Did he attend?

15  A.   Yes.

16  Q.   Did he bring anyone with him?

17  A.   Yes.

18  Q.   Who?

19  A.   Joe Panzarella, Kevin McMahon, Frank Rodicci, Johnny

20  Borelli, and I think a couple others.

21  Q.   John Borelli, you mentioned him before.

22       Who was he?

23  A.   He was with Charles.

24  Q.   An associate?

25  A.   Yes.

1   Q.   What about Frank Rodicci?

2   A.   He was with Charles at that time as well.

3   Q.   Did you invite Michael Reiter to the wedding as well?

4   A.   Yes.

5   Q.   Did he attend?

6   A.   Yes.

7   Q.   Where did the wedding take place?

8   A.   The Sands in Atlantic beach.

9   Q.   The Sands?

10  A.   The Sands in Atlantic beach.

11  Q.   Was there a reception after the wedding?

12  A.   Yes.

13  Q.   Was the reception videotaped?

14  A.   Yes.

15  Q.   Who videotaped the reception?

16  A.   A hired videographer, I don't know.

17  Q.   Did you have give any special instructions to that

18  person?

19  A.   He was to stay away from Charles' table.

20  Q.   Why?

21  A.   Because my understanding was that --.

22        MS. SHARKEY:  Objection.

23        THE COURT:  Sustained.

24        MR. NORRIS:  If it's objectionable, can I ask it one

25  more time, and if it's objectionable --.

1          THE COURT:  You can ask a question.

2    Q.   Were you the one that asked the videographer not to film

3    the defendant's table?

4          MS. SHARKEY:  Objection.

5          THE COURT:  Were you instructed by anybody to do

6    that?

7          THE WITNESS:  I was told that you don't videotape

8    mobsters.

9          THE COURT:  Who told you that?

10          THE WITNESS:  It was just known.  Actually, my

11    brother-in-law had a mob wedding and he had actually had told

12    me.

13          THE COURT:  I'll allow it.

14    Q.   The defendant didn't tell you not to videotape his

15    table, correct?

16    A.   No.

17    Q.   You just decided to do it on your own?

18    A.   Yes.

19    Q.   And was the videographer successful in avoiding the

20    defendant?

21    A.   No.

22    Q.   Was there ever a shot of the defendant's table?

23    A.   No, it was a shot of him walking by.

24    Q.   Have you given a videotape of your wedding to the

25    government?

1  A.   Yes.

2  Q.   What form was the video in when you gave it to the

3  government?

4  A.   A VCR tape.

5  Q.   Prior to the trial, did you watch a short excerpt from

6  that tape?

7  A.   Yes.

8  Q.   I'm showing you what has been marked for identification

9  as Government's Exhibit 321.

10        Do you recognize that?

11  A.   Yes.

12  Q.   That is the excerpt that you watched?

13  A.   Yes.

14        MR. NORRIS:  We offer it.

15        THE COURT:  Admitted.

16        (So marked in evidence Government's Exhibit 321.)

17        MR. NORRIS:  It's a very short one minute tape.  Can

18  we publish it now to the jury?

19        THE COURT:  You may.

20        MR. NORRIS:  Your Honor, permission to play it from

21  the laptop instead of from the DVD.

22        THE COURT:  I don't care how you play it as long as

23  the jury can see it.

24  Q.   As it takes, can you see it?

25  A.   Yes.

1  Q.   Explain who is in it.

2       (Whereupon, a videotape was played.)

3  A.   That's myself and Michael Reiter.

4  Q.   Michael Reiter is up there with you?

5  A.   Yes.

6  Q.   This is The Sands in Atlantic beach?

7  A.   Yes.

8  Q.   Is there anyone in this clip or the next clip that you

9  recognize, anyone relating to the defendant and what we were

10 discussing today?

11 A.   There is Charles Carneglia and Frank Rodicci.

12 Q.   That was the defendant walking by in sunglasses at your

13 wedding?

14 A.   Yes.

15 Q.   With Frank Rodicci walking behind him?

16 A.   Yes.

17 Q.   Did you ever know the defendant to come to a sitdown

18 armed?

19 A.   No.

20 Q.   Have you ever seen the defendant carry a gun?

21 A.   No.

22 Q.   Have you ever seen him with any other kind of weapon?

23 A.   Yes.

24 Q.   What?

25 A.   A blackjack.

1    Q.    What is a blackjack?

2    A.    A blackjack is a leather banded weapon with a piece of

3    metal inside it with a handle.

4    Q.    Do you know what you are supposed to do with it?

5            MS. SHARKEY:  Objection.

6            THE COURT:  I think we've had that in evidence

7    already.

8    Q.    Where did you see the defendant with a blackjack?

9    A.    In his car.

10   Q.    What kind of car did he have?

11   A.    A Pontiac Bonneville.

12   Q.    Where exactly was the blackjack?

13   A.    In sort of like the center right here, next to his seat.

14   Q.    Did you ever see him use it?

15   A.    No.

16   Q.    Let's go back to Michael Reiter for a moment.

17          Was anyone else in his family affiliated with organized

18   crime?

19   A.    Yes.

20   Q.    Who?

21   A.    His father and his brother.

22   Q.    What were their names?

23   A.    Mark and Greg Reiter.

24   Q.    Which one was his brother?

25   A.    Greg Reiter.

1  Q.  What family were they affiliated with?

2  A.  The Gambino Family.

3  Q.  What was the rank?

4  A.  Associates.

5  Q.  Who were they with?

6  A.  John Carneglia, Angelo Ruggiero.

7  Q.  Were you close to Mark and Greg?

8  A.  I met Mark once or twice and Greg, I was friendly with.

9  Q.  Is Greg still alive?

10  A.  No.

11  Q.  What happened to him?

12  A.  He was murdered.

13  Q.  When?

14  A.  In the late '80s.

15  Q.  Who killed him?

16  A.  Michael Reiter told me that Tommy Karate's crew killed

17  him.

18  Q.  Who is Tommy Karate?

19  A.  A Bonanno mobster.

20  Q.  Did Michael Reiter tell you why Tommy Karate and his

21  crew killed Greg Reiter?

22      MS. SHARKEY:  Objection--withdrawn.

23  A.  Over a drug dispute.

24  Q.  Explain what he told you?

25  A.  Michael Reiter had owed--I mean--one of Tommy Karate's

1   crew members owed Greg Reiter $80,000 and Greg was I guess

2   threatening him and then he got on the phone when Tommy

3   Karate called him and was disrespectful to him as well.

4   Q.   Did Michael tell you what Greg told Tommy Karate?

5   A.   Yes.

6   Q.   What?

7   A.   He said you are not a gangster, you are a prankster.

8   Q.   Then Greg Reiter was killed?

9   A.   Yes.

10  Q.   Who was the member of Karate's crew who owed Greg the

11  money?

12  A.   A guy named Harrigan.

13  Q.   Harrigan?

14  A.   Harrigan.

15  Q.   Was that his last name?

16  A.   Yes.

17  Q.   What happened to Harrigan?

18  A.   He was murdered.

19  Q.   By who?

20  A.   Michael Reiter and Franky Mariconda.

21  Q.   How do you know?

22  A.   Michael Reiter told me.

23  Q.   This happened before or after you began reporting to the

24  defendant?

25  A.   After.

1  Q.   When did Michael Reiter tell you that he and Franky

2  Mariconda had killed Harrigan?

3  A.   I believe later that day.

4  Q.   Later the day it happened?

5  A.   Yes.

6  Q.   Had you previously known that Michael Reiter had wanted

7  to kill Harrigan?

8  A.   Yes.

9  Q.   How did you know?

10        MS. SHARKEY:  Objection.

11        THE COURT:  I'll allow it.

12  A.   He told us, he told me.

13  Q.   Had he ever asked you for help?

14  A.   Yes.

15  Q.   When?

16  A.   About a year prior.

17  Q.   What did he ask you to do?

18  A.   If I would go with him to kill Michael Harrigan.

19  Q.   Did he offer you any money?

20  A.   No.

21  Q.   What did you say when Michael Reiter asked you if you

22  would help him kill Harrigan?

23  A.   I said:  Mike, I'm not a murderer, I'm a businessman.

24  Q.   You didn't do it?

25  A.   What?

1   Q.   You didn't do it?

2   A.   No.

3   Q.   Do you know if Michael Reiter ever asked anyone else for

4   help?

5   A.   Yes.

6   Q.   Who did he tell you that he asked?

7   A.   He told me he asked Franky Mariconda for help.

8   Q.   Did he ever ask anyone else before that?

9   A.   I believe he asked a few people.

10  Q.   Who?

11          MS. SHARKEY:  Objection.

12          THE COURT:  Find out how he found this out.

13  Q.   How did you find out who else Michael Reiter asked to

14  help him kill Harrigan?

15  A.   He told me.

16  Q.   Who did he tell you that he told?

17  A.   Peter Zuccaro.

18  Q.   Anyone else?

19  A.   John Alite.

20  Q.   Anyone else?

21  A.   I'm not sure.

22  Q.   Michael Reiter told you that he at one point asked Peter

23  Zuccaro for help in killing Harrigan?

24  A.   Yes.

25  Q.   And John Alite?

1    A.   Yes.

2    Q.   Did he tell you whether they agreed to get involved?

3    A.   They didn't agree.

4    Q.   Did Michael Reiter tell you where he and Franky

5    Mariconda killed Harrigan?

6    A.   Yes.

7    Q.   Where?

8    A.   Outside of New Park Pizza.

9    Q.   Did he say how they killed him?

10   A.   Yes.

11   Q.   What did he say?

12   A.   He said that they waited on him for a while and that

13   they saw him on a pay phone, Michael Reiter walked up to him,

14   shot him in the face and then Franky Mariconda finished him

15   off with whatever he did, a few shots.

16   Q.   Where were you when Michael Reiter told you that he and

17   Mariconda had killed Harrigan?

18   A.   In my apartment sleeping in Manhattan.

19   Q.   Where were you when he told you that he killed him?

20   A.   I was on a street in Brooklyn in I think it's

21   Bensonhurst.

22   Q.   Bensonhurst?

23   A.   Yes.

24   Q.   Who else was there?

25   A.   Me, my friend Jeff and Michael Reiter.

1   Q.   Why was your friend Jeff there with you?

2   A.   He drove me to go meet Michael Reiter.

3   Q.   What was in Bensonhurst?

4   A.   It was about a block and a half from a guy named Danny's

5   club.

6   Q.   Who is Danny?

7   A.   Danny Fama.

8   Q.   Who was he?

9   A.   An associate in the Gambino Family.

10  Q.   Who was Franky Mariconda?

11  A.   He was friendly with Danny Fama.

12  Q.   Whose crew were they in?

13  A.   Sammy The Bull.

14  Q.   Do you know his real name?

15  A.   Sammy Gravano.

16  Q.   What was his rank in the family?

17  A.   Underboss.

18  Q.   Did Michael Reiter tell you how he came to be in

19  Bensonhurst that day?

20  A.   Yes.  He said that after they killed him, that Franky

21  drove him back to Bensonhurst.  I believe Franky lived there.

22  Q.   How did you come to meet them in Bensonhurst that day?

23  A.   He called me at my house that day and said come meet him

24  in Brooklyn.

25  Q.   And you went and took Jeff with you?

1   A.   Yes, I called him back, I says:  It will be all right,

2   just come meet me.  I called my Jeff.  He came and picked me

3   up.  We went to go meet him.

4   Q.   What time was day was this?

5   A.   We probably got there around 12:00, maybe 1:00.  I'm not

6   sure.

7   Q.   Where did you go after--?

8          THE COURT:  Is that a.m., p.m.?

9          THE WITNESS:  In the noon.

10  Q.   Where did you go after Michael Reiter told you what had

11  happened?

12  A.   He asked us could we give him a ride back to his car.

13  Q.   Did he say where his car was?

14  A.   In Queens.

15  Q.   Did he say why he needed a ride back to Queens?

16  A.   He left his car there.

17  Q.   Where?

18  A.   On Cross Bay Boulevard.

19  Q.   Where?

20  A.   In front of a Chinese place on Cross Bay Boulevard very

21  close to New Park Pizza.

22  Q.   Near New Park Pizza?

23  A.   Yes.

24  Q.   What was going through your mind when Michael Reiter

25  asked you to come and take him to pick up his car?

1          MS. SHARKEY:  Objection.

2          THE COURT:  I'll allow it.

3    A.   Fear.

4    Q.   Did you ever have a subsequent conversation with Michael

5    Reiter about the murder?

6    A.   Yes.

7    Q.   Where?

8    A.   In the city.

9    Q.   Manhattan?

10   A.   Yes.

11   Q.   Where?

12   A.   At a bar in the city, I believe it was 57th Street.

13   Q.   What did he tell you about the murder in that

14   conversation?

15   A.   He told me that he ran into Franky Mariconda, Franky

16   told him he was broke that he needed to make $10,000 and

17   Michael goes here, let's do this.

18   Q.   So here is what?

19   A.   He said okay, give him $10,000 to go kill Harrigan with

20   him.

21   Q.   He agreed to go kill Harrigan with Reiter for $10,000?

22   A.   Yes.

23   Q.   Were you still with Michael Reiter--withdrawn.

24        You testified earlier that you were already reporting to

25   the defendant at the time that Michael Reiter told you about

1  this murder, correct?

2  A.    Yes.

3  Q.    How did Michael Reiter react when you found out you were

4  reporting to defendant and no longer were going to be

5  affiliated with him?

6  A.    Very angry.

7  Q.    Did you ever have a conversation with him about it?

8  A.    Yes.

9  Q.    Did he tell you how he knew that you were now on record

10  with the defendant?

11  A.    Yes.

12  Q.    How?

13  A.    He told me Peter Zuccaro told him.

14  Q.    What did Michael Reiter tell you that Peter Zuccaro told

15  him?

16          MS. SHARKEY:  Objection.

17          THE COURT:  I'll allow it.

18  A.    He basically told him verbatim my conversation that I

19  had with Charles, that I was not going to give him $500 a

20  week, that I was going to give him $400 a week because things

21  were slow and that conversation.

22  Q.    What did Michael Reiter say to you after he told you

23  what he had heard from Peter Zuccaro?

24  A.    He told me:  Don't you think my family could use the

25  money, and it was in a threatening manner, that I'm going to

1  talk to his father and I'm going to do what they say.

2  Q.   What did you say?

3  A.   I said no problem, I just don't want to be bothered.

4  Q.   Where were you when you were talking to him?

5  A.   Inside his car.

6  Q.   How were you feeling?

7  A.   Terrified.

8  Q.   This is after the murder of Harrigan?

9  A.   Yes.

10 Q.   Did you ever find out if Michael did talk to his father?

11 A.   Yes.

12 Q.   How?

13 A.   I called him several days later and I asked him, I told

14 him:  Listen, I know you a long time, I don't want any

15 problems, whatever you want me to do.  And he said:  Do

16 worry, I spoke to my father.  Leave it alone.

17 Q.   So you stayed with the defendant?

18 A.   Yes.

19         THE COURT:  How much longer are you going to be?

20         MR. NORRIS:  About 45 minutes, judge.

21         THE COURT:  Why don't we take a break now.

22         (Jury out at 2:07 p.m.)

23         THE COURT:  Thank you.

24         10 minutes, please.

25         (Recess.)

Adams/Direct/Norris

(Continued on next page.)

1    THE COURT:  We have an updated government exhibit

2  list which will be marked Court Exhibit 2 of today's date.

3    (So marked Court Exhibit 2 in evidence.)

4    (Jury in at 2:30 p.m.)

5    (Witness resumes the stand.)

6  DIRECT EXAMINATION (Continued)

7  BY MR. NORRIS:

8  Q.   Now, you testified before that in addition to the

9  gambling business, you were also involved in a marijuana

10  business with Michael Reiter, is that correct?

11  A.   Yes.

12  Q.   Could you please keep your voice up.

13  A.   Yes.

14  Q.   Were you ever involved in a marijuana business with

15  anyone else?

16  A.   Yes.

17  Q.   Who?

18  A.   Jonathan Winston.

19  Q.   Was Winston affiliated with organized crime?

20  A.   No.

21  Q.   Who else was involved in your marijuana with Jonathan

22  Winston?

23  A.   Chris McMahon, a guy named Vincent Merald.

24  Q.   Who was Vincent Merald?

25  A.   He was a distributor who gave Winston the marijuana.

1   Q.   Where did he live?

2   A.   Arizona.

3   Q.   What was your part in the marijuana business?

4   A.   Introducing dealers.

5   Q.   To who?

6   A.   To Winston.

7   Q.   What quantities did you deal in?

8   A.   Pounds.

9   Q.   You said before that you were involved in the business

10  from about 1991 to 1994, is that correct?

11  A.   Yes.

12  Q.   That was the same period that you were in the gambling

13  machine business?

14  A.   Yes.

15  Q.   You made about a million dollars from selling marijuana?

16  A.   Yes.

17  Q.   Did you ever tell the defendant about your marijuana

18  business?

19  A.   No.

20  Q.   Why not?

21  A.   I thought I could get hurt or extorted more.

22  Q.   Now, from what you testified before--withdrawn.

23       Why did you think you might get hurt if you told him?

24       MS. SHARKEY:  Objection.

25       MR. FARBER:  Objection.

1        THE COURT:  It's already in.  I'll allow it to

2   continue.

3   A.   We weren't allowed to deal drugs.

4   Q.   From what you testified to before, it appears that the

5   rule against drug dealing is broken fairly openly in

6   organized crime, is that fair to say?

7   A.   Yes.

8   Q.   And the defendant's brother and John Gotti's brother

9   Gene Gotti were both captains and they both broke the rule,

10  correct?

11  A.   Yes.

12  Q.   Did the defendant ever ask you if you were dealing

13  drugs?

14  A.   Yes.

15  Q.   How did that come about?

16       MS. SHARKEY:  Objection.

17       THE COURT:  I'll allow it.

18  A.   Chris McMahon was arrested for marijuana distribution

19  and Charles had found out about it and he approached me to

20  see if I got in trouble on that case.

21  Q.   Where were you when you talked to him about it?

22  A.   At Phil's bait shop.

23  Q.   At the bait shop?

24  A.   Yes.

25  Q.   What did you tell him when the defendant asked if you

1  too had gotten in trouble?

2  A.   I told him I did not.

3  Q.   Did he appear to believe you?

4        MS. SHARKEY:  Objection.

5        THE COURT:  You may answer.

6  A.   He asked for proof, an article that was written.

7  Q.   There was an article?

8  A.   Yes.

9  Q.   From what?

10  A.   In a local paper regarding the arrest.

11  Q.   He asked you to bring him an article to prove that Chris

12  McMahon had been arrested but you hadn't?

13  A.   Yes.

14  Q.   Did you bring him the article?

15  A.   Yes.

16  Q.   After you showed him the article, did the defendant

17  leave you alone?

18  A.   Yes.

19  Q.   Why did you ultimately stop dealing marijuana?

20  A.   I went into the brokerage business, the stock brokerage

21  business.

22  Q.   Now, you've testified to a number of sit-downs the

23  defendant attended on your behalf relating to the gambling

24  machine business.

25        Is that correct?

1   A.   Yes.

2   Q.   Did the defendant--withdrawn.

3        Did you ever ask the defendant to attend any sit-downs

4   relating to your brother Greg?

5   A.   Yes.

6   Q.   What happened?

7   A.   He had a fight.

8        (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Adams-direct/Norris

1  DIRECT EXAMINATION (Cont.'d)

2  BY MR. NORRIS:

3  Q.   Who?

4  A.   My brother Greg had a fight with some individuals in a

5  nightclub.

6  Q.   Where?

7  A.   In the Hamptons.

8       And then he had another fight with the same people in a

9  bar in the city.  After that fight I went to Charles to see

10  if he could just end it, tell them to leave my brother alone.

11  Q.   Did he agree?

12  A.   Yes.

13  Q.   What did he do?

14  A.   He went to go meet the -- a couple of the kids who were

15  involved with the fight with my brother and the individual

16  they were with.

17  Q.   Did you have an understanding as to who that individual

18  was that they were with?

19  A.   Yes.

20       MS. SHARKEY:   Objection.

21       THE COURT:  I will allow it.

22  Q.   Who?

23  A.   A guy named Brody.

24  Q.   Was he affiliated with organized crime?

25  A.   I believe he was with the Genovese family.

1   Q.   Did the defendant actually attend a sit-down with that

2   individual?

3   A.   Yes.

4   Q.   Did you attend?

5   A.   No.

6   Q.   Did your brother attend?

7   A.   Yes.

8   Q.   Did your brother tell you what happened?

9   A.   Yes.

10   Q.   What happened?

11        MS. SHARKEY:  Objection.

12        THE COURT:  I will allow it.

13   Q.   You may answer.

14   A.   That they had sat down and Charles spoke to Brody and

15   basically they were supposed to stay away from each other, to

16   leave each other alone, not to fight.

17   Q.   The defendant told Brody to leave your brother alone?

18   A.   Told him that his people with him should leave my

19   brother alone.

20   Q.   Did that settle the problem?

21   A.   No.

22   Q.   What happened?

23   A.   They jumped my brother again.

24   Q.   Did you ask the defendant to get involved again?

25   A.   Yes.

1  Q.   Did he?

2  A.   Yes.

3  Q.   What happened?

4  A.   He went to go see Brody and I believe the individuals

5  who did it and it was straightened out.

6  Q.   Did they leave your brother alone after that?

7  A.   Yes.

8  Q.   Now, did there come a time when you stopped making money

9  from both the gambling machines and the marijuana business

10 and began making money a different way?

11 A.   Yes.

12 Q.   When did that occur?

13 A.   1995.

14 Q.   What was the new work you began doing?

15 A.   I worked at a stock brokerage firm, boiler room.

16 Q.   Was it First United Equities that you talked about

17 earlier?

18 A.   Yes.

19 Q.   Whose firm was it?

20 A.   Jonathan Winston and Jason Cohen.

21 Q.   Jonathan Winston was the individual you were in the

22 marijuana business with as well?

23 A.   Yes.

24 Q.   How did it come about that you joined First United?

25 A.   They were opening a firm and he asked me to get

1   involved.

2   Q.   What was to be your stake in the firm?

3   A.   12-and-a-half percent.

4   Q.   Did you agree to get involved?

5   A.   Yes.

6   Q.   Did you invest any money in First United?

7   A.   Yes.

8   Q.   How much?

9   A.   500,000.

10  Q.   Did you have other money invested with Winston at that

11  point.

12  A.   Yes.

13  Q.   What?

14  A.   A million two.

15  Q.   What was he doing with that money?

16  A.   He had it in some type of land real estate deal on Long

17  Island.

18  Q.   So, it was a million two plus the 500,000 you invested

19  directly in First United?

20  A.   He directed it because he had the money.

21  Q.   And that's 1.7 million total, correct?

22  A.   Yes.

23  Q.   How did he come to have $1.7 million of your money?

24  A.   Through the marijuana business and the gambling money.

25  Q.   Had he never paid you?

1  A.   Never paid me.

2  Q.   He never paid you from both businesses or only one?

3  A.   The marijuana.  The gambling money I had given to him

4  periodically.

5  Q.   Did you have a specific return in mind you were hoping

6  to make on your investment in First United?

7  A.   No.  We were just looking to build a big business.

8  Q.   Did you get a salary?

9  A.   Yes.

10  Q.   What?

11  A.   10,000 a month.

12  Q.   Did you receive commissions as well?

13  A.   No.

14  Q.   Bonuses?

15  A.   No.

16  Q.   Now, at the outset of your joining First United, what

17  were your responsibilities supposed to be?

18  A.   Recruit brokers.

19  Q.   And at any point did you also buy and sell stocks

20  yourself?

21  A.   Yes.

22  Q.   Did you need a license to do that?

23  A.   Yes.

24  Q.   What is the license called?

25  A.   A Series 7.

1  Q.  Who issues the Series 7 license?

2  A.  NASDAQ, Securities and Exchange Commission.

3  Q.  NASDAQ or the Securities and Exchange Commission?

4  A.  Yes.

5  Q.  How do you get a Series 7 license?

6  A.  You go to take a test.

7  Q.  Did you take the test?

8  A.  No.

9  Q.  How did you come to get the license if you didn't take

10  the test?

11  A.  I paid somebody to take it for me.

12  Q.  Who?

13  A.  Guy named Dave Schwartzberg.

14  Q.  Is that illegal?

15  A.  Yes.

16  Q.  You testified that your role in First United initially

17  was recruiting other brokers.  Did that role change over

18  time?

19  A.  Yes.

20  Q.  How soon?

21  A.  Shortly.

22  Q.  When you first began working for First United, did you

23  think that the firm made money legitimately or

24  illegitimately?

25  A.  Legitimately.

1  Q.   Legitimate?

2  A.   When I first started, yes.

3  Q.   Did your views subsequently change?

4  A.   Almost immediately.

5  Q.   What changed your view?

6  A.   I realized that it was just a manipulation and a pump

7  and dump.

8  Q.   It was a boiler room?

9  A.   It was a blatant boiler room.

10 Q.   And again explain to the jury what happens in a boiler

11 room?

12 A.   In a boiler room you have a group of individuals

13 basically all working together and hide sales tactics to have

14 investors buy only the house stocks, only the stocks that

15 they can make the most commission in in order to manipulate

16 the stock price higher so they could either sell their stock

17 or we could sell the trading desk stock at a big profit or

18 they can make commissions and the firm can make their money.

19 The stock in essence is worthless and being pumped up on hot

20 air basically.

21 Q.   What is a house stock?

22 A.   Stocks that we cared about, stocks that we had a vested

23 interest in getting higher.

24 Q.   When you say "we cared about"you mean First United?

25 A.   Firm, yes.

1   Q.   Why didn't other investors outside of First United care

2   about First United house stock?

3           MS. SHARKEY:   Objection.

4           THE COURT:  I will allow it.

5   A.   Because they were deals that we did basically of small

6   cap stocks which don't make money, the companies do not make

7   money and they're grossly overvalued.  Meaning if they're

8   trading at five or $10, they're probably worth 10 cents or 20

9   cents.

10  Q.   Are some of the companies that are -- withdrawn.

11          Do house stocks represent investments in real companies?

12  A.   Yes.

13  Q.   Are they profitable companies?

14  A.   No.

15  Q.   So, their only purpose, is it fair to say -- withdrawn.

16          The only purpose of the house stock is it fair to say is

17  to make money for the firm that has the interest in it?

18  A.   Yes.

19  Q.   When you realized First United was involved in pump and

20  dump schemes, did you decide to stay with the firm or did you

21  leave?

22  A.   I stayed.

23  Q.   Even though it was making illegal profits through fraud?

24  A.   Yes.

25  Q.   When you first joined First United was it backed by

1  organized crime?

2  A.   No.

3  Q.   Did you come to learn whether organized crime more

4  generally was involved in the securities field at that time?

5  A.   Yes.

6  Q.   How so?

7  A.   It was word and rumors going around that the small

8  boiler rooms all had a mobster behind them.

9  Q.   Was that your experience?

10  A.   Yes.

11  Q.   Did you start to realize that your organized crime

12  connection would become useful to the business?

13  A.   Yes.

14  Q.   Did there come a time that you asked the defendant for

15  assistance in resolving a dispute which arose while you

16  worked at First United?

17  A.   Yes.

18  Q.   Can you describe in general terms to the jury what kind

19  of problems First United had that required assistance?

20  A.   During a manipulation you're trying to get stock as high

21  as possible.  There are certain other individuals who try to

22  sell the stock where they want to get it lower.  You're

23  making your money if the stock goes as high as possible and

24  they're make the money if the stock goes to zero, where it

25  belongs.

Adams-direct/Norris

1    There were certain individuals who would short sell the

2  stock in order to cover it and buy it back at very, very

3  cheap prices where it belongs.

4  Q.    You used the term "short seller;" is that right?

5  A.    Yes.

6  Q.    Is it fair to say a short seller is the enemy of a firm

7  trying to engage in a pump and dump scheme with the house

8  stock?

9  A.    Yes.

10  Q.    Why is that?

11        THE COURT:  You better have him define a short

12  seller, please.

13  Q.    Can you define a short seller please?

14  A.    A short seller is an individual who sells the stock in

15  the security that the firm, the boiler room is trying to pump

16  up.  They sell the stock without in essence having it, so

17  they're just selling say 100,000 shares of stock that they

18  don't have at $8 and hoping it goes down to $1, where they

19  can capture the seven dollar spread in between and buy back

20  the stock in the open market and lock in the profit.

21  Q.    What was your understanding as to why a short seller

22  might think a house stock was going to drop in price?

23  A.    Because they all did.

24  Q.    Aside from problems with short sellers, what other types

25  of problems did First United start to have that you thought

1  would require the assistance of defendant?

2  A.   We had three goons come to the office one time

3  threatening brokers who had left our firm and gone to theirs.

4  Q.   Why did they come to threaten you, if the brokers had

5  already left?

6  A.   I guess somebody in our firm maybe -- I don't know the

7  exact story.  Someone in our firm had words with them or was

8  trying to keep the book of business at the firm, at the

9  boiler room, keep the book of business here instead of them

10  taking it with them.

11  Q.   Was the issue that brokers had left First United or was

12  the issue brokers had left First United and taken their

13  investments with them?

14  A.   That they had taken their investments with them.

15  Q.   Why would that be problematic if a broker left First

16  United and took the investment with them?

17  A.   Because if they take their investments with them and go

18  to the other firm, they will sell all the investments, the

19  stocks, to our firm at a grossly overpriced rate.  The firm

20  did not have the money to buy the stocks at that ridiculous

21  rate, so, in essence, it would destroy the manipulation.  The

22  stocks would go from ten to down to practically nothing.

23  Q.   So, if a broker at First United had some of his clients

24  investing in First United's house stocks and left to go to a

25  different brokerage, what was your understanding as to what

1  would happen when that broker would go to that new firm?

2  A.   He would try his best to sell our stocks at whatever he

3  could get.

4  Q.   Why wouldn't they simply hold onto the house stocks?

5  Were they considered their house stocks in the new firm?

6  A.   No.   There was only one person who cared about the house

7  stocks.   It was First United Equities.

8  Q.   Now, did the dispute that the defendant became involved

9  in involve particular stocks?

10  A.   Yes.

11  Q.   Which stock?

12  A.   Ashton Technologies, National Medical Financial, and

13  Mama Tish.

14  Q.   And Mama Tish?

15  A.   Yes.

16  Q.   And did those disputes eventually result in sit-downs?

17  A.   Yes.

18  Q.   Was the defendant involved in all three?

19  A.   Yes.

20  Q.   Were any other members of the Gambino family involved in

21  any of those sit-downs related to those three stocks?

22  A.   Yes.

23  Q.   Who?

24  A.   Lenny DiMaria.

25  Q.   Again, who's Lenny DiMaria?

1  A.   Captain in the family.

2  Q.   And which stocks did the sit-downs that Lenny DiMaria

3  got involved in relate to?

4  A.   National Medical and Ashton Technologies.

5  Q.   He wasn't involved in the Mama Tish sit down?

6  A.   No.

7  Q.   Now, apart from the sit-down the defendant attended

8  relating to the three stocks, did he ever attend any other

9  sit-downs for you relating to your work in the securities

10 field?

11 A.   Yes.

12 Q.   Which stock?

13 A.   Ashton Technologies.

14 Q.   Any other stocks -- let me ask it again.

15     Apart from the sit-downs relating to Ashton

16 Technologies, Mama Tish and National Medical Financial, did

17 the defendant ever attend any other sit-downs for you

18 relating to your work in the securities field?

19 A.   No.

20 Q.   Let's start with National Medical Financial.  What kind

21 of company was that?

22 A.   It was a medical billing company.

23 Q.   Did it actually exist?

24 A.   Yes.

25 Q.   Was it profitable?

1    A.    No.

2    Q.    Was it one of First United's house stocks?

3    A.    Yes.

4    Q.    Was it overvalued?

5    A.    Yes.

6    Q.    A lot?

7    A.    Grossly overvalued.

8    Q.    How did National Medical come to be one of First

9    United's house stocks?

10   A.    We participated in an offering with one of the owner's

11   friends who had bought out the company and he had given First

12   United a piece.

13   Q.    How much?

14   A.    Ten percent.

15   Q.    Anything illegal about that?

16   A.    No.

17   Q.    What did First United do once it had the ten percent?

18   A.    Continued to buy it aggressively to in essence own the

19   whole float and dominate the price.

20   Q.    What does the word "float" mean?

21   A.    Amount of shares outstanding.  Once they buy all the

22   shares outstanding they can control the price.

23   Q.    And why would it be profitable to own all of the shares

24   of the company like National Medical?

25   A.    Then they can manipulate it to higher levels or wherever

1   they wanted it and basically control the commissions.

2   Q.   And once the price is manipulated, who would the stock

3   get sold to?

4   A.   Unsuspecting investors, public.

5   Q.   Whose investors?

6   A.   The firm's brokers.

7   Q.   The firm would sell it to its own investors?

8   A.   Yes.

9   Q.   Now, how did First United apart from acquiring the

10  stock, how did it manipulate the stock price of National

11  Medical?

12  A.   They bought the stock aggressively in the open market

13  and then they would not -- the brokers who had the stock were

14  not allowed to sell it.

15  Q.   Let's take a step back.

16       The firm has it in its account.  Did it then sell it to

17  its clients, has its clients invest in the company?

18  A.   Yes.

19  Q.   How would that be accomplished?

20  A.   The brokers would get on the phone and sell it to

21  unsuspecting investors who had no idea that the company was

22  basically worthless and they would try to have them buy as

23  much as possible from them.

24  Q.   It would be the existing clients or new clients?

25  A.   Both.

Adams-direct/Norris

1  Q.   What types of sales tactics were used to get a client to

2  buy a house stock like National Medical?

3  A.   High pressure sales tactics and, also, buying a

4  legitimate company like a -- any legitimate company and

5  immediately switching them over to the house stock.

6  Q.   Why would it help to first sell to a client stock in a

7  legitimate company?

8  A.   Give credibility, name recognition.

9  Q.   Again, if one of your brokers sold house stock to a

10  client, was the client allowed to sell it?

11  A.   No.

12  Q.   Were you a broker who would do this cold calling and

13  sell stocks -- house stocks to clients?

14  A.   No.

15  Q.   You were in charge of brokers that did?

16  A.   Yes.

17  Q.   What did you instruct your brokers to do once clients

18  bought these house stocks?

19  A.   Hold it.

20  Q.   So, how did the firm ultimately profit?

21  A.   By selling it to these investors at ridiculous prices

22  when they owned it cheaper.

23  Q.   And did they also take commissions, the brokers?

24  A.   Yes.

25  Q.   How much?

Adams-direct/Norris

1   A.   A lot.

2   Q.   Give the jury an example.

3   A.   Brokers made hundreds of thousands a year.

4   Q.   What about per share, what types of commissions would

5   the brokers receive?

6   A.   They can make a dollar, two dollars a share.

7   Q.   What is a normal commission for a legitimate stock?

8   A.   Three to six cents.

9   Q.   Did First United brokers give preferential treatment to

10  anyone?

11  A.   Yes.

12  Q.   Who?

13  A.   Themselves, friends, family and the trading account.

14  Q.   And the trading account?

15  A.   Yes.

16  Q.   What is the trading account?

17  A.   It is the firm's, in essence, bank account.

18  Q.   How did you treat yourselves and your friends

19  differently from how you treated First United's clients?

20  A.   With preferential treatment.

21  Q.   Was the goal to make money for yourself?

22  A.   Yes.

23  Q.   And to steal it from your clients?

24  A.   Yes.

25  Q.   Now, you mentioned another stock called Ashton

1  Technologies.  Which firm brought that stock public?

2  A.    First United Equities.

3  Q.    How?

4  A.    Through an IPO.

5  Q.    What is an IPO?

6  A.    Initial public offering.

7  Q.    What does that mean?

8  A.    Meaning that they gave the company money and registered

9  it to go public.

10  Q.    When did that occur?

11  A.     '96, '97 -- end of '96 I believe.

12  Q.    What kind of company was Ashton Technologies?

13  A.    It has an electronic trading device that matched buyers

14  and sellers anonymously.

15  Q.    Was it profitable?

16  A.    No.

17  Q.    Was it overvalued?

18  A.    Yes.

19  Q.    A lot?

20  A.    Grossly overvalued.

21  Q.    And what happened after Ashton Technologies' stock went

22  public?

23  A.    It attracted a short seller named John Fiero.

24  Q.    Before that happened did the price go up?

25  A.    Yes.

1   Q.   Was that the idea?

2   A.   Yes.

3   Q.   How did the price go up?

4   A.   Manipulation.

5   Q.   And what was First United's goal with respect to buying

6   up the stock after it went public?

7   A.   Sell it to unsuspecting investors.

8   Q.   Did things go according to plan?

9   A.   No.

10  Q.   What happened?

11  A.   Short seller named John Fiero started -- went on the

12  stock and started shorting the stock.

13  Q.   Again, in lay terms, that means he started betting the

14  price was going to fall ultimately?

15  A.   Yes.

16  Q.   What did that do to First United's ability to profit

17  from the IPO?

18  A.   It crippled its capability to make any money in that

19  security.

20  Q.   Who was John Fiero?

21  A.   He was a known short seller who was connected to the

22  mob.

23  Q.   What is the simplest way of explaining what a short

24  seller does?

25  A.   Short seller bets that the ridiculously overpriced stock

1  that is say $10 a share will wind up where it belongs in say

2  six months or a year's time at 50 cents and they'll sell it

3  at $10 and buy it back at 50 cents less than a year later.

4  Q.   You said he was connected to organized crime himself?

5  A.   Yes.

6  Q.   Who was he connected to?

7  A.   Philly Abramo.

8  Q.   Who is Phil Abramo?

9  A.   Captain in the DeCalvacante family.

10  Q.   That's the New Jersey based family you talked about

11  earlier?

12  A.   Yes.

13  Q.   Have you ever heard about Fiero putting any firms out of

14  business?

15  A.   Yes.

16  Q.   What firms?

17  A.   Hanover Sterling and I believe a couple of other boiler

18  rooms.

19  Q.   Did you decide to do something when he started short

20  selling Ashton Technologies'stock and interfering with the

21  IPO?

22  A.   Yes.

23  Q.   What?

24  A.   I had heard that he was friendly with a Gambino

25  associate in Queens so I went to Charles for help.

1  Q.   Who was that Gambino associate?

2  A.   Anthony Guarino.

3  Q.   What did you tell the defendant?

4  A.   I said that a guy named Fiero was shorting the stock who

5  is very friendly or had some sort of relationship with

6  Anthony Guarino, that if we did not get Fiero off the stock

7  that the manipulation cannot continue.

8  Q.   What did he agree to do, if anything?

9  A.   Help.

10 Q.   What did he do?

11 A.   He met with Anthony Guarino and then Anthony Guarino

12 told us he was with Philly Abramo.

13 Q.   Anthony Guarino said he was with Philly Abramo or Fiero

14 was?

15 A.   That John Fiero was with Phil Abramo.

16 Q.   And what happened next, after you found that out?

17 A.   Anthony Guarino set up a meeting for me and Charles to

18 meet with Philly Abramo in the city.

19 Q.   New York City?

20 A.   Yes.

21 Q.   Where is that?

22 A.   I believe a restaurant in Little Italy.

23 Q.   Do you recall what restaurant?

24 A.   No.  It was all the way downtown though.

25 Q.   Philly Abramo you said was a captain in the DeCalvacante

1  family?

2  A.   Yes.

3  Q.   Do you know where he worked?

4  A.   A brokerage firm in the city named Sovereign Equities.

5  Q.   That was an actual mobster who himself worked in a

6  brokerage firm?

7  A.   Yes.

8  Q.   Have you ever heard of another wise guy actually working

9  in a brokerage?

10  A.   No.

11  Q.   Who attended the meeting at the restaurant?

12  A.   Me, Charles, Phil Abramo, Anthony Guarino and I'm not

13  sure if Panzarella was there.

14  Q.   Did Fiero attend that meeting?

15  A.   No.

16  Q.   What happened at the meeting?

17  A.   We discussed the situation with Phil Abramo.

18  Q.   Did the defendant ask Abramo to do anything?

19  A.   Yes, if he could get Fiero off the stock.

20  Q.   What did Abramo say?

21  A.   He was noncommittal.

22  Q.   How did the meeting end?

23  A.   There wasn't a final resolution.  He didn't say whether

24  he was going to do it or not.  He said many people come to

25  him every day for this type of help.  He didn't say if he was

1  going to do it or not at that date.

2  Q.   After the sit-down did Fiero stop shorting the Ashton

3  Technologies stock?

4  A.   No.

5  Q.   How could you tell?

6  A.   His name was Fiero Brothers and it was on the box as a

7  market-maker in the security.

8  Q.   Explain what that means.

9  A.   There's market makers that trade the stock.  Say there's

10  ten on the stock, his name is Fiero Brothers and his name was

11  clearly on the stock if you went into the computer screen to

12  look that he was selling the stock.

13  Q.   So, you could see he, Fiero, was still heavily invested

14  in Ashton?

15  A.   Clearly.

16  Q.   What did you do when you saw Fiero wasn't stopping?

17  A.   I told Charles this and --.

18  Q.   The defendant?

19  A.   Yes.

20  Q.   What did he do?

21  A.   He instructed me to try to call Phil Abramo and see if

22  we can get another meeting.

23  Q.   Did you call Abramo?

24  A.   Yes.

25  Q.   What did he do?

Adams-direct/Norris

1   A.   He was sort of hemming and hawing like he doesn't know,

2   the guy really is not with him.  He was trying to be a little

3   distant like the guy is not with him.

4   Q.   Fiero wasn't with him?

5   A.   Yes.

6   Q.   That's the impression he tried to give you?

7   A.   Yes.

8   Q.   What did you do?

9   A.   I told Charles.

10  Q.   And what did the defendant do?

11  A.   He told me to go see Philly Abramo and to tell him if

12  he's not with him he'll take care of him.

13  Q.   Say the name so we understand who you're talking about.

14       What did the defendant say to you to do?

15  A.   Charles Carneglia told me to see -- go see Phil Abramo

16  and that if John Fiero, the short seller, was not with Phil

17  Abramo that he would take care of him.

18  Q.   What did you understand the defendant to mean by that he

19  would take care of it?

20            MS. SHARKEY:   Objection.

21            THE COURT:  I'll permit it.

22  Q.   You may answer.

23  A.   That he would use some type of violence to get him out

24  of the way.

25  Q.   Fiero?

1  A.   Yes.

2  Q.   What did you do?

3  A.   I told Phil Abramo what Charles said.

4  Q.   What did he do?

5  A.   He got on the phone and called Fiero's office.

6  Q.   What happened?

7  A.   He spoke to somebody at that office and said you better

8  get -- you better get off the stock or there's going to be a

9  problem.

10  Q.   How do you know that Abramo did that?

11  A.   I was standing there.

12  Q.   Then what happened?

13  A.   They got off the stock.

14  Q.   Immediately?

15  A.   Yes.

16  Q.   And did the stock price go back up?

17  A.   Yes.

18  Q.   And the manipulation continued?

19  A.   Yes.

20  Q.   Now, going back to National Medical, did there come a

21  time that a dispute arose with respect to National Medical

22  Financial Services?

23  A.   Yes.

24  Q.   Was that dispute after the one with Fiero over Ashton

25  Technologies?

1  A.   Yes.

2  Q.   What was the origin of the dispute over National

3  Medical?

4  A.   Three goons had come to our office threatening with some

5  brokers that -- about some brokers who used to work at First

6  United had come to them.

7  Q.   Where had the brokers that used to work at First United

8  gone to?

9  A.   Landmark Securities.

10  Q.   And who owned Landmark Securities?

11  A.   Eric Aronson.

12  Q.   And did he have any connections or affiliation with

13  organized crime?

14  A.   Yes.

15  Q.   With who?

16  A.   Ralphie Lombardi.

17  Q.   Who was Ralphie Lombardi?

18  A.   Captain in the Colombo family.

19  Q.   Who are the brokers that had left First United first and

20  gone to Landmark Securities?

21  A.   Guy named Kevin McPhee (ph.) and his brother and a guy

22  Howard Weinstein.

23  Q.   How was it they came to leave First United and end up at

24  Landmark Securities?

25  A.   They were recruited there.

1  Q.   Aronson recruited them away?

2  A.   Yes.

3  Q.   Were they important brokers at First United?

4  A.   Yes.

5  Q.   Why?

6  A.   They had a lot of assets on their management, meaning

7  they had a lot of house stocks in their book.

8  Q.   Did they have a lot of National Medical and Ashton

9  Technologies stocks?

10 A.   Yes.

11 Q.   Again, why would it be a problem for them to take those

12 assets and go to another firm?

13 A.   If they're taking those assets and went to Landmark

14 Securities, they would in essence sell the assets back to us,

15 whereas we would not be there to buy them because we didn't

16 have the capital to buy them and the stock would probably

17 wind up where it belongs, down significantly lower.  Say, if

18 it was at $7 or $8, down to maybe a dollar or $2, if they had

19 sold all those stocks.

20 Q.   Did you have an understanding as to whether Landmark

21 Securities was engaged in market manipulation the same way

22 First United was?

23 A.   Yes.

24 Q.   It wasn't that they didn't want to do the same thing

25 First United was doing, they just wanted to do it with

1  different stock?

2  A.   They wanted to take that capital and put it into

3  manipulation of their stocks.

4  Q.   Their own house stocks?

5  A.   Yes.

6  Q.   So, now, you mentioned three goons showed up.  What do

7  you mean?

8  A.   Three goons showed up at the door asking for the owner

9  of First United Jonathan Winston.

10  Q.   Were you there?

11  A.   Yes.

12  Q.   What did you do?

13  A.   We brought them into the office.  They -- they came into

14  our office, they shut the door and they proceeded to threaten

15  us.

16  Q.   What did they say?

17  A.   They would blow us up, blow me up and my family.

18  Q.   What did they want you to do?

19  A.   Leave the brokers that left us with them and not call

20  them.  I guess not bother them about the assets under

21  management that they had taken.

22  Q.   How did you respond -- withdrawn.

23       You said "three goons," what do you mean?

24  A.   Three guys who are big guys acting like gangsters,

25  threatening.

1  Q.   Did you know who they were?

2  A.   No.

3  Q.   How did you respond when they threatened to blow you and

4  your family up?

5  A.   I told them first they should do their homework, second,

6  to check 101st Avenue.

7  Q.   Did you tell them your name?

8  A.   Hunter.

9  Q.   And what did you mean by 101st Avenue?

10 A.   The club that Charles was with.

11 Q.   What club?

12 A.   101st Avenue club.

13 Q.   Where is it located?

14 A.   On 101st Avenue in Ozone Park.

15 Q.   Does it have another name?

16 A.   The Bergin Hunt and Fish.

17 Q.   Whose club is it?

18 A.   The Gottis.

19 Q.   Why didn't you just tell these goons directly that you

20 were with Charles Carneglia?

21 A.   It is not something to mention his name to get him in

22 trouble.

23 Q.   What did they say when you told them do their homework

24 and to go check by 101st Avenue?

25 A.   They were just like you're talking tough because you got

1  all these guys and they left.

2  Q.   They left?

3  A.   They left.

4  Q.   What happened next?

5  A.   Charles sent four or five or whatever amount of guys --.

6  Q.   I'll stop you right there.  Did you tell the defendant

7  what happened?

8  A.   Yes.

9  Q.   Did you ask him to do anything?

10  A.   I said I had a problem with these guys.  He said who is

11  the problem with, I gave the name.  He said what's the

12  address.

13  Q.   What name did you give him?

14  A.   Landmark Securities.

15  Q.   What else did you tell him?

16  A.   He asked for the address of the brokerage.

17  Q.   Did you ask him to do anything else?

18  A.   No.

19  Q.   What happened next?

20  A.   He sent some guys --.

21        MS. SHARKEY:   Objection.

22  Q.   How did you find out?

23        THE COURT:  I will allow it.

24  A.   Joe Panzarella had gone there with several guys and

25  started yelling and shaking the place up.

1  Q.   How did you find that out?

2  A.   He told me.

3  Q.   Who told you?

4  A.   Joe Panzarella.

5  Q.   What do you mean he started yelling and shaking the

6  place up?

7  A.   Yelling and threatening, you go into our place, you

8  don't know who you're messing with.

9  Q.   Did he leave any message?

10  A.   Left his beeper number.

11  Q.   What happened next?

12  A.   Vincent Dragonetti and Steve Iaria had come to me saying

13  that they had heard there was a problem.

14  Q.   Vincent Dragonetti -- I will stop you right there -- and

15  Steve Iaria were the individuals in the Brooklyn crew, Nicky

16  Corozzo's crew that you mentioned earlier; is that correct?

17  A.   Yes.

18  Q.   And did you know them at that point?

19  A.   I met Stevie maybe once.

20  Q.   Steve Iaria?

21  A.   Yes.

22  Q.   And this is before the time that you were doing

23  loansharking with him, correct?

24  A.   Yes.

25  Q.   And what happened when they came to you?

1  A.   They came to me and basically just to feel me out to see

2  who I was with and at the end of the conversation --

3  Q.   What do you mean feel you out, see who you were with?

4  A.   See if I was with anybody.

5  Q.   Okay.

6       What did you tell them when they asked you if you were

7  with anybody?

8  A.   I told them I'm with 101st Avenue.

9  Q.   What happened in the rest of the conversation?

10 A.   He said, Oh, Charlie.

11 Q.   He?

12 A.   Vinny Dragonetti said, Oh, Charlie, and then he knew.  I

13 didn't say yes or no, but he knew.

14 Q.   And what else did they say to you?

15 A.   He had said he was at a dinner with several people and

16 my name was passed to them on a piece of paper.

17 Q.   Who is "he"?

18 A.   Vincent Dragonetti.

19 Q.   And who did he have dinner with?

20 A.   Stevie Iaria, Nicky Corozzo, Lenny DiMaria, Mike Anoti

21 (ph.), Mario, Brother, Phil Abramo and Joe Waverly.  Maybe a

22 couple others.

23 Q.   There are a lot of names.  Phil Abramo, that's the

24 captain from the DeCalvacante family you previously had the

25 run-in with over the Fiero Brothers interfering with Ashton

1    Technologies?

2    A.    Yes.

3    Q.    And did Dragonetti and Iaria tell you what happened

4    after your name came up at the meeting?

5              MS. SHARKEY:    Objection.

6              THE COURT:    Overruled.

7    A.    They told me that they knew me, but they weren't sure

8    who I was with.

9    Q.    Who is "they"?

10   A.    Vinny Dragonetti and Steve Iaria were not sure who I was

11   with or if I was with anybody.

12   Q.    Was someone at the meeting familiar with who you were

13   with?

14   A.    Phil Abramo said he's with you guys.

15   Q.    Who was asking at that meeting who you were with?

16   A.    Joe Waverly.

17   Q.    Do you know who Joe Waverly was?

18   A.    A captain of the Colombo family.

19   Q.    Same family as Ralphie Lombardi?

20   A.    Yes.

21   Q.    The person that Eric Aronson at Landmark Securities is

22   with?

23   A.    Yes.

24   Q.    So, what happened next?

25             MS. SHARKEY:    Objection, foundation.

1    THE COURT:  I'll allow it.  Proceed, please.

2  A.   Charles -- Joey had been beeped by the people, Ralphie's

3  brother, a guy named Charlie and they went over there, Joe

4  Panzarella and Charles Carneglia went to that club to meet

5  them.

6  Q.   How did you learn that?

7  A.   Charles told me.

8  Q.   What happened?

9  A.   They apologized to Charles, he didn't know the place was

10  with him.

11  Q.    "The place," meaning First United?

12  A.   First United Equities was with him and they said that

13  Ralphie had had some type of surgery and that they would have

14  to get in touch with him.

15  Q.   Did Charles tell you what he said?

16  A.   No.

17  Q.   What happened next?

18  A.   Charles did not know Ralphie Lombardi so he was

19  introduced to him through Lenny DiMaria.

20  Q.   Why was it important that someone introduce the

21  defendant to Ralph Lombardi, a captain in the Colombo family?

22    MS. SHARKEY:   Objection.

23    THE COURT:  You may proceed.

24  A.   Charles told me that he cannot approach Ralphie Lombardi

25  because he doesn't know him, being he's a made guy he had to

1  be introduced and Lenny was friends with him.

2  Q.   So, did Charles -- withdrawn.

3       Did Lenny introduce Charles to Ralph Lombardi?

4  A.   Yes.

5  Q.   And what happened?

6  A.   They discussed the situation, they went back and forth a

7  little bit arguing and then that was it for that meeting.

8  Q.   And the situation again, just to make clear to the jury,

9  was what?

10 A.   The situation was they had sent guys to our office --.

11 Q.   Who is "they"?

12 A.   The Landmark had sent three guys to our office

13 threatening and the situation was a fight, an argument over

14 the brokers books.  Brokers book of business, the assets,

15 house stock that they had under management in those books.

16 Q.   Those books included National Medical and Ashton

17 Technologies'house stocks, among others?

18 A.   Yes.

19 Q.   Was any resolution reached at that meeting between Lenny

20 DiMaria, the defendant and Ralphie Lombardi?

21 A.   No.

22 Q.   What happened next?

23 A.   I met Lenny DiMaria with Charles in a diner.

24 Q.   What diner?

25 A.   It was on Rockaway Avenue in Brooklyn, a diner.

1  Q.   What did you discuss with them?

2  A.   We discussed the situation regarding the -- what was

3  going on with the Landmark stealing brokers.

4  Q.   Did Lenny DiMaria make any proposal to you that day?

5  A.   Yes.

6  Q.   What did he say to you?

7  A.   Why don't I leave it alone and he would give me $500,000

8  or get me $500,000.

9  Q.   What did you understand him to mean?

10 A.   Meaning that leave the assets with Landmark Securities,

11 let me bury First United, put it into their house stocks,

12 make who knows how much money and I would be paid off that

13 money, $500,000, and just walk away.

14 Q.   By "bury First United," you understood that to mean

15 what?

16 A.   Meaning let them have the house stock, let them sell all

17 the stocks back to First United and whatever happens happens.

18 Q.   Put it out of business?

19 A.   Yes.

20 Q.   What did you say when he made that proposal to you?

21 A.   I said I couldn't do that.

22 Q.   Why?

23 A.   Because I was friends and partners with these guys.

24 Q.   What was Lenny DiMaria's reaction?

25 A.   He respected it.

1   Q.   Did he say that to you?

2   A.   He told Stevie Iaria that.

3   Q.   Is this the first time you had met Lenny DiMaria?

4   A.   Yes.

5   Q.   Did he tell you who he was at that meeting?

6   A.   No.

7   Q.   Did the defendant tell you who he was?

8   A.   Yes.

9   Q.   What did he tell you?

10  A.   That he was a captain with Nicky.

11  Q.   What was the outcome of the meeting after you told Lenny

12  DiMaria that you wouldn't take the 500,000 to walk away?

13  A.   It had to go forward.  We had to meet with Ralphie.

14  Q.   With Ralphie Lombardi?

15  A.   Yes.

16  Q.   Did there come a time that you and the defendant

17  ultimately did sit down with Ralph Lombardi?

18  A.   Yes.

19  Q.   Where?

20  A.   In a diner in Long Island.

21  Q.   Who else was there?

22  A.   Joe Panzarella, Ralph Lombardi, a guy named Charlie and

23  a guy named Raymond, one of Ralphie's guys.

24  Q.   And you mentioned Joe Panzarella a lot.  Would he

25  consistently come to these meetings?

1  A.   Yes.

2  Q.   What function did he perform at the meeting?  Did he

3  talk?

4  A.   Yeah.  He would talk a little bit, but basically like

5  muscle.

6  Q.   Big guy?

7  A.   Yes.

8  Q.   How big?

9  A.   Six two, 250.

10  Q.   Did any of the brokers who had left First United also

11  show up at that sit-down?

12  A.   Yes.

13  Q.   Who?

14  A.   A guy named Kevin McPhee.

15  Q.   What was your reaction when you saw him?

16  A.   I told him he just pressed charges on one of the brokers

17  at First United after a fight.

18  Q.   Did he come in?

19  A.   No.

20  Q.   So, what happened at the sit-down?

21  A.   They discussed the scenario and it was supposed to be

22  like on hold.

23  Q.   What do you mean?

24  A.   Meaning that we're not supposed to -- they were going to

25  sort it out.

Adams-direct/Norris

1  Q.  There's no resolution reached?

2  A.  No.

3  Q.  Did First United ever get back any of its brokers?

4  A.  Yes.

5  Q.  All of them?

6  A.  No.

7  Q.  Which one?

8  A.  Howard Weinstein.

9  Q.  Did that create any other issues?

10  A.  Yes.

11  Q.  What?

12  A.  Howard Weinstein was paid $25,000 cash to go to Landmark

13  Securities.  When he came back they wanted their money back.

14  Q.  How did you learn that?

15  A.  They were calling Howard and threatening him.

16  Q.  Did you tell the defendant about that?

17  A.  Yes.

18  Q.  What did he do?

19  A.  Said get the money back from Howard.

20  Q.  Did you?

21  A.  Yes.

22  Q.  $25,000?

23  A.  Yes.

24  Q.  What form?

25  A.  Cash.

Adams-direct/Norris

1  Q.   What did you do with it?

2  A.   I gave it to Charles.

3  Q.   What did he do with it?

4  A.   I don't know.

5  Q.   Did you ever find out whether Landmark received that

6  money?

7  A.   They said they didn't get it.  They were still

8  threatening Howard.

9  Q.   Did they eventually stop threatening Howard Weinstein?

10 A.   Yes.

11 Q.   Did there come a time that the defendant told you how

12 Landmark was doing?

13 A.   Yes.

14 Q.   What did he tell you?

15 A.   He told me they were doing good, that they had all sorts

16 of deals about to go public.

17 Q.   So, the relationship between First United and Landmark

18 was starting to improve?

19 A.   Yes.

20 Q.   You testified before one of the defendant's close

21 friends in the Gambino family was Jackie Cavallo, correct?

22 A.   Yes.

23 Q.   You understood him, like the defendant, to be a soldier

24 in the Gambino family?

25 A.   Yes.

1  Q.  Did you and the defendant ever meet with Jackie to

2  discuss stock with him?

3  A.  Yes.

4  Q.  Where did the meeting take place?

5  A.  In Matteo's in Huntington.

6  Q.  Approximately when?

7  A.   '97, '96, '97.

8  Q.  Around this time?

9  A.  Yeah.

10  Q.  Was it just the three of you at the meeting?

11  A.  No.

12  Q.  Who else attended?

13  A.  A couple of stock brokers and a guy named Mikey Gow.

14  Q.  Is Mikey Gow the brother of Tony Lee you told us about

15  earlier?

16  A.  Yes.

17  Q.  Again, that's another soldier in the Gambino family?

18  A.  Yes.

19  Q.  There were six of you in all at that meeting?

20  A.  Yes.

21  Q.  What did you discuss?

22  A.  We discussed that they wanted to open up a branch office

23  of a brokerage.

24  Q.  Who is "they"?

25  A.  Mikey Gow and these stock brokers and maybe First United

Adams-direct/Norris

1    first would want to do it with them.

2    Q.    What did you say?

3    A.    I said we'll get back to you.

4    Q.    Now, the last stock, Mama Tish, you testified there was

5    a sit-down over Mama Tish.  Can you explain how that arose?

6              THE COURT:  Could you spell that, please?

7              THE WITNESS:  M-a-m-a T-i-s-c-h, I believe, or

8    T-i-s-h.

9    Q.    What kind of company was Mama Tish?

10   A.    Italian ices.

11             THE COURT:  What?

12             THE WITNESS:  Italian ices.

13   Q.    Can you explain to the jury how the dispute over Mama

14   Tish arose?

15   A.    We had gotten --.

16   Q.    Who's "we"?

17   A.    First United had received stock and several other places

18   received stock and when the deal opened up and went public,

19   the manipulation was a failure.

20   Q.    Before we get to the failure, how did it come to be that

21   First United got involved in Mama Tish?

22   A.    Me, Charles, Ralphie Lombardi, Eric Aronson, I believe

23   Joe Panzarella and this guy Charlie all went to a restaurant

24   named Tesoro's on Long Island.

25   Q.    Tesoro's?

Adams-direct/Norris

1    A.    Tesoro's on Long Island.

2    Q.    What happened at that meeting?

3    A.    We had discussed that they were taking the deal public.

4    Q.    Who is "they"?

5    A.    Landmark Securities was taking the stock public.

6    Q.    Meaning through an IPO?

7    A.    Yes.

8    Q.    Continue.

9    A.    And they were suggesting it was going to be a great deal

10   and we should participate.

11   Q.    And did the IPO take place?

12   A.    Yes.

13   Q.    And did First United get a stake?

14   A.    Yes.

15   Q.    What stake?

16   A.    Ten percent.

17   Q.    And --?

18   A.    9.9 percent.

19   Q.    9.9 percent?

20   A.    Yes.

21   Q.    Was the IPO successful?

22   A.    No.

23   Q.    What happened?

24   A.    It got rescinded, meaning that the deal did not close.

25   It was pulled off the market.

Adams-direct/Norris

1  Q.  How quickly after the stock went public?

2  A.  Within a couple of days.

3  Q.  What did the stock price do in the moments after it went

4  public?

5  A.  It went up for a minute and then it went down.  It went

6  up for a very short period of time and then went down.

7  Q.  Did a sit-down result?

8  A.  Yes.

9  Q.  When did the first sit-down over Mama Tish take place?

10  A.  In Tesoro's.

11  Q.  Tesoro's again?

12  A.  Yes.

13  Q.  Who attended that meeting?

14  A.  Me, Charles, Joey, Eric Aronson, John Maglioco (ph.).

15  Q.  By "Joey" you mean?

16  A.  Joe Panzarella.

17  Q.  Who is John Maglioco?

18  A.  Eric Aronson's father-in-law.

19  Q.  What happened at that meeting?

20  A.  It was a bunch of just finger pointing.

21  Q.  Meaning what?

22  A.  That they were blaming us and we were blaming them.

23  Q.  Landmark is blaming First United and you were blaming

24  --?

25  A.  Yes.

1  Q.    -- Landmark?

2  A.    Yes.

3  Q.    What was your reaction when Eric Aronson blamed First

4  United for what had happened?

5  A.    That it wasn't our fault, that he was basically off the

6  stock from day one.  From the beginning of the stock coming

7  out he was not any type of participant or didn't help

8  manipulate it at all.  He just basically threw it out there.

9  Q.    In lay terms he didn't do a very good job manipulating

10  the stock?

11  A.    No.

12  Q.    Was there any resolution reached at the sit-down?

13  A.    No.

14  Q.    Was there a subsequent sit-down?

15  A.    Yes.

16  Q.    Who attended that sit-down?

17  A.    Myself, Charles, Joe Panzarella, Carmine Agnello, John

18  Maglioco (ph.), the guy Charlie and Eric Aronson.

19  Q.    Who is Carmine Agnello?

20  A.    John Gotti Jr.'sbrother-in-law.

21  Q.    Is he affiliated with organized crime?

22  A.    Yes.

23  Q.    What family?

24  A.    Soldier in the Gambino family.

25  Q.    Does he have a nickname?

1  A.   Carmine Bull.

2  Q.   Bull?

3  A.   Bull.

4  Q.   How would he come into the picture?

5  A.   He had given Eric Aronson money before the deal went

6  public.

7  Q.   How much?

8  A.   500,000.

9  Q.   Agnello invested 500,000 in the Mama Tish IPO?

10 A.   Yes.

11 Q.   And did you have a conversation with the defendant about

12 that?

13 A.   Yes.

14 Q.   What did he tell you?

15 A.   He told me to come to the sit-down.

16 Q.   Did he tell you whether Agnello had found out already

17 the IPO was a failure?

18 A.   Yes.

19 Q.   He had?

20 A.   Yes.

21 Q.   What happened at the sit-down?

22 A.   It again started with the finger pointing, but basically

23 Carmine's deal was not whether the stock went up or down or

24 sideways, his deal was he gave them X amount of money and he

25 was promised X amount of money back.

1  Q.   So, he wanted a fixed return?

2  A.   Yes.

3  Q.   Did you say anything to Eric Aronson at that sit-down

4  about whose money should have been protected first?

5  A.   Yes.

6  Q.   What did you say?

7  A.   I said I don't understand why you didn't take Carmine

8  out of the stock as soon as it came out when it was up and

9  that Joe Panzarella had had stock that him and Charles were

10  going to go partners on and that was taken out as soon as it

11  opened at a profit.

12  Q.   Do you know how much Panzarella had invested in Mama

13  Tish?

14  A.   Around 75,000.

15  Q.   How did you come to have the understanding that the

16  defendant was to share in the profit from that investment?

17  A.   We discussed it.

18  Q.   Who's "we"?

19  A.   Me, Charles and Joey.

20  Q.   Joe Panzarella?

21  A.   Joe Panzarella.

22  Q.   Did Carmine Agnello say anything when you brought up the

23  money Panzarella had invested that the defendant was supposed

24  to get a piece of?

25  A.   No.

1  Q.  What did he say when he heard you and Aronson going back

2  and forth about who was at fault?

3  A.  He just said he wanted his money.

4  Q.  Did he say what his expected return was?

5  A.  No.

6  Q.  Did the conversation become heated?

7  A.  Yes.

8  Q.  How so?

9  A.  Carmine started -- started getting threatening with Eric

10  and then the guy John Maglioco tried to get in his way and

11  then this guy Charlie tried to calm him down and then Charles

12  got in Charlie's face and told him to back up.

13  Q.  Meaning the defendant interceded and told the other

14  person Charlie to back up?

15  A.  Yes.

16  Q.  How did things end?

17  A.  He backed up and then everything calmed down.

18  Q.  So, to summarize, why was the Mama Tish IPO a failure?

19  A.  It was just sold immediately and there was no

20  manipulation, it did not go higher, it was going lower.  So,

21  on manipulation if the stock goes lower from day one there is

22  no manipulation, everyone sells, it goes to zero.

23  Q.  Is it fair to say the pump didn't work?

24  A.  Yes.  It was strictly dump.

25          THE COURT:  When you reach a breaking point, I think

1    we ought to break.

2              MR. NORRIS:   Two pages, very quick.

3              THE COURT:   Yes, and then we'll take our final break

4    for the day.

5    Q.   Did you leave First United?

6    A.   Yes.

7    Q.   Did you continue in the securities field?

8    A.   Yes.

9    Q.   Did you continue to manipulate stocks?

10   A.   Yes.

11   Q.   You continued to commit securities fraud?

12   A.   Yes.

13   Q.   How long did that continue?

14   A.   Till 2001.

15   Q.   You were arrested?

16   A.   Yes.

17   Q.   Now, you testified before that you eventually pled

18   guilty to both securities fraud and money laundering,

19   correct?

20   A.   Yes.

21   Q.   You were sentenced to nine years in prison?

22   A.   Yes.

23   Q.   You were also ordered to pay restitution?

24   A.   Yes.

25   Q.   This was $100 million?

1   A.   Yes.

2   Q.   Can you estimate -- withdrawn.

3        You also testified you bore that obligation with other

4   people, correct?

5   A.   Yes.

6   Q.   Can you estimate how many people you defrauded over the

7   course of your career?

8   A.   Hundreds.

9   Q.   You made a lot of money, didn't you?

10  A.   Yes.

11  Q.   Millions?

12  A.   Yes.

13  Q.   You had a big house?

14  A.   Yes.

15  Q.   Drove a fancy car?

16  A.   Yes.

17  Q.   What fancy car?

18  A.   Bentley.

19  Q.   Anything else?

20  A.   Jaguar.

21  Q.   It was all a total fraud?

22  A.   Yes.

23            MR. NORRIS:   Pause there.

24            THE COURT:  Take ten, please.

25            (Recess taken.)

1          THE COURT:  Bring in the defendant, let's have the

2     witness and then the jury.

3               Jury in, please.

4               (The jury enters the courtroom.)

5          THE COURT:  Yes, be seated, please.

6     DIRECT EXAMINATION (Cont.'d)

7     BY MR. NORRIS:

8     Q.   You testified previously that you continued to pay the

9     defendant $400 a week in protection money from 1991 through

10    March of 2001, when you were indicted, correct?

11    A.   Yes.

12    Q.   Why did you stop paying him protection money when you

13    were indicted?

14    A.   Because I got in trouble, brokers went out of business.

15    I had to get a lawyer and I was going to prison myself, I

16    didn't have any source of income at that time.

17    Q.   Did there come a time when you had a discussion with the

18    defendant about whether you had to continue to pay him?

19    A.   Yes.

20    Q.   Where did that discussion take place?

21    A.   In Joseph Corozzo's office.

22    Q.   You previously identified a captain in the Gambino

23    family Joseph Corozzo.  Is that the Joseph Corozzo you're

24    referring to?

25    A.   No.  The attorney.

Adams-direct/Norris

1  Q.   What's his relationship, if any, with Joseph Corozzo the

2  captain?

3  A.   His son.

4  Q.   Was Corozzo your lawyer?

5  A.   Briefly, yes.

6  Q.   Explain.

7  A.   He had bailed us out of jail.

8  Q.   Who's "us"?

9  A.   Me and my brother.

10  Q.   Was he still your lawyer when you had this discussion

11  with the defendant?

12  A.   No.

13  Q.   Why did you go to his office and meet with the

14  defendant?

15  A.   Joseph had called me and he said to come by his office,

16  that a friend of mine was there.

17  Q.   He said that a friend of his was there?

18  A.   No.  For me to meet with a friend of mine.

19  Q.   Did he say what that friend's name was?

20  A.   No.

21  Q.   What did you understand him to mean?

22  A.   My friend would be there.

23  Q.   Who did you understand your friend to be?

24  A.   Charles Carneglia.

25  Q.   The defendant?

1    THE COURT:  I couldn't understand that.

2    THE WITNESS:  He said your friend would be there,

3  Charles Carneglia.

4  Q.   In essence, he said come to my office and meet with the

5  defendant?

6  A.   Yes.

7    THE COURT:  Fix where the office was and when this

8  happened, please.

9  Q.   Where was Joseph Corozzo's office?

10 A.   New York City, I believe on 38th and Madison in New York

11 City.

12 Q.   And you had testified you were arrested in March 2001,

13 correct?

14 A.   Yes.

15 Q.   Approximately how long after you were arrested did

16 Joseph Corozzo call you and say come to his office to meet

17 with the defendant?

18 A.   Few days, within the week.

19 Q.   Very shortly thereafter?

20 A.   Yes.

21   THE COURT:  Fix approximately what date that would

22 be, please.

23 Q.   Do you recall what date exactly in March 2001 --?

24   THE COURT:  Or approximately.

25 Q.   -- you were arrested?

1  A.   No.   Sometime in March.

2  Q.   Sometime in March?

3  A.   Yes.

4  Q.   Approximately within a few days or a week that you were

5  summoned to go meet with the defendant at Joseph Corozzo's

6  office?

7  A.   Yes.

8           THE COURT:  What year?

9           THE WITNESS:  2001.

10          THE COURT:  What time of the day?

11          THE WITNESS:  Afternoon.

12          THE COURT:  Proceed.

13  Q.   What happened when you got to Corozzo's office?

14  A.   When I got to Joseph's office he walked me into the

15  conference room where Charles was.

16  Q.   The defendant was there?

17  A.   Yes.

18  Q.   Did you have an understanding as to whether Corozzo was

19  the defendant's lawyer at the time?

20  A.   Yes.

21  Q.   What was that understanding?

22  A.   He was his lawyer.

23  Q.   Were you aware whether the defendant was under

24  indictment at that time as well?

25  A.   Yes.

Adams-direct/Norris

1   Q.   A different case from yours?

2   A.   Yes.

3   Q.   And Corozzo represented him in that case?

4   A.   Yes.

5   Q.   What happened when Corozzo walked you into the

6   conference room to meet with the defendant?

7   A.   Corozzo left.  I went into the room by myself and

8   briefly greeted each other.

9   Q.   How did you greet the defendant?

10  A.   I kissed him and at that point he like hugged me and put

11  his hand up and down my back.

12  Q.   What do you mean he put his hand up and down your back?

13  A.   Like he was feeling for a wire.

14  Q.   Had he ever done that to you before?

15       MS. SHARKEY:   Objection.  Objection.

16       THE COURT:  I will allow it.

17  A.   No.

18  Q.   Were you surprised when he rubbed your back up and down

19  after he greeted you?

20  A.   Yes.

21  Q.   After the defendant rubbed your back, what did you

22  discuss?

23  A.   I told him that I couldn't pay him anymore.

24  Q.   What did you say to him?

25  A.   That I had just gotten indicted, I was in a very bad

1  position and I couldn't pay him anymore.

2  Q.   What did he say?

3  A.   You're my friend, I never threatened you.  I said if

4  we're friends then I can tell you.

5  Q.   He said you're my friend, he never threatened you?

6  A.   He said I'm not threatening you.

7  Q.   What did you understand him to mean?

8  A.   That he understood I wasn't paying him anymore, that I

9  wasn't going to pay him at that moment.

10 Q.   Were you surprised when he said to you I'm your friend,

11 I never threatened you?

12 A.   Not really.  I didn't really think about it.

13 Q.   What did you say to him when he said I'm your friend, I

14 never threatened you?

15 A.   I said if we're friends you'll understand and I can tell

16 you this.

17 Q.   Was that the end of the conversation?

18 A.   Yes.

19 Q.   How did you feel at that point?

20 A.   Uncomfortable.

21 Q.   Did the defendant eventually go to prison?

22 A.   Yes.

23 Q.   And, in fact, you testified earlier that there was a

24 going away party for him like his brother had had in the

25 Hamptons years earlier, correct?

1    A.    Yes.

2    Q.    Where was the defendant's going away party?

3    A.    At Carosella's.

4    Q.    Where is Carosella's?

5    A.    Howard Beach on Cross Bay Boulevard.

6    Q.    Do you know who owned Carosella's?

7    A.    Yes.

8    Q.    Who?

9    A.    Frank Russo.

10   Q.    Who else attended the going away party?

11   A.    Joe Panzarella, Tommy Frigenti, Joseph Corozzo, the

12   attorney, Tommy's father Bankie and several others.  I think

13   Phil -- a guy named Phil was there from the bait store.

14   Q.    You mentioned Tommy Frigenti.   Who is that?

15   A.    He was with Charles.

16   Q.    An associate?

17   A.    Yes.

18   Q.    And his father Bankie?

19   A.    Yes.

20   Q.    Do you know if that's his real name?

21   A.    No.

22   Q.    Was everyone sitting around the table or standing up?

23   A.    Both.

24   Q.    Do you recall anything about the discussion that

25   occurred at one point?

Adams-direct/Norris

1    A.   At one point later in the evening, me, Charles and

2    Joseph Corozzo were sitting there.

3    Q.   Again, that's the lawyer?

4    A.   Yes.

5    Q.   And what did you, Charles and Joseph Corozzo discuss?

6    A.   Charles said to Joseph Corozzo I don't know, there's no

7    direction here, I have no direction.

8    Q.   He said there's no direction here?

9    A.   Yes.  We don't have any direction.

10   Q.   What did Joseph say?

11   A.   He said don't worry, there will be direction real soon.

12   Q.   What did the defendant say?

13   A.   He understood.  He said when uncle comes home or Nick

14   comes home.

15   Q.   He said when uncle comes home or Nick?

16   A.   Yes.

17   Q.   Who did you understand the defendant to be referring to?

18   A.   Nicky Corozzo.

19   Q.   Captain in the Gambino family?

20   A.   Yes.

21   Q.   Brother of Joseph Corozzo, the captain?

22   A.   Yes.

23   Q.   Uncle to Joseph Corozzo, the lawyer?

24   A.   Yes.

25   Q.   Did you have an understanding as to what they were

1  discussing?

2       MS. SHARKEY:  Objection.

3       THE COURT:  I'll accept that, you may continue.

4  A.   Meaning the direction and leadership of the Gambino

5  family.

6  Q.   Did you have an understanding as to where Nicholas

7  Corozzo was at that point?

8  A.   Prison.

9  Q.   Who was boss in the family at that time, if you know?

10 A.   Pete Gotti.

11 Q.   Are you sure?

12       MS. SHARKEY:  Objection.

13       THE COURT:  I will allow it.

14 A.   I'm not 100 percent sure, no.

15 Q.   You think it was Pete Gotti?

16 A.   I believe.  I'm not sure.

17 Q.   How did the defendant appear to react to the prospect of

18 Nicky Corozzo coming home and providing direction to the

19 family?

20       MS. SHARKEY:  Objection.

21       THE COURT:  I will allow it.

22 A.   He was excited.  He understood.

23 Q.   He appeared okay with that prospect?

24 A.   Yes.

25 Q.   Now, before the defendant went away to prison, did he

1    say anything to you?

2    A.   Yes.

3    Q.   What did he say?

4    A.   If I had a problem to go see Tommy Sneakers.

5    Q.   His captain?

6    A.   Yes.

7    Q.   What did you say?

8    A.   Okay.

9    Q.   You testified before that after the meeting you had with

10   the defendant at Joseph Corozzo's office you stopped paying

11   the weekly protection payments to him, correct?

12   A.   Yes.

13   Q.   Did there ever come a point after that that you paid the

14   defendant after he went to prison?

15   A.   Yes.

16   Q.   When?

17   A.   When he first went to prison I paid him for the first

18   several months' commissary money.

19   Q.   What is commissary?

20   A.   It is money so they can eat and get supplies while

21   they're in prison.

22   Q.   Who asked you to send the defendant commissary money?

23   A.   One time I saw Tommy Sneakers and he said to me are you

24   doing the right thing, meaning the commissary money, and Joe

25   Panzarella as well said, you know, please, send the

1  commissary money.

2         THE COURT:  I want you to fix these dates, please,

3  if you can.

4         MR. NORRIS:   I will do it.

5  Q.   First, who first asked you to send the defendant money

6  in his commissary?

7  A.   Joe Panzarella.

8  Q.   Approximately how long -- withdrawn.

9       Do you know exactly what month the defendant went to

10 prison?

11 A.   No.

12 Q.   Approximately how long after the defendant went to

13 prison did Joe Panzarella ask you to put money into the

14 defendant's commissary account?

15 A.   Right away.

16 Q.   And did you put money into the defendant's commissary

17 account?

18 A.   Yes.

19 Q.   What amount?

20 A.   400 a month.

21 Q.   $400 a month?

22 A.   Yes.

23 Q.   How many times did you give the defendant $400 a month

24 in commissary money?

25 A.   Three, four times.

1   Q.   In a row?

2   A.   Yes.

3   Q.   Did you put the money in the defendant's commissary

4   account in your own name?

5   A.   No.

6   Q.   How did you get it to him?

7   A.   My brother-in-law with -- I gave it to my brother-in-law

8   once and Joe Panzarella a couple of times and they sent it

9   out.

10  Q.   Your brother-in-law was Peter Arena?

11  A.   Yes.

12  Q.   He was affiliated with the Colombo crime family?

13  A.   Yes.

14  Q.   In what form did you give the money to Peter Arena to

15  give to the defendant?

16  A.   Cash.

17  Q.   And in what form did you give the money to Joe

18  Panzarella to give to the defendant?

19  A.   Cash.

20  Q.   Did you have an understanding as to how they then

21  transferred the money to the defendant's custody?

22  A.   I think they got a money order and mailed it out.

23  Q.   Money order bearing their name?

24  A.   No.

25  Q.   You mentioned you also talked to the defendant's

1   captain, Tommy Sneakers, about the fact that you were sending

2   the defendant commissary money; is that correct?

3   A.   Yes.

4   Q.   How did you come to have a conversation with him?

5   A.   I saw him on the street outside of a bar in Brooklyn one

6   night.

7   Q.   What neighborhood?

8   A.   Bay Ridge.

9   Q.   Was he with anybody?

10  A.   Yes.

11  Q.   Who?

12  A.   Pete Gotti.

13  Q.   And who did you understand Pete Gotti to be at that

14  time?

15  A.   The boss.

16  Q.   And what did Tommy Sneakers say to you?

17  A.   He said are you doing the right thing by Charles.

18  Q.   Are you doing the right thing by Charles?

19  A.   Yes.

20  Q.   What did you understand him to mean?

21  A.   Sending commissary.

22  Q.   What did you say?

23  A.   Yes.

24  Q.   Did Panzarella ever ask you to send --?

25           THE COURT:  Excuse me.  Fix the time on this,

Adams-direct/Norris

1   please.

2   Q.   That conversation -- I'll ask you a question.

3        That conversation -- withdrawn.

4        Do you know how long after the defendant went to prison

5   that conversation took place?

6   A.   A month or two tops.

7   Q.   So, is that while you were already sending the defendant

8   money?

9   A.   Yes.

10  Q.   Through Joe Panzarella and your brother-in-law?

11  A.   Yes.

12       THE COURT:  It was a month or two after he went to

13  prison?

14       THE WITNESS:  Yes.

15       MR. NORRIS:   After the defendant went to prison.

16       THE COURT:  Yes.

17  Q.   Now, did Panzarella ever ask you to send the defendant

18  anything aside from commissary money?

19  A.   Yes, not to send him.  He asked for it.

20  Q.   What did he ask for?

21  A.   $5,000.

22  Q.   Did he say why the defendant needed $5,000?

23  A.   No.

24  Q.   Did you give him $5,000?

25  A.   No.

1   Q.   Did you give him anything?

2   A.   Yes.

3   Q.   What?

4   A.   $2,500.

5   Q.   How did you give him the money?

6   A.   Cash.

7            THE COURT:  Fix the time of this conversation.

8            MR. NORRIS:   I was just about to do it, sir.

9   Q.   Approximately how long after the defendant went to

10  prison did you give Joe Panzarella $2,500?

11  A.   Three months after.

12  Q.   Three months after he went to prison?

13  A.   Yes.

14  Q.   So, is that the same time when you're giving him money

15  for his commissary?

16  A.   Yes.

17  Q.   Did you ever send the defendant any more commissary

18  money?

19  A.   No.

20  Q.   Why not?

21  A.   After the fourth month or third or fourth month and I

22  gave Joe the $2,500, Joey was pressing me for the other

23  2,500, I said Joe, listen, I'm not in a position to do this

24  anymore, I can't do it, I'm facing more prison time than

25  Charles.

1  Q.   What did Panzarella say to you?

2  A.   He was like he wanted it and I'm like I can't do it

3  right now.

4  Q.   You said you were facing more prison time than the

5  defendant.  Do you know how long the defendant's prison

6  sentence was?

7  A.   I'm not sure.  I think four years or so, five years.

8  Q.   Four or five years?

9  A.   Yeah.

10 Q.   Do you consider yourself to still be with the

11 defendant --

12         THE COURT:  Excuse me.  If you can, fix whether

13 there was any further conversation on this and when to the

14 best of his recollection the last conversation on this issue

15 occurred.

16 Q.   Did you ever have any other conversations with Joe

17 Panzarella about giving the defendant money?

18 A.   No.

19 Q.   Did you ever have any conversations with the defendant

20 about giving him more money?

21 A.   No.

22 Q.   Did you ever have any conversations with anyone else

23 about giving the defendant more money?

24 A.   No.

25 Q.   Did you consider yourself -- withdrawn.

1    Did you consider yourself to be with Charles Carneglia

2  after he went to prison?

3         MS. SHARKEY:   Objection.

4  A.   Yeah.

5  Q.   Yes?

6  A.   Yes.

7         MS. SHARKEY:   Objection.

8         THE COURT:  Overruled.   You may answer.

9  A.   Yes.

10 Q.   Did there come a time when anyone ever offered to switch

11 you to another part of the family?

12 A.   Yes.

13 Q.   Who offered to switch you?

14 A.   Stevie Iaria.

15 Q.   And is that the associate of Nicky Corozzo's and Vinny

16 Dragonetti's that you told the jury about earlier?

17 A.   Yes.

18 Q.   And at that time I believe you told the jury you were

19 engaged in loansharking with Steve Iaria, correct?

20 A.   Yes.

21 Q.   And with Vinny Dragonetti as well, correct?

22 A.   Yes.

23 Q.   And was that one of your sources of income after you had

24 been indicted?

25 A.   Yes.

1  Q.   Was that your main source of income after you had been

2  indicted?

3  A.   Yes.

4  Q.   When did Steve Iaria offer to switch you to another part

5  of the family?

6  A.   At Vincent Dragonetti's brother's wedding.

7  Q.   Do you know when that was?

8  A.   Sometime in 2002, 2003.

9  Q.   When did you go to prison ultimately?

10  A.   2004.

11  Q.   Do you recall what month?

12  A.   February.

13  Q.   This was sometime before you went to prison I take it?

14  A.   Oh, yeah.

15  Q.   You said the wedding was one of Vincent Dragonetti's

16  brothers?

17  A.   Yes.

18  Q.   Do you recall which brother?

19  A.   I believe Vito.

20  Q.   Did he have any other brothers that you knew?

21  A.   Yes.

22  Q.   Who?

23  A.   Nicholas.

24  Q.   Where did that wedding take place?

25  A.   At the El Carib in Brooklyn.

1  Q.   What is that?

2  A.   It is a big catering hall in Brooklyn.

3  Q.   Do you recall whether any other members or associates of

4  the Gambino family attended that wedding?

5  A.   Yes.

6  Q.   Tell the jury who you recall being there and what their

7  rank was.

8  A.   Vincent Dragonetti, soldier; Stevie Iaria, associate;

9  Mike Anoti, soldier; Mario, soldier; Billy Scotto, soldier.

10 There were others.  I'm not sure.

11       THE COURT:  Do we have a date for that wedding?

12       MR. NORRIS:  I asked him.  I believe he doesn't

13 recall the date.

14       THE WITNESS:  I'm not sure of the date.  2002 or

15 2003.

16 Q.   Do you know Mario's last name?

17 A.   No.

18 Q.   Whose crew do you understand him to be in?

19 A.   Nicky Corozzo's.

20 Q.   And what did Steve Iaria say to you exactly about his

21 proposal?

22 A.   That I should switch over to them, to JoJo.  I should be

23 transferred.

24 Q.   Who did you understand JoJo to be?

25 A.   Captain in the Gambino family.

1   Q.   JoJo Corozzo?

2   A.   Yes.

3   Q.   What did you say to Steve Iaria?

4   A.   Please, leave it alone.

5   Q.   Explain to the jury why you said that.

6   A.   Charles had told me before he went away that if I had a

7   problem to go see Tommy Sneakers.  It would be disrespectful

8   to him to switch to another group in the family without

9   permission from Charles.

10  Q.   You still consider yourself to be with the defendant at

11  that point, correct?

12  A.   Yes.

13  Q.   Even though you hadn't paid him in months?

14  A.   Yes.

15  Q.   When did you stop being with the defendant?

16  A.   Late 2004.

17  Q.   What happened then?

18  A.   I began cooperating with the government.

19  Q.   I'll show you a couple more photographs.  I am showing

20  you what's in evidence as Government's Exhibit 2 R.  Who's

21  that?

22  A.   Sammy Gravano.

23  Q.   What's the highest rank he attained in the family?

24  A.   Underboss.

25  Q.   Showing you what's in evidence as Government's Exhibit

2 J.  Who is that

A.    Mikey Scars.

Q.    Do you know his real last name?

A.    DiLeonardo.

Q.    What is the highest rank he attained in the Gambino family?

A.    Captain.

Q.    Showing you what's in evidence as Government's Exhibit 2 I.  Who's that

A.    Jackie Nose.

Q.    Do you know his real last name?

A.    D'Amico.

Q.    What is the highest rank he attained in the family?

A.    I'm not sure.  I think captain.

Q.    Showing you what's in evidence as Government's Exhibit 2 QQQ.  Who's that

A.    Ronny One Arm.

Q.    Do you know what his real last name is?

A.    I think Trucchio.

Q.    What is the highest rank he attained in the family?

A.    Captain.

Q.    Showing you what's in evidence as Government's Exhibit 2 XX-1.  Do you know who that is

A.    Maybe John Gotti.  I'm not sure.

Q.    You don't know.  Showing you what's in evidence as

1  Government's Exhibit 2 EE.  Who's that?

2  A.    John Alite.

3  Q.    Who is John Alite?

4  A.    He is an associate with the Gambino family.

5  Q.    Do you know him to have committed any crimes?

6  A.    I heard he was a drug dealer.

7  Q.    Showing you what's in evidence as Government's Exhibit

8  2 CC.  Who's that

9  A.    Myself, Hunter Adams.

10  Q.    You testified that after you were arrested in 2001 for

11  securities fraud and money laundering, you ultimately pled

12  guilty and were sentenced to nine years in prison, correct?

13  A.    Yes.

14  Q.    You surrendered to the Bureau of Prisons, I believe you

15  said February 2004, correct?

16  A.    Yes.

17  Q.    Did you decide to make a change once you went to prison?

18  A.    Yes.

19  Q.    What?

20  A.    Cooperate.

21  Q.    Why?

22  A.    I decided that's the only way in this life to get killed

23  and go to jail and I just wanted to get out.

24  Q.    Again, when did you decide to begin cooperating?

25  A.    The end of 2004.

Adams-direct/Norris

1   Q.   Up till that point --?

2        THE COURT:  Can you fix what "end of 2004" means.

3   Q.   Do you recall what month exactly?

4   A.   October.  I believe October of 2004.

5   Q.   You reported to prison in February 2004?

6   A.   Yes.

7   Q.   Before you made the decision to start cooperating, what

8   was your understanding as to what your relationship would be

9   with the defendant when you got out of prison?

10  A.   That I was with him.

11  Q.   You would still be expected to pay him?

12  A.   Yes.

13  Q.   And the fact that you had stopped paying him for a time

14  didn't mean you weren't going to have to resume paying him?

15  A.   Yes.

16  Q.   Now, you testified this morning that you engaged in

17  loansharking with Dragonetti and Steve Iaria on two

18  occasions, correct?

19  A.   Yes.

20  Q.   Once in 2002, correct?

21  A.   Yes.

22  Q.   And a second time from 2003 to 2004, correct?

23  A.   Yes.

24  Q.   And you made about, you said, $80,000 in loansharking

25  during that time?

1   A.   Yes.

2   Q.   Were you still earning money from loansharking while you

3   were in prison?

4   A.   Yes.

5   Q.   How were you getting the money?

6   A.   Stevie was meeting my brother-in-law.

7   Q.   Steve Iaria was meeting your brother-in-law?

8   A.   Yes.

9   Q.   Peter Arena?

10  A.   Yes.

11  Q.   Were you getting the money yourself?

12  A.   No.

13  Q.   Who was getting the money?

14  A.   Peter Arena.

15  Q.   What was Peter Arena doing with the money?

16  A.   Giving it to my wife.

17  Q.   Did there come a time that you told -- withdrawn.

18       Did there come a time that you sent a message to Steve

19  Iaria that you wanted to take your money back?

20  A.   Yes.

21  Q.   Did you get it back?

22  A.   Yes.

23  Q.   How did you get it back?

24  A.   He gave it to my brother-in-law.

25  Q.   Why did you send the message to Steve Iaria that you

1  didn't want to have loan shark money out on the street

2  anymore?

3  A.   When I decided to cooperate I knew I would never do

4  anything illegal again.

5  Q.   Again, that's October of 2004?

6  A.   Yes.

7  Q.   How much longer did you have to serve in your nine year

8  sentence when you decided to begin cooperating with the

9  government?

10 A.   Five-and-a-half years with good time.

11 Q.   With good time?

12 A.   Yes.

13 Q.   Did you eventually begin engaging in proffers?

14 A.   Yes.

15 Q.   What type of location were you first proffered?

16 A.   In a prison, a conference room.

17 Q.   Did you proceed to tell the government about the crimes

18 you've committed?

19 A.   Yes.

20 Q.   Did that include crimes beyond the ones you had pled

21 guilty to?

22 A.   Yes.

23 Q.   Including drug dealing, loansharking, illegal gambling?

24 A.   Yes.

25 Q.   In addition to talking about your own crimes, have you

1    told the government about crimes other people committed?

2    A.    Yes.

3    Q.    People in the Gambino crime family?

4    A.    Yes.

5    Q.    Other crime families?

6    A.    Everything I knew.

7    Q.    Crimes your brother committed?

8    A.    Yes.

9    Q.    Did you pick the people you wanted to talk about?

10   A.    No.

11   Q.    Did you determine what was talked about in a given

12   proffer session?

13   A.    No.

14   Q.    Ever?

15   A.    Never.

16   Q.    At some point after you began proffering, did the

17   sentencing judge reduce your sentence?

18   A.    Yes.

19   Q.    You were released?

20   A.    Yes.

21   Q.    Again, when?

22   A.    January of 2008.

23   Q.    How long after you first began proffering did that

24   occur?

25   A.    Almost three years.

1  Q.   What was your understanding as to why the sentencing

2  judge had reduced your sentence?

3  A.   My cooperation.

4  Q.   So, how long did you serve in prison for securities

5  fraud and money laundering?

6  A.   47 months.

7  Q.   After you were released, did you plead guilty to

8  additional crimes?

9  A.   Yes.

10 Q.   How long after your release?

11 A.   Couple weeks.

12 Q.   Couple weeks later?

13 A.   Yes.  Two or three weeks.

14 Q.   What did you plead guilty to?

15 A.   Loansharking and racketeering.

16 Q.   What is your understanding of what racketeering is?

17 A.   A group of individuals working together as an

18 enterprise.

19 Q.   What enterprise had you committed crimes with?

20 A.   The Gambino family.

21 Q.   Have you been sentenced yet for those crimes?

22 A.   No.

23 Q.   Has the prosecutor asked you questions about the

24 information you've provided?

25 A.   Yes.

1  Q.   Many times?

2  A.   Yes.

3  Q.   Over many years now?

4  A.   Yes.

5  Q.   Do you continue to be debriefed about different matters?

6  A.   Yes.

7  Q.   At some point after your release did you move to an

8  undisclosed location?

9  A.   Yes.

10  Q.   Why?

11  A.   For my safety.

12  Q.   Did you speak to me and others before testifying today?

13  A.   Yes.

14  Q.   Did you speak with me several times, in fact?

15  A.   Yes.

16  Q.   Did you go through the types of questions you might be

17  asked?

18  A.   Yes.

19  Q.   Did we discuss cross-examination?

20  A.   Yes.

21  Q.   Were you provided with any information about the case?

22  A.   No.

23  Q.   Were you shown any documents?

24  A.   No.

25  Q.   Were you shown any newspaper articles?

Adams-direct/Norris

1  A.   No.

2  Q.   Were you shown any physical evidence?

3  A.   No.

4  Q.   Were you told who you would testify against?

5  A.   No.

6  Q.   Did you guess from the types of questions I asked you

7  who you probably would be testifying against?

8  A.   Yes.

9  Q.   I show you what's been marked for identification as

10  Government Exhibit 3500 HA-5.

11      Do you recognize that?

12  A.   Yes.

13  Q.   What is it?

14  A.   It is a cooperation agreement.

15  Q.   Whose?

16  A.   Mine.

17  Q.   Turn to the last page.  Whose signature is on the last

18  page?

19  A.   Mine.

20  Q.   Under that agreement, what is the maximum penalty you

21  now face?

22  A.   20 years.

23  Q.   Can you be fined?

24  A.   Yes.

25  Q.   Who decides the fine?

1  A.  The Judge.

2  Q.  Can you be required to pay restitution?

3  A.  Yes.

4  Q.  Who decides the amount?

5  A.  The Judge.

6  Q.  Do you know what your sentence will be?

7  A.  No.

8  Q.  Who decides your sentence?

9  A.  The Judge.

10 Q.  What is your understanding of your obligations under

11 your cooperation agreement?

12 A.  To tell the truth.

13 Q.  What do you get if you comply with your obligations?

14 A.  5K1 letter.

15 Q.  What's your understanding as to what a 5K1 letter is?

16 A.  A letter regarding the cooperation.

17 Q.  Does it include all of the crimes you've committed?

18 A.  Yes.

19 Q.  Does it also address the assistance you've provided to

20 government?

21 A.  Yes.

22 Q.  If you get a 5K1 letter, does the government recommend a

23 sentence?

24 A.  No.

25 Q.  Who decides the sentence after reviewing the letter?

1    A.   The Judge.

2    Q.   As you sit here today, do you have any time --

3    withdrawn.

4         As you sit here today, do you have any idea how much

5    time you will get when you are sentenced?

6    A.   No.

7    Q.   What is your understanding of what happens if you lie?

8    A.   The agreement is thrown out.

9    Q.   Do you get to take your guilty plea back?

10   A.   No.

11   Q.   What's the maximum sentence you face for the crimes you

12   pled guilty to?

13   A.   20 years.

14            MR. NORRIS:   No further questions.

15            THE COURT:  You did not offer that 3500 material.

16            MR. NORRIS:   We'll offer it now, Judge.

17            MS. SHARKEY:   Objection.

18            THE COURT:  Sustained.

19            THE COURT:  Is it redacted?

20            MR. NORRIS:   Not yet.

21            THE COURT:  We'll deal with it on redirect.  Proceed

22   with cross, please.

23            MS. SHARKEY:   May I have the boards moved, please.

24   Thanks.

25   CROSS-EXAMINATION

1   BY MS. SHARKEY:

2   Q.   Good morning -- I mean good afternoon, excuse me.

3   A.   Good afternoon.

4   Q.   Mr. Adams, you're the poster boy for a successful market

5   manipulation, wouldn't you agree?

6   A.   Yes.

7   Q.   And you made millions of dollars in the stock market,

8   right?

9   A.   Yes.

10  Q.   And you stole millions of dollars in the stock market,

11  correct?

12  A.   Yes.

13  Q.   And you didn't steal it from companies, you stole it

14  from small investors that your pump and dump scheme called

15  and encouraged and pressured to give you money, right?

16  A.   Yes.

17  Q.   And you were also successful in the marijuana business,

18  right?

19  A.   Yes.

20  Q.   I'm sorry.

21  A.   Yes.

22  Q.   And that was a business with your friend Jonathan

23  Winston, right?

24  A.   Yes.

25  Q.   You made millions in the marijuana business, right?

Adams-cross/Sharkey

1    A.    A million dollars.

2    Q.    How about Joker Poker, yet another venue, another market

3    which you were successful, right?

4    A.    Yes.

5    Q.    And you testified on direct examination that at some

6    point you made ten or $20,000 a week, right?

7    A.    Yes.

8    Q.    You had over 200 machines all over the city, correct?

9    A.    150 -- around 150.

10   Q.    In all five boroughs?

11   A.    In Brooklyn, Harlem and Washington Heights and The

12   Bronx.

13   Q.    And your cut of that at some point was up to 20 grand a

14   week, right, Mr. Adams?

15   A.    Gross, yes.

16   Q.    Now, you also were indicted in 2001 for securities

17   fraud, right?

18   A.    Yes.

19   Q.    And you were named not only as an undisclosed principal

20   in a number of security actions, but you were also named as a

21   Gambino family associate in 2001, when you pled guilty,

22   right?

23   A.    When I was indicted, yes.

24   Q.    When you were indicted and you pled guilty before you

25   decided to cooperate with the government and claim that you

1  had been extorted, you pled guilty to being a Gambino family

2  associate, right?

3  A.    No.

4  Q.    Do you remember that?

5  A.    I didn't plead guilty to being a Gambino associate.

6  Q.    Did you plead guilty to Counts One and 16 of that

7  indictment?

8  A.    I would have to see it, yes.

9  Q.    Would a copy of your indictment refresh your

10  recollection?

11  A.    If you could show me that I pled guilty to being a

12  Gambino family associate.

13  Q.    Let me show you a copy of your superseding indictment.

14        Your attorney at the time you pled guilty was a woman

15  named Sarita Kedia, right?

16  A.    Yes.

17  Q.    And Ms. Kedia was your second or third attorney,

18  correct?

19  A.    Second.

20  Q.    She was associated with Mr. Corozzo and Mr. Shargel,

21  right?

22  A.    Yes.

23  Q.    And I want to direct your attention, see if this

24  refreshes your recollection as being a named Gambino

25  associate on this indictment, referring to page --?

1    THE COURT:  Excuse me.  The issue is what he pleaded

2  to, not what was named.  Reframe it.

3    MS. SHARKEY:   I will rephrase it.

4  Q.   Were you indicted and named as a Gambino family

5  associate?

6  A.   Yes.

7  Q.   And did you plead guilty to Count One and 16 of that

8  indictment?

9  A.   Yes.

10 Q.   Thank you.

11   That was before you reached out to the government,

12 right?

13 A.   Yes.

14 Q.   And when you pled guilty on that indictment, you were

15 subject to 20 years, right?

16 A.   Yes.

17 Q.   Litigated the case, right?

18 A.   I pled guilty.

19 Q.   Your lawyer negotiated with the prosecutors for the

20 government, right?

21 A.   Yes.

22 Q.   And you negotiated a plea for a nine year bid, right?

23 A.   Yes.

24 Q.   And you testified on direct examination that you did

25 approximately four-and-a-half years of that nine year bid

1  before you decided to cooperate, right?

2  A.    About four years, yes.

3  Q.    Switched lawyers, reached out to the government, right?

4  A.    Yes.

5  Q.    Now, you also realized prior to going to jail, but after

6  you were indicted, that you needed to make some money, right?

7  A.    Yes.

8  Q.    This is after your pump and dumps were closed down,

9  correct?

10  A.    Correct.

11  Q.    We'll talk about them in a while, but the way you

12  decided to make money after you were indicted in March of

13  2001 was to shylock, right?

14  A.    Yes.

15  Q.    After you were indicted were your assets frozen, by the

16  way?

17  A.    My house was liened, yes.

18  Q.    You put $50,000 out on the street with Steve Iaria and

19  Mr. Dragonetti after you were indicted, right?

20  A.    Yes.

21  Q.    Where did you get that $50,000, Mr. Hunter -- Mr. Adams,

22  excuse me?

23  A.    From the stocks.

24  Q.    When you say you got it from the stocks, let's be a

25  little more specific for the members of the jury.  Where did

1   you get the $50,000?

2   A.   We had stock certificates of certain investors that we

3   had in our brokerage account and we basically took the money

4   out as we wanted to and used it as our own personal piggy

5   bank.

6   Q.   You stole $50,000 from investors after your indictment,

7   right?

8   A.   No.

9   Q.   Well, you were indicted in March of 2001, right?

10  A.   Yes.

11  Q.   And you testified on direct examination that after your

12  indictment you shylocked at least twice?

13  A.   Yes.

14  Q.   Right.

15       And the first time you shylocked you shylocked with

16  Steve Iaria and Dragonetti, right?

17  A.   Yes.

18  Q.   Colombo family associates, right?

19  A.   No.

20  Q.   I'm sorry.  Gambino family associates, right?

21  A.   Yes.

22  Q.   And you gave them $225,000, right?

23  A.   Yes.

24  Q.   Where did you get $225,000 cash?

25  A.   It was cash I had accumulated from my fraud schemes.

1  Q.   When you say it was the cash you had accumulated, this

2  was after you were under indictment, right?

3  A.   Yes.

4  Q.   After you made bail, right?

5  A.   Yes.

6  Q.   After you were out and had an attorney, right?

7  A.   Yes.

8  Q.   Where was that $250,000 accumulated?

9  A.   From stock fraud.

10  Q.   Where did you keep it?

11  A.   In my house.

12  Q.   And you parked that money with Iaria and Dragonetti, you

13  testified this morning that they shylocked it for you, right?

14  A.   Yes.

15  Q.   You expected to get a point per week, right?

16  A.   Yes.

17  Q.   How much money would that be per week?

18  A.   $2,200.

19  Q.   That was after you were indicted and while you were

20  negotiating a plea with the government, right?

21  A.   Yes.

22  Q.   At some point the persons with whom you parked that

23  money, they pulled the plug on the deal, right?

24  A.   Yes.

25  Q.   And they gave you back your money, right?

1    A.    Yes.

2    Q.    These people who were extorting you, this family who was

3    extorting you returned $225,000 to you after you were under

4    indictment, right?

5    A.    Yes.

6    Q.    And then at some point you pled guilty, right?

7    A.    Yes.

8    Q.    And you pled guilty in November 2002, right?

9    A.    I think three, Miss.

10   Q.    Okay, 2003.

11         Weren't you sentenced in 2003?

12   A.    I pled guilty -- I'm sorry, you're right.

13   Q.    You pled guilty in November 2002, right?

14   A.    Yes.

15   Q.    And you parked some more money with these individuals

16   from the family that was extorting you, right?

17   A.    Yes.

18   Q.    And this time the people that were extorting you you

19   parked $50,000, didn't you?

20   A.    Yes.

21   Q.    50 grand, right?

22   A.    Uh-huh.

23   Q.    Where did you get that?

24   A.    From the proceeds they gave back to me I gave them back

25   50.

1  Q.   So, of the original two twenty-five that was returned to

2  you by the family that was extorting you, you gave them

3  another $50,000, right?

4  A.   Yes.

5  Q.   And I think you just testified a little while ago that

6  after you started cooperating with the government, and

7  correct me if I'm wrong, you said let me have my 50 grand

8  back; is that right?

9  A.   Yes.

10 Q.   The people that you're extorting returned that $50,000,

11 right?

12 A.   Yes.

13 Q.   Were you afraid of them at that point, Mr. Adams?

14 A.   Of Stevie Iaria?

15 Q.   Yes.

16 A.   They were not threatening me.  I was not afraid of them

17 at the moment.

18 Q.   Were you afraid of them when you gave them the $225,000

19 after you had been indicted?

20 A.   No.  We were doing business together.  They were a

21 criminal, I was a criminal.

22 Q.   When you were in jail, this family that was extorting

23 you, right, was actually collecting the money that you had

24 parked out on the street, right, that 50 grand?

25 A.   That they put out on the street, yes.

1   Q.   The 50,000 that was your money that they put out on the

2   street, right?

3   A.   Yes.

4   Q.   And they were collecting the money for you, correct?

5   A.   Yes.

6   Q.   And they were giving your wife the money, correct?

7   A.   They were giving my brother-in-law the money.  He was

8   giving it to my wife.

9   Q.   Let's talk about your brother-in-law for a second.  What

10  year did you get married, what year was the video taken?

11  A.    '93.

12  Q.   And you married a woman named Suzanne, right?

13  A.   Yes.

14  Q.   And Suzanne's brother-in-law is Peter Arena, right?

15  A.   Yes.

16  Q.   And Peter Arena is with the Colombo crime family, right?

17  A.   His father was with the Colombo crime family.

18  Q.   Peter Arena's father was the underboss of the Colombo

19  crime family, right?

20  A.   I thought boss.

21  Q.   Pardon?

22  A.   I thought boss.

23  Q.   Well, I don't know.  Let's take your -- boss of the

24  Colombo crime family, right, right?

25  A.   Yes.

1  Q.  Family to you, right?

2  A.  He married my wife's sister.

3  Q.  Close with your wife's sister?

4  A.  Me?

5  Q.  Yeah.

6  A.  Not really.

7  Q.  Well, did you trust her husband to pick up your money

8  from the street while you were incarcerated and prior to your

9  cooperating with the government?

10  A.  Yes.

11  Q.  And you testified on direct examination that you started

12  cooperating within how many months of hitting the

13  penitentiary?

14  A.  Less than a year.

15  Q.  Now, you're not in the Witness Security Program, right?

16  A.  No.

17  Q.  And you've never applied to be in the Witness Security

18  Program, right?

19  A.  No, I did.

20  Q.  You were denied?

21  A.  I didn't go forward.

22  Q.  And you said you were living in an undisclosed location,

23  right?

24  A.  Yes.

25  Q.  You're living in New York City, aren't you?

1  A.   I come back to New York City.

2           MR. BURLINGAME:  Objection.

3           MR. NORRIS:  Objection, Judge.

4           THE COURT:  I will allow it.

5  Q.   And you're familiar, aren't you, with the Night Bridge

6  Mortgage company?

7  A.   Yes.

8  Q.   In fact, you worked there, right?

9  A.   I was.

10 Q.   When did you stop?

11 A.   Couple weeks ago.

12 Q.   Couple weeks ago?

13          MR. NORRIS:  Objection, Judge, to getting the

14 specifics of his current life.  He testified on direct he

15 moved to an undisclosed location for his safety.

16 Q.   You're working in Long Island under your own name,

17 right?

18          MR. BURLINGAME:  Objection.

19          MR. NORRIS:  Objection.

20          THE COURT:  Do you understand you're putting the

21 witness in great danger now with that question?

22          MS. SHARKEY:  Respectfully, Judge --

23          THE COURT:  Do you understand that?

24          MS. SHARKEY:  Respectfully, Judge, I think that's

25 inaccurate.

1          THE COURT:  Do you wish to persist in the

2    questioning?  You may do so.

3    Q.   Have you changed your name?

4    A.   No.

5    Q.   Are you working in a mortgage company?

6    A.   Not currently.  I was, yes.

7    Q.   Up to a couple weeks ago, right?

8    A.   Yes.

9    Q.   Somebody was fronting in that mortgage company, right?

10   A.   No.

11   Q.   You're working with your brother in that mortgage

12   company?

13   A.   Actually, no.

14   Q.   Did you meet with your brother at this mortgage company

15   in Long Island on a regular basis?

16          MR. NORRIS:   Objection.

17          THE COURT:  I will allow the defendant to pursue the

18   line.

19   A.   We met there.

20   Q.   You never elected to go into the Witness Security

21   Program, right?

22   A.   No.

23   Q.   Who are you working with, FBI agents, when you're

24   working with the government now; who's your contact?

25   A.   What do you mean by working with?

1  Q.   Do you talk to --?

2  A.   I agreed to cooperate with the government.  I don't

3  understand what you mean by I'm working with.

4  Q.   Mr. Adams, you just told Mr. Norris that you have been

5  debriefed a number of times, right?

6  A.   Yes.

7  Q.   And did you ever tell the persons who are debriefing you

8  that you're working in a mortgage company?

9  A.   Yes.

10 Q.   They know you're working in a mortgage company?

11 A.   I believe so.

12 Q.   In the community, correct?

13 A.   We didn't discuss where.

14 Q.   Mr. Adams, you never sought the help of the Witness

15 Security Program to change your name, did you?

16 A.   No.

17       THE COURT:  You understand, ladies and gentlemen, I

18 intended no criticism of the attorney.  Do you understand

19 that?

20       (Jurors nodding.)

21       THE COURT:  Whatever an attorney does does not

22 affect your view of the guilt or innocence of the defendant.

23 You all understand that?

24       (Jurors nodding.)

25       THE COURT:  Proceed.

1        MS. SHARKEY:   Thank you, Judge.

2   Q.   You had every option to join the Witness Security

3   Program, right?

4   A.   Yes.

5   Q.   But you decided not to, right?

6   A.   My family didn't want to go.  My children didn't want to

7   go.

8   Q.   You're not with your wife, though, at this point,

9   correct?

10  A.   Right.  It doesn't mean I don't want to see my children,

11  Miss.

12  Q.   I understand, Mr. Adams.

13       Nonetheless, you declined to go into the Witness

14  Security Program, right?

15  A.   Yes.

16  Q.   You declined to apply to have your name changed, right?

17  A.   Yes.

18  Q.   What do you do at this mortgage company?

19  A.   I don't work there currently.

20  Q.   What did you do a couple weeks ago at the mortgage

21  company; did you make cold calls?

22  A.   Oh, no.

23  Q.   What did you do?

24  A.   Tried to recruit people to come there.

25  Q.   Oh, you tried to recruit mortgage brokers?

1   A.   Basically tried to find lead sources.

2   Q.   When you say try to find lead sources, let's talk in

3   plain English.  What does that mean?

4   A.   Get leads where -- for people who might want business in

5   that industry.

6   Q.   When you say people who want -- might want business in

7   that industry, are you talking about individuals whose homes

8   are in foreclosure, Mr. Adams?

9   A.   No.

10  Q.   What are you talking about?

11  A.   Individuals who can maybe save money on their mortgage

12  who are paying an exorbitant rate.  Right now the mortgage

13  rates are as low as they have been in probably 40 years.  A

14  guy paying eight or nine percent can get a five percent rate

15  and save money.

16  Q.   You're back in the financial industry after pleading

17  guilty to securities fraud, right?

18  A.   I don't currently work there.

19  Q.   Pardon?

20  A.   I don't currently work there.

21  Q.   You dropped out, what, two weeks ago?

22  A.   Yes.

23  Q.   And did you ever score any customers?

24  A.   No.

25  Q.   How long did you work there?

Adams-cross/Sharkey

1    A.   Six, seven months.

2    Q.   And who did you work -- how many people are in that

3    office?

4    A.   It varied from ten people to maybe 30.

5    Q.   You ran that office, right, Mr. Adams?

6    A.   No.

7    Q.   You were just one of the little brokers calling up

8    people for their financial information; is that what your

9    testimony is?

10   A.   I never called anybody.

11   Q.   What did you do?

12   A.   I tried to recruit people, tried to identify lead

13   sources.

14   Q.   Let's talk English, Mr. Adams.

15   A.   I tried to recruit loan officers who want to do business

16   to maybe come work there.

17   Q.   When you say you tried to recruit loan officers who

18   wanted to come there, they would be individuals kind of

19   similar to your pump and dump that would reach out to members

20   of the public and manage their finances and in this case

21   their home mortgages, right?

22   A.   People who try to save individuals money on their

23   mortgage, yes.

24   Q.   Now you're trying to save the community, right,

25   Mr. Adams

1   A.   I'm just trying to work legitimately and never commit a

2   crime again.

3   Q.   Did you apply for any of the bail-out money from

4   Congress?

5   A.   No, I didn't, Miss.

6   Q.   Have you thought of it?

7   A.   No.

8   Q.   Mr. Adams, you are a money machine, aren't you?

9   A.   No.

10  Q.   Making millions in the stock market, right?

11  A.   Made a couple million dollars.

12  Q.   Stole millions in the stock market, right?

13  A.   Yes.

14  Q.   Made millions of dollars in selling marijuana, right?

15  A.   One million dollars, yes.

16  Q.   You say one million dollars.  We'll get to talk about

17  that, sir.

18  A.   Okay.

19  Q.   Let's talk about your first career out of high school,

20  and that was in the Joker Poker business, right?

21  A.   Yes.

22  Q.   And I think you testified this morning that you started

23  out in Joker Poker with a guy named Haber, right?

24  A.   Yes.

25  Q.   And that was in Queens, right?

1   A.   No.

2   Q.   Where was it?

3   A.   In Long Island.

4   Q.   And how did you meet Mr. Haber?

5   A.   My father.

6   Q.   And you knew Joker Poker was illegal, right?

7   A.   At the time I wasn't, but I quickly discovered it was.

8   Q.   Well, you knew that Joker Poker was filled with

9   individuals from organized crime, right?

10  A.   Yes.

11  Q.   You didn't trying to get a job at the local grocery

12  store, did you, Mr. Adams?

13  A.   I came back from my first job with my uncle and went

14  into the poker business with Bruce, correct.

15  Q.   Pardon?

16  A.   I came back from working with my uncle in Florida and

17  went to work with Bruce Haber.

18  Q.   You were a natural at making money, right?

19  A.   I was doing what I was told as a salesman, trying to get

20  spots.

21  Q.   I'm sorry, I lost the last part?

22  A.   I was trying to get spots to place the poker machines,

23  correct.

24  Q.   You were what, 18 years old?

25  A.   Yes.

Adams-cross/Sharkey

1    Q.    You were doing pretty good, right?

2    A.    Yes.

3    Q.    You were good at it, right?

4    A.    Yes.

5    Q.    You got a lot of spots, right?

6    A.    Yes.

7    Q.    How long were you with Haber?

8    A.    About a year.

9    Q.    And was Haber affiliated with organized crime?

10    A.    No.

11    Q.    Are you sure?

12    A.    Not that I know of.

13    Q.    How much money were you making with Mr. Haber?

14    A.    About anywhere around a thousand a week.

15    Q.    That's pretty good money for a 17 year old, right?

16    A.    17, no.

17    Q.    How old were you then?

18    A.    18.

19    Q.    Oh, is it good money for an 18 year old?

20    A.    Yes.

21    Q.    Cash, right?

22    A.    Yes.

23    Q.    From working with Haber you decided to expand, right?

24    A.    Yes.

25    Q.    And you started to work with Michael Reiter, right?

1   A.   Yes.

2   Q.   And you're about 18 years old, 19 years old, right?

3   A.   Uh-huh.

4   Q.   And how did you meet Reiter?

5   A.   In a bar on Long Island, Montanas.

6   Q.   And you were friends with Reiter, weren't you?

7   A.   Friendly.

8   Q.   Well, you used to go out and socialize with the Reiters,

9   didn't you?

10  A.   Sometimes.

11  Q.   You would go to parties and bars, correct?

12  A.   Yes.

13  Q.   And the Reiters were big drug dealers, right?

14  A.   Yes.

15  Q.   And you also met some other nice friends through them,

16  didn't you?  Peter Zuccaro ring a bell?

17  A.   I met him, yes.

18  Q.   You not only met him, you socialized with him when you

19  were with the Reiters, right?

20  A.   Couple times.

21  Q.   Go out drinking, right?

22  A.   With Peter Zuccaro, no, we never met and went out

23  drinking.  Maybe I had a couple drinks in a bar when I saw

24  him.  I never had any plans with Peter Zuccaro.

25  Q.   Well, amongst your friends were Michael and Greg Reiter,

1  right?

2  A.  I was friendly with them, yes.

3  Q.  Well, you were business partners with Michael Reiter,

4  weren't you?

5  A.  Yes.

6  Q.  And you were friends with Greg Reiter, right?

7  A.  Yes.

8  Q.  And they moved an awful lot of marijuana, right?

9  A.  I believe so, yes.

10  Q.  And through your after hour wind downs, you would go out

11  drinking with them, right?

12  A.  I've gone out drinking with them, yes.

13  Q.  And you would go out and you would meet Johnny Alite and

14  Peter Zuccaro, right?

15  A.  No.

16  Q.  You never socialized with Peter Zuccaro when you were

17  with the Reiters, Mr. Adams?

18  A.  Mr. Zuccaro was at a bar once or twice, but I was not

19  social friends with him at all.

20  Q.  Now, you and Michael Reiter did very well in the Joker

21  Poker industry, correct?

22  A.  Yes.

23  Q.  And you testified on direct examination that you were

24  able to expand the business because Reiter was connected with

25  organized crime, right?

Adams-cross/Sharkey

1  A.   I was able not to have a problem with organized crime

2  because Reiter was connected with organized crime.

3  Q.   You were a businessman, right?

4  A.   Yes.

5  Q.   And you held yourself out today just to be a

6  businessman, but you had a gun in your apartment in your

7  safe, right?

8  A.   Yes, I did.

9  Q.   You had $85,000 in cash in your apartment, in your safe,

10 right?

11 A.   82, yes.

12 Q.   You associated with drug dealers and criminals, right?

13 A.   Yes.

14 Q.   And your career of choice was running Joker Poker

15 machines, right?

16 A.   Yes.

17 Q.   Now, Joker Poker machines were placed in bodegas and

18 other venues in challenged neighborhoods, correct?

19 A.   Yes.

20 Q.   You didn't put any on Park Avenue, did you?

21 A.   No.

22 Q.   You didn't put any down by Gracie Mansion or City Hall?

23 A.   No.

24 Q.   Did you try to get any in the lobby of the federal court

25 house?

1   A.   No.

2   Q.   Rough business, right?

3   A.   It was the business I was in.

4   Q.   Rough business, right, Mr. Adams?

5   A.   Yes.

6   Q.   And you split the proceeds of that business 50/50 with

7   the spots owners, right?

8   A.   Yes.

9   Q.   And you testified earlier that you made between ten and

10  $20,000 a week doing that, right?

11  A.   Yes.  For a short period of time, yes.

12  Q.   Now, I think you testified, sir, on direct examination

13  that you were getting tired of doing all the work yourself,

14  and Michael Reiter taking the profit, right?

15  A.   Michael Reiter had gotten a job in the union, a

16  full-time job and I went on my own.

17  Q.   Didn't you testify this morning that Reiter was getting

18  50 percent, but you were doing all the work?

19  A.   Yes.

20  Q.   And by the way, who picked up the cash from the

21  locations?

22  A.   Both of us.

23  Q.   And did you carry that gun when you go to pick up the

24  cash?

25  A.   Never.

1   Q.   Well, what time of day did you pick up the cash, sir?

2   A.   Daytime.

3   Q.   And did the owner of the bodegas meet you?

4   A.   Yes.

5   Q.   How many cash pickups would you make in a day?  Would

6   you hit all 150 spots?

7   A.   No.

8   Q.   How many would you do a day?

9   A.   Maybe 15, 20.

10  Q.   Pardon?

11  A.   Maybe 20.

12  Q.   When you're with Reiter --?

13  A.   Oh, he came with me to collect the spots.

14  Q.   And you and Reiter would take 15 to 20 spots a day,

15  right?

16  A.   Reiter had 15 spots.

17  Q.   I'm sorry?

18  A.   I only had 15 places with Mr. Reiter.

19  Q.   When you went to pick up the cash with Reiter, how much

20  per spot would you pick up, how much cash would it be?

21  A.   Could be $50, could be $500.

22  Q.   Could be more, right?

23  A.   Yes.

24  Q.   Depending on the spot, right?

25  A.   Yes.

1   Q.   How much would the most -- what's the most money when

2   you were with Reiter that you would pick up at a particular

3   location?

4   A.   A thousand, $1,500.  Usually about a thousand.

5   Q.   And you would hit, you said, 15 spots a day?

6   A.   Yes, 15 spots, Miss.

7   Q.   So, you and Reiter could be walking around with 15 grand

8   through challenged neighborhoods, right?

9   A.   No.  I think the most we ever had was 6,000.  About

10  6,000.

11  Q.   And you went to these spots like every day?

12  A.   No.

13  Q.   How often, how many times a week?

14  A.   Once a week we collected those spots.

15  Q.   And did Reiter carry a gun?

16  A.   In the spots, no.

17  Q.   Pardon.

18  A.   No.

19  Q.   How do you know?

20  A.   I never saw him with a gun, that's all I know.

21  Q.   Did anybody ever try to hold you up for the $15,000,

22  $6,000, however much money?

23  A.   No.

24  Q.   Now, you testified that you were with Reiter for how

25  long, sir?

1  A.  Couple of years.  Few years.

2  Q.  Few years.  How many?

3  A.  Couple years.

4  Q.  How many?

5  A.  Maybe one year.  With the machines you're talking about?

6  Q.  Yup.

7  A.  Maybe a year.

8  Q.  Now, I'm going to jump ahead for one second with

9  Mr. Reiter.  You testified on direct examination that your

10  friend Greg was murdered, right

11  A.  Yes.

12  Q.  And this is the guy that was your partner's brother,

13  right?

14  A.  Yes.

15  Q.  What year was that?

16  A.  Late eighties.

17  Q.  And this is around the time you started the business,

18  right?  Is that true?

19  A.  No.

20  Q.  When did you --?

21  A.  I was in a year or two prior.

22  Q.  You were in it for about a year or two, you would party

23  with the Reiter brothers?

24  A.  Yeah, year and a half, two.

25  Q.  I'm sorry?

1    A.   Year and a half, two years prior.

2    Q.   And you were in it with Reiter at the time Greg Reiter

3    was killed, right?

4    A.   I had some -- a few spots left with him.  I was

5    basically on my own, yes.

6    Q.   And your business partner, friend asked you to commit a

7    murder with him, right?

8    A.   Yes.

9    Q.   Now, you testified on direct examination that Michael

10   Reiter got a job, right?

11   A.   Yes.

12   Q.   And, so, he decided in your testimony to drop the Joker

13   Poker business?

14   A.   No.

15   Q.   Did you buy his spots from him?

16   A.   No.

17   Q.   Did you buy his machines from him?

18   A.   No.

19   Q.   By the way, when you were managing this Joker Poker

20   business, you had other people working for you, right?

21   A.   Yes.

22   Q.   How many people?

23   A.   Two.

24   Q.   And what did they do?

25   A.   Fixed the machines, helped collect.

1  Q.   What were their names?

2  A.   Scott and I don't know the last name and Todd Grama.

3  Q.   Oh, Todd Grama?

4  A.   Yes.

5  Q.   Now, sir, you testified on direct examination that at

6  some point you wanted to go out on your own, right?

7  A.   Yes.

8  Q.   And it was your testimony this morning that Reiter

9  referred you to Charlie Carneglia, right?

10 A.   Reiter referred me to Charlie Carneglia?

11 Q.   Reiter suggested you speak with Charlie Carneglia?

12 A.   I never said that.

13 Q.   Did I mischaracterize that?

14 A.   Yes.

15 Q.   Is it accurate, sir, you actually went shopping for

16 help?

17 A.   Never.

18 Q.   Are you sure about that?

19 A.   Yes.

20        THE COURT:  Excuse me, do you want to --.

21        MS. SHARKEY:   This is a good point to break.

22        THE COURT:  Yes, pursue that tomorrow.

23        MS. SHARKEY:   Thank you, Judge.

24        THE COURT:  9:30.  Ladies and gentlemen, thank you.

25 Have a good evening.

1           (The jury exits the courtroom.)

2           THE COURT:  All right, I'll hear any applications at

3    nine tomorrow morning.

4           MS. SHARKEY:   Thank you, Judge.

5           THE COURT:  Thank you.

6           (An adjournment was taken to Thursday, February 12,

7    2000 nine at 9 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    Government's Exhibit 321................................

3    2087

4    Court Exhibit 1........................................

5    2046

6    Court Exhibit 2........................................

7    2100

8    H U N T E R   A D A M S........................... 1971

9    DIRECT EXAMINATION

10   BY MR. NORRIS:  .......................................

11   1972

12   CROSS-EXAMINATION

13   BY MS. SHARKEY:  ......................................

14   2185

15

16

17

18

19

20

21

22

23

24

25